Daniel R. Watkins
Nevada State Bar No. 11881
DW@wl-llp.com
Eran S. Forster
Nevada State Bar No. 11124
eforster@wl-llp.com
WATKINS & LETOFSKY, LLP
8215 S. Eastern Ave., Ste. 265
Las Vegas, NV 89123
Office:(702) 901-7553; Fax: (702) 974-1297
Attorneys for Plaintiff, Karl Hansen

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| KARL HANSEN,<br><br>                Plaintiff,<br><br>vs.<br><br>ELON MUSK; TESLA, INC.; TESLA MOTORS, INC.; U.S. SECURITY ASSOCIATES; DOES 1 THROUGH 50<br><br>                Defendants. | Case No.:  3:19-cv-00413<br><br>**COMPLAINT FOR DAMAGES**<br><br>**(DEMAND FOR JURY TRIAL)** |

COMES NOW, Plaintiff, Karl Hansen and files this civil action against Defendants, and each of them, for violations of The Sarbanes Oxley Act, Intentional Interference with Business Relations, and Breach of Contract.

//
//
//
//
//
//
//
//
//

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under 18 U.S.C. § 1514A(b)(1)(B).
2. Supplemental Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over the State law claims which are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.
3. Plaintiff has exhausted his administrative remedies.
4. All conditions precedent to jurisdiction under section 18 U.S.C. § 1514A, et seq. have occurred or been complied with:
   a. Plaintiff alleged his allegations and filed a complaint with the Occupational Safety and Health Administration ("OHSA") via their Whistle Blowing Program within 180 days of the violations alleged herein.
   b. Plaintiff and OSHA abided by the complaint procedures required under 29 CFR Part 1980, et seq.
   c. OSHA has not issued a final decision within 180 days of the filing of Plaintiff's OSHA complaint. The delay was not due to the bad faith of the claimant.
5. Venue is proper in the District of Nevada because the unlawful employment practices alleged herein were committed in whole or in part in the District of Nevada pursuant to 28 U.S.C. § 1391(b).

## PARTIES

### PLAINTIFF

6. Plaintiff, Karl Hansen (hereinafter, "Plaintiff"), was a qualified/eligible "employee" of defendants Tesla, Inc. (hereinafter, "TESLA"), and US Security Associates, Inc. (hereinafter, "USSA") (collectively, "Defendants").
7. Plaintiff worked for TESLA and USSA at Tesla's Gigafactory 1 ("Gigafactory") located at 1 Electric Avenue, Sparks, NV 89434.

//

**DEFENDANTS**

8. At all relevant times, Defendant Tesla is a Delaware corporation qualified to do business in Nevada. Defendant Tesla is listed on the NASDAQ as TSLA.

9. Defendant USSA is a Delaware corporation qualified to do business in Nevada.

10. Defendant ELON MUSK was the Corporate Executive Officer ("CEO") for Defendant TESLA at all relevant times contained herein.

11. The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1 through 50, inclusive are unknown to Plaintiff at this time, who therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each of the fictitiously named Defendants are in some way responsible for, or participated in, or contributed to, the matters and things complained of herein, and is legally responsible in some manner. Plaintiff will seek leave to amend this Complaint when the true names, capacities, participation and responsibilities have been ascertained.

**STATEMENT OF FACTS**

12. Mr. Karl Hansen (hereinafter, "HANSEN") attended orientation at TESLA, Inc. on March 4, 2018 and was subsequently hired by TESLA, Inc. on March 5, 2018.

13. HANSEN was hired as a Protection Associate, and was assigned to the TESLA Gigafactory (hereinafter, "Gigafactory"), located at 1 Electric Ave., Sparks, Nevada, 89434.

14. HANSEN's supervisor, Sean Gouthro (hereinafter "Gouthro"), changed HANSEN's position to Investigation Associate during the swing shift, to work personally under him and to investigate criminal activity occurring at the Gigafactory.

15. HANSEN was later assigned and assumed the responsibilities as an Investigations Case Specialist while the current case specialist, Kristopher Halladay ("Halladay"), was on vacation.

16. HANSEN was assigned a wide range of investigations while employed at TESLA. His two primary investigations were the investigation of (1) thefts occurring at TESLA's

Gigafactory, costing TESLA and their investors somewhere between $37 to $150 million dollars; and (2) the association of Mexican Drug Cartel members and their alleged narcotic trafficking at TESLA's Gigafactory.

17. Later, HANSEN also discovered and started investigating the award of improper contracts at the Gigafactory by senior TESLA management that was defrauding TESLA out of a substantial amount of money.

18. HANSEN's investigation regarding the thefts at TESLA is significant because (1) the thefts at TESLA's Gigafactory were in excess of $37 to $150 million dollars, which is a significant portion of its quarterly earnings; (2) the thefts were carried out by TESLA employees, contractors, and/or individuals impersonating TESLA contractors; and (3) established links with organized criminal elements.

19. The investigation of the Mexican drug cartel is significant because HANSEN established a link that corroborates law enforcement's investigation that organized criminal elements had ties to TESLA's Gigafactory. *See example* USA v. Mora et al., Nevada District Court, Case No.: 3:18-mj-00102.

20. HANSEN's investigation about the improper contracts is significant because the contracts were awarded by senior TESLA management and cost TESLA millions of dollars. For example, one contract in particular cost TESLA approximately $900,000 for a job that would normally cost $65,000 to $75,000 to complete.

21. HANSEN believes that the findings from the investigations would lead to information that, if discovered, would create an obligation on TESLA's part to report to its shareholders the thefts and improper award of contracts.

22. HANSEN's investigations, and time at TESLA, also led to other important information that would be significant to TESLA and its shareholders, including but not limited to, employees and contractors being terminated for discovering underlying facts related to HANSEN's investigations. For example, HANSEN learned of a contractor by the name of Lynn Thompson, who discovered TESLA employees stealing about $13,000 of copper wire resulting in Mr. Thompson making a report about the theft to local law

1  enforcement. Lynn Thompson was then terminated from his position for making his
2  report to law enforcement.

3  23. HANSEN reported his findings of criminal activity up the chain of command, from Gouthro to TESLA's CEO, Elon Musk. Due to his reporting of the criminal activities taking place at TESLA, and because of their significance to shareholders, HANSEN was informed on June 19, 2018, that he was being terminated. TESLA claimed that his termination was due to alleged restructuring of the company and his last day would be July 16, 2018.

4  24. HANSEN was also informed that Gouthro arranged a contract job with USSA, a third party contractor aiding Gouthro's team at TESLA. The new position was a salaried position as an investigator with a starting salary of $87,500 per year. Gouthro informed HANSEN that USSA was awarded a three-year contract with TESLA and that HANSEN would work under Matt German (hereinafter "German") and continue his investigations under Gouthro. Gouthro then introduced HANSEN to German and they went over the terms of the contract, his position as an investigator, his salary requirements and job responsibilities. HANSEN accepted the offer from German. German informed HANSEN that he was being streamlined into the position and that he only had to complete an online job application, background check, and drug test.

5  25. HANSEN continued with his investigations under Gouthro's team.

6  26. HANSEN informed senior management and subsequently briefed them on his new findings related to his investigation of the thefts at TESLA and ties with possible criminal enterprises. HANSEN requested coordination with local, state, and federal law enforcement to further his investigation due to the scope and complexities involved, and believing sufficient probable cause had been established to warrant official involvement of law enforcement authorities. HANSEN also informed his supervisors about a possible cover-up by senior management to hide these facts and terminate employees and contractors with information regarding the cover-up – allowing the

cover up to continue and not become readily available to outsiders, including shareholders.

27. HANSEN was singled out, avoided, and treated differently after he briefed TESLA's management on the illegal, fraudulent, and material information regarding thefts, improper contracts, organized crime and direct ties to senior management.

28. HANSEN subsequently learned that TESLA hired a new Senior Manager of Global Security by the name of Nick Gicinto. HANSEN was informed that Nick Gicinto and his current team were spying on TESLA employees using devices to monitor emails, cell phones, and data communications from TESLA employees. HANSEN expressed concern to his supervisors regarding what he believed was illegal conduct.

29. Gicinto told HANSEN there was no need to involve law enforcement and Gicinto's team would use "outside vendors" to examine HANSEN's investigations.

30. TESLA, after hiring Jeff Jones, Uber's former head of security, hired former Uber security employees Nick Gicinto and Jacob Nocon.

31. While at Uber, Jeff Jones, Nick Gicento, and Jacob Nocon all allegedly engaged in numerous illegal methods of investigations such as wiretapping and hacking. Their behavior is described in a document referred to in the "Jacobs Letter," a document produced in Waymo LLC v. Uber Technologies, Inc., filed in the United States District Court, District of Northern California, Case No.: :17-cv-00939-WHA, as Document No.: 2401   (https://www.documentcloud.org/documents/4330131-Waymo-Uber-Jacobs Letter.html)

32. HANSEN worked with Nocon and Gicinto, who were working under Jeff Jones at TESLA. While working with such individuals HANSEN became aware that the organizational structure and practices outlined in the "Jacobs Letter," reflected a similar structure and practices being deployed against employees of TESLA with approval of MUSK.  HANSEN learned of illegal activities conducted by Jeff Jones' team which HANSEN is informed and believes included the purported hacking and wiretapping into former employee Martin Tripp's computer and phone. Further, HANSEN was

present following Mr. Tripp's termination, while Mr. Gicinto directed Andrew Lindemulder, IT supervisor at the Gigagfactory, to install a router that was capable of intercepting and collecting phone communications which HANSEN believed would be in violation of Federal and State laws and was material information that should be disclosed to shareholders.

33. The disclosure of the tactics used by such individuals while with Uber, was reported by numerous press outlets and Uber was forced to publicly disassociate itself from such tactics, and HANSEN believes that maintaining the employment of such employees and condoning or encouraging the continued use of such illegal tactics is very material to TESLA and its shareholders. However, to HANSEN's knowledge, the ongoing use of such highly illegal tactics by Tesla has not been reported to shareholders and does not appear in any of its 10Qs or other filings. HANSEN continued to express his concerns to senior management.

34. On June 21, 2018, HANSEN informed German that he completed the required online application to work at USSA and German informed HANSEN that he would be contacted regarding the background check and drug test.

35. On June 28, 2018, HANSEN was informed by TESLA management that his new job position with USSA was being revoked and all new internal investigations were being handled by Nick Gicinto who was reporting directly to MUSK.

36. HANSEN followed up with German and German informed HANSEN that he was not aware of the loss in his position and that USSA was continuing with his employment.

37. Thereafter, HANSEN was stripped of his security clearance and email at TESLA. Gouthro didn't want HANSEN communicating with him and instead directed HANSEN to report to Gicinto and his team at TESLA. HANSEN repeatedly tried to contact German to determine the status of his new job but at this time, wasn't receiving any feedback from German.

38. Finally, on July 8, 2018, HANSEN had a telephone conversation with German and German informed HANSEN that TESLA management was being very cryptic with him

regarding HANSEN's contract. HANSEN informed German of his investigation and the information that he knew. In the meantime, TESLA was seeking a new investigator to replace HANSEN's former position. Gicinto told HANSEN the investigator selected for this was Nocon.

39. Following HANSEN's conversation with German on July 8, 2018, HANSEN learned that he was being targeted by MUSK and that TESLA pressured USSA to breach their contract with HANSEN. USSA did not want to remove HANSEN from the Gigafactory and instead secured HANSEN a basic hourly position at the Gigafactory's west gate entrance.

40. On or about August 9, 2018, HANSEN submitted information to the SEC regarding TESLA's misconduct.

41. On or about August 29, 2018, TESLA and MUSK learned via HANSEN that HANSEN provided information to the SEC as a whistleblower.

42. On or about August 30, 2018, MUSK arrived at the Gigafactory through the west gate entrance while HANSEN was stationed at said entrance. MUSK noticed that HANSEN was on duty. MUSK became infuriated and within ten minutes had USSA remove HANSEN from his post. HANSEN was told by USSA security supervisors they had been commanded to "do something" with HANSEN and "I don't give a fuck if you take him up into the hills and hide him" from MUSK.

43. HANSEN was subsequently informed by USSA that his position at the TESLA Gigafactory had been eliminated and he would be trained for a different position unrelated to TESLA.

44. On September 4, 2018, HANSEN received a call from German stating that TESLA, through Jeff Jones, directed German to "remove HANSEN from the TESLA contract effective immediately." German specifically stated that TESLA pressured USSA to breach their agreement with HANSEN by retracting offers, demoting HANSEN, and ultimately terminating HANSEN.

//

# COUNT I

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

**(Against TESLA, MUSK, AND DOES 1-50, inclusive.)**

45. Plaintiff hereby incorporates paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46. Defendant USSA entered into a 3-year contract with Defendant TESLA to provide TESLA with security services at the TESLA Gigafactory.

47. Defendant USSA offered Plaintiff employment for a term of three years at a pay of $87,500.00 per year plus annual bonus incentives to work as an investigator at TESLA's Gigafactory.

48. Plaintiff accepted Defendant USSA's offer of employment for a term of three years at a rate of pay of $87,500.00 per year plus annual bonus incentives.

49. Defendant TESLA was aware of the contract that Plaintiff had with USSA.

50. Defendant MUSK became aware of the contract defendant USSA entered into with Plaintiff after witnessing Plaintiff working at TESLA's Gigafactory.

51. Defendant MUSK did not approve with Plaintiff's contract with Defendant USSA because Plaintiff complained about TESLA's illegal activities to his internal supervisors and was a whistleblower to the SEC.

52. Defendant MUSK and Defendant TESLA did not have a right to decide the personnel defendant USSA would use to staff the Gigafactory.

53. Defendant MUSK, by and through his corporation TESLA, pressured USSA to breach their contract with Plaintiff.

54. TESLA informed Plaintiff that his position would be eliminated by USSA prior to USSA having knowledge of MUSK's and TESLA's intentions to eliminate Plaintiff's position.

55. USSA breached its contract by eliminating Plaintiff's position at the Gigafactory.

56. Management at TESLA, including Plaintiff's former supervisor Sean Gouthro, and management at Defendant USSA, fought to keep Plaintiff at the Gigafactory.

57. Defendant USSA reassigned Plaintiff as a security guard at the Gigafactory albeit at a lower rate of pay.

58. Defendant MUSK was not satisfied that Plaintiff still worked at the Gigafactory and pressured YSSA, via Defendant TESLA, to eliminate Plaintiff's newly assigned position.

59. Defendant USSA further breached its contract with Plaintiff by eliminating Plaintiff's newly assigned position that he had at the Gigafactory.

60. Defendant MUSK and Defendant TESLA engaged in wrongful conduct intending to cause Defendant USSA to breach its contract with Plaintiff.

61. Defendant MUSK and Defendant TESLA's wrongful conduct caused Defendant USSA to breach its contract on two separate occasions.

62. The breach of contract by Defendant USSA caused Plaintiff damages.

63. Defendant MUSK and Defendant TESLA's intentional and wrongful conduct caused Defendant USSA to breach its contract.

64. Plaintiff has suffered damages in excess of $15,000.00.

## COUNT II
## BREACH OF CONTRACT
### (Against USSA, AND DOES 1-50, inclusive.)

65. Plaintiff hereby incorporates paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66. Defendant USSA offered Plaintiff a position as a security investigator at a rate of $87,500.00, plus annual bonus incentives, for a term of three years.

67. Plaintiff accepted Defendant USSA's offer and started working and performing the terms agreed to under his contract. Specifically, Plaintiff began working as a security investigator for Defendant USSA.

68. Plaintiff was qualified to perform the essential functions as a security investigator.

69. Defendant USSA breached its contract with Plaintiff by eliminating Plaintiff's position and rate of pay.

70. Defendant USSA failed to pay Plaintiff the agreed upon rate of pay at $87,500.00 for a term of three years.

71. Defendant USSA's breached caused Plaintiff damages in excess of $15,000.00

## COUNT III

## WHISTLEBLOWER - SOX

## (Against TESLA, MUSK, USSA, AND DOES 1-50, inclusive.)

72. Plaintiff hereby incorporates paragraphs 1 through 71 of this Complaint as though fully set forth herein.

73. Plaintiff was an employee of both Defendant TESLA and Defendant USSA.

74. Plaintiff engaged in a protected activity. Specifically, Plaintiff reported misconduct by TESLA to his internal supervisors at both USSA and TESLA, including but not limited to, MUSK.

75. Plaintiff was terminated from TESLA, lost his position at USSA, and eventually terminated at USSA because of his reporting of misconduct to his internal supervisors at TESLA, USSA, and to MUSK.

76. The misconduct Plaintiff reported includes but is not limited to, the improper union contracts, TESLA spying on employees, the thefts at TESLA being orchestrated by organized crime and TESLA's management actively concealing and participating in the misconduct.

77. Plaintiff believes the misconduct alleged in these pleadings constitute violations of federal criminal law provisions prohibiting mail, wire, or bank fraud, rules and regulations of the SEC, or provisions of federal law relating to fraud against shareholders.

78. Plaintiff was damaged in excess of $15,000.00 by Defendant TESLA, USSA, and MUSK's violation of the whistle blower provisions of the Sarbanes Oxley Act.

//
//
//

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF, KARL HANSEN, prays that this Court grant the following relief:

A. Economic Loss for Back Pay and Front Pay, plus prejudgment interest;

B. Compensatory Damages in accordance with 42 U.S.C. §12117, 42 U.S.C. §1983, and other applicable statutes;

C. Reasonable attorneys' fees pursuant to 42 U.S.C. §12205 and other applicable statutes;

D. Punitive Damages;

E. Costs of suit incurred herein; and

F. Such other and further relief as the court deems just and proper

DATED this 19th day of July, 2019.        WATKINS & LETOFSKY, LLP

*/s/ Daniel R. Watkins*

By: _____
Daniel R. Watkins
Nevada State Bar No. 11881
Eran S. Forster
Nevada State Bar No. 11124
8215 S. Eastern Ave., Ste. 265
Las Vegas, NV 89123
Office:(702) 901-7553; Fax: (702) 974-1297
Attorneys for Plaintiff, Karl Hansen

**REQUEST FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procedure 38(b) and 42 U.S.C. §1981a, PLAINTIFF demands a trial by jury in this action on all issues so triable.

DATED this 19th day of July, 2019.     WATKINS & LETOFSKY, LLP

*/s/ Daniel R. Watkins*

By: _____
Daniel R. Watkins
Nevada State Bar No. 11881
Eran S. Forster
Nevada State Bar No. 11124
8215 S. Eastern Ave., Ste. 265
Las Vegas, NV 89123
Office:(702) 901-7553; Fax: (702) 974-1297
Attorneys for Plaintiff, Karl Hansen