Mark R. Thierman, Nev.  Bar No. 8285
mark@thiermanbuck.com
Joshua D. Buck, Nev.  Bar No. 12187
josh@thiermabuck.com
Leah L. Jones, Nev.  Bar No. 13161
leah@thiermanbuck.com
Josh Hendrickson, Nev.  No. 12225
**THIERMAN BUCK LLP**
7287 Lakeside Drive
Reno, Nevada 89511
Tel. (775) 284-1500
Fax.  (775) 703-5027

Nicholas Woodfield (Pro Hac Vice)
nwoodfield@employmentlawgroup.com
**The Employment Law Group, P.C.**
1717 K Street, N.W., Suite 1110
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)

*Attorneys for the Plaintiff*

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KARL HANSEN,<br><br>        Plaintiff,<br><br>        v.<br><br>ELON MUSK; TESLA, INC.; TESLA MOTORS, INC.; U.S. SECURITY ASSOCIATES; *et al*.<br><br>        Defendant(s). | Case No.: 3-19-cv-00413-LRH-WGC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

Plaintiff Karl Hansen, by and through counsel, submits this opposition to both motions

to dismiss brought by Defendants Tesla, Inc., ("Tesla") Tesla Motors, Inc. ("Tesla Motors"),

Elon Musk ("Musk"), and U.S. Security Associates, Inc. ("USSA") (collectively, the

"Defendants").

- 1 -

**PROCEDURAL HISTORY**

Hansen submitted filed his Sarbanes-Oxley Act ("SOX") whistleblower retaliation claims with OSHA on December 18, 2018.  Hansen filed the instant Complaint on July 19, 2019, after it was administratively exhausted.  All claims other than his SOX retaliation claims were compelled to be resolved into arbitration pursuant to an arbitration agreement, and the instant SOX claim was stayed pending those proceedings.  On June 8, 2022, Judge Hoffman issued a Final Award for the Defendants on all arbitrated claims, and on June 17, 2022, Tesla Parties moved to lift the stay and, on August 15, 2022, filed the instant Motion to Dismiss.  USSA's Motion for the same followed on August 16, 2022.

**STATEMENT OF FACTS**

On August 3, 2018, Hansen, who had previously worked for Tesla but was at that point an hourly employee of USSA working on a Tesla contract at the Gigafactory, wrote an email directly to Musk in which he outlined his concerns about what he had seen at Gigafactory 1.  Ex 5.  In his email Hansen raised concerns about allegations of cartel activity at Gigafactory 1 and stated that he had concerns that there was cartel involvement in the supply of lithium for batteries for Model 3 production at Gigafactory 1.  *Id.* Hansen also detailed significant theft of parts of tools at Gigafactory 1 that could pose safety risks to employees.  *Id.*  He also reported that the theft at Gigafactory 1 was widespread and organized and that he had discovered the improper award of contracts.

Tesla Party corporate representative Jacob Nocon testified that this was the last thing Musk and the Tesla Parties needed on August 3, 2018, as the stakes for the Tesla Parties were high at that moment in time.  Hearing Transcript, 358:21 to 359:25.  In response to Hansen's email, Nick Gicinto asked the employee relations and legal departments to begin an investigation into Hansen and his allegations, and escalated the investigation directly to Musk, who opined that Hansen

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1    sounded "like a conspiracy nut." Ex. 5. If Hansen's internal email was a problem when "Tesla

2    was struggling financially" given "the perilous situation that the company was in," one can only

3    imagine what the reaction was when the Tesla Parties first learned on August 16, 2018, that

4    Hansen submitted a TCR to the Securities & Exchange Commission alleging that various material

5    

6    omissions and misstatements were made by Tesla to the investing public in violation of sections

7    17(a) (2) and (3) of the Securities Act of 1933. Ex. 2.

8          On August 16, 2018, a reporter emailed Musk and asked, "Would you like to comment

9    on the contents of the SEC tip from Karl Hansen?" Ex. 4. The reporter detailed the allegations of

10   securities fraud made by Hansen as detailed in Hansen's attorney's press release. *Id.*

11   

12         On August 23, 2018, Kenneth Davis, part of Tesla's investigations team, sent an email to

13   Tesla's Global Head of Security Jeff Jones and Musk with the subject line, "Karl Hansen – SEC

14   Whistleblower – Immediate attention?" Ex. 3. Davis sent photos of Hansen working at the Main

15   Lobby Entrance and reported that he "wanted to bring your attention to, what to me, is a very

16   disturbing observation of an incident that could lead to devastating ramifications to the security

17   of the Gigafactory, as well as damaging effects to the company as a whole."

18   

19   / / /

20   / / /

21   / / /

22   

23   

24   

25   

26   

27   

28   

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

**From:**      Kenneth Davis [kendavis@tesla.com]
**Sent:**      8/23/2018 11:02:03 AM
**To:**        Jeff Jones [jeff.jones@tesla.com]
**CC:**        Elon Musk [erm@tesla.com]
**Subject:**   Karl Hansen- SEC Whistleblower- Immediate attention?





Good morning Jeff,

My name is Ken Davis and I am currently part of the Investigations Team at Gigafactory 1. I wanted to bring your attention to, what to me, is a very disturbing observation of an incident that could lead to devastating ramifications to the security of the Gigafactory, as well as damaging effects to the company as a whole.

The above photo snippets, obtained live on 8-22-2018 (yesterday) depict a single U.S. Security Guard manning the Lima 1 position (Main Lobby Entrance) at GF1. This guard is none other than Karl Hansen, the ex-Tesla

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

Security Guard and current party to the SEC-Whistleblower legal issue. The Lima 1 position is, in my opinion, the first line and most important level of security in the facility, as we no longer scan badges at the North Gate Employee Entrance. What I find extremely disturbing and potentially dangerous is the fact that an ex-Tesla Security Guard, who is a current party to an active SEC Investigation against Tesla and has already displayed acts of very questionable character, is at this time the sole gatekeeper and first contact for visitors and employees at the Gigafactory.

At the moment these snippets were obtained Mr Hansen not only has access to the Gigafactory shared drives from the desktop on the post desk, but also has the ability to allow entrance into the facility to any one person he chooses. Kind of like the wolf guarding the hen house. The ability at this time for Mr Hansen to possibly allow unrestricted and unfettered access to either an investigator for Attorney Stuart Meissner, a reporter, or any other individual(s) with nefarious incentives, to the internal areas of the Gigafactory is not only available but would seem very likely, given his individual monetary incentive as a part of the current and active lawsuit. Also, the observation of a proven disgruntled ex-employee walking around the facility with a large unchecked backpack over his shoulders, is horrifying at the least.

I will admit that I am not currently privileged to nor aware of any possible legalities/contractual issues between Tesla and U.S. Security; therefore, if Tesla Security is aware of and is handling the issue, I will apologize for taking your time. However, knowing the devastating effects that this situation could lead to, I feel it is my responsibility, as well as my duty, to raise awareness to the situation.

Also, I would like to address the current possible SEC investigation as it pertains to Mr Hansen. I was designated by my Supervisor, Sean Gouthro, as Mr Hansen's trainer when he tentatively joined the Investigations team. I also worked side by side in the same room during the same shift as Mr Hansen. Because of this, I am privileged to possess intimate details into the supposed "cartel" investigation Mr.Hansen conducted, including it's origin, authorizations, and errors made by Mr Hansen which lead to incorrect accusations, reporting, and very poor conclusions. I had a brief meeting with my immediate supervisor a few weeks prior to Mr Hanson's notification of his part in the Reduction of Force, along with other Protection Officers. In this meeting I made my supervisor aware of the large mistakes being made by Mr Hansen, as well as describing him as a "Narcissistic and egotistical individual with delusions of grandeur".

I am more than willing to assist and provide any intellectual knowledge I may have , as well as any physical evidence that may be helpful in this matter. I would also like to have the opportunity to discuss, in my opinion, how current security management caused and procured Mr Hansen's activities and beliefs, and how some of the accusations made by Mr Hansen to his and Martin Tripp's Attorney were established. This is the main reason I am bypassing the normal chain of command and reaching out to you.

Thank you for your time.
Ken

Ex. 3.

Valerie Workman was Tesla's Associate General Counsel, Compliance, in August of 2018. Ms. Workman testified that at first, she was investigating the allegations raised by Mr. Hansen in his August 3, 2018 email to Mr. Musk, Ex. 4, *supra*, <u>but then she began to investigate Mr. Hansen himself after she received Mr. Davis's email to Mr. Musk</u>, Ex. 3, *supra*:

> 485:10      Q.  Did you do it in response to the
> 11   e-mail that I showed you?
> 12         A.  I know I did it in response to
> 13   speaking with Mr. Davis.  I can't recall if I
> 14   also used that e-mail that you just showed me,
> 15   but I spoke directly to Mr. Davis.  And it's on

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

16  the basis of my conversation with him that I
17  conducted the investigation into Mr. Hansen's
18  e-mail.

Thereafter Ms. Workman testified that she witnessed Mr. Hansen on Fox New on August

29, 2018,[1] discussing his SEC TCR allegations against the Tesla Parties:

492:13        Q.  And was it -- did everyone at
14   Tesla -- was that the talk of the company the
15   next day?
16        A.  I think it was the talk of the legal
17   team.  I don't know that it was the talk for the
18   company, but it was certainly a buzz.
19        Q.  When you say "the talk of the legal
20   team," who was talking about it?
21        A.  Colleagues in the room.  It was big
22   news.  It was on the media.  Everybody.  I mean,
23   everybody --
24        Q.  So tell me what everyone was talking
25   about.  Tell me what -- when you went like that,
493:1     *Hansen v. Elon Musk - Arbitration Day 2*
 2   tell me what they were saying.
 3        A.  It was an allegation on Fox News that
 4   actually -- there's someone actually talking in
 5   the news to Fox News about allegations against
 6   Tesla.  That was huge.
…
496:9        Q.  So August 23rd is when the eyes
10   started turning at Mr. Hansen and what he might
11   have done?
12        A.  I don't remember the date I spoke to
13   Mr. Davis, but it was Mr. Davis raising concerns
14   about Karl Hansen to me that caused me to look
15   into his e-mail.
16        Prior to that, I was investigating
17   Mr. Hansen's concerns.
18        Q.  And nobody was asking you to do
19   anything before that; correct?
20        A.  Before I start --
21        Q.  Like prior to, say, August 3rd, no
22   one was asking you to investigate Mr. Hansen;

---

[1] Hansen appeared the Fox Business Network on August 29, 2018, to discuss the SEC
complaint. Ex. 6, https://video.foxbusiness.com/v/5828313541001#sp=show-clips.

Emphasis added.

Critically, Ms. Workman testified that she did the following in chronological order: received the allegations from Ken Davis, who raised concerns to Musk and Jones because Mr. Hansen was an SEC whistleblower working as a contractor at the Gigafactory; started investigating Mr. Hansen rather than his allegations, because Ken Davis raised concerns to Musk and Jones about Mr. Hansen being an SEC whistleblower working as a contractor at the Gigafactory; saw Mr. Hansen on Fox News on August 29, 2018, talking about his SEC allegations against the Tesla Parties that were "the talk of the legal team" and "certainly a buzz" at a time when Tesla was in a truly "perilous situation," as per Mr. Nocon; and then reached out to Jeff Jones and asked for prompt validation of Mr. Davis's allegations that, until that time, had not warranted immediate scrutiny by Tesla's Head of Global Security.

Tesla Human Resources Senior Manager Jenna Ferrua testified that in August of 2018, Tesla had roughly 70,000 employees, but for unexplained reasons, Tesla's Associate General Counsel, Compliance, its Head of Global Security, its Deputy General Counsel (Yusuf Mohamed), and Ms. Ferrua convened on an expedited basis to remove Hansen, an hourly contractor whose singular notoriety was that he was an SEC whistleblower who had been on Fox News on August 29, 2018, talking about his SEC allegations a from all Tesla contracts.

USSA's Matt German received a call from Jeff Jones directing German to remove Hansen from all Tesla contracts, effective immediately.  Transcript 556:1-19.  Tesla did not inform German the reason for Hansen's removal, only that "Karl was no longer welcomed on Tesla property." *Id*.  German, as USSA's corporate representative, testified that but for Tesla's direction, there was no reason USSA would have removed Hansen on September 4, 2018, from the Tesla Contract at the Gigafactory. Transcript 560-561.  He was earning $19.80 per hour x 40

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com   www.thiermanbuck.com

1  Emphasis added.

2  Critically, Ms. Workman testified that she did the following in chronological order:

3  received the allegations from Ken Davis, who raised concerns to Musk and Jones because Mr.

4  Hansen was an SEC whistleblower working as a contractor at the Gigafactory; started

5  investigating Mr. Hansen rather than his allegations, because Ken Davis raised concerns to Musk

6  and Jones about Mr. Hansen being an SEC whistleblower working as a contractor at the

7  Gigafactory; saw Mr. Hansen on Fox News on August 29, 2018, talking about his SEC

8  allegations against the Tesla Parties that were "the talk of the legal team" and "certainly a buzz"

9  at a time when Tesla was in a truly "perilous situation," as per Mr. Nocon; and then reached out

10  to Jeff Jones and asked for prompt validation of Mr. Davis's allegations that, until that time, had

11  not warranted immediate scrutiny by Tesla's Head of Global Security.

12  Tesla Human Resources Senior Manager Jenna Ferrua testified that in August of 2018,

13  Tesla had roughly 70,000 employees, but for unexplained reasons, Tesla's Associate General

14  Counsel, Compliance, its Head of Global Security, its Deputy General Counsel (Yusuf

15  Mohamed), and Ms. Ferrua convened on an expedited basis to remove Hansen, an hourly

16  contractor whose singular notoriety was that he was an SEC whistleblower who had been on Fox

17  News on August 29, 2018, talking about his SEC allegations a from all Tesla contracts.

18  USSA's Matt German received a call from Jeff Jones directing German to remove

19  Hansen from all Tesla contracts, effective immediately.  Transcript 556:1-19.  Tesla did not

20  inform German the reason for Hansen's removal, only that "Karl was no longer welcomed on

21  Tesla property." *Id*.  German, as USSA's corporate representative, testified that but for Tesla's

22  direction, there was no reason USSA would have removed Hansen on September 4, 2018, from

23  the Tesla Contract at the Gigafactory. Transcript 560-561.  He was earning $19.80 per hour x 40

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1  hours per week at the Gigafactory when he was removed.  Mr. Hansen then took some time off

2  and resumed working at USSA at another location on October 4, 2018, but at a lower hourly rate

3  of $15 per hour, and worked there for the twelve weeks remaining in 2018.[2] In 2019, Mr. Hansen

4  worked for U.S. Security at $15.00 per hour through January 13, 2019.[3]

5        Mr. Hansen left U.S. Security on January 13, 2019, and had brief employment in 2019

6  with Silver Legacy and BCH Gaming.  His 2019 W-2 forms report $6,898 from Silver Legacy

7  and $8,174 from BCH gaming.  In early 2020, Mr. Hansen began employment with the Federal

8  Government that included a wage and benefits package but is less than he should have earned

9  when he was supposed to start his original employment with U.S. Security in July 2018.

10  Accordingly, Mr. Hansen was earning $19.80 per hour before he was removed from all Tesla

11  contracts, and then USSA paid him $15.00 per hour afterward.  He left USSA after 18 weeks on

12  January 13, 2019, and he began working for the federal government in approximately February

13  2020, approximately 73 weeks later.

## LEGAL STANDARD

        "To survive a Motion to Dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556

U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  At

the Motion to Dismiss stage, the Court must accept all factual allegations in the complaint as true

and draw all reasonable inferences in favor of the Plaintiff." *Id.*  Where a plaintiff presents such a

pleading, a Motion to Dismiss under FRCP 12(b)(6) must be denied.  To foreclose litigation of

---

[2] Hansen's income for those twelve weeks should have been $7,200 = 12 weeks x $15.00 per hour x 40 hours per week.

[3] Hansen's earnings for those two weeks should have been $1,200 = 2 weeks x $15.00 per hours x 40 hours per week.

- 8 -

an issue under collateral estoppel: (1) the issue at stake must be identical to the one alleged in

prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the

determination of the issue in the prior litigation must have been a critical and necessary part of

the judgment in the earlier action.  *Clark v. Bear Stearns & Co., Inc.,* 966 F.2d 1318, 1320 (9th

Cir. 1992); *Washington Mut. Inc. v. United States,* 636 F.3d 1207, 1216 (9th Cir. 2011).

## ARGUMENT

### I.      The Retaliation Elements under the Sarbanes-Oxley Act and the Dodd-Frank Act Differ Substantially.

Hansen asserted claims under the Dodd-Frank Wall Street Reform & Consumer

Protection Act, Pub.  L. 111-203 ("Dodd-Frank") in arbitration, and SOX and Dodd-Frank have

dramatically different elements, different standards of law, and different standards of evidence.

Dodd-Frank prohibits an employer from discharging, demoting, suspending, threatening,

harassing, directly or indirectly, or in any other manner discriminating against a whistleblower.

15 U.S.C. § 78u-6 (h)(1)(A). It explicitly protects the activity of "providing information to the

[Securities and Exchange] Commission…" 15 U.S.C. § 78u-6(h)(1)(A)(i).  Courts have applied

traditional whistleblower burden shifting frameworks to Dodd-Frank, holding that to state a

whistleblower retaliation claim under the Dodd-Frank Act, 15 U.S.C. § 78u-6, a plaintiff must

show that: "(1) plaintiff engaged in a protected activity, (2) plaintiff suffered a materially adverse

employment action, and (3) the adverse action was causally connected to the protected activity."

*Hall v. Teva Pharmaceutical USA, Inc.*, 214 F. Supp.  3d 1281, 1289 (S.D. Fla. 2016) citing 76

Fed.  Reg. at 34304 n.41.  Once a plaintiff establishes a *prima facie* case of retaliation under

Dodd-Frank, the defendant needs to offer some legitimate non-retaliatory reason for the adverse

action.  If the defendant meets this low burden, the plaintiff may argue that the reason given is

pretextual in nature and that the true reason was retaliatory.  In its construction, the Dodd-Frank

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1    Act utilizes the phrase "because of" to describe the causal connection that must be established

2    between the adverse action and the protected conduct; in other words, the Dodd-Frank Act

3    utilizes by statute a 'but-for' causation standard. *EEOC v. Abercrombie & Fitch Stores, Inc.,* 575

4    U.S. 768, 772-773 (2015); *University of Texas Southwestern Med. Ctr. V. Nassar,* 570 U.S. 338,

5    350 (2013); *Lawrence v. Int'l Bus. Mach. Corp.,* 2017 WL 3278917 at *11 (S.D.N.Y. 2017).

6

7            The elements of a *prima facie* case differ under SOX in three substantial ways. First,

8    SOX protects a far wider range of activity, including but not limited to providing, causing to be

9    provided, or otherwise assisting in an investigation regarding any conduct that they reasonably

10   believe violates any law or regulation of the SEC concerning fraud against shareholders to any

11   regulatory or law enforcement agency, member of Congress, or anyone with supervisory or

12   investigative authority over the employee. 18 U.S.C. § 1514A, *et seq.* Second, SOX requires

13   only that Plaintiff prove "the protected activity was a <u>contributing factor</u> in the unfavorable

14   action." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 805 (6th Cir. 2015) (emphasis

15   added). Third, and critically, SOX provides a statutory burden shifting procedure that differs

16   significantly from other whistleblower protection statutes, including Dodd-Frank. In *Kim v.*

17   *Boeing Co.*, No. 11-35879, 2012 WL 5351230 (9th Cir. Oct. 25, 2012) (case below ALJ No.

18   2010-SOX-22), the Ninth Circuit declared that "SOX whistleblower claims are governed by a

19   burden-shifting procedure under which a plaintiff is first required to make out a *prima facie* case

20   of retaliatory discrimination. Then, 'if the plaintiff meets this burden, the employer assumes the

21   burden of demonstrating by clear and convincing evidence that it would have taken the same

22   adverse employment action in the absence of the plaintiff's protected activity.' *Van Asdale v.*

23   *Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009) (emphasis added)." *Kim*, *supra*, slip op. at 2.

24   In other words, under SOX: the range of protected activities is wider, the burden for proving a

25

26

27

28

1    causal connection is substantially lower, and the burden of production shifts to Defendant in a

2    wholly different fashion.

3    **II.      The SOX Retaliation Elements were Neither Litigated Nor Resolved at Arbitration.**

4            SOX's evidentiary burden significantly differ from Dodd-Frank's, and Judge Hoffman

5    did not the shifted evidentiary burdens present in a SOX claim because Judge Hoffman was not

6

7    presented with a SOX claim to evaluate.  Hence Hansen's SOX claims cannot be dismissed

8    because resolving claims on Dodd-Frank's inapposite elements, and burdens of proof do not

9    meet the requirement of the determination of the issue in the prior litigation.  *See Clark,* 966 F.2d

10   at 1320; *Washington Mut. Inc,* 636 F.3d at 1216; *Greenblatt,* 763 F.2d at 1360. To the extent

11   these issues might have been considered, SOX's inapposite elements and burdens of proof were

12

13   not critical and necessary elements in the arbitration decision because they were never

14   considered.

15       **A.  Protected Activity**

16          There are two types of activity protected by whistleblower protection statutes.  When a

17   witness contributes to an investigation, either through testimony or filing of a complaint, they

18

19   engage in *participatory* protected conduct.  *Crawford v. Metropolitan Government of Nashville*

20   *and Davidson County, Tenn.,* 555 U.S. 271, 274 (2009); *see also* EEOC-CVG-2016-1(II)(A)(1).

21   When one opposes or objects to illegal activity, with or without a filing, it is *oppositional*

22   protected activity.  *Crawford,* 555 U.S. at 274; *see also* EEOC-CVG-2016-1(II)(A)(2).  Under

23

24   anti-retaliation statutes, "[p]articipatory activities are vigorously protected" because such

25   activities are "essential to the machinery set up by" the statutes in question.  *Laughlin v.*

26   *Metropolitan Washington Airports Authority,* 149 F.3d 253, 259 & n.4 (quoting *Hashimoto v.*

27   *Dalton,* 118 F.3d 671, 680 (9th Cir.1997)) (internal quotation marks omitted).  Oppositional

28

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1  activity, however, "serves a more limited purpose." *Sias v. City Demonstration Agency,* 588 F.2d

2  692, 695 (9th Cir.1978).  Accordingly, the Ninth Circuit has held that "opposition" requires that

3  an employee's act of opposing illegal actions be "legal" and "reasonable in view of the

4  employer's interest in maintaining a harmonious and efficient operation." *Silver v. KCA, Inc.,*

5  586 F.2d 138, 141 (9th Cir.1978) (citations omitted).

6

7          Only participatory activity is protected Under Dodd-Frank, as the statute only protects

8  "any individual who provides… information relating to a violation of the security laws to the

9  [Securities and Exchange] Commission…" 15 U.S.C. § 78u-6(a)(6).  However, under SOX,

10  some activity that would traditionally be considered oppositional is protected to the exact same

11  extent as participatory conduct, as the statute extends protection to any who even provides

12  information to their supervisor.  18 U.S.C. § 1514A(a)(1) *et seq.* Importantly, SOX does not

13  require that the whistleblower be correct that the conduct they are reporting actually constitutes a

14  violation of law, only that the whistleblower reasonably believes it to be the case.  *Id.*

15  "[O]pposition activity is protected when it responds to an employment practice that the employee

16  *reasonably believes* is unlawful." *EEOC v. Navy Fed.  Credit Union,* 424 F.3d 397, 406-07 (4th

17  Cir. 2005) (citing *United States ex rel.  Wilson v. Graham County Soil & Water Conservation*

18

19  *Dist.,* 367 F.3d 245, 255 (4th Cir. 2004), *vacated on other grounds*, 545 U.S. 409 (2005); and

20  *Nealon v. Stone,* 958 F.2d 584, 590 (4th Cir. 1992)); *see also Peters*, 327 F.3d at 320-21.

21  Hansen does not need to be right.  When one raises a complaint in good faith, they do not need to

22  be correct; it is still protected activity.  *Id.*

23

24          In his analysis of Plaintiff's Dodd-Frank claim, Judge Hoffman concluded that Hansen's

25  filing of his complaint with the SEC, which is the literal definition of participatory protected

26  activity under the statute, could not have been protected activity because Hansen's concerns did

27

28

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1   not originate with him and Hansen did not know what was contained within Tesla's financial

2   statements. *Id.* From a legal perspective, this was completely wrong. Moreover, this cannot

3   preclude an issue under SOX, because while filings with the SEC *are* the only form of protected

4   activity under Dodd-Frank, they *are not* the only form of protected activity under SOX. 18

5   U.S.C. § 1514A, *et seq.* Moreover, SOX does not require that Hansen need be the genesis of

6   such concerns or know any details of Tesla's financial disclosures, only that Hansen reasonably

7   believed the reported conduct violated federal securities laws. *Deltek, Inc. v. Dep't of Labor,*

8   *Admin. Review Bd.,* 649 Fed. Appx. 320, 328 (4th Cir. 2016).

9          The issue of whether Hansen engaged in activity protected by SOX was not actually

10  litigated and was not a critical and necessary part of the arbitrated claims. Therefore, it cannot

11  be precluded by collateral estoppel. *Clark,* 966 F.2d at 1320; *see also Washington Mut. Inc.,* 636

12  F.3d at 1216; *Greenblatt,* 763 F.2d at 1360.

### B. The Arbitration Did Not Determine Whether Hansen Was Subject To Adverse Action or Suffered Damages

13         Judge Hoffman specifically did not consider whether Hansen's reassignment was an

14  adverse action or whether he had suffered damages. Final Award at 7, n. 1 ("Respondents'

15  arguments that the reassignment was not an adverse action… and that Hansen failed to prove

16  damages are not analyzed here…"). Indeed, in his consideration at Summary Judgment, Judge

17  Hoffman noted that "Respondents do not argue that the reassignment is not adverse action."

18  Interim Award on Tesla's and USSA's Motions for Summary Judgment at 5, n. 4. At no point in

19  did Judge Hoffman evaluate whether Hansen suffered an adverse employment action as defined

20  under SOX. Hansen's reassignment constitutes adverse action under SOX, which specifically

21  prohibits discharge, demotion, suspension, threatening, harassing, or "in any other manner"

22  discriminating against an employee in part due to their protected activity. 18 U.S.C.§ 1514A(a).

It is further undisputed that Hansen made less when he was removed from the Gigafactory.

The issue of whether Hansen was subject to adverse action and damages protected against by SOX was not actually litigated and was not a critical and necessary part of the arbitrated claims.  Therefore, it cannot be precluded by collateral estoppel.  *Clark,* 966 F.2d at 1320; *see also Washington Mut. Inc.,* 636 F.3d at 1216; *Greenblatt,* 763 F.2d at 1360.

### C.  The Causation Analysis in SOX retaliation claims and Dodd-Frank Claims Differ Substantially

The Dodd-Frank Act utilizes the phrase "because of" to describe the causal connection that must be established between the adverse action and the protected conduct; in other words, the Dodd-Frank Act utilizes by statute a 'but-for' causation standard.  *EEOC v. Abercrombie & Fitch Stores, Inc.,* 575 U.S. 768, 772-773 (2015); *University of Texas Southwestern Med.  Ctr. V. Nassar,* 570 U.S. 338, 350 (2013); *Lawrence v. Int'l Bus.  Mach.  Corp.,* 2017 WL 3278917 at *11 (S.D.N.Y. 2017).  However, SOX requires only that Plaintiff prove "the protected activity was a <u>contributing factor</u> in the unfavorable action." *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 805 (6th Cir. 2015) (emphasis added).  A contributing factor means any factor which, alone or in connection with other factors, tends to affect in any way the outcome of a personnel decision.  *See Rookaird v. BNSF Ry. Co.,* 908 F.3d 451, 461 (9th Cir. 2018); *Gunderson v. BNSF Ry. Co*., 850 F.3d 962, 969 (8th Cir. 2017) (quoting *Kuduk v. BNSF Ry. Co.,* 768 F.3d 786, 791 (8th Cir. 2014*); Allen v. Admin. Review Bd.*, 514 F.3d 468, 476 n.3 (5th Cir. 2008); *Marano v. Dept. of Justice,* 2 F.3d 1137, 1140 (Fed.  Cir. 1993).

Judge Hoffman evaluated the evidence produced by Plaintiff according to the "but for" causation standard upon which Dodd-Frank relies.  Final Award at 5, 7.  Whether there was a causal connection between Plaintiff's protected activity and Defendants' adverse action under SOX's entirely different and significantly lower standard was not litigated and was not a critical

- 14 -

THERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thermanbuck.com www.thermanbuck.com

1    and necessary part of the arbitrated claims.  Therefore, it cannot be precluded by collateral

2    estoppel.  *Clark,* 966 F.2d at 1320; *see also Washington Mut. Inc.,* 636 F.3d at 1216; *Greenblatt,*

3    763 F.2d at 1360.

4            **D.  Defendants' Defensive Burden Under SOX Does Not Exist in Dodd-Frank**

5            Under the Dodd-Frank Act, 15 U.S.C. § 78u-6, a plaintiff must show that: "(1) plaintiff

6    engaged in a protected activity, (2) plaintiff suffered a materially adverse employment action,

7    and (3) the adverse action was causally connected to the protected activity." *Hall v. Teva*

8    *Pharmaceutical USA, Inc.*, 214 F. Supp.  3d 1281, 1289 (S.D. Fla. 2016) citing 76 Fed.  Reg. at

9    34304 n.41.  Once the *prima facie* case is established, the defendant may proffer some legitimate

10   non-retaliatory reason for its adverse actions against the plaintiff.  *Id.*  If the defendant meets this

11   low burden of production, the plaintiff may still prevail by proving that the proffered reason is

12   pretextual and that the true cause, according to the aforementioned but for causation standard,

13   was retaliation.  *Id.*

14           SOX's statutory burden shifting differs significantly from Dodd-Frank's.  In *Kim v.*

15   *Boeing Co.*, No. 11-35879, 2012 WL 5351230 (9th Cir. Oct. 25, 2012) (case below ALJ No.

16   2010-SOX-22), the Ninth Circuit wrote: "SOX whistleblower claims are governed by a burden-

17   shifting procedure under which a plaintiff is first required to make out a *prima facie* case of

18   retaliatory discrimination.  Then, 'if the plaintiff meets this burden, the employer assumes the

19   burden of demonstrating <u>by clear and convincing evidence</u> that it would have taken the same

20   adverse employment action in the absence of the plaintiff's protected activity.' *Van Asdale v.*

21   *Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009) (emphasis added)." *Kim*, *supra*, slip op. at 2.

22           Judge Hoffman neither considered nor applied SOX's burden shifting when making his

23   Dodd-Frank liability determination.  *See generally* Final Award.  The issue of whether

24   Defendants' proffered reasons for taking adverse action against Hansen met the clear and

convincing evidence threshold mandated under SOX to rebut Hansen's *prima facie* case was not

litigated and thus was not a critical and necessary part of the arbitrated claims.  Therefore, the

SOX claim cannot be precluded by collateral estoppel.  *Clark,* 966 F.2d at 1320; *see also*

*Washington Mut. Inc.,* 636 F.3d at 1216; *Greenblatt,* 763 F.2d at 1360.

### III.   It is Contrary to Public Policy to Allow Collateral Estoppel to Preclude the Litigation Non-Arbitrable Claims by Claiming that the Non-Arbitrable Claims were Precluded by Other Issues Addressed in the Arbitration.

Defendants' reliance on *Clark* for the proposition that arbitration may collaterally estop

SOX claims is misguided, as *Clark* was decided a decade prior to the passage of SOX, which

*explicitly* bars binding arbitration of SOX retaliation claims.  18 U.S.C. § 1514(e)(2).[4]

Defendants cite no case law after the passage of SOX to support this assertion.  Even if SOX's

prohibition of binding arbitration did not bar collateral estoppel via arbitration of entirely

different claims—a proposition that would frustrate the purpose of the statute which explicitly

forbids binding arbitration—a decision in arbitration cannot preclude SOX claims that were not

subject to the arbitration agreement.

"In civil litigation, where issue preclusion and its ramifications first developed, the

availability of appellate review is a key factor.  […] In significant part, preclusion doctrine is

premised on 'an underlying confidence that the result achieved in the initial litigation was

substantially correct.' […] 'In the absence of appellate review,' [the Supreme Court has]

observed, 'such confidence is often unwarranted.'" *Bravo-Fernandez v. United States,* 580 U.S.

___, 137 S. Ct. 352, 358 (2016) (internal citations omitted); *see also Standefer v. United States*,

447 U.S. 10, 23, n. 18 (1980).  It would undermine Congress's intent if a court were to allow an

arbitration decision to form the basis for dismissing on the basis of collateral estoppel claims

---

[4] "No predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section." 18 U.S.C. § 1514(e)(2).

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

arising out of a statute that explicitly prohibits resolution of same by binding arbitration.  Such a

decision would effectively eviscerate Congress's mandate that SOX whistleblower protections

cannot be forced to be resolved through arbitration.

## **CONCLUSION**

Defendants have not satisfied the required elements of collateral estoppel doctrine.  In

light of the foregoing, their Motions to Dismiss should be denied.

Dated: September 6, 2022                              Respectfully Submitted,

THIERMAN BUCK LLP
By:___ */s/ Joshua D. Buck*___
Joshua D. Buck
Mark R. Thierman
Leah L. Jones
Joshua R. Hendrickson

The Employment Law Group, P.C.
Nicholas Woodfield, Esq.

*Attorneys for Plaintiff*

**THIERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 6, 2022, a true and correct copy of the

foregoing was served via ECF upon the following:

Crane M. Pomerantz
Nevada Bar No. 14103
Clark Hill PLLC
3800 Howard Hughes Parkway, Ste. 500
Las Vegas, NV 89169
Phone: (702) 862-8300
Facsimile: (702) 862-8400
Email: cpomerantz@clarkhill.com

Christopher F. Robertson
Massachusetts Bar No. 642094
Seyfarth Shaw LLP
World Trade Center East Two Seaport Lane,
Suite 1200
Boston, Massachusetts 02210-2028
Telephone: (617) 946-4800
Facsimile: (617) 946-4801
Email: crobertson@seyfarth.com

*Attorneys for Defendants*
*Elon Musk, Tesla, Inc., and*
*Tesla Motors, Inc.*

Matthew T. Cecil
Nevada State Bar No. 9525
Holland & Hart LLP
9555 Hillwood Drive, 2nd Floor
Las Vegas, NV 89134
Tel: (702) 669-4600
Fax: (702) 669-4650
Email: MTCecil@hollandhart.com

Jeremy T. Naftel (*pro hac vice*)
California State Bar No. 185215
Janine M. Braxton
California State Bar No. 296321
Alex A. Smith
California State Bar No. 317224
Martenson, Hasbrouck & Simon LLP
455 Capitol Mall, Suite 400
Sacramento, California 95814
Email: jnaftel@martensonlaw.com
jbraxton@martensonlaw.com

*Attorneys for Defendant*
*U.S. Security Associates, Inc.*

/s/ Jennifer Edison-Strekal
Jennifer Edison-Strekal