# EXHIBIT 1

Evidentiary Hearing Transcript

```
 1            JUDICIAL ARBITRATION AND MEDIATION SERVICES
                               (JAMS)
 2
      KARL HANSEN,                      )
 3                                      )
              Complainant,             )     JAMS REFERENCE NO.
 4                                      )     1260005897
      v.                                )
 5                                      )
      ELON MUSK; TESLA, INC., TESLA    )
 6    MOTORS, INC.; and U.S.           )
      SECURITY ASSOCIATES,             )
 7                                      )
              Respondents.             )
 8    _____ )

 9

10                          *REVISED*

11                     EVIDENTIARY HEARING

12                   MONDAY, APRIL 11, 2022

13

14                         VOLUME 1

15

16              On Monday, April 11, 2022, the

17    following proceedings came on to be heard in the

18    above-entitled and -numbered cause before Judge

19             Carl (Bill) Hoffman (Ret.).

20

21

22

23    Proceedings were reported by stenographic method

24    by: DEBRA A. DIBBLE, RDR, CRR, CRC

25    Job #: 208973
```

```
1      Hansen v Elon Musk - Arbitration Day 1
2
3   ARBITRATOR:
4           Judge Carl (Bill) W. Hoffman (Ret.)
5
6   FOR THE CLAIMANT:
7           THE EMPLOYMENT LAW GROUP
            BY:   NICHOLAS WOODFIELD, ESQ.
8                 R. SCOTT OSWALD, ESQ.
            888 17th Street, NW
9           Washington, DC 20006
10
11
12
13   FOR THE RESPONDENT:
14           SEYFARTH SHAW
             BY:   CHRISTOPHER ROBERTSON, ESQ.
15                 ANNE DUNNE, ESQ.
             World Trade Center East
16           Two Seaport Lane
             Boston, Massachusetts 02210
17
             Counsel for Elon Musk; Tesla, Inc.; and
18           Tesla Motors, Inc.
19
20
21
22
23
24
25
```

```
1      Hansen v Elon Musk - Arbitration Day 1
2       MARTENSON HASBROUCK & SIMON
        BY:   JANINE BRAXTON, ESQUIRE
              ALEX SMITH, ESQ.
3              ROBIN LARGENT, ESQ.
4       455 Capitol Mall
        Sacramento, California 95814
5
        Counsel for U.S. Security Associates
6
7
8
9
10   ALSO PRESENT:
11      Karl Hansen
12      Stephanie Stroup
        Tesla in-house counsel
13
        Jaime Bodiford
14      Tesla in-house counsel
15      Lisa Flegenheimer
        Tesla paralegal
16
17
18
19
20
21
22
23
24
25
```

```
1      Hansen v Elon Musk - Arbitration Day 1
2             ------------
3           P R O C E E D I N G S
4        April 11, 2022, 9:12 a.m. PDT
5             ------------
6           JUDGE HOFFMAN:  We've scheduled four
7   days for the hearing, which seems to me like it
8   will be plenty of time.  My review of the witness
9   shows that there are about 12 discrete witnesses,
10  not including the rebuttal witnesses, of course.
11          So I think we're going to have plenty
12  of time to get everybody on, get all of the
13  information on.  And nevertheless, I'm going to
14  keep track of the time used by each side.  And I
15  would expect that at the end of the hearing, if
16  there's a dispute, each side gets to use half the
17  time to make their presentation.  So I'll be
18  keeping track of that.  As I said, I don't think
19  that's going to be a problem at all in this case.
20          I have the joint exhibit list, and
21  I've reviewed it.  And the way that I'll handle
22  the exhibits is that I will consider exhibits
23  which your witnesses or you have talked about and
24  drawn my attention to.  I know in arbitrations
25  like this, I know a lot of times there are loads
```

```
1      Hansen v Elon Musk - Arbitration Day 1
2   of documents that are provided just in case but
3   they're not used.  And so I will only consider in
4   my award those exhibits that have been addressed.
5           In order to make sure that I have a
6   good list, what I would ask counsel to do is to
7   identify the exhibit, for example, in talking to
8   a witness, laying a foundation for Exhibit 1,
9   talking about it and then at some time moving to
10  admit the exhibit.  By doing that, that gives a
11  clear opportunity for the other side to object
12  and gives me a good opportunity to understand
13  what the objection is.  And so that's how we'll
14  proceed.
15          At the end of the hearing, then, I
16  will have built a list of exhibits that have been
17  offered, admitted; and if they're not admitted,
18  I'll have those too and the reason why they were,
19  they were not admitted.  The rules of evidence
20  don't apply here.  And so I can tell you that I
21  will hear your objection and understand what your
22  objection is, but because the rules of evidence
23  don't apply, often I will say it's admitted and
24  I'll give it the weight that it deserves.  You've
25  probably heard that before in arbitration, and
```

Hansen v Elon Musk - Arbitration Day 1

1      Hansen v Elon Musk - Arbitration Day 1
2  nothing new here.
3           I think -- I would like to get an
4  understanding of what the -- of what the sequence
5  of witnesses is going to be today, just for
6  planning purposes.  I'd like to work about three
7  or four hours in the morning, take about a
8  half-hour lunch, and then work the rest of the
9  afternoon.  But I want to do that.  I'm sensitive
10  to the idea that we want to have a witness that's
11  on the stand, stays on the stand so they can get
12  done.  And so I appreciate counsel communicating
13  back and forth on what your plans are and how
14  you're going to present your witnesses.
15           Speaking of witnesses, I know that
16  there is a motion in limine that's been brought
17  by Tesla and the Tesla part of the Respondents,
18  objecting to the calling of Elon Musk in this
19  case.  I've reviewed the motion and the response.
20  I don't see anything new in the response, and so
21  at this time I'm going to grant the motion in
22  limine.
23           Obviously if during the case there
24  becomes a time, Mr. Woodfield, when you believe
25  that your case is stronger to call a different

1      Hansen v Elon Musk - Arbitration Day 1
2  witness, then, of course, you can renew your
3  request to have that witness called.  And that
4  would be true of Mr. Musk and anybody else who
5  might be objected to along the way.
6           I guess I want to ask now, do counsel
7  have any issues that they'd like to bring up
8  before we get started?
9           First of all, Mr. Woodfield.
10           MR. WOODFIELD:  No, I think we've
11  ironed them out, Your Honor.  I think I can tell
12  you a couple of things that counsel have done in
13  preparation for the hearing that will expedite
14  matters.
15           First of all, we have an agreed
16  witness order, and we've agreed that we'll call
17  the witnesses once and work through them in our
18  cross/direct, et cetera, so that we only have to
19  use the one time.  And the witness order will be
20  Mr. Hansen first and then Mr. Nocon today.
21           And then we think we'll probably be
22  done for the day.
23           JUDGE HOFFMAN:  Okay.
24           MR. WOODFIELD:  And then tomorrow,
25  we'll start with Mr. German, and then the

1      Hansen v Elon Musk - Arbitration Day 1
2  complainant's case will rest.
3           And then the -- I expect that the
4  Respondents will call Ms. Ferrua, Ms. Workman,
5  perhaps, and Mr. Mohamed, perhaps, and then we're
6  submitting, Nick Gicinto, Jeff Jones, and
7  Marshall Sprott, their depositions into the
8  record so they can be read.  We've just submitted
9  them.
10           Obviously the first 20 to 30 pages of
11  them are, you know, here are the ground rules of
12  the depositions.  But they're -- those
13  individuals are no longer employed by Tesla; so
14  rather than going through the rigamarole of
15  bringing them in, we figured that you -- rather
16  than reading bits of the deposition to you, we'd
17  just give them.
18           So I personally think, and I think --
19  I think the Tesla counsel would concur, but I'll
20  leave it up to them, but I think we'll be done by
21  close of business tomorrow.
22           JUDGE HOFFMAN:  Would you give me
23  those three names again?  It was Gicinto?
24           MR. WOODFIELD:  Jones and Sprott.
25           JUDGE HOFFMAN:  Okay.  It looks like

1      Hansen v Elon Musk - Arbitration Day 1
2  we're not going to have a time problem, then.
3           Okay.  Thank you very much.
4           Anything further, Mr. Woodfield?
5           MR. WOODFIELD:  No, Your Honor.
6           JUDGE HOFFMAN:  Okay.  Counsel for
7  Tesla, Mr. Robertson.  Any preliminary issues
8  you'd like to bring?
9           MR. ROBERTSON:  No, Your Honor, just
10  confirming that we did file through the JAMS
11  system this morning the three transcripts.  Those
12  should be now logged in to the system.  And you
13  probably had access to most of them from the
14  prior motions, but now they're submitted formally
15  in this case and in this hearing.  So we should
16  be fine on that.
17           I don't think there's any other
18  preliminary matters from us.  I appreciate you
19  identifying how we'll get documents in.  There's
20  obviously a lot of exhibits --
21           MS. BRAXTON:  Janine Braxton on
22  behalf of USSA.  I don't know that we have
23  anything additional to add, and I think that's
24  it.
25           I guess one thing I didn't hear

Hansen v Elon Musk - Arbitration Day 1

1  discussed is the post-trial -- or excuse me, the
2  post-hearing briefs.  I know that there was some
3  discussion about this.  We would certainly like
4  to do that.
5      JUDGE HOFFMAN:  Why don't we take
6  that up after we've presented the evidence?  I
7  mean, I certainly don't object to post-hearing
8  briefs.  And since we're going to have a court
9  reporter taking all of the information, it will
10 be easier to write the briefs.  I understand
11 that.  So let's take that up at the end and see
12 what the consensus is.
13     Mr. Robertson, I want to be clear in
14 my notes that you represent Elon Musk, Tesla,
15 Inc., and Tesla Motors, Inc.  Is that right?
16     MR. ROBERTSON:  That's correct,
17 Your Honor.
18     JUDGE HOFFMAN:  All right.  And then
19 Ms. Dunne has U.S. Security Associates.
20     MR. ROBERTSON:  No, Ms. Dunne is with
21 me.
22     JUDGE HOFFMAN:  Yes, I'm incorrect.
23     Janine Braxton.
24     MS. BRAXTON:  Yes, Janine Braxton,

Hansen v Elon Musk - Arbitration Day 1

1  Robin Largent and Alex Smith.  We're all with
2  Martenson, Hasbrouck & Simon, outside counsel
3  representing USSA.
4      JUDGE HOFFMAN:  Okay.  All right.
5  Thank you.  My notes were correct, my
6  recollection was not.
7      All right.  Good.  Good.  All right.
8  Well, good.  If there's nothing else
9  preliminarily, then I would invite the sides to
10 make their opening statement, if you wish,
11 starting with Mr. Woodfield.
12     MR. WOODFIELD:  All right.  Thank
13 you, Your Honor.
14     I'll be brief because I think you're
15 right and the issues have been narrowed.
16     At this point I don't think there is
17 a tremendous factual dispute in terms of the
18 narrative of the facts of the case, and I think
19 that the narrative of the facts of the case was
20 pretty well set forth in the motion for summary
21 judgment, and I think the -- I think the Court,
22 or the board -- forgive me, the arbitration
23 panel, will hear it, along the same lines.
24     Really it's what is the -- what is

Hansen v Elon Musk - Arbitration Day 1

1  the law and the -- as it aligns to the facts.
2  And I'd just point out as we're going forward
3  what I think are sort of the things that I would
4  like the arbitrator to be aware of as we proceed.
5  And I'm just going to show very briefly, because
6  I anticipate this will take about five minutes.
7      The legal standard on a whistleblower
8  claim, on a Dodd-Frank, in a SOX claim are the
9  same because they are the statute, effectively.
10     One, the plaintiff must establish a
11 prima facia case by proving a preponderance of
12 the evidence that they engaged in protected
13 activity, that the employer knew or suspected,
14 either actually or constructively, that they
15 engaged in protected activity, that they suffered
16 an unfavorable personnel or employment action,
17 and that the protected activity was a
18 contributing factor in the unfavorable action.
19     Employer may then avoid liability if
20 it proves by clear and convincing evidence that
21 the employer would have taken the same personnel
22 action in the absence of the protected activity.
23 And that standard was accepted by Kim -- the
24 Ninth Circuit in Kim versus Boeing, where it said

Hansen v Elon Musk - Arbitration Day 1

1  SOX whistleblower claims are governed by the
2  burden-shifting procedure, which the plaintiff is
3  required to make a prima facia case; and then if
4  the plaintiff meets their burden, the employer
5  assumes the burden of demonstrating by clear and
6  convincing evidence that it would have taken the
7  same adverse employment action in the absence of
8  the plaintiffs' protected activity.
9      And I point out Kalkunte, because
10 Kalkunte was the first SOX case that was won, and
11 it went up through the ARB, and the ARB really
12 set the standard.  It spent a lot of time on it,
13 and I'm going to tell you it spent a lot of time
14 briefing it because we wanted to get it right.
15 It also spent a lot of time getting it right, and
16 I know that because it was my case.
17     The ARB stated that the respondents
18 could only avoid liability when it got to the
19 clear and convincing evidence stage to show that
20 they discharged the complainant when they did.
21 Even if she had not engaged in protected
22 activity, they had to show they would have
23 discharged her when they did, because the
24 standard becomes not that they had a reason to

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2  terminate her but that they would have terminated
 3  her when they did in light of the protected
 4  activity.  And that's similar to the Wheat case
 5  that I referred you to.
 6        It's not that they could find a
 7  reason to terminate her, but you have to look at
 8  why they terminated her relative to the protected
 9  activity.  And that's the issue I want to
10  pull the arbitrator's attention to here, because
11  on August 3rd, Karl Hansen, Elon -- e-mailed Elon
12  Musk and raised issues about large-scale theft,
13  cartel activity, you know, issues of significance
14  that he wanted to bring attention to the -- to
15  Tesla management's attention, and he wanted to
16  put it up on a large scale so that they were
17  aware of it.
18        Now, Elon Musk was clearly aware of
19  this at this point, as was Tesla management,
20  because Elon Musk even responded.  But
21  importantly, Nick Gicinto wrote back saying that
22  Yusuf Mohamed, who was an assistant general
23  counsel, if I recall, but the head of employer
24  relations, was involved in investigation into
25  Mr. Hansen's allegations as of August 3rd, along
```

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2  with Nick Gicinto.
 3        So as of August 3rd, the time starts.
 4  The allegations are raised.
 5        And then there is a TCR filed.  The
 6  TCR is filed with the SEC.  Now, this is really
 7  important.  A TCR is a filing with the SEC that
 8  advises of what an individual believes is a stock
 9  issue; but what's important here, for people who
10  don't do employment law, is when you engage in
11  protected activity, there are two forms of
12  protected activity under statutes that have
13  retaliation clauses.  There's participatory
14  activity and oppositional activity.
15        Oppositional includes opposing
16  things, saying I am opposed to this activity,
17  filing a complaint.  Filing a complaint like a
18  TCR is oppositional activity, but it also is
19  participatory activity because you are
20  participating in the process.
21        Once you are participating in the
22  process, you cannot then criticize the person for
23  their objective and subjective belief.  They
24  conflate.  Someone's belief -- once they're
25  participating in the process, you cannot
```

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2  criticize them for participating in the SEC
 3  process.
 4        Now, this is important because
 5  objective/subjective goes out the window at that
 6  point.  And so the protected activity is there,
 7  plus, you cannot terminate them for some -- just
 8  filing a TCR.  These are all things I want to
 9  bring everyone's attention to.
10        And then the next thing I want to
11  bring attention to, because these are all points
12  that I want everyone to know on the way.  There
13  is this e-mail that I think we've all seen
14  several times.  This is Kenneth Davis's e-mail.
15        Kenneth Davis is a coworker of
16  Mr. Hansen.  He was a coworker.  And he wrote to
17  Mr. Musk.  And Jeff Jones, who is the head of
18  global security, and he wrote about Karl Hansen
19  because Karl Hansen was working for USSA.  And he
20  wrote the e-mail saying, Karl Hansen, SEC
21  whistleblower, immediate attention.
22        And he said, My name is Ken Davis,
23  and I am part of the investigations team at the
24  Gigafactory.  I wanted to bring your attention to
25  what is, to me, a very disturbing observation.
```

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2        He pointed out that Karl Hansen filed
 3  an SEC complaint and is still working there, and
 4  called him effectively a fox -- or a wolf
 5  guarding the henhouse and talked about how
 6  horrifying it was that this SEC whistleblower was
 7  at the threshold of Tesla.
 8        Now, what's critical about this is it
 9  goes to Jeff Jones and Elon Musk.  And in Tesla's
10  interrogatory answers, interrogatory answer
11  No. 12 -- and this is on page 9 of 11.  It's
12  Karl -- it was signed by Nicole White on
13  June 4th.
14        It was a question:
15        Identify and explain in detail any
16  complaints or allegations leveled against Hansen
17  when he was employed by any Respondent or
18  thereafter.
19        ANSWER:  The Tesla Respondents
20  object.
21        And then it says on August 23rd,
22  Tesla received a report regarding Hansen's
23  behavior from Hansen's colleague, Kenneth Davis.
24        That's this e-mail.  SEC
25  whistleblower.
```

Hansen v Elon Musk - Arbitration Day 1

1
2    Davis reported witnessing Hansen
3    violating Tesla policies, including involving
4    third parties with his investigations and sending
5    confidential Tesla information to outside e-mail
6    addresses to be accessed by individuals not
7    employed by Tesla.
8    Davis expressed concerns about Hansen
9    being temporarily placed at the desk of the
10   Gigafactory.  Specifically, Davis cited to the
11   risks of Hansen possibly having unrestricted
12   access into Tesla's network, coupled with his
13   role as a gatekeeper into the Gigafactory after
14   Davis became concerned about Hansen's erratic and
15   unauthorized activities and involvement of
16   individuals outside of Tesla.
17   As a result of this report, Tesla
18   reviewed Hansen's employee and contractor e-mail
19   accounts and found that he forwarded numerous
20   Tesla internal documents to his personal e-mail
21   and address in violation of Tesla policies.
22   During this review, Tesla also determined that
23   Hansen permanently deleted the contents of his
24   sent items folders.
25   Now, what's critical is, on

Hansen v Elon Musk - Arbitration Day 1

1    August 3rd, Nick Gicinto could have investigated
2    all of these things, employee relations could
3    have investigated these things.  Nothing really
4    happened.  Elon Musk was there.  They weren't
5    that interested in pursuing things.
6    There was a protected activity, a
7    complaint of it to Elon Musk.  The TCR was filed.
8    The complaint about it was filed to Elon Musk.
9    It was escalated to Mr. Davis.  And in response,
10   Tesla said as a result of this report -- and this
11   is the interrogatory answer.  As the result of
12   Ken Davis's report, Tesla reviewed Hansen's
13   record.
14   And if you go back to the standard,
15   Tesla has to show by clear and convincing
16   evidence it would have discharged Mr. Hansen when
17   it did, even if he had not engaged in protected
18   activity.  It engage -- it went after him because
19   of the report that he had engaged in the
20   protected activity because of the SEC complaint,
21   not because he -- well, forgive me.  I'm jumbling
22   my words here -- that it was able to find items
23   that it could terminate him for is a red herring.
24   The fact that it dug up the information because

Hansen v Elon Musk - Arbitration Day 1

1    of Mr. Davis's report means that it cannot meet
2    its burden by clear and convincing evidence.
3    Moreover, Tesla, in its supplemental
4    productions after summary judgment, produced a
5    partial waiver of the attorney-client privilege
6    showing that on August 31st, after Mr. Hansen
7    went on Fox News, that there was a flurry of
8    activity to get rid of him.  There were no
9    reports that were of any activity going --
10   ongoing back to August 3rd, pre-dating the TCR.
11   Everything happened after the TCR.
12   And so going back to the Wheat case,
13   it is irrelevant that you can find things that
14   are terminable activities afterwards if you can't
15   show why you didn't terminate them beforehand.
16   Now, Tesla can come back and say,
17   well, we didn't know about them beforehand; but
18   the problem is Nick Gicinto, who is a domestic
19   security person, and Elon Musk knew as of
20   August 3rd, two weeks before the protected
21   activity, that there was this issue.  And they
22   could have looked up the e-mails, looked up all
23   of this issue, but it wasn't an issue.
24   It only became an issue after the

Hansen v Elon Musk - Arbitration Day 1

1    protected activity.  And the Wheat case that I
2    put forward said that it doesn't matter if an
3    individual is terminated for an act that was
4    terminable before the protected activity, the
5    employer then has to explain why it was only
6    terminable after the protected activity.  That is
7    the same standard that is set forth in Kalkunte
8    and in the language.  So I want to point that out
9    as we go forward here, because the evidence
10   really isn't disputed, that Mr. Hansen sent these
11   things and that Tesla can assert that this is
12   terminable activity.
13   The problem they have is that they
14   didn't terminate him for -- beforehand, before he
15   engaged in the TCR activity, and therefore they
16   can't show that it wasn't retaliatory by clear
17   and convincing evidence.
18   JUDGE HOFFMAN:  Is that it?  I was
19   waiting for a conclusion.  Okay.  Got it.  Thank
20   you very much.  All right.
21   Would the respondents like to make an
22   opening statement now or do you reserve that and
23   would you like to make it a little bit later?
24   Go ahead.

1    Hansen v Elon Musk - Arbitration Day 1
2         MR. ROBERTSON:  Your Honor, I would
3    like to make one now.  I think I can be very
4    brief.
5         JUDGE HOFFMAN:  Okay.
6         MR. ROBERTSON:  First of all, you
7    know, normally we'd get into an argument about
8    the lies in closings, not in openings, so I'm
9    comfortable pushing that discussion off until the
10   end of the case where it would normally be
11   discussed.  But the one thing you did not hear,
12   none of us heard, from Mr. Woodfield in his
13   opening, was any denial of what Mr. Hansen
14   actually did.  Not one.  There is absolutely no
15   dispute in this case that Mr. Hansen sent drafts
16   of e-mails from his Tesla account to his personal
17   account.
18        Mr. Woodfield is correct, that is not
19   in dispute at all.  And that information included
20   badging records, video surveillance footage from
21   the facility.  It included personal information,
22   including personal phone numbers of contractors
23   and employees.  It included all sorts of
24   information that he admits, and that he already
25   admitted and under oath when he was deposed in

1    Hansen v Elon Musk - Arbitration Day 1
2    this case, that he understood both that it was
3    violative of not only Tesla's but USSA's
4    policies.  And he also admitted in his deposition
5    that, yeah, if someone found this, they should be
6    concerned.  And Tesla was concerned.
7         Now, what I'm hearing from
8    Mr. Woodfield is none of that matters because
9    once you go to the SEC, you've got tenure.
10   That's it.  You cannot be terminated.  Because
11   even if they find something as egregious as the
12   conduct that we have here that's admitted to have
13   been done, somehow it doesn't matter.  Because,
14   man, I went to the government, they knew about
15   it, so the fact that I violated all of these
16   policies and procedures, the fact that I did all
17   of these things that I admit violated those
18   policies and procedures, nope, can't do anything
19   about it.
20        And what's critical here is Tesla did
21   not actually direct USSA to terminate Mr. Hansen.
22   His documents from the time frame and his
23   pleadings in this case are replete with
24   references to the fact that he was terminated.
25   He was terminated from Tesla as part of a RIF,

1    Hansen v Elon Musk - Arbitration Day 1
2    and he was terminated from Tesla as part of a RIF
3    that occurred and he was notified of in June of
4    2018.
5         And then he was part of a group, not
6    solely, not himself, not alone, part of a very
7    large group, as many as 40 people were sent and
8    offboarded to a contractor USSA and then assigned
9    back to the Gigafactory to work, and to work as a
10   security guard.  Not as an investigator, as a
11   security guard.
12        And he's placed back at Tesla, with
13   USSA, under an agreement where he understood it
14   was at will, he understood he had to comply with
15   policies, he understood what his job should have
16   been.  All Tesla did -- and again, I agree with
17   Mr. Woodfield, there is no dispute.  There's no
18   dispute that on August 31st, as part of reviewing
19   Mr. Hansen's e-mails, they uncovered that large
20   swaths of this information, which was proprietary
21   to Tesla, had been sent to his personal Gmail
22   account.  Which doesn't just raise the issue of
23   the violation of policy.  It raises the issue of
24   the security of that e-mail.  We all know how
25   vulnerable Gmail is.  I mean, my firm won't even

1    Hansen v Elon Musk - Arbitration Day 1
2    let us use Gmail.
3         So these policies violations were
4    very serious, and Tesla took them very seriously.
5    But even then, again, undisputed of what they
6    uncovered, they didn't direct USSA to terminate
7    Mr. Hansen.  They simply said we would like him
8    to not be on our property anymore.  And that's
9    what happened.
10        And he was perfectly free to go
11   accept other assignments from USSA, which he
12   ultimately did.  He took some time off.  He was
13   basically absent for a month and came back and
14   then took some assignments from USSA.  Those are
15   the facts.  That's what happened.  And again, I
16   don't really think any of that's in dispute.  I
17   think there's a lot of revisionist history here
18   about what happened, but a company is not
19   handcuffed from taking action with regard to a
20   contractor in this case, not even an employee,
21   when they uncover something as egregious as the
22   violations that Mr. Hansen admittedly engaged in
23   and simply request that their contractor not
24   contract him back to their facility until
25   they've -- unless and until they direct them to

Hansen v Elon Musk - Arbitration Day 1

1  do that in the future.
2  
3          That's all that happened here.  And
4  that was perfectly appropriate.  There's no --
5  absolutely no evidence that Tesla acted
6  inappropriately in any way.  Thank you.
7          JUDGE HOFFMAN:  Thank you.
8          Ms. Braxton, would you like to speak
9  now?
10         MS. LARGENT:  I'm actually going to
11 provide the opening statement on behalf of USSA
12 this morning.
13         JUDGE HOFFMAN:  Okay.  Ms. Largent.
14         MS. LARGENT:  And to start off, USSA
15 joins in Tesla's opening statement and in the
16 points raised by Tesla in arguing that the
17 evidence will not support a finding of
18 retaliation against Tesla.  And that Tesla
19 actually had legitimate nonretaliatory reasons
20 for requesting Mr. Hansen's removal from their
21 site.  However, even if the arbitrator were to
22 find that Tesla asked for Hansen's removal from
23 their site for a retaliatory reason, there's
24 still no legal or factual basis for holding USSA
25 liable for that conduct.

Hansen v Elon Musk - Arbitration Day 1

1  
2          Mr. Hansen's counsel did not even
3  mention USSA in his opening statement.  And
4  that's for a good reason.  It's undisputed and
5  will remain undisputed at the hearing that USSA
6  did not even know about Hansen's protected
7  activity in order to retaliate against him for
8  it.
9          Mr. Hansen alleges in paragraph 96 of
10 his third amended statement of claims, and you
11 heard his counsel articulately explain here this
12 morning that the protected activity at issue is
13 Mr. Hansen's filing of an SEC complaint on
14 August 9, 2018.
15         At no time prior to his removal from
16 the Tesla site did Matt German, the USSA
17 representative who made the removal decision at
18 Tesla's request, know about this complaint.  It's
19 axiomatic under well-established law that a party
20 cannot retaliate against someone for something
21 they did not know about.  USSA similarly did not
22 and could not know that Tesla was retaliating
23 against Mr. Hansen for filing an SEC complaint
24 given that USSA didn't know about the complaint
25 in order to suspect this in the first place.

Hansen v Elon Musk - Arbitration Day 1

1  
2          The facts have shown and the
3  testimony at the hearing will support that the
4  only reason USSA removed Hansen from the Tesla
5  account is because Tesla exercised its
6  contractual right to request removal under the
7  terms of the master agreement between Tesla and
8  USSA.  USSA asked for a reason for the removal
9  request but wasn't provided one.
10         Accordingly, USSA simply granted the
11 request in accordance with that service
12 agreement.
13         Further underscoring the absence of
14 any improper conduct by USSA, as Tesla's counsel
15 noted, USSA kept Hansen employed and gave him a
16 new assignment after he was removed from the
17 Tesla account.  The only reason Mr. Hansen is not
18 employed by USSA anymore is because he
19 voluntarily resigned for a higher paying job.  In
20 sum, there's no basis for liability against USSA
21 on Mr. Hansen's Dodd-Frank claim, which is the
22 only claim that remains against USSA in this
23 action.
24         I also join in points raised by
25 Tesla's counsel in the opening statement that the

Hansen v Elon Musk - Arbitration Day 1

1  standard for proving liability for retaliation
2  under Dodd-Frank appears to have been miscited by
3  plaintiff's counsel, and will be happy to brief
4  the legal issue in closing and in post-hearing
5  briefs, should we do those.
6          JUDGE HOFFMAN:  All right.  Thank you
7  very much.
8          Mr. Woodfield, you can call your
9  first witness.
10         MR. WOODFIELD:  I want to ask, if I
11 could, just before we start since we're going to
12 be going for a while, might I take two minutes to
13 run to the restroom?
14         JUDGE HOFFMAN:  Yes.  Of course.
15 Let's take a brief break for five minutes.
16         MR. WOODFIELD:  Thank you.
17         (Recess taken, 9:44 a.m. to
18 9:52 a.m. PDT.)
19         JUDGE HOFFMAN:  Mr. Woodfield, go
20 ahead and call your first witness.
21         MR. WOODFIELD:  Your Honor, before I
22 do, how do you want to handle exhibits?  Would
23 you like me to put them up on my screen?  Would
24 you like to have me call them and have everyone

Hansen v Elon Musk - Arbitration Day 1

1  pull them up individually?
2          JUDGE HOFFMAN:  I have the exhibits
3  with me, and so I'm going to mark -- I'm going to
4  refer to the exhibits.  But if you want to have
5  the witness talk about a particular provision, of
6  course, you're going to have to put it up.  So I
7  don't know if that answers your question or not.
8          MR. WOODFIELD:  I will -- if I want
9  them to look at something that I want to
10 emphasize on the screen, I'll place it up, but
11 otherwise I'll just refer to everything broadly.
12         All right.  At this point,
13 Your Honor, I'd like to call Mr. Karl Hansen as
14 complainant's first witness.
15         JUDGE HOFFMAN:  All right.  Debbie,
16 would you swear the witness.
17         ------------
18         KARL ERIK HANSEN,
19         having been duly sworn,
20         testified as follows:
21              *  *  *
22              *  *  *
23              *  *  *
24              *  *  *

Hansen v Elon Musk - Arbitration Day 1

2          ------------
3          EXAMINATION
4          ------------
5  BY MR. WOODFIELD:
6      Q.  Mr. Hansen, can I get you to state
7  your full name for the record, please?
8      A.  Yes.  It's Karl Erik Hansen.
9      Q.  And, Mr. Hansen, how old are you?
10     A.  Just turned 50.
11     Q.  And where do you live?
12     A.  Currently I live south of Seattle, in
13 a town called Puyallup, Washington.
14     Q.  And are you married and have a
15 family?
16     A.  So, yes.  My -- you know, my wife and
17 I have five children:  son, four daughters, and
18 three grandchildren, and another grandchild on
19 the way.
20     Q.  And tell us about your background and
21 education.
22     A.  Well, my education began -- first
23 off, I'll start by saying I don't have a formal
24 degree.  Throughout my career, on active duty as
25 well as -- well, throughout my life, up to this

Hansen v Elon Musk - Arbitration Day 1

1  point, I've accumulated probably over
2  200-semester hours in various courses of study.
3          I had Central Texas College, the
4  University of South Florida, Fayetteville
5  Technical Community College; and as of most
6  recently, the University of Washington, where in
7  2020 I enrolled in their paralegal studies
8  program.
9          I studied in criminal justice at
10 Central Texas; and also in South Florida, I was
11 working in juvenile justice and juvenile
12 corrections and received training in that field;
13 and ultimately while on active duty in the
14 early '90s, I was a volunteer at a -- in a fire
15 department, and I studied firefighting with an
16 emphasis on hazardous materials and emergency
17 vehicle operations.
18     Q.  And let me ask you, in February 2018,
19 did you apply as a protection associate at Tesla?
20     A.  Yes, sir, I did.
21     Q.  And if I could get you to take a look
22 at joint Exhibit No. 16.  Is that your resumé
23 that you submitted to Tesla?
24     A.  Where is the exhibit?  I'm sorry.

Hansen v Elon Musk - Arbitration Day 1

1      Q.  Do you have it on your laptop in
2  front of you?
3      A.  Yes.  Just a second here.  You have
4  to bear with me.  I have to use two computers,
5  unfortunately.
6      Q.  That's all right.  I'll tell you
7  what.  Hold on one second.
8      A.  And you said 16, correct?
9      Q.  Yes.  Let me show it to you very
10 briefly.
11         Do you see this document, this --
12     A.  Yes, sir.
13     Q.  This is joint Exhibit No. 16.
14         Can you tell me about your work
15 history through 2018?
16     A.  Sure.  My work history began while in
17 high school.  Initially I joined the New York
18 State Army National Guard, while in high school,
19 and became a member of the New York State
20 Counterdrug Task Force, assigned to Wellesley
21 Island, working counterdrug operations in
22 conjunction with U.S. Customs.
23         I then went on active duty, stayed on
24 active duty for several years in the U.S. Army,

Hansen v Elon Musk - Arbitration Day 1

1  was an infantry soldier during that time.  And I
2  did have a -- had a couple of breaks in
3  service.
4
5         Back then, you know, as a young
6  soldier, you kind of weigh your options and look
7  and see if the grass is greener on the outside or
8  if you want to stay on active duty.  And so I
9  did.  Stayed out for a little bit.  And then I
10 had a two-year stint where I was a -- I was in
11 the U.S. Coast Guard.  I was a marine science
12 technician and a maritime law enforcement
13 boarding officer.
14         And took another break in service and
15 worked in the private sector for a water company,
16 an international water company, contracting with
17 municipalities in Houston, Texas; Fort Wayne,
18 Indiana; and Philadelphia, Pennsylvania.  I was
19 in charge of quality assurance and fielding a
20 meter -- metering installation technician crews
21 throughout those cities.
22         At the end of the last contract, I
23 went back on active duty in the Army and decided
24 to continue that career.  I was an infantry
25 noncommissioned officer during that time and then

Hansen v Elon Musk - Arbitration Day 1

1  was very fortunate.  I applied to and became a
2  sworn federal agent with the U.S. Army criminal
3  investigation command.
4         During my tenure, in that role, I
5  served as both a field special agent, conducting
6  felony criminal investigations in the field, up
7  until I was selected to join the Protective
8  Services Battalion of U.S. Army, CID.
9         I'm not sure if you're familiar with
10 that, but basically, the CID also has an arm
11 similar to the Secret Service where we provide
12 executive protection.  I was assigned to, in my
13 last assignment, the protective services details
14 of former U.S. Department of Defense Secretary
15 Donald Rumsfeld and Robert Gates.
16         Ultimately, I retired from active
17 duty in 2010, and I continued my career with the
18 Department of Defense as a federal medical
19 ombudsman, working for the U.S. Army Medical
20 Command headquarters, Office of the Surgeon
21 General.
22         And in that capacity of about six
23 years or so, I was responsible for assisting
24 veterans of all branches of the armed forces

Hansen v Elon Musk - Arbitration Day 1

1  throughout the state of Alaska without access to
2  medical care and other issues.  A lot of that
3  involved investigating complaints associated with
4  either medical malpractice or medical evaluation
5  boards.  Anybody who's on -- been on active duty
6  or the military is probably familiar with that.
7         And about 2016, the Department of
8  Defense, the Army decided they were going to
9  basically transition away from warrior transition
10 units, which were special medical units developed
11 to care for wounded and injured soldiers coming
12 back from Iraq and Afghanistan.
13         I transferred down to Joint Base
14 Lewis-McChord in the same capacity, working for
15 the Intrepid Spirit Center, dealing with TBI and
16 PTSD, and ultimately received a promotion in
17 federal service.
18         I was selected as the area
19 representative and senior investigator for the
20 Federal Maritime Commission's Southern California
21 AOR, where I worked for approximately fourteen
22 months, right up until making a transition to go
23 to Reno to go to work for Tesla.
24         * * *
25

Hansen v Elon Musk - Arbitration Day 1

1  BY MR. WOODFIELD:
2       Q.  So let me ask, is Exhibit No. 16,
3  joint Exhibit No. 16, the resumé that you
4  submitted to Tesla?
5       A.  I believe it is, yes.
6       MR. WOODFIELD:  Okay.  So I would
7  just offer joint Exhibit 16.
8       JUDGE HOFFMAN:  Any objection to 16?
9       MR. ROBERTSON:  No objection.
10      JUDGE HOFFMAN:  There being no
11 objection, 16 is in.
12      (Whereupon, Exhibit 16 was received.)
13 BY MR. WOODFIELD:
14      Q.  Why did you move to Reno?
15      A.  Well, I stayed with FMC for, like I
16 said, 14 months.  And as a matter of life, my
17 wife and I at that time decided to separate, and
18 I -- you know, those situations have their -- had
19 their moments and their impacts.
20      And I had a good friend who I served
21 with, was a military officer years ago.  He is
22 currently a physician and a realtor, and he was
23 expanding his real estate business into Reno,
24 Lake Tahoe.  And after some discussion, I decided

Hansen v Elon Musk - Arbitration Day 1

1    that I would go out there.

3            I would work with him to set up an
4    office, and part of doing that would have
5    required me to get my Nevada real estate license
6    through, you know, self-study and whatnot.  So I
7    needed to supplement my income, which led to,
8    again, applying to Tesla.

9       Q.  And so you applied to Tesla.  And let
10   me show you what is marked as joint Exhibit
11   No. 126.  Tell me if you've got it in front of
12   you, but I'll pull it up at the same time.

13      A.  I don't.  I'll search.

14          MR. WOODFIELD:  It's all right.  I'll
15   pull them up.

16          THE WITNESS:  All right.  Thank you.
17   I can't remember what I do to receive an exhibit.
18   I'll figure it out.

19   BY MR. WOODFIELD:

20      Q.  This is a February 2018 offer letter
21   to you.  Do you recall --

22      A.  Yes, it is.

23      Q.  -- this?

24      A.  Yes, I do.  Yes, sir.

25      Q.  Is this the offer letter that you

Hansen v Elon Musk - Arbitration Day 1

1    received for it, to become a protection associate
2    at Tesla?

4       A.  Yes, it is.

5       Q.  When you were still working at -- in
6    your last job, for the Federal Maritime
7    Commission, you were making $98,700 -- $787;
8    correct?

9       A.  Actually, when I left, I was 102, I
10   believe.  I was a GS-13, Step 2 at that time.

11      Q.  Why would you take a job at 16.50 an
12   hour?

13      A.  Well, like I said, I was looking to
14   supplement my income with something that was
15   commensurate with my background, security and/or
16   investigations, and that seemed suitable at the
17   time.

18      Q.  All right.  And when did you start
19   your employment -- oh, forgive me.

20          MR. WOODFIELD:  At this point I just
21   offered joint Exhibit 126.

22          JUDGE HOFFMAN:  It's admitted.

23          (Whereupon, Exhibit 126 was
24   admitted.)

25          *  *  *

Hansen v Elon Musk - Arbitration Day 1

1    BY MR. WOODFIELD:

3       Q.  When did you start working for Tesla?

4       A.  I began working on March 5, 2018.

5       Q.  And what was your first job with
6    Tesla?  What was your first job title?

7       A.  I was a protection associate.

8       Q.  And when, if ever, did your position
9    change -- your position at Tesla change?

10      A.  That would have been on or about
11   April 2nd of 2018, when Sean Gouthro, who was
12   then my supervisor, the supervisor of the
13   internal investigations department, changed my
14   position to an investigations associate, working
15   under him on the swing shift at the Gigafactory
16   to conduct investigations containing criminal
17   activities and basically other duties as assigned
18   as to investigations.

19      Q.  And who did you begin training with
20   at that time?

21      A.  That would have been Ken Davis.
22   Ken Davis, on April 2nd, yes, sir.

23      Q.  And what was Ken Davis's job then?

24      A.  He also was an investigator.  He had
25   been in that department prior to my tenure.

Hansen v Elon Musk - Arbitration Day 1

1       Q.  And did he remain in that department?

3       A.  To my knowledge, he did.

4       Q.  And when, if ever, did your position
5    change again?

6       A.  That was on or about the beginning of
7    May.  May 1st of 2018.  There was another
8    employee, by the name of Kris Halladay, who
9    worked directly for Mr. Gouthro as his
10   investigative case specialist.  Mr. Halladay was
11   going to be, I believe, for two or three weeks --
12   I don't recall specifically -- and I was selected
13   to assume his responsibilities during his absence
14   in addition to my investigative role and duties.

15          And I did that probably -- until he
16   returned, and ultimately through -- I assisted
17   with that.  Mr. Gouthro and Mr. Halladay, until
18   the end of June, around June 28th.

19      Q.  Okay.  And when you were working as
20   an investigative case specialist, what exactly
21   were your job duties and responsibilities?

22      A.  So I was the -- during that time, I
23   was -- you were the face, basically.  Anybody
24   coming into the security or badging office that
25   wanted to report to -- a complaint to

Hansen v Elon Musk - Arbitration Day 1

1  investigations, whether that -- you know, theft
2  of property, anything.  I was designated as the
3  primary point of contact to field those initial
4  introductions and then triage those cases
5  according to then the system that Tesla was
6  using, and delegate those to other investigators.
7      Q.  And where were you geographically
8  working?
9      A.  Geographically, I was inside of the
10  Gigafactory during that role, in what they called
11  the SOC or SCC.
12          And also geographically I worked in a
13  trailer on-site.  It was the security trailer and
14  it was identified as squaw trailer.
15      Q.  And because we're at the outset of
16  this, we're just sort of setting the factual
17  predicate, what is the Gigafactory?
18      A.  So the Gigafactory, I believe it's
19  Tesla's first production facility for -- for
20  their electric vehicles.  They actually --
21  correction.  They -- they manufactured, at least
22  during my tenure there -- were the batteries that
23  were going into their Model 3 cars.  And that was
24  the big ramp at that time.

Hansen v Elon Musk - Arbitration Day 1

1      Q.  Okay.  And where -- where is -- was
2  the Gigafactory located in Sparks, Nevada?
3      A.  It is, yes, sir.
4      Q.  And in terms of the size of the
5  facility, do you have any idea of how many people
6  worked in the facility?  Or at the facility
7  overall?
8      A.  You know, I -- I do know that it was
9  estimated that at any given time there were
10  anywhere between 6- to 8,000 people once they got
11  off to -- to running their production shifts.
12  It's a very large facility.
13      Q.  And when you were working as an
14  investigative case specialist, what did your
15  investigations reveal, if anything?
16      A.  Well, I -- I was assigned a wide
17  variety of investigations, but primarily I was
18  tasked with reports of theft.  And there was
19  primarily copper wire, and I want to also talk
20  about scrap; right?  Scrap, raw materials, but
21  copper wire, spools of copper wire were a big
22  deal.  And I began to see that -- I mean, there
23  were a lot of these, and there were a lot that
24  had been being investigated prior to my tenure,

Hansen v Elon Musk - Arbitration Day 1

1  but I started to look at these and started to
2  hear things about certain contractors and certain
3  lay-down yards, and it appeared that this might
4  be more organized.  You know, larger organized
5  efforts here.
6          So that's -- that, narcotics, of
7  course, revealed a lot of narcotics issues.
8          (Discussion off the record.)
9          JUDGE HOFFMAN:  You understand,
10  Mr. Hansen, that all of your testimony is
11  important, and Debbie needs time to write that
12  down so that I can review it later.
13          THE WITNESS:  Yes, sir.
14          JUDGE HOFFMAN:  Thank you.
15  BY MR. WOODFIELD:
16      Q.  All right.  Now, you mentioned that
17  there was copper theft.  Now, in the last decade,
18  has there been a spike in the price of copper as
19  far as you know?
20      A.  Yes.
21      Q.  And what has that meant for
22  manufacturers that are involved -- that use
23  copper as a raw material?
24      A.  Well, I'd say it's a target.  And a

Hansen v Elon Musk - Arbitration Day 1

1  lot of times it becomes an easy target,
2  particularly at larger facilities or facilities
3  where access is not protected.  But it is
4  definitely -- it is a commodity that is sought
5  after.
6      Q.  And you stated that you thought that
7  there was some sort of pattern in the copper
8  theft that you observed?
9      A.  Yes, sir, that's correct.  And that
10  was based on reports.  You know, when I started
11  analyzing and talking to Mr. Halladay and looking
12  at the -- looking at the history of the reports,
13  the timing, and looking at things and trying
14  to -- trying to do a link analysis on
15  commonalities, I started to put together a
16  spreadsheet and graphs and look at these things.
17  And there were a -- there were a lot of
18  complaints related to these things.  And
19  particularly copper wire.  Copper wire --
20  information I received and evidence that I
21  received indicated that contractors were
22  either -- were intentionally leaving lay-down
23  yards unsecured or couldn't secure them.  They
24  were finding locks cut, gates removed.  They were

Page 46

Hansen v Elon Musk - Arbitration Day 1

1          Hansen v Elon Musk - Arbitration Day 1
2  pulling excess wire, large footages of this wire,
3  rolling it up and throwing it in their pickup
4  trucks and whatever and rolling it out of there.
5  But there was commonalities between certain
6  larger contractors that reported quite a bit of
7  this ongoing.
8      Q.  I'm going to show you now what I'm
9  marking as joint Exhibit 138.
10     A.  Okay.
11     Q.  And it's up on the screen for you to
12  see.
13     A.  Yes, sir.  Okay.
14     Q.  Who is Marshall Sprott?
15     A.  Marshall Sprott was my supervisor
16  initially when I went there and continued to be
17  somebody that I talked to and reported to along
18  with Mr. Gouthro, pretty regularly, with respect
19  to all of these things.
20     Q.  Do you remember what his job title
21  was at Tesla?
22     A.  At the time, I believe the first
23  shift security operations supervisor.
24     Q.  And Christopher Milburn, do you
25  remember what his job title was?

Page 47

Hansen v Elon Musk - Arbitration Day 1

1     A.  He also was a supervisor.  I believe
2  he was a second shift operations supervisor, a
3  counterpart or colleague of Marshall Sprott's and
4  Mr. Gouthro's.
5     Q.  And then Sean Gouthro and Kristopher
6  Halladay, were they your colleagues or were they
7  people above you?  Where were they relative to
8  you on an organizational chart?
9     A.  So Sean Gouthro was my supervisor in
10  investigations.  Kristopher Halladay --
11  essentially Kristopher Halladay and I were peers,
12  if you will.
13     He ultimately came back and took the
14  full responsibilities of the investigative case.
15  Specialist role, but also conducted
16  investigations himself, just as I did and as
17  Mr. Davis did.
18     Q.  So as of June 19th, were you
19  monitoring video to see what vehicles might be
20  taking copper from the Giga site?
21     A.  Yes, sir.  Yes, sir.  That was part
22  of, you know, ongoing investigation into these
23  copper thefts?
24     Q.  And who is Lane Shipley?

Page 48

Hansen v Elon Musk - Arbitration Day 1

1          Hansen v Elon Musk - Arbitration Day 1
2     A.  Lane Shipley was also a gentleman who
3  worked specifically and exclusively as a
4  control-room operator in the SOC or SCC.
5     Did -- another employee that worked
6  for Mr. Gouthro, under Mr. Gouthro in the
7  organizational chart.
8     Q.  And did anyone ever tell you that you
9  were -- your -- that they thought your concerns
10  about copper theft were misplaced, or that you --
11  when you said that you thought that the copper
12  thefts were connected, did anyone ever tell you
13  that they thought you might be barking up the
14  wrong tree?
15     A.  Mr. Woodfield, could you say again?
16     Q.  Did anyone ever tell you that they --
17  did anyone ever disagree with you when you
18  posited that the copper thefts might be related?
19     A.  No, they did not disagree with me.
20  In fact, quite the contrary.
21     Q.  I'm going to offer joint Exhibit 138
22  at this time.
23     JUDGE HOFFMAN:  Any objection?
24     MR. ROBERTSON:  No objection,
25  Your Honor.

Page 49

Hansen v Elon Musk - Arbitration Day 1

1          Hansen v Elon Musk - Arbitration Day 1
2     JUDGE HOFFMAN:  Okay.  Thank you.
3  138 is in.
4     (Whereupon, Exhibit 138 was
5  received.)
6  BY MR. WOODFIELD:
7     Q.  Did you ever form an opinion as to
8  how large the copper theft problem was at the
9  copper factory?  Or I mean at the Gigafactory?
10     A.  Absolutely.  Copper, raw materials --
11  copper alone, there were estimates that it was up
12  into the seven figures.
13     And you know, compiling that with --
14  everybody used the term "scrap."  That's kind of
15  a collective term that used, because not only
16  were -- were these things, were -- was copper
17  being stolen, but all of the other raw materials,
18  castings, different things associated with --
19  battery packs, they were -- it was well into the
20  seven figures.  In fact, there's even a report by
21  Elon Musk himself that there was $37 million
22  worth of raw materials, copper, scraps that went
23  missing between January and June of 2018, was
24  missing, stolen, unaccounted for, and that that
25  could have -- that there were estimates that that

Page 50

Hansen v Elon Musk - Arbitration Day 1

1    would have been in excess of close to 100 or over
2    $100 million.
3        Q.  Now, in terms of the magnitude of the
4    theft problem, did other people in the security
5    department share your opinion?
6        A.  Yes, sir, they did.  In fact,
7    specifically Marshall Sprott, Sean Gouthro,
8    Kristopher Halladay, Ken Davis, all of these
9    investigators, all the supervisors did.  Chris
10   Milburn.  All of these guys were aware of what
11   was going on and the problems.  And a gentleman
12   that came up in my investigation was a man named
13   Lynn Thompson who had been reporting for months
14   ongoing thefts.
15       Q.  Okay.  And what did Lynn Thompson
16   note?
17       A.  Well, Lynn Thompson -- Lynn Thompson
18   came on my radar because of an incident that
19   occurred.  I think it was on -- started on
20   June 6th, ultimately culminated on June 7th,
21   wherein Mr. Thompson observed an individual
22   pushing a cart with copper wire behind the
23   Gigafactory.  This involved -- this involved, of
24   course, security; Christopher Milburn responded

Page 51

Hansen v Elon Musk - Arbitration Day 1

1    to that.
2        Ultimately the case was given to me.
3    And when I looked in the system, I saw that the
4    morning of the report, there were actually two
5    arrests made.  There were three involved parties,
6    one of whom was an actual Panasonic employee.
7    The other -- the other two were not.  The
8    arrestees, one was a convicted felon, and the
9    other was a homeless gentleman.  I'm sorry, he
10   was a homeless gentleman residing at a homeless
11   shelter.
12       The other was an illegal immigrant,
13   who were given badges, fraudulent identification
14   badges, and brought onto the site by the third
15   party.
16       Ultimately, Mr. Thompson reported
17   this, police were involved, the arrests were
18   made.  Mr. Thompson indicated to me that he had
19   been reporting for months, internally.  He had
20   requested video footage.  You know, his job -- he
21   was an OSHA superintendent out there, or a senior
22   electrical superintendent and an OSHA trainer and
23   inspector.
24       So his responsibilities were to -- I

Page 52

Hansen v Elon Musk - Arbitration Day 1

1    believe he worked the overnight shift -- were to
2    go through and inspect electrical sites, security
3    of lay-down guards, all of this stuff.
4        And so ultimately, that is what he
5    reported, in addition to any other questions you
6    may have.  I mean, I think the record shows --
7    we've already talked about some of Mr. Thompson's
8    reports to me.
9        Q.  What was the reaction of Tesla
10   management when you raised your concerns about
11   the scope of copper theft in -- especially that
12   they may be related?
13       A.  The concerns I got, their reaction
14   was, Okay.
15       And I'll tell you, the reaction
16   between Sean Gouthro and Marshall Sprott, the day
17   I briefed them -- this is early June or mid-June
18   time frame.  I briefed them regarding information
19   obtained and testimony and statements made to me
20   by Lynn Thompson.
21       And Marshall Sprott stood up and --
22   after the disclosure of this information, and
23   then the names of potential players and Tesla
24   employees, senior contract personnel, senior

Page 53

Hansen v Elon Musk - Arbitration Day 1

1    superintendents in the construction industry,
2    Marshall Sprott said:  Sean, this is what we've
3    been -- this is what we've been waiting for.
4        And again, that was another request
5    for me, at that time, to bring in law enforcement
6    and brief them, not only on the copper theft, but
7    now mind you, this is also -- they were aware of
8    Elon Musk just put out, on June 5th, his -- they
9    were doing an audit to find out what happened
10   to -- apparently, I was told -- we were told they
11   were doing an audit to find out what happened to
12   all of this scrap, this copper.
13       Q.  Did management take you up on the
14   offer to bring in law enforcement?
15       A.  No.  In fact, I was -- I believe
16   around June 8th, Mr. Gouthro had explained to
17   me -- I had just -- and again, to shift off to
18   another investigation, but Mr. Gouthro had
19   shortly before this handed me a document related
20   to allegations of cartel trafficking, drug
21   trafficking.
22       And in speaking of that, and the
23   copper thefts, particularly the arrest related to
24   Lynn Thompson and so forth, Mr. Gouthro stated

Hansen v Elon Musk - Arbitration Day 1

1  that he had set up a meeting for -- I believe it
2  was the following week with Tesla's legal
3  counsel, with the Storey County DA's office, and
4  with his contact at the FBI, a contact he had at
5  the FBI.
6        And I asked him -- followed up on
7  that with him, and at that point he said, no,
8  we're not talking to law enforcement. Marshall
9  Sprott, when I -- I pushed the issue in that
10 meeting after briefing them, Marshall Sprott just
11 threw his hands up in the air. And I was told to
12 continue doing what I was doing but that I would
13 not talk to law enforcement.
14     Q. And did you ask why you wouldn't talk
15 to law enforcement?
16     A. I did ask several times, and I was
17 told that I was not allowed to talk to law
18 enforcement. I was to conduct my investigations.
19     Q. What happened on June 19, 2018?
20     A. On June 19th, I received a text
21 message from Marshall Sprott directing me --
22 directing me to meet him at a trail, at a job
23 trail. It's important to note, you know, Tesla
24 talks about the RIF. I was subject to a RIF, and

Hansen v Elon Musk - Arbitration Day 1

1  there was no secret that Tesla was -- had entered
2  into a contract with U.S. Security. It was
3  regularly talked about.
4        In fact, in the weeks preceding this,
5  as you might imagine any organization, when
6  employees hear that there might be a change or a
7  transition or layoffs, people become concerned
8  and they start asking questions. I had already
9  transitioned into the investigations department.
10 So in the weeks preceding June 19, while I'm
11 conducting investigations, doing my job --
12     MR. WOODFIELD: Slow down.
13     A. -- people had repeatedly asked who
14 was going to be impacted by this, who was going
15 to go over to U.S. Securities. And so Sean
16 Gouthro had a meeting with the investigations
17 staff and specifically stated that the
18 investigations department is not being impacted
19 at all, nobody from investigations. It's only
20 for protection associates assigned to operation.
21 BY MR. WOODFIELD:
22     Q. So I'm going to show you now -- and
23 just slow down a little bit. Just pause, take a
24 breath between sentences.

Hansen v Elon Musk - Arbitration Day 1

1        But I'm going to show you what's
2  marked as joint Exhibit No. 133. This is an
3  e-mail from Marshall Sprott, whose title is
4  security supervisor Gigafactory 1, on June 19th
5  where it says: Karl Hansen was given the layoff
6  notice today.
7        Was that the day that you were
8  advised you were being laid off?
9      A. Via connection --
10     Q. I'm sorry?
11     A. Hello?
12     MR. WOODFIELD: All right. Karl, can
13 you hear me?
14     THE WITNESS: I can't hear,
15 unfortunately.
16     JUDGE HOFFMAN: I can't hear
17 Mr. Hansen either. He's frozen up.
18     MR. WOODFIELD: All right. Karl,
19 your line seems to be freezing for a second.
20     (Technical discussion off the
21 record.)
22     JUDGE HOFFMAN: We'll go off the
23 record for a minute.
24     (Recess taken, 10:25 a.m. to

Hansen v Elon Musk - Arbitration Day 1

1  10:26 a.m. PDT)
2        JUDGE HOFFMAN: Back on the record.
3  BY MR. WOODFIELD:
4      Q. Karl, I've just showed an exhibit
5  which was joint Exhibit 133, which was an e-mail
6  from Marshall Sprott.
7        Was that the day that you were laid
8  off, on June 9th -- Tuesday, June 19, 2018 or
9  told you were going to be laid off?
10     A. Yes, sir. As I was saying, I met --
11 I went to the trailer, met with Mr. Gouthro,
12 Heather Brown, and Marshall Sprott, and that is
13 an e-mail.
14     MR. WOODFIELD: And I'll offer joint
15 Exhibit 133 at this time.
16     MR. ROBERTSON: No objection.
17     JUDGE HOFFMAN: There being no
18 objection, 133 is in.
19     (Whereupon, Exhibit 133 was
20 received.)
21 BY MR. WOODFIELD:
22     Q. And when were you told that your
23 employment was going to end? When were you told
24 that the layoff was going to be effective?

Hansen v Elon Musk - Arbitration Day 1

1    Hansen v Elon Musk - Arbitration Day 1
2        A.  This was approximately June 16th
3    or -- or, I'm sorry, July 16th or 17th.  I
4    believe it was July 16th.
5        Q.  And were you told what would happen
6    to you as of that date?
7        A.  I was.  Based on my meeting with
8    Matt German on that day, Mr. Gouthro, on the
9    19th, after telling me that my position -- I was
10   being eliminated, indicated that he had worked
11   with Matt German, introduced me to Mr. German,
12   who offered me a position as an investigator.
13   Still working for Mr. Gouthro, but as a -- as a
14   USSA employee.
15       Q.  And what was Matt German's job, do
16   you recall?
17       A.  He was -- at the time I was told --
18   he was the national accounts manager for
19   U.S. Security.
20       Q.  And what were you told about why your
21   employment with Tesla was ending or would be
22   ending on July 16th, 2018?
23       A.  I was told it was due to a reduction
24   in force.
25       Q.  And did you have any reason to doubt

1    Hansen v Elon Musk - Arbitration Day 1
2    that?
3        A.  I did have a reason to doubt that.
4    As I said, in the weeks preceding this, even the
5    day before, Sean Gouthro and I had discussions.
6    I specifically asked him.  And, in fact, a
7    supervisor came in and gave me an award a day or
8    two prior to that.  You know, it was a little
9    token of appreciation for my hard work.  And they
10   told me.
11           And what I was doing.  I had received
12   a Tesla-embossed notebook and, you know, the full
13   little water bottle.
14       Q.  Who was the supervisor?
15       A.  Not Marshall Sprott.  He was aware of
16   it.  I've forgot his name.  Parker Fellows.
17       Q.  And what was the award for?
18       A.  They told me that they were giving me
19   this award because they appreciated my hard work
20   and my efforts consistent with the investigations
21   I was doing.
22       Q.  So you spoke with Matt German.  And
23   what did he tell you about being an investigator
24   with USSA?
25       A.  I spoke with him and he told me that

1    Hansen v Elon Musk - Arbitration Day 1
2    him and Mr. Gouthro, as well as, you know,
3    parties involved in negotiating this security
4    contract with the U.S. Security, that basically
5    Mr. Gouthro and Mr. German had a position to
6    offer me as an investigator.
7            Mr. German indicated that this was
8    one of his specialty positions, one of their
9    specialty positions.  He offered me a three-year
10   contract as an investigator at eighty-seven-five
11   a year, with annual bonuses.
12           The -- to start -- I was to continue
13   what I was doing in investigations until my last
14   day on July 16th or 17th, at which time I would
15   essentially stay where I was staying, or where I
16   was at, and to continue to work for Mr. Gouthro.
17       Q.  Before I get to that, let me do just
18   this one thing.  Let me show you Exhibit 177 very
19   quickly.
20           JUDGE HOFFMAN:  Which exhibit are you
21   going to?
22           MR. WOODFIELD:  This may be one where
23   I -- it may have switched.  It was the joint pay
24   -- or the Tesla pay statements.
25           Anne, is that -- do I have that

1    Hansen v Elon Musk - Arbitration Day 1
2    number wrong?
3            MS. DUNNE:  You do.  Give me one
4    second, Nick, and I'll let you know what it is.
5            That is Exhibit 136, Nick.
6            MR. WOODFIELD:  I appreciate that.
7    BY MR. WOODFIELD:
8        Q.  Let me just show you this right now.
9            I'm showing you joint Exhibit 136.
10   Are these your pay statements from when you were
11   working at Tesla?
12       A.  Yes, sir.
13           MR. WOODFIELD:  At this time,
14   Your Honor, I would offer joint Exhibit 136.
15           MR. ROBERTSON:  No objection,
16   Your Honor.
17           JUDGE HOFFMAN:  Okay.  136 is in.
18           (Whereupon, Exhibit 136 was
19   received.)
20   BY MR. WOODFIELD:
21       Q.  All right.  And now I'm going to show
22   you joint Exhibit No. 121.
23           Are these e-mails -- although it says
24   9-11-2018, is that the date that this was
25   printed?

Hansen v Elon Musk - Arbitration Day 1
1    Hansen v Elon Musk - Arbitration Day 1
2         A.  Yes, that's the date that that was
3    printed.
4         Q.  And did -- are these e-mails with
5    Matt -- or text messages with Matt German?
6         A.  That is what they are, yes, sir.
7         Q.  And when he told you that he wanted
8    your resumé for a specialty position, did he tell
9    you what the specialty position's file was?
10        A.  He did not.
11             MR. WOODFIELD:  Okay.  I'm going to
12   shut that down for right now.  I'm going to offer
13   joint Exhibit 121 at this time.
14             JUDGE HOFFMAN:  Do you want to offer
15   the page -- the Bates number 853 or do you want
16   to offer the entire stack?
17             MR. WOODFIELD:  The stack of text
18   messages between Mr. Hansen and Mr. German.
19             JUDGE HOFFMAN:  Any objection?
20             MR. ROBERTSON:  No objection.
21             JUDGE HOFFMAN:  Okay.  121 is in.
22             (Whereupon, Exhibit 121 was
23   received.)
24   BY MR. WOODFIELD:
25        Q.  Did you end up working for USSA on a

1    Hansen v Elon Musk - Arbitration Day 1
2    three-year employment contract at $87,500 per
3    year?
4         A.  No, I did not.  After Tesla's
5    interference with that, I worked essentially as a
6    security officer.
7         Q.  And tell me, when you say Tesla's
8    interference, what do you mean by that, sir?
9         A.  Well, I mean that -- I believe on or
10   about June 28th, I was notified that the position
11   that I was offered was no longer going to be
12   handled.  It wasn't in existence.
13             I was not going to be an
14   investigator; that was the bottom line.  And that
15   Tesla made that decision.  Jeff Jones made that
16   decision.
17        Q.  And so what was the job offer that
18   was made to you for starting at USSA?
19        A.  Could you ask the question again,
20   please?
21        Q.  Yes.  When you began work in July of
22   2018, what was the job offer that you accepted?
23   What were the terms that you accepted that you
24   started work under?
25        A.  Matt German apologized for what had

1    Hansen v Elon Musk - Arbitration Day 1
2    happened and told me that he -- his hands were
3    tied and that he would essentially pay me as a
4    supervisor at the supervisor rate, $27 an hour.
5    But simultaneously telling me that Jeff Jones
6    also said that I would not have -- nor would I --
7    I wouldn't be in investigations, nor would I be
8    in any capacity having supervisory access or a
9    supervisory role.  So essentially I was a
10   security officer, a physical security officer,
11   observing, reporting, and documenting.
12        Q.  And what was the rate of pay?
13        A.  $27 an hour.
14        Q.  Now, I'm going to show you joint
15   Exhibit No. 129 at this time.
16             These are e-mails from June 27th and
17   28th, with Priscilla Petersen, who worked for
18   Aerotek.com, Kristopher Halladay, Elizabeth -- it
19   looks like Hoene, Marshall Sprott, carbon-copying
20   Sean Gouthro, subject Julio Alarcon.
21             Who is Julio Alarcon?
22        A.  Julio Alarcon was in fact the
23   individual that Mr. Gouthro -- he was the
24   individual who provided the fraudulent badges to
25   the two individuals that he brought onto the

1    Hansen v Elon Musk - Arbitration Day 1
2    Gigafactory the night that Lynn Thompson observed
3    and reported the theft.  Julio Alarcon was
4    somebody that Mr. Gouthro informed me he was
5    working with the Storey County DA's office
6    regarding the prosecution or the investigation
7    into the theft of a Tesla badge-making machine.
8    And Mr. Alarcon had been identified, according to
9    Mr. Gouthro, in his communications with the DA's
10   office as the individual who may have been in
11   possession of that machine.  That was information
12   that came to me even prior to -- prior to the
13   incident with Mr. Thompson, wherein I identified
14   Mr. Alarcon as the driver of the vehicle in that
15   incident.  Subsequently tracked him, identified
16   him involved in casing the Gigafactory, accessing
17   the Gigafactory at unauthorized hours, but
18   ultimately reported this to Mr. Gouthro because
19   of his involvement with the DA's office regarding
20   the prior theft of this badge-making machine.
21   And I thought that there might be a link there.
22        Q.  Was Mr. Alarcon an employee of
23   Aerotek?
24        A.  Was who, sir?
25        Q.  Mr. Alarcon.

Page 66

```
1        Hansen v Elon Musk - Arbitration Day 1
2        A.  Yes, he was.  He was a contract
3   employee out there.
4        Q.  So at this point I'm going to offer
5   Exhibit No. 129.
6        MR. ROBERTSON:  No objection.
7        JUDGE HOFFMAN:  Okay, 129 is in.
8        (Whereupon, Exhibit 129 was
9   received.)
10  BY MR. WOODFIELD:
11       Q.  And I'm going to start -- I'm going
12  to show you joint Exhibit 31.
13       Are these text messages you had with
14  Marshall Sprott on Thursday, June 28, 2018?
15       A.  Yes, sir.  Yes, they are.
16       Q.  And were you raising the issues of
17  cartel activity with Mr. Sprott at this point?
18       A.  Yes.  Mr. Sprott was definitely aware
19  of the cartel allegations and the document that
20  ultimately was given to me by Mr. Gouthro.
21       Q.  And was Mr. Sprott at that point
22  suggesting that you might be chasing a wild hare
23  or going down an unproductive route here or
24  not -- doing something wasteful?
25       MR. ROBERTSON:  I'm just going to
```

Page 67

```
1        Hansen v Elon Musk - Arbitration Day 1
2   object, Your Honor, just to the extent that it's
3   a bit leading.  I just think we'd rather hear the
4   witness than Mr. Woodfield.  That's my objection.
5        JUDGE HOFFMAN:  So I understand, your
6   objection is that it's -- that there's
7   insufficient foundation?
8        MR. ROBERTSON:  Yes, that's right,
9   Your Honor, and so it's then foundation and
10  leading, so...
11       JUDGE HOFFMAN:  Okay.  I guess I
12  agree that to understand this exchange of text
13  messages, I might need a little bit more
14  information.
15  BY MR. WOODFIELD:
16       Q.  What were you and Mr. Sprott talking
17  about in these text messages, sir?
18       A.  Specifically it appears that these
19  were primarily related to lithium, lithium
20  supplies and shipments, as well as thefts of
21  solar panels, I believe -- yes, solar panels, up
22  at the Microgrid site.
23       Q.  And did Mr. Sprott at any time
24  express any concern about the allegations that
25  you were raising that there might be cartel
```

Page 68

```
1        Hansen v Elon Musk - Arbitration Day 1
2   activity at the Gigafactory site?
3        A.  No, not at all.  And interesting --
4   this date of June 28th is also significant as
5   related to the cartel piece and this
6   investigation.  And it's significant because what
7   I learned during this time is that not only was I
8   looking into these allegations, in fact, the FBI
9   had at that time had a then-sealed indictment and
10  an ongoing investigation of a major drug
11  trafficking organization identified as the Mora
12  DTO.
13       And this investigation spanned for
14  approximately January of 2018 through the release
15  by the U.S. Attorney's Office of the indictment
16  identifying 20 or so members of this
17  drug-trafficking organization, the leader of whom
18  was a gentleman named Mora.
19       While I was conducting investigations
20  into the cartel piece, looking at lithium,
21  looking at these players, the Morales family, and
22  whatnot, I determined -- I saw this indictment
23  and I realized that four or five of these
24  employee -- of these people named in this
25  indictment by the FBI that were just arrested had
```

Page 69

```
1        Hansen v Elon Musk - Arbitration Day 1
2   been employees and/or were employees during this
3   time that I was conducting these investigations
4   at the Gigafactory.
5        And I printed these documents off.  I
6   showed them to Mr. Gouthro.  I provided them to
7   Mr. Sprott, and I was told, Oh, wow.  This is --
8   this is crazy.  Okay.  Keep doing what you're
9   doing.
10       So the answer is no.  I guess that
11  was a circuitous way of getting to no, but it's
12  important to lay that foundation that this wasn't
13  just Karl Hansen just arbitrarily going down
14  wild, you know, rabbit holes here.  The FBI
15  conducted this investigation for a period of
16  seven -- six, seven months.  These guys are now
17  currently in federal prison as a result of their
18  ties to the -- this employee from the
19  Gigafactory, the leader of this DTO, was in fact
20  tied to and linked by the Feds to the Sinaloa
21  drug cartel in Mexico.
22       JUDGE HOFFMAN:  Mr. Hansen, let me
23  interrupt for a minute.  You're -- you've gotten
24  great leeway in being able to testify in this
25  case, but I'm listening carefully to the
```

Hansen v Elon Musk - Arbitration Day 1

1  questions that are being asked, and I'm hearing
2  answers that are not necessarily particularly
3  related to the question that's asked.  And so
4  your narratives make it difficult for me to
5  figure out what you know and what you learned at
6  some other time.  So I would ask you to focus on
7  the questions that are being asked and answer
8  those questions, but don't -- don't explain any
9  further unless your counsel asks you to do that.
10          Do you understand?
11          THE WITNESS:  Yes, sir.
12          JUDGE HOFFMAN:  Okay.  Thank you.
13  BY MR. WOODFIELD:
14      Q.  Did Marshall Sprott ever tell you
15  that he expressed any disagreement with you about
16  your concerns about potential cartel activity at
17  the Gigafactory?
18      A.  No, sir.
19          MR. WOODFIELD:  I'm going to offer
20  joint Exhibit No. 31 at this time.
21          MR. ROBERTSON:  No objection.
22  Although, Your Honor, I would note there's
23  handwriting on the document.  I don't think we've
24  established what that is.  So I have no objection

Hansen v Elon Musk - Arbitration Day 1

1  to the texts, but I don't think we have context
2  for the handwriting at this point.
3          MR. WOODFIELD:  Why don't I fill that
4  in.
5  BY MR. WOODFIELD:
6      Q.  Mr. Hansen, what is the handwriting
7  on joint Exhibit No. 31?
8      A.  Can you scroll down, please, so I can
9  review it again?
10          [Document review.]
11      A.  Those were notes that I made to
12  myself when I had printed those off.
13      Q.  Up here at the top?
14      A.  Yes, explaining what the nature of
15  those texts was.
16          MR. WOODFIELD:  Now I'm going to show
17  you what is marked as joint Exhibit 209.
18          JUDGE HOFFMAN:  Exhibit 31 is in.
19          MR. WOODFIELD:  Thank you.
20          (Whereupon, Exhibit 31 was received.)
21  BY MR. WOODFIELD:
22      Q.  Sir, who is Jake Nocon?
23      A.  Jacob Nocon was an investigator
24  brought in with Nick Gicinto working -- he was a

Hansen v Elon Musk - Arbitration Day 1

1  supervisor of investigations at some point.  I
2  don't know what his current role is.
3      Q.  He was a Tesla employee?
4      A.  I was told he was a Tesla employee,
5  yes.  Initially he was not.  I guess he was a
6  contractor and then subsequently became a Tesla
7  employee.
8      Q.  Why did you send him a text message
9  on June 28, 2018?
10      A.  Because I was directed to speak
11  directly with Jake Nocon.  I was told that also
12  with respect to the job I had, the investigations
13  role, that Jacob Nocon would be conducting
14  interviews for anybody being assigned to any
15  investigative role out there.
16      Q.  Okay.  And did you provide background
17  information about what you were doing to
18  Jacob Nocon?
19      A.  Yes, sir, with respect to my work.
20      Q.  And then did you speak to him on --
21  he wrote back to you and he said:  I'll give you
22  a call later this morning on June 28th.
23          Did you speak to him subsequently?
24      A.  Yes, we did speak.

Hansen v Elon Musk - Arbitration Day 1

1          MR. WOODFIELD:  At this point I'm
2  going to offer joint Exhibit 209.
3          MR. ROBERTSON:  No objection.
4          JUDGE HOFFMAN:  Joint 209 is in.
5          (Whereupon, Exhibit 209 was
6  received.)
7  BY MR. WOODFIELD:
8      Q.  And when you spoke with Mr. Nocon,
9  what did you talk about?
10      A.  We talked a little bit about the
11  investigations I was working, my concerns related
12  to the cartel matter, and also the piece with
13  respect to having to interview with him now for a
14  position.
15          And Mr. Nocon recommended that I
16  speak with Mr. Gouthro and that law enforcement
17  bring in narcotics dogs, schedule narcotics law
18  enforcement canines to come and run through the
19  facility.
20      Q.  Do you know if that was ever done?
21      A.  Can you say that again, please?
22      Q.  Do you know if that was ever done?
23      A.  That never was done.
24      Q.  Did Mr. Nocon ever tell you what

Hansen v Elon Musk - Arbitration Day 1

1   happened with regard to that plan?
2   happened with regard to that plan?
3        A.  No.
4        Q.  I'm going to show you what's marked
5   as joint Exhibit No. 137.
6             And I'll just simply state, these are
7   more e-mails about Julio Alarcon.
8        A.  Yes, sir.
9        Q.  Through July 5th.
10            Did you continue to follow up on
11  Julio Alarcon for a while?
12       A.  Mr. Woodfield, can you please repeat
13  the question?
14       Q.  Yes.
15            Did you continue to follow up on
16  Julio Alarcon?
17       A.  Yes, I did.
18       Q.  And why did you continue to work on
19  the Julio Alarcon case?
20       A.  Because Mr. Alarcon had still been
21  employed and was still accessing the facility
22  after the incident involving Mr. Thompson on
23  June 7th.
24            MR. WOODFIELD:  I'm going to offer
25  joint Exhibit 137 at this time.

Hansen v Elon Musk - Arbitration Day 1

1
2            MR. ROBERTSON:  No objection.
3            JUDGE HOFFMAN:  137 is in.
4            (Whereupon, Exhibit 137 was
5   received.)
6   BY MR. WOODFIELD:
7        Q.  Between the time when you were
8   advised that you were going to be laid off and
9   when you started work with USSA, did you continue
10  to have access to your Tesla e-mail?
11       A.  No, I did not.  Sometime between
12  June -- that June 28th date and July, around
13  July 8th, my access was removed and eliminated.
14       Q.  Did you ever delete your Tesla
15  e-mails?
16       A.  Can you repeat that, please?
17       Q.  Yes.
18            Did you ever delete your Tesla
19  e-mails, like your sent folder or your -- any --
20       A.  No, sir, I never did.  No, I never
21  did that.
22       Q.  Did you ever delete any e-mails at
23  all?
24            Can you hear me?
25       A.  I've got a low bandwidth notice right

Hansen v Elon Musk - Arbitration Day 1

1   now, so I didn't hear your question.
2   now, so I didn't hear your question.
3        Q.  Did you ever delete any Tesla e-mails
4   at all?
5        A.  I'm sure I did delete an e-mail or
6   two here or there throughout the normal course of
7   duties.
8        Q.  But did you ever delete -- when you
9   learned that your job might be ending or to
10  frustrate anyone being able to see what you might
11  have done, did you ever delete large swaths of
12  e-mails?
13       A.  No, sir.  Absolutely not.
14       Q.  Who, if anyone, at USSA did you tell
15  about what you investigated at Tesla?
16       A.  Matt German was well aware.  Rick
17  McLellan was aware.  Ryan Leslie was aware.
18  Other colleagues and employees were aware of the
19  investigations I had been working.
20       Q.  What was Rick McLellan's job?
21       A.  Rick was the on-site -- on-site, I
22  guess, operations manager for U.S. Security.
23       Q.  And what did you tell Mr. McLellan?
24       A.  Can you repeat that again?
25       Q.  Yes.  What did you tell Mr. McLellan?

Hansen v Elon Musk - Arbitration Day 1

1        A.  With respect to my --
2        Q.  What you --
3        A.  -- my work?
4        Q.  What you witnessed or what you
5   investigated at Tesla.
6        A.  I told Mr. McLellan specifically --
7   Mr. McLellan was well aware of the investigations
8   into the thefts.  He -- I reported to him
9   everything that I had reported to Mr. Gouthro.
10            At that time, there was a period
11  there where Mr. McLellan had direct access and
12  was communicating with Mr. Gouthro and Mr. Sprott
13  consistently.
14       Q.  And what about Mr. German, what did
15  you tell Mr. German?
16       A.  I told Mr. German essentially the
17  same thing.  They were aware.  Mr. German was
18  aware of what I was investigating and the
19  concerns I had raised.
20       Q.  And why did you tell Mr. German and
21  Mr. McLellan?
22       A.  I believe it was still -- they needed
23  to know.  After what I had seen in this short
24  period of time start to happen with respect to

Hansen v Elon Musk - Arbitration Day 1

1    the offer of the job that Mr. German offered me,
2    they needed to be aware of what I was working on,
3    I felt.
4         Q.  Okay.  And what did you tell
5    Mr. Leslie?
6         A.  I worked extensively with Mr. Leslie,
7    and Mr. Leslie was well aware.  I didn't get into
8    specifics as far as investigative notes or
9    different things like that, but I told Mr. Leslie
10   that I had some very serious concerns about what
11   had happened with the job, and I had -- I felt
12   that this was due to -- due to the Tesla being
13   concerned, that their whole push was to ramp up
14   their Model 3 and they didn't care about anything
15   else that was going on inside the facility.
16        Q.  Why did you tell Mr. Leslie that?
17        A.  Mr. Leslie shared that same opinion,
18   and he was perplexed with the fact -- with what
19   had actually happened to me, he told me.
20        Q.  I'm going to show you now what I'm
21   marking as joint Exhibit No. 71.
22        Do you recall sending this e-mail to
23   Jake Nocon on Wednesday, July 11th?
24        A.  Yes, sir, I do.

Hansen v Elon Musk - Arbitration Day 1

1         Q.  And why did you send this e-mail to
2    Jake Nocon on Wednesday, July 11th?
3         A.  Well, because I had already had
4    discussions with Mr. McLellan and Mr. German,
5    obviously, with respect to this position and me
6    no longer being able to work.
7         Mr. McLellan told me that Jacob Nocon
8    was going to be -- he was told that Jacob Nocon
9    was going to be interviewing anybody that would
10   work in Tesla's investigations departments,
11   period.  And so I reached out, because I was
12   given the name Jake Nocon as a primary point of
13   contact.
14        Q.  And why were you interested in
15   continuing to work at Tesla, given what you had
16   seen?
17        A.  Well, I thought Tesla was a -- I
18   really did.  I thought Tesla was a great
19   up-and-coming company, that the opportunities
20   were there.  Mr. German had offered me a position
21   with an exceptional salary in a role that I
22   really enjoyed.
23        Q.  And did you want to continue to work
24   for USSA or for Tesla or for both?

Hansen v Elon Musk - Arbitration Day 1

1         A.  I was content to work for both.  I
2    would have liked to stay on for Tesla as
3    originally planned, but it worked out.  I would
4    have worked for U.S. Security based on the offer
5    that I had received.
6         MR. WOODFIELD:  I'm going to offer
7    joint Exhibit No. 71 at this time.
8         MR. ROBERTSON:  No objection.
9         JUDGE HOFFMAN:  Okay, Exhibit 71 is
10   in.
11        (Whereupon, Exhibit 71 was received.)
12   BY MR. WOODFIELD:
13        Q.  What, if anything, did Rick McLellan
14   at USSA tell you in response to your e-mail that
15   you sent to Jake Nocon?
16        A.  Rick McLellan advise --
17        THE WITNESS:  Can you hear me?  I
18   have low bandwidth.
19        MR. WOODFIELD:  I can hear you.
20        A.  Okay.  Rick McLellan indicated that
21   my position as an investigator working for USSA
22   was no longer being offered because Jacob Nocon
23   had been assigned to work under Nick Gicinto and
24   was handling all investigations and that Jeff

Hansen v Elon Musk - Arbitration Day 1

1    Jones directed that all persons assigned to
2    investigations were required to interview with
3    Mr. Nocon.
4    BY MR. WOODFIELD:
5         Q.  When, if ever, did you speak with
6    anyone at USSA about Tesla's involvement in your
7    employment prospects with USSA?
8         A.  Specifically, on several occasions, I
9    believe I was -- on or about July 12th, I had
10   discussed my confusion with Mr. German, I
11   believe, via text messages.
12        Q.  And what did Mr. German tell you?
13        A.  He basically told me initially
14   that an unspecified person, somebody he wouldn't
15   identify, above him, was preventing me from being
16   hired, as Matt German and I had discussed.  And
17   he asked for some time.  I gave him some time.
18   He ultimately got back to me.  Told me that he
19   was frustrated and he said that I was going to be
20   his swing shift supervisor, end of story.  And
21   something along the lines of I refuse to play BS
22   games.
23        Q.  And what else, if anything, did he
24   tell you?

Hansen v Elon Musk - Arbitration Day 1

1    Hansen v Elon Musk - Arbitration Day 1
2        A.  My gosh, we had a lot of discussions.
3   He did tell me he was apologizing -- he was
4   apologetic, that he was sorry.  That, you know,
5   basically Jeff Jones told him that I would not be
6   in investigations and nor would I be in any
7   supervisory capacity for USSA.
8        Q.  Who is Jeff Jones?
9        A.  Jeff Jones, then, was -- he was -- he
10  reported directly to Elon Musk.  I think he was
11  the overall director of global security
12  operations.
13       Q.  Do you have any idea why you might
14  have been on Jeff Jones's radar?
15       A.  Speculating?  Yeah.  I think because
16  I was bringing up things and requesting to speak
17  to law enforcement.  Every time I did,
18  Mr. Gouthro told me that he would discuss it with
19  Mr. Jones, and, you know, this just went back and
20  forth.
21           And they -- they being Tesla,
22  Elon Musk, Jeff Jones were really focused on
23  Tesla's stock price, the upcoming Quarter 2
24  release and the Model 3 ramp.  I mean, there was
25  things ongoing at that time; so that's my

1    Hansen v Elon Musk - Arbitration Day 1
2   personal belief.
3        Q.  Did you end up being hired by USSA?
4        A.  Yes, sir, I did.
5        Q.  And what job did you get hired for at
6   USSA?
7        A.  Ultimately I got hired as a security
8   officer, a physical security officer.
9        Q.  And what was your compensation, your
10  rate of compensation?
11       A.  Matt German directed Rick McLellan to
12  put me on the books at the rate of a shift
13  supervisor at $27 an hour.
14       Q.  I'm going to show you joint
15  Exhibits 22 and 195.
16           Is 195 your application for
17  employment at USSA?
18       A.  Yes, sir, it is.
19       Q.  And 22 -- hold on one second.
20           MR. WOODFIELD:  22 is the arbitration
21  agreement, but I would offer the arbitration
22  agreement and joint Exhibits 22 and 195 in the
23  application at this time.
24           MR. ROBERTSON:  So 22 and 195?  Yeah,
25  no objection.

1    Hansen v Elon Musk - Arbitration Day 1
2           JUDGE HOFFMAN:  Okay.  22 and 195 are
3   in.
4           (Whereupon, Exhibit 22 was received.)
5           (Whereupon, Exhibit 195 was
6   received.)
7           JUDGE HOFFMAN:  Mr. Woodfield, if you
8   want to think about a good breaking point.  We've
9   been going about an hour.
10          MR. WOODFIELD:  I love every break I
11  can take.
12          JUDGE HOFFMAN:  Is now a good time?
13          MR. WOODFIELD:  Yes, sir.
14          JUDGE HOFFMAN:  Okay.  Let's -- I've
15  got five after 11:00.  Let's come back at 11:15
16  my time, so quarter after the hour.
17          MR. WOODFIELD:  Thank you, sir.
18          (Recess taken, 11:04 a.m. to
19  11:19 a.m. PDT)
20          JUDGE HOFFMAN:  It looks like we have
21  everybody back, so let's continue the examination
22  of Mr. Hansen.
23          MR. WOODFIELD:  All right.
24  Thank you, Your Honor.
25                * * *

1    Hansen v Elon Musk - Arbitration Day 1
2   BY MR. WOODFIELD:
3        Q.  Mr. Hansen, did you remain employed
4   as a swing shift supervisor with a rate pay of
5   $27 for the entire remaining time that you worked
6   at USSA?
7        A.  I remained at that pay rate, but
8   definitely did not have any supervisory
9   responsibilities; and instead, I conducted daily
10  security operations, reporting, documenting,
11  access control and just basically continuing to
12  work at outside, further isolated posts
13  throughout my tenure until I was removed from the
14  Gigafactory.
15       Q.  And what is -- what is physical
16  security?
17       A.  So physically security really begins
18  with an operational presence of security
19  officers, officers who conduct roving patrols in
20  a given area.  They check for secured access to
21  doors and buildings and things like that.  So
22  physical security is just that.  It's a physical
23  presence in and around a particular area.
24       Q.  And so when you were employed at the
25  Gigafactory by USSA, what were your job duties

Hansen v Elon Musk - Arbitration Day 1

1    Hansen v Elon Musk - Arbitration Day 1
2   and responsibilities?
3        A.  So essentially I was a security
4   officer.  I would be placed in, for instance, the
5   D unit of the Gigafactory.  It was far removed on
6   the third floor, sitting for a shift of eight
7   hours watching a temperature gauge on a boiler
8   machine.  Or I would be placed out at an access
9   gate, monitoring traffic coming in and going out,
10  verifying ID badges and different things like
11  that.
12           And just documenting in my notes and
13  reports and continuing to report anything related
14  to my -- the ongoing investigation of reports of
15  theft and other matters.
16       Q.  One second.
17           All right.  I'm going to show you
18  right now Exhibits 147, 176, and 173.  I'm going
19  to show you them now.  It says joint Exhibit 147,
20  which is an e-mail dated July 18th.  And then
21  there is a July 27th -- or July 22, 2018 e-mail,
22  and a July 31st e-mail.
23           Let me ask you, what did you do to
24  help transition your investigation work with --
25  at Tesla to Tesla when you worked for USSA?

1    Hansen v Elon Musk - Arbitration Day 1
2        A.  Can you be more specific?
3        Q.  Yes.  Let me ask you to take a look
4   at the e-mail marked as Exhibit No. 147.
5        A.  Okay.
6        Q.  There's an e-mail about hidden copper
7   at the southern end of the Gigafactory.
8        A.  Yes, sir.
9        Q.  Were you involved in investigation of
10  the hidden copper at the southern end of the
11  Gigafactory?
12       A.  I don't specifically recall being
13  directly involved in that particular matter.
14       Q.  Okay.  Were you asked -- I'm going to
15  refer you to an e-mail from Nick Gicinto on
16  July 22nd.  It says:  Our conversation.  It says:
17  Thank you so much for talking to me this week.
18  I'm really glad we had time to clarify a few
19  things related to hiring and your background.
20           MR. ROBERTSON:  Which exhibit are you
21  on now?  Excuse me, Mr. Woodfield.
22           MR. WOODFIELD:  This is joint
23  Exhibit 176.
24  BY MR. WOODFIELD:
25       Q.  Do you recall receiving this e-mail,

1    Hansen v Elon Musk - Arbitration Day 1
2   sir?
3        A.  Yes, I do.
4        Q.  And do you recall what you met with
5   Mr. Gicinto about?
6        A.  Mr. Gicinto and I had a telephone
7   conversation on that day, June -- or July, I
8   believe it was 22nd.  We did not meet.  And we
9   spoke about the concerns I had with respect to
10  the investigative role and position and what had
11  happened with that USSA offer.  And Mr. Gicinto
12  explained his rationale in this e-mail.  But I
13  never received this e-mail until August.  I never
14  saw it until then.
15       Q.  And this was sent to
16  kahansen@tesla.com on July 22, 2018; is that
17  correct?
18       A.  Yes, sir, it is.
19       Q.  And were you still getting e-mails at
20  your kahansen@tesla.com address at that point?
21       A.  No, sir, that didn't exist any
22  longer.
23       Q.  There's an e-mail from Sean Gouthro
24  on July 31st saying:  Karl no longer has access
25  to Tesla e-mail since the RIF; is that correct?

1    Hansen v Elon Musk - Arbitration Day 1
2        A.  Yes, that's correct.
3        Q.  That's e-mail -- or that's joint
4   Exhibit No. 173 being sent back in response,
5   where Gerhard Pretorius was trying to follow up
6   with you about your allegations, including your
7   allegations about the cartel.
8            Did anyone at Tesla try to reach out
9   to you in July about the cartel activities and
10  contact you at anything other than your Tesla
11  address that did not -- that you had no access
12  to?
13       A.  No.
14           MR. WOODFIELD:  I'm going to offer at
15  this time Exhibits 147, Exhibits 176, and 173.
16           MR. ROBERTSON:  No objection.
17           JUDGE HOFFMAN:  Okay.  147, 176, and
18  173 are in.
19           (Whereupon, Exhibit 147 was
20  received.)
21           (Whereupon, Exhibit 176 was
22  received.)
23           (Whereupon, Exhibit 173 was
24  received.)
25           *  *  *

Hansen v Elon Musk - Arbitration Day 1

1  BY MR. WOODFIELD:
2
3      Q.  Were you refusing at any time in July
4  to meet with anyone from Tesla to communicate any
5  information about any offers about your
6  allegations about cartel activity or drug
7  activity or theft activity?
8      A.  No.
9      Q.  When, if ever, did you reach out to
10  Elon Musk about what you had uncovered at Tesla?
11      A.  August 3rd of 2018.
12      Q.  And why did you write an e-mail to
13  Elon Musk about what you had observed at Tesla?
14      A.  Because due to everything that
15  happened -- Elon Musk had regularly put out
16  company-wide e-mails to all employees stating
17  that essentially he had an open door if anybody
18  wanted to contact him directly with any concerns
19  and issues they felt weren't being addressed by
20  leadership at lower levels in the organization.
21      Q.  I'm going to show you now what's
22  marked as joint Exhibit 186.
23          This is an e-mail you sent on
24  August 3rd, to Sean Gouthro, Elon Musk -- two
25  Elon Musk addresses, Gerhard Pretorius, Jake

Hansen v Elon Musk - Arbitration Day 1

1  Nocon, Jeff Jones, Nick Gicinto.  And it's a
2  lengthy e-mail where you raise issues about
3  cartel activity, theft, a number of problems at
4  the Gigafactory.
5
6      Why did you send this to Mr. Musk
7  directly?
8      A.  Again, I sent it to Mr. Musk as well
9  as everybody else addressed there because these
10  were issues that I had raised repeatedly.  Had
11  discussed with management.  Discussed with my
12  supervisory personnel.  I was directed to
13  investigate these things, and, you know, by this
14  time, a lot had happened.
15      And I -- the more things began to
16  transition, I became further isolated, and so I
17  felt that Mr. Musk opened the door and said, hey,
18  e-mail me if you have an issue, and I felt that
19  that was the important thing to do.
20      Q.  And Nick Gicinto then subsequently
21  wrote to Mr. Musk later that day.
22      Were you aware that Mr. Gicinto
23  followed up with Mr. Musk?
24      A.  I was not until I saw this e-mail.
25      Q.  Did anyone from Tesla, before

Hansen v Elon Musk - Arbitration Day 1

1  August 3, 2018, ever tell you that they thought
2  your allegations about cartel activity or
3  organized crime at the Gigafactory, did they tell
4  you that they thought those ideas might be
5  misguided?
6      A.  No, sir.
7      Q.  Why did you also send the e-mail to
8  Mr. Gicinto?
9      A.  Well, Mr. Gicinto reported directly
10  to Mr. Musk.
11      Q.  Now, did you ever refuse to
12  participate in any subsequent investigation
13  performed by Tesla?
14      A.  Yes, I did.
15      Q.  And what was that investigation that
16  you refused to participate in?
17      A.  I don't know what their investigation
18  was.  I was directed to report to a conference
19  room inside the Gigafactory to discuss my e-mail
20  with Ricky Gecewich, who was in employee
21  relations.
22      Q.  And did you?
23      A.  I had one meeting.  I was -- retained
24  counsel.  I was represented at that time, back in

Hansen v Elon Musk - Arbitration Day 1

1  July of 2018, and I went to that one meeting,
2  heard what he had to say, and I determined that I
3  would not go back after that.
4      Q.  And what did Mr. Gecewich have to
5  say?
6      A.  Mr. Gecewich indicated that he did
7  not -- essentially he did not feel that he had
8  enough information to look into the issues that I
9  raised in my e-mail, and he asked -- asked me to
10  sit there and have a discussion with him and an
11  HR representative from U.S. Security about the
12  concerns I raised in the e-mail.
13      And I told him that all of the
14  information that I had was reported to
15  Mr. Gouthro, Mr. Sprott, all of those supervisors
16  had everything for months, and that I wasn't
17  prepared to have a lengthy discussion at that
18  time.
19      Q.  And why were you apprehensive, sir?
20      A.  I was very apprehensive because I had
21  seen -- this is a very short period of time.  I
22  had -- the more -- as time went by, through July
23  and into August, I kept being pushed further and
24  further out.  Tesla interfered with the contract

Page 94

```
1        Hansen v Elon Musk - Arbitration Day 1
2   job, the investigator role.
3            Jeff Jones later interfered and
4   directed Matt German that I would not be involved
5   in a supervisory role.  I would not have any
6   investigative capacity.  I was banned by
7   Jeff Jones from being inside the Gigafactory.  I
8   was further isolated and pushed out and out.
9            But not only that, I had also seen,
10  within about seven hours of Mr. Thompson
11  reporting his theft, the badging system indicated
12  that he had been terminated.  And I found that to
13  be amazing, and -- which led me to talk to him
14  and obtain additional evidentiary information.
15           And then I saw -- observed -- what
16  happened with Martin Tripp; Martin Tripp was
17  another individual that was employed there, who
18  had also raised significant allegations regarding
19  scrap, theft of materials high into the seven
20  figures, and, you know, they -- they being Tesla,
21  Tesla put out all sorts of information that --
22  charging Martin Tripp with being heavily armed
23  and coming back to the Gigafactory to shoot the
24  place up.  And I did not know what to expect.  I
25  had no idea of what to expect.
```

Page 95

```
1        Hansen v Elon Musk - Arbitration Day 1
2            And after talking to counsel, I
3   decided I was not going to get in -- engage in
4   any further discussion.
5       Q.  And was your entire Tesla e-mail
6   record history available to Tesla at that time?
7       A.  Yes, sir.
8       Q.  And were all of your database files
9   that you had compiled when you were working for
10  Tesla still available to Tesla?
11      A.  Yes, sir.
12      Q.  And you referred Tesla to all of your
13  supervisors for your previous reports?
14      A.  Yes, sir.
15      Q.  What did you do next?
16      A.  Next is I worked to prepare the TCR
17  for submission to the SEC.
18      Q.  I'm going to show you what's joint
19  exhibit -- what's marked as joint Exhibit No. 19.
20           And this is the TCR, tips,
21  complaints, and referrals that was submitted on
22  your behalf by your prior counsel, or your SEC
23  counsel; correct?
24      A.  Yes, sir.
25           MR. WOODFIELD:  And I'm going to
```

Page 96

```
1        Hansen v Elon Musk - Arbitration Day 1
2   offer at this time joint Exhibit No. 19.
3            JUDGE HOFFMAN:  Any objection?
4            MR. ROBERTSON:  This is the TCR?
5   Yeah, no objection.
6            JUDGE HOFFMAN:  19 is in.
7            (Whereupon, Exhibit 19 was received.)
8            JUDGE HOFFMAN:  I don't have 186 in
9   either, which is the August 3rd e-mail.  Any
10  objection to that one?
11           MR. ROBERTSON:  No, no objection to
12  that one.
13           JUDGE HOFFMAN:  186 is in as well.
14           (Whereupon, Exhibit 186 was
15  received.)
16  BY MR. WOODFIELD:
17      Q.  Why did you file a TCR with the SEC?
18      A.  Because at that time, nothing had
19  been happening.  And the pressure on me, I --
20  look, I had been isolated.  I was -- I felt I was
21  targeted.  I was constantly in a fight or flight
22  mode every time I'd show up out there.  And I was
23  aware of serious felony criminal activity ongoing
24  there.
25           And furthermore, I believed there was
```

Page 97

```
1        Hansen v Elon Musk - Arbitration Day 1
2   sufficient probable cause to engage local, state,
3   and federal law enforcement pertaining to
4   numerous violations of certain criminal statutes,
5   and as well as misstatements being made publicly
6   about what was really going on inside Tesla at
7   that time.
8            And I felt I had -- I felt I had --
9   that was a course of action that I felt
10  appropriate.
11      Q.  And I'm now going to show you what's
12  marked as joint Exhibit 6.
13           Is this the press release that your
14  attorney issued on August 16, 2018?
15      A.  Yes, sir, it is.
16           MR. WOODFIELD:  I'm going to offer at
17  this time joint Exhibit 6.
18           MR. ROBERTSON:  No objection.
19           JUDGE HOFFMAN:  6 is in.
20           (Whereupon, Exhibit 6 was received.)
21  BY MR. WOODFIELD:
22      Q.  What reaction, if any, was there at
23  the Gigafactory after the press release issued by
24  your attorney was made public?
25      A.  Management was surprised.  Actually,
```

1    Hansen v Elon Musk - Arbitration Day 1
2    some of them said they were surprised; some of
3    them said they weren't surprised about this.
4         Q.  How do you know that?
5         A.  I'm sorry?
6         Q.  How do you know?
7         A.  Because Mr. Gicinto -- I'm sorry,
8    Mr. Sprott told me about this.  In fact,
9    Matt German told me that he felt I did the right
10   thing.  And, in fact, I had several conversations
11   with Mr. German about this.
12        Mr. McLellan, Mr. McLellan was aware
13   of this, and Mr. McLellan told me that he
14   understood, because he himself had been part of
15   some type of civil action involving a wrongful
16   termination or something of that in his past.
17   And they told me that they would do what they
18   could do to -- to keep me working and to protect
19   me, but they were concerned about me.
20        And so colleagues, other associates
21   mentioned it.  People knew about it.  And my
22   understanding that -- was that -- from Mr. Sprott
23   specifically, that -- because at this time,
24   Mr. Gouthro was not talking to me, but Mr. Sprott
25   indicated that Jeff Jones and Elon Musk were

1    Hansen v Elon Musk - Arbitration Day 1
2    pissed off about this.  I'm sorry, but that's
3    what I was told.  And that's the extent.
4         Q.  I'm going to show you joint
5    Exhibit 183.
6         This is an e-mail sent by
7    Kenneth Davis on August 23rd.  And there are some
8    pictures in here.
9         Can you tell me, in the red circles,
10   who those individuals are?
11        A.  That appears to be me.
12        Q.  And where is that?
13        A.  That's inside the main lobby, the
14   main access point to the Gigafactory.
15        Q.  And is that surveillance at the
16   Gigafactory?
17        A.  Yes, sir, it is.
18        Q.  And this would have been dated
19   August 23rd, after you filed your SEC
20   whistleblower action and after the SEC TCR press
21   release; correct?
22        A.  Yes, sir.
23        MR. WOODFIELD:  I'm going to offer at
24   this time joint Exhibit 183.
25        MR. ROBERTSON:  No objection.

1    Hansen v Elon Musk - Arbitration Day 1
2         JUDGE HOFFMAN:  183 is in.
3         (Whereupon, Exhibit 183 was
4    received.)
5    BY MR. WOODFIELD:
6         Q.  Where were you when those photographs
7    were taken?
8         A.  I was working inside that facility.
9    If I can tell you about that, the -- a decision
10   had been made to place me in the D quad, way down
11   up on the boiler room.  And I was summoned by
12   Mr. Shipley to report to the main lobby to
13   relieve another officer.  And so that is what led
14   me to there where I was stationed, to work the
15   shift transition.
16        Q.  Did you know that Ken Davis harbored
17   any thoughts about you being an SEC
18   whistleblower?
19        A.  No, sir, I did not.
20        Q.  When, if ever, did you appear on
21   Fox News?
22        A.  That was August 29th of 2018.
23        Q.  And why did you appear on Fox News?
24        A.  That was my attorney, Mr. Meissner,
25   had arranged that, to discuss the SEC complaint.

1    Hansen v Elon Musk - Arbitration Day 1
2         Q.  And what did you discuss on Fox News?
3         A.  I discussed the allegations outlined
4    in the TCR.
5         Q.  And what happened on August 30, 2018,
6    when you were back at the Gigafactory?
7         A.  An incident involving Mr. Musk
8    occurred.  Mr. Musk came to the Gigafactory
9    unannounced.  He approached through the west
10   gate, with -- in a Tesla Model S with a driver.
11   They didn't know that at the time.  The vehicle
12   was approaching fast and flashing its lights.  I
13   was inside a security building and another
14   officer was outside at the actual gate access
15   road.
16        I saw the officer trying to slow down
17   the vehicle.  He was unable to do that.  The
18   vehicle slowed a little bit, but it did not stop.
19   I stepped down out of the shack and was very
20   close to the vehicle, and I put my hand up in an
21   effort to stop that.  And Mr. Musk was staring at
22   me directly.  I was looking directly at him.
23        They -- he dropped his head.  He said
24   something to the driver.  The driver and Mr. Musk
25   looked back at me and all of the sudden they

Hansen v Elon Musk - Arbitration Day 1

1   accelerated at a high rate of speed.

2           And I got on the phone.  I notified

3   Mr. Shipley in the security operations center

4   that -- Voyager was his code name, what they

5   called him within security -- that he had arrived

6   unannounced at this Gigafactory.  And Mr. Shipley

7   expressed some very significant concern about

8   that, thanked me, and hung up the phone.

9       Q.  When, if ever, did you hear any

10  further comments about that?

11      A.  A short time after that, U.S.

12  Security supervisors came to the gate, and

13  Mr. McLellan, also on that speakerphone at that

14  time, indicated that they were directed to

15  come -- they asked me what the hell happened, and

16  I explained nothing happened.  I just reported

17  that Mr. Musk showed up.  Mr. McLellan advised

18  Mr. Leslie that he didn't give a damn what the

19  hell happened to Mr. Hansen, get him the F out of

20  here.  I don't care if you have to take him up in

21  the hills and hide him, but Musk is pissed.  Get

22  him out of here.  And so at that point I

23  ultimately departed from my shift.

24      Q.  And where did you go?

25

Hansen v Elon Musk - Arbitration Day 1

1       A.  I went home.

2       Q.  And what, if anything --

3       A.  I said --

4       Q.  I'm sorry, go ahead.

5       A.  I was told to go home and await a

6   phone call.

7       Q.  And then what happened next?

8       A.  Well, I got a call from Matt German

9   telling me that I was no longer welcome at the

10  Gigafactory.  That Jeff Jones directed him to

11  have me removed immediately.

12          And I asked why --

13      Q.  And what date was that?

14      A.  That was August 30th.  Or 31st.  I

15  believe that was -- I know Matt German had a call

16  with him and he told me on the 30th.  But I

17  received a call the following day.

18          And ultimately, on September 4th, was

19  when I had a follow-up call, and Matt German had

20  told me it was time to go and that I was done.

21      Q.  And so what happened then?

22      A.  Well, at that point I needed to take

23  some time off and kind of figure out what I was

24  doing.  I traveled to Washington to see my

25

Hansen v Elon Musk - Arbitration Day 1

1   family; the doctor recommended that.  I was under

2   a tremendous amount of stress, anxiety, severe

3   hypertension to require medication now.  But --

4           So I did.  And I received an e-mail

5   from Scott Wiebke, who at that time Matt

6   German -- I was told Matt German was talking to,

7   and that U.S. Security would offer me another

8   position at other contractor in the Reno area

9   upon my return.

10      Q.  Let me show you what's marked as

11  joint Exhibit 205.

12          JUDGE HOFFMAN:  I'm sorry, what was

13  the exhibit?

14          MR. WOODFIELD:  205.  Joint

15  Exhibit 205.

16  BY MR. WOODFIELD:

17      Q.  And the e-mail came in -- there was

18  an e-mail chain coming -- forgive me, I'm going

19  to go back.

20          Starting off where Scott Wiebke

21  reached out to you about jobs, and you reported

22  back that you had been out of time and needed to

23  take time off as recommended by your doctor.  And

24  he offered you a job; correct?

25

Hansen v Elon Musk - Arbitration Day 1

1       A.  Yes, sir.

2       Q.  And how much was the next job you

3   had?  How much did it pay?

4       A.  $16 an hour, I believe.

5       Q.  And how much time had you taken off

6   after Tesla had you removed from the Gigafactory

7   site?

8       A.  Two weeks, if I recall correctly.

9   Maybe a couple weeks.  September 4th.  I was back

10  by October, the beginning of October to start

11  working.

12      Q.  And why did you take that time off?

13      A.  Because my doctor recommended.  I

14  needed a break.

15      Q.  And where were the new USSA jobs

16  located?

17      A.  This one particularly was in Verdi,

18  Nevada.

19      Q.  And what did you do there?

20      A.  Same thing.  I was physical security

21  tasks, such as controls, access control, and

22  security checks of deliveries coming into this

23  manufacturing facility.

24      Q.  And how long did you stay in that

25

1      Hansen v Elon Musk - Arbitration Day 1
2  job?
3          A.  To approximately January 13th or
4  19th.  Somewhere in there.
5          Q.  I'm going to show you joint
6  Exhibits 221 and 123.  Here's 221.
7              Forgive me, that's --
8              Hold on one second.
9              All right.  Is this your resignation
10  from USSA?
11         A.  Yes, sir.
12         Q.  And why did you resign from USSA?
13         A.  Because I needed to -- I needed to
14  make additional money.  I needed to find
15  something that paid more.  And I was also at that
16  time contemplating looking to get back into the
17  federal sector.
18         Q.  And I'm going to show you right now
19  Exhibit --
20             Forgive me, I'm going to offer right
21  now joint Exhibit 123.
22             JUDGE HOFFMAN:  There being no
23  objection, 123 is in.
24             (Whereupon, Exhibit 123 was
25  received.)

1      Hansen v Elon Musk - Arbitration Day 1
2          MR. WOODFIELD:  I'm going to show you
3  right now joint Exhibit 199.
4              Are these your pay stubs while
5  working for USSA?
6          A.  Yes, sir.  Appear to be.  Yes.
7          MR. WOODFIELD:  I'm going to offer
8  joint Exhibit 199.
9          MR. ROBERTSON:  No objection.
10         JUDGE HOFFMAN:  199 is in.
11             (Whereupon, Exhibit 199 was
12  received.)
13  BY MR. WOODFIELD:
14         Q.  Would you have resigned your initial
15  job from Tesla had you not been let go in the
16  RIF?
17         A.  No, sir.
18         Q.  And why wouldn't you have resigned?
19         A.  I enjoyed it.  It was -- Tesla was an
20  up-and-coming company.  It was a large operation,
21  and it had been explained to me that they were
22  just really in their -- in the preliminary stages
23  of scaling in so many aspects, and I thought it
24  would be interesting to work in that sector.
25         Q.  Would you have resigned from USSA if

1      Hansen v Elon Musk - Arbitration Day 1
2  you were still working at the Gigafactory?
3          A.  No, sir.
4          Q.  And why wouldn't you have resigned if
5  you were still working at the Gigafactory?
6          MR. ROBERTSON:  Objection.
7          MS. BRAXTON:  Sorry.
8          JUDGE HOFFMAN:  I didn't hear the
9  objection.
10         MS. BRAXTON:  Strike that.
11         JUDGE HOFFMAN:  Okay.
12  BY MR. WOODFIELD:
13         Q.  And why wouldn't you have resigned if
14  you were still working at the Gigafactory?
15         A.  Again, the same -- the same
16  opportunity, the same place to work.  And had I
17  had the ability to continue to perform in that
18  capacity, I saw no reason to leave.
19         Q.  What are you currently doing for
20  employment?
21         A.  I'm currently a federal civil rights
22  investigator with the U.S. Department of Housing
23  and Urban Development.
24         Q.  And when did you start your job
25  with HUD?

1      Hansen v Elon Musk - Arbitration Day 1
2          A.  August of -- August of 2020.
3          Q.  And what is your compensation at HUD?
4          A.  I'm currently a GS-11, Step 5,
5  approximately right at 83,000 a year.
6          Q.  And I'm going to show you joint
7  Exhibit No. 111.
8              Is this your most recent resumé up
9  through when you were applying to work for HUD?
10         A.  Yes, sir, it is.
11         Q.  So you worked for the VA for a while
12  after you worked for USSA?
13         A.  That's correct.
14         Q.  And it says you worked for a while as
15  a private consultant as well?
16         A.  That's correct.  I did advocacy work,
17  you know, during this time.  For years I've done
18  that, yes.
19         Q.  And what did you do for the
20  Boomtown Casino Hotel?
21         A.  Boomtown, I was an investigator and a
22  security supervisor.
23         Q.  And what about for the El Dorado
24  resorts?
25         A.  El Dorado, the role I was hired was

Hansen v Elon Musk - Arbitration Day 1

1    investigator.
2
3         MR. WOODFIELD:  I'm going to offer
4    Exhibit 111 as well.
5         JUDGE HOFFMAN:  Any objection?
6         MR. ROBERTSON:  No objection.
7         JUDGE HOFFMAN:  111 is in.
8         (Whereupon, Exhibit 111 was
9    received.)
10        JUDGE HOFFMAN:  Mr. Woodfield, you
11   mentioned No. 221, which is an e-mail, but you
12   didn't discuss it or move to admit it.
13        MR. WOODFIELD:  I realized I had
14   doubled up an exhibit, but no, I'm not going to
15   offer 221.
16        JUDGE HOFFMAN:  Okay.
17   BY MR. WOODFIELD:
18        Q.  How has the Tesla parties' and USSA's
19   treatment of you impacted you emotionally?
20        A.  It's been four years now, right at.
21   And my health has been seriously impacted.
22   Emotionally, I suffered from posttraumatic stress
23   as a result of this situation.  I have increased
24   significant hypertension that we are currently
25   still working to -- working with my doctor to get

Hansen v Elon Musk - Arbitration Day 1

1    under control, different medications.
2
3         And emotionally and physiologically,
4    for instance, I suffered from severe acute stress
5    reactions also as a result of this.  Emotionally,
6    my anxiety, I'm on medication for anxiety, to
7    deal with the matters associated with that
8    stress.  So it has impacted myself, my family.
9    It is -- it has been a life-changing event in so
10   many ways.
11        And I'm working through that.  But it
12   has had a tremendous impact emotionally.  And I
13   struggle with things.  I struggle with -- I
14   struggle with anxiety.  I am scared of this high
15   blood pressure, this hypertension issue.
16        Prior to this, I was an avid trail
17   and ultramarathon runner.  I mean, I'm starting
18   to get back into those things, but I never had
19   any of these issues.  Not this hypertension,
20   never.  And so it's been tremendously stressful
21   on myself.  And particularly as a father and as a
22   grandfather, it's been a tough ride.  So I'm --
23   that's all I can say about that.
24        Q.  And why did you pursue this suit?
25        A.  Because it was the right thing to do.

Hansen v Elon Musk - Arbitration Day 1

1    I felt that I needed to do this.  Because what
2    happened was in violation of the law, in my
3    opinion.  And I saw no other option that would
4    allow me to pursue relief.
5         MR. WOODFIELD:  I don't have any
6    further questions, Your Honor.
7
8         ------------
9              EXAMINATION
10        ------------
11   BY JUDGE HOFFMAN:
12        Q.  I have one question that I want to
13   ask, but I just didn't hear the answer to.  So
14   I'm going to take it a little bit out of turn,
15   and then we can talk about whether or not the
16   respondents want to start their cross-examination
17   now or would you prefer to have a break.
18        But pending that question,
19   Mr. Hansen, I didn't hear your answer to the
20   question:  After you were reassigned from the
21   Gigafactory, what -- but you continued to work
22   with USSA, where did you work?
23        A.  Your Honor, that was at a company
24   called Arconic in Verdi -- Verdi, Nevada, outside
25   of Reno.

Hansen v Elon Musk - Arbitration Day 1

1         JUDGE HOFFMAN:  Okay.  Thank you.
2         THE WITNESS:  You're welcome, sir.
3         JUDGE HOFFMAN:  All right.  So now,
4    what do you want to do on cross-examination,
5    Respondents?
6
7         Do you want to take a break?
8         MR. ROBERTSON:  I'm happy to start
9    and then we can go -- I don't know when you
10   wanted to break for lunch.  Let me go like
11   30 minutes or so, and then...
12        JUDGE HOFFMAN:  Okay.  All right.  So
13   let's plan on breaking then at about 12:30 my
14   time.  So that's about 35 minutes, and we'll
15   start cross-examination now from Tesla.
16        MR. ROBERTSON:  Okay.  Thank you.
17        ------------
18             EXAMINATION
19        ------------
20   BY MR. ROBERTSON:
21        Q.  Mr. Hansen, why don't we start where
22   the testimony left off.  You mentioned the
23   emotional stress and the -- all of those things.
24        Did you produce any medical records
25   in this case to us?

Page 114

Hansen v Elon Musk - Arbitration Day 1

1    A. I have not at this time, no.
2    Q. Okay. In addition, did you produce
3 any of the pay information that you got from the
4 Boomtown Casino or time?
5    A. Yes.
6    Q. That's your testimony, that you
7 produced that information to us?
8    A. I provided information on that to
9 counsel, all my earning statements and W-2s.
10    Q. Okay. Well, do you know whether that
11 information has been provided to us?
12    A. I don't know the answer to that. I
13 assume they -- I assume it was.
14    Q. Okay. Well, you had an expert
15 witness at one point in this case; correct?
16    A. Yes.
17    Q. Do you know whether the information
18 that was provided to your expert was actually
19 provided to us?
20    A. I don't know the answer to that.
21    Q. Well, you didn't in your testimony
22 point -- like, pull out, like, your pay stubs
23 from the Boomtown Casino and try to introduce
24 those into evidence, did you?

Page 115

Hansen v Elon Musk - Arbitration Day 1

1    A. No, I didn't.
2    Q. Okay. Nor did you put in your pay
3 stubs from The Row or any of the other places you
4 worked in order to establish what you had made
5 after you left USSA.
6        Isn't that right?
7    A. Mr. Robertson, I don't think that's
8 accurate. That information was provided to
9 counsel, provided to the prior expert, and -- for
10 them to conduct their analysis. Whether that was
11 produced here, I don't know.
12    Q. Well, that wasn't my question. You
13 just finished testifying, like this morning.
14        So my question was: Over the last
15 two and a half hours that you testified, did you
16 seek in your direct testimony that we just heard
17 to authenticate or put in the evidence of what
18 you actually earned from other employment after
19 January of 2019?
20    A. As entered and offered exhibits here,
21 no.
22    Q. Okay. And I want to go -- again, so
23 starting where we --
24        And you just looked at an e-mail that

Page 116

Hansen v Elon Musk - Arbitration Day 1

1 was from USSA after you left Tesla in September
2 of 2018, where there were other opportunities
3 offered to you.
4        Do you recall that?
5    A. Yes.
6    Q. And if we go to Exhibit 205 -- which
7 I believe is already in evidence -- there's a
8 reference to a number of opportunities, one with
9 UPS, one with Greyhound, and one with Walmart.
10        Do you recall those opportunities
11 being offered to you?
12    A. I believe they were in the e-mail. I
13 recall that.
14    Q. Do you have any idea what those
15 opportunities would have paid?
16    A. I believe my conversation with
17 Mr. Wiebke about the pay rates at those
18 facilities and the number of hours available was
19 less than what it was as Verdi.
20    Q. So your testimony -- and this is
21 important. You said the -- not just the pay
22 rate, but the number of hours that was available,
23 those are relevant factors, right, to the job
24 opportunities you might have?

Page 117

Hansen v Elon Musk - Arbitration Day 1

1    A. Yes, they would be relevant.
2    Q. So, for example, if you had an
3 opportunity that gave you an opportunity to make
4 more overtime, that would be relevant; right?
5    A. Potentially, yes.
6    Q. Okay. Mr. Hansen, you don't deny, do
7 you, that you removed information from Tesla by
8 using your Tesla e-mail and sending materials to
9 your personal Gmail account? Correct?
10    A. No, sir, I don't.
11    Q. In fact, among the things that you
12 sent to yourself from your Tesla e-mail to your
13 personal Gmail account were information such as
14 badging records; correct?
15    A. Yes, sir.
16    Q. Okay. And photographs from the
17 interior of the Tesla facility, you admit to
18 taking those; right?
19    A. Yes, sir.
20    Q. And you admit to taking video
21 surveillance footage, clips of that; correct?
22    A. Yes, sir.
23    Q. And in addition, license plate
24 information, for example, photographs of

Hansen v Elon Musk - Arbitration Day 1

1  individual license plates from the Tesla parking
2  lot?
3
4      A.  Yes, sir.
5      Q.  Did you also send to yourself things
6  like visitor logs, of who visited the
7  Gigafactory?
8      A.  Yes, sir, I did.
9      Q.  And you understood that that
10  information was proprietary to Tesla; right?
11      A.  I did, yes.
12      Q.  Okay.  And you knew that Tesla had
13  policies and procedures that prohibited removing
14  such proprietary information from the facility;
15  right?
16      A.  I did, unless otherwise directed.
17      MR. ROBERTSON:  I want to go to
18  Exhibit 1.  Joint Exhibit 1.  Anne is making sure
19  she has the tech right, and hopefully we can pull
20  this up.
21  BY MR. ROBERTSON:
22      Q.  Okay.  And, Mr. Hansen, I've put up
23  on the screen what's been marked Exhibit 1.  This
24  is a letter from a law firm Hueston Hennigan
25  dated September 4, 2018.

Hansen v Elon Musk - Arbitration Day 1

1
2      Do you see that?
3      A.  Yes, I do.
4      Q.  And it's to a Stuart Meissner.
5      Do you know who Mr. Meissner is?
6      A.  He's my SEC attorney.
7      Q.  Okay.  And did you review or see this
8  letter on or around September 4th when it was
9  sent to Mr. Meissner?
10      A.  I did.
11      Q.  Okay.  And if we go down to the
12  second paragraph, looking at No. 2 there, it
13  says:  On June 18, 2018, Mr. Hansen forwarded
14  numerous Tesla internal documents to his personal
15  Gmail account, including internal security
16  badging records which display the recorded dates
17  and times that named individuals access Tesla
18  facilities, documents from personnel files which
19  display employee picture identification, employee
20  ID numbers, and personal license plate numbers,
21  and photos of facility parking lots taken from
22  Tesla security cameras which include date and
23  time-stamped photographs of dozens of parked
24  cars.
25      Do you see that?

Hansen v Elon Musk - Arbitration Day 1

1
2      A.  I do see that, yes.
3      Q.  Did you send to yourself from your
4  Tesla e-mail to your personal Gmail account
5  information on June 18, 2018?
6      A.  I believe I did, yes.
7      Q.  Okay.  And if we go to Exhibit 92.
8      MR. ROBERTSON:  Oh, can I move to
9  introduce Exhibit 1?
10      MR. WOODFIELD:  No objection.
11      JUDGE HOFFMAN:  Exhibit 1 is in.
12      (Whereupon, Exhibit 1 was received.)
13  BY MR. ROBERTSON:
14      Q.  Let's go to 92, joint Exhibit 92.
15      Mr. Hansen, I have an e-mail here.
16  It appears to be an e-mail dated June 18th, at
17  3:52 p.m., if you look at the top.
18      A.  Yes, sir.
19      Q.  And the title is Copper Theft.  And
20  then it goes on from there.  If you go to the
21  second page.
22      So it looks to be attaching certain
23  badging records.  Do you see this?
24      A.  Yes, sir, I do.
25      Q.  Okay.  Is this an e-mail that you

Hansen v Elon Musk - Arbitration Day 1

1
2  sent from your Tesla account to your personal
3  Gmail account on June 18, 2018?
4      A.  Yes, it is.
5      Q.  And I think you testified earlier,
6  because you said that this material would be
7  available.  If someone did an investigation and
8  sought to find out what e-mails you had sent from
9  your Tesla account, would this be an example of
10  the type of e-mail that would -- that they would
11  discover?
12      A.  I would assume so, yes.
13      MR. ROBERTSON:  I would move
14  Exhibit 92 in.
15      MR. WOODFIELD:  No objection.
16      JUDGE HOFFMAN:  92 is in.
17      (Whereupon, Exhibit 92 was received.)
18  BY MR. ROBERTSON:
19      Q.  Let's go to 94.
20      Mr. Hansen, I've now put up on the
21  screen what's joint Exhibit 94.
22      Do you see this?
23      A.  I do, yes, sir.
24      Q.  And this is an e-mail.  It looks to
25  be from June 9th of 2018, and again, it's an

Hansen v Elon Musk - Arbitration Day 1

1     Hansen v Elon Musk - Arbitration Day 1
2  e-mail from your Tesla account to your personal
3  Gmail account; am I right?
4       A.  You are.  Yes, sir.
5       Q.  And am I correct that it's
6  attaching -- well, why don't you tell me, based
7  on what you can see here, if you have an
8  understanding of what types of information are
9  attached to this e-mail you sent to your personal
10 e-mail account?
11      A.  This was information related to the
12 investigation associated with Julio Alarcon, also
13 the incident for which two individuals were
14 arrested after being reported by Lynn Thompson.
15      So this is images.  Obviously I
16 believe these are vehicles accessing -- the time
17 they're accessing the facility to perpetrate
18 those crimes.
19      Q.  So, for example, if I count, there's
20 probably -- I can do the math, but there's well
21 over 20 photographs of the facility as well as
22 badging records and other information?
23      Is that a fair estimate?
24      A.  Yes.  Yes.
25      Q.  Let's go to 95 -- oh, I move 94 in.

1     Hansen v Elon Musk - Arbitration Day 1
2       MR. WOODFIELD:  No objection.
3       JUDGE HOFFMAN:  94 is in.
4       (Whereupon, Exhibit 94 was received.)
5  BY MR. ROBERTSON:
6       Q.  Let's go to 95.
7       Mr. Hansen, showing you what's been
8  marked joint Exhibit 95.  Looks to be additional
9  badging records that are being forwarded from you
10 to your personal e-mail account; is that correct?
11      A.  Yes, sir.
12      MR. ROBERTSON:  I'll move 95 in,
13 please.
14      MR. WOODFIELD:  No objection.
15      JUDGE HOFFMAN:  95 is in.
16      (Whereupon, Exhibit 95 was received.)
17      MR. ROBERTSON:  96.
18 BY MR. ROBERTSON:
19      Q.  Mr. Hansen, I've now put up on the
20 screen Exhibit 96, joint Exhibit 96.
21      This is an e-mail from your Tesla
22 account to your Gmail account on June 15, 2018,
23 and we looked at it.  It appears to have seven
24 attachments.  And on the first page there's
25 certain badging records and then it carries on to

1     Hansen v Elon Musk - Arbitration Day 1
2  the next page.
3       Is this, again, information, badging
4  record information that you sent from your Tesla
5  account to your Gmail account?
6       A.  Yes, sir.
7       MR. ROBERTSON:  I move that document
8  in.
9       MR. WOODFIELD:  No objection,
10 Your Honor.
11      JUDGE HOFFMAN:  96 is in.
12      (Whereupon, Exhibit 96 was received.)
13 BY MR. ROBERTSON:
14      Q.  Mr. Hansen, I've now put up on the
15 screen the joint Exhibit No. 96 [sic].  This
16 appears to be an e-mail from April 8, 2018 --
17 April 26 -- again, from your Tesla account, to
18 your personal Gmail account.
19      Is that accurate?
20      A.  Yes, sir.
21      Q.  And then there's a number of
22 attachments here, which appear to be various
23 photographs.  Are these, well, why don't you
24 explain.  What are these attachments?
25      And just specifically what are

1     Hansen v Elon Musk - Arbitration Day 1
2  they -- what are they documents of or photographs
3  of?
4       A.  They're screenshot images.  They
5  appear to be screenshot images obtained during
6  the course of an investigation.
7       Q.  And those screenshot images are from
8  the Tesla security cameras; correct?
9       A.  Yes, they are.
10      Q.  Okay.  So I just -- so the arbitrator
11 can understand, Tesla has a number of cameras
12 located around the Gigafactory facility; correct?
13      A.  Yes, they do.
14      Q.  Okay.  And those cameras capture
15 images of various aspects of the factory, and the
16 comings and goings of individuals coming to and
17 from the factory; is that fair?
18      A.  That is.  They do, and they can, yes.
19      Q.  And what you've done here is taken
20 clips from those video camera feeds, and that's
21 what you're sending from your Tesla account to
22 your personal account; is that correct?
23      A.  That is correct.  That appears to
24 be -- I can't tell whether they're -- I think
25 they're screenshots.  I don't know if they're

Hansen v Elon Musk - Arbitration Day 1

1   actual videos, but yes.
2
3       Q.  Okay.
4           MR. ROBERTSON:  Let's go to 100.  And
5   move 99, please.
6           MR. WOODFIELD:  No objection.
7           JUDGE HOFFMAN:  99 is in.
8           (Whereupon, Exhibit 99 was received.)
9   BY MR. ROBERTSON:
10      Q.  This is joint Exhibit 100,
11  Mr. Hansen.  This is now July 17, 2018.  And
12  again, from your Tesla account to your personal
13  account.
14          Do you see that?
15      A.  I do.  Yes, sir.
16      Q.  So as of July 17, 2018, your Tesla
17  account was still active; correct?
18      A.  I believe it was, yes.  Until shortly
19  thereafter.
20      Q.  So this is actually the day that you
21  started at USSA; correct?
22      A.  Based on -- I think it was the 17th,
23  yes.
24      Q.  And so here, if I'm correct, are you
25  forwarding to yourself, from your Tesla account

Hansen v Elon Musk - Arbitration Day 1

1   to your personal Gmail account, are these
2   visitors -- names of visitors to the Gigafactory
3   that visited on June 29th?
4       A.  Can you scroll down that document for
5   me, please?
6           [Document review.]
7       A.  If you could keep going.
8           [Document review.]
9           If you could go through -- keep
10  going, sir.
11          [Document review.]
12          MR. ROBERTSON:  Actually, Anne is in
13  control.
14          THE WITNESS:  Oh, okay, ma'am.
15  Sorry.
16          MR. ROBERTSON:  No problem.
17          MS. DUNNE:  No worries.
18          MR. ROBERTSON:  Gotta give respect
19  where respect is due.
20          THE WITNESS:  If you could keep going
21  through them, please, for me.
22      A.  Yes, these are tours.  Specifically
23  this was related to inquiries into lithium, and
24  vendors.  Ms. Carroll sent that to me, but yes.

Hansen v Elon Musk - Arbitration Day 1

1
2   BY MR. ROBERTSON:
3       Q.  Okay.  And again, this is something
4   that you sent from your Tesla e-mail to your
5   personal Gmail account; correct?
6       A.  Yes, sir.
7           MR. ROBERTSON:  I move that document
8   in, please.
9           JUDGE HOFFMAN:  There being no
10  objection, 100 is in.
11          MR. WOODFIELD:  There's no objection.
12          (Whereupon, Exhibit 100 was
13  received.)
14  BY MR. ROBERTSON:
15      Q.  So let's go back to what was joint
16  Exhibit 6.  It's already in evidence.
17          You were shown this document during
18  your direct testimony.
19          You recall that, Mr. Hansen?
20      A.  Yes, sir, I do.
21      Q.  And this is the press release that
22  your attorney issued on -- it appears to be
23  August 16, 2018; is that correct?
24      A.  Yes, sir.
25      Q.  So it wasn't just that you went to

Hansen v Elon Musk - Arbitration Day 1

1
2   the Securities and Exchange Commission and filed
3   the TCR.  You also put out a press release about
4   it through your attorney; isn't that correct?
5       A.  My attorney did the press release.
6   With my cooperation, yes.
7       Q.  Did you review the press release
8   before it was sent?
9       A.  I did, yes.
10      Q.  Okay.  Let's go to the second page.
11          And did you confirm that the
12  information in the press release was accurate?
13      A.  I did, yes.
14      Q.  The second paragraph, you talked
15  about this -- you know, your concerns about drug
16  cartel activity.
17          Do you recall that?
18      A.  Yes, sir.
19          MR. ROBERTSON:  Can we bring it up so
20  folks can see it, Anne, a little bit?  The second
21  paragraph that starts "Failed"?
22          I just want to make sure people can
23  read this.
24  BY MR. ROBERTSON:
25      Q.  So one of the allegations in this

Hansen v Elon Musk - Arbitration Day 1

1    press release is that Tesla:  Failed to disclose
2    a recent internal investigation by Tesla into a
3    May 24, 2018 written notification it received
4    from the U.S. Drug Enforcement
5    Administration/Storey County Sheriff's Office
6    Task Force, all caps, and then DEA in quotes.
7            Do you see that?
8        A.  I do.
9        Q.  Is there any such thing as the U.S.
10   Drug Enforcement Administration/Storey County
11   Sheriff's Office Task Force?
12       A.  There is a counterdrug task force.
13   And as you are probably aware, there are
14   multiagency counterdrug task forces comprised of
15   varying law enforcement agencies, particularly in
16   my experience and, as I was told by Mr. Gouthro
17   and Mr. Sprott upon receiving this document, that
18   this came from a member of the Storey County DEA
19   task force.
20       Q.  That wasn't my question.  So,
21   Mr. Hansen, I am happy to -- I want the testimony
22   to be as complete as possible.  But on
23   cross-examination, I'm going to ask you some
24   questions where I'm going to ask for a "yes" or

Hansen v Elon Musk - Arbitration Day 1

1    "no" answer.  And to the extent you can --
2    obviously if you need to explain, your lawyer can
3    do that on redirect as well.  But it's --
4            Anyway, are you aware of any
5    organization that is known as the U.S. Drug
6    Enforcement Administration/Storey County
7    Sheriff's Office Task Force?
8        A.  Not in those specific words --
9        Q.  Okay.
10       A.  -- no.
11       Q.  In fact, didn't you know that the tip
12   that came in was actually from an organization
13   called Secret Witness?
14       A.  I learned that long after this.
15       Q.  So what you're saying is you know
16   that now --
17       A.  Correct.
18       Q.  -- that, in fact, this tip didn't
19   come from any government organization, it came
20   from a nonprofit known as Secret Witness.
21       A.  I don't know about the corporate
22   status of Secret Witness.  My understanding is
23   that Secret Witness is a tip line that was set
24   up.  And my understanding of it, upon a later

Hansen v Elon Musk - Arbitration Day 1

1    finding out about it, was that that tip line went
2    into law enforcement, to Storey County Sheriff's
3    Department.  That's the way I interpreted the
4    information I received later.
5        Q.  Well, do you know whether in
6    connection with this anonymous tip -- and I
7    understand the tip was anonymous; right?
8        A.  I do now know that, yes.
9        Q.  Okay.  Do you know whether any member
10   of law enforcement did anything to investigate
11   or, quote, verify anything in that anonymous tip?
12       A.  I was told, when it was given to me
13   on more than one occasion, that the deputy, who
14   was purportedly a member of the DEA task force
15   for Storey County, had preliminarily validated
16   information in the tip.
17       Q.  You were told that by whom?
18       A.  I was told that by my supervisor,
19   Mr. Gouthro.
20       Q.  Did anyone else tell you that?
21       A.  Mr. Sprott later confirmed that, in
22   conversations with myself and Mr. Gouthro, on
23   numerous -- several of the briefings that I would
24   give them pertaining to these allegations.

Hansen v Elon Musk - Arbitration Day 1

1        Q.  That's what I understood --
2            Oh, sorry.
3        A.  So --
4        Q.  So is it now your testimony that both
5    Mr. Gouthro and Mr. Sprott, at Tesla, confirmed
6    to you that this anonymous tip had been verified
7    by the U.S. Drug Enforcement Administration?
8        A.  No, that's not what I testified to.
9        Q.  Okay.
10       A.  I stated that Mr. Gouthro and
11   Mr. Sprott both had told me that the information
12   had been preliminarily validated by Deputy -- I
13   believe it was Mendoza, who was a task force
14   member of the Storey County DEA task force.
15       Q.  So preliminarily validated.  That's
16   what you were told by another Tesla employee.
17       A.  That's correct.  My supervisor,
18   that's correct.
19       Q.  And other than that, hearing that
20   from these two people, did you do anything on
21   your own to determine whether in fact the
22   United States Drug Enforcement Administration had
23   actually done anything in connection with this
24   anonymous tip through Secret Witness?

Hansen v Elon Musk - Arbitration Day 1

1       Hansen v Elon Musk - Arbitration Day 1
2       A.  My attorney spoke with DEA directly.
3  And I'm not going to get into those discussions I
4  had with him, but he did have a conversation with
5  the DEA.  And as -- if you know federal law
6  enforcement, they will confirm or deny the very
7  existence of these types of investigations, and
8  that was the answer that he received.
9       Q.  So the answer is no to my specific
10 question?  My specific question is, did you ever
11 get any confirmation from anybody specific to the
12 fact that whether the department -- U.S.
13 Department of -- or U.S. Drug Enforcement
14 Administration actually did anything in
15 connection with this anonymous tip?
16      A.  No, I didn't.
17      Q.  Okay.  But that's what you put in a
18 press release that was issued at the time that
19 you submitted the claim with the SEC; correct?
20      A.  Yes, sir.
21      Q.  Similarly, if we go to the first page
22 in this press release.
23           So the first bullet says:  Failed to
24 disclose thefts of copper and other raw materials
25 through Tesla's Gigafactory valued at over

1       Hansen v Elon Musk - Arbitration Day 1
2  $37 million which occurred between January and
3  June 2018.
4       Do you see that?
5       A.  I do see that, yes, sir.
6       Q.  Do you have any evidence, document,
7  or written evidence of any thefts that occurred
8  during the period January through June 2018 other
9  than the $13,000 attempted theft that
10 Mr. Thompson raised when the two folks were
11 arrested?
12      A.  The evidence is in the records.  Yes,
13 there is evidence of that.
14           Do I have it?  No longer.  I don't
15 have that.
16      Q.  Okay.  Were you personally involved
17 investigating any specific theft of copper other
18 than the Lynn Thompson?
19      A.  I -- yes.  Yes.
20      Q.  Do you have any quantification that
21 you can give me of how much copper we're talking
22 about, how much was involved, in the things that
23 you actually personally investigated?
24      A.  I don't know.  I can't give an
25 estimate to that.  I don't know what ever

1       Hansen v Elon Musk - Arbitration Day 1
2  happened to those investigations, but there were
3  a significant number of them.
4       Q.  Well, do you remember when you were
5  deposed in this case?
6       A.  Yes, I do.
7       Q.  And your testimony was given under
8  oath; correct?
9       A.  I do.
10      Q.  Do you recall whether in your
11 deposition you were able to quantify any specific
12 copper thefts beyond the $13,000 at issue in the
13 Lynn Thompson matter?
14      A.  I don't recall specifically.
15      Q.  Okay.
16      A.  Probably not.  What was your
17 question?  Specifically?
18      Q.  I think you answered the question.  I
19 think I'm fine.
20      A.  Okay.  Thank you.
21      Q.  So, Mr. Hansen, you'll agree with
22 me -- I think you testified to this on direct --
23 that you were not willing after August 3rd to
24 meet with Tesla investigators beyond that one
25 meeting with Mr. -- and I think we all pronounce

1       Hansen v Elon Musk - Arbitration Day 1
2  it differently -- Gecewich from Tesla Human
3  Resources.  Is that correct?
4       A.  Yes.
5       Q.  And there were requests made to you
6  to cooperate in the investigation; correct?
7       A.  There was the initial request by
8  Mr. Gecewich.
9       Q.  And again, you -- other than that
10 initial meeting, beyond that you refused to
11 cooperate; is that fair?
12      A.  That is fair, yes.
13           MR. ROBERTSON:  Actually, Your Honor,
14 this might be a good point.  I think we're close
15 enough, if everyone agrees.  About four minutes
16 shy of 12:30.
17           JUDGE HOFFMAN:  Okay.  That's fine.
18           MR. ROBERTSON:  And I'll organize a
19 little bit.  It will make it smoother when we
20 start up again.
21           JUDGE HOFFMAN:  Okay, good.  Well,
22 let's go ahead and take a break from now until
23 the top of the hour, which is about 30 minutes.
24           MR. ROBERTSON:  Your Honor, may I
25 make a quick request?

Page 138

Hansen v Elon Musk - Arbitration Day 1

1    Hansen v Elon Musk - Arbitration Day 1
2         JUDGE HOFFMAN:  Sure.
3         MR. ROBERTSON:  Since Mr. Hansen is
4    in the midst of his cross, can I ask for a
5    direction that he not confer with his counsel?
6         JUDGE HOFFMAN:  About any pending
7    questions?
8         MR. ROBERTSON:  Well, I just -- it's
9    up to you.  Typically when someone is in the
10   middle of cross, we have requested that they not
11   have the opportunity to --
12        I guess about any of the prior
13   testimony.  I mean, obviously anything we haven't
14   asked him about.
15        JUDGE HOFFMAN:  Mr. Woodfield, do you
16   have any objection to that instruction?
17        MR. WOODFIELD:  No, not at all.
18        JUDGE HOFFMAN:  Okay.  Mr. Hansen,
19   don't discuss your testimony with anyone.
20        MR. ROBERTSON:  And we'll
21   obviously -- we'll obviously abide by that with
22   our witnesses as well.
23        JUDGE HOFFMAN:  Okay.
24        All right.  Thank you very much.
25   We'll see you in about a half hour.

Page 139

1    Hansen v Elon Musk - Arbitration Day 1
2         MR. ROBERTSON:  Thank you.
3         THE WITNESS:  Thank you.
4         (Recess taken, 12:28 p.m. to
5    1:03 p.m. PDT)
6         JUDGE HOFFMAN:  Let's continue with
7    cross-examination of Mr. Hansen by Mr. Robertson
8    and we're on the record.
9         MR. ROBERTSON:  Thank you.  Let's go
10   to joint Exhibit 126, which I believe is already
11   in the record.
12   BY MR. ROBERTSON:
13        Q.  So, Mr. Hansen, during your direct
14   testimony, you were shown the offer letter from
15   Tesla dated February 26, 2018.
16        Do you see that?
17        A.  Yes, sir.
18        Q.  And do you recall when you actually
19   applied for the position?
20        A.  I don't.
21        Q.  Okay.  Sometime before February of
22   2018?
23        A.  Yes, sir.
24        Q.  And on the very first page, it says
25   your rate of pay will be $16.50 per hour.

Page 140

1    Hansen v Elon Musk - Arbitration Day 1
2         Do you see that?
3         A.  Yes, sir.
4         Q.  You had mentioned that you were
5    working for the federal government in southern
6    California and making over $100,000 in annual
7    salary; correct?
8         A.  Yes, sir.
9         Q.  And isn't it true that in addition to
10   that, you had retirement contributions?
11        A.  I have disability pay.
12        Q.  Okay.  So even more than $100,000 you
13   were being paid when you were working with the
14   government; correct?
15        A.  Yes, sir.
16        Q.  Okay.  And yet, I think you testified
17   to this, you took this job at $16.50 an hour as
18   part of your move to Reno; is that fair?
19        A.  Yes, sir.
20        Q.  Isn't it a fair statement,
21   Mr. Hansen, that this job was always a short-term
22   job?
23        A.  I don't think that's a fair
24   statement, no.
25        Q.  Okay.  That's fine, Mr. Hansen.

Page 141

1    Hansen v Elon Musk - Arbitration Day 1
2         Let's go to the second page.
3         Let me do follow-up on that.
4         During the time that you went up to
5    Reno, did you ever look for any federal
6    government employment?
7         A.  Yes, sir, I did.
8         Q.  So during this period you were
9    actually looking for other employment potentially
10   with the federal government; correct?
11        A.  Yes, sir, I was.
12        Q.  Okay.  And you understand that -- as
13   a former government employee myself, that more
14   likely than not, when you leave a certain step,
15   the hope is you can go back in at that step;
16   correct?
17        A.  Yes, sir, I'd agree with that.
18        Q.  If we look at the next page, the
19   first nonindented paragraph starts:  The company
20   is excited.
21        Do you see that?
22        A.  Yes, sir.
23        Q.  And you agree that the document
24   states that:  Your employment with the company is
25   for no specified time period and constitutes

Hansen v Elon Musk - Arbitration Day 1

1  at-will employment; right?
2
3      A.  Yes, sir.
4      Q.  And you understood that.  You
5  understood that your employment with Tesla
6  beginning in -- when you started in
7  February-March of 2018 was at will; correct?
8      A.  Yes, sir, I did.
9      Q.  And likewise, you could leave at any
10 time as well?
11     A.  Yes, sir.
12         MR. ROBERTSON:  And if we go down,
13 Anne.
14 BY MR. ROBERTSON:
15     Q.  In the second-to-the-last paragraph
16 there at the bottom, states:  As a Tesla
17 employee, you will be expected to abide by all
18 Tesla policies and procedures, and as a condition
19 of your employment, you will sign and comply with
20 Tesla's standard confidentiality agreement which
21 prohibits unauthorized use or disclosure of Tesla
22 confidential information or the confidential
23 information of Tesla clients.
24         Do you see that?
25     A.  Yes, sir.

Hansen v Elon Musk - Arbitration Day 1

1      Q.  And you understood that agreeing to
2
3  these confidentiality provisions was part of the
4  agreement that you had with Tesla when you became
5  employed by them; correct?
6      A.  Yes, sir.
7      Q.  Did you also understand that to the
8  extent you left Tesla, you had an obligation to
9  return any Tesla materials that you had -- that
10 you had in your possession?
11     A.  Not at that time, I did not realize
12 that.
13     Q.  Thank you.  Do you realize that now?
14     A.  On seeing these documents and
15 throughout the course of discovery, and during
16 our deposition, you had asked that question, I
17 believe.  But yes, I understand that.
18     Q.  Okay.  So whether you knew it then or
19 now, you do understand that part of the
20 obligation you had was to return any Tesla
21 materials that you had upon your separation from
22 Tesla; correct?
23     A.  Yes.
24     Q.  And you did not do that; is that
25 correct?

Hansen v Elon Musk - Arbitration Day 1

1      A.  I did not.
2
3      Q.  Can we go to pull up joint
4  Exhibit 131?
5          Mr. Hansen, I'm pulling up an e-mail.
6  It's been identified as joint Exhibit 131.  It's
7  an e-mail from May of 2018, between Marshall
8  Sprott and Jeff Jones.
9      A.  I see it, yes, sir.
10     Q.  Okay.
11         MR. ROBERTSON:  And, Nick, I'd move
12 this in.
13         MR. WOODFIELD:  No objection.
14         JUDGE HOFFMAN:  131 is in.
15         (Whereupon, Exhibit 131 was
16 received.)
17         MR. ROBERTSON:  Thank you,
18 Your Honor.
19 BY MR. ROBERTSON:
20     Q.  And the subject line is "Officer
21 Justifications."
22         Do you see that?
23     A.  Yes, I do.
24     Q.  And there's a list of people --
25         MR. ROBERTSON:  If we start at the

Hansen v Elon Musk - Arbitration Day 1

1  bottom.  Anne, if you can scroll down to the
2
3  bottom of this e-mail.
4          Actually, go to the bottom of the
5  first page.  Yeah, right there.  Perfect.  That
6  should get everybody.
7  BY MR. ROBERTSON:
8      Q.  There's a list of people that starts
9  with Amber Dobbins, then there is a Bruce Huddler
10 and then it goes on.
11         Do you see that?
12     A.  Yes, sir.
13     Q.  Okay.  Let's talk for a second about
14 Bruce Huddler.
15         Did you know who Mr. Huddler was?
16     A.  Yes, I do.
17     Q.  And it says here, he's law
18 enforcement, Army, Navy and SWAT veteran with
19 over 30 years of security, law enforcement, huge
20 asset to the team.
21         Do you see that?
22     A.  Yes.
23     Q.  And was he in the security side of
24 the business, if you will?
25     A.  He was in the operational physical

Page 146

Hansen v Elon Musk - Arbitration Day 1

1    security side, yes.
2
3        Q.  Yes.  So he was essentially in the
4    same general group that you were in; is that
5    fair?
6        A.  Yes.
7        Q.  And was he a supervisor?
8        A.  I don't recall, honestly.
9        Q.  Okay.  Would you agree with me that
10   he had more experience than you?
11       A.  He did have years in before me, yes.
12       Q.  Okay.  Let's go to the next -- down
13   on the next page.  There's someone named
14   Kevin Swindle.
15           Do you see that?
16       A.  Yes.
17       Q.  Do you know who Mr. Swindle was?
18       A.  Yes, I did.
19       Q.  And it says:  Navy Master of Arms,
20   military law enforcement background and casinos,
21   and then to us.  An incredible performer with
22   ambitions to match.
23           Do you see that?
24       A.  I do, yes, sir.
25       Q.  To the extent you knew Mr. Swindle,

Page 147

Hansen v Elon Musk - Arbitration Day 1

1    is that an accurate description of him?
2
3        A.  It absolutely is.  Mr. Swindle is a
4    stand-up guy.
5        Q.  Okay.  Likewise, if we look at
6    Marcus Rogers, it says:  Very hard-working
7    officer that previously worked security.
8        A.  I don't know who he is.
9        Q.  So two down from Mr. Swindle, do you
10   see Mr. Rogers?
11       A.  Yes, I see him.
12       Q.  And did you know who Marcus Rogers
13   was at that time?
14       A.  I don't recall that name at all,
15   actually.
16       Q.  It talks about him currently working
17   on several major projects for security.
18           Do you have any understanding of what
19   those projects might have been?
20       A.  No, I don't.
21       Q.  And then Rahul Sidher, S-I-D-H-E-R.
22           Do you know who that was?
23       A.  Yes.
24       Q.  This is my No. 1 officer.
25           Do you see that?

Page 148

Hansen v Elon Musk - Arbitration Day 1

1
2        A.  Yes.
3        Q.  And won officer of the month for
4    March.
5            And it says:  Currently working with
6    me on an Officer Training Program and Officer
7    Field Manual.
8            Do you see that?
9        A.  I do, yes.
10       Q.  And were you aware that Mr. Sidher
11   was working with Mr. Sprott on those things at
12   this time?
13       A.  I was aware that he was working with
14   Mr. Sprott on those things, specifically an SOP.
15       Q.  So would you agree with me that this
16   group of folks in the security group is a pretty
17   talented group?
18       A.  I would, yes.
19       Q.  And that it was competitive within
20   the group to -- for promotions or to be
21   successful within the group?
22       A.  I would, yes.
23       Q.  And would you agree with me that the
24   fact that you may have been, you know, moved over
25   to USSA, could have just simply been that there

Page 149

Hansen v Elon Musk - Arbitration Day 1

1
2    was -- there were others that were more talented
3    than you, with more experience?
4        A.  Can you restate your question,
5    please.
6        Q.  Sure.
7            I'm just saying, is it possible that
8    the reason that -- when the RIF came along, that
9    the reason you were put on the list for the RIF
10   was simply because there were more talented
11   people that Mr. Sprott decided he would rather
12   keep than you?
13       A.  I would disagree with that.
14       Q.  So you thought you were more talented
15   than all of these people?
16       A.  That wasn't my answer, no.
17       Q.  Okay.
18       A.  I was working --
19       Q.  Okay.
20       A.  I'm sorry.  I was working in
21   investigations at that time.
22       Q.  But that wasn't the position you were
23   offered at U.S. Security; correct?
24       A.  In May -- this e-mail during May, I
25   had transitioned over, and it said Mr. Hansen was

Hansen v Elon Musk - Arbitration Day 1

1  working under Sean as an investigations officer.
2  So those other folks were not part of the
3  investigations team.
4      Q.  So why are you even on this list?
5      A.  I can't answer that.
6      Q.  Let's go to 130.
7          Actually, no.
8          Let me just ask you, Mr. Hansen:  Do
9  you know who Ivan Garcia Flores was?  No exhibit,
10 just do you know who that was in that June of '18
11 time frame?
12     A.  Ivan Garcia Flores.  I don't recall.
13 I mean, I think there might have been an officer
14 named Flores in security, but I don't -- that
15 name doesn't really ring a bell.
16     Q.  What about James Null?
17     A.  James Null.  That name -- yes.  Yes,
18 I remember James Null.
19     Q.  And do you -- were you part of any
20 discussions with either Mr. Flores or Mr. Null --
21 were discussed as potentially not being part of
22 the RIF?
23     A.  I can't recall.
24     Q.  Do you know whether they ended up

Hansen v Elon Musk - Arbitration Day 1

1  being part of the RIF?
2      A.  No, sir, I do not know.
3      Q.  Yeah, let's go to 181.
4          So, Mr. Hansen, showing you 181,
5  which is an e-mail from Mr. German to Mr. Jones,
6  at the top, and then below that is an e-mail,
7  looks like from Mr. Gouthro.
8      A.  If you could keep scrolling down a
9  little bit, please.  I don't see Mr. Gouthro's
10 header there.
11         MR. ROBERTSON:  Yeah, pull up,
12 actually, Anne.
13         THE WITNESS:  Oh, okay.
14         MR. ROBERTSON:  Go up.
15 BY MR. ROBERTSON:
16     Q.  Do you see right there?
17     A.  I see it now.
18     Q.  Okay.  So, the e-mail to Matt, I
19 assume that's Matt German, says:  There's 17
20 names are internals we would like to see come on
21 board with your organization.
22         Do you see that?
23     A.  Yes, sir, I do.
24     Q.  And their pay rates are listed?

Hansen v Elon Musk - Arbitration Day 1

1      A.  Yes, sir.
2      Q.  And it says:  Please match if
3  possible.
4          Do you see that?
5          And so is it your recollection that
6  there were roughly 17 people that were part of
7  this RIF along with you?  That were internal?
8      A.  That is a number that I recall, yes.
9      Q.  Okay.
10         MR. ROBERTSON:  Move 181 in.
11         MR. WOODFIELD:  No objection.
12         JUDGE HOFFMAN:  181 is in.
13         (Whereupon, Exhibit 181 was
14 received.)
15 BY MR. ROBERTSON:
16     Q.  Mr. Hansen, you did, in fact, apply
17 for a position with U.S. Security; correct?
18     A.  Yes, I did.
19         MR. ROBERTSON:  Let's go to
20 Exhibit 22.
21         So this is already in.
22         JUDGE HOFFMAN:  Are you saying 22?
23         MR. ROBERTSON:  22, two-two.
24         JUDGE HOFFMAN:  Yes, I have 22 in.

Hansen v Elon Musk - Arbitration Day 1

1  BY MR. ROBERTSON:
2      Q.  So, Mr. Hansen, do you recall in your
3  direct testimony, you were asked questions about
4  the agreement that you signed with -- the
5  agreement you signed in connection with taking
6  the position at USSA?
7      A.  Yes, sir.
8      Q.  Okay.  And looking at Exhibit 22 --
9          MR. ROBERTSON:  If we go to the
10 signature page, I just want to confirm that's his
11 signature.  Let's go up a little bit.
12 BY MR. ROBERTSON:
13     Q.  Is that on that page there,
14 Mr. Hansen, is that your signature?
15     A.  It is, yes, sir.
16     Q.  And does that reflect that the date
17 that you signed this was July 17, 2018?
18     A.  Yes, it does.
19     Q.  Okay.  If we go to the first page.
20 There's -- on the left side, there's a paragraph
21 that states, Policy.
22         Do you see that?
23     A.  Yes, I do.
24     Q.  Okay.

Page 154

Hansen v Elon Musk - Arbitration Day 1

1        Hansen v Elon Musk - Arbitration Day 1
2        A.  Thank you.  That's better.
3        Q.  Yeah.  And it states:  Even though
4   the supplier is my employer, I agree to comply
5   with both the supplier and Tesla's rules of
6   conduct.  And then it goes through a list of
7   policies.
8            Do you see that?
9        A.  I do, yes.
10       Q.  Okay.  And did you understand that
11  by -- even though you were working at USSA, by
12  being positioned back at Tesla, that you were
13  agreeing to abide not only by USSA's policies but
14  also to Tesla's policies.
15       A.  I did, yes.
16       Q.  Okay.  And you understood that one of
17  those policies is reflected in the next
18  paragraph, paragraph 2 here, was policies related
19  to Tesla's information.
20       A.  Yes, sir.
21       Q.  Then, if we go to paragraph 9.
22       Paragraph 9, Mr. Hansen, do you see
23  there where it says Contractor Relationship?  It
24  says:  I understand and agree that nothing in
25  this agreement shall confer any right with

Page 155

Hansen v Elon Musk - Arbitration Day 1

1        Hansen v Elon Musk - Arbitration Day 1
2   respect to continuation of contractor
3   relationship, nor shall it interfere in any way
4   with my right or Tesla's right to end my
5   contractor relationship at any time with or
6   without cause.
7            Do you see that?
8        A.  Yes, sir, I do.
9        Q.  And you understood that that was a
10  term of the agreement that you signed at the time
11  that you moved to USSA in July of 2018; correct?
12       A.  Yes, sir.
13       Q.  Let's to go 14.6.
14       And then, looking at paragraph 14.6,
15  that states:  This agreement is the final,
16  complete, and exclusive agreement of the parties
17  with respect to the subject matter hereof, and
18  supersedes and merges all prior or
19  contemporaneous discussions or agreements between
20  us regarding such subject matter.
21            Do you see that?
22       A.  I see that, yes.
23       Q.  It also says:  No modification or
24  amendment to this agreement nor any waiver of any
25  rights under this agreement will be effective

Page 156

Hansen v Elon Musk - Arbitration Day 1

1        Hansen v Elon Musk - Arbitration Day 1
2   unless in writing and signed by the party to be
3   charged.
4            Do you see that?
5        A.  Yes, sir, I do.
6        Q.  Okay.  So you understand -- did you
7   understand, when you signed this agreement, that
8   any prior discussions you'd had, verbally or
9   otherwise with anyone at Tesla or USSA, were
10  superseded at this agreement?
11       A.  Yeah, at the time I signed it, I
12  probably was not aware of that.
13       Q.  Okay.
14       A.  But I'm aware of it now.
15       Q.  You understand it now; correct?
16       A.  I do, yes, sir.
17       Q.  Okay.  So to the extent that you had
18  any discussions about a salaried position or a
19  particular investigator position, you understood
20  that accepting a role as a security guard through
21  USSA with this agreement, that that essentially
22  took place of -- replaced any of those prior
23  discussions?
24       A.  I see what it says.  I read it.  I
25  acknowledged that's what it stated.  At that time

Page 157

Hansen v Elon Musk - Arbitration Day 1

1        Hansen v Elon Musk - Arbitration Day 1
2   I did not.
3        Q.  Okay.  But before you signed this,
4   did you ask anybody about it?
5        A.  No.  At that point what was done was
6   done.
7        Q.  Mr. Hansen, I'm going to direct you
8   to Exhibit 121.  This is an exhibit that you were
9   shown in your direct testimony.
10       A.  Yes, sir.
11       Q.  And you testified, I think on
12  multiple occasions during your direct testimony,
13  that your salary or your wage at USSA was $27 an
14  hour.
15       That was your testimony; right?
16       A.  Yeah, it became 27 an hour, if I
17  recall correctly.
18       Q.  Well, I think that's important.
19  That's why I want to focus on this.
20       What was your actual salary when you
21  started at USSA?
22       A.  I can't recall specifically the
23  timing of that.
24       Q.  Do you know what it was on
25  September 4th, when you were asked to no longer

Hansen v Elon Musk - Arbitration Day 1

1    be stationed at the Tesla facility?
2        A.  I believe I was still at the 27 an
3    hour rate.
4        Q.  Okay.  And that's -- sitting here
5    today, that's your recollection?
6        A.  I said I believe it was, yes.  I
7    believe that's --
8        Q.  I'm sorry.  I don't want to
9    interrupt.
10           But did you go back and look at your
11   pay records before your testimony today?
12       A.  No. I did not.
13       Q.  Okay.  And again, you started at USSA
14   on July 17th; correct?
15       A.  Yes.
16       Q.  Okay.  These texts that we're looking
17   at here -- well, actually, they run certain
18   dates.
19           MR. ROBERTSON:  So let's go to
20   KH 0861.  So at the top.
21   BY MR. ROBERTSON:
22       Q.  So this looks to be a text string
23   that starts around July 11th of 2018.
24           Am I reading that right, Mr. Hansen?

Hansen v Elon Musk - Arbitration Day 1

1        A.  Yes, sir.
2        Q.  Okay.  So -- and this is before you'd
3    agreed to start at USSA?
4            Right?
5        A.  I'm not sure I understand the
6    question.
7        Q.  Just July 11th is before July 17th.
8        A.  Oh, it is, yes.  Yes.
9        Q.  Okay.  My point is, until you started
10   work on July 17th, you had the option to not take
11   the job at USSA and go look for another job;
12   right?
13       A.  You're absolutely right, yes.
14       Q.  Right.  And you elected --
15   understanding what the job would be and
16   understanding what you would do, you decided you
17   still wanted to work at USSA starting on
18   July 17th.
19       A.  Yes, sir, I did.
20       Q.  Okay.  And now go to the next page.
21           It looks to be a text here.  It says:
22   I'm clarifying with Rick.  I want you as the
23   swing sup until you can land an investigator
24   role.  It says:  I got shut down.  I don't know

Hansen v Elon Musk - Arbitration Day 1

1    what the specifics are, but I can offer you an
2    officer role at 19.80.  I truly hate doing this
3    and don't understand why, but I have my orders.
4            Do you see that?
5        A.  I do, yes, sir.
6        Q.  Okay.  And, in fact, isn't it true
7    that the job you took was an officer role at
8    $19.80 an hour when you started at USSA on
9    July 17, 2018?
10       A.  I do not recall specifically, but
11   seeing that 19.80 does reflect my memory, yes.  I
12   do believe that at that point, I was making that
13   money.
14       Q.  Okay.  And that's my point.  So you'd
15   had discussions about other potential jobs, other
16   potential pay?
17       A.  Yes, sir.
18       Q.  Maybe a supervisor, maybe other
19   things, but ultimately you were told by
20   Matt German on July 11th, six days before you
21   started, that the job you were actually being
22   offered was as an officer role at $19.80 an hour;
23   correct?
24       A.  Yes, sir.

Hansen v Elon Musk - Arbitration Day 1

1        Q.  And that's the job you took?
2        A.  It is.
3        Q.  Okay.  All right.  Mr. Hansen, I'm
4    going to direct your attention to Exhibit 33.
5    And I'm just going to apologize.  I mean, it's
6    your text, but there's some language in there.  I
7    think we can all handle it, but...
8            So, Mr. Hansen, this is a document
9    that's been identified as Exhibit 33.
10       A.  Sure.
11       Q.  It appears to be a text from June 8th
12   at 7:30 p.m.
13       A.  Yes, sir.
14       Q.  Can you just tell me who this text is
15   with?
16       A.  That was my then roommate, ultimately
17   became my roommate, Missy Wells, Melissa Wells.
18       Q.  Did you refer to Missy Wells at one
19   point as your common-law wife?
20       A.  I did, yes.
21       Q.  Okay.  But the wife you mentioned
22   earlier with the five kids, is that Missy or --
23       A.  That's somebody else.  It's my wife.
24   My original wife.

Hansen v Elon Musk - Arbitration Day 1

1    Q.  Okay.  So this seems to be
2  referencing some conversation you had with
3  Mr. Gouthro?
4    A.  It is, yes.
5    Q.  Okay.  And do you have any idea where
6  Mr. Gouthro obtained the information that you are
7  conveying then to Ms. Wells here?
8    A.  Mr. Gouthro indicated that
9  information came from his contact on the Storey
10  County DEA Task Force and, in fact, his
11  meetings, according to Mr. Gouthro, with his law
12  enforcement contacts he had.  So that's where
13  this came from.
14    Q.  Do you have any idea who these law
15  enforcement contacts were?
16    A.  I know -- I believe I said what is
17  Mendoza or Mendez, if I recall correctly, was the
18  name of the particular officer.  I know that on
19  5-24 of '18 -- actually, no, that's the only one
20  I know is Mendoza.
21    Q.  And it mentions in here:  Here's the
22  damn deal.  And it says:  We will be discussing
23  witness protection as a real possibility.
24    A.  Yeah, I --

Hansen v Elon Musk - Arbitration Day 1

1    Q.  Witness protection for who?
2    A.  That wasn't really clear by
3  Mr. Gouthro.  Because during the time that that
4  e-mail came out, he had had discussions that
5  indicated that he had an FBI contact, and
6  somebody with the senate -- a Nevada senator
7  staff coming -- meeting with law enforcement and
8  Tesla legal and HR.  And it was never clear with
9  respect to witness protection, what or who he was
10  talking about.  I don't know if that was
11  potential witnesses.  I didn't know all of the
12  information that he actually had at that time.
13    Q.  And that's my question, Mr. Hansen.
14  If you were the one that was doing this
15  investigation, if you were the one that was the
16  person tasked with doing this investigation, why
17  wouldn't you have gone to these meetings with law
18  enforcement with Mr. Gouthro?
19    A.  Because I was denied after he set
20  these meetings up.  To my knowledge, they never
21  occurred.  And after the first one was cancelled,
22  there was supposed to be one on 5-24 of '18.  And
23  then again on 6-5 of 2018, Mr. Gouthro had
24  previously -- this is June 8th, but prior to

Hansen v Elon Musk - Arbitration Day 1

1  that, he had set up these meetings, he said.
2    And after not seeing them come to
3  fruition, my requests to meet with law
4  enforcement to clarify that, number one, the
5  information in that tip, and additional
6  information pertaining to Mr. Suarez, Salas here,
7  were important steps, I thought.  But I was told
8  I would not participate, I would not talk to
9  anybody in law enforcement, I would not contact
10  Storey County myself.
11    Q.  And so you never actually met with --
12  during this time frame, June of 2018, did you
13  ever meet with anyone from the Drug Enforcement
14  Administration or agency?
15    A.  No, sir, I did not.
16    Q.  Okay.
17    And again, so other than what you
18  were hearing from Mr. Gouthro, did you have any
19  other independent knowledge of any federal or
20  state investigation into the specific allegations
21  of that anonymous tip that you were looking into?
22    A.  Yes.
23    Q.  From whom?
24    A.  Knowledge and information released by

Hansen v Elon Musk - Arbitration Day 1

1  the U.S. Attorney's Office regarding the
2  indictment of 20 members of the drug task
3  force -- or of a DTO.
4    Q.  And so it's your testimony that
5  the -- this announcement by the U.S. Attorney of
6  those individuals and the same individuals that
7  you were looking at?
8    A.  That these individuals -- the
9  individuals named in the tip -- because the tip
10  did contain identifying information, names,
11  contact information, as well as Western Union
12  information, allegedly regarding payments for
13  shipments of methamphetamine and cocaine.
14    So social media ties, I began to see
15  through open source information, these
16  individuals and their associates had ties to
17  several of these players that were indicted in
18  June of 2018 and subsequently arrested.  And four
19  of them -- I correct my previous testimony,
20  because four of them, to include the leader of
21  this DTO, had been an employee at the
22  Gigafactory.
23    Q.  Okay.  That's what you -- that's --
24  that was what you were looking at and that's what

Hansen v Elon Musk - Arbitration Day 1

1  Hansen v Elon Musk - Arbitration Day 1
2  you concluded was -- it was in fact the same
3  people that this anonymous tip was identifying
4  that were the people that were indicted.
5       A.  No, the -- there -- the
6  distinguishing difference is that several of
7  these people had ties and communicated on
8  different social media platforms and whatnot with
9  the people named in the tip as well as some of
10 those that were in the indictment.
11      Q.  And so I really want to make sure I
12 have the right answer here.
13          Can you or can you not confirm
14 whether anyone that's actually been indicted by
15 the U.S. Attorney's Office in Nevada are these
16 people identified in this anonymous tip?
17      A.  No.  Not directly, no.
18      Q.  Thank you.  Let's go to Exhibit 63.
19          JUDGE HOFFMAN:  Did I hear
20 Exhibit 33?
21          MR. ROBERTSON:  No, Your Honor, 63.
22 63.
23          JUDGE HOFFMAN:  No, but did you --
24          MR. ROBERTSON:  Yes, can I move 33
25 in, please.

1  Hansen v Elon Musk - Arbitration Day 1
2          JUDGE HOFFMAN:  Any objection?
3          MR. WOODFIELD:  No, Your Honor.
4          JUDGE HOFFMAN:  33 is in.
5          (Whereupon, Exhibit 33 was received.)
6          JUDGE HOFFMAN:  Now we're on to 63?
7          MR. ROBERTSON:  Yeah, now we're on
8  63, Your Honor.
9          JUDGE HOFFMAN:  Yeah.  Let me catch
10 up.
11          MR. ROBERTSON:  Yeah, sorry.
12 BY MR. ROBERTSON:
13      Q.  Mr. Hansen, I've put before you
14 what's been identified as Exhibit 63.
15      A.  Yes, sir.
16      Q.  Do you recognize what this document
17 is?
18      A.  It appears to be a screenshot of an
19 e-mail.  Or of a "sent" box of e-mails.
20      Q.  So is this -- I'll represent it goes
21 on for how many pages?
22      A.  58 pages.
23      Q.  Did you actually print out basically
24 a summary of your entire "sent" box for the
25 period -- and we can do this -- for the period --

1  Hansen v Elon Musk - Arbitration Day 1
2  what appears to be -- if we look at the first
3  one, it's March 8th.
4          MR. ROBERTSON:  And then now, Anne,
5  let's go to the last page.
6       Q.  I'm sorry, it's March 5th, at the
7  bottom.
8          Do you see that?
9       A.  I see 3-5 of '18, yes.
10      Q.  And then let's go to the last page.
11 And it looks like it runs through July 17th;
12 right?
13      A.  It does, yes.
14      Q.  So is that basically the period that
15 you worked as an employee of Tesla, from
16 March 5th of '18 through July 17th of '18?
17      A.  It appears that's accurate, yes.
18      Q.  And did you print out a log of your
19 "sent" folder?
20      A.  I believe I did.  I think that's what
21 we're looking at here.
22      Q.  And then you took that home?
23      A.  No, I can't recall when -- I believe
24 I did that after September 4th, in preparation of
25 materials.

1  Hansen v Elon Musk - Arbitration Day 1
2       Q.  So is this a printout of your Tesla
3  e-mail or is this a printout of your Gmail?
4       A.  That would be my Tesla e-mail.
5       Q.  Right.
6       A.  And I believe I did that -- I believe
7  they were screenshots from the cell phone that I
8  had at the time that had those Tesla apps on it
9  that we were required to use.
10      Q.  So basically you printed out this
11 document which reflects your "sent" folder from
12 your Tesla company e-mail for the period that you
13 were employed at Tesla.
14      A.  Yes.
15      Q.  So this would reflect the e-mails
16 that were sent from your Tesla e-mail to whomever
17 during the period that you were employed;
18 correct?
19      A.  It would, yes.
20      Q.  Okay.
21          So, for example, if we look at the
22 last page, which I think we're on.  Do you see
23 there's a reference here to Missy Wells?
24      A.  Yes, I do.
25      Q.  Okay.  And so this would reflect that

Hansen v Elon Musk - Arbitration Day 1

1  you sent an e-mail from your Tesla e-mail account
2  to, in this case, Ms. Wells?
3  A.  Yes.
4      MR. ROBERTSON:  Okay.  And can we go
5  to 3380.
6  Q.  And so, for example, here there's
7  another e-mail to Ms. Wells.  It looks to be on
8  June 19, 2018?
9  A.  Yes.
10  Q.  And it just says:  Forward:  Attached
11  Image.
12      Do you see that?
13  A.  I do, yes, sir.
14  Q.  So in addition to sending e-mails
15  from your Tesla account to your personal e-mail,
16  did you also send e-mails from your Tesla account
17  to Ms. Wells's personal e-mail?
18  A.  I did, yes.
19  Q.  And did those e-mails contain some of
20  the same information we talked about,
21  photographs, badging records, those kinds of
22  things?
23  A.  Yes, sir.
24  Q.  I want to go to 3382.

Hansen v Elon Musk - Arbitration Day 1

1      In the middle do you see this,
2  Mr. Hansen, it says mgerman@ussecurityassociates.
3  It says Resumé?
4  A.  Yes, sir.
5  Q.  And this is at June 21st of '18;
6  correct?
7  A.  Yes, sir, it is.
8  Q.  So is that when you -- if you can
9  remember, is that when you first sent your resume
10  to Mr. German?
11  A.  I believe it is.  I believe 6-21 is
12  the date that I also did the online application.
13  Q.  Okay.
14      MR. ROBERTSON:  Just give me one sec.
15  Sorry.
16      THE WITNESS:  No worry.
17  BY MR. ROBERTSON:
18  Q.  Let's go to 176.
19      MR. ROBERTSON:  Move to admit 63.
20      MR. WOODFIELD:  No objection.
21      JUDGE HOFFMAN:  All right.  63 is in.
22      (Whereupon, Exhibit 63 was received.)
23      JUDGE HOFFMAN:  Did you say we're
24  going to 176?

Hansen v Elon Musk - Arbitration Day 1

1      MR. ROBERTSON:  Yes.
2      JUDGE HOFFMAN:  Okay.  Thanks.
3  BY MR. ROBERTSON:
4  Q.  So, Mr. Hansen, I've put on the
5  screen joint Exhibit 176.  It's an e-mail from
6  Mr. Gicinto to yourself dated July 22, 2018.
7      Do you see that?
8  A.  Yes, sir, I do.
9  Q.  And I think you testified to this on
10  your direct.  You had a conversation with
11  Mr. Gicinto around this time?
12  A.  Yes, I did.
13  Q.  And if you look at the No. 1.
14  A.  Yes.
15  Q.  It states that:  He clarified that my
16  team previously reached out to U.S. Securities
17  for a contracting role on our team to fill an
18  immediate need.  This was not an FTE role, and
19  ultimately the role never materialized.  We did
20  not take on a U.S. Securities contractor to
21  support investigations.
22      Do you see that?
23  A.  Yes, I do.
24  Q.  And isn't that true, that Tesla ended

Hansen v Elon Musk - Arbitration Day 1

1  up not taking on a U.S. Securities contractor to
2  support investigations?
3  A.  To my knowledge, that never did
4  happen.
5  Q.  Okay.  And then the next point, he
6  says:  Well, my team does have FT slots now
7  available.  Those roles have scaled back from
8  what was originally identified and are highly
9  selective.  We are not preferring any candidates,
10  despite what others may have speculated about,
11  and are actively working with recruiters to
12  source candidates for us, and anyone is free to
13  apply to the job posting on the website.
14      Do you see that?
15  A.  Yes, I do.
16  Q.  And do you recall having that
17  discussion with Mr. Gicinto?
18  A.  Yes.
19  Q.  Okay.  In fact, you did apply for the
20  position back at Tesla; right?
21  A.  I applied for a position on -- I
22  believe it was July 11th, yes.
23  Q.  That's my point.  So after you had
24  sent your resume to Mr. German and after you had

Hansen v Elon Musk - Arbitration Day 1

1  applied for the position at USSA, you then also
2  applied for a position back at Tesla; correct?
3
4      A.  I did, yes.
5      Q.  Okay.  So in essence, you had applied
6  to two jobs.
7          One at USSA and one back at Tesla;
8  correct?
9      A.  Yes.
10     Q.  Okay.  And ultimately, you accepted
11 the job at USSA and you were not offered the job
12 at Tesla; correct?
13     A.  That is correct, yes.
14     Q.  And do you have any understanding of
15 who else applied for the position that you
16 applied for?
17     A.  I have no idea.
18     Q.  Right.  And you don't know how
19 qualified they were; is that right?
20     A.  No, I don't.
21     Q.  Do you know whether the position to
22 be investigator in Mr. Gicinto's group required a
23 college degree?
24     A.  The one that was referred to, that we
25 are talking about, that you and I previously

Hansen v Elon Musk - Arbitration Day 1

1  discussed, it did state that, yes, it did require
2  a college degree, and it was more directed
3  towards the forensic side of, you know, that type
4  of work.
5      Q.  Okay.  And you understand that Tesla
6  uses recruiters; right?
7      A.  Yes, I do.
8      Q.  And by recruiter, you understand by
9  that I mean they use -- they have basically
10 people in HR that screen applications before
11 they're sent along to the people posting to the
12 job; right?
13     A.  Yes, sir.
14     Q.  And do you have any knowledge of
15 whether your application was or was not accepted
16 or rejected by the recruiters?
17     A.  I have no knowledge either way.
18     Q.  Okay.  And if a recruiter looked at
19 your resumé and decided you weren't qualified, do
20 you have any basis to think that any recruiter
21 had any knowledge of the investigations you were
22 conducting?
23     A.  I can't answer that question.
24     Q.  That's fine.  Thank you.
25

Hansen v Elon Musk - Arbitration Day 1

1          So let's go to 71.
2      MR. ROBERTSON:  In fact, did I move
3  that document in?
4      MR. WOODFIELD:  I believe you did.
5      MR. ROBERTSON:  Okay.
6      71, I believe, is already in.
7      MR. WOODFIELD:  Yes.
8  BY MR. ROBERTSON:
9      Q.  And so, Mr. Hansen, pointing you to
10 what has been identified as Exhibit 71, this is
11 the e-mail that you sent to Mr. Nocon on July 11,
12 2018.
13         Do you recall your testimony about
14 this?
15     A.  I do, yes.
16     Q.  And in this e-mail, which is
17 July 11th of 2018, you note that -- in the first
18 paragraph, you say:  Although the scope of that
19 work had not been specifically defined at that
20 time, preliminary figures were discussed along
21 with a scope of work consistent with the position
22 posted today.
23         Do you see that?
24     A.  In the -- I'm reading --

Hansen v Elon Musk - Arbitration Day 1

1      Q.  In the second --
2      A.  In the first --
3      Q.  That's fine.
4      A.  I do see that, yes.
5      Q.  All right.  And so, again, while some
6  preliminary scope of work and potential pay had
7  been discussed, nothing was ever put in writing;
8  correct?
9      A.  That's correct, nothing was in
10 writing.
11     Q.  Okay.  In fact, the only job with
12 USSA that you took that was in writing was the
13 one you applied for for the security guard
14 position; correct?
15     A.  That's correct.
16     Q.  And then at the bottom of this
17 e-mail, you state in the last full paragraph:  I
18 have applied for the position by the Tesla
19 internal website and attached my resumé as
20 prompted.
21         So, in fact, as of July 11, 2018, you
22 had also applied for that job back at Tesla;
23 correct?
24     A.  That's correct, yes.

1        Hansen v Elon Musk - Arbitration Day 1
2        Q.  And you understood that the job that
3  now -- well, I'll scratch that.  That's fine.
4        MR. ROBERTSON:  Hang on.  We're just
5  looking for a document, please.
6        If you can go to 150.
7  BY MR. ROBERTSON:
8        Q.  So we're going to go to Exhibit 150.
9        A.  Okay.
10       Q.  Mr. Hansen, we've put up on the
11 screen Exhibit 150 --
12       A.  I see it.
13       Q.  -- which is the Tesla, Inc. Master
14 Services Agreement.
15       Do you see that?
16       A.  Yes, I do.
17       MR. ROBERTSON:  And, Nick, I'll go
18 ahead and move this in.
19       MR. WOODFIELD:  No objection.
20       JUDGE HOFFMAN:  150 is in.
21       (Whereupon, Exhibit 150 was
22 received.)
23 BY MR. ROBERTSON:
24       Q.  And did you understand, Mr. Hansen,
25 that in addition to your agreements with USSA and

1        Hansen v Elon Musk - Arbitration Day 1
2  Tesla, that there was also an agreement between
3  Tesla and USSA that governed the whole
4  outsourcing arrangement of their security
5  personnel?
6        A.  I was aware there was a contract.
7  That's all I knew.
8        Q.  Okay.  You knew there was --
9  notwithstanding the agreements you signed, you
10 knew, independent of that, there was an agreement
11 between Tesla and USSA; right?
12       A.  Yes.  Absolutely.
13       Q.  At the time did you know any of the
14 specific terms of whatever agreement was between
15 Tesla and USSA?
16       A.  No, I had no knowledge of that.
17       Q.  Did you have any knowledge of how --
18 what USSA would have to do in order to have
19 anybody approved for any particular position?
20       A.  I don't.
21       Q.  For example, you mentioned
22 supervisor.  And we saw the texts regarding you
23 being potentially a supervisor.
24       Do you recall that?
25       A.  I do.

1        Hansen v Elon Musk - Arbitration Day 1
2        Q.  Do you know what USSA had to do in
3  order for any particular person to be approved as
4  a supervisor?
5        A.  I don't know.
6        Q.  And had you -- but did you know that
7  someone who was a supervisor was more expensive
8  to Tesla than someone who was not a supervisor?
9        A.  Yes, I'm -- I'm generally familiar
10 that, you know, pay raise with contract security
11 worked that way.
12       Q.  Right.  So you knew to the extent
13 that USSA was supplying someone in a different
14 role, it may cost Tesla more money?
15       A.  Yes, that's accurate.  I agree with
16 that.
17       Q.  Okay.  Do you know whether Tesla ever
18 paid USSA for you to be a supervisor?
19       A.  I have no knowledge of any of the
20 bill rate versus pay rate, anything related to
21 that, sir.
22       Q.  And that's my question.  So to the
23 extent that whatever arrangement you had with
24 USSA and what you might have been paid during the
25 time you were at USSA, you don't know what Tesla

1        Hansen v Elon Musk - Arbitration Day 1
2  actually paid for you?
3        A.  That's accurate, I don't know.
4        Q.  Do you know of any specific USSA
5  individual that you worked with at the time you
6  were there that was a supervisor?
7        A.  Yes.  Yes.
8        Q.  Who?
9        A.  Rick McLellan, Ryan Leslie.  Those
10 are the two that come to my mind, right now.
11 Rick McLellan and Ryan Leslie.  I don't recall
12 the others, if there were --
13       Q.  Was Rick McLellan already employed by
14 USSA by the time you got there?
15       A.  My understanding he was, yes.
16       Q.  And same with Ryan Leslie?
17       A.  I don't know the answer to that.
18       Q.  But Rick McLellan, you knew, was
19 already at USSA working with Tesla at the time
20 you came over?
21       A.  I don't know specifically.  I do know
22 that Rick had been employed by USSA prior to
23 being assigned his management role at that site.
24 I understood from him that he was employed in
25 their business operations office in Reno, but

Hansen v Elon Musk - Arbitration Day 1

1    that is the extent of my knowledge.  I hope
2    that --
3       Q.  Okay.  So you don't know whether
4    Mr. McLellan was being paid as a supervisor by
5    Tesla through the USSA contract?
6       A.  No, sir, I don't.
7       Q.  Okay.  And you understood that Tesla
8    had the right under its agreement to determine
9    whether it would pay somebody to be in any
10   particular role; right?
11      A.  I've never read the agreement, so I
12   don't know the --
13      Q.  Okay.
14          So whatever the agreement says, then
15   it's whatever the agreement says?
16      A.  Yeah.
17      Q.  Is that fair?
18      A.  Fair enough.  I would agree.
19      Q.  Okay.
20          MR. ROBERTSON:  Actually, Your Honor,
21   is this a good time?  I know we've been going
22   since -- I have the wrong time.
23          JUDGE HOFFMAN:  I couldn't hear you.
24   Are you saying you want to take a break?

Hansen v Elon Musk - Arbitration Day 1

1          MR. ROBERTSON:  No, no, I was just
2    looking at my clock, and since I'm on East Coast
3    time, I'm very different than you all.  So I
4    think we started -- yeah, no, we're fine.  I was
5    just trying to make sure to be cognizant of
6    everyone.
7          So hang on one second.
8          Why don't you mention and then I can
9    tell you where I --
10         JUDGE HOFFMAN:  We've been going for
11   about an hour.
12         MR. WOODFIELD:  Your Honor, I would
13   appreciate a five-minute bio break.
14         MR. ROBERTSON:  Yeah, that's fine.
15         JUDGE HOFFMAN:  Okay.  Let's do that.
16   Let's take five minutes.
17         MR. ROBERTSON:  Perfect.  Thank you.
18         MR. WOODFIELD:  Thank you.
19         (Recess taken, 2:03 p.m. to
20   2:11 p.m. PDT)
21         JUDGE HOFFMAN:  We're ready whenever
22   you are, Mr. Robertson.
23         MR. ROBERTSON:  Excellent.
24             *  *  *

Hansen v Elon Musk - Arbitration Day 1

1    BY MR. ROBERTSON:
2       Q.  So let's go actually to 49 first.
3          So, Mr. Hansen, I've put up on the
4    screen Exhibit 49.
5       A.  Yes, sir, I see it.
6       Q.  And is this the anonymous tip that
7    came in?
8       A.  Yes, sir.
9       Q.  Okay.  And again, is the handwriting
10   at the top yours?
11      A.  It is, yes, sir.
12      Q.  And it says -- in your handwriting,
13   it says:  Initial handwriting from LE/DEA.
14          What's LE?
15      A.  Law enforcement.
16      Q.  And I assume you wrote all of this on
17   this document after you received it?
18      A.  Yes, sir.
19      Q.  Do you know how much after?
20      A.  I did that in preparation to
21   documents presented to counsel.
22      Q.  Okay.  So after the litigation was
23   started?
24      A.  Yes, sir.

Hansen v Elon Musk - Arbitration Day 1

1       Q.  Okay.  Do you see on the left it says
2    Routing?
3       A.  I do see that, yes.
4       Q.  It says:  Routing Storey County and
5    DEA?
6       A.  Yes.
7       Q.  Do you have any understanding of why,
8    if this was already something that was with the
9    DEA or Storey County, it would be routed to them?
10      A.  I have no idea.
11      Q.  Okay.  Did you ever ask anybody?
12      A.  No, I didn't.
13      Q.  And again, other than your
14   discussions with Mr. Gouthro, did you do anything
15   further to understand where this anonymous tip
16   came from?
17      A.  Other than the attempts I made and my
18   discussions with -- to talk to law enforcement
19   and with Mr. Gouthro, no.
20      Q.  Sitting here today, do you have any
21   idea who submitted this?
22      A.  I have no clue, no, sir.
23      Q.  That was not something your
24   investigation was ever able to uncover?

Page 186

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2        A.  It was not.
 3        Q.  And other than looking at Facebook
 4   and social media posts, did you ever do any
 5   other -- did you utilize any other resources in
 6   conducting this investigation?
 7        A.  Open source resources that I just
 8   talked about, in addition to attempting to
 9   interview people who had knowledge, potential
10   knowledge of the drug trafficking operations
11   inside and around Reno, Nevada.
12        Q.  Oh, so even outside of Tesla, were
13   you doing -- like actually talking to people,
14   just -- (crosstalk)
15        A.  Yes.  Yes, I did.  Yes.
16        Q.  Do know whether a criminal background
17   check was ever run on any of these folks?
18        A.  I don't know if one was done.
19        Q.  So you do know, though, that at some
20   point Mr. Gicinto and Mr. Nocon became involved
21   in this investigation; correct?
22        A.  I don't know what their involvement
23   was.  They stated that they took a look at the
24   information.
25        Q.  Right.  And when you say they took a
```

Page 187

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2   look, do you know whether they ran a formal
 3   criminal background check on these people?
 4        A.  I don't know.
 5        Q.  Have you in any of your law
 6   enforcement experience or government experience
 7   ever run a criminal background check on someone?
 8        A.  I have, yes.
 9        Q.  So you understand what that would
10   turn up?
11        A.  I do.
12        Q.  Okay.  And to the extent that a
13   background check was run on these folks, criminal
14   background check and it didn't turn anything up,
15   would that be something that's relevant to
16   whether the allegations had merit?
17        A.  Are you asking my opinion on that?
18        Q.  Well, you are an investigator and you
19   said you were tasked with investigating this.
20   I'm trying to understand to the extent that you
21   personally did not run a criminal background
22   check --
23        A.  Mm-hmm.
24        Q.  -- is that something that, if it had
25   been done, may or may not have provided credence
```

Page 188

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2   or lack thereof to this anonymous tip?
 3        A.  It may have given -- no, I don't
 4   think -- I don't think it's something -- the
 5   lack -- the absence of a criminal background or
 6   the presence of a criminal background -- I should
 7   say it could have -- potentially, if there was a
 8   criminal background run on these individuals and
 9   there was negative information or derogatory
10   information, particularly related to criminal
11   activity such as drug trafficking or what have
12   you, then that could lead to credence of
13   supporting the allegations.  But there -- at the
14   same time, the absence of that information also,
15   I don't think that just stops an investigation
16   dead in the water, based on, you know, the extent
17   of allegations in a particular matter.
18        Q.  All right.  So even if someone had
19   gone and done a criminal background check and it
20   came back negative, there was nothing negative in
21   it, for purposes of you being the investigator,
22   that would not have satisfied you.  You would
23   think more needed to be done?
24        A.  Yes.
25        Q.  And, in fact, isn't it true that at
```

Page 189

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2   some point you were told by Mr. Gouthro and
 3   Mr. Sprott to stand down in your investigation?
 4        A.  I'm not sure specifically what
 5   investigation you're talking about.
 6        Q.  Are there any other investigations
 7   that you were conducting where either Mr. Sprott
 8   or Mr. Gouthro told you to stop?
 9        A.  Mr. Gouthro, during a communication I
10   had with him regarding theft, particularly
11   Lynn Thompson information and evidence,
12   Mr. Gouthro was confused in thinking that I was
13   at the time interviewing outside -- using outside
14   sources or talking to outside sources, and I
15   wasn't.  Those were internal employees and
16   witnesses to those matters.  And Mr. Gouthro had
17   sent me a text to the effect of let's hold off
18   until we talk to Nick Gicinto.
19        So that -- to answer your question,
20   yes, that's what I can recall right now.
21        Q.  Actually, isn't it true -- you
22   mentioned Mr. Halladay.  So Mr. Halladay had
23   taken some time off, you said?
24        A.  That's correct.
25        Q.  And Mr. Halladay came back, didn't
```

Hansen v Elon Musk - Arbitration Day 1

1  he?
2      A.  He did.
3      Q.  And wasn't it then that he took over
4  that investigation of the copper thefts involving
5  Mr. Thompson?
6      A.  I'm not aware of that.
7      Q.  Okay.  So you're not aware that
8  Mr. Halladay was the one responsible, once he
9  returned, for taking over that investigation?
10     A.  I don't have any knowledge of that.
11  I continued that investigation during my tenure
12  right up until being notified that I was no
13  longer going to work in investigations.
14     Q.  Right.  I understand you continued to
15  do the investigation.  But do you know whether or
16  not in fact management had instructed
17  Mr. Halladay to continue and finish the
18  investigation and not you?
19     A.  I don't have any knowledge of that,
20  but it was also important to realize that several
21  investigators oftentimes, particularly
22  Mr. Halladay, did overlap on investigations that
23  he or Gouthro had delegated to other
24  investigators.  So that was common.

Hansen v Elon Musk - Arbitration Day 1

1      Q.  I want to understand your testimony.
2  You're saying you never heard about it, but if
3  you heard about it, that would have been normal?
4          MR. WOODFIELD:  Objection.  I'm not
5  sure I understand that.
6          MR. ROBERTSON:  I'm just -- I'll
7  withdraw the question.
8  BY MR. ROBERTSON:
9      Q.  All I'm trying to understand,
10  Mr. Hansen, is do you recall at any point in time
11  either Mr. Sprott or Mr. Gouthro coming to you
12  and explaining that now that Kris Halladay was
13  back, that he would take over the copper
14  investigation involving Mr. Thompson and not you?
15     A.  No, that conversation never happened.
16     Q.  Okay.  And so you're not aware of
17  any -- well, do you recall any communication from
18  either Mr. Sprott or Mr. Gouthro saying that you
19  were upsetting people in other parts of the
20  factory with some of the questions you were
21  asking in your investigations?
22     A.  I do, and I believe you're
23  specifically referring to a trip I made to a
24  warehouse pertaining to lithium shipments, trying

Hansen v Elon Musk - Arbitration Day 1

1  to identify information related to lithium coming
2  out of Central and South America.  So I do recall
3  that, yes.
4      Q.  Okay.  And you recall it being
5  reported back that there were people that were
6  upset about the fact that you had been there and
7  asking questions?
8      A.  I do, yes.
9      Q.  I'm going to go to 23.  Oh, I've got
10  to move 49 in.
11         MR. ROBERTSON:  So move 49.
12         JUDGE HOFFMAN:  There being no
13  objection, 49 is in.
14         (Whereupon, Exhibit 49 was received.)
15         MR. ROBERTSON:  Thank you,
16  Your Honor.
17  BY MR. ROBERTSON:
18     Q.  So, Mr. Hansen, I've put up on the
19  screen what's been marked as joint Exhibit 23.
20         It's an e-mail dated August 1st, from
21  yourself to a Linette Lopez.
22         Do you see that?
23     A.  I do, yes, sir.
24     Q.  And your blind-copying Ms. Wells?

Hansen v Elon Musk - Arbitration Day 1

1      A.  I did, yes.
2      Q.  Okay.  And this is August 1st;
3  correct?
4      A.  It is, yes.
5      Q.  Okay.  And so this is before you had
6  sent the e-mail that you referenced in your
7  direct testimony to Mr. Musk and others; correct?
8      A.  It is, yes.
9      Q.  And who is Ms. Lopez?
10     A.  She's a journalist.
11     Q.  With Business Insider?
12     A.  Yes, sir.
13     Q.  And in your direct testimony, you
14  mentioned Martin Tripp.  Do you remember that?
15     A.  I do.
16     Q.  Okay.  And Martin Tripp was somebody
17  who had been sued by Tesla; correct?
18     A.  He was, yes.
19     Q.  And he was sued by Tesla because he
20  had removed confidential information; correct?
21     A.  So Tesla alleged.
22     Q.  Well, it's more than alleged.  You
23  understand what ended up happening in the Tripp
24  case; correct?

Hansen v Elon Musk - Arbitration Day 1

1    A.  I do, I understand the Tripp case,
2  yes.
3    Q.  Okay.  And one of the things that
4  Mr. Tripp had to admit ultimately was that he had
5  taken confidential information from Tesla; right?
6    A.  I don't know any of the specifics.
7    Q.  Well, do you know he ended up paying
8  money to Tesla to resolve the case?
9    A.  I was aware that that was part of the
10  outcome of the case, but yes, I'm aware of that.
11    Q.  That what was part of the outcome of
12  the case?  That he ended up having to pay money
13  to Tesla; correct?
14    A.  I believe that was reported in the
15  media, correct.
16    Q.  Okay.  And, in fact, when you sent
17  this e-mail to Ms. Lopez, you knew at this point,
18  as of August 1st, that Ms. Lopez had been in
19  communication with Martin Tripp; right?
20    A.  I had learned that, yes.
21    Q.  Okay.  And is that why you reached
22  out to her, because you knew that she'd already
23  been in communication with Mr. Tripp?
24    A.  I reached out to her because I was

Hansen v Elon Musk - Arbitration Day 1

1  represented by counsel at that time, and
2  Mr. Meissner had been talking to several media
3  resources.  But primarily, yes, I knew that she
4  had been in contact with Mr. Tripp.
5    Q.  Okay.  And notwithstanding that, you
6  were -- so your -- is it your testimony -- I
7  don't want to know any discussion, but had you
8  actually retained counsel by August 1st of 2018?
9    A.  I had retained counsel in July of
10  2018.
11    Q.  July of 2018.  Okay.
12    So why, as of August 1st, are you
13  sending this versus this coming from your
14  attorney?
15    A.  I think it explains what I was
16  looking to do.  I was looking to obtain some
17  additional information, if possible.
18    Q.  Did you tell -- I guess I can't ask
19  that.
20    Okay.  But at this point you were
21  represented by counsel.
22    A.  That's correct, yes, sir.
23    Q.  And if we go down the document, to
24  the last paragraph -- yeah, right there.  The

Hansen v Elon Musk - Arbitration Day 1

1  last line of the last full paragraph says:  An
2  investigation that was predicated on a -- what I
3  was told was a validated report provided to Tesla
4  by law enforcement, members of local LE and those
5  assigned to a federal task force.
6    Q.  Do you see that?
7    A.  I do, yes.
8    Q.  And again, was the only source of
9  what you were told Mr. Gouthro?
10    A.  I'm sorry, with respect to that -- to
11  the tip?
12    Q.  Yeah, you say:  The investigation
13  that was predicated on a -- what I was told was a
14  validated report provided to Tesla by law
15  enforcement.
16    What I'm trying to understand is when
17  you told Ms. Lopez, a member of the press, that
18  the report was validated, about your
19  investigation, and you say you were told that,
20  was the sole source of what you were told
21  Mr. Gouthro?
22    A.  Yes.
23    Q.  Okay.  You did nothing to yourself
24  validate anything with regard to -- or to confirm

Hansen v Elon Musk - Arbitration Day 1

1  whether or not before the tip came in it was
2  actually validated in any way by law enforcement?
3    A.  I think I've already testified that I
4  did, I made attempts to do that, and I obtained
5  information -- and outside of ties via social
6  media that you had mentioned, I had made attempts
7  to do that.
8    Q.  Right, you made attempts, but you
9  actually personally have not been able to
10  validate any of it; correct?
11    A.  No.  At that point, no, I hadn't.
12    Q.  Okay.  And if we go to the middle
13  paragraph.  It starts, Additionally.
14    A.  Okay.
15    Q.  It says:  300,000 to 500,000 worth
16  that was stolen in approximately 2.5 months, and
17  had been being reported, in all caps.
18    Q.  Do you see that?
19    A.  I see that, yes.
20    Q.  What did you mean there?  I mean,
21  where are you coming up with 300,000 to $500,000
22  worth was stolen in approximately 2.5 months?
23    A.  That information came from
24  Superintendent Thompson, references his estimates

Hansen v Elon Musk - Arbitration Day 1
1    over that time period, it lists initially during
2    one of our preliminary conversations.
3        Q.  So, again, your sole source for
4    making that statement to a member of the press
5    was what Mr. Thompson told you?
6        A.  No.  My sole source was not also
7    that.  You have to remember, Elon Musk himself
8    reported 37 to -- upwards of $100 million of
9    scrap, raw materials, that included copper, being
10   otherwise stolen, compromised, on June 5th,
11   between January and June of 2018.
12       So, no, it's not just sole piece of
13   my investigation, and information was not just
14   Lynn Thompson.
15       Q.  But that's what I'm trying to
16   understand, Mr. Hansen.  You keep saying my
17   investigation, my investigation.
18       You were told by Lynn Thompson there
19   was this 300 to $500,000 number.
20       Did you have any specific evidence
21   that you personally reviewed that would support
22   that number beyond what Mr. Thompson told you?
23       A.  No, I didn't.  But when those numbers
24   were briefed to Mr. Sprott and Mr. Gouthro, they

Hansen v Elon Musk - Arbitration Day 1
1    too indicated that it was likely in excess of
2    millions based on the investigations that had
3    been being conducted, even --
4        Q.  That's not my --
5        Sorry, I'll let you finish.
6        That's not my question.  My question
7    is very specific.  You wrote to a member of the
8    press -- and we'll get to what you attached.  You
9    made a specific reference, not to millions of
10   dollars, to 300 to $500,000 in 2.5 months.
11       And my question is, was there any
12   basis for that statement to a member of the press
13   other than what you heard from Mr. Thompson?
14       A.  You broke up on me, sir,
15   Mr. Robertson.  Could you please repeat that?
16       Q.  Sure.
17       I'm talking about a very specific
18   number in here.  300,000 to 500,000 worth in
19   2.5 months.  Not millions, not 37 million.
20   Nothing.  A very specific number in here that you
21   reported to a member of the press.  And I just
22   want to understand, that number, the sole source
23   for that number is Mr. Thompson.  It was not any
24   independent investigation and verification that

Hansen v Elon Musk - Arbitration Day 1
1    you personally did.
2        A.  That's accurate.  Mr. Thompson --
3    sure.
4        Q.  Thank you.
5        A.  You're welcome.
6        Q.  Thank you.
7        You have no knowledge of whether any
8    of these issues, this purported theft, whether
9    any of it found its way into Tesla's financial
10   statements; right?
11       A.  I don't at this time, no.
12       Q.  Well, it's more than that; right?  I
13   think when you were deposed, I asked you
14   specifically:  Where did this concern over thefts
15   come from?  And I think you acknowledged it came
16   from an audit that was done and possibly the CFO
17   of the company; correct?
18       A.  That's accurate, yes, sir.  That's
19   part of it.
20       Q.  So if the CFO, in an audit, flagged
21   this, on what possible basis do you believe that
22   it wouldn't have been something that was known by
23   accounting and included and factored into the
24   financial statements?

Hansen v Elon Musk - Arbitration Day 1
1        A.  Based on the financial statements
2    released to the public, my counsel indicated that
3    none of this was reported during that time, in
4    any of your disclosures or quarterly disclosures.
5    That's the extent of my knowledge.
6        MR. WOODFIELD:  Objection,
7    Your Honor.  I think there's --
8        MR. ROBERTSON:  I think -- wait a
9    minute, Nick.  Wait, wait.
10       MR. WOODFIELD:  -- the witness.
11       MR. ROBERTSON:  Wait.
12       MR. WOODFIELD:  Hold on.
13       Your Honor, I would like to -- you
14   know, at a point, if the witness is not
15   responsive, I think the answer is to ask you to
16   direct the witness, but just talking over the
17   witness and redirecting him is not the answer.  I
18   mean, the problem is -- and I've been generous on
19   this -- but it's not just cutting the witness off
20   and chastising him and telling him to do certain
21   things.
22       I think the answer here is that if
23   the witness is unresponsive, the request is to
24   you; but there's getting to be a certain amount

Page 202

Hansen v Elon Musk - Arbitration Day 1

1  of just cutting the witness off and redirecting
2  him.
3
4         JUDGE HOFFMAN:  Okay.  I understand.
5  I guess I want to go back to the beginning, that
6  Mr. Hansen, you need to listen carefully to the
7  questions that are asked and you need to answer
8  them.
9         And I think we can solve that matter.
10  If there's an objection to the question, then
11  lodge that objection, and maybe we need to
12  tighten up our examination here a little bit to
13  the point.
14         MR. ROBERTSON:  Sure.
15         Yeah, I think I had a different
16  issue, Your Honor.  So I thought I asked a very
17  specific question, which was:  How do you know
18  whether any of this would be reflected in the
19  company's financial statements?  I think that's a
20  fair question.  My concern was he started to talk
21  about what his lawyer told him.
22         I was just going to move to strike
23  it, because I think, you know, I -- I don't
24  think -- I don't think he wants to open this up
25  as to what his lawyer told him about -- you know,

Page 203

Hansen v Elon Musk - Arbitration Day 1

1  a lawyer that's not his current lawyer -- about
2  what was or was not.  And so I -- you know, that
3  was where I was going, but...
4
5         JUDGE HOFFMAN:  I think you're
6  absolutely right.
7         I don't think, Mr. Hansen, that you
8  want to go too far down that line of saying you
9  did it because your counsel told you to do it.
10  If you know the answer to the question, say it.
11  And if you don't know the answer, say you don't.
12         THE WITNESS:  Understood.
13         JUDGE HOFFMAN:  Okay.
14         MR. ROBERTSON:  And so I'll rephrase
15  and see if we can do this this way.
16  BY MR. ROBERTSON:
17     Q.  Mr. Hansen, sitting here today, do
18  you have any knowledge of any specific line item
19  in any Tesla financial statement that was
20  misstated because of copper thefts?
21     A.  No.
22     Q.  Okay.  And do you have any knowledge
23  of Tesla's accounting system period?
24     A.  No, I did not.
25         MR. ROBERTSON:  If we go to the next

Page 204

Hansen v Elon Musk - Arbitration Day 1

1  page, Anne.
2
3  BY MR. ROBERTSON:
4     Q.  So, Mr. Hansen, I'm now looking at
5  the second page of this e-mail that you sent to
6  Ms. Lopez.  Am I seeing here that you've attached
7  photographs?
8     A.  Yes, sir, I did.
9     Q.  Are these photographs from the Tesla
10  premises?
11     A.  Yes, they are.
12     Q.  And you forwarded those to Ms. Lopez
13  as a member of the press; correct?
14     A.  Yes, I did.
15     Q.  Okay.  One of the other things you
16  had mentioned in, I believe, the e-mail to
17  Mr. Musk on August 3rd and others was bid
18  rigging.
19         Do you recall that?
20     A.  I do, yes.
21     Q.  Did you personally have any knowledge
22  of any specific bid or contract that was rigged
23  or fraudulent during the time you were at Tesla?
24     A.  No, I did not.
25         MR. ROBERTSON:  I want to go back to

Page 205

Hansen v Elon Musk - Arbitration Day 1

1  Exhibit 27.
2
3         Different point, I promise,
4  everybody.
5         Can I move to admit 23?
6         MR. WOODFIELD:  No objection.
7         JUDGE HOFFMAN:  23 is in.
8         MR. ROBERTSON:  Thank you.
9         (Whereupon, Exhibit 23 was received.)
10         MR. ROBERTSON:  27.
11  BY MR. ROBERTSON:
12     Q.  So, Mr. Hansen, I'm directing you
13  back to Exhibit 27.  This was the exchange you
14  had with Mr. German?
15     A.  Yes, sir.
16     Q.  In June.
17         And on the first page, do you see
18  Mr. German says:  Hey Karl, good to hear from
19  you?
20     A.  Yes, sir.
21     Q.  No, because:  Technically the next
22  step is a round of interviews, but we will be
23  bypassing that.
24         And it says:  Now a background check
25  will be initiated and a drug screen will be

Hansen v Elon Musk - Arbitration Day 1
1  Hansen v Elon Musk - Arbitration Day 1
2  scheduled.
3          Do you see that?
4      A.  Yes, I do.
5      Q.  Okay.  Do you know, was a background
6  check done on you before you went to USSA?
7      A.  Yes.
8      Q.  And you had to authorize that; right?
9      A.  I did, yes.
10     Q.  Did these -- some of the people you
11 were looking and reviewing in connection with the
12 cartel allegations, they were contractors to
13 Tesla; correct?
14     A.  Some of them were, yes, sir.
15     Q.  So we saw like Aerotek.
16     A.  Yes.  That's correct, yes.
17     Q.  Did you have any knowledge of what
18 background checks were required by any of the
19 contractors that hired -- any of the contractors
20 that were some of the folks you were looking at?
21     A.  No.
22     Q.  Do you know what representations the
23 contractor has to make to Tesla about whether any
24 of the people that they're contracting back to
25 Tesla have any criminal history?

1  Hansen v Elon Musk - Arbitration Day 1
2      A.  No, I don't.
3      Q.  So, Mr. Hansen, we saw the TCR that
4  you submitted.
5          Do you recall that?
6      A.  Yes.
7      Q.  Did the SEC ever reach out to you to
8  speak to you?
9      A.  To date, no, they didn't.
10     Q.  Okay.  In fact, didn't you file a
11 subsequent TCR as recently as last year?
12     A.  I did, yes.
13     Q.  Have they responded to you in
14 connection with that filing?
15     A.  Acknowledged receipt of that.
16     Q.  But no investigator from the SEC has
17 ever reached out to you or asked to interview
18 you?
19     A.  No, not at this time.
20     Q.  Have you ever met with any individual
21 from the Drug Enforcement Agency in connection
22 with the anonymous tip?
23     A.  No, I did not.
24     Q.  Let's go to 62.
25          So we're going to Exhibit 62.

1  Hansen v Elon Musk - Arbitration Day 1
2      A.  Okay.
3      Q.  Mr. Hansen, I'm showing you what's
4  been marked as Exhibit 62.  Looks to be a text
5  exchange.
6          Do you know who this text exchange
7  was with?
8      A.  Ms. Wells.
9      Q.  So this is as of August 30th?
10     A.  Correct.
11     Q.  Is that your handwriting?  Or whose
12 handwriting is that on the upper left?
13     A.  That was Ms. Wells's.
14     Q.  And so were you texting with
15 Ms. Wells while you were working?
16     A.  I was, yes.
17     Q.  And do you know if USSA or Tesla's
18 policies have any prohibition of texting with
19 outside folks while you're working?
20     A.  No, I don't.  I don't recall
21 specifically.
22     Q.  But do you recall when you were
23 onboarded with USSA, did you have to agree to a
24 manual?
25     A.  I did.  Yes, sir.

1  Hansen v Elon Musk - Arbitration Day 1
2      Q.  Did you ever look at it to see what
3  the rules were with regard to texting while you
4  were on the job?
5      A.  I read the entire manual, I just
6  don't recall at this point what the manual stated
7  specifically regarding that.
8      Q.  Okay.  So this is on August 30th, and
9  you mentioned this, that Mr. Musk drove through
10 the gate; right?
11     A.  That's correct, yes.
12     Q.  And is this you communicating that
13 with Ms. Wells?
14     A.  It is, yes.
15     Q.  And you say:  He recognized me, I'm
16 sure.
17          Do you see that?
18     A.  I did.  I do, yes.
19     Q.  Do you have any knowledge other than
20 this of whether he actually recognized you?
21     A.  No.
22     Q.  Okay.  And I just want to make sure I
23 know the texts that are yours and Ms. Wells's if
24 we go to 3327.
25          It's the third page.

Hansen v Elon Musk - Arbitration Day 1

1      It's hard to read, and I'll clean it
2  up.
3      It says:  Next time that blank comes
4  in my God damn window, he's going to experience
5  climate change, all right.
6      Who was that?
7      He's going to be seeing stars.
8      A.  That was Wells.
9      Q.  Okay.  Did you and Ms. Wells ever
10  discuss causing any harm to Mr. Musk?
11      A.  Absolutely not.
12      Q.  She's just being funny here?
13      A.  I assume she was.
14      MR. ROBERTSON:  I move in 62.
15      A.  And I don't think -- I don't even
16  know what that's referring to.  I don't think
17  that that's referring to Mr. Musk at all.
18      JUDGE HOFFMAN:  Any objection to 62?
19      MR. WOODFIELD:  No, Your Honor.
20      JUDGE HOFFMAN:  62 is in.
21      (Whereupon, Exhibit 62 was received.)
22  BY MR. ROBERTSON:
23      Q.  And, looking at the top left, there's
24  a reference to Exhibit No. 14 in handwriting.

Hansen v Elon Musk - Arbitration Day 1

1      A.  Yes.
2      Q.  Exhibit 14 to what?
3      A.  I don't recall specifically.
4      Q.  Well, was this part of a submission
5  that was made to any member of the press?
6      A.  No.  I don't recall what it was
7  referencing.
8      Q.  I mean, was -- do you recall
9  compiling exhibits for something?
10      A.  I did when I retained initial
11  counsel, and I put together things that I
12  referenced as exhibits.  That might have been
13  what that was, in compiling that and information
14  for the SEC as well.
15      Q.  Did you complain that you were being
16  underutilized?
17      A.  I know Matt German complained that I
18  was being underutilized.
19      Q.  So you personally, you never
20  complained to anyone that you were being
21  underutilized.  Is that your testimony?
22      A.  Not that I recall.  That is my
23  testimony.  I think after discussing that with
24  Mr. German and maybe Mr. McLellan, where that

Hansen v Elon Musk - Arbitration Day 1

1  conversation originated, perhaps those
2  discussions, we may have had a discussion about
3  it; but I don't recall complaining about that to
4  anybody specifically.
5      Q.  Do you recall saying thanks so much,
6  guys, this is yet another great use of my
7  experience?
8      A.  I don't recall that.
9      What are you referring to when you
10  say that?
11      Q.  I'm asking you whether you recall
12  saying that to anybody.
13      A.  No.  Sitting here today, I don't
14  recall saying that.
15      Q.  All right.  Let's pull up 73.
16      MR. ROBERTSON:  Admit 62?  I'm sorry.
17  Move to admit 62, please.
18      JUDGE HOFFMAN:  62 is in.
19      MR. ROBERTSON:  Thank you.
20      Anne's keeping me honest.
21      JUDGE HOFFMAN:  And what's the next
22  one you're going to?
23      MR. ROBERTSON:  I'm going to 73.
24      JUDGE HOFFMAN:  Thank you.  I'm

Hansen v Elon Musk - Arbitration Day 1

1  there.
2  BY MR. ROBERTSON:
3      Q.  Mr. Hansen, looking at Exhibit 73,
4  are these text exchanges with Ms. Wells?
5      A.  They appear to be, yes.
6      Q.  And again, are these texts that
7  you're texting her while you're working?
8      A.  Yes.
9      Q.  If we go to the next page, the second
10  page.
11      A.  Yes.
12      Q.  And you say:  It's a blank waste of
13  my time, skills, and abilities, but when we were
14  in the pre-op briefing and they announced that
15  I'd be sitting in this f'ing chair, I said, hey,
16  thanks so much guys.  This is yet again another
17  great use of my expertise.
18      A.  So that -- that is -- yes, I did say
19  that in that message, and that is directly
20  related to the conversation with Mr. German on
21  that day in that specific location.
22      Q.  But you did say that.
23      A.  I just said yes, I did.
24      Q.  Okay.

Hansen v Elon Musk - Arbitration Day 1

1    MR. ROBERTSON:  Do we have his USSA
2
3    papers?  199.
4        Oh, did I move that one in?  I'd like
5    to move this one in.  73.
6        JUDGE HOFFMAN:  With no objection, 73
7    is in.
8        (Whereupon, Exhibit 73 was received.)
9        MR. ROBERTSON:  And now we're moving
10   to 199.
11   BY MR. ROBERTSON:
12   Q.  Mr. Hansen, I'm putting in front of
13   you what's been marked as joint Exhibit 199.
14   These are the pay records from USSA.
15       Do you recognize these?
16   A.  Yes.
17   Q.  And when we look at the first page,
18   it says that the period beginning 7-13 through
19   7-26-18.
20       Do you see that?
21   A.  I do, yes.
22   Q.  With the pay date of August 3rd.
23       And again, I think we've established
24   you started working on July 17th; correct?
25   A.  I believe that's accurate, yes.

Hansen v Elon Musk - Arbitration Day 1

1    Q.  And here, there's two pay rates, if
2
3    we look at the -- look below.  There's the $19.80
4    pay rate for 34 hours and $27 for 25 hours.
5        Do you see that?
6    A.  I do, yes.
7    Q.  Okay.  So isn't it true that, in
8    fact, at some point during this first two weeks
9    that you were employed at USSA, you were making
10   $19.80 an hour?
11   A.  That is correct, yes.
12   Q.  Okay.  And it's another point in time
13   you were making 27.
14   A.  That's correct, yes, sir.
15   Q.  And do you know when each of those
16   periods were?
17   A.  I don't.  I don't recall
18   specifically.
19   Q.  And then if we can to go USSA 150,
20   which is one, two, three -- four pages in.
21       And I believe, Mr. Hansen, we
22   established that your last day at USSA, that you
23   were assigned back to the -- or assigned to the
24   Tesla property was September 4th; is that right?
25   A.  Yes, that's correct.

Hansen v Elon Musk - Arbitration Day 1

1
2    Q.  Okay.  And it shows here on this pay
3    period beginning 8-24 through September 6th, that
4    your pay rate is $19.80; correct?
5    A.  It does, yes.
6    Q.  So that was, in fact, your pay rate
7    at the time that you were -- that the request was
8    made that you no longer be assigned to the Tesla
9    factory; correct?
10   A.  It appears that's accurate, yes.
11   Q.  And did you ever make more than
12   $16.50 an hour when you were working as an
13   employee of Tesla?
14   A.  No, I don't believe I did.
15   Q.  Okay.  So, in fact, the move from
16   Tesla to USSA, you got a raise?
17   A.  I did, yes.
18   Q.  Let's go to 178.
19       MR. ROBERTSON:  Oh, move to admit the
20   pay records, 199.
21       MR. WOODFIELD:  I think they were
22   admitted before, but --
23       MS. DUNNE:  They've been admitted.
24       JUDGE HOFFMAN:  199 is in.
25       MR. ROBERTSON:  Thank you.

Hansen v Elon Musk - Arbitration Day 1

1
2    178.
3    BY MR. ROBERTSON:
4    Q.  So, Mr. Hansen, I've put in front of
5    you what's been identified as Exhibit 178.
6    A.  I see it, yes.
7    Q.  That looks to be an e-mail from a
8    Karl Hannah at karlhannah@contractor.net to
9    Greg Slettvet at Tesla.
10       Subject, Karl Hansen.
11       Do you see this?
12   A.  I do, yes.
13   Q.  Okay.  Do you know whose e-mail
14   Karl Hannah is?
15   A.  I have no idea.
16   Q.  Okay.  It's not you?
17   A.  It's definitely not me.
18   Q.  Okay.  Do you know who Jens Peter is?
19   A.  Jens Peter Clausen was -- I think he
20   was an executive vice president, I think, at the
21   factory at one time, during my tenure there.  I
22   don't know if he's still there, but...
23   Q.  Did he ever say the things that are
24   in this e-mail?
25   A.  No, sir.

Page 218

Hansen v Elon Musk - Arbitration Day 1

1
2   Q.  Do you have any idea where this came
3   from?
4       A.  I have no idea.  First I saw it was
5   when it was produced in discovery.
6       Q.  Okay.  Did anyone talk to you about
7   this e-mail or ask you any questions about it?
8       A.  Never.
9       Q.  Okay.
10      MR. ROBERTSON:  Move this in.
11      MR. WOODFIELD:  I'm going to object
12  on this one.  This is -- no one's ever seen this.
13  It's from some unidentified e-mail.  It's hearsay
14  in the rankest form, and all it is is slanderous,
15  defamatory.  I mean, this is just -- if the rules
16  of evidence applied, we wouldn't even be horsing
17  around with this nonsense.
18      JUDGE HOFFMAN:  So the objection is
19  foundation and relevance?  I'm not seeing either
20  foundation or relevance in this document.  Maybe
21  you can enlighten me.
22      MR. ROBERTSON:  Well, the issue was
23  Mr. Jones, so they made a lot of comments about
24  Jeff Jones, and, you know, what Jeff Jones may
25  have seen.

Page 219

Hansen v Elon Musk - Arbitration Day 1

1
2       I don't know that this was used in
3   his deposition.
4       I mean, I can withdraw it.  That's
5   fine.  I've asked the questions.  It's -- I'll
6   just withdraw it, Your Honor.  It's easier.
7       JUDGE HOFFMAN:  Okay.
8       MR. ROBERTSON:  Let's go to 145.
9   BY MR. ROBERTSON:
10      Q.  So, Mr. Hansen, do you know whether
11  after you -- well, let me back-up.
12      Did you ever personally have any
13  interactions with the Storey County district
14  attorney in connection with any copper theft?
15      A.  I did not, no.
16      Q.  Okay.  And do you know whether
17  Mr. Gouthro was having direct communications with
18  the Storey County District Attorney's Office with
19  regard to the copper theft issue?
20      A.  Mr. Gouthro indicated to me that he
21  had been in regular contact with the DA's office
22  there.
23      Q.  Okay.
24      Do you know whether there was ever
25  any conclusion that was reached as to how much

Page 220

Hansen v Elon Musk - Arbitration Day 1

1
2   copper, the value of the copper that the
3   attempted theft was that Mr. Thompson raised?
4       A.  I'm sorry, can you repeat the
5   question, please?
6       Q.  Sure.
7       Do you know whether there was ever a
8   conclusion as to the value of the copper that was
9   the subject of the attempted theft that
10  Mr. Thompson was involved in?
11      A.  I believe that you had asked me that
12  during the depo, and it came out to something
13  like $675, is what you had reported to me during
14  the deposition.
15      Q.  Okay.  And beyond that amount of
16  $675, again, have you ever had any specific
17  incident, a specific incident of theft or
18  attempted theft of copper that you were involved
19  in during the time you were at Tesla?
20      A.  Mr. Robertson, I'm sorry, sir.  It
21  was cutting out.  Can you please repeat that?
22      Q.  Probably easier to -- I can just --
23      Other than -- was there any specific
24  incident of copper theft that you were personally
25  involved in and investigating while you were at

Page 221

Hansen v Elon Musk - Arbitration Day 1

1
2   Tesla other than the Lynn Thompson theft or
3   attempted theft?
4       A.  Yes, there were -- there were several
5   other investigations that I participated in with
6   respect to various thefts of copper, whether --
7       Q.  It --
8       A.  Yes.
9       Q.  And in any of those investigations,
10  do you recall any specific quantification of the
11  amount -- the value of the copper at issue that
12  was the subject of either the theft or the
13  attempted theft?
14      A.  No, sir, I don't.
15      Q.  So in terms of how that theft or
16  attempted theft might have affected or impacted
17  Tesla's financial statements, do you have any
18  knowledge of that?
19      A.  No, I don't.
20      MR. ROBERTSON:  Actually, Your Honor,
21  if we can get -- what time is it?  We've been
22  going about an hour.  If I can have five minutes,
23  I can wrap it up.
24      JUDGE HOFFMAN:  Okay.  Let's take
25  five.

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2             (Recess taken, 3:02 p.m. to
 3   3:11 p.m. PDT)
 4             JUDGE HOFFMAN:  Can we go ahead and
 5   start?
 6             MR. ROBERTSON:  All set?
 7             JUDGE HOFFMAN:  Yeah, go ahead.
 8   BY MR. ROBERTSON:
 9        Q.  All right.  Mr. Hansen, we mentioned
10   quickly the -- your communications with Ms. Lopez
11   at Business Insider.
12             Do you recall that?
13        A.  Yes, sir.
14        Q.  You also communicated with other
15   press outlets; correct?
16        A.  I did, yes.
17        Q.  Including CNBC?
18        A.  Yes.
19        Q.  Bloomberg?
20        A.  Yes.
21        Q.  The Wall Street Journal?
22        A.  Yes.
23        Q.  The Nevada Appeal?
24        A.  Yes.
25        Q.  Chartcast?
```

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2        A.  That wasn't a media out -- resource.
 3        Q.  The LA Times?
 4        A.  Yes.
 5        Q.  You've also done podcasts; right?
 6        A.  I did two podcasts.
 7        Q.  You did a podcast on somebody called
 8   TSLAQ?
 9        A.  That -- yes, that's correct.
10        Q.  And more than once; right?  You did a
11   couple of podcasts; right?
12        A.  I did, yes.
13        Q.  And how recently have you done those?
14        A.  It's been a couple of years.
15        Q.  You also have a Twitter account;
16   correct?
17        A.  I do.
18        Q.  And isn't it true that even within
19   the last 48 hours, you've posted Twitter comments
20   about Tesla on your Twitter account?
21        A.  I have.
22        Q.  Well, you mentioned sort of how
23   emotionally distressed you are about this, but
24   you've gone on, with numerous press outlets,
25   you've done a podcast and you're still Twittering
```

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2   about Tesla.
 3             Is that all correct?
 4        A.  Sure, that's correct.
 5        Q.  Let's go to Exhibit 17.
 6             And while she's pulling that up, in
 7   fact, you've also talked with someone at Netflix
 8   about doing a documentary; right?
 9        A.  I did, yes.
10        Q.  And you've talked to book publishers
11   and authors about doing a book?
12        A.  I have talked to people about writing
13   a book potentially.
14        Q.  And if there was a Netflix
15   documentary for a book, you would assume that you
16   would make some money from that; right?
17             MR. WOODFIELD:  Objection, calls for
18   speculation.
19             MR. ROBERTSON:  So is he answering or
20   not?
21             I think there's a pending objection.
22             MR. WOODFIELD:  There is.
23             JUDGE HOFFMAN:  I'm sorry, I was
24   muted.  The objection is overruled.
25             Answer if you can.
```

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2        A.  So in preliminary discussions
 3   regarding that, yeah, there could be a potential
 4   to make some money.
 5   BY MR. ROBERTSON:
 6        Q.  And likewise, when you file a TCR
 7   with the SEC, if the SEC investigates and
 8   ultimately there's a settlement or a payment by
 9   the target of that whistleblower complaint, you
10   would expect to share in any recovery; correct?
11        A.  Mr. Robertson, you broke up.  I
12   really apologize, but I did not hear your
13   question.
14        Q.  Okay.  Mr. Hansen, when you filed
15   your TCR with the Securities and Exchange
16   Commission, had the SEC investigated and had
17   there been any claim against Tesla where Tesla
18   paid money, you expected to share in that money;
19   correct?
20        A.  I don't know if that's an
21   expectation.  There's a potential written into
22   the laws, as I understand it, that that is a
23   potential.
24        Q.  Well, you understand there's a
25   difference between picking up the phone and
```

Page 226

Hansen v Elon Musk - Arbitration Day 1

1  calling the SEC and providing them information
2  and filing an actual complaint in the
3  Whistleblower Program with the SEC; correct?
4          A.  Again, I -- it came in all garbled,
5  sir.  Unfortunately I did not hear any of that.
6          MR. ROBERTSON:  Is everyone else
7  hearing me okay or is it just Mr. Hansen?
8          JUDGE HOFFMAN:  I think it's just
9  Mr. Hansen.  I'm hearing you fine.
10         MR. ROBERTSON:  Okay.
11         I'll try again, Mr. Hansen.
12  BY MR. ROBERTSON:
13         Q.  You understand --
14         A.  I really apologize.
15         Q.  That's okay.  It's okay.  We'll get
16  through it.
17         Mr. Hansen, you understand there is a
18  big difference between just calling up the SEC
19  and providing them information and actually
20  filing a claim through a TCR with the
21  whistleblower office; correct?
22         A.  Yes.
23         Q.  Okay.  And in one instance, you
24  can -- you would be entitled to a share of any
25

Page 227

Hansen v Elon Musk - Arbitration Day 1

1  recovery that you would get in the event the SEC
2  recovered money from Tesla; right?
3          MR. WOODFIELD:  Objection --
4          A.  Potentially, any whistleblower.
5          MR. WOODFIELD:  Objection,
6  Your Honor.  There's actually no right to
7  recovery under the SEC program.  It's an awards
8  program and the SEC -- there's no such right or
9  entitlement.
10         MR. ROBERTSON:  Your Honor --
11         JUDGE HOFFMAN:  That was the
12  definition of a speaking objection.
13         MR. ROBERTSON:  Yes.  Thank you,
14  Your Honor.
15         JUDGE HOFFMAN:  If the objection is
16  competence of this witness or lack of foundation,
17  I'll take that.  But I'll let the question go
18  unless you have a specific objection like
19  competence or foundation or hearsay or that sort
20  of thing.
21         MR. ROBERTSON:  And I think we got an
22  answer.  So, Your Honor, if you think the record
23  will be okay, I'll move on.
24         JUDGE HOFFMAN:  I didn't hear the
25

Page 228

Hansen v Elon Musk - Arbitration Day 1

1  answer, I'm sorry.
2          MR. ROBERTSON:  Oh, fine.
3  BY MR. ROBERTSON:
4          Q.  So, Mr. Hansen, did you understand
5  that to the extent you filed a TCR and the SEC
6  actually brought some kind of action against
7  Tesla and recovered money, that part of that --
8  that you could potentially share in that money?
9          THE WITNESS:  My screen is locked and
10  I can't hear.
11         MR. ROBERTSON:  Shall we have him log
12  out and log back in?  I'll hold the question.
13  BY MR. ROBERTSON:
14         MR. WOODFIELD:  Karl, can you hear
15  us?
16         JUDGE HOFFMAN:  Mr. Hansen, can you
17  hear us?
18         THE WITNESS:  I just heard the last
19  part of that, Your Honor.
20         JUDGE HOFFMAN:  Well, let's keep
21  plugging away.
22         MR. ROBERTSON:  Let's keep plugging
23  away.
24  BY MR. ROBERTSON:
25         Q.  If I have you, Mr. Hansen, I'll try

Page 229

Hansen v Elon Musk - Arbitration Day 1

1  to -- hopefully we can get this in.
2          So my question, Mr. Hansen was, to
3  the extent that you filed a TCR with the SEC, did
4  you understand that --
5          A.  All I heard was SEC.
6          MR. ROBERTSON:  I'm not sure what to
7  do, folks.
8          JUDGE HOFFMAN:  Well, if we could
9  have Mr. Hansen call in on a phone line, I guess.
10         MR. ROBERTSON:  Yeah.  I'm fine with
11  that.
12         MS. BRAXTON:  Maybe it makes sense to
13  log out at least once and try logging back in and
14  see if that fixes it.
15         MR. WOODFIELD:  Well, it's probably a
16  bandwidth issue, so the simplest thing for him to
17  do is to go on mute here and dial in with the
18  phone.
19         JUDGE HOFFMAN:  Yeah, that makes
20  sense to me.  I think that would work, if you --
21         Mr. Hansen, if you mute your Zoom,
22  and then go ahead and call in on the phone line,
23  I think you'll be able to testify more clearly.
24         Let's go off the record.
25

Hansen v Elon Musk - Arbitration Day 1

1      Hansen v Elon Musk - Arbitration Day 1
2              (Recess taken, 3:20 p.m. to
3      3:23 p.m. PDT)
4              JUDGE HOFFMAN:  Okay.  We're in
5      business.
6              Back on the record.
7      BY MR. ROBERTSON:
8          Q.  Excellent.  So when we broke off,
9      Mr. Hansen, I was just asking you whether -- did
10     you understand when you filed the TCR with the
11     SEC that if the SEC brought a claim and --
12             MR. ROBERTSON:  We're not there yet.
13     I'm trying to clean up the last question.
14             Sorry.
15     BY MR. ROBERTSON:
16         Q.  That if the SEC brought any kind of
17     claim and the SEC was able to settle with or got
18     a judgment against Tesla, that you would be
19     entitled to a monetary payment.
20         A.  No, I didn't think I -- I didn't
21     expect that that was an entitlement.  I
22     understand that there was a process involved with
23     that.  That was my understanding, that
24     potentially that could happen.
25         Q.  Right.  So you knew that part of this

1      Hansen v Elon Musk - Arbitration Day 1
2      process of filing with TCR was that you might get
3      money at the end of the day?
4          A.  Yeah, I did.
5          Q.  Let's go to Exhibit 17.
6              Mr. Hansen, I've put up on the screen
7      joint Exhibit 17.
8          A.  I see it, yes.
9          Q.  Is this the -- or why don't you just
10     explain, what is this document?
11         A.  A preliminary report by Mr. Gouthro,
12     a couple weeks after being given that tip,
13     primarily comprised of information related to
14     those identified in the -- in that very
15     preliminary document.
16         Q.  Okay.  So, Mr. Hansen, do you recall
17     around when you prepared this document?
18         A.  I believe it was June 12, 2018.
19         Q.  And was there any subsequent report
20     that you prepared and submitted to Mr. Gouthro
21     after this one?
22         A.  No, there was not.
23         Q.  Okay.  And in this report, at the top
24     there's a line item that says estimated value,
25     and it says TBD.

1      Hansen v Elon Musk - Arbitration Day 1
2              Do you see that?
3          A.  Yes, I see that.
4          Q.  Okay.  And in terms of this drug
5      cartel, to the extent that there was a drug
6      cartel operating within the Gigafactory, that
7      wouldn't have had any effect on Tesla's financial
8      statements, would it?
9              MR. ROBERTSON:  Objection, calls for
10     speculation.
11             JUDGE HOFFMAN:  Overruled.
12             You can answer if you know.
13         A.  Your Honor, I don't know.  I don't
14     know.
15     BY MR. ROBERTSON:
16         Q.  What I'm trying to understand is
17     Tesla was not in the business of selling drugs
18     and getting revenue or income from drug dealing;
19     right?
20         A.  That's correct, and I don't think
21     that was the basis of the allegations.
22         Q.  Right.  Well, you filed a claim with
23     the SEC claiming that Tesla had SEC violations
24     based upon, in part, these allegations of a drug
25     cartel.  And I'm just trying to understand

1      Hansen v Elon Musk - Arbitration Day 1
2      whether you have any understanding of how a drug
3      cartel, purportedly operating within one of the
4      Tesla facilities, has any impact on the financial
5      statements that are provided to shareholders.
6              MR. WOODFIELD:  Your Honor, I'm going
7      to object at this point because now we're getting
8      into the legal question of the efficacy of
9      whether a TCR is viable and what's a -- what's a
10     viable 10-K reportable event.  And I think that's
11     beyond the ken of an average individual.
12             JUDGE HOFFMAN:  Well, it probably is,
13     but the witness can answer what his understanding
14     is of the impact of a drug investigation on
15     Tesla, if he knows.
16         A.  So, Mr. Robertson, your question was
17     if there was a cartel operating out of the
18     Gigafactory; is that correct?
19     BY MR. ROBERTSON:
20         Q.  We can read it back.  My question is:
21     How does the allegation, unproven allegation of a
22     potential drug activity within the Gigafactory,
23     how does that impact Tesla's financial statements
24     it provides to his shareholders?
25         A.  I'm not qualified to --

Page 234

Hansen v Elon Musk - Arbitration Day 1

1        Hansen v Elon Musk - Arbitration Day 1
2        MR. WOODFIELD:  Same objection --
3    A.  -- answer that question.
4 BY MR. ROBERTSON:
5    Q.  Okay.  And again, there came a point
6 in time where you were asked by Tesla personnel
7 to turn over your work product related to this
8 investigation and you refused; correct?
9    A.  I did, yes.
10    Q.  And, Mr. Hansen, if I had my dates
11 right, your attorney put out a press release
12 about you having gone to the SEC on August 16th;
13 is that correct?
14    A.  Please repeat the question.
15    Q.  Sure.
16        My understanding is that in
17 connection with your -- that Mr. Meissner, your
18 attorney, put out a press release indicating that
19 you had spoken to the SEC on August 16th; is that
20 correct?
21    A.  August 16th is the date of the press
22 release that Mr. Meissner put out.
23    Q.  Right.
24        And that August 16th was when in that
25 press release it was disclosed that you had filed

Page 235

Hansen v Elon Musk - Arbitration Day 1

1 something with the SEC; correct?
2    A.  Yes, that is correct.
3    Q.  Was your contract through USSA
4 terminated on the 17th of July -- I mean, of
5 August?
6    A.  I didn't hear that.  Please repeat
7 the question.
8    Q.  Was your -- what -- did Tesla
9 instruct USSA to end your assignment at the
10 Gigafactory on the 16th of August?
11    A.  No, they did not.
12    Q.  Did they do it on the 17th of August?
13    A.  No, they did not.
14    Q.  In fact, it was several weeks later,
15 at the end of August, when the instruction came;
16 correct?
17    A.  That is correct, yes.
18    Q.  And then -- oh, yeah, it says here:
19 Name of investigators, Karl Hansen & Associate.
20 Who was your associate?
21    A.  I'm sorry, say again?
22    Q.  Sure.
23        In this document, it says:  Name of
24 investigators.  It says:  Karl Hansen &

Page 236

Hansen v Elon Musk - Arbitration Day 1

1        Hansen v Elon Musk - Arbitration Day 1
2 Associate.
3        Who is your associate?
4    A.  Mr. Gouthro, and I also referred to
5 Ms. Wells is aware of this investigation, as was
6 Mr. Gouthro.
7    Q.  So, wait a minute, wait a minute.
8        So the associate referenced in here
9 is Ms. Wells?
10    A.  I can't hear a word you're saying.
11    MR. ROBERTSON:  Can everyone else
12 hear me?
13    MR. WOODFIELD:  Yes.
14    A.  Okay.  I just got you now.  So the
15 associate is Mr. Gouthro.
16 BY MR. ROBERTSON:
17    Q.  No.  It says investigation
18 supervisor, S. Gouthro.
19        Name of investigators, Karl Hansen &
20 Associate.  Who is the associate?
21    A.  The associate is also Mr. Gouthro,
22 and I mentioned that Ms. Wells was aware of this
23 as well.
24    Q.  I understand.  Ms. Wells was not
25 employed by Tesla; correct?

Page 237

Hansen v Elon Musk - Arbitration Day 1

1        Hansen v Elon Musk - Arbitration Day 1
2    A.  No, she was not.
3    Q.  Did Ms. Wells ever have any authority
4 to engage in any activities on behalf of Tesla?
5    A.  No, she did not.
6    Q.  Let's go to seven --
7    MR. ROBERTSON:  What?
8        Oh, admit 17, please.  Move to
9 admit 17.
10    MR. WOODFIELD:  No objection.
11    JUDGE HOFFMAN:  17 is in.
12    (Whereupon, Exhibit 17 was received.)
13 BY MR. ROBERTSON:
14    Q.  Let's go to 73.
15        While Anne's finding that,
16 Mr. Hansen, there was a discussion of Ken Davis.
17 We saw the e-mail from Mr. Davis.
18        Do you recall that?
19    A.  Yes, I do.
20    Q.  Okay.  Ken Davis was never your
21 supervisor; right?
22    A.  No, he was not.
23    Q.  But Mr. Davis did train you when you
24 first came to Tesla; correct?
25    A.  Yes, he did.

Page 238

Hansen v Elon Musk - Arbitration Day 1

1       Hansen v Elon Musk - Arbitration Day 1
2       Q.  Did you tell Mr. Davis at some point
3  that you were e-mailing information from your
4  Tesla account to your personal Gmail account?
5       A.  I don't recall whether I told him
6  that.
7       Q.  So you don't know one way or the
8  other whether you might have mentioned that to
9  him?
10      A.  I don't.  I don't recall.
11      Q.  Okay.  Were you involved in any
12  discussions with any Tesla management in which
13  Ken Davis was also in the room?
14      A.  Yes, with Sean Gouthro and on
15  occasion Marshall Sprott periodically.
16      Q.  Did you ever hear Mr. Davis criticize
17  you or criticize your work?
18      A.  No, I never did.
19      Q.  So to the extent Mr. Davis expressed
20  concerns about you, do you have any reason -- any
21  basis, based on your interactions with Mr. Davis,
22  to know why that would be?
23      A.  No, sir.
24      Q.  Mr. Hansen, I've put in front of you
25  what's been identified as Exhibit 73,

Page 239

Hansen v Elon Musk - Arbitration Day 1

1       Hansen v Elon Musk - Arbitration Day 1
2  joint Exhibit 73.
3       A.  Yes, sir, I see it.
4       Q.  And do you know who this text chain
5  is with?
6       A.  I'm reading it.  Hold on.
7       Q.  That's fine.
8       A.  You're going too fast here.  But to
9  answer your question, it is with Ms. Wells.
10      Q.  Ms. Wells.  Okay.
11          And again, was this while you were
12  working?
13      A.  It appears to be, yes.
14      Q.  Okay.  And again, I'll leave the
15  language out, but were you having discussions
16  with -- well, in the first paragraph on the first
17  page -- let's go back up -- it looks like there's
18  a reference to someone else have -- making
19  comments about Jeff Jones.
20      A.  I'm reading it.  Hang on --
21      Q.  Okay.
22      A.  -- please.
23          [Document review.]
24          THE WITNESS:  Okay.  So I -- what is
25  your question, then?

Page 240

Hansen v Elon Musk - Arbitration Day 1

1       Hansen v Elon Musk - Arbitration Day 1
2  BY MR. ROBERTSON:
3       Q.  Yeah, my question is, is this
4  referencing Mr. German in this first paragraph?
5       A.  Yes, it is.
6       Q.  Okay.  And were you having
7  discussions with Matt German at USSA about
8  Mr. Jones?
9       A.  We discussed Mr. Jones on occasion,
10  yes.
11      Q.  And the last sentence says:  Yeah,
12  when they know you're a threat to them, most
13  people act like that.
14          I said:  Yep.
15          Did you talk about --
16      A.  That's the --
17      Q.  Okay.  Did you talk about you as a
18  threat?
19      A.  Mr. German told me that Mr. Jones and
20  the -- regarded me as a threat.
21      Q.  Okay.  And, Mr. Hansen, after you
22  left Tesla, so after your assignment with Tesla
23  was ended, did you reach out to the FBI?
24      A.  My attorney reached out to the FBI,
25  who subsequently reached out to me.

Page 241

Hansen v Elon Musk - Arbitration Day 1

1       Hansen v Elon Musk - Arbitration Day 1
2       Q.  Well, did you raise concerns with the
3  FBI that Tesla, after you left, was still
4  monitoring your phone and your computer?
5       A.  Yes.
6       Q.  And was there ever any concrete
7  evidence developed that that was occurring?
8       A.  I was told that there was evidence
9  being obtained.  There was -- I don't know what
10  that was, and I don't know to the extent of what
11  the FBI did with it.
12      Q.  Well, you say evidence being
13  obtained.  My question:  Was there ever any
14  concrete evidence that was presented for you that
15  anyone at Tesla was continuing to monitor your
16  computer or your phone after your assignment on
17  September 4th was ended at the Gigafactory?
18      A.  No, none was ever presented to me
19  directly.
20          MR. ROBERTSON:  I think I'm done.
21          THE WITNESS:  Sir, did you get my
22  answer?  I'm sorry.
23          MR. ROBERTSON:  Yes.
24          THE WITNESS:  Okay.
25          MR. ROBERTSON:  Okay, that's all I

Hansen v Elon Musk - Arbitration Day 1

1  have.  Thank you very much, Mr. Hansen.  I know
2  that was a slog, but I appreciate it.
3
4          JUDGE HOFFMAN:  Okay.  Thank you.
5          So we're -- how are we doing on our
6  timing?  We -- I think I would prefer to have
7  both sets of cross-examination be conducted
8  before redirect by Mr. Woodfield, and so that
9  means that USSA would begin its questioning now.
10 And so my question is:  Is that desirable?
11         I know you all are on the East Coast
12 and so you're on a different clock than I am.
13 And it seems like we're okay on time.  So would
14 the --
15         MR. ROBERTSON:  Yep.
16         JUDGE HOFFMAN:  Would you prefer to
17 wait until tomorrow to start cross or would you
18 rather press on tonight?
19         MR. ROBERTSON:  So, we -- those of us
20 on the East Coast certainly from Boston are fine.
21 Nick, are you good?  We're good.  We
22 had assumed, Your Honor, we'd go until 5 o'clock
23 West Coast time.  That would be 12:00 to 5:00.
24 (sic)
25         MR. WOODFIELD:  I'm fine.

Hansen v Elon Musk - Arbitration Day 1

1          MR. ROBERTSON:  We planned for that.
2          JUDGE HOFFMAN:  Okay.  All right,
3  good.  Then it's -- we take off your screen --
4          Oh, did you move to admit 73?
5          MR. ROBERTSON:  Yes, Your Honor,
6  thank you.
7          JUDGE HOFFMAN:  Okay.  So 73 is in.
8          (Whereupon, Exhibit 73 was received.)
9          JUDGE HOFFMAN:  So, cross-examination
10 by USSA.
11         MS. BRAXTON:  Your Honor, can we take
12 15 before we start?
13         JUDGE HOFFMAN:  Yes, let's start at
14 4:00 my time, which is late your time.
15         15 minutes.  At the top of the hour,
16 we'll be back.
17         MR. WOODFIELD:  Thank you.
18         JUDGE HOFFMAN:  Thank you.
19         (Recess taken, 3:45 p.m. to
20 4:02 p.m. PDT).
21         JUDGE HOFFMAN:  We are back on the
22 record.
23         We are back on the record now for
24 cross-examination by USSA, and that will be done

Hansen v Elon Musk - Arbitration Day 1

1  by Ms. Braxton.
2          As a side note, I wanted to just
3  mention, since I didn't before, that the
4  witnesses and parties and attorneys should not
5  separately record these proceedings.  We'll have
6  a good record of the proceedings from the court
7  reporter.
8          All right.  Let's go ahead and
9  proceed with cross-examination.  Ms. Braxton.
10         MS. BRAXTON:  Thank you.
11              ------------
12              EXAMINATION
13              ------------
14 BY MS. BRAXTON:
15     Q.  Good afternoon, Karl.
16         So you've testified, you know, about
17 your employment, and I will do my best not to ask
18 repetitive questions, but I will focus more so on
19 your USSA employment because I would like to get
20 additional detail from you about your experiences
21 and your claims as they relate to USSA.  And with
22 that, I do want to confirm and at least clarify
23 something that I've heard today throughout the
24 course of your testimony.

Hansen v Elon Musk - Arbitration Day 1

1          Is it your testimony that all of the
2  criminal activity that you reported to Tesla was
3  essentially stuff that they already knew about
4  because you had reported it at some point prior
5  to that in some form?
6          Prior to your SEC complaint?
7      A.  I don't think I understand the
8  question.  I'm really sorry.  Can you repeat
9  that?
10     Q.  Sure.  Sure.
11         So before you came to USSA, you had
12 testified today to a series of concerns that you
13 raised when you were working for Tesla.
14         Is it your testimony that all of the
15 activity, criminal activity that you
16 investigated, you reported to Tesla prior to the
17 time that you joined USSA?
18     A.  Yes, that is correct.
19     Q.  And isn't it also true that Elon
20 himself at some point on or around June 5th of
21 2018 had indicated that there was some theft that
22 he was aware about? -- aware of, excuse me.
23     A.  Yes, that is accurate.
24     Q.  Okay.  And even with that, you were

Hansen v Elon Musk - Arbitration Day 1

1     still brought on to USSA; right?  Tesla still
2     recommended that USSA hire you.
3
4          A.  Yes, ma'am, that is correct.
5          Q.  And as the RIF that has been
6     testified and described today in testimony, as
7     part of the RIF, you weren't the only employee
8     that was subject to the RIF; is that correct?
9          A.  Yes, ma'am, that's correct.
10         Q.  And so there were plenty of other
11    employees that were impacted by the RIF around
12    that time as well; right?
13         A.  Yes, there were.
14         Q.  And so I understand at some point
15    prior to you joining USSA Security, there was
16    some discussion about you assuming an
17    investigator role, and that never materialized;
18    is that correct?
19         A.  I'm sorry, Ms. Braxton, could you
20    repeat that question, please?
21         Q.  Sure.  So prior to you joining USSA,
22    there was some discussion about you assuming an
23    investigator role.  However, that never
24    materialized; correct?
25         A.  That is correct, yes.

Hansen v Elon Musk - Arbitration Day 1

1          Q.  And you don't have any reason to
2     believe that the reason that that never
3     materialized or came to fruition has anything to
4     do with USSA not wanting it to happen; is that
5     correct?
6          A.  That is correct, yes.
7          Q.  So it's not your testimony here today
8     that the reason the investigator program didn't
9     happen, as far as USSA is concerned, that it
10    wasn't USSA's doing or decision for doing away
11    with the investigative program.
12         A.  Yes, that is correct.
13         Q.  Okay.  And so you would agree that at
14    some point, Tesla made a decision and USSA was no
15    longer going to be having an investigative
16    program at the Gigafactory.
17         A.  No, that's not accurate.
18         Q.  Okay.
19         A.  My -- I was --
20              Go ahead.
21         Q.  Okay.  So you would agree that Tesla
22    directed USSA that there was no longer going to
23    be an investigative program; correct?
24         A.  Ma'am, you broke up just a little bit

Hansen v Elon Musk - Arbitration Day 1

1     there.  Could you repeat the question one more
2     time?  I'm sorry.
3          Q.  No, sure.  So at some point when
4     there was a decision made that USSA was no longer
5     going to handle this investigative program at the
6     Gigafactory, that was a decision made by Tesla;
7     is that correct?
8          A.  Yes, ma'am, that is correct.
9          Q.  And when you joined USSA, there was
10    some discussion about whether or not you would or
11    wouldn't assume a supervisor role; is that
12    correct?
13         A.  That is correct, yes.
14         Q.  And isn't it true that ultimately
15    Matt German determined that you were going to be
16    a supervisor; correct?
17         A.  He did, yes.
18         Q.  Okay.  And he also determined that
19    you were going to be paid as a supervisor; is
20    that correct?
21         A.  That is correct.
22         Q.  Okay.  And in making that decision, I
23    understand that there was some communication that
24    he had with you about that.  And wasn't it his

Hansen v Elon Musk - Arbitration Day 1

1     position that no matter who told him at Tesla
2     that they didn't want you to be a supervisor,
3     that was irrelevant to him because he was going
4     to make a -- make you a supervisor; is that
5     correct?
6          A.  We did have that conversation, and
7     subsequent to that conversation he advised me
8     that Jeff Jones directed him, as well as
9     Mr. McLellan, that I would not be in any
10    supervisory capacity or any investigative
11    capacity for U.S. Security.
12         Q.  Okay.  But as far as the direction is
13    concerned, he disagreed with them; right?  And he
14    proceeded and made you a supervisor anyway;
15    correct?
16         A.  He paid me as a supervisor.
17         Q.  Okay.  And is it your testimony today
18    that you did not perform any work as a supervisor
19    for USSA?
20         A.  I believe I initially began doing
21    that with Ryan Leslie, and it was shortly after
22    that began that Mr. German notified me, I believe
23    his hands were tied and that I was not to be
24    an -- in an investigative capacity or a

Hansen v Elon Musk - Arbitration Day 1

1    supervisory capacity.
2    
3         Q.  Okay.  And, sir, I want to be clear
4    when I'm talking about your role at USSA -- if I
5    say investigator, then I'll ask you about an
6    investigative role, but I want to be clear that
7    the role ultimately when you were hired for
8    U.S. Security was as a security officer; is that
9    correct?
10        A.  I will concede that, yes.
11        Q.  So at some point at USSA, you assume
12   a supervisor role.  Matt German makes sure that
13   you are getting paid as a supervisor.  And at
14   some point you are no longer a supervisor.
15             Is it true that you worked with an
16   individual named Nubia at some point while you
17   were employed at USSA?
18        A.  Yes.  And I don't recall her last
19   name, but I do recall Nubia, yes.
20        Q.  Sure.  And do you recall also telling
21   Nubia that you were going to step down as a
22   supervisor?
23        A.  I don't recall telling her that.  I
24   have no recollection of that.
25        Q.  Well, isn't it true that at some

Hansen v Elon Musk - Arbitration Day 1

1    
2    point you decided that you were going to step
3    down as a supervisor?
4         A.  Yes.
5         Q.  Okay.  And you -- no one at USSA
6    forced you to step down; is that correct?
7         A.  Matt German made it very clear that I
8    would not be in any such capacity, as directed by
9    Jeff Jones, and that he would continue to pay me
10   at the supervisor rate.
11        Q.  Okay.  But you just testified that
12   Matt German is the one who essentially made you a
13   supervisor.  Correct?
14        A.  He did.  He said that would happen.
15   And ultimately he directed Mr. McLellan to put me
16   on the books at the rate of pay of a supervisor,
17   although I was not working in that capacity any
18   longer.
19        Q.  Okay.  You don't have any evidence
20   that Mr. -- anyone made Mr. McLellan or
21   Mr. German reduce you down from a supervisor to a
22   regular security officer; correct?
23        A.  Aside from Matt German telling me
24   that, I don't.
25        Q.  Okay.  And -- so your testimony here

Hansen v Elon Musk - Arbitration Day 1

1    
2    today is that Mr. German told you that you
3    weren't going to be able to be a supervisor.  Is
4    that what you're telling me?
5         A.  That is correct, yes, ma'am.
6         Q.  Okay.  So when you told Nubia that
7    you were stepping down as a supervisor, it was --
8    you weren't -- you were doing that voluntarily;
9    right?
10             MR. WOODFIELD:  Objection,
11   Your Honor.  That mischaracterizes the prior
12   testimony.  He said he didn't do that.
13             You're on mute, sir.
14             JUDGE HOFFMAN:  I agree with the
15   objection.  I think that misstates the testimony.
16   If you want to go at it a different way, you
17   can --
18             MS. BRAXTON:  Sure.
19             JUDGE HOFFMAN:  -- Ms. Braxton.
20             MS. BRAXTON:  Sure.  So I'd like to
21   introduce as another exhibit, it's a joint
22   exhibit, No. 55.
23             And Alex will be helping me with the
24   exhibits.
25             JUDGE HOFFMAN:  Okay.

Hansen v Elon Musk - Arbitration Day 1

1    
2             This has been introduced.  Any
3    objection to 55?
4             MR. WOODFIELD:  I'm reading it right
5    now.
6             JUDGE HOFFMAN:  Okay.
7             MS. BRAXTON:  Specifically page 3227.
8             If we can zoom in just a little bit.
9    Mr. Hansen, take an opportunity just to read this
10   page.
11             THE WITNESS:  I can't see the exhibit
12   yet.
13             Okay.  And your question related to
14   that exhibit is what?
15   BY MS. BRAXTON:
16        Q.  My question is -- first of all, do
17   you recognize this text exchange?  On page --
18        A.  I recognize it.
19        Q.  And can you tell me who is involved
20   in this text exchange?
21        A.  That would be myself and Nubia.
22        Q.  Okay.  And the person on August 21st
23   at 9:17, is that a message from you?
24             MR. WOODFIELD:  Forgive me, which
25   is -- when you said "is that a message from you,"

Page 254

Hansen v Elon Musk - Arbitration Day 1

1
2  what message?
3        MS. BRAXTON:  Sure.  I'll read it.
4  So there's a text message, Tuesday, August 21,
5  9:17.  That says:  I didn't know anything about
6  two leads.  I did tell Rick yesterday I wasn't
7  interested in being a supervisor with everything
8  going on.
9  BY MS. BRAXTON:
10       Q.  Mr. Hansen, is that your text message
11  to Nubia?
12       A.  Yeah, it is.
13       Q.  Does that refresh your recollection
14  whether or not you informed Rick McLellan that
15  you were no longer interested in being a
16  supervisor on or around August 21st?
17       A.  Yes, we had those discussions.
18       Q.  Okay.  Thank you.
19       MS. BRAXTON:  Thank you, Alex.
20       MS. SMITH:  You're welcome.
21       JUDGE HOFFMAN:  Do you move to
22  introduce 55, or that page?
23       MS. BRAXTON:  Yes.
24       JUDGE HOFFMAN:  Okay.  Exhibit 55,
25  page 3227 is admitted.

Page 255

Hansen v Elon Musk - Arbitration Day 1

1
2        (Whereupon, Exhibit 55-3227 was
3  received.)
4  BY MS. BRAXTON:
5        Q.  And now I would like to pull what I
6  believe has previously been entered into evidence
7  is joint Exhibit 199.
8        A.  Yes, ma'am, I see that.
9        MS. BRAXTON:  And, Alex, if you can
10  scroll to the pay week that includes August 21st,
11  2018.
12  BY MS. BRAXTON:
13       Q.  Mr. Hansen, would you agree that this
14  appears to be your earnings statement from USSA
15  for the period beginning August 10, 2018 through
16  August 23, 2018?
17       A.  I'm sorry, can you repeat that?
18       Q.  Sure.
19       Does this appear -- would you agree
20  that this is your pay statement from USSA for the
21  period of August 10th through August 23, 2018?
22       A.  Yes.
23       Q.  And it appears that your pay goes
24  down from a supervisory rate to 19.80 during this
25  pay period.

Page 256

Hansen v Elon Musk - Arbitration Day 1

1
2        Would you agree?
3        A.  Yes, it does appear.
4        Q.  Okay.
5        A.  For a period of time, yes.
6        Q.  Okay.  I'm sorry, what was that?
7        A.  Yes, it does appear that way.  That
8  is correct.
9        Q.  Okay.  Thank you.
10       And the timing of that, on or
11  around -- between 18 -- August 10, 2018 and
12  August 23, 2018, that coincides with the time
13  that you told Nubia that you had to step down as
14  supervisor; is that correct?
15       A.  It appears to, yes.
16       Q.  And so, Mr. Hansen, I do want to talk
17  a little bit about your employment at USSA.  And
18  let's start with your process when you were hired
19  by USSA.
20       Do you remember any kind of new
21  employment orientation or having to fill out any
22  new -- any documents as a new hire when you
23  joined USSA?
24       A.  Yes.
25       Q.  Okay.  And is it true that at or

Page 257

Hansen v Elon Musk - Arbitration Day 1

1
2  around the time that you were hired by USSA, you
3  reviewed their employee handbook?
4        A.  Yes.
5        MS. BRAXTON:  I would like to
6  introduce joint exhibit numbers 194 and -- oh,
7  I'll go slowly.
8  BY MS. BRAXTON:
9        Q.  And, Mr. Hansen, can you take a look
10  at this?
11       A.  Yes, ma'am, I see it.
12       Q.  Okay.  And do you recognize that as
13  your signature on this document?
14       A.  It is my signature, yes.
15       Q.  And do you agree that you received a
16  copy of USSA's security officer handbook at or
17  around the date that you signed this document?
18       A.  Yes, I do agree.
19       MS. BRAXTON:  And now I would like to
20  submit or admit that into evidence.
21       MR. WOODFIELD:  No objection.
22       JUDGE HOFFMAN:  194 is in.
23       MR. WOODFIELD:  I believe it's 193,
24  sir.  No, it's 194.  I apologize.  Sorry.
25       (Whereupon, Exhibit 194 was

1       Hansen v Elon Musk - Arbitration Day 1
2  received.)
3              MS. BRAXTON:  And now I would like to
4  introduce joint Exhibit No. 195.
5              JUDGE HOFFMAN:  Any objection to 195?
6              MR. WOODFIELD:  No, Your Honor.
7              JUDGE HOFFMAN:  Okay, it's in.
8              MR. WOODFIELD:  I think it may
9  already be in, but -- no.
10             MS. BRAXTON:  Yeah, I think that's
11 already in.  I'm actually looking for our
12 handbook.  Give me a second, here.
13             JUDGE HOFFMAN:  Oh, okay.
14             MS. BRAXTON:  Give me a second.  It's
15 on one of these Post-Its.
16             197?  Okay.  Joint Exhibit 197.  My
17 apologies.
18             MR. WOODFIELD:  No objection.
19 BY MS. BRAXTON:
20     Q.  Mr. Hansen, do you recognize this
21 document?  We can scroll a little bit.  I don't
22 expect you to read the -- I just want to make
23 sure you --
24     A.  No, I -- that's not necessary, I do
25 recognize it.

1       Hansen v Elon Musk - Arbitration Day 1
2      Q.  Okay.  Perfect.  And you recognize
3  this as U.S. Securities security officer's
4  handbook?
5      A.  Yes, I do.
6              MS. BRAXTON:  I would like to admit
7  that into evidence.
8              JUDGE HOFFMAN:  Okay.  197 is in.
9             (Whereupon, Exhibit 197 was
10 received.)
11 BY MS. BRAXTON:
12     Q.  Okay.  Thanks.
13             So we just reviewed the fact that you
14 signed and acknowledged at the time you were
15 hired with USSA some of its policies and receipt
16 and acknowledgment of the employee handbook.  And
17 during the time that you worked for USSA, fair to
18 say that your supervisors were employees of USSA
19 as well as?
20     A.  Yes, ma'am, that's correct.
21     Q.  And your USSA supervisors were
22 actually present on the site with you; is that
23 correct?
24     A.  That's correct, yes.
25     Q.  And during the time that you were

1       Hansen v Elon Musk - Arbitration Day 1
2  employed by USSA, you were paid only by USSA for
3  the work you performed at the Gigafactory; is
4  that correct?
5      A.  That's correct, yes.
6      Q.  And if you had any issues or concerns
7  with your employment at the Gigafactory during
8  the time that you were a USSA employee, you
9  understood that you could go to your direct
10 supervisors, also USSA employees; is that
11 correct?
12     A.  Yes, I understood that.
13     Q.  And likewise, you understood that if
14 you had any personnel issues that perhaps you
15 didn't think were within the purview of your
16 supervisors, you could also go to USSA's Human
17 Resources; correct?
18     A.  I didn't know that I could have done
19 that.  I assume I could have done that.  I'll
20 stipulate to that, I could have done that.
21     Q.  Okay.  Fair enough.
22             And during the time that you were
23 employed for USSA at the Gigafactory, your hours
24 were dictated by your supervisors, your USSA
25 supervisors; is that correct?

1       Hansen v Elon Musk - Arbitration Day 1
2      A.  That's fair, yes.
3      Q.  If you weren't going to be able to
4  make it for a shift or you had to call out, you
5  would have to notify your USSA supervisors; is
6  that correct?
7      A.  Yes.
8      Q.  And I want to introduce joint Exhibit
9  No. 204.
10             JUDGE HOFFMAN:  Any objection?
11             204 is in.
12             (Whereupon, Exhibit 204 was
13 received.)
14             MS. BRAXTON:  Just take a moment.  We
15 can scroll through this.
16             You can let Alex know.  She's doing
17 that.
18             [Document review.]
19     A.  I see the exhibit.
20 BY MS. BRAXTON:
21     Q.  Okay.  And I'm only going to focus on
22 the top e-mail, from -- it appears to be from you
23 to Matt German on August 1st, 2018.
24             It looks like you are asking
25 Mr. German about his feedback for you attending a

Hansen v Elon Musk - Arbitration Day 1

1 meeting.  Is it -- this is on or around
2 August 1st.  Would you agree that that's when
3 this is happening?  That you reached out to
4 Matt German?
5            (Court reporter clarification)
6        A.  Yes, ma'am, the answer was yes.  I
7 would agree.
8 BY MS. BRAXTON:
9        Q.  So fair to say that as of August 1st
10 of 2018, some folks from Tesla are trying to
11 arrange a meeting with you; is that correct?
12        A.  That's -- yes.  That's correct.
13        Q.  And rather than meeting with these
14 people, you are engaged in kind of having
15 conversations with the press.
16            Would you agree with that?
17            MR. WOODFIELD:  Objection,
18 Your Honor.  That's a misstatement of prior
19 testimony.
20            JUDGE HOFFMAN:  The witness can
21 testify what he recalls.
22        A.  Can you repeat the question, please?
23 BY MS. BRAXTON:
24        Q.  Sure.  How about this?

Hansen v Elon Musk - Arbitration Day 1

1        So as of August 1, 2018, isn't it
2 true that you were engaged in communications with
3 Linette from one of the media outlets you talked
4 about earlier?
5        A.  I did e-mail Linette Lopez at that
6 time, yes.
7        Q.  And so at the same time, while you
8 were reaching out to Linette Lopez from whatever
9 media entity she was from, at the same time Tesla
10 was trying to arrange a meeting with you; is that
11 correct?
12        A.  Yes, it appears they were.
13        Q.  And you wouldn't talk to them, the
14 individuals from Tesla who were trying to speak
15 to you; is that correct?
16        A.  I did have one meeting on August 9th
17 with Ricky Gecewich.  After that, I did not
18 participate further in meeting with them.
19        Q.  But on August 1st when they were
20 reaching out to you, you were not interested at
21 that -- at least at that time in speaking with
22 them.
23        A.  That is correct.
24        Q.  And on 8-9, you did tell Ricky

Hansen v Elon Musk - Arbitration Day 1

1 Gecewich when he reached out -- or when you
2 communicated with Ricky Gecewich, you said you
3 had an attorney and -- but you would discuss; is
4 that correct?
5        A.  That is correct, yes.
6        Q.  And I'm sorry, to clarify, when you
7 spoke to Mr. Gecewich on August 9th, you said you
8 had an attorney and you would not discuss it with
9 him; is that correct?
10        A.  Actually, I'm going to have to see
11 the e-mail, if you want to pull that up.  I don't
12 recall at this moment what my exact language was
13 or verbiage was.
14        Q.  Okay.  Sure.
15            Do you recall or do you -- when
16 you -- on or around August 9th when Ricky is
17 trying to get in touch with you, do you remember
18 telling him that you would not speak to him
19 because you had an attorney?
20        A.  I don't recall that specifically at
21 this time.
22        Q.  Okay.  And so now I'm going to talk
23 about -- you testified earlier about some
24 conversations that you had with various

Hansen v Elon Musk - Arbitration Day 1

1 individuals at USSA; and specifically as it
2 relates to your investigations, you did
3 understand that to the extent you had conducted
4 investigations for Tesla as a Tesla employee, you
5 were expected to maintain the contents of that
6 confidentially; correct?
7        A.  Unless otherwise directed, yes.
8        Q.  Okay.  And when you transitioned to
9 USSA, you didn't disclose any of that
10 confidential information to USSA employees
11 generally, did you?
12        A.  No, I did not.
13        Q.  So you knew it wouldn't be
14 appropriate for you to go discussing the contents
15 of your highly secretive investigations with USSA
16 employees after you became a USSA employee; is
17 that correct?
18        A.  The only people that had knowledge
19 were ultimately -- what I was working with was
20 Mr. German, Mr. Leslie, and Rick McLellan.  Other
21 than that, no.
22        Q.  Okay.  And when you say had
23 knowledge, what specifically did you share
24 with -- let's start with Matt German.

1    Hansen v Elon Musk - Arbitration Day 1
2         What did you tell Matt German?
3         A.  I shared exactly information related
4    to the -- help with the investigations that I was
5    conducting, specifically the cartel investigation
6    and the reports of theft.
7         Q.  Okay.  And this you were sharing with
8    them -- I don't want -- I don't want to be broad.
9    Specifically, are you saying that you shared this
10   with Matt German?  Who are you -- who is this --
11        A.  Matt German and Rick McLellan and I
12   both had discussions about these investigations,
13   as I did with supervisor Ryan Leslie.
14        Q.  Okay.  And why did they have a need
15   to know this information?
16        A.  Because of my communications and
17   their concerns with what Tesla was directing them
18   to do regarding my positions, the interference
19   with the contract that Matt German initially
20   offered me.  The subsequent directives from
21   Tesla, Jeff Jones specifically, to not have me
22   working in an investigator role or a supervisory
23   capacity.  And subsequently, ultimately at
24   Tesla's direction, restricting me from the
25   Gigafactory and moving me further out in isolated

1    Hansen v Elon Musk - Arbitration Day 1
2    positions.
3         Q.  Okay.
4         A.  And they were constructive about that
5    as well.
6         Q.  And but you weren't an investigator
7    at this time; right?  You didn't have a need to
8    tell them.
9         A.  I felt I did have a need to tell
10   them, because Matt German was perplexed about
11   what was going on.  He talked about Tesla being
12   very cryptic with him.  Not initially disclosing
13   who -- ultimately he was talking to Jeff Jones.
14   Both Rick McLellan and Matt German stated that
15   they were going to do what they could to protect
16   me.
17        Q.  Isn't it true that at some point
18   Matt German told you, Look, I am -- your USSA --
19   I'm USSA, and, you know, to the extent that you
20   want to share this confidential investigative
21   information, that's not my role, and he was
22   not -- you know, they sought very much so to not
23   involve themselves in the investigative work that
24   you had done?
25        A.  That's fair, yes.  Yes.  Initially,

1    Hansen v Elon Musk - Arbitration Day 1
2    yes.  That -- a conversation like that, I recall,
3    occurred.
4         Q.  Okay.  And specifically with respect
5    to Matt German, what did you tell him about your
6    investigations?
7         A.  I don't recall specifically
8    everything that I stated, but as he and I were
9    discussing these changes to my role and the
10   directives he was getting, I explained to him
11   that I was directed to investigate allegations of
12   potential narcotics trafficking involving
13   Mexican -- a Mexican drug cartel, or personnel
14   associated with that.  In addition, the thefts.
15   The thefts were no secret.  Matt German,
16   U.S. Security, everybody was aware of the rampant
17   theft and everything going on there.  So, I mean,
18   he had knowledge of that as well.
19        Q.  And you didn't have any --
20        A.  Those were specific --
21        Q.  Sorry.  Sorry, it looks like you
22   paused some time and then there's a delay.  So
23   I'm not purposely interrupting you.  You can
24   finish.
25        A.  No, I think I answered.  I was

1    Hansen v Elon Musk - Arbitration Day 1
2    waiting to hear your response, ma'am.  I
3    apologize.
4         Q.  Sure.
5             What I was going to say is during the
6    time that you were at the Gigafactory as a USSA
7    employee, it's true that Mr. German was not
8    working or -- he was not present on a daily basis
9    in the Gigafactory; would you agree?
10        A.  Absolutely.  That is absolutely true.
11   He traveled extensively.
12        Q.  Okay.  And even further, wasn't it
13   true that he was actually assigned and working
14   out of Kansas, Wichita, Kansas?
15        A.  He was.  He told me that that was his
16   home location.
17        Q.  And even fair to say that you didn't
18   see him regularly or frequently at all?
19        A.  That's fair.  I think I saw him on
20   a -- four times, perhaps.
21        Q.  So your testimony is that you
22   actually saw Mr. German in person about four
23   times during the duration that you worked for
24   USSA at the Gigafactory?
25        A.  It was during my total tenure, with

Page 270

Hansen v Elon Musk - Arbitration Day 1

1    Hansen v Elon Musk - Arbitration Day 1
2  both companies.
3       Q.  I know that you exchanged some text
4  messages with Mr. German.  And I do want to kind
5  of visit some of those, but before that, to the
6  extent that you were sharing information with
7  Mr. German about your investigations, as you've
8  just testified to, what was this method of
9  communication?  How did you communicate this
10 information to him?
11      A.  We had telephonic discussions, we
12 exchanged text messages, and we met on two of
13 those occasions -- well, we met on the -- I think
14 it was two occasions that he was actually at the
15 facility, that we had a discussion -- we had
16 discussions.
17      Q.  And when you discussed the contents
18 of the investigations that you had done, was that
19 before you had joined USSA as an employee?  When
20 you discussed those investigations with
21 Mr. German, was that before you had joined USSA
22 as an employee?
23      A.  Those began approximately prior to
24 that transition, yes.
25          Probably end of June, beginning of

Page 271

1    Hansen v Elon Musk - Arbitration Day 1
2  July, after I was notified that the investigator
3  role was not going to -- you know, not moving
4  forward.
5       Q.  And isn't it true that at some point
6  Mr. German was very clear with you in that he no
7  longer wished to exchange text messages or have
8  calls at some point?
9       A.  Mr. German asked me to delete text
10 messages between him and I.
11      Q.  Okay.  And at that time, was it your
12 understanding that he didn't wish to exchange
13 casual text messages with you anymore, or have
14 any kind of casual phone calls?
15      A.  I don't -- I don't know -- are you
16 asking me what my understanding was?
17      Q.  Yes.
18      A.  I can't answer that.
19      Q.  Okay.
20      A.  I don't know what you're looking for
21 there.
22      Q.  Sure.  When he asked you to delete
23 those text messages, you didn't delete them;
24 right?
25      A.  No, I did not.

Page 272

1    Hansen v Elon Musk - Arbitration Day 1
2       Q.  Do you recall any further
3  conversations or communications with Mr. German
4  after he essentially told you, please delete all
5  of these text messages, I don't want to have --
6  continue, you know, discussing any of these
7  issues with you?
8       A.  I don't recall specifically whether
9  he said he didn't want to discuss any of these
10 issues anymore with me.  I do recall him stating
11 that -- asking me to delete the messages.  We had
12 a telephone conversation also regarding that
13 after the fact, but I don't remember the date
14 specifically.
15      Q.  Okay.  And this telephone
16 conversation that you're referencing, is this --
17 when you had this telephone conversation, did the
18 communications between you and German continue
19 after that?
20      A.  I don't recall when specifically they
21 stopped occurring.
22      Q.  Okay.
23      A.  Or if there's even an end date to
24 them.  I really don't recall.
25      Q.  Well, isn't it true, Mr. Hansen, that

Page 273

1    Hansen v Elon Musk - Arbitration Day 1
2  you produced all of the relevant evidence that
3  you had related to conversations or
4  communications you may have had with Mr. German
5  as part of this case in discovery?
6       A.  Yes.
7       Q.  And it would have been your goal and
8  your objective to make sure that you produced all
9  of the communications that you were able to
10 document with Mr. German; is that correct?
11      A.  That's correct.
12      Q.  And earlier you testified that you
13 had informed various persons within U.S. Security
14 about some of the concerns that you had raised,
15 including investigations.  And to the extent that
16 you shared any of those concerns, is it true
17 that --
18          Well, first of all, excuse me.
19 Strike that.
20          Mr. Hansen, do you have any evidence
21 or is it your testimony today that at some point
22 you told Mr. German about your SEC complaint?
23      A.  Yes, Mr. German was aware of that.
24      Q.  Okay.  And did --
25      A.  I can't recall specifically when.

Page 274

Hansen v Elon Musk - Arbitration Day 1

1    Q.  Did he know when you filed -- or
2  excuse me.  You said he's aware of that.  What
3  evidence do you have to demonstrate that
4  Mr. German was aware of the SEC filing?
5    A.  I can't recall off the top of my head
6  specifically, but at the media release by my
7  attorney on the 16th as well is when everybody
8  became aware of that.  But I don't know what
9  additional evidence you're asking about.
10   Q.  Sure.  So is it your testimony that
11 Mr. German knew about your SEC complaint because
12 of a press release from your attorney?
13   A.  I'm not sure when exactly -- that is
14 my testimony, that -- and he became aware,
15 definitely then, at that time.  I don't recall
16 specifically.  I may have had a conversation with
17 him about that, on or about the 9th, but I don't
18 know.  I don't recall that specifically.
19   Q.  Okay.  You said that he became aware
20 of it because of the press release.  How do you
21 know that?
22   A.  Because it was talked about
23 extensively in and throughout the Gigafactory at
24 that time.  Supervisors were aware of it.
25

Page 275

Hansen v Elon Musk - Arbitration Day 1

1  Rick McLellan was aware of it -- became aware of
2  it, and actually had discussed it after that
3  press release had gone out.
4    Q.  So you're saying that -- when you say
5  discussed it, who discussed it after the press
6  release?
7    I want to make sure I'm hearing what
8  you're saying clearly.
9    A.  U.S. Security supervisors,
10 Ryan Leslie, Rick McLellan.
11   Q.  Okay.  Do you have any evidence that
12 Matt --
13   A.  And --
14   Q.  Do you have any evidence that
15 Matt German specifically knew?  I hear what
16 you're telling me.  You're telling me that there
17 was a press release and there were lots of people
18 talking about it at the Gigafactory.
19   My question to you is, are you aware
20 or do you have any information or facts to
21 suggest that Matt German knew about this?
22   A.  I do believe so, and I believe that
23 it's -- the evidence is in the record.  And I'm
24 not -- I don't remember it -- you have to read
25

Page 276

Hansen v Elon Musk - Arbitration Day 1

1  the text messages.  If you want to pull all of
2  those up, we can go through all of Matt German's
3  text messages.
4    Q.  Absolutely.  I've read all of the
5  evidence, all 7,500 of your pages that you
6  produced, and I do not see any evidence of that,
7  but we can absolutely pull up Mr. German's text
8  exchange with you.  I believe it's already been
9  entered into evidence as joint Exhibit No. 121.
10   So if you -- I don't know if you have
11 the ability to scroll, but I will definitely ask
12 Alex to scroll this.  And we're going to look for
13 wherever it is that you tell -- tell me where it
14 is that you're telling Mr. German about your SEC
15 complaint.
16   [Document review.]
17   A.  If you could slow down just a little
18 bit, please.
19   MS. BRAXTON:  Sure.
20   A.  Keep going.
21   [Document review.]
22   Yeah, keep scrolling slow, that would
23 be fine.
24   [Document review.]
25

Page 277

Hansen v Elon Musk - Arbitration Day 1

1    Okay.  Hold on there.
2    Okay.  Keep going, please.
3    [Document review.]
4    Can you slow down just a little,
5  please?  I'm sorry.
6    MS. BRAXTON:  Yes, no problem.
7    A.  Okay.  To keep -- keep going, please.
8    [Document review.]
9    Okay.  Keep going.
10   [Document review.]
11   Slow down, please.
12   Okay.  Keep going.
13   [Document review.]
14 BY MS. BRAXTON:
15   Q.  So, Mr. Hansen, what date --
16   A.  Yes, ma'am.
17   Q.  You do know the date that you filed
18 your SEC complaint; right?
19   A.  I do, yes.
20   Q.  And I think that -- you know, I don't
21 want to preclude you from reading this whole
22 thread, but the dates are fairly, fairly clear
23 that this text message exchange ends on or around
24 August 3rd.  We'll go down to the bottom.  If you

Hansen v Elon Musk - Arbitration Day 1

1    want us to go back so you can read, we can.  But
2    I just think timing alone might help clarify --
3    or speed this up.
4        A.  If you could scroll down just --
5    please.
6            Oh, go up -- continue going back the
7    way you were going.  I apologize.
8            Okay.  Right there, "chance to look
9    at the e-mail, and if so..."
10           Keep going down or up, however you
11   were scrolling.
12           No, the other way.  I do apologize.
13           Hold on a sec.
14           [Document review.]
15       A.  Okay.  Continue scrolling.
16   BY MS. BRAXTON:
17       Q.  Down?  Down?
18       A.  Yes, down, please.
19           [Document review.]
20       A.  Yeah, continue, please.
21           [Document review.]
22       A.  Yeah, I don't see the date, but I
23   believe that was around August 9th.
24           I could be wrong.

Hansen v Elon Musk - Arbitration Day 1

1    BY MS. BRAXTON:
2        Q.  So I'll help with the time frame
3    here, because I think obviously that's very
4    important.
5            MS. BRAXTON:  So regarding -- if we
6    could scroll up for one second, Alex, just to the
7    "shots fired."
8            Maybe this will refresh your
9    recollection, Mr. Hansen.
10   BY MS. BRAXTON:
11       Q.  This "shots fired" e-mail, or text
12   message, do you remember the timing generally
13   when Mr. German would have told you shots fired
14   and he loved it?
15       A.  Can you scroll up a little bit more
16   to the prior.
17           Okay.  Stop right there, please.
18           Can you scroll down just a little
19   bit.
20           [Document review.]
21       A.  Yeah, I do -- I'm not sure, but I
22   believe that might have been around August 9th.
23   That's the best of my recollection.
24           * * *

Hansen v Elon Musk - Arbitration Day 1

1    BY MS. BRAXTON:
2        Q.  Okay.  All right.  I'm sure I can
3    call it up for you.
4            So let's focus on Wednesday, 14:05.
5    There's a text message that says:  Hey Matt, have
6    you had a chance to look at that e-mail?  And if
7    so, do you have an opinion on my attendance?  I
8    would like to --
9            MS. BRAXTON:  We'll come back to
10   this, but let's pull up joint Exhibit No. 204.
11   BY MS. BRAXTON:
12       Q.  So here is an e-mail from August 1st,
13   also a Wednesday, and it is an e-mail from you to
14   Matt.  And you're asking -- you can read it
15   yourself.  I won't read it for you.  But
16   essentially you're asking him for some feedback
17   about attending a meeting, and you want his
18   feedback.
19           And this is on August 1st --
20       A.  Correct.
21       Q.  -- 2018, a Wednesday.
22           And so now I'd like to go back to the
23   text message that's also on a Wednesday, and it's
24   about a meeting.

Hansen v Elon Musk - Arbitration Day 1

1        A.  Mm-hmm.
2        Q.  Maybe this will help refresh your
3    recollection.
4            All right.  So if we can get back to
5    that Wednesday.  All right.  Hey, Matt.  Have you
6    had a chance to look at that e-mail?  And if so,
7    do you have an opinion on my attendance?
8            Mr. Hansen, after reviewing the mail
9    that you sent to Mr. German on August 1, 2018,
10   asking about his feedback for a meeting and your
11   attendance, and this text message that you also
12   sent on a Wednesday asking about his -- whether
13   or not he had an opportunity to look at your
14   e-mail, does this refresh your recollection as to
15   the date of this text exchange?
16       A.  It potentially does.  We were talking
17   about two different meetings, an August 9th
18   meeting with Mr. Gecewich was not the meeting
19   that was being referred to in the prior e-mail
20   that you put up.  That was a request to meet with
21   Gerhard Pretorius.
22       Q.  Sure.
23           But at the same time, you are asking
24   Mr. German about his opinion on your attendance

Page 282

Hansen v Elon Musk - Arbitration Day 1

1    at a meeting on August 1, 2018; would you agree?
2        A.   I would, yes.
3        Q.   Okay.  So is it possible that this
4    e-mail -- or excuse me, this text message on
5    Wednesday at 14:05 was sent on August 1, 2018?
6        A.   I suppose it's possible.
7        Q.   Please scroll down a little bit.
8            Okay.  And I'm sure we'll go
9    through -- we'll go through other exhibits that I
10   think will help focus the time frame of this.
11   But for now, those are the only questions that I
12   have for that at this time.
13           Mr. Hansen, you just testified about
14   essentially that everyone knew because there was
15   this stuff on the media and people were talking
16   about it.  Did you ever discuss your Fox News
17   appearance with Mr. German?
18       A.   I don't recall specifically.
19       Q.   If you had discussed it, is that
20   something that you think would have been
21   important to memorialize in writing?  Document?
22       A.   Sure.
23       Q.   So you think it would have been a
24   good idea that if you did have a conversation

Page 283

Hansen v Elon Musk - Arbitration Day 1

1    with Mr. German about your Fox News media, it
2    would have been something that you noted
3    somewhere, made a memo, a document or something
4    to memorialize that event?
5        A.   I don't know.  I mean, I'm
6    speculating.  I spoke to nobody about that prior
7    to -- on my day off attending that.
8        Q.   Okay.  And if Matt German were to
9    testify that he never talked to you about a
10   Fox News media -- your appearance on Fox News,
11   are you saying essentially that that -- do you
12   think that would be untruthful or not true?
13       A.   Matt German acknowledged that he was
14   aware of that when he spoke to me prior --
15   when -- after Tesla asked USSA to remove me, he
16   had stated that he had observed and seen the
17   Fox News piece, or knew I was on Fox News.
18           So prior to that, I can't answer.
19       Q.   Just give me one second.  I'm
20   actually looking at the --
21           MS. BRAXTON:  I'm sorry, Ms. -- the
22   court reporter, do you mind reading that answer
23   back for me?
24           (Whereupon, the following testimony

Page 284

Hansen v Elon Musk - Arbitration Day 1

1    was read by the court reporter.)
2        "ANSWER:  Matt German acknowledged
3    that he was aware of that when he spoke to me
4    prior -- when -- after Tesla asked USSA to remove
5    me, he had stated that he had observed and seen
6    the Fox News piece, or knew I was on Fox News.
7        "So prior to that, I can't answer."
8            (End of readback.)
9    BY MS. BRAXTON:
10       Q.   Okay.  And, Mr. Hansen, do you have
11   any evidence that you told Mr. German this?
12       A.   In my phone conversation with him
13   when he notified me that Jeff Jones directed him
14   to remove me from the Tesla property.  We had a
15   conversation.  That's the evidence I have
16   regarding that.
17       Q.   Okay.  And aside from this phone
18   conversation that you're referencing, is there
19   any other evidence that you are aware of that
20   indicates or suggests that you told Mr. German
21   about your Fox News appearance?
22       A.   No.
23       Q.   And for the -- I'm sorry, strike
24   that.

Page 285

Hansen v Elon Musk - Arbitration Day 1

1            And, Mr. Hansen, I know that we just
2    looked back at the text messages; but without
3    pulling that back up, isn't it true that during
4    the time that you were employed at USSA, you had
5    never raised any claims that Mr. German had
6    retaliated against you?
7        A.   That's correct, yes.
8        Q.   And isn't it true, in fact, that you
9    believe that Mr. German was a straight shooter
10   when it came to --
11       A.   That is --
12       Q.   And --
13       A.   Yes.
14       Q.   Sorry.
15           And during the time that you were
16   employed by USSA, did you feel that he was very
17   supportive of your employment and continued
18   employment as a USSA employee?
19       A.   Yes, I did.
20       Q.   And you don't believe that Mr. German
21   had any reason to remove you from the Gigafactory
22   other than that he received a request from Tesla,
23   do you?
24       A.   That was the reason he gave me, and

Hansen v Elon Musk - Arbitration Day 1
1  no, I don't.  I believe that he was given that
2  directive.
3
4        Q.  And you don't have any reason to
5  believe that Mr. German had any negative feelings
6  about you because you had done investigations or
7  you were involved investigating theft at the
8  Gigafactory; correct?
9        A.  No.
10           That is correct, yes.
11        Q.  And when you did share with him
12  information about your investigations and the
13  work that you were doing, he was very supportive
14  and he didn't give you any kind of negative
15  responses as far as you can recall; is that
16  correct?
17        A.  That is correct, yes, ma'am.
18        Q.  Do you -- I do want to pull back up
19  the text exchange, 121.  If we can all turn back
20  to that.
21           MS. BRAXTON:  Okay.  So let's go
22  to -- I believe it's KH 864.  Yeah, it's part
23  of -- yeah.
24           Okay.  Scroll up just a little bit.
25        Q.  So right there in that text message,

Hansen v Elon Musk - Arbitration Day 1
1  Mr. Hansen, is that your text message, a text
2  message from you to Matt German?
3        A.  It is, yes.
4        Q.  And is it true that you actually told
5  him that he's been the only guy to shoot straight
6  with you?
7        A.  Yes, it is.
8        Q.  And also, we did look at this exhibit
9  earlier, and the purpose -- we started talking
10  about timing and so on and so forth, and the
11  date, but in this text exchange, which appears to
12  be the only record of the text messages that you
13  exchanged with Mr. German, anywhere in here did
14  you inform him that you filed an SEC complaint?
15        A.  No.  Not in that, no.
16        Q.  So nowhere in the text exchange or
17  text messages that you exchanged with Mr. German
18  did you inform him that you had filed an SEC
19  complaint?
20        A.  No.
21        Q.  And, Mr. Hansen, isn't it true that
22  you recorded conversations that you had with
23  Mr. German without his consent?
24        A.  Yes.
25

Hansen v Elon Musk - Arbitration Day 1
1        Q.  And your recorded phone calls with
2  Mr. German, those were made without his consent;
3  is that correct?
4        A.  Yes.
5        Q.  And you didn't produce those;
6  correct?
7        A.  No.
8        Q.  If you had one that you think
9  essentially showed or captured you telling
10  Mr. German about the SEC complaint or the
11  Fox News thing that you did, did -- didn't you
12  think it would have been important to produce
13  those?
14           MR. WOODFIELD:  Objection.  We
15  produced every recording we had.
16        A.  Yeah, I think we did actually, now
17  that I think about it.
18           MS. BRAXTON:  Okay.  Can we take a
19  short break?
20           JUDGE HOFFMAN:  Sure.  How long do
21  you want?
22           MS. BRAXTON:  Ten minutes.
23           JUDGE HOFFMAN:  Ten minutes.  You've
24  got it.  We'll be back at 5:15 my time.

Hansen v Elon Musk - Arbitration Day 1
1           (Recess taken, 5:05 p.m. to
2  5:15 p.m. PDT)
3           MS. BRAXTON:  Okay.  Are we back on?
4           JUDGE HOFFMAN:  Yes.
5  BY MS. BRAXTON:
6        Q.  Okay, Mr. Hansen.  So just before the
7  break, you testified that Matt German knew about
8  the SEC complaint and that he told you --
9           MR. WOODFIELD:  Has the judge said
10  we're back on and the court reporter?
11           MS. BRAXTON:  Oh, sorry.
12           MR. WOODFIELD:  I think you have to
13  wait.
14           MS. BRAXTON:  I did get a thumbs-up
15  from the court reporter.
16           JUDGE HOFFMAN:  Yeah, I think we're
17  good to go.
18           Okay.  We got a thumbs-up from the
19  court reporter.
20  BY MS. BRAXTON:
21        Q.  Okay.  So just before the break,
22  Mr. Hansen, you testified that Mr. German knew
23  about the SEC complaint and that he told you that
24  he knew in the call when he called to inform you

Hansen v Elon Musk - Arbitration Day 1

1  that you were being removed from the account.

2        You also testified that you recorded

3  your calls with Mr. German, and that you did not

4  have his permission to record him during those

5  phone calls.

6        MS. BRAXTON:  We do have the removal

7  phone call, and we would like to submit that as

8  impeachment evidence, because we've just listened

9  to it and there is no mention of an SEC complaint

10  or a Fox News appearance.  And I think it's very,

11  very important that the Judge, Mr. Hoffman,

12  consider introducing this recording.  It's only

13  about four and a half minutes.

14        JUDGE HOFFMAN:  I guess first of all,

15  is there an objection to the consideration of

16  that recording?

17        MR. WOODFIELD:  I think it would be

18  beneficial to hear the recording.

19        JUDGE HOFFMAN:  So there's no

20  objection.  It hasn't been marked yet, so it

21  needs to be marked and presented somehow.

22        Maybe what we can do is I can listen

23  to it right now if you want to, and then you can

24  mark it and put it into the record.

Hansen v Elon Musk - Arbitration Day 1

1        MR. WOODFIELD:  Well, I --

2  Your Honor, from an evidentiary standpoint, I

3  think perhaps the way to do it would be for

4  the -- for USSA to play it and ask him if it

5  sounds like the recording he made of it, and then

6  he could -- she could ask if it refreshed his

7  recollection, but it's still there for the

8  impeachment purposes for the arbitrator, because

9  you've heard it as well.

10        Because if he says that's the

11  recording he made, you're in the same position,

12  then we don't need to offer the recording itself.

13        JUDGE HOFFMAN:  Well, I'm fine either

14  way.  There's no question as to authenticity of

15  the recording, because it's his recording.  So he

16  has made this recording.  And so I'll -- I'll

17  handle it however USSA would like to present this

18  evidence.  It's their evidence of impeachment, so

19  however you want to handle it is fine with me.

20        You can stipulate that you've

21  listened to the recording and it doesn't say what

22  Mr. Hansen says it said, or you can let me hear

23  it, or however you want to do it.

24        MR. WOODFIELD:  Well, I'm not going

25

Hansen v Elon Musk - Arbitration Day 1

1  to stipulate to that.  I haven't the slightest

2  idea, and I thought their characterization of the

3  text was a little loose, so I would like to hear

4  the -- I'd like to hear the recording.

5        MS. BRAXTON:  Permission to play,

6  Your Honor?

7        JUDGE HOFFMAN:  Sure.  Go ahead and

8  play it.

9        MS. BRAXTON:  Was everyone else able

10  to hear that?

11        MR. WOODFIELD:  Nobody has heard

12  anything.

13        JUDGE HOFFMAN:  No, I didn't hear

14  anything.

15        MS. BRAXTON:  Okay.  I think I may

16  have been on mute.  I'm so sorry.  Let's try that

17  one more time.  I think it was me, Alex.

18        (Tape played.)

19        MR. WOODFIELD:  We can't hear

20  anything.

21        MS. BRAXTON:  Okay.  Can we --

22        MS. DUNNE:  I have an idea.  I think

23  maybe if you play the recording and share your

24  screen while you're playing it, like while you're

Hansen v Elon Musk - Arbitration Day 1

1  playing the MP4, whatever type file it is, I

2  think that it will come through on the Zoom.

3        (Technical discussion off the

4  record.)

5        MR. WOODFIELD:  I can't hear

6  anything.

7        JUDGE HOFFMAN:  Yeah, I'm not hearing

8  anything either.

9        MS. BRAXTON:  Okay.  Was anyone able

10  to hear any of that?

11        JUDGE HOFFMAN:  No.

12        (Technical discussion off the

13  record.)

14        MS. BRAXTON:  Can we take a few

15  minutes just so we can figure out this

16  technology?  I'm sure we can try to figure out a

17  way to make this work.

18        JUDGE HOFFMAN:  Sure.  Go ahead.

19        MS. BRAXTON:  You can see it.  You

20  just can't hear it.

21        (Recess taken, 5:22 p.m. to

22  5:24 p.m. PDT)

23        JUDGE HOFFMAN:  Let's go back to

24  where Ms. Braxton is now going to continue her

1    Hansen v Elon Musk - Arbitration Day 1
2    cross-examination.  And --
3            Let's go on the record now, Deb.
4            So we are back on the record and
5    we've had -- I've taken a few minutes to address
6    some technological issues, and now, Ms. Braxton
7    is going to play a recording of a telephone
8    conversation that she has received in discovery.
9            (Tape played.)
10           MR. HANSEN:  All right.  If you can
11   hear me, I can hear you.  Go ahead, my friend.
12           MR. GERMAN:  Okay.  Let me preface
13   this with saying I have to get through a business
14   piece first and then I have a personal piece at
15   the end of it.  Okay?
16           Sounds good.
17           So business, you are effectively
18   removed via client request from the Tesla site.
19   I will not go into details of the material.  You
20   are aware and letter has been populated from
21   Tesla to both yourself and your lawyers.  I will
22   let that take its course.  All right?
23           Moving into the business piece now --
24   or the personal piece.  I'm working with the
25   region right now to reassign you to another one

1    Hansen v Elon Musk - Arbitration Day 1
2    of our accounts but keep your rate the same.  So
3    as U.S. Security Associates, we will eat whatever
4    marginal difference, the contractual pay rates
5    from your new account and keep you at your
6    current rate.
7            MR. HANSEN:  Okay.  I -- wow, I
8    appreciate that.  Can't ask for more than that as
9    I need to stay employed.  And holy shit.
10           MR. GERMAN:  I'm not going to go into
11   details on that, but you know who I am and what
12   I'm about?
13           MR. HANSEN:  Absolutely.  Absolutely.
14           I didn't -- I didn't know any of
15   this, actually.  I mean, I suspected something
16   was coming down the road, quite honestly.  You
17   know, you heard the piece about Elon Musk coming
18   through the gate last week.
19           MR. GERMAN:  Oh yeah.
20           MR. HANSEN:  I'm sure -- yeah.  Yeah.
21   Okay.
22           And I -- I haven't seen the letter.
23   Do you have the letter?  Can you forward that --
24           MR. GERMAN:  No --
25           MR. HANSEN:  -- to me?  Or is that

1    Hansen v Elon Musk - Arbitration Day 1
2    not something that you guys can do?  I'd have
3    to --
4            MR. GERMAN:  I don't have it.  They
5    told me it was supposed to be sent to your
6    representation and that -- well, they didn't
7    specifically say you, but they said your
8    representation was sent at 5:00 p.m. Pacific
9    Time.
10           MR. HANSEN:  Well, today.
11           MR. GERMAN:  Yep.
12           MR. HANSEN:  Okay, buddy.  All right.
13   Well, I damn sure appreciate it.
14           MR. GERMAN:  Not a call I wanted to
15   make.
16           MR. HANSEN:  No.  But like you said,
17   I mean, I've known who you were from the
18   beginning, and you've not wavered with your
19   integrity, and you knew what -- well, maybe you
20   didn't know the specifics, but you did
21   acknowledge that you knew something was going on.
22   And it was before your time, and you stuck in
23   there to support me, and I appreciate the hell
24   out of that.
25           MR. GERMAN:  You got it.

1    Hansen v Elon Musk - Arbitration Day 1
2            MR. HANSEN:  All right, my friend.
3            MR. GERMAN:  All right.  So we'll let
4    the -- we'll let the Tesla piece play out.  What
5    I do need from you is -- this is effective
6    immediately, so do not go in on your shift
7    tonight.
8            MR. HANSEN:  Okay.
9            MR. GERMAN:  We do need you to bring
10   the badge over to the branch office tomorrow, if
11   you have some time.  Obviously Rick is out of
12   town.  I'm not sure if you've had a chance to
13   meet Scott.
14           MR. HANSEN:  I know Scott, yeah.
15           MR. GERMAN:  Scott is a good dude.
16           MR. HANSEN:  He really is.
17           MR. GERMAN:  I'll let Scott know what
18   is going on, and if you could do that for me, I
19   would appreciate it, sir.
20           MR. HANSEN:  Sure can, man.  I'll
21   make that happen tomorrow.  I appreciate you.
22           MR. GERMAN:  All right, Karl.
23           MR. HANSEN:  All right, Matt.  You
24   take care, man.  We'll talk soon.
25           Hey, who will let me know about where

Hansen v Elon Musk - Arbitration Day 1

1  I'm going to go, though, actually?  Will that be
2  in a couple of days or something?
3        MR. GERMAN:  Yeah, this shouldn't be
4  too long.  But that will be from Scott.  We're
5  working with the region.  Last we had planned was
6  we have a new UPS account starting up, and I
7  don't think it starts until the 15th.  So I was
8  really hoping to ride this wave at least until
9  then.
10       MR. HANSEN:  Yeah.
11       MR. GERMAN:  But that clearly didn't
12 happen.
13       MR. HANSEN:  Okay.
14       MR. GERMAN:  So we may be able to
15 work something out, you know, until that takes
16 off.  All right.
17       MR. HANSEN:  All right.  Well, I'll
18 talk to him tomorrow, get that badge back to him,
19 and I'll wait for further direction and guidance.
20       MR. GERMAN:  All right.
21       MR. HANSEN:  Thanks, Matt.  All
22 right, brother.  You take care.  Yeah, bye-bye.
23       (Tape ended.)
24       MS. BRAXTON:  Are we back on the

1        Hansen v Elon Musk - Arbitration Day 1
1   I'm going to go, though, actually?  Will that be
2   in a couple of days or something?
3        MR. GERMAN:  Yeah, this shouldn't be
4   too long.  But that will be from Scott.  We're
5   working with the region.  Last we had planned was
6   we have a new UPS account starting up, and I
7   don't think it starts until the 15th.  So I was
8   really hoping to ride this wave at least until
9   then.
10       MR. HANSEN:  Yeah.
11       MR. GERMAN:  But that clearly didn't
12  happen.
13       MR. HANSEN:  Okay.
14       MR. GERMAN:  So we may be able to
15  work something out, you know, until that takes
16  off.  All right.
17       MR. HANSEN:  All right.  Well, I'll
18  talk to him tomorrow, get that badge back to him,
19  and I'll wait for further direction and guidance.
20       MR. GERMAN:  All right.
21       MR. HANSEN:  Thanks, Matt.  All
22  right, brother.  You take care.  Yeah, bye-bye.
23       (Tape ended.)
24       MS. BRAXTON:  Are we back on the

1        Hansen v Elon Musk - Arbitration Day 1
2   record?
3        JUDGE HOFFMAN:  Yes.  Well, we have
4   been on the record, yeah.
5        MS. BRAXTON:  Sorry, my apologies.  I
6   had my volume on low.  We are back on the record;
7   correct?
8        JUDGE HOFFMAN:  We are on the record
9   and the recording was recorded.
10       MS. BRAXTON:  Okay.  Perfect.
11  BY MS. BRAXTON:
12       Q.  So, Mr. Hansen, that's the call you
13  were referencing where Mr. German informed you of
14  the removal; is that correct?
15       A.  That is, yes.
16       MS. BRAXTON:  Okay.  And so I do --
17  for everyone who is on the East Coast, I do have
18  a next line of questioning, but I do want to at
19  least be considerate.  It's 5:30 here.  I know
20  it's probably 8:30, if I can do my math
21  correctly, where you are.  Everyone have any
22  thoughts or opinions?  I think this is a good
23  breaking point.
24       MR. WOODFIELD:  I think we're going
25  to have to finish with the witness tonight.  I

1        Hansen v Elon Musk - Arbitration Day 1
2   would like to not carry him over.
3        JUDGE HOFFMAN:  How much more time do
4   you have to do?
5        MS. BRAXTON:  I'd definitely say less
6   than an hour.  I would probably say 30 to 45.
7        JUDGE HOFFMAN:  And then, there will
8   be some redirect?
9        MR. WOODFIELD:  Right now I have one
10  question.
11       (Discussion off the record.)
12       JUDGE HOFFMAN:  Well, let's -- let's
13  stop, then, because that's the most important
14  thing is to give your record.
15       So we'll pick up tomorrow morning,
16  then, at 9 o'clock and continue this, and then
17  we'll be able to go right into our next witness,
18  so I guess will be Mr. Nocon.
19       MR. ROBERTSON:  Correct, Your Honor,
20  he's standing by.  We'll give him an update and
21  let him know that given what we've just heard,
22  have him ready about -- we're going to start at
23  9:00.  We'll have him ready at about 10:00,
24  West Coast.
25       Yeah, that will work.

1        Hansen v Elon Musk - Arbitration Day 1
2        JUDGE HOFFMAN:  Okay.  Okay.  Good.
3        Mr. Hansen, bearing this break, you
4   are advised not to discuss your testimony with
5   anybody.  All right?
6        THE WITNESS:  Yes, Your Honor, I
7   understand.
8        JUDGE HOFFMAN:  Okay.  Thank you.
9   Then we are off the record.  And I'll see you all
10  tomorrow at 9:00 a.m.
11       (Time noted: 5:32 p.m. PDT)

Page 302

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2              C E R T I F I C A T E
 3
 4        I, DEBRA A. DIBBLE, RDR, CRR, Notary
 5   Public, do hereby certify:
 6              That the witnesses hereinbefore set
 7   forth were duly sworn by me and that such
 8   transcript is a true record of the testimony
 9   given;
10
11              I further certify that I am not
12   related to any of the parties to this action by
13   blood or marriage; and that I am in no way
14   interested in the outcome of this matter.
15              IN WITNESS WHEREOF, I have hereunto
16   set my hand on 4-11-2022.
17
18
19   _____
20   DEBRA A. DIBBLE, RDR, CRR, CRC
21   NOTARY PUBLIC
22
23
24
25
```

Page 303

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2                    INDEX
 3
 4   PROCEEDINGS                              4
 5
 6   EXAMINATION OF KARL ERIK HANSEN:
 7   BY MR. WOODFIELD                        31
 8   BY JUDGE HOFFMAN                       112
 9   BY MR. ROBERTSON                       113
10   BY MS. BRAXTON                         244
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 304

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2              DEPOSITION EXHIBITS
 3   NUMBER        DESCRIPTION          PAGE
 4   Exhibit 1    was received          120
 5   Exhibit 6    was received           97
 6   Exhibit 16   was received           37
 7   Exhibit 17   was received          237
 8   Exhibit 19   was received           96
 9   Exhibit 22   was received           84
10   Exhibit 23   was received          205
11   Exhibit 31   was received           71
12   Exhibit 33   was received          167
13   Exhibit 49   was received          192
14   Exhibit 55   was received          255
15   Exhibit 62   was received          210
16   Exhibit 63   was received          171
17   Exhibit 71   was received           80
18   Exhibit 73   was received          214
19   Exhibit 73   was received          243
20   Exhibit 92   was received          121
21   Exhibit 94   was received          123
22   Exhibit 95   was received          123
23   Exhibit 96   was received          124
24   Exhibit 99   was received          126
25
```

Page 305

```
 1        Hansen v Elon Musk - Arbitration Day 1
 2   Exhibit 100   was received         128
 3   Exhibit 111   was received         110
 4   Exhibit 121   was received          62
 5   Exhibit 123   was received         106
 6   Exhibit 126   was received          39
 7   Exhibit 129   was received          66
 8   Exhibit 131   was received         144
 9   Exhibit 133   was received          57
10   Exhibit 136   was received          61
11   Exhibit 137   was received          75
12   Exhibit 138   was received          49
13   Exhibit 147   was received          89
14   Exhibit 150   was received         178
15   Exhibit 173   was received          89
16   Exhibit 176   was received          89
17   Exhibit 181   was received         152
18   Exhibit 183   was received         100
19   Exhibit 186   was received          96
20   Exhibit 194   was received         257
21   Exhibit 195   was received          84
22   Exhibit 197   was received         259
23   Exhibit 199   was received         107
24   Exhibit 204   was received         261
25   Exhibit 209   was received          73
```

**$**

**$100** 50:3 198:9

**$100,000** 140:6,12

**$13,000** 135:9 136:12

**$16** 105:5

**$16.50** 139:25 140:17 216:12

**$19.80** 160:9,23 215:3,10 216:4

**$27** 64:4,13 83:13 85:5 157:13 215:4

**$37** 49:21 135:2

**$500,000** 197:22 198:20 199:11

**$675** 220:13,16

**$787** 39:7

**$87,500** 63:2

**$98,700** 39:7

**0**

**0861** 158:21

**1**

**1** 4:1 5:1,8 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,5 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1

85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1, 18,23 119:1 120:1,9, 11,12 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1,24 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1,14 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1

255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1,2 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1,10 282:1,2,6 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1

**10** 255:15 256:11

**10-K** 233:10

**100** 50:2 126:4,10 128:10,12

**102** 39:9

**10:00** 300:23

**10:25** 56:25

**10:26** 57:2

**10th** 255:21

**11** 4:4 17:11 176:12 177:22

**111** 109:7 110:4,7,8

**11:00** 84:15

**11:04** 84:18

**11:15** 84:15

**11:19** 84:19

**11th** 78:24 79:3 158:24 159:8 160:21 173:23 176:18

**12** 4:9 17:11 231:18

**121** 61:22 62:13,21, 22 157:8 276:10 286:19

**123** 106:6,21,23,24

**126** 38:11 39:21,23 139:10

**129** 64:15 66:5,7,8

**12:00** 242:23

**12:28** 139:4

**12:30** 113:13 137:16

**12th** 81:10

**130** 150:7

**131** 144:4,6,14,15

**133** 56:3 57:6,16,19, 20

**136** 61:5,9,14,17,18

**137** 74:5,25 75:3,4

**138** 46:9 48:21 49:3,4

**13th** 106:3

**14** 37:17 210:25 211:3

**14.6** 155:13,14

**145** 219:8

**147** 86:18,19 87:4 89:15,17,19

**14:05** 280:5 282:6

**15** 123:22 243:13,16

**150** 178:6,8,11,20,21 215:19

**15th** 298:8

**16** 32:23 33:9,14 37:3,4,8,9,12,13 97:14 128:23

**16.50** 39:11

**16th** 58:2,3,4,22 60:14 234:12,19,21, 24 235:11 274:8

**17** 126:11,16 151:20 152:7 153:18 160:10 224:5 231:5,7 237:8, 9,11,12

**173** 86:18 89:4,15,18, 23

**176** 86:18 87:23 89:15,17,21 171:19, 25 172:6

**177** 60:18

**178** 216:18 217:2,5

**17th** 58:3 60:14 126:22 158:15 159:8,

11,19 168:11,16 214:24 235:5,13

**18** 119:13 120:5 121:3 150:11 162:20 163:23 168:9,16 171:6 256:11

**181** 151:4,5 152:11, 13,14

**183** 99:5,24 100:2,3

**186** 90:22 96:8,13,14

**18th** 86:20 120:16

**19** 54:20 55:11 57:9 95:19 96:2,6,7 170:9

**19.80** 160:3,12 255:24

**193** 257:23

**194** 257:6,22,24,25

**195** 83:15,16,22,24 84:2,5 258:4,5

**197** 258:16 259:8,9

**199** 107:3,8,10,11 214:3,10,13 216:20, 24 255:7

**19th** 47:19 54:21 56:5 58:9 106:4

**1:03** 139:5

**1st** 41:7 192:21 193:3 194:19 195:9,13 261:23 262:3,10 263:20 280:13,20

**2**

**2** 39:10 82:23 119:12 154:18

**2.5** 197:17,23 199:11, 20

**20** 8:10 68:16 122:21 165:3

**200-semester** 32:3

**2010** 35:18

**2016** 36:8

**2018** 24:4 27:14 32:19 33:16 38:20

40:4,11 41:7 49:23
54:20 57:9 58:22
63:22 66:14 68:14
72:10 86:21 88:16
90:11 92:2 93:2
97:14 100:22 101:5
116:3 118:25 119:13
120:5 121:3,25
123:22 124:16
126:11,16 128:23
130:4 135:3,8
139:15,22 142:7
144:7 153:18 155:11
158:24 160:10
163:24 164:13
165:19 170:9 172:7
176:13,18 177:22
195:9,11,12 198:12
231:18 245:22
255:11,15,16,21
256:11,12 261:23
262:11 263:2 280:22
281:10 282:2,6

**2019** 115:20

**2020** 32:8 109:2

**2022** 4:4

**204** 261:9,11,12
280:11

**205** 104:12,15,16
116:7

**209** 71:18 73:3,5,6

**21** 254:4

**21st** 171:6 253:22
254:16 255:10

**22** 83:15,19,20,22,24
84:2,4 86:21 88:16
152:21,23,24,25
153:9 172:7

**221** 106:6 110:11,15

**22nd** 87:16 88:8

**23** 192:10,20 205:5,7,
9 255:16,21 256:12

**23rd** 17:21 99:7,19

**24** 130:4

**25** 215:4

**26** 124:17 139:15

**27** 157:16 158:3

205:2,10,13 215:13

**27th** 64:16 86:21

**28** 66:14 72:10

**28th** 41:18 63:10
64:17 68:4 72:23
75:12

**29th** 100:22 127:4

**2:03** 183:20

**2:11** 183:21

**2nd** 40:11,22

━━━━━━━━━

**3**

**3** 42:24 78:15 82:24
92:2

**3-5** 168:9

**30** 8:10 101:5 113:11
137:23 145:19 300:6

**300** 198:20 199:11

**300,000** 197:16,22
199:19

**30th** 103:15,17 208:9
209:8

**31** 66:12 70:21 71:8,
19,21

**31st** 20:7 24:18 86:22
88:24 103:15

**3227** 253:7 254:25

**33** 161:5,10 166:20,
24 167:4,5

**3327** 209:24

**3380** 170:6

**3382** 170:25

**34** 215:4

**35** 113:14

**37** 198:9 199:20

**3:02** 222:2

**3:11** 222:3

**3:20** 230:2

**3:23** 230:3

**3:45** 243:20

**3:52** 120:17

**3rd** 14:11,25 15:3
19:2 20:11,21 90:11,
24 96:9 136:23
204:17 214:22
277:25

━━━━━━━━━

**4**

**4** 118:25

**4-11-2022** 302:16

**40** 24:7

**45** 300:6

**48** 223:19

**49** 184:3,5 192:11,12,
14,15

**4:00** 243:15

**4:02** 243:21

**4th** 17:13 103:19
105:10 119:8 157:25
168:24 215:24
241:17

━━━━━━━━━

**5**

**5** 40:4 109:4 242:22

**5-24** 162:20 163:23

**50** 31:10

**500,000** 197:16
199:19

**55** 252:22 253:3
254:22,24

**55-3227** 255:2

**58** 167:22

**5:00** 242:23 296:8

**5:05** 289:2

**5:15** 288:25 289:3

**5:22** 293:22

**5:24** 293:23

**5:30** 299:19

**5:32** 301:11

**5th** 53:9 74:9 168:6,

16 198:11 245:21

━━━━━━━━━

**6**

**6** 97:12,17,19,20
128:16

**6-** 43:11

**6-21** 171:12

**6-5** 163:24

**62** 207:24,25 208:4
210:15,19,21,22
212:17,18,19

**63** 166:18,21,22
167:6,8,14 171:20,
22,23

**6th** 50:21 216:3

━━━━━━━━━

**7**

**7,500** 276:6

**7-13** 214:18

**7-26-18** 214:19

**71** 78:22 80:8,10,12
176:2,7,11

**73** 212:16,24 213:4
214:5,6,8 237:14
238:25 239:2 243:5,
8,9

**7:30** 161:13

**7th** 50:21 74:23

━━━━━━━━━

**8**

**8** 124:16

**8,000** 43:11

**8-24** 216:3

**8-9** 263:25

**83,000** 109:5

**853** 62:15

**864** 286:22

**8:30** 299:20

**8th** 53:17 75:13
161:12 163:25 168:3

━━━━━━━━━

**9**

**9** 17:11 27:14 154:21,
22 300:16

**9-11-2018** 61:24

**90s** 32:15

**92** 120:7,14 121:14,
16,17

**94** 121:19,21 122:25
123:3,4

**95** 122:25 123:6,8,12,
15,16

**96** 27:9 123:17,20
124:11,12,15

**99** 126:5,7,8

**9:00** 300:23 301:10

**9:12** 4:4

**9:17** 253:23 254:5

**9:44** 29:18

**9:52** 29:19

**9th** 57:9 121:25
263:17 264:8,17
274:18 278:24
279:23 281:18

━━━━━━━━━

**A**

**a.m.** 4:4 29:18,19
56:25 57:2 84:18,19
301:10

**abide** 138:21 142:17
154:13

**abilities** 213:14

**ability** 108:17 276:12

**absence** 12:23 13:8
28:13 41:13 188:5,14

**absent** 25:13

**absolutely** 22:14
26:5 49:10 76:13
147:3 159:14 179:12
203:6 210:12 269:10
276:5,8 295:13

**accelerated** 102:2

Index: accept..appears

**accept** 25:11

**accepted** 12:24
63:22,23 174:10
175:16

**accepting** 156:20

**access** 9:13 18:12
36:2 45:4 64:8 75:10,
13 77:12 85:11,20
86:8 88:24 89:11
99:14 101:14 105:22
119:17

**accessed** 18:6

**accessing** 65:16
74:21 122:16,17

**accordance** 28:11

**account** 22:16,17
24:22 28:5,17
117:10,14 119:15
120:4 121:2,3,9
122:2,3,10 123:10,22
124:5,17,18 125:21,
22 126:12,13,17,25
127:2 128:5 170:2,
16,17 223:15,20
238:4 290:2 295:5
298:7

**accounting** 200:24
203:23

**accounts** 18:19
58:18 295:2

**accumulated** 32:2

**accurate** 115:9
124:19 129:12 147:2
168:17 180:15 181:3
200:3,19 214:25
216:10 245:24
247:18

**acknowledge**
296:21

**acknowledged**
156:25 200:16
207:15 259:14
283:14 284:3

**acknowledgment**
259:16

**act** 21:4 240:13

**acted** 26:5

**action** 12:17,19,23
13:8 25:19 28:23
97:9 98:15 99:20
228:7 302:12

**active** 31:24 32:14
33:24,25 34:8,23
35:17 36:6 126:17

**actively** 173:12

**activities** 18:15
20:15 40:17 89:9
237:4

**activity** 12:14,16,18,
23 13:9,23 14:4,9,13
15:11,12,14,16,18,19
16:6 19:7,19,21 20:9,
10,22 21:2,5,7,13,16
27:7,12 66:17 68:2
70:17 90:6,7 91:4
92:3 96:23 129:16
188:11 233:22 245:3,
16

**actual** 51:7 101:14
126:2 157:20 226:3

**acute** 111:4

**add** 9:23

**addition** 41:14 52:6
114:3 117:24 140:9
170:15 178:25 186:8
268:14

**additional** 9:23
94:14 106:14 123:8
164:6 195:18 244:21
274:10

**Additionally** 197:14

**address** 18:21 88:20
89:11 294:5

**addressed** 5:4 90:19
91:9

**addresses** 18:6
90:25

**Administration**
133:8,23 134:14
164:15

**Administration/
storey** 130:6,11
131:7

**admit** 5:10 23:17
110:12 117:18,21

**admits** 22:24

**admitted** 5:17,19,23
22:25 23:4,12 39:22,
24 216:22,23 254:25

**admittedly** 25:22

**adverse** 13:8

**advise** 80:17

**advised** 56:9 75:8
102:18 249:8 301:4

**advises** 15:8

**advocacy** 109:16

**Aerotek** 65:23
206:15

**Aerotek.com** 64:18

**affected** 221:16

**Afghanistan** 36:13

**afternoon** 6:9
244:16

**agencies** 130:16

**agency** 164:15
207:21

**agent** 35:3,6

**agree** 24:16 67:12
136:21 141:17,23
146:9 148:15,23
154:4,24 180:15
182:19 208:23
247:14,22 252:14
255:13,19 256:2
257:15,18 262:3,8,17
269:9 282:2

**agreed** 7:15,16 159:4

**agreeing** 143:2
154:13

**agreement** 24:13
28:7,12 83:21,22
142:20 143:4 153:5,6
154:25 155:10,15,16,
24,25 156:7,10,21
178:14 179:2,10,14
182:9,12,15,16

**agreements** 155:19
178:25 179:9

**agrees** 137:15

**ahead** 21:25 29:21
103:5 137:22 178:18
222:4,7 229:23 244:9
247:21 292:8 293:19
294:11

**air** 54:12

**Alarcon** 64:20,21,22
65:3,8,14,22,25 74:7,
11,16,19,20 122:12

**Alaska** 36:2

**Alex** 11:2 252:23
254:19 255:9 261:16
276:13 279:7 292:18

**aligns** 12:2

**allegation** 233:21

**allegations** 14:25
15:4 17:16 53:21
66:19 67:24 68:8
89:6,7 90:6 92:3
94:18 101:3 129:25
132:25 164:21
187:16 188:13,17
206:12 232:21,24
268:11

**alleged** 193:22,23

**allegedly** 165:13

**alleges** 27:9

**allowed** 54:18

**amazing** 94:13

**Amber** 145:9

**ambitions** 146:22

**amended** 27:10

**amendment** 155:24

**America** 192:3

**amount** 104:3
201:25 220:15
221:11

**analysis** 45:15
115:11

**analyzing** 45:12

**and/or** 39:15 69:2

**Anne** 60:25 118:18
127:13 129:20
142:13 145:2 151:13
168:4 204:2

**Anne's** 212:21
237:15

**announced** 213:15

**announcement**
165:6

**annual** 60:11 140:6

**anonymous** 132:7,
8,12 133:7,25 134:15
164:22 166:3,16
184:7 185:16 188:2
207:22

**answering** 224:19

**answers** 17:10 30:8
70:3

**anticipate** 12:7

**anxiety** 104:3 111:6,
14

**anymore** 25:8 28:18
271:13 272:10

**AOR** 36:22

**apologetic** 82:4

**apologies** 258:17
299:5

**apologize** 161:6
225:12 226:15
257:24 269:3 278:8,
13

**apologized** 63:25

**apologizing** 82:3

**apparently** 53:11

**Appeal** 222:23

**appearance** 282:18
283:11 284:22
290:11

**appeared** 44:4

**appears** 29:3 67:18
99:11 120:16 123:23
124:16 125:23
128:22 161:12

Index: application..authenticate

167:18 168:2,17
216:10 239:13
255:14,23 256:15
261:22 263:13
287:12

**application** 83:16,23
171:13 175:16

**applications** 175:11

**applied** 35:2 38:9
139:19 173:22 174:2,
3,5,15,16 177:14,19,
23 218:16

**apply** 5:20,23 32:20
152:17 173:14,20

**applying** 38:8 109:9

**appreciated** 59:19

**appreciation** 59:9

**apprehensive**
93:20,21

**approached** 101:9

**approaching** 101:12

**approved** 179:19
180:3

**approximately**
36:22 58:2 68:14
106:3 109:5 197:17,
23 270:23

**apps** 169:8

**April** 4:4 40:11,22
124:16,17

**ARB** 13:12,18

**arbitrarily** 69:13

**arbitration** 4:1 5:1,
25 6:1 7:1 8:1 9:1
10:1 11:1,23 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1

61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1,20,21
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1

238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1

**arbitrations** 4:24

**arbitrator** 12:5 26:21
125:10 291:1

**arbitrator's** 14:10

**Arconic** 112:24

**area** 36:19 85:20,23
104:9

**arguing** 26:16

**argument** 22:7

**arm** 35:11

**armed** 35:25 94:22

**Arms** 146:19

**Army** 33:19,25 34:23
35:3,9,20 36:9
145:18

**arrange** 262:12
263:11

**arranged** 100:25

**arrangement** 179:4
180:23

**arrest** 53:24

**arrested** 68:25
122:14 135:11
165:19

**arrestees** 51:9

**arrests** 51:6,18

**arrived** 102:6

**articulately** 27:11

**asks** 70:10

**aspects** 107:23
125:15

**assert** 21:12

**asset** 145:20

**assigned** 24:8 33:21
35:13 40:17 43:17
55:21 72:15 80:24
81:2 181:23 196:6
215:23 216:8 269:13

**assignment** 28:16
35:14 235:10 240:22
241:16

**assignments** 25:11,
14

**assistant** 14:22

**assisted** 41:16

**assisting** 35:24

**associate** 32:20 39:2
40:7,14 235:20,21
236:2,3,8,15,20,21
295:3

**associates** 10:20
55:21 98:20 165:17
295:3

**assume** 41:13
114:14 121:12
151:20 184:17
210:14 224:15
248:12 250:11
260:19

**assumed** 242:22

**assumes** 13:6

**assuming** 246:16,22

**assurance** 34:19

**at-will** 142:2

**attached** 122:9
170:11 177:20 199:9
204:6

**attaching** 120:22
122:6

**attachments** 123:24
124:22,24

**attempted** 135:9
220:3,9,18 221:3,13,
16

**attempting** 186:8

**attempts** 185:18
197:5,7,9

**attendance** 280:8
281:8,12,25

**attending** 261:25
280:18 283:8

**attention** 4:24 14:10,
14,15 16:9,11,21,24
161:5

**attorney** 97:14,24
100:24 119:6 128:22
129:4,5 134:2 165:6
195:15 219:14
234:11,18 240:24
264:4,9,20 274:8,13

**Attorney's** 68:15
165:2 166:15 219:18

**attorney-client** 20:6

**attorneys** 244:5

**audit** 53:10,12
200:17,21

**August** 14:11,25
15:3 17:21 19:2 20:7,
11,21 24:18 27:14
88:13 90:11,24 92:2
93:24 96:9 97:14
99:7,19 100:22 101:5
103:15 109:2 128:23
136:23 192:21 193:3
194:19 195:9,13
204:17 208:9 209:8
214:22 234:12,19,21,
24 235:6,11,13,16
253:22 254:4,16
255:10,15,16,21
256:11,12 261:23
262:3,10 263:2,17,20
264:8,17 277:25
278:24 279:23
280:13,20 281:10,18
282:2,6

**authenticate** 115:18

**authenticity** 291:15

**authority** 237:3

**authorize** 206:8

**authors** 224:11

**average** 233:11

**avid** 111:16

**avoid** 12:20 13:19

**await** 103:6

**award** 5:4 59:7,17,19

**awards** 227:8

**aware** 12:5 14:17,18 50:11 53:8 59:15 66:18 76:16,17,18 77:8,18,19 78:3,8 91:22 96:23 98:12 130:14 131:5 148:10, 13 156:12,14 179:6 190:7,8 191:17 194:10,11 236:5,22 245:23 268:16 273:23 274:3,5,9,15, 20,25 275:2,20 283:15 284:4,20 294:20

**axiomatic** 27:19

**B**

**back** 6:13 14:21 19:15 20:11,13,17 24:9,12 25:13,24 34:5,23 36:13 47:14 57:3 72:22 81:19 82:19 84:15,21 89:4 92:25 93:4 94:23 101:6,25 104:20,23 105:10 106:16 111:18 128:15 141:15 154:12 158:11 173:8,21 174:3,7 177:23 188:20 189:25 191:14 192:6 202:5 204:25 205:13 206:24 215:23 228:13 229:14 230:6 233:20 239:17 243:17,22,24 278:2,7 280:10,23 281:5 283:24 285:3,4

286:18,19 288:25 289:4,11 293:24 294:4 298:19,25 299:6

**back-up** 219:11

**background** 31:20 39:15 72:17 87:19 146:20 186:16 187:3, 7,13,14,21 188:5,6,8, 19 205:24 206:5,18

**badge** 297:10 298:19

**badge-making** 65:7, 20

**badges** 51:14,15 64:24 86:10

**badging** 22:20 41:24 94:11 117:15 119:16 120:23 122:22 123:9, 25 124:3 170:22

**bandwidth** 75:25 80:19 229:17

**banned** 94:6

**barking** 48:13

**Base** 36:14

**based** 45:11 58:7 80:5 122:6 126:22 188:16 199:3 201:2 232:24 238:21

**basically** 25:13 35:11 36:10 40:17 41:23 60:4 81:14 82:5 85:11 167:23 168:14 169:10 175:10

**basis** 26:24 28:20 175:21 199:13 200:22 232:21 238:21 269:8

**Bates** 62:15

**Battalion** 35:9

**batteries** 42:23

**battery** 49:19

**bear** 33:5

**bearing** 301:3

**began** 31:22 33:17 40:4 43:23 63:21

91:15 165:15 249:21, 23 270:23

**begin** 40:19 242:9

**beginning** 41:6 105:11 142:6 202:5 214:18 216:3 255:15 270:25 296:18

**begins** 85:17

**behalf** 9:22 26:11 95:22 237:4

**behavior** 17:23

**belief** 15:23,24 83:2

**believed** 96:25

**believes** 15:8

**bell** 150:16

**beneficial** 290:19

**bid** 204:17,22

**big** 42:25 43:22 226:19

**bill** 180:20

**bio** 183:14

**bit** 21:24 34:9 46:6 55:24 67:3,13 73:11 101:18 112:14 129:20 137:19 151:10 153:12 202:12 247:25 253:8 256:17 258:21 276:19 279:16,20 282:8 286:24

**bits** 8:16

**blank** 210:4 213:13

**blind-copying** 192:25

**blood** 111:15 302:13

**Bloomberg** 222:19

**board** 11:23 151:22

**boarding** 34:13

**boards** 36:6

**Boeing** 12:25

**boiler** 86:7 100:11

**bonuses** 60:11

**book** 224:10,11,13, 15

**books** 83:12 251:16

**Boomtown** 109:20, 21 114:5,24

**Boston** 242:20

**bottle** 59:13

**bottom** 63:14 142:16 145:2,3,4 168:7 177:17 277:25

**box** 167:19,24

**branch** 297:10

**branches** 35:25

**Braxton** 9:21 10:24, 25 26:8 108:7,10 229:13 243:12 244:2, 10,11,15 246:19 252:18,19,20 253:7, 15 254:3,9,19,23 255:4,9,12 257:5,8, 19 258:3,10,14,19 259:6,11 261:14,20 262:9,24 276:20 277:7,15 278:17 279:2,6,11 280:2,10, 12 283:22 284:10 286:21 288:19,23 289:4,6,12,15,21 290:7 292:6,10,16,22 293:10,15,20,25 294:6 298:25 299:5, 10,11,16 300:5

**break** 29:16 34:14 84:10 105:15 112:17 113:7,10 137:22 182:25 183:14 288:20 289:8,22 301:3

**breaking** 84:8 113:13 299:23

**breaks** 34:3

**breath** 55:25

**briefed** 52:18,19 198:25

**briefing** 13:15 54:11 213:15

**briefings** 132:24

**briefly** 12:6 33:11

**briefs** 10:3,9,11 29:6

**bring** 7:7 9:8 14:14 16:9,11,24 53:6,15 73:18 129:19 297:9

**bringing** 8:15 82:16

**broad** 266:8

**broadly** 30:12

**broke** 199:15 225:11 230:8 247:25

**brother** 298:23

**brought** 6:16 51:15 64:25 71:25 228:7 230:11,16 246:2

**Brown** 57:13

**Bruce** 145:9,14

**BS** 81:22

**buddy** 296:12

**building** 101:13

**buildings** 85:21

**built** 5:16

**bullet** 134:23

**burden** 13:5,6 20:3

**burden-shifting** 13:3

**business** 8:21 37:24 145:24 181:25 193:12 222:11 230:5 232:17 294:13,17,23

**bye-bye** 298:23

**bypassing** 205:23

**C**

**California** 36:21 140:6

**call** 6:25 7:16 8:4 29:9,21,25 30:14 72:23 103:7,9,16,18, 20 229:10,23 261:4 280:4 289:25 290:8 296:14 299:12

**called** 7:3 17:4 31:13

42:11 102:6 112:24
131:14 223:7 289:25

**calling** 6:18 226:2,19

**calls** 224:17 232:9
271:8,14 288:2
290:4,6

**camera** 125:20

**cameras** 119:22
125:8,11,14

**cancelled** 163:22

**candidates** 173:10,
13

**canines** 73:19

**capacity** 35:23 36:15
64:8 82:7 94:6
108:18 249:11,12,25
250:2 251:8,17
266:23

**caps** 130:7 197:18

**capture** 125:14

**captured** 288:10

**carbon-copying**
64:19

**care** 36:3,12 78:15
102:21 297:24
298:23

**career** 31:24 34:24
35:18

**carefully** 69:25
202:6

**carries** 123:25

**Carroll** 127:25

**carry** 300:2

**cars** 42:24 119:24

**cart** 50:23

**cartel** 14:13 53:21
66:17,19 67:25 68:5,
20 69:21 70:17 73:13
89:7,9 90:6 91:4 92:3
129:16 206:12 232:5,
6,25 233:3,17 266:5
268:13

**case** 4:19 5:2 6:19,
23,25 8:2 9:15 11:19,

20 12:12 13:4,11,17
14:4 20:13 21:2
22:10,15 23:2,23
25:20 41:10,20 43:15
47:15 51:3 69:25
74:19 113:25 114:16
136:5 170:3 193:25
194:2,9,11,13 273:5

**cases** 42:5

**casing** 65:16

**Casino** 109:20
114:5,24

**casinos** 146:20

**castings** 49:18

**casual** 271:13,14

**catch** 167:9

**causing** 210:11

**cell** 169:7

**center** 36:16 102:4

**Central** 32:4,11
192:3

**certify** 302:5,11

**cetera** 7:18

**CFO** 200:17,21

**chain** 104:19 239:4

**chair** 213:16

**chance** 278:9 280:7
281:7 297:12

**change** 40:9 41:5
55:7 210:6

**changed** 40:13

**characterization**
292:3

**charge** 34:19

**charged** 156:3

**charging** 94:22

**chart** 47:9 48:7

**Chartcast** 222:25

**chasing** 66:22

**chastising** 201:21

**check** 85:20 186:17

187:3,7,13,14,22
188:19 205:24 206:6

**checks** 105:23
206:18

**children** 31:17

**Chris** 50:10

**Christopher** 46:24
50:25

**CID** 35:9,11

**circles** 99:9

**Circuit** 12:25

**circuitous** 69:11

**cited** 18:10

**cities** 34:21

**civil** 98:15 108:21

**claim** 12:9 28:21,22
134:19 225:17
226:21 230:11,17
232:22

**claiming** 232:23

**claims** 13:2 27:10
244:22 285:6

**clarification** 262:6

**clarified** 172:16

**clarify** 87:18 164:5
244:23 264:7 278:3

**clarifying** 159:23

**Clausen** 217:19

**clauses** 15:13

**clean** 210:2 230:13

**clear** 5:11 10:14
12:21 13:6,20 19:16
20:3 21:17 163:3,9
250:3,6 251:7 271:6
277:23

**client** 294:18

**clients** 142:23

**climate** 210:6

**clips** 117:22 125:20

**clock** 183:3 242:12

**close** 8:21 50:2

101:20 137:14

**closing** 29:5

**closings** 22:8

**clue** 185:23

**CNBC** 222:17

**Coast** 34:11 183:3
242:11,20,23 299:17
300:24

**cocaine** 165:14

**code** 102:5

**cognizant** 183:6

**coincides** 256:12

**colleague** 17:23
47:4

**colleagues** 47:7
76:18 98:20

**collective** 49:15

**college** 32:4,6
174:23 175:3

**comfortable** 22:9

**comings** 125:16

**command** 35:4,21

**commensurate**
39:15

**comments** 102:11
218:23 223:19
239:19

**Commission** 39:7
129:2 225:16

**Commission's**
36:21

**commodity** 45:5

**common** 190:25

**common-law**
161:20

**commonalities**
45:16 46:5

**communicate** 90:4
270:9

**communicated**
166:7 222:14 264:3

**communicating**
6:12 77:13 209:12

**communication**
189:9 191:18 194:20,
24 248:24 270:9

**communications**
65:9 219:17 222:10
263:3 266:16 272:3,
18 273:4,9

**Community** 32:6

**companies** 270:2

**company** 25:18
34:15,16 79:20
107:20 112:23
141:19,24 169:12
200:18

**company's** 202:19

**company-wide**
90:16

**compensation** 83:9,
10 109:3

**competence**
227:17,20

**competitive** 148:19

**compiled** 95:9

**compiling** 49:13
211:10,14

**complain** 211:16

**complainant** 13:21

**complainant's** 8:2
30:15

**complained** 211:18,
21

**complaining** 212:4

**complaint** 15:17
17:3 19:8,9,21 27:13,
18,23,24 41:25
100:25 225:9 226:3
245:7 273:22 274:12
276:16 277:19
287:15,20 288:11
289:9,24 290:10

**complaints** 17:16
36:4 45:19 95:21

**complete** 130:23
155:16

**comply** 24:14 142:19 154:4

**comprised** 130:15 231:13

**compromised** 198:11

**computer** 241:4,16

**computers** 33:5

**concede** 250:10

**concern** 67:24 102:8 200:15 202:20

**concerned** 18:14 23:6 55:8 78:14 98:19 247:10 249:14

**concerns** 18:8 48:9 52:11,14 70:17 73:12 77:20 78:11 88:9 90:18 93:13 129:15 238:20 241:2 245:13 260:6 266:17 273:14, 16

**concluded** 166:2

**conclusion** 21:20 219:25 220:8

**concrete** 241:6,14

**concur** 8:19

**condition** 142:18

**conduct** 23:12 26:25 28:14 40:16 54:19 85:19 115:11 154:6

**conducted** 47:16 69:15 85:9 199:4 242:7 265:4

**conducting** 35:6 55:12 68:19 69:3 72:14 175:23 186:6 189:7 266:5

**confer** 138:5 154:25

**conference** 92:19

**confidential** 18:5 142:22 193:21 194:6 265:11 267:20

**confidentiality** 142:20 143:3

**confidentially** 265:7

**confirm** 129:11 134:6 153:11 166:13 196:25 244:23

**confirmation** 134:11

**confirmed** 132:22 133:6

**confirming** 9:10

**conflate** 15:24

**confused** 189:12

**confusion** 81:11

**conjunction** 33:23

**connected** 48:12

**connection** 56:10 132:7 133:24 134:15 153:6 206:11 207:14, 21 219:14 234:17

**consensus** 10:13

**consent** 287:24 288:3

**considerate** 299:19

**consideration** 290:16

**consistent** 59:20 176:22

**consistently** 77:14

**constantly** 96:21

**constitutes** 141:25

**construction** 53:2

**constructive** 267:4

**constructively** 12:15

**consultant** 109:15

**contact** 42:4 54:5 79:14 89:10 90:18 162:10 163:6 164:10 165:12 195:5 219:21

**contacts** 162:13,16

**contemplating** 106:16

**contemporaneous** 155:19

**content** 80:2

**contents** 18:23 265:6,15 270:17

**context** 71:2

**continuation** 155:2

**continue** 34:24 54:13 60:12,16 74:10,15,18 75:9 79:24 84:21 108:17 139:6 190:18 251:9 272:6,18 278:7,16,21 293:25 300:16

**continued** 35:18 46:16 112:21 190:12, 15 285:18

**continuing** 79:16 85:11 86:13 241:15

**contract** 25:24 34:22 52:25 55:3 60:4,10 63:2 66:2 93:25 179:6 180:10 182:6 204:22 235:4 266:19

**contracting** 34:16 172:18 206:24

**contractor** 18:18 24:8 25:20,23 72:7 104:9 154:23 155:2,5 172:21 173:2 206:23

**contractors** 22:22 44:3 45:22 46:6 206:12,19

**contractual** 28:6 295:4

**contrary** 48:20

**contributing** 12:19

**contributions** 140:10

**control** 85:11 105:22 111:2 127:14

**control-room** 48:4

**controls** 105:22

**conversation** 87:16 88:7 116:17 134:4 162:3 172:11 191:16 212:2 213:21 249:7,8 268:2 272:12,16,17 274:17 282:25 284:13,16,19 294:8

**conversations** 98:10 132:23 198:3 262:16 264:25 272:3 273:3 287:23

**conveying** 162:8

**convicted** 51:9

**convincing** 12:21 13:7,20 19:16 20:3 21:18

**cooperate** 137:6,11

**cooperation** 129:6

**copper** 43:20,22 44:18,19,24 45:8,20 47:21,24 48:10,11,18 49:8,9,10,11,16,22 50:23 52:12 53:7,13, 24 87:6,10 120:19 134:24 135:17,21 136:12 190:5 191:14 198:10 203:20 219:14,19 220:2,8, 18,24 221:6,11

**copy** 257:16

**corporate** 131:22

**correct** 10:17 11:6 22:18 33:9 39:8 45:10 88:17,25 89:2 95:23 99:21 104:25 109:13,16 114:16 117:10,15,22 122:5 123:10 125:8,12,22, 23 126:17,21,24 128:5,23 129:4 131:18 133:18,19 134:19 136:8 137:3,6 140:7,14 141:10,16 142:7 143:5,22,25 149:23 152:18 155:11 156:15 158:15 160:24 165:20 169:18 171:7 174:3,8,12,13 177:9, 10,15,16,24,25 186:21 189:24 193:4, 8,18,21,25 194:14,16 195:23 197:11 200:18 204:13 206:13,16 208:10 209:11 214:24 215:11,14,25 216:4,9 222:15 223:9,16

**correction** 42:22

**corrections** 32:13

**correctly** 105:9 157:17 162:18 299:21

**cost** 180:14

**counsel** 5:6 6:12 7:6, 12 8:19 9:6 11:3 14:23 27:2,11 28:14, 25 29:4 54:4 70:10 92:25 95:2,22,23 114:10 115:10 138:5 184:22 195:2,9,10,22 201:3 203:9 211:12

**count** 122:19

**counterdrug** 33:21, 22 130:13,15

**counterpart** 47:4

**County** 54:4 65:5 130:6,11,19 131:7 132:3,16 133:15 162:11 164:11 185:5, 10 219:13,18

**couple** 7:12 34:3 105:10 223:11,14 231:12 298:3

**coupled** 18:12

**courses** 32:3

**court** 10:9 11:22 244:7 262:6 283:23 284:2 289:11,16,20

**coworker** 16:15,16

**crazy** 69:8

**CRC** 302:20

**credence** 187:25
188:12

**crews** 34:20

**crime** 92:4

**crimes** 122:18

**criminal** 32:10 35:3,
7 40:16 96:23 97:4
186:16 187:3,7,13,21
188:5,6,8,10,19
206:25 245:3,16

**critical** 17:8 18:25
23:20

**criticize** 15:22 16:2
238:16,17

**cross** 138:4,10
242:17

**cross-examination**
112:16 113:5,15
130:24 139:7 242:7
243:10,25 244:10
294:2

**cross/direct** 7:18

**crosstalk** 186:14

**CRR** 302:4,20

**cryptic** 267:12

**culminated** 50:21

**current** 72:3 203:2
295:6

**Customs** 33:23

**cut** 45:25

**cutting** 201:20 202:2
220:21

**D**

**DA's** 54:4 65:5,9,19
219:21

**daily** 85:9 269:8

**damn** 102:19 162:23
210:5 296:13

**database** 95:8

**date** 58:6 61:24 62:2
68:4 75:12 103:14
119:22 153:17
171:13 207:9 214:22
234:21 257:17
272:13,23 277:16,18
278:23 281:16
287:12

**dated** 86:20 99:18
118:25 120:16
139:15 172:7 192:21

**dates** 119:16 158:19
234:10 277:23

**daughters** 31:17

**Davis** 16:15,22 17:23
18:2,8,10,14 19:10
40:21,22 47:18 50:9
99:7 100:16 237:16,
17,20,23 238:2,13,
16,19,21

**Davis's** 16:14 19:13
20:2 40:23

**day** 4:1 5:1 6:1 7:1,22
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1,17 53:1 54:1
55:1 56:1,8 57:1,8
58:1,8 59:1,5,7 60:1,
14 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1,7 89:1 90:1
91:1,21 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1,18
104:1 105:1 106:1
107:1 108:1 109:1

110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1,20 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1,22 214:1
215:1,22 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1,3 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1

278:1 279:1 280:1
281:1 282:1 283:1,8
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1

**days** 4:7 160:21
298:3

**DEA** 130:7,19 132:15
133:15 134:2,5
162:11 185:6,10

**dead** 188:16

**deal** 43:23 111:7
162:23

**dealing** 36:16 232:18

**Deb** 294:3

**Debbie** 30:16 44:12

**DEBRA** 302:4,20

**decade** 44:18

**decided** 34:23 36:9
37:18,25 95:3 149:11
159:17 175:20 251:2

**decision** 27:17
63:15,16 100:9
247:11,15 248:5,7,23

**defamatory** 218:15

**Defense** 35:15,19
36:9

**defined** 176:20

**definition** 227:13

**degree** 31:24 174:23
175:3

**delay** 268:22

**delegate** 42:7

**delegated** 190:24

**delete** 75:14,18,22
76:3,5,8,11 271:9,22,
23 272:4,11

**deleted** 18:23

**deliveries** 105:23

**demonstrate** 274:4

**demonstrating** 13:6

**denial** 22:13

**denied** 163:20

**deny** 117:7 134:6

**departed** 102:24

**department** 32:16
35:15,19 36:8 40:13,
25 41:2 50:6 55:10,
19 108:22 132:4
134:12,13

**departments** 79:11

**depo** 220:12

**deposed** 22:25
136:5 200:14

**deposition** 8:16 23:4
136:11 143:16 219:3
220:14

**depositions** 8:7,12

**deputy** 132:14
133:13

**derogatory** 188:9

**description** 147:2

**deserves** 5:24

**designated** 42:3

**desirable** 242:10

**desk** 18:9

**detail** 17:15 244:21

**details** 35:14 294:19
295:11

**determine** 133:22
182:9

**determined** 18:22
68:22 93:3 248:16,19

**developed** 36:11
241:7

**Development**
108:23

**dial** 229:18

**DIBBLE** 302:4,20

**dictated** 260:24

**difference** 166:6
225:25 226:19 295:4

**differently** 137:2

**difficult** 70:5

**direct** 23:21 25:6,25
77:12 115:17 128:18
136:22 139:13 153:4
157:7,9,12 161:5
172:11 193:8,14
201:17 219:17 260:9

**directed** 72:11 81:2
83:11 91:12 92:19
94:4 102:15 103:11
118:16 175:3 247:23
249:9 251:8,15 265:8
268:11 284:14

**directing** 54:22,23
205:12 266:17

**direction** 138:5
249:13 266:24
298:20

**directive** 286:3

**directives** 266:20
268:10

**directly** 41:9 72:12
82:10 87:13 90:18
91:7 92:10 101:22
134:2 166:17 213:20
241:19

**director** 82:11

**disability** 140:11

**disagree** 48:17,19
149:13

**disagreed** 249:14

**disagreement** 70:16

**discharged** 13:21,
24 19:17

**disclose** 130:2
134:24 265:10

**disclosed** 234:25

**disclosing** 267:12

**disclosure** 52:23
142:21

**disclosures** 201:5

**discover** 121:11

**discovery** 143:15
218:5 273:5 294:8

**discrete** 4:9

**discuss** 82:18 92:20
100:25 101:2 110:12
138:19 210:11 264:4,
9 272:9 282:17 301:4

**discussed** 10:2
22:11 81:11,17 91:11
101:3 150:22 175:2
176:21 177:8 240:9
270:17,20 275:3,6
282:20

**discussing** 162:23
211:24 265:15 268:9
272:6

**discussion** 10:4
22:9 37:25 44:9
56:21 93:11,18 95:4
173:18 195:8 212:3
237:16 246:16,22
248:11 270:15 293:4,
13 300:11

**discussions** 59:5
79:5 82:2 134:3
150:21 155:19 156:8,
18,23 160:16 163:5
185:15,19 212:3
225:2 238:12 239:15
240:7 254:17 266:12
270:11,16

**display** 119:16,19

**dispute** 4:16 11:18
22:15,19 24:17,18
25:16

**disputed** 21:11

**distinguishing**
166:6

**distressed** 223:23

**district** 219:13,18

**disturbing** 16:25

**Dobbins** 145:9

**doctor** 104:2,24
105:14 110:25

**document** 33:12
53:20 66:19 70:24
71:11 124:7 127:5,7,
9,12 128:7,17 130:18

135:6 141:23 161:9
167:16 169:11 176:4
178:5 184:18 195:24
218:20 231:10,15,17
235:24 239:23
257:13,17 258:21
261:18 273:10
276:17,22,25 277:4,
9,11,14 278:15,20,22
279:21 282:22 283:4

**documentary** 224:8,
15

**documenting** 64:11
85:10 86:12

**documents** 5:2 9:19
18:20 23:22 69:5
119:14,18 125:2
143:14 184:22
256:22

**Dodd-frank** 12:9
28:21 29:3

**dogs** 73:18

**dollars** 199:11

**domestic** 20:19

**Donald** 35:16

**door** 90:17 91:17

**doors** 85:21

**Dorado** 109:23,25

**doubled** 110:14

**doubt** 58:25 59:3

**dozens** 119:23

**drafts** 22:15

**drawn** 4:24

**driver** 65:14 101:10,
24

**dropped** 101:23

**drove** 209:9

**drug** 53:21 68:10
69:21 90:6 129:15
130:5,11 131:6
133:8,23 134:13
164:14 165:3 186:10
188:11 205:25
207:21 232:4,5,18,24
233:2,14,22 268:13

**drug-trafficking**
68:17

**drugs** 232:17

**DTO** 68:12 69:19
165:4,22

**dude** 297:15

**due** 58:23 78:13
90:14 127:20

**dug** 19:25

**duly** 30:20 302:7

**Dunne** 10:20,21 61:3
127:18 216:23
292:23

**duration** 269:23

**duties** 40:17 41:14,
21 76:7 85:25

**duty** 31:24 32:14
33:24,25 34:8,23
35:18 36:6

**E**

**e-mail** 16:13,14,20
17:24 18:5,18,20
24:24 56:4 57:6,14
75:10 76:5 78:23
79:2 80:15 86:20,21,
22 87:4,6,15,25
88:12,13,23,25 89:3
90:12,23 91:3,18,24
92:8,20 93:10,13
95:5 96:9 99:6 104:5,
18,19 110:11 115:25
116:13 117:9,13
120:4,15,16,25
121:10,24 122:2,9,10
123:10,21 124:16
128:4 144:5,7 145:3
149:24 151:6,7,19
163:5 167:19 169:3,
4,12,16 170:2,8,16,
18 172:6 176:12,17
177:18 192:21 193:7
194:18 204:5,16
217:7,13,24 218:7,13
237:17 261:22 263:6
264:12 278:10
279:12 280:7,13,14
281:7,15,20 282:5

**e-mailed** 14:11

**e-mailing** 238:3

**e-mails** 20:23 22:16
24:19 61:23 62:4
64:16 74:7 75:15,19,
22 76:3,12 88:19
90:16 121:8 167:19
169:15 170:15,17,20

**earlier** 121:5 161:23
263:5 264:24 273:12
287:10

**early** 32:15 52:18

**earned** 115:19

**earning** 114:10

**earnings** 255:14

**easier** 10:11 219:6
220:22

**East** 183:3 242:11,20
299:17

**easy** 45:2

**eat** 295:3

**education** 31:21,22

**effect** 189:17 232:7

**effective** 57:25
155:25 297:5

**effectively** 12:10
17:4 294:17

**efficacy** 233:8

**effort** 101:21

**efforts** 44:6 59:20

**egregious** 23:11
25:21

**eighty-seven-five**
60:10

**EI** 109:23,25

**elected** 159:15

**electric** 42:21

**electrical** 51:23 52:3

**eliminated** 58:10
75:13

**Elizabeth** 64:18

**Elon** 4:1 5:1 6:1,18 7:1 8:1 9:1 10:1,15 11:1 12:1 13:1 14:1, 11,18,20 15:1 16:1 17:1,9 18:1 19:1,5,8, 9 20:1,20 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1,21 50:1 51:1 52:1 53:1,9 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1,10,22 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1,10,13,15, 24,25 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1,25 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1

188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1,8 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1,20 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1,17 296:1 297:1 298:1 299:1 300:1 301:1 302:1

**emergency** 32:17

**emotional** 113:23

**emotionally** 110:19, 22 111:3,5,12 223:23

**emphasis** 32:17

**emphasize** 30:11

**employed** 8:13 17:17 18:7 28:15,18 74:21 85:3,24 94:17 143:5 169:13,17 181:13,22,24 215:9 236:25 250:17 260:2, 23 285:5,17 295:9

**employee** 18:18 19:3 25:20 41:8 48:5 51:7 58:14 65:22 66:3 68:24 69:18 72:4,5,8 92:21 119:19 133:17 141:13 142:17 165:22 168:15 216:13 246:7 257:3 259:16 260:8 265:5, 17 269:7 270:19,22 285:19

**employees** 22:23 52:25 55:7 69:2 76:18 90:16 189:15 246:11 259:18 260:10 265:11,17

**employer** 12:14,20, 22 13:5 14:23 21:6 154:4

**employment** 12:17 13:8 15:10 39:19 57:24 58:21 63:2 81:8 83:17 108:20 115:19 141:6,9,24 142:2,5,19 244:18,20 256:17,21 260:7 285:18,19

**end** 4:15 5:15 10:12 22:10 34:22 41:18 57:24 62:25 81:21 83:3 87:7,10 155:4 231:3 235:10,16 270:25 272:23 284:9 294:15

**ended** 150:25 172:25 193:24 194:8,13 240:23 241:17 298:24

**ending** 58:21,22 76:9

**ends** 277:24

**enforcement** 34:12 53:6,15 54:9,14,16, 19 73:17,19 82:17 97:3 130:5,11,16 131:7 132:3,11 133:8,23 134:6,13 145:18,19 146:20 162:13,16 163:8,19 164:5,10,14 184:16 185:19 187:6 196:5, 16 197:3 207:21

**engage** 15:10 19:19 95:3 97:2 237:4

**engaged** 12:13,16 13:22 19:18,20 21:16 25:22 262:15 263:3

**enjoyed** 79:23 107:19

**enlighten** 218:21

**enrolled** 32:8

**entered** 55:2 115:21 255:6 276:10

**entire** 62:16 85:5 95:5 167:24 209:5

**entitled** 226:25 230:19

**entitlement** 227:10 230:21

**entity** 263:10

**Erik** 30:19 31:8

**erratic** 18:14

**escalated** 19:10

**essence** 174:5

**essentially** 47:12 60:15 63:5 64:3,9 77:17 86:3 90:17 93:8 146:3 156:21 245:4 251:12 272:4 280:17 282:15 283:12 288:10

**establish** 12:11 115:5

**established** 70:25 214:23 215:22

**estate** 37:24 38:5

**estimate** 122:23 135:25

**estimated** 43:10 231:24

**estimates** 49:11,25 197:25

**evaluation** 36:5

**event** 111:9 227:2 233:10 283:5

**engage** section continues...

**everyone's** 16:9

**evidence** 5:19,22 10:7 12:13,21 13:7, 20 19:17 20:3 21:10, 18 26:5,17 45:21 114:25 115:18 116:8 128:16 135:6,7,12,13 189:11 198:21 218:16 241:7,8,12,14 251:19 255:6 257:20 259:7 273:2,20 274:4,10 275:12,15, 24 276:6,7,10 284:12,16,20 290:9 291:19

**evidentiary** 94:14 291:3

**exact** 264:13

**examination** 31:3 84:21 112:9 113:18 202:12 244:13

**Excellent** 183:24 230:8

**exceptional** 79:22

**excess** 46:2 50:2 199:2

**exchange** 67:12 129:2 205:13 208:5,6 225:15 253:17,20 271:7,12 276:9 277:24 281:16 286:19 287:12,17

**exchanged** 270:3,12 287:14,18

**exchanges** 213:5

**excited** 141:20

**exclusive** 155:16

**exclusively** 48:3

**excuse** 10:2 87:21 245:23 273:18 274:3 282:5

**executive** 35:13 217:20

**exercised** 28:5

**exhibit** 4:20 5:7,8,10 32:23,25 33:14 37:3, 4,8,13 38:10,17

39:21,23 46:9 48:21
49:4 56:3 57:5,6,16,
20 60:18,20 61:5,9,
14,18,22 62:13,22
64:15 66:5,8,12
70:21 71:8,18,19,21
73:3,6 74:5,25 75:4
78:22 80:8,10,12
84:4,5 86:19 87:4,20,
23 89:4,19,21,23
90:22 95:19 96:2,7,
14 97:12,17,20 99:5,
24 100:3 104:12,14,
16 106:19,21,24
107:3,8,11 109:7
110:4,8,14 116:7
118:18,23 120:7,9,
11,12,14 121:14,17,
21 123:4,8,16,20
124:12,15 126:8,10
128:12,16 139:10
144:4,6,15 150:10
152:14,21 153:9
157:8 161:5,10
166:18,20 167:5,14
171:23 172:6 176:11
178:8,11,21 184:5
192:15,20 205:2,9,13
207:25 208:4 210:22,
25 211:3 213:4
214:8,13 217:5 224:5
231:5,7 237:12
238:25 239:2 243:9
252:21,22 253:11,14
254:24 255:2,7
257:6,25 258:4,16
259:9 261:8,12,19
276:10 280:11 287:9

**exhibits** 4:22 5:4,16
9:20 29:23 30:3,5
83:15,22 86:18 89:15
106:6 115:21 211:10,
13 252:24 282:10

**exist** 88:21

**existence** 63:12
134:7

**expanding** 37:24

**expect** 4:15 8:3
94:24,25 225:10
230:21 258:22

**expectation** 225:21

**expected** 142:17

**expedite** 7:13

**expensive** 180:7

**experience** 130:17
146:10 149:3 187:6
210:5 212:8

**experiences** 244:21

**expert** 114:15,19
115:10

**expertise** 213:18

**explain** 17:15 21:6
27:11 70:9 124:24
131:3 231:10

**explained** 53:17
88:12 102:17 107:21
268:10

**explaining** 71:15
191:13

**explains** 195:16

**express** 67:24

**expressed** 18:8
70:16 102:8 238:19

**extensively** 78:7
269:11 274:24

**extent** 67:2 99:3
131:2 143:8 146:25
156:17 180:12,23
182:2 187:12,20
188:16 201:6 228:6
229:4 232:5 238:19
241:10 265:4 267:19
270:6 273:15

---

**F**

**f'ing** 213:16

**face** 41:23

**Facebook** 186:3

**facia** 12:12 13:4

**facilities** 45:3 116:19
119:18 233:4

**facility** 22:21 25:24
42:20 43:6,7,13
73:20 74:21 78:16
100:8 105:24 117:18

118:14 119:21
122:17,21 125:12
158:2 270:15

**fact** 19:25 23:15,16,
24 48:20 49:20 50:7
53:16 55:5 59:6
64:22 68:8 69:19
78:19 98:8,10 117:12
131:12,19 133:22
134:12 148:24
152:17 160:7 162:11
166:2 173:20 176:3
177:12,22 188:25
190:17 192:7 194:17
207:10 215:8 216:6,
15 224:7 235:15
259:13 272:13 285:9

**factor** 12:19

**factored** 200:24

**factors** 116:24

**factory** 49:9 125:15,
17 191:21 216:9
217:21

**facts** 11:19,20 12:2
25:15 28:2 275:21

**factual** 11:18 26:24
42:17

**Failed** 129:21 130:2
134:23

**fair** 122:23 125:17
137:11,12 140:18,20,
23 146:5 182:18,19
202:20 259:17
260:21 261:2 262:10
267:25 269:17,19

**fairly** 277:23

**familiar** 35:10 36:7
180:9

**family** 31:15 68:21
104:2 111:8

**fast** 101:12 239:8

**father** 111:21

**Fayetteville** 32:5

**FBI** 54:5,6 68:8,25
69:14 163:6 240:23,
24 241:3,11

**February** 32:19

38:20 139:15,21

**February-march**
142:7

**federal** 35:3,19
36:18,21 39:6 69:17
97:3 106:17 108:21
134:5 140:5 141:5,10
164:20 196:6

**Feds** 69:20

**feedback** 261:25
280:17,19 281:11

**feeds** 125:20

**feel** 93:8 285:17

**feelings** 286:5

**Fellows** 59:16

**felon** 51:9

**felony** 35:7 96:23

**felt** 78:4,12 90:19
91:17,18 96:20 97:8,
9 98:9 112:2 267:9

**Ferrua** 8:4

**field** 32:13 35:6,7
42:4 148:7

**fielding** 34:19

**fight** 96:21

**figure** 38:18 70:6
103:24 293:16,17

**figured** 8:15

**figures** 49:12,20
94:20 176:21

**file** 9:10 62:9 96:17
207:10 225:6 293:2

**filed** 15:5,6 17:2 19:8,
9 99:19 129:2 225:14
228:6 229:4 230:10
232:22 234:25 274:2
277:18 287:15,19

**files** 95:8 119:18

**filing** 15:7,17 16:8
27:13,23 207:14
226:3,21 231:2 274:5

**fill** 71:4 172:18
256:21

**final** 155:15

**financial** 200:10,25
201:2 202:19 203:19
221:17 232:7 233:4,
23

**find** 14:6 19:23 20:14
23:11 26:22 53:10,12
106:14 121:8

**finding** 26:17 45:25
132:2 237:15

**fine** 9:16 136:19
137:17 140:25
175:25 177:4 178:3
183:5,15 219:5
226:10 228:3 229:11
239:7 242:20,25
276:24 291:14,20

**finish** 190:18 199:6
268:24 299:25

**finished** 115:14

**fire** 32:15

**fired** 279:8,12,14

**firefighting** 32:16

**firm** 24:25 118:24

**five-minute** 183:14

**fixes** 229:15

**flagged** 200:21

**flashing** 101:12

**flight** 96:21

**floor** 86:6

**Flores** 150:10,13,15,
21

**Florida** 32:5,11

**flurry** 20:8

**FMC** 37:16

**focus** 70:7 157:19
244:19 261:21 280:5
282:11

**focused** 82:22

**folder** 75:19 168:19
169:11

**folders** 18:24

**folks** 129:20 135:10 148:16 150:3 186:17 187:13 206:20 208:19 229:8 262:11

**follow** 74:10,15 89:5

**follow-up** 103:20 141:3

**footage** 22:20 51:21 117:22

**footages** 46:2

**force** 33:21 58:24 130:7,12,13,20 131:8 132:15 133:14,15 162:11 165:4 196:6

**forced** 251:6

**forces** 35:25 130:15

**forensic** 175:4

**forgive** 11:23 19:22 39:19 104:19 106:7, 20 253:24

**forgot** 59:16

**form** 49:7 218:14 245:6

**formal** 31:23 187:2

**formally** 9:14

**forms** 15:11

**Fort** 34:17

**fortunate** 35:2

**forward** 12:3 21:3,10 170:11 271:4 295:23

**forwarded** 18:19 119:13 123:9 204:12

**forwarding** 126:25

**found** 18:19 23:5 94:12 200:10

**foundation** 5:8 67:7, 9 69:12 218:19,20 227:17,20

**fourteen** 36:22

**fox** 17:4 20:8 100:21, 23 101:2 282:17 283:2,11,18 284:7,22 288:12 290:11

**frame** 23:22 52:19 150:12 164:13 279:3 282:11

**fraudulent** 51:14 64:24 204:23

**free** 25:10 173:13

**freezing** 56:20

**frequently** 269:18

**friend** 37:21 294:11 297:2

**front** 33:3 38:11 214:12 217:4 238:24

**frozen** 56:18

**fruition** 164:4 247:4

**frustrate** 76:10

**frustrated** 81:20

**FT** 173:7

**FTE** 172:19

**full** 31:7 47:15 59:12 177:18 196:2

**funny** 210:13

**future** 26:2

---

**G**

**games** 81:23

**garbled** 226:5

**Garcia** 150:10,13

**gate** 86:9 101:10,14 102:13 209:10 295:18

**gatekeeper** 18:13

**gates** 35:16 45:25

**gauge** 86:7

**gave** 28:15 59:7 81:18 117:4 285:25

**Gecewich** 92:21 93:5,7 137:2,8 263:18 264:2,3,8 281:19

**general** 14:22 35:22 146:4

**generally** 180:9 265:12 279:13

**generous** 201:19

**gentleman** 48:2 50:12 51:10,11 68:18

**geographically** 42:8,10,13

**Gerhard** 89:5 90:25 281:22

**German** 7:25 27:16 58:8,11 59:22 60:5,7 62:5,18 63:25 76:16 77:15,16,17,18,21 78:2 79:5,21 81:11, 13,17 83:11 94:4 98:9,11 103:9,16,20 104:7 151:6,20 160:21 171:11 173:25 205:14,18 211:18,25 213:21 240:4,7,19 248:16 249:23 250:12 251:7, 12,21,23 252:2 261:23,25 262:5 265:21,25 266:2,10, 11,19 267:10,14,18 268:5,15 269:7,22 270:4,7,21 271:6,9 272:3,18 273:4,10, 22,23 274:5,12 275:16,22 276:15 279:14 281:10,25 282:18 283:2,9,14 284:3,12,21 285:6, 10,21 286:5 287:3, 14,18,24 288:3,11 289:8,23 290:4 294:12 295:10,19,24 296:4,11,14,25 297:3,9,15,17,22 298:4,12,15,21 299:13

**German's** 58:15 276:3,8

**get all** 4:12

**Gicinto** 8:6,23 14:21 15:2 19:2 20:19 71:25 80:24 87:15 88:5,6,11 91:2,20,22 92:9,10 98:7 172:7, 12 173:18 186:20 189:18

**Gicinto's** 174:22

**Giga** 47:21

**Gigafactory** 16:24 18:10,13 24:9 40:15 42:11,18,19 43:3 49:9 50:24 56:5 65:2, 16,17 68:2 69:4,19 70:18 85:14,25 86:5 87:7,11 91:5 92:4,20 94:7,23 97:23 99:14, 16 101:6,8 102:7 103:11 105:7 108:2, 5,14 112:21 118:7 125:12 127:3 134:25 165:23 232:6 233:18, 22 235:11 241:17 247:17 248:7 260:3, 7,23 266:25 269:6,9, 24 274:24 275:19 285:22 286:8

**give** 5:24 8:17,22 61:3 72:22 102:19 127:19 132:25 135:21,24 171:15 258:12,14 283:20 286:14 300:14,20

**giving** 59:18

**glad** 87:18

**global** 16:18 82:11

**Gmail** 24:21,25 25:2 117:10,14 119:15 120:4 121:3 122:3 123:22 124:5,18 127:2 128:5 169:3 238:4

**goal** 273:7

**God** 210:5

**goings** 125:16

**good** 5:6,12 11:8,9 27:4 37:21 84:8,12 137:14,21 182:22 205:18 242:21 243:4 244:7,16 282:25 289:18 294:16 297:15 299:22 301:2

**gosh** 82:2

**Gotta** 127:19

**Gouthro** 40:11 41:9, 17 46:18 47:6,10

48:6 50:8 52:17 53:17,19,25 55:17 57:12 58:8,13 59:5 60:2,5,16 64:20,23 65:4,9,18 66:20 69:6 73:17 77:10,13 82:18 88:23 90:24 93:16 98:24 130:17 132:20, 23 133:6,11 158:2 162:4,7,9,12 163:4, 19,24 164:19 185:15, 20 189:2,8,9,12,16 190:24 191:12,19 196:10,22 198:25 219:17,20 231:11,20 236:4,6,15,18,21 238:14

**Gouthro's** 47:5 151:10

**governed** 13:2 179:3

**government** 23:14 131:20 140:5,14 141:6,10,13 187:6

**grandchild** 31:18

**grandchildren** 31:18

**grandfather** 111:22

**grant** 6:21

**granted** 28:10

**graphs** 45:17

**grass** 34:7

**great** 69:24 79:19 212:7 213:18

**greener** 34:7

**Greg** 217:9

**Greyhound** 116:10

**ground** 8:11

**group** 24:5,7 146:4 148:16,17,20,21 174:22

**GS-11** 109:4

**GS-13** 39:10

**guard** 24:10,11 33:19 34:11 156:20 177:14

**guarding** 17:5

**guards** 52:4

**guess** 7:6 9:25 67:11 69:10 72:6 76:22 138:12 195:19 202:5 229:10 290:15 300:18

**guidance** 298:20

**guy** 147:4 287:6

**guys** 50:11 69:16 212:7 213:17 296:2

---

**H**

**half** 4:16 115:16 138:25 290:14

**half-hour** 6:8

**Halladay** 41:8,10,17 45:12 47:7,11,12 50:9 64:18 189:22,25 190:9,18,23 191:13

**hand** 101:20 302:16

**handbook** 257:3,16 258:12 259:4,16

**handcuffed** 25:19

**handed** 53:20

**handle** 4:21 29:23 161:8 248:6 291:18, 20

**handled** 63:12

**handling** 80:25

**hands** 54:12 64:2 249:24

**handwriting** 70:24 71:3,7 184:10,13,14 208:11,12 210:25

**hang** 178:4 183:8 239:20

**Hannah** 217:8,14

**Hansen** 4:1 5:1 6:1 7:1,20 8:1 9:1 10:1 11:1 12:1 13:1 14:1, 11 15:1 16:1,16,18, 19,20 17:1,2,16 18:1, 2,8,11,23 19:1,17 20:1,7 21:1,11 22:1, 13,15 23:1,21 24:1

25:1,7,22 26:1 27:1, 9,23 28:1,4,15,17 29:1 30:1,14,19 31:1, 6,8,9 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,11 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1,6,18 57:1 58:1 59:1 60:1 61:1 62:1,18 63:1 64:1 65:1 66:1 67:1 68:1 69:1,13,22 70:1 71:1,7 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1,22 85:1,3 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1,20 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1,19 113:1,21 114:1 115:1 116:1 117:1,7 118:1, 22 119:1,13 120:1,15 121:1,20 122:1 123:1,7,19 124:1,14 125:1 126:1,11 127:1 128:1,19 129:1 130:1,22 131:1 132:1 133:1 134:1 135:1 136:1,21 137:1 138:1,3,18 139:1,7, 13 140:1,21,25 141:1 142:1 143:1 144:1,5 145:1 146:1 147:1 148:1 149:1,25 150:1,9 151:1,5 152:1,17 153:1,3,15 154:1,22 155:1 156:1 157:1,7 158:1,25 159:1 160:1 161:1,4, 9 162:1 163:1,14 164:1 165:1 166:1 167:1,13 168:1 169:1 170:1 171:1,3 172:1, 5 173:1 174:1 175:1 176:1,10 177:1 178:1,10,24 179:1 180:1 181:1 182:1 183:1 184:1,4 185:1 186:1 187:1 188:1

189:1 190:1 191:1,11 192:1,19 193:1 194:1 195:1 196:1 197:1 198:1,17 199:1 200:1 201:1 202:1,6 203:1, 7,17 204:1,4 205:1, 12 206:1 207:1,3 208:1,3 209:1 210:1 211:1 212:1 213:1,4 214:1,12 215:1,21 216:1 217:1,4,10 218:1 219:1,10 220:1 221:1 222:1,9 223:1 224:1 225:1,14 226:1,8,10,12,18 227:1 228:1,5,16,25 229:1,3,10,22 230:1, 9 231:1,6,16 232:1 233:1 234:1,10 235:1,20,25 236:1,19 237:1,16 238:1,24 239:1 240:1,21 241:1 242:1,2 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1,9 254:1,10 255:1,13 256:1,16 257:1,9 258:1,20 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1,25 273:1,20 274:1 275:1 276:1 277:1,16 278:1 279:1,10 280:1 281:1,9 282:1,14 283:1 284:1,11 285:1,2 286:1 287:1, 2,22 288:1 289:1,7, 23 290:1 291:1,23 292:1 293:1 294:1,10 295:1,7,13,20,25 296:1,10,12,16 297:1,2,8,14,16,20, 23 298:1,11,14,18,22 299:1,12 300:1 301:1,3 302:1

**Hansen's** 14:25 17:22,23 18:14,18 19:13 24:19 26:20,22 27:2,6,13 28:21

**happen** 58:5 77:25 173:5 230:24 247:5, 10 251:14 297:21

298:13

**happened** 19:5 20:12 25:9,15,18 26:3 53:10,12 54:20 64:2 74:2 78:12,20 88:11 90:15 91:14 94:16 101:5 102:16, 17,20 103:8,22 112:3 136:2 191:16

**happening** 96:19 193:24 262:4

**happy** 29:4 113:8 130:22

**harbored** 100:16

**hard** 59:9,19 210:2

**hard-working** 147:6

**hare** 66:22

**harm** 210:11

**Hasbrouck** 11:3

**hate** 160:3

**hazardous** 32:17

**head** 14:23 16:17 101:23 274:6

**header** 151:11

**headquarters** 35:21

**health** 110:21

**hear** 5:21 9:25 11:24 22:11 44:3 55:7 56:14,15,17 67:3 75:24 76:2 80:18,20 102:10 108:8 112:13, 19 166:19 182:24 205:18 225:12 226:6 227:25 228:11,14,17 235:7 236:10,12 238:16 269:2 275:16 290:19 291:23 292:4, 5,11,14,20 293:6,11, 21 294:11

**heard** 5:25 22:12 27:11 93:3 115:17 191:3,4 199:14 228:18 229:6 244:24 291:10 292:12 295:17 300:21

**hearing** 4:7,15 5:15 7:13 9:15 23:7 27:5

28:3 70:2 133:20 164:19 226:8,10 275:8 293:8

**hearsay** 218:13 227:20

**Heather** 57:13

**heavily** 94:22

**hell** 102:16,20 296:23

**helping** 252:23

**henhouse** 17:5

**Hennigan** 118:24

**hereinbefore** 302:6

**hereof** 155:17

**hereunto** 302:15

**herring** 19:24

**hey** 91:17 205:18 213:16 280:6 281:6 297:25

**hidden** 87:6,10

**hide** 102:22

**high** 33:18,19 94:19 102:2 111:14

**higher** 28:19

**highly** 173:9 265:16

**hills** 102:22

**hire** 246:3 256:22

**hired** 81:17 83:3,5,7 109:25 206:19 250:7 256:18 257:2 259:15

**hiring** 87:19

**history** 25:17 33:16, 17 45:13 95:6 206:25

**Hoene** 64:19

**Hoffman** 4:6 7:23 8:22,25 9:6 10:6,19, 23 11:5 21:19 22:5 26:7,13 29:7,15,20 30:3,16 37:9,11 39:22 44:10,15 48:23 49:2 56:17,23 57:3, 18 60:20 61:17 62:14,19,21 66:7 67:5,11 69:22 70:13

71:19 73:5 75:3
80:10 84:2,7,12,14,
20 89:17 96:3,6,8,13
97:19 100:2 104:13
106:22 107:10 108:8,
11 110:5,7,10,16
112:11 113:2,4,12
120:11 121:16 123:3,
15 124:11 126:7
128:9 137:17,21
138:2,6,15,18,23
139:6 144:14 152:13,
23,25 166:19,23
167:2,4,6,9 171:22,
24 172:3 178:20
182:24 183:11,16,22
192:13 202:4 203:5,
13 205:7 210:19,21
212:19,22,25 214:6
216:24 218:18 219:7
221:24 222:4,7
224:23 226:9 227:12,
16,25 228:16,20
229:9,20 230:4
232:11 233:12
237:11 242:4,16
243:3,8,10,14,19,22
252:14,19,25 253:6
254:21,24 257:22
258:5,7,13 259:8
261:10 262:21
288:21,24 289:5,17
290:12,15,20 291:14
292:8,14 293:8,12,
19,24 299:3,8 300:3,
7,12 301:2,8

hold 33:8 83:19
106:8 189:17 201:13
228:13 239:6 277:2
278:14

holding 26:24

holes 69:14

holy 295:9

home 103:2,6 168:22
269:16

homeless 51:10,11

honest 212:21

honestly 146:8
295:16

Honor 7:11 9:5,9
10:18 11:14 22:2

29:22 30:14 48:25
61:14,16 67:2,9
70:23 84:24 112:7,23
124:10 137:13,24
144:18 166:21 167:3,
8 182:21 183:13
192:17 201:8,14
202:16 210:20 219:6
221:20 227:7,11,15,
23 228:19 232:13
233:6 242:22 243:6,
12 252:11 258:6
262:19 291:3 292:7
300:19 301:6

hope 141:15 182:2

hoping 298:9

horrifying 17:6

horsing 218:16

Hotel 109:20

hour 39:12 64:4,13
83:13 84:9,16 105:5
137:23 138:25
139:25 140:17
157:14,16 158:4
160:9,23 183:12
215:10 216:12
221:22 243:16 300:6

hours 6:7 32:3 65:17
86:7 94:10 115:16
116:19,23 215:4
223:19 260:23

Housing 108:22

Houston 34:17

HR 93:12 163:9
175:11

HUD 108:25 109:3,9

Huddler 145:9,14,15

Hueston 118:24

huge 145:19

Human 137:2 260:16

hung 102:9

hypertension 104:4
110:24 111:15,19

I

ID 86:10 119:20

idea 6:10 43:6 82:13
94:25 116:15 162:6,
15 174:17 185:11,22
217:15 218:2,4
282:25 292:3,23

ideas 92:5

identification 51:14
119:19

identified 42:15
65:8,13,15 68:11
144:6 161:10 166:16
167:14 173:9 176:11
217:5 231:14 238:25

identify 5:7 17:15
81:16 192:2

identifying 9:19
68:16 165:11 166:3

illegal 51:13

Image 170:12

images 122:15
125:4,5,7,15

imagine 55:6

immediately 103:12
297:6

immigrant 51:13

impact 111:12 233:4,
14,23

impacted 55:15,19
110:19,21 111:8
221:16 246:11

impacts 37:20

impeachment 290:9
291:9,19

important 15:7,9
16:4 44:12 54:24
69:12 91:19 116:22
157:18 164:8 190:21
279:5 282:22 288:13
290:12 300:13

importantly 14:21

improper 28:14

inappropriately
26:6

incident 50:19
65:13,15 74:22 101:7
122:13 220:17,24

include 119:22
165:21

included 22:19,21,
23 198:10 200:24

includes 15:15
255:10

including 4:10 18:3
22:22 89:6 119:15
222:17 273:15

income 38:7 39:14
232:18

incorrect 10:23

increased 110:23

incredible 146:21

independent 164:20
179:10 199:25

Indiana 34:18

indicating 234:18

indicted 165:18
166:4,14

indictment 68:9,15,
22,25 165:3 166:10

individual 15:8 21:4
50:22 64:23,24 65:10
94:17 118:2 181:5
207:20 233:11
250:16

individually 30:2

individuals 8:13
18:6,16 64:25 99:10
119:17 122:13
125:16 165:7,9,10,17
188:8 263:15 265:2

industry 53:2

infantry 34:2,24

inform 287:15,19
289:25

information 4:13
10:10 18:5 19:25
22:19,21,24 24:20

inappropriately continued...

45:21 52:19,23 65:11
67:14 72:18 90:5
93:9,15 94:14,21
114:4,8,9,12,18
115:9 117:8,14,25
118:10,14 120:5
122:8,11,22 124:3,4
129:12 132:5,17
133:12 142:22,23
154:19 162:7,10
163:13 164:6,7,25
165:11,12,13,16
170:21 186:24 188:9,
10,14 189:11 192:2
193:21 194:6 195:18
197:6,24 198:14
211:14 226:2,20
231:13 238:3 265:11
266:3,15 267:21
270:6,10 275:21
286:12

informed 65:4
254:14 273:13
299:13

initial 42:4 107:14
137:7,10 184:14
211:11

initially 33:18 46:16
72:6 81:14 198:2
249:21 266:19
267:12,25

initiated 205:25

injured 36:12

inquiries 127:24

inside 42:10 78:16
92:20 94:7 97:6
99:13 100:8 101:13
186:11

Insider 193:12
222:11

inspect 52:3

inspector 51:24

installation 34:20

instance 86:4 111:4
226:24

instruct 235:10

instructed 190:17

instruction 138:16

235:16

insufficient 67:7

integrity 296:19

intentionally 45:23

interactions 219:13 238:21

interested 19:6 79:15 254:7,15 263:21 302:14

interesting 68:3 107:24

interfere 155:3

interfered 93:25 94:3

interference 63:5,8 266:18

interior 117:18

internal 18:20 40:13 119:14,15 130:3 152:8 177:20 189:15

internally 51:20

internals 151:21

international 34:16

interpreted 132:4

interrogatory 17:10 19:12

interrupt 69:23 158:10

interrupting 268:23

interview 73:14 81:3 186:9 207:17

interviewing 79:10 189:13

interviews 72:15 205:22

Intrepid 36:16

introduce 114:24 120:9 252:21 254:22 257:6 258:4 261:8

introduced 58:11 253:2

introducing 290:13

introductions 42:5

investigate 91:13 132:11 268:11

investigated 19:2,4 43:25 76:15 77:6 135:23 225:16 245:17

investigates 225:7

investigating 36:4 77:19 135:17 187:19 220:25 286:7

investigation 14:24 35:4 47:23 50:13 53:19 65:6 68:6,10, 13 69:15 86:14,24 87:9 92:13,16,18 121:7 122:12 125:6 130:3 137:6 163:16, 17 164:21 185:25 186:6,21 188:15 189:3,5 190:5,10,12, 16,19 191:15 196:3, 13,20 198:14,18 199:25 233:14 234:8 236:5,17 266:5

investigations 16:23 18:4 35:7 39:16 40:13,14,16,18 42:2 43:16,18 47:11, 17 54:19 55:10,12, 17,19,20 59:20 60:13 64:7 68:19 69:3 72:2, 13 73:12 76:19 77:8 79:11 80:25 81:3 82:6 134:7 136:2 149:21 150:2,4 172:22 173:3 175:22 189:6 190:14,23 191:22 199:3 221:5,9 265:3,5,16 266:4,12 268:6 270:7,18,20 273:15 286:6,12

investigative 41:10, 14,20 43:15 47:15 72:16 78:9 88:10 94:6 247:12,16,24 248:6 249:11,25 250:6 267:20,23

investigator 24:10 36:20 40:24 58:12 59:23 60:6,10 63:14 71:24 80:22 94:2

108:22 109:21 110:2 156:19 159:24 174:22 187:18 188:21 207:16 246:17,23 247:9 250:5 266:22 267:6 271:2

investigators 42:7 50:10 136:24 190:22, 25 235:20,25 236:19

invite 11:10

involve 267:23

involved 14:24 36:4 44:23 50:24 51:6,18 60:3 65:16 87:9,13 94:4 135:16,22 186:20 220:10,18,25 230:22 238:11 253:19 286:7

involvement 18:15 65:19 81:7 186:22

involving 18:3 74:22 98:15 101:7 190:5 191:15 268:12

Iraq 36:13

ironed 7:11

irrelevant 20:14 249:4

Island 33:22

isolated 85:12 91:16 94:8 96:20 266:25

issue 14:9 15:9 20:22,24,25 24:22,23 27:12 29:5 54:10 91:18 111:15 136:12 202:16 218:22 219:19 221:11 229:17

issued 97:14,23 128:22 134:18

issues 7:7 9:7 11:16 14:12,13 36:3 44:8 66:16 90:19 91:3,10 93:9 111:19 200:9 260:6,14 272:7,10 294:6

item 203:18 231:24

items 18:24 19:23

Ivan 150:10,13

J

Jacob 71:24 72:14, 19 79:8,9 80:23

Jake 71:23 72:12 78:24 79:3,13 80:16 90:25

James 150:17,18,19

JAMS 9:10

Janine 9:21 10:24,25

January 49:23 68:14 106:3 115:20 135:2,8 198:12

Jeff 8:6 16:17 17:9 63:15 64:5 80:25 82:5,8,9,14,22 91:2 94:3,7 98:25 103:11 144:8 218:24 239:19 249:9 251:9 266:21 267:13 284:14

Jens 217:18,19

job 24:15 28:19 39:6, 11 40:5,6,23 41:21 46:20,25 51:21 54:23 55:12 58:15 63:17,22 72:13 76:9,20 78:2, 12 83:5 85:25 94:2 104:25 105:3 106:2 107:15 108:24 116:24 140:17,21,22 159:12,16 160:8,22 161:2 173:14 174:11 175:13 177:12,23 178:2 209:4

jobs 104:22 105:16 160:16 174:6

join 28:24 35:8

joined 33:18 245:18 248:10 256:23 270:19,21

joining 246:15,21

joins 26:15

joint 4:20 32:23 33:14 36:14 37:4,8

38:10 39:21 46:9 48:21 56:3 57:6,15 60:23 61:9,14,22 62:13 64:14 66:12 70:21 71:8,18 73:3,5 74:5,25 78:22 80:8 83:14,22 86:19 87:22 89:3 90:22 95:18,19 96:2 97:12,17 99:4, 24 104:12,15 106:5, 21 107:3,8 109:6 118:18 120:14 121:21 123:8,20 124:15 126:10 128:15 139:10 144:3, 6 172:6 192:20 214:13 231:7 239:2 252:21 255:7 257:6 258:4,16 261:8 276:10 280:11

Jones 8:6,24 16:17 17:9 63:15 64:5 81:2 82:5,8,9,19,22 91:2 94:3,7 98:25 103:11 144:8 151:6 218:23, 24 239:19 240:8,9,19 249:9 251:9 266:21 267:13 284:14

Jones's 82:14

Journal 222:21

journalist 193:11

judge 4:6 7:23 8:22, 25 9:6 10:6,19,23 11:5 21:19 22:5 26:7, 13 29:7,15,20 30:3, 16 37:9,11 39:22 44:10,15 48:23 49:2 56:17,23 57:3,18 60:20 61:17 62:14, 19,21 66:7 67:5,11 69:22 70:13 71:19 73:5 75:3 80:10 84:2, 7,12,14,20 89:17 96:3,6,8,13 97:19 100:2 104:13 106:22 107:10 108:8,11 110:5,7,10,16 112:11 113:2,4,12 120:11 121:16 123:3,15 124:11 126:7 128:9 137:17,21 138:2,6, 15,18,23 139:6 144:14 152:13,23,25

166:19,23 167:2,4,6,
9 171:22,24 172:3
178:20 182:24
183:11,16,22 192:13
202:4 203:5,13 205:7
210:19,21 212:19,22,
25 214:6 216:24
218:18 219:7 221:24
222:4,7 224:23 226:9
227:12,16,25 228:16,
20 229:9,20 230:4
232:11 233:12
237:11 242:4,16
243:3,8,10,14,19,22
252:14,19,25 253:6
254:21,24 257:22
258:5,7,13 259:8
261:10 262:21
288:21,24 289:5,10,
17 290:12,15,20
291:14 292:8,14
293:8,12,19,24
299:3,8 300:3,7,12
301:2,8

**judgment** 11:22 20:5
230:18

**Julio** 64:20,21,22
65:3 74:7,11,16,19
122:12

**July** 58:3,4,22 60:14
63:21 74:9 75:12,13
78:24 79:3 81:10
86:20,21,22 87:16
88:7,16,24 89:9 90:3
93:2,23 126:11,16
153:18 155:11
158:15,24 159:8,11,
19 160:10,21 168:11,
16 172:7 173:23
176:12,18 177:22
195:10,12 214:24
235:5 271:2

**jumbling** 19:22

**June** 17:13 24:3
41:18 47:19 49:23
50:21 52:18 53:9,17
54:20,21 55:11 56:5
57:9 58:2 63:10
64:16 66:14 68:4
72:10,23 74:23 75:12
88:7 119:13 120:5,16
121:3,25 123:22
127:4 135:3,8 150:11

161:12 163:25
164:13 165:19 170:9
171:6 198:11,12
205:16 231:18
245:21 270:25

**justice** 32:10,12

**Justifications**
144:21

**juvenile** 32:12

---

### K

**kahansen@tesla.
com** 88:16,20

**Kalkunte** 13:10,11
21:8

**Kansas** 269:14

**Karl** 14:11 16:18,19,
20 17:2,12 30:14,19
31:8 56:6,13,19 57:5
69:13 88:24 205:18
217:8,10,14 228:14
235:20,25 236:19
244:16 297:22

**karlhannah@
contractor.net**
217:8

**keeping** 4:18 212:21

**ken** 16:22 19:13
40:21,22,23 50:9
100:16 233:11
237:16,20 238:13

**Kenneth** 16:14,15
17:23 99:7

**Kevin** 146:14

**KH** 158:21 286:22

**kids** 161:23

**Kim** 12:24,25

**kind** 34:6 49:14
103:24 228:7 230:16
256:20 262:15 270:4
271:14 286:14

**kinds** 170:22

**knew** 12:14 20:20
23:14 98:21 118:12
143:18 146:25 179:7,

8,10 180:12 181:18
194:18,23 195:4
230:25 245:4 265:14
274:12 275:16,22
282:15 283:18 284:7
289:8,23,25 296:19,
21

**knowledge** 41:3
163:21 164:20,25
173:4 175:15,18,22
179:16,17 180:19
182:2 186:9,10
190:11,20 200:8
201:6 203:18,22
204:21 206:17
209:19 221:18
265:19,24 268:18

**Kris** 41:8 191:13

**Kristopher** 47:6,11,
12 50:9 64:18

---

### L

**LA** 223:3

**lack** 188:2,5 227:17

**laid** 56:9 57:8,10 75:8

**Lake** 37:25

**land** 159:24

**Lane** 47:25 48:2

**language** 21:9 161:7
239:15 264:13

**laptop** 33:2

**large** 14:16 24:7,19
43:13 46:2 49:8
76:11 107:20

**large-scale** 14:12

**Largent** 11:2 26:10,
13,14

**larger** 44:5 45:3 46:6

**late** 243:15

**law** 12:2 15:10 27:19
34:12 53:6,15 54:9,
14,16,18 73:17,18
82:17 97:3 112:3
118:24 130:16 132:3,
11 134:5 145:17,19
146:20 162:12,15

163:8,18 164:4,10
184:16 185:19 187:5
196:5,15 197:3

**laws** 225:22

**lawyer** 131:3 202:21,
25 203:2

**lawyers** 294:21

**lay** 69:12

**lay-down** 44:4 45:23
52:4

**laying** 5:8

**layoff** 56:6 57:25

**layoffs** 55:8

**LE** 184:15 196:5

**LE/DEA** 184:14

**lead** 188:12

**leader** 68:17 69:19
165:21

**leadership** 90:20

**leading** 67:3,10

**leads** 254:6

**learned** 68:7 70:6
76:9 131:15 194:21

**leave** 8:20 108:18
141:14 142:9 239:14

**leaving** 45:23

**led** 38:7 94:13 100:13

**leeway** 69:24

**left** 39:9 113:22 115:6
116:2 143:8 153:21
185:2 208:12 210:24
240:22 241:3

**legal** 12:8 26:24 29:5
54:3 163:9 233:8

**legitimate** 26:19

**lengthy** 91:3 93:18

**Leslie** 76:17 78:6,7,
8,10,17,18 102:19
181:9,11,16 249:22
265:21 266:13
275:11

**letter** 38:20,25

118:24 119:8 139:14
294:20 295:22,23

**leveled** 17:16

**levels** 90:20

**Lewis-mcchord**
36:15

**liability** 12:20 13:19
28:20 29:2

**liable** 26:25

**license** 38:5 117:24
118:2 119:20

**lies** 22:8

**life** 31:25 37:17

**life-changing** 111:9

**light** 14:3

**lights** 101:12

**likewise** 142:9 147:5
225:6 260:13

**limine** 6:16,22

**lines** 11:24 81:22

**Linette** 192:22 263:4,
6,9

**link** 45:15 65:21

**linked** 69:20

**list** 4:20 5:6,16
144:24 145:8 149:5
150:5 154:6

**listed** 151:25

**listen** 202:6 290:23

**listened** 290:9
291:22

**listening** 69:25

**lists** 198:2

**lithium** 67:19 68:20
127:24 191:25 192:2

**litigation** 184:23

**live** 31:11,12

**loads** 4:25

**lobby** 99:13 100:12

**local** 97:2 196:5

located 43:3 105:17
125:12

location 213:22
269:16

locked 228:10

locks 45:25

lodge 202:11

log 168:18 228:12,13
229:14

logged 9:12

logging 229:14

logs 118:6

long 105:25 131:15
288:21 298:5

longer 8:13 63:11
79:7 80:23 88:22,24
103:10 135:14
157:25 190:14 216:8
247:16,23 248:5
250:14 251:18
254:15 271:7

looked 20:23 51:4
101:25 115:25
123:23 175:19 285:3

loose 292:4

Lopez 192:22 193:10
194:18,19 196:18
204:6,12 222:10
263:6,9

lot 4:25 9:20 13:13,
14,16 25:17 36:3
43:24 44:8 45:2,18
82:2 91:14 118:3
218:23

lots 119:21 275:18

love 84:10

loved 279:15

low 75:25 80:19
299:6

lower 90:20

lunch 6:8 113:10

Lynn 50:14,16,18
52:21 53:25 65:2
122:14 135:18
136:13 189:11

198:15,19 221:2

---

**M**

machine 65:7,11,20
86:8

made 27:17 51:6,19
52:20 63:15,18 71:12
97:5,24 100:10 115:5
137:5 185:18 191:24
197:5,7,9 199:10
211:6 216:8 218:23
247:15 248:5,7
249:15 251:7,12,20
283:4 288:3 291:6,
12,17

magnitude 50:4

mail 281:9

main 99:13,14
100:12

maintain 265:6

major 68:10 147:17

make 4:17 5:5 11:11
13:4 21:22,24 22:3
70:5 106:14 117:4
129:22 137:19,25
166:11 183:6 206:23
209:22 216:11
224:16 225:4 249:5
258:22 261:4 273:8
275:8 293:18 296:15
297:21

makes 229:13,20
250:12

making 36:23 39:7
118:18 140:6 160:13
198:5 215:9,13
239:18 248:23

malpractice 36:5

man 23:14 50:13
297:20,24

management 14:19
52:11 53:14 91:11
97:25 181:23 190:17
238:12

management's
14:15

manager 58:18
76:22

manual 148:7 208:24
209:5,6

manufactured
42:22

manufacturers
44:23

manufacturing
105:24

March 40:4 148:4
168:3,6,16

Marcus 147:6,12

marginal 295:4

marine 34:11

maritime 34:12
36:21 39:6

mark 30:4 290:25

marked 38:10 56:3
71:18 74:4 87:4
90:22 95:19 97:12
104:11 118:23 123:8
192:20 208:4 214:13
290:21,22

marking 46:9 78:22

marriage 302:13

married 31:14

Marshall 8:7 46:14,
15 47:4 50:8 52:17,
22 53:3 54:9,11,22
56:4 57:7,13 59:15
64:19 66:14 70:15
144:7 238:15

Martenson 11:3

Martin 94:16,22
193:15,17 194:20

master 28:7 146:19
178:13

match 146:22 152:3

material 44:24 121:6
294:19

materialized 172:20
246:17,24 247:4

materials 32:17

43:21 49:10,17,22
94:19 117:9 134:24
143:9,21 168:25
198:10

math 122:20 299:20

Matt 27:16 58:8,11,15
59:22 62:5 63:25
76:16 81:17 83:11
94:4 98:9 103:9,16,
20 104:6,7 151:19,20
160:21 211:18 240:7
248:16 250:12 251:7,
12,23 261:23 262:5
265:25 266:2,10,11,
19 267:10,14,18
268:5,15 275:13,16,
22 276:3 280:6,15
281:6 283:9,14 284:3
287:3 289:8 297:23
298:22

matter 21:3 23:13
37:17 73:13 87:13
136:13 155:17,20
188:17 202:9 249:2
302:14

matters 7:14 9:18
23:8 86:15 111:7
189:16

Mclellan 76:17,23,25
77:7,8,12,22 79:5,8
80:14,17,21 83:11
98:12,13 102:14,18
181:9,11,13,18 182:5
211:25 249:10
251:15,20 254:14
265:21 266:11
267:14 275:2,11

Mclellan's 76:20

means 20:2 242:9

meant 44:22

media 165:15 166:8
186:4 194:16 195:3
197:7 223:2 263:4,10
274:7 282:16 283:2,
11

medical 35:19,20
36:3,5,11 113:24

medication 104:4
111:6

medications 111:2

meet 20:2 54:23 88:8
90:4 136:24 164:4,14
281:21 297:13

meeting 54:2,11
55:17 58:7 92:24
93:2 136:25 137:10
163:8 262:2,12,14
263:11,17,19 280:18,
25 281:11,19 282:2

meetings 162:12
163:18,21 164:2
281:18

meets 13:5

Meissner 100:24
119:4,5,9 195:3
234:17,22

Melissa 161:18

member 33:20
130:19 132:10,15
133:15 196:18 198:5
199:8,13,22 204:13
211:6

members 68:16
165:3 196:5

memo 283:4

memorialize 282:22
283:5

memory 160:12

Mendez 162:18

Mendoza 133:14
162:18,21

mention 27:3 183:9
244:4 290:10

mentioned 44:17
98:21 110:11 113:22
140:4 161:22 179:21
189:22 193:15 197:7
204:16 209:9 222:9
223:22 236:22 238:8

mentions 162:22

merges 155:18

merit 187:16

message 54:22 72:9
213:20 253:23,25
254:2,4,10 277:24

279:13 280:6,24
281:12 282:5 286:25
287:2,3

**messages** 62:5,18
66:13 67:13,17 81:12
270:4,12 271:7,10,
13,23 272:5,11
276:2,4 285:3
287:13,18

**met** 57:11,12 88:4
164:12 207:20
270:12,13

**meter** 34:20

**metering** 34:20

**methamphetamine**
165:14

**method** 270:8

**Mexican** 268:13

**Mexico** 69:21

**mgerman@
ussecurityassociat
es** 171:3

**Microgrid** 67:22

**mid-june** 52:18

**middle** 138:10 171:2
197:13

**midst** 138:4

**Milburn** 46:24 50:11,
25

**military** 36:7 37:22
146:20

**million** 49:21 50:3
135:2 198:9 199:20

**millions** 199:3,10,20

**mind** 53:8 181:10
283:23

**minute** 56:24 69:23
201:10 236:7

**minutes** 12:7 29:13,
16 113:11,14 137:15,
23 183:17 221:22
243:16 288:23,24
290:14 293:16 294:5

**mischaracterizes**
252:11

**miscited** 29:3

**misguided** 92:6

**misplaced** 48:10

**missing** 49:23,24

**misstated** 203:20

**misstatement**
262:19

**misstatements** 97:5

**misstates** 252:15

**Missy** 161:18,19,23
169:23

**Mm-hmm** 187:23
281:2

**mode** 96:22

**Model** 42:24 78:15
82:24 101:10

**modification** 155:23

**Mohamed** 8:5 14:22

**moment** 261:14
264:13

**moments** 37:20

**monetary** 230:19

**money** 106:14
160:14 180:14 194:9,
13 224:16 225:4,18
227:3 228:8,9 231:3

**monitor** 241:15

**monitoring** 47:20
86:9 241:4

**month** 25:13 148:3

**months** 36:23 37:17
50:14 51:20 69:16
93:17 197:17,23
199:11,20

**Mora** 68:11,18

**Morales** 68:21

**morning** 6:7 9:11
26:12 27:12 51:5
72:23 115:14 300:15

**motion** 6:16,19,21
11:21

**motions** 9:14

**Motors** 10:16

**move** 37:15 110:12
120:8 121:13 122:25
123:12 124:7 126:5
128:7 140:18 144:11
152:11 166:24
171:20 176:3 178:18
192:11,12 202:22
205:5 210:15 212:18
214:4,5 216:15,19
218:10 227:24 237:8
243:5 254:21

**moved** 148:24
155:11

**moving** 5:9 214:9
266:25 271:3 294:23

**MP4** 293:2

**multiagency** 130:15

**multiple** 157:12

**municipalities**
34:17

**Musk** 4:1 5:1 6:1,18
7:1,4 8:1 9:1 10:1,15
11:1 12:1 13:1 14:1,
12,18,20 15:1 16:1,
17 17:1,9 18:1 19:1,
5,8,9 20:1,20 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1,
21 50:1 51:1 52:1
53:1,9 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1,10,22 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1,10,13,
15,24,25 91:1,6,8,17,
21,23 92:1,11 93:1
94:1 95:1 96:1 97:1
98:1,25 99:1 100:1
101:1,7,8,21,24
102:1,18,22 103:1
104:1 105:1 106:1

107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1,8
194:1 195:1 196:1
197:1 198:1,8 199:1
200:1 201:1 202:1
203:1 204:1,17 205:1
206:1 207:1 208:1
209:1,9 210:1,11,18
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1

274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1,17 296:1 297:1
298:1 299:1 300:1
301:1 302:1

**mute** 229:18,22
252:13 292:17

**muted** 224:24

**N**

**named** 50:13 68:18,
24 119:17 146:13
150:15 165:10 166:9
250:16

**names** 8:23 52:24
127:3 151:21 165:11

**narcotics** 44:7,8
73:18 268:12

**narrative** 11:19,20

**narratives** 70:5

**narrowed** 11:16

**national** 33:19 58:18

**nature** 71:15

**Navy** 145:18 146:19

**necessarily** 70:3

**needed** 38:7 77:23
78:3 103:23 104:23
105:15 106:13,14
112:2 188:23

**negative** 188:9,20
286:5,14

**negotiating** 60:3

**Netflix** 224:7,14

**network** 18:12

**Nevada** 38:5 43:3
105:19 112:24 163:7
166:15 186:11
222:23

**News** 20:8 100:21,23
101:2 282:17 283:2,

11,18 284:7,22
288:12 290:11

**Nick** 8:6 14:21 15:2
19:2 20:19 61:4,5
71:25 80:24 87:15
91:2,20 144:11
178:17 189:18
201:10 242:21

**Nicole** 17:12

**night** 65:2

**Ninth** 12:25

**Nocon** 7:20 71:23,24
72:12,14,19 73:9,16,
25 78:24 79:3,8,9,13
80:16,23 81:4 91:2
176:12 186:20
300:18

**noncommissioned**
34:25

**nonindented** 141:19

**nonprofit** 131:21

**nonretaliatory**
26:19

**nonsense** 218:17

**normal** 76:6 191:4

**Notary** 302:4,21

**note** 50:17 54:24
70:23 176:18 244:3

**notebook** 59:12

**noted** 28:15 283:3
301:11

**notes** 10:15 11:6
71:12 78:9 86:12

**notice** 56:7 75:25

**notification** 130:4

**notified** 24:3 63:10
102:3 190:13 249:23
271:2 284:14

**notify** 261:5

**notwithstanding**
179:9 195:6

**Nubia** 250:16,19,21
252:6 253:21 254:11
256:13

**Null** 150:17,18,19,21

**number** 61:2 62:15
91:4 116:9,19,23
124:21 125:11 136:3
152:9 164:5 198:20,
23 199:19,21,23,24

**numbers** 22:22
119:20 198:24 257:6

**numerous** 18:19
97:4 119:14 132:24
223:24

**O**

**oath** 22:25 136:8

**object** 5:11 10:8
17:20 67:2 218:11
233:7

**objected** 7:5

**objecting** 6:18

**objection** 5:13,21,22
37:9,10,12 48:23,24
57:17,19 61:15
62:19,20 66:6 67:4,6
70:22,25 73:4 75:2
80:9 83:25 89:16
96:3,5,10,11 97:18
99:25 106:23 107:9
108:6,9 110:5,6
120:10 121:15 123:2,
14 124:9 126:6
128:10,11 138:16
144:13 152:12 167:2
171:21 178:19 191:5
192:14 201:7 202:10,
11 205:6 210:19
214:6 218:18 224:17,
21,24 227:4,6,13,16,
19 232:9 234:2
237:10 252:10,15
253:3 257:21 258:5,
18 261:10 262:18
288:15 290:16,21

**objective** 15:23
273:8

**objective/
subjective** 16:5

**obligation** 143:8,20

**observation** 16:25

**observed** 45:9 50:22
65:2 90:13 94:15
283:17 284:6

**observing** 64:11

**obtain** 94:14 195:17

**obtained** 52:20
125:5 162:7 197:5
241:9,13

**occasion** 132:14
238:15 240:9

**occasions** 81:9
157:12 270:13,14

**occurred** 24:3 50:20
101:8 135:2,7 163:22
268:3

**occurring** 241:7
272:21

**October** 105:11

**offboarded** 24:8

**offer** 37:8 38:20,25
48:21 53:15 57:15
60:6 61:14 62:12,14,
16 63:17,22 66:4
70:20 73:3 74:24
78:2 80:5,7 83:21
88:11 89:14 96:2
97:16 99:23 104:8
106:20 107:7 110:3,
15 139:14 160:2
291:13

**offered** 5:17 39:21
58:12 60:9 63:11
78:2 79:21 80:23
104:25 115:21 116:4,
12 149:23 160:23
174:11 266:20

**offers** 90:5

**office** 35:21 38:4
41:24 54:4 65:5,10,
19 68:15 130:6,12
131:8 165:2 166:15
181:25 219:18,21
226:22 297:10

**officer** 34:13,25
37:22 63:6 64:10
83:8 86:4 100:13
101:14,16 144:20
147:7,24 148:3,6
150:2,14 160:3,8,23

**162:19 250:8 251:22
257:16**

**officer's** 259:3

**officers** 85:19

**oftentimes** 190:22

**ombudsman** 35:20

**on-site** 42:14 76:21

**onboarded** 208:23

**one's** 218:12

**ongoing** 20:11 46:7
47:23 50:15 68:10
82:25 86:14 96:23

**online** 171:13

**open** 90:17 165:16
186:7 202:24

**opened** 91:17

**opening** 11:11 21:23
22:13 26:11,15 27:3
28:25

**openings** 22:8

**operating** 232:6
233:3,17

**operation** 55:21
107:20

**operational** 85:18
145:25

**operations** 32:18
33:22 46:23 47:3
76:22 82:12 85:10
102:4 181:25 186:10

**operator** 48:4

**opinion** 49:7 50:6
78:18 112:4 187:17
280:8 281:8,25

**opinions** 299:22

**opportunities** 79:20
116:3,9,11,16,25

**opportunity** 5:11,12
108:16 117:4 138:11
253:9 281:14

**opposed** 15:16

**opposing** 15:15

**oppositional** 15:14,
15,18

**option** 112:4 159:11

**options** 34:6

**order** 5:5 7:16,19
27:7,25 115:5 179:18
180:3

**orders** 160:4

**organization** 55:6
68:11,17 90:20
131:6,13,20 151:22

**organizational** 47:9
48:7

**organize** 137:18

**organized** 44:5 92:4

**orientation** 256:21

**original** 161:25

**originally** 80:4 173:9

**originated** 212:2

**OSHA** 51:22,23

**outcome** 194:11,12
302:14

**outlets** 222:15
223:24 263:4

**outlined** 101:3

**outset** 42:16

**outsourcing** 179:4

**overlap** 190:23

**overnight** 52:2

**overruled** 224:24
232:11

**overtime** 117:5

**P**

**p.m.** 120:17 139:4,5
161:13 183:20,21
222:2,3 230:2,3
243:20,21 289:2,3
293:22,23 296:8
301:11

**Pacific** 296:8

Index: packs..posited

**packs** 49:19

**pages** 8:10 167:21, 22 215:20 276:6

**paid** 106:15 116:16 140:13 180:18,24 181:2 182:5 225:18 248:20 249:17 250:13 260:2

**Panasonic** 51:7

**panel** 11:24

**panels** 67:21

**papers** 214:3

**paragraph** 27:9 119:12 129:14,21 141:19 142:15 153:21 154:18,21,22 155:14 176:19 177:18 195:25 196:2 197:14 239:16 240:4

**paralegal** 32:8

**parked** 119:23

**Parker** 59:16

**parking** 118:2 119:21

**part** 6:17 16:23 23:25 24:2,5,6,18 38:4 47:22 98:14 140:18 143:3,19 150:3,20,22 151:2 152:7 194:10, 12 200:20 211:5 228:8,19 230:25 232:24 246:7 273:5 286:22

**partial** 20:6

**participate** 92:13,17 164:9 263:19

**participated** 221:5

**participating** 15:20, 21,25 16:2

**participatory** 15:13, 19

**parties** 18:4 51:6 60:3 155:16 244:5 302:12

**parties'** 110:18

**parts** 191:20

**party** 27:19 51:16 156:2

**past** 98:16

**patrols** 85:19

**pattern** 45:8

**pause** 55:24

**paused** 268:22

**pay** 60:23,24 61:10 64:3,12 85:4,7 105:4 107:4 114:4,23 115:3 116:18,22 139:25 140:11 151:25 158:12 160:17 177:7 180:10,20 182:10 194:13 214:14,22 215:2,4 216:2,4,6,20 251:9,16 255:10,20, 23,25 295:4

**paying** 28:19 194:8

**payment** 225:8 230:19

**payments** 165:13

**PDT** 4:4 29:19 57:2 84:19 139:5 183:21 222:3 230:3 243:21 289:3 293:23 301:11

**peers** 47:12

**pending** 112:18 138:6 224:21

**Pennsylvania** 34:18

**people** 15:9 24:7 43:6,11 47:8 50:5 55:8,14 68:24 98:21 129:22 133:21 144:24 145:8 149:11, 15 152:7 166:3,4,7,9, 16 175:11,12 186:9, 13 187:3 191:20 192:6 206:10,24 224:12 240:13 262:15 265:19 275:18 282:16

**Perfect** 145:5 183:18 259:2 299:10

**perfectly** 25:10 26:4

**perform** 108:17 249:19

**performed** 92:14 260:3

**performer** 146:21

**period** 69:15 77:11, 25 79:12 93:22 135:8 141:8,25 167:25 168:14 169:12,17 198:2 203:23 214:18 216:3 255:15,21,25 256:5

**periodically** 238:15

**periods** 215:16

**permanently** 18:23

**permission** 290:5 292:6

**perpetrate** 122:17

**perplexed** 78:19 267:10

**person** 15:22 20:20 81:15 163:17 180:3 253:22 269:22

**personal** 18:20 22:16,21,22 24:21 83:2 117:10,14 119:14,20 120:4 121:2 122:2,9 123:10 124:18 125:22 126:12 127:2 128:5 170:16,18 238:4 294:14,24

**personally** 8:18 135:16,23 187:21 197:10 198:22 200:2 204:21 211:20 219:12 220:24

**personnel** 12:17,22 52:25 91:12 119:18 179:5 234:6 260:14 268:13

**persons** 81:2 273:13

**pertaining** 97:3 132:25 164:7 191:25

**Peter** 217:18,19

**Petersen** 64:17

**Philadelphia** 34:18

**phone** 22:22 102:3,9 103:7 169:7 225:25 229:10,19,23 241:4, 16 271:14 284:13,18 288:2 290:6,8

**photographs** 100:6 117:17,25 119:23 122:21 124:23 125:2 170:22 204:7,9

**photos** 119:21

**physical** 64:10 83:8 85:15,22 105:21 145:25

**physically** 85:17

**physician** 37:23

**physiologically** 111:3

**pick** 300:15

**picking** 225:25

**pickup** 46:3

**picture** 119:19

**pictures** 99:8

**piece** 68:5,20 73:13 198:13 283:18 284:7 294:14,23,24 295:17 297:4

**pissed** 99:2 102:22

**place** 27:25 30:11 94:24 100:10 108:16 156:22

**places** 115:4

**plaintiff** 12:11 13:3,5

**plaintiff's** 29:4

**plaintiffs'** 13:9

**plan** 74:2 113:13

**planned** 80:4 243:2 298:6

**planning** 6:6

**plans** 6:13

**plate** 117:24 119:20

**plates** 118:2

**platforms** 166:8

**play** 81:22 291:5 292:6,9,24 294:7 297:4

**played** 292:19 294:9

**players** 52:24 68:21 165:18

**playing** 292:25 293:2

**pleadings** 23:23

**plenty** 4:8,11 246:10

**plugging** 228:21,22

**podcast** 223:7,25

**podcasts** 223:5,6,11

**point** 11:17 12:3 13:10 14:19 16:6 21:9 30:13 32:2 39:20 42:4 54:8 66:4, 17,21 71:3 72:2 73:2 79:13 84:8 88:20 99:14 102:23 103:23 114:16,23 137:14 157:5 159:10 160:13, 15 161:20 173:6,24 186:20 189:2 191:11 194:18 195:21 197:12 201:15 202:13 205:3 209:6 215:8,12 233:7 234:5 238:2 245:5,21 246:14 247:15 248:4 250:11,14,16 251:2 267:17 271:5,8 273:21 299:23

**pointed** 17:2

**pointing** 176:10

**points** 16:11 26:16 28:24

**police** 51:18

**policies** 18:3,21 23:4,16,18 24:15 25:3 118:13 142:18 154:7,13,14,17,18 208:18 259:15

**policy** 24:23 153:22

**populated** 294:20

**posited** 48:18

**position** 40:8,9,14
41:4 58:9,12 60:5
62:8 63:10 73:15
79:6,21 80:22 88:10
104:9 139:19 149:22
152:18 153:7 156:18,
19 173:21,22 174:2,
3,15,21 176:22
177:15,19 179:19
249:2 291:12

**position's** 62:9

**positioned** 154:12

**positions** 60:8,9
266:18 267:2

**possession** 65:11
143:10

**possibility** 162:24

**possibly** 18:11
200:17

**post-hearing** 10:3,8
29:5

**Post-its** 258:15

**post-trial** 10:2

**posted** 176:23
223:19

**posting** 173:14
175:12

**posts** 85:12 186:4

**posttraumatic**
110:22

**potential** 52:24
70:17 160:16,17
163:12 177:7 186:9
225:3,21,23 233:22
268:12

**potentially** 117:6
141:9 150:22 179:23
188:7 224:13 227:5
228:9 230:24 281:17

**pre-dating** 20:11

**pre-op** 213:15

**preceding** 55:5,11
59:4

**preclude** 277:22

**predicate** 42:18

**predicated** 196:3,14

**preface** 294:12

**prefer** 112:17 242:6,
16

**preferring** 173:10

**preliminarily** 11:10
132:16 133:12

**preliminary** 9:7,18
107:22 176:21 177:7
198:3 225:2 231:11,
15

**premises** 204:10

**preparation** 7:13
168:24 184:21

**prepare** 95:16

**prepared** 93:18
231:17,20

**preponderance**
12:12

**presence** 85:18,23
188:6

**present** 6:14 259:22
269:8 291:18

**presentation** 4:17

**presented** 10:7
184:22 241:14,18
290:22

**president** 217:20

**press** 97:13,23 99:20
128:21 129:3,5,7,12
130:2 134:18,22
196:18 198:5 199:9,
13,22 204:13 211:6
222:15 223:24
234:11,18,21,25
242:18 262:16
274:13,21 275:4,6,18

**pressure** 96:19
111:15

**Pretorius** 89:5 90:25
281:22

**pretty** 11:21 46:18
148:16

**preventing** 81:16

**previous** 95:13

**previously** 147:7
163:25 172:17
174:25 255:6

**price** 44:19 82:23

**prima** 12:12 13:4

**primarily** 43:18,20
67:19 195:4 231:13

**primary** 42:4 79:13

**print** 167:23 168:18

**printed** 61:25 62:3
69:5 71:13 169:10

**printout** 169:2,3

**prior** 9:14 27:15
40:25 43:25 59:8
65:12,20 95:22
111:16 115:10
138:12 155:18 156:8,
22 163:25 181:22
245:5,7,17 246:15,21
252:11 262:19
270:23 279:17
281:20 283:7,15,19
284:5,8

**Priscilla** 64:17

**prison** 69:17

**private** 34:15 109:15

**privilege** 20:6

**probable** 97:2

**problem** 4:19 9:2
20:19 21:14 49:8
50:5 127:17 201:19
277:7

**problems** 50:12 91:4

**procedure** 13:3

**procedures** 23:16,
18 118:13 142:18

**proceed** 5:14 12:5
244:10

**proceeded** 249:15

**proceedings** 244:6,
7

**process** 15:20,22,25
16:3 230:22 231:2

**produce** 113:24
114:3 288:6,13

**produced** 20:5 114:8
115:12 218:5 273:2,8
276:7 288:16

**product** 234:7

**production** 42:20
43:12

**productions** 20:5

**program** 32:9 148:6
226:4 227:8,9 247:9,
12,17,24 248:6

**prohibited** 118:13

**prohibition** 208:18

**prohibits** 142:21

**projects** 147:17,19

**promise** 205:3

**promotion** 36:17

**promotions** 148:20

**prompted** 177:21

**pronounce** 136:25

**property** 25:8 42:3
215:24 284:15

**proprietary** 24:20
118:10,14

**prosecution** 65:6

**prospects** 81:8

**protect** 98:18 267:15

**protected** 12:13,16,
18,23 13:9,22 14:3,8
15:11,12 16:6 19:7,
18,21 20:21 21:2,5,7
27:6,12 45:4

**protection** 32:20
35:13 39:2 40:7
55:21 162:24 163:2,
10

**protective** 35:8,14

**proves** 12:21

**provide** 26:11 35:12
72:17

**provided** 5:2 28:9
64:24 69:6 114:9,12,
19,20 115:9,10
187:25 196:4,15
233:5

**providing** 226:2,20

**proving** 12:12 29:2

**provision** 30:6

**provisions** 143:3

**PTSD** 36:17

**public** 97:24 201:3
302:5,21

**publicly** 97:5

**publishers** 224:10

**pull** 14:10 30:2 38:12,
15 114:23 118:19
144:3 151:12 212:16
255:5 264:12 276:2,8
280:11 286:18

**pulling** 46:2 144:5
224:6 285:4

**purported** 200:9

**purportedly** 132:15
233:3

**purpose** 287:10

**purposely** 268:23

**purposes** 6:6 188:21
291:9

**pursue** 111:24 112:5

**pursuing** 19:6

**purview** 260:15

**push** 78:14

**pushed** 54:10 93:24
94:8

**pushing** 22:9 50:23

**put** 14:16 21:3 29:24
30:7 45:16 53:9
83:12 90:15 94:21
101:20 115:3,18
118:22 121:20
123:19 124:14 129:3
134:17 149:9 167:13
172:5 177:8 178:10
184:4 192:19 211:12

217:4 231:6 234:11,
18,22 238:24 251:15
281:21 290:25

**putting** 214:12

**Puyallup** 31:13

## Q

**quad** 100:10

**qualified** 174:19
175:20 233:25

**quality** 34:19

**quantification**
135:20 221:10

**quantify** 136:11

**quarter** 82:23 84:16

**quarterly** 201:5

**question** 17:14 30:8
63:19 70:4 74:13
76:2 112:12,18,20
115:13,15 130:21
134:10 136:17,18
143:16 149:4 159:7
163:14 175:24
180:22 189:19 191:8
199:7,12 202:10,17,
20 203:10 220:5
225:13 227:18
228:13 229:3 230:13
233:8,16,20 234:3,14
235:8 239:9,25 240:3
241:13 242:10 245:9
246:20 248:2 253:13,
16 262:23 275:20
291:15 300:10

**questioning** 242:9
299:18

**questions** 52:6 55:9
70:2,8,9 112:7
130:25 138:7 153:4
191:21 192:8 202:7
218:7 219:5 244:19
282:12

**quick** 137:25

**quickly** 60:19 222:10

**quote** 132:12

**quotes** 130:7

## R

**rabbit** 69:14

**radar** 50:19 82:14

**Rahul** 147:21

**raise** 24:22 91:3
180:10 216:16 241:2

**raised** 14:12 15:4
26:16 28:24 52:11
77:20 91:10 93:10,13
94:18 135:10 220:3
245:14 273:14 285:6

**raises** 24:23

**raising** 66:16 67:25

**ramp** 42:25 78:14
82:24

**rampant** 268:16

**ran** 187:2

**rankest** 218:14

**rate** 64:4,12 83:10,12
85:4,7 102:2 116:23
139:25 158:4 180:20
215:4 216:4,6
251:10,16 255:24
295:2,6

**rates** 116:18 151:25
215:2 295:4

**rationale** 88:12

**raw** 43:21 44:24
49:10,17,22 134:24
198:10

**RDR** 302:4,20

**reach** 89:8 90:9
207:7 240:23

**reached** 79:12
104:22 172:17
194:22,25 207:17
219:25 240:24,25
262:4 264:2

**reaching** 263:9,21

**reaction** 52:10,14,16
97:22

**reactions** 111:5

**read** 8:8 129:23
156:24 182:12 209:5
210:2 233:20 253:9
254:3 258:22 275:25
276:5 278:2 280:15,
16 284:2

**readback** 284:9

**reading** 8:16 158:25
176:25 239:6,20
253:4 277:22 283:23

**ready** 183:22 300:22,
23

**real** 37:24 38:5
162:24

**realize** 143:11,13
190:21

**realized** 68:23
110:13

**realtor** 37:23

**reason** 5:18 13:25
14:7 26:23 27:4 28:4,
8,17 58:25 59:3
108:18 149:8,9
238:20 247:2,3,9
285:22,25 286:4

**reasons** 26:19

**reassign** 294:25

**reassigned** 112:20

**rebuttal** 4:10

**recall** 14:23 38:21
41:12 58:16 78:23
87:12,25 88:4 105:9
116:5,11,14 128:19
129:17 136:10,14
139:18 146:8 147:14
150:13,24 152:9
153:3 157:17,22
160:11 162:18
168:23 173:17
176:14 179:24
181:11 189:20
191:11,18 192:3,5
204:19 207:5 208:20,
22 209:6 211:4,7,9,
23 212:4,6,9,12,15
215:17 221:10
222:12 231:16
237:18 238:5,10
250:18,19,20,23

264:13,16,21 268:2,7
272:2,8,10,20,24
273:25 274:6,16,19
282:19 286:15

**recalls** 262:22

**receipt** 207:15
259:15

**receive** 38:17

**received** 17:22 32:13
36:17 37:13 39:2
45:21,22 49:5 54:21
57:21 59:11 61:19
62:23 66:9 71:21
73:7 75:5 80:6,12
84:4,6 88:13 89:20,
22,24 96:7,15 97:20
100:4 103:18 104:5
106:25 107:12 110:9
120:12 121:17 123:4,
16 124:12 126:8
128:13 130:4 132:5
134:8 144:16 152:15
167:5 171:23 178:22
184:18 192:15 205:9
210:22 214:8 237:12
243:9 255:3 257:15
258:2 259:10 261:13
285:23 294:8

**receiving** 87:25
130:18

**recent** 109:8 130:3

**recently** 32:7 207:11
223:13

**recess** 29:18 56:25
84:18 139:4 183:20
222:2 230:2 243:20
289:2 293:22

**recognize** 167:16
214:15 253:17,18
257:12 258:20,25
259:2

**recognized** 209:15,
20

**recollection** 11:7
152:6 158:6 250:24
254:13 279:10,24
281:4,15 291:8

**recommended**
73:16 104:2,24
105:14 246:3

**record** 8:8 19:14
31:7 44:9 52:7 56:22,
24 57:3 95:6 124:4
139:8,11 227:23
229:25 230:6 243:23,
24 244:6,7 275:24
287:13 290:5,25
293:5,14 294:3,4
299:2,4,6,8 300:11,
14 301:9 302:8

**recorded** 119:16
287:23 288:2 290:3
299:9

**recording** 288:16
290:13,17,19 291:6,
12,13,16,17,22
292:5,24 294:7 299:9

**records** 22:20
113:24 117:15
119:16 120:23
122:22 123:9,25
135:12 158:12
170:22 214:14
216:20

**recovered** 227:3
228:8

**recovery** 225:10
227:2,8

**recruiter** 175:9,19,21

**recruiters** 173:12
175:7,17

**red** 19:24 99:9

**redirect** 131:4 242:8
300:8

**redirecting** 201:18
202:2

**reduce** 251:21

**reduction** 58:23

**refer** 30:5,12 87:15
161:19

**reference** 116:9
169:23 199:10
210:25 239:18

**referenced** 193:7
211:13 236:8

**references** 23:24
197:25

**referencing** 162:3 211:8 240:4 272:16 284:19 299:13

**referrals** 95:21

**referred** 14:5 95:12 174:24 236:4 281:20

**referring** 191:24 210:17,18 212:10

**reflect** 153:17 160:12 169:15,25

**reflected** 154:17 202:18

**reflects** 169:11

**refresh** 254:13 279:9 281:3,15

**refreshed** 291:7

**refuse** 81:22 92:12

**refused** 92:17 137:10 234:8

**refusing** 90:3

**regard** 25:19 74:2 196:25 209:3 219:19

**regarded** 240:20

**region** 294:25 298:6

**regular** 219:21 251:22

**regularly** 46:18 55:4 90:15 269:18

**rejected** 175:17

**relate** 244:22

**related** 45:19 48:18 52:13 53:20,24 67:19 68:5 70:4 73:12 86:13 87:19 122:11 127:24 154:18 180:20 188:10 192:2 213:21 231:13 234:7 253:13 266:3 273:3 302:12

**relates** 265:3

**relations** 14:24 19:3 92:22

**relationship** 154:23 155:3,5

**relative** 14:8 47:8

**release** 68:14 82:24 97:13,23 99:21 128:21 129:3,5,7,12 130:2 134:18,22 234:11,18,22,25 274:7,13,21 275:4,7, 18

**released** 164:25 201:3

**relevance** 218:19,20

**relevant** 116:24 117:2,5 187:15 273:2

**relief** 112:5

**relieve** 100:13

**remain** 27:5 41:2 85:3

**remained** 85:7

**remaining** 85:5

**remains** 28:22

**remember** 38:17 46:20,25 136:4 150:19 171:10 193:15 198:8 256:20 264:18 272:13 275:25 279:13

**removal** 26:20,22 27:15,17 28:6,8 290:7 299:14

**remove** 283:16 284:5,15 285:22

**removed** 28:4,16 45:25 75:13 85:13 86:5 103:12 105:7 117:8 193:21 290:2 294:18

**removing** 118:13

**renew** 7:2

**Reno** 36:24 37:15,24 104:9 112:25 140:18 141:5 181:25 186:11

**repeat** 74:12 75:16 76:24 199:16 220:4, 21 234:14 235:7 245:9 246:20 248:2 255:17 262:23

**repeatedly** 55:14 91:10

**repetitive** 244:19

**rephrase** 203:14

**replaced** 156:22

**replete** 23:23

**report** 17:22 18:17 19:11,13,20 20:2 41:25 49:20 51:5 86:13 92:19 100:12 196:4,15,19 231:11, 19,23

**reportable** 233:10

**reported** 18:2 46:6, 17 51:17 52:6 65:3, 18 77:9,10 82:10 92:10 93:15 102:17 104:22 122:14 192:6 194:15 197:18 198:9 199:22 201:4 220:13 245:3,5,17

**reporter** 10:10 244:8 262:6 283:23 284:2 289:11,16,20

**reporting** 50:14 51:20 64:11 85:10 94:11

**reports** 20:10 43:19 45:11,13 52:9 86:13, 14 95:13 266:6

**represent** 10:15 167:20

**representation** 296:6,8

**representations** 206:22

**representative** 27:17 36:20 93:12

**represented** 92:25 195:2,22

**representing** 11:4

**request** 7:3 25:23 27:18 28:6,9,11 53:5 137:7,25 201:24 216:7 281:21 285:23 294:18

**requested** 51:21 138:10

**requesting** 26:20 82:16

**requests** 137:5 164:4

**require** 104:4 175:2

**required** 13:4 38:5 81:3 169:9 174:22 206:18

**reserve** 21:23

**residing** 51:11

**resign** 106:12

**resignation** 106:9

**resigned** 28:19 107:14,18,25 108:4, 13

**resolve** 194:9

**resorts** 109:24

**resource** 223:2

**resources** 137:3 186:5,7 195:4 260:17

**respect** 46:18 72:13, 20 73:14 77:2,25 79:6 88:9 127:19,20 155:2,17 163:10 196:11 221:6 268:4

**responded** 14:20 50:25 207:13

**Respondent** 17:17

**respondents** 6:17 8:4 13:18 17:19 21:22 112:16 113:6

**response** 6:19,20 19:10 80:15 89:4 269:2

**responses** 286:15

**responsibilities** 41:13,21 47:15 51:25 85:9 86:2

**responsible** 35:24 190:9

**responsive** 201:16

**rest** 6:8 8:2

**restate** 149:4

**restricting** 266:24

**restroom** 29:14

**result** 18:17 19:11,12 69:17 110:23 111:5

**resumé** 32:23 37:4 62:8 109:8 171:4,10 173:25 175:20 177:20

**retained** 92:24 195:9,10 211:11

**retaliate** 27:7,20

**retaliated** 285:7

**retaliating** 27:22

**retaliation** 15:13 26:18 29:2

**retaliatory** 21:17 26:23

**retired** 35:17

**retirement** 140:10

**return** 104:10 143:9, 20

**returned** 41:16 190:10

**reveal** 43:16

**revealed** 44:8

**revenue** 232:18

**review** 4:8 18:22 44:13 71:10,11 119:7 127:7,9,12 129:7 239:23 261:18 276:17,22,25 277:4, 9,11,14 278:15,20,22 279:21

**reviewed** 4:21 6:19 18:18 19:13 198:22 257:3 259:13

**reviewing** 24:18 206:11 281:9

**revisionist** 25:17

**Rick** 76:16,20,21 80:14,17,21 83:11 159:23 181:9,11,13,

18,22 254:6,14 265:21 266:11 267:14 275:2,11 297:11

**Ricky** 92:21 263:18, 25 264:3,17

**rid** 20:9

**ride** 111:22 298:9

**RIF** 23:25 24:2 54:25 88:25 107:16 149:8,9 150:23 151:2 152:8 246:5,7,8,11

**rigamarole** 8:14

**rigged** 204:22

**rigging** 204:18

**rights** 108:21 155:25

**ring** 150:16

**risks** 18:11

**road** 101:15 295:16

**Robert** 35:16

**Robertson** 9:7,9 10:14,17,21 22:2,6 37:10 48:24 57:17 61:15 62:20 66:6,25 67:8 70:22 73:4 75:2 80:9 83:24 87:20 89:16 96:4,11 97:18 99:25 107:9 108:6 110:6 113:8,16,20 115:8 118:17,21 120:8,13 121:13,18 123:5,12,17,18 124:7,13 126:4,9 127:13,17,19 128:2, 7,14 129:19,24 137:13,18,24 138:3, 8,20 139:2,7,9,12 142:12,14 144:11,17, 19,25 145:7 151:12, 15,16 152:11,16,20, 24 153:2,10,13 158:20,22 166:21,24 167:7,11,12 168:4 170:5 171:15,18,20 172:2,4 176:3,6,9 178:4,7,17,23 182:21 183:2,15,18,23,24 184:2 191:7,9 192:12,16,18 199:16

201:9,12 202:14 203:14,16,25 204:3, 25 205:8,10,11 210:15,23 212:17,20, 24 213:3 214:2,9,11 216:19,25 217:3 218:10,22 219:8,9 220:20 221:20 222:6, 8 224:19 225:5,11 226:7,11,13 227:11, 14,22 228:3,4,12,22, 24 229:7,11 230:7, 12,15 232:9,15 233:16,19 234:4 236:11,16 237:7,13 240:2 241:20,23,25 242:15,19 243:2,6 300:19

**Robin** 11:2

**Rogers** 147:6,10,12

**role** 18:13 35:5 41:14 42:11 47:16 64:9 72:3,14,16 79:22 88:10 94:2,5 109:25 156:20 159:25 160:3, 8,23 172:18,19,20 180:14 181:23 182:11 246:17,23 248:12 250:4,6,7,12 266:22 267:21 268:9 271:3

**roles** 173:8

**rolling** 46:3,4

**room** 92:20 100:11 238:13

**roommate** 161:17, 18

**roughly** 152:7

**round** 205:22

**route** 66:23

**routed** 185:10

**Routing** 185:3,5

**roving** 85:19

**Row** 115:4

**rules** 5:19,22 8:11 154:5 209:3 218:15

**Rumsfeld** 35:16

**run** 29:14 73:19 158:18 186:17 187:7, 13,21 188:8

**runner** 111:17

**running** 43:12

**runs** 168:11

**Ryan** 76:17 181:9,11, 16 249:22 266:13 275:11

--------

**S**

**S-I-D-H-E-R** 147:21

**salaried** 156:18

**salary** 79:22 140:7 157:13,20

**Salas** 164:7

**satisfied** 188:22

**scale** 14:16

**scaled** 173:8

**scaling** 107:23

**scared** 111:14

**SCC** 42:12 48:4

**schedule** 73:18

**scheduled** 4:6 206:2

**school** 33:18,19

**science** 34:11

**scope** 52:12 176:19, 22 177:7

**Scott** 104:6,21 297:13,14,15,17 298:5

**scrap** 43:21 49:14 53:13 94:19 198:10

**scraps** 49:22

**scratch** 178:3

**screen** 29:24 30:11 46:11 118:23 121:21 123:20 124:15 172:6 175:11 178:11 184:5 192:20 205:25 228:10 231:6 243:4 292:25

**screenshot** 125:4,5, 7 167:18

**screenshots** 125:25 169:7

**scroll** 71:9 127:5 145:2 255:10 258:21 261:15 276:12,13 278:5 279:7,16,19 282:8 286:24

**scrolling** 151:9 276:23 278:12,16

**Sean** 40:11 47:6,10 50:8 52:17 53:3 55:16 59:5 64:20 88:23 90:24 150:2 238:14

**search** 38:13

**Seattle** 31:12

**sec** 15:6,7 16:2,20 17:3,6,24 19:21 23:9 27:13,23 95:17,22 96:17 99:19,20 100:17,25 119:6 134:19 171:15 207:7, 16 211:15 225:7,16 226:2,4,19 227:2,8,9 228:6 229:4,6 230:11,16,17 232:23 234:12,19 235:2 245:7 273:22 274:5, 12 276:15 277:19 278:14 287:15,19 288:11 289:9,24 290:10

**second-to-the-last** 142:15

**secret** 35:12 55:2 131:14,21,23,24 133:25 268:15

**Secretary** 35:15

**secretive** 265:16

**sector** 34:15 106:17 107:24

**secure** 45:24

**secured** 85:20

**Securities** 55:16 129:2 172:17,21 173:2 225:15 259:3

**security** 10:20 16:18 20:20 24:10,11,24 39:15 41:24 42:14 46:23 50:5,25 52:3 55:3 56:5 58:19 60:3, 4 63:6 64:10 76:22 80:5 82:11 83:7,8 85:10,16,17,18,22 86:3 93:12 101:13 102:4,6,13 104:8 105:21,23 109:22 119:15,22 125:8 145:19,23 146:2 147:7,17 148:16 149:23 150:15 152:18 156:20 177:14 179:4 180:10 246:15 249:12 250:8 251:22 257:16 259:3 268:16 273:13 275:10 295:3

**seek** 115:17

**selected** 35:8 36:19 41:12

**selective** 173:10

**self-study** 38:6

**selling** 232:17

**senate** 163:7

**senator** 163:7

**send** 72:9 79:2 91:6 92:8 118:5 120:3 170:17

**sending** 18:4 78:23 117:9 125:21 170:15 195:14

**senior** 36:20 51:22 52:25

**sense** 229:13,21

**sensitive** 6:9

**sentence** 240:11

**sentences** 55:25

**separate** 37:18

**separately** 244:6

**separation** 143:21

**September** 103:19 105:10 116:2 118:25 119:8 157:25 168:24

Index: sequence..specifically

215:24 216:3 241:17

**sequence** 6:4

**series** 245:13

**served** 35:6 37:21

**service** 28:11 34:4, 14 35:12 36:18

**services** 35:9,14 178:14

**set** 11:21 13:13 21:8 38:3 54:2 131:24 163:20 164:2 222:6 302:6,16

**sets** 242:7

**setting** 42:17

**settle** 230:17

**settlement** 225:8

**severe** 104:3 111:4

**shack** 101:19

**share** 50:6 225:10,18 226:25 228:9 265:24 267:20 286:11 292:24

**shared** 78:18 266:3,9 273:16

**shareholders** 233:5, 24

**sharing** 266:7 270:6

**she'd** 194:23

**shelter** 51:12

**Sheriff's** 130:6,12 131:8 132:3

**shift** 40:15 46:23 47:3 52:2 53:18 81:21 83:12 85:4 86:6 100:15 102:24 261:4 297:6

**shifts** 43:12

**Shipley** 47:25 48:2 100:12 102:4,7

**shipments** 67:20 165:14 191:25

**shit** 295:9

**shoot** 94:23 287:6

**shooter** 285:10

**short** 77:24 93:22 102:12 288:20

**short-term** 140:21

**shortly** 53:20 126:18 249:22

**shots** 279:8,12,14

**show** 12:6 13:20,23 19:16 20:16 21:17 33:10 38:10 46:8 55:23 56:2 60:18 61:8,21 64:14 66:12 71:17 74:4 78:21 83:14 86:17,19 90:21 95:18 96:22 97:11 99:4 104:11 106:5,18 107:2 109:6

**showed** 57:5 69:6 102:18 288:10

**showing** 20:7 61:9 123:7 151:5 208:3

**shown** 28:2 128:17 139:14 157:9

**shows** 4:9 52:7 216:2

**shut** 62:12 159:25

**shy** 137:16

**sic** 124:15 242:24

**side** 4:14,16 5:11 145:23 146:2 153:21 175:4 244:3

**sides** 11:10

**Sidher** 147:21 148:10

**sign** 142:19

**signature** 153:11,12, 15 257:13,14

**signed** 17:12 153:5, 6,18 155:10 156:2,7, 11 157:3 179:9 257:17 259:14

**significance** 14:13

**significant** 68:4,6 94:18 102:8 110:24

136:3

**similar** 14:4 35:12

**similarly** 27:21 134:21

**Simon** 11:3

**simplest** 229:17

**simply** 25:7,23 28:10 74:6 148:25 149:10

**simultaneously** 64:5

**Sinaloa** 69:20

**sir** 32:21 33:13 38:24 40:22 43:4 44:14 45:10 46:13 47:22 50:7 57:11 61:12 62:6 63:6 65:24 66:15 67:17 70:12,19 71:23 72:20 74:8 75:20 76:13 78:25 83:4,18 84:13,17 87:8 88:2,18,21 92:7 93:20 95:7,11,14,24 97:15 99:17,22 100:19 105:2 106:11 107:6,17 108:3 109:10 113:3 117:11, 16,20,23 118:4,8 120:18,24 121:23 122:4 123:11 124:6, 20 126:15 127:11 128:6,20,24 129:18 134:20 135:5 139:17, 23 140:3,8,15,19 141:7,11,17,22 142:3,8,11,25 143:6 144:9 145:12 146:24 151:3,24 152:2 153:8,16 154:20 155:8,12 156:5,16 157:10 159:2,20 160:6,18,25 161:14 164:16 167:15 170:14,24 171:5,8 172:9 175:14 180:21 182:7 184:6,9,12,19, 25 185:23 192:24 193:13 195:23 199:15 200:19 204:8 205:15,20 206:14 208:25 215:14 217:25 220:20 221:14 222:13 226:6

238:23 239:3 241:21 250:3 252:13 257:24 297:19

**sit** 93:11

**site** 26:21,23 27:16 47:21 51:15 67:22 68:2 105:8 181:23 259:22 294:18

**sites** 52:3

**sitting** 86:6 158:5 185:21 203:17 212:14 213:16

**situation** 110:23

**situations** 37:19

**size** 43:5

**skills** 213:14

**slanderous** 218:14

**Slettvet** 217:9

**slightest** 292:2

**slog** 242:3

**slots** 173:7

**slow** 55:13,24 101:16 276:18,23 277:5,12

**slowed** 101:18

**slowly** 257:7

**Smith** 11:2 254:20

**smoother** 137:19

**SOC** 42:12 48:4

**social** 165:15 166:8 186:4 197:6

**solar** 67:21

**soldier** 34:2,6

**soldiers** 36:12

**sole** 196:21 198:4,7, 13 199:23

**solely** 24:6

**solve** 202:9

**Someone's** 15:24

**son** 31:17

**SOP** 148:14

**sort** 12:4 42:17 45:8 223:22 227:20

**sorts** 22:23 94:21

**sought** 45:5 121:8 267:22

**sounds** 291:6 294:16

**source** 165:16 173:13 186:7 196:9, 21 198:4,7 199:23

**sources** 189:14

**south** 31:12 32:5,11 192:3

**southern** 36:21 87:7, 10 140:5

**SOX** 12:9 13:2,11

**spanned** 68:13

**Sparks** 43:3

**speak** 26:8 72:11,21, 24,25 73:17 81:6 82:16 207:8 263:15 264:19

**speakerphone** 102:14

**speaking** 6:15 53:23 227:13 263:22

**special** 35:6 36:11

**specialist** 41:10,20 43:15 47:16

**specialty** 60:8,9 62:8,9

**specific** 87:2 131:9 134:9,10,11 135:17 136:11 164:21 179:14 181:4 198:21 199:8,10,18,21 202:17 203:18 204:22 213:22 220:16,17,23 221:10 227:19 268:20

**specifically** 18:10 41:12 48:3 50:8 55:18 59:6 67:18 77:7 81:9 87:12 98:23 124:25 127:23 136:14,17 148:14 157:22 160:11 176:20 181:21 189:4

191:24 200:15 208:21 209:7 211:4 212:5 215:18 253:7 264:21 265:2,24 266:5,9,21 268:4,7 272:8,14,20 273:25 274:7,17,19 275:16 282:19 296:7

**specifics** 78:9 160:2 194:7 296:20

**speculated** 173:11

**speculating** 82:15 283:7

**speculation** 224:18 232:10

**speed** 102:2 278:4

**spent** 13:13,14,16

**spike** 44:19

**Spirit** 36:16

**spoke** 59:22,25 73:9 88:9 134:2 264:8 283:7,15 284:4

**spoken** 234:19

**spools** 43:22

**spreadsheet** 45:17

**Sprott** 8:7,24 46:14, 15 50:8 52:17,22 53:3 54:10,11,22 56:4 57:7,13 59:15 64:19 66:14,17,18,21 67:16,23 69:7 70:15 77:13 93:16 98:8,22, 24 130:18 132:22 133:6,12 144:8 148:11,14 149:11 189:3,7 191:12,19 198:25 238:15

**Sprott's** 47:4

**squaw** 42:15

**stack** 62:16,17

**staff** 55:18 163:8

**stage** 13:20

**stages** 107:22

**stand** 6:11 189:3

**stand-up** 147:4

**standard** 12:8,24 13:13,25 19:15 21:8 29:2 142:20

**standing** 300:20

**standpoint** 291:3

**staring** 101:21

**stars** 210:8

**start** 7:25 26:14 29:12 31:23 39:18 40:3 55:9 60:12 66:11 77:25 105:11 108:24 112:16 113:8, 15,21 137:20 144:25 159:4 222:5 242:17 243:13,14 256:18 265:25 300:22

**started** 7:8 44:2 45:11,16 50:20 63:24 75:9 126:21 142:6 157:21 158:14 159:10 160:9,22 183:5 184:24 202:20 214:24 287:10

**starting** 11:12 63:18 104:21 111:17 115:24 159:18 298:7

**starts** 15:3 129:21 141:19 145:8 158:24 197:14 298:8

**state** 31:6 33:19,20 36:2 74:6 97:2 164:21 175:2 177:18

**stated** 13:18 45:7 53:25 55:18 133:11 156:25 186:23 209:6 267:14 268:8 283:17 284:6

**statement** 11:11 21:23 26:11,15 27:3, 10 28:25 140:20,24 198:5 199:13 203:19 255:14,20

**statements** 52:20 60:24 61:10 114:10 200:11,25 201:2 202:19 221:17 232:8 233:5,23

**states** 133:23 141:24 142:16 153:22 154:3

155:15 172:16

**stating** 90:16 272:10

**stationed** 100:14 158:2

**status** 131:23

**statute** 12:10

**statutes** 15:12 97:4

**stay** 34:8 60:15 80:3 105:25 295:9

**stayed** 33:24 34:9 37:16

**staying** 60:15

**stays** 6:11

**step** 39:10 109:4 141:14,15 205:22 250:21 251:2,6 256:13

**stepped** 101:19

**stepping** 252:7

**steps** 164:8

**stint** 34:10

**stipulate** 260:20 291:21 292:2

**stock** 15:8 82:23

**stolen** 49:17,24 197:17,23 198:11

**stood** 52:22

**stop** 101:18,21 189:8 279:18 300:13

**stopped** 272:21

**stops** 188:15

**Storey** 54:4 65:5 130:19 132:3,16 133:15 162:10 164:11 185:5,10 219:13,18

**story** 81:21

**straight** 285:10 287:6

**Street** 222:21

**stress** 104:3 110:22 111:4,8 113:23

**stressful** 111:20

**strike** 108:10 202:22 273:19 284:24

**string** 158:23

**stronger** 6:25

**struggle** 111:13,14

**Stuart** 119:4

**stubs** 107:4 114:23 115:4

**stuck** 296:22

**studied** 32:10,16

**studies** 32:8

**study** 32:3

**stuff** 52:4 245:4 282:16

**Suarez** 164:7

**subject** 54:25 64:20 144:20 155:17,20 217:10 220:9 221:12 246:8

**subjective** 15:23

**submission** 95:17 211:5

**submit** 257:20 290:8

**submitted** 8:8 9:14 32:24 37:5 95:21 134:19 185:22 207:4 231:20

**submitting** 8:6

**subsequent** 92:13 207:11 231:19 249:8 266:20

**subsequently** 65:15 72:7,24 91:20 165:19 240:25 266:23

**successful** 148:21

**sudden** 101:25

**sued** 193:18,20

**suffered** 12:16 110:22 111:4

**sufficient** 97:2

**suggest** 275:22

**suggesting** 66:22

**suggests** 284:21

**suit** 111:24

**suitable** 39:16

**sum** 28:20

**summary** 11:21 20:5 167:24

**summoned** 100:11

**superintendent** 51:22,23 197:25

**superintendents** 53:2

**superseded** 156:10

**supersedes** 155:18

**supervisor** 40:12 46:15,23 47:2,3,10 56:5 59:7,14 64:4 72:2 81:21 83:13 85:4 109:22 132:19 133:18 146:7 160:19 179:22,23 180:4,7,8, 18 181:6 182:5 236:18 237:21 248:12,17,20 249:3, 5,15,17,19 250:12, 13,14,22 251:3,10, 13,16,21 252:3,7 254:7,16 256:14 266:13

**supervisors** 50:10 93:16 95:13 102:13 259:18,21 260:10,16, 24,25 261:5 274:25 275:10

**supervisory** 64:8,9 82:7 85:8 91:12 94:5 249:11 250:2 255:24 266:22

**supplement** 38:7 39:14

**supplemental** 20:4

**supplier** 154:4,5

**supplies** 67:20

**supplying** 180:13

**support** 26:17 28:3 172:22 173:3 198:22

296:23

**supporting** 188:13

**supportive** 285:18 286:13

**suppose** 282:7

**supposed** 163:23 296:5

**Surgeon** 35:21

**surprised** 97:25 98:2,3

**surveillance** 22:20 99:15 117:22

**suspect** 27:25

**suspected** 12:14 295:15

**SWAT** 145:18

**swaths** 24:20 76:11

**swear** 30:17

**Swindle** 146:14,17, 25 147:3,9

**swing** 40:15 81:21 85:4 159:24

**switched** 60:23

**sworn** 30:20 35:3 302:7

**system** 9:11,12 42:6 51:4 94:11 203:23

---

**T**

**Tahoe** 37:25

**takes** 298:16

**taking** 10:10 25:19 47:21 117:19,21 153:6 173:2 190:10

**talented** 148:17 149:2,10,14

**talk** 30:6 43:20 54:14, 15,18 73:10 94:13 112:15 145:13 164:9 185:19 189:18 202:20 218:6 240:15, 17 256:16 263:14 264:23 297:24

298:19

**talked** 4:23 17:5 46:17 52:8 55:4 73:11 129:14 170:21 186:8 224:7,10,12 263:4 267:11 274:23 283:10

**talking** 5:7,9 45:12 54:9 67:16 87:17 95:2 98:24 104:7 135:21 163:11 174:25 186:13 189:5, 14 195:3 199:18 201:17 250:4 267:13 275:19 281:17 282:16 287:10

**talks** 54:25 147:16

**tape** 292:19 294:9 298:24

**target** 44:25 45:2 225:9

**targeted** 96:21

**task** 33:21 130:7,12, 13,15,20 131:8 132:15 133:14,15 162:11 165:3 196:6

**tasked** 43:19 163:17 187:19

**tasks** 105:22

**TBD** 231:25

**TBI** 36:16

**TCR** 15:5,6,7,18 16:8 19:8 20:11,12 21:16 95:16,20 96:4,17 99:20 101:4 129:3 207:3,11 225:6,15 226:21 228:6 229:4 230:10 231:2 233:9

**team** 16:23 145:20 150:4 172:17,18 173:7

**tech** 118:19

**technical** 32:6 56:21 293:4,13

**Technically** 205:21

**technician** 34:12,20

**technological** 294:6

**technology** 293:17

**telephone** 88:6 272:12,15,17 294:7

**telephonic** 270:11

**telling** 58:9 64:5 103:10 201:21 250:20,23 251:23 252:4 264:19 275:17 276:15 288:10

**temperature** 86:7

**temporarily** 18:9

**Ten** 288:23,24

**tenure** 23:9 35:5 40:25 42:23 43:25 85:13 190:12 217:21 269:25

**term** 49:14,15 155:10

**terminable** 20:15 21:5,7,13

**terminate** 14:2,7 16:7 19:24 20:16 21:15 23:21 25:6

**terminated** 14:2,8 21:4 23:10,24,25 24:2 94:12 235:5

**termination** 98:16

**terms** 11:18 28:7 43:5 50:4 63:23 179:14 221:15 232:4

**Tesla** 6:17 8:13,19 9:7 10:15,16 14:15, 19 17:7,19,22 18:3,5, 7,16,17,20,21,22 19:11,13,16 20:4,17 21:12 22:16 23:6,20, 25 24:2,12,16,21 25:4 26:5,16,18,22 27:16,22 28:4,5,7,17 32:20,24 36:24 37:5 38:8,9 39:3 40:3,6,9 42:6 46:21 52:10,24 54:24 55:2 58:21 60:24 61:11 63:15 65:7 72:4,5,7 75:10, 14,18 76:3,15 77:6 78:13 79:16,18,19,25 80:3 82:21 86:25

88:25 89:8,10 90:4, 10,13 91:25 92:14 93:25 94:20,21 95:5, 6,10,12 97:6 101:10 105:7 107:15,19 110:18 113:15 116:2 117:8,9,13,18 118:2, 10,12 119:14,17,22 120:4 121:2,9 122:2 123:21 124:4,17 125:8,11,21 126:12, 16,25 128:4 130:2,3 133:6,17 136:24 137:2 139:15 142:5, 16,18,21,23 143:4,8, 9,20,22 154:12 156:9 158:2 163:9 168:15 169:2,4,8,12,13,16 170:2,16,17 172:25 173:21 174:3,7,12 175:6 177:19,23 178:13 179:2,3,11,15 180:8,14,17,25 181:19 182:6,8 186:12 193:18,20,22 194:6,9,14 196:4,15 203:19 204:9,23 206:13,23,25 215:24 216:8,13,16 217:9 220:19 221:2 223:20 224:2 225:17 227:3 228:8 230:18 232:17, 21 233:4,15 234:6 235:9 236:25 237:4, 24 238:4,12 240:22 241:3,15 245:3,14,17 246:2 247:15,22 248:7 249:2 262:11 263:10,15 265:5 266:17,21 267:11 283:16 284:5,15 285:23 294:18,21 297:4

**Tesla's** 17:9 18:12 23:3 26:15 27:18 28:14,25 42:20 54:3 63:4,7 79:11 81:7 82:23 134:25 142:20 154:5,14,19 155:4 200:10 203:23 208:17 221:17 232:7 233:23 266:24

**Tesla-embossed** 59:12

**testified** 30:21 115:16 121:5 133:9 136:22 140:16 157:11 172:10 197:4 244:17 245:13 246:6 251:11 264:24 270:8 273:12 282:14 289:8, 23 290:3

**testify** 69:24 229:24 262:22 283:10

**testifying** 115:14

**testimony** 28:3 44:11 52:20 113:22 114:7,22 115:17 116:21 128:18 130:22 133:5 136:7 138:13,19 139:14 153:4 157:9,12,15 158:12 165:5,20 176:14 191:2 193:8, 14 195:7 211:22,24 244:25 245:2,15 246:6 247:8 249:18 251:25 252:12,15 262:20 269:21 273:21 274:11,15 283:25 301:4 302:8

**Texas** 32:4,11 34:17

**text** 54:21 62:5,17 66:13 67:12,17 72:9 81:12 158:23 159:22 161:7,12,15 189:17 208:4,6 213:5 239:4 253:17,20 254:4,10 270:3,12 271:7,9,13, 23 272:5 276:2,4,8 277:24 279:12 280:6, 24 281:12,16 282:5 285:3 286:19,25 287:2,12,13,17,18 292:4

**texting** 208:14,18 209:3 213:8

**texts** 71:2,16 158:17 179:22 209:23 213:7

**thanked** 102:9

**theft** 14:12 42:2 43:19 44:18 45:9 48:10 49:8 50:5 52:12 53:7 65:3,7,20 86:15 90:7 91:4

94:11,19 120:19
135:9,17 189:10
200:9 219:14,19
220:3,9,17,18,24
221:2,3,12,13,15,16
245:22 266:6 268:17
286:7

**thefts** 47:24 48:12,18
50:15 53:24 67:20
77:9 134:24 135:7
136:12 190:5 200:15
203:20 221:6 268:14,
15

**then-sealed** 68:9

**thereof** 188:2

**thing** 9:25 16:10
22:11 60:18 77:18
91:19 98:10 105:21
111:25 130:10
227:21 229:17
288:12 300:14

**things** 7:12 12:4
15:16 16:8 19:3,4,6
20:14 21:12 23:17
44:3 45:14,17,19
46:19 49:16,18 78:10
82:16,25 85:21 86:10
87:19 91:13,15
111:13,18 113:23
117:12 118:5 135:22
148:11,14 160:20
170:23 194:4 201:22
204:15 211:12
217:23

**thinking** 189:12

**Thompson** 50:14,
16,18,22 51:17,19
52:21 53:25 65:2,13
74:22 94:10 122:14
135:10,18 136:13
189:11 190:6 191:15
197:25 198:6,15,19,
23 199:14,24 200:3
220:3,10 221:2

**Thompson's** 52:8

**thought** 45:7 48:9,
11,13 65:21 79:18,19
92:2,5 107:23 149:14
164:8 202:16 292:3

**thoughts** 100:17
299:22

**thread** 277:23

**threat** 240:12,18,20

**three-year** 60:9 63:2

**threshold** 17:7

**threw** 54:12

**throwing** 46:3

**thumbs-up** 289:15,
19

**Thursday** 66:14

**tied** 64:3 69:20
249:24

**ties** 69:18 165:15,17
166:7 197:6

**tighten** 202:12

**time** 4:8,12,14,17 5:9
6:21,24 7:19 9:2
13:13,14,16 15:3
23:22 25:12 27:15
34:2,25 37:18 38:12
39:10,17 40:20 41:22
42:25 43:10 44:12
46:22 48:22 52:19
53:6 57:16 58:17
60:14 61:13 62:13
64:15 67:23 68:7,9
69:3 70:7,21 74:25
75:7 77:11,25 80:8
81:18 82:17,25 83:23
84:12,16 85:5 87:18
89:15 90:3 91:14
92:25 93:19,22,23
95:6 96:2,18,22 97:7,
17 98:23 99:24
101:11 102:12,15
103:21,24 104:6,23,
24 105:6,13 106:16
109:17 113:14 114:2,
5 122:16 134:18
141:4,25 142:10
143:11 147:13
148:12 149:21
150:12 155:5,10
156:11,25 163:4,13
164:13 169:8 172:12
176:21 179:13
180:25 181:5,14,19
182:22,23 183:4
188:14 189:13,23
191:11 195:2 198:2
200:12 201:4 204:23

207:19 210:4 213:14
215:12 216:7 217:21
220:19 221:21 234:6
242:13,23 243:15
245:18 246:12 248:3
256:5,12 257:2
259:14,17,25 260:8,
22 263:7,8,10,22
264:22 267:7 268:22
269:6 271:11 274:16,
25 279:3 281:24
282:11,13 285:5,16
288:25 292:18 296:9,
22 297:11 300:3
301:11

**time-stamped**
119:23

**times** 4:25 16:14
45:2 54:17 119:17
223:3 269:20,23

**timing** 45:14 157:23
242:6 256:10 278:3
279:13 287:11

**tip** 131:12,19,24
132:2,7,8,12,17
133:7,25 134:15
164:6,22 165:10
166:3,9,16 184:7
185:16 188:2 196:12
197:2 207:22 231:12

**tips** 95:20

**title** 40:6 46:20,25
56:4 120:19

**today** 6:5 7:20 56:7
158:6,12 176:23
185:21 203:17
212:14 244:24
245:13 246:6 247:8
249:18 252:2 273:21
296:10

**token** 59:9

**told** 53:11 54:12,18
57:10,23,24 58:5,17,
20,23 59:10,18,25
62:7 64:2 69:7 72:5,
12 77:7,17 78:10,20
79:8,9 81:14,19 82:5,
18 93:14 98:8,9,13,
17 99:3 103:6,17,21
104:7 130:17 132:13,
18,19 133:12,17

160:20 164:8 189:2,8
196:4,10,14,18,20,21
198:6,19,23 202:21,
25 203:9 238:5
240:19 241:8 249:2
252:2,6 256:13
267:18 269:15 272:4
273:22 279:14
284:12,21 287:5
289:9,24 296:5

**tomorrow** 7:24 8:21
242:17 297:10,21
298:19 300:15
301:10

**tonight** 242:18 297:7
299:25

**top** 71:14 120:17
137:23 151:7 158:21
184:11 210:24
231:23 243:16
261:22 274:6

**total** 269:25

**touch** 264:18

**tough** 111:22

**tours** 127:23

**town** 31:13 297:12

**track** 4:14,18

**tracked** 65:15

**traffic** 86:9

**trafficking** 53:21,22
68:11 186:10 188:11
268:12

**trail** 54:23,24 111:16

**trailer** 42:14,15 57:12

**train** 237:23

**trainer** 51:23

**training** 32:13 40:19
148:6

**transcript** 302:8

**transcripts** 9:11

**transferred** 36:14

**transition** 36:10,23
55:8 86:24 91:16
100:15 270:24

**transitioned** 55:10
149:25 265:9

**traveled** 103:25
269:11

**treatment** 110:19

**tree** 48:14

**tremendous** 11:18
104:3 111:12

**tremendously**
111:20

**triage** 42:5

**trip** 191:24

**Tripp** 94:16,22
193:15,17,24 194:2,
5,20,24 195:5

**trucks** 46:4

**true** 7:4 140:9 160:7
172:25 188:25
189:21 215:7 223:18
245:20 248:15
250:15,25 256:25
263:3 267:17 269:7,
10,13 271:5 272:25
273:16 283:13 285:4,
9 287:5,22 302:8

**TSLAQ** 223:8

**Tuesday** 57:9 254:4

**turn** 112:14 187:10,
14 234:7 286:19

**turned** 31:10

**Twitter** 223:15,19,20

**Twittering** 223:25

**two-two** 152:24

**two-year** 34:10

**type** 98:15 121:10
175:4 293:2

**types** 122:8 134:7

**Typically** 138:9

---

### U

**U.S.** 10:20 33:23,25
34:11 35:3,9,15,20
55:3,16 58:19 60:4

68:15 76:22 80:5
93:12 102:12 104:8
108:22 130:5,10
131:6 133:8 134:12,
13 149:23 152:18
165:2,6 166:15
172:17,21 173:2
249:12 250:8 259:3
268:16 273:13
275:10 295:3

**ultimately** 25:12
32:14 35:17 36:17
41:16 47:14 50:21
51:3,17 52:5 65:18
66:20 81:19 83:7
102:24 103:19
160:20 161:17
172:20 174:10 194:5
225:8 248:15 250:7
251:15 265:20
266:23 267:13

**ultramarathon**
111:17

**unable** 101:17

**unaccounted** 49:24

**unannounced** 101:9
102:7

**unauthorized** 18:15
65:17 142:21

**uncover** 25:21
185:25

**uncovered** 24:19
25:6 90:10

**underscoring** 28:13

**understand** 5:12,21
10:11 44:10 67:5,12
70:11 125:11 132:8
141:12 143:7,17,19
154:10,24 156:6,7,15
159:6 160:4 175:6,9
178:24 185:16 187:9,
20 190:15 191:2,6,10
193:24 194:2 196:17
198:17 199:23 202:4
225:22,24 226:14,18
228:5 229:5 230:10,
22 232:16,25 236:24
245:8 246:14 248:24
265:4 301:7

**understanding** 6:4

**understood** 23:2
24:13,14,15 98:14
118:9 133:2 142:4,5
143:2 154:16 155:9
156:19 178:2 181:24
182:8 203:12 260:9,
12,13

**underutilized**
211:17,19,22

**undisputed** 25:5
27:4,5

**unfavorable** 12:17,
19

**unidentified** 218:13

**Union** 165:12

**unit** 86:5

**United** 133:23

**units** 36:11

**University** 32:5,7

**unproductive** 66:23

**unproven** 233:21

**unresponsive**
201:24

**unrestricted** 18:11

**unsecured** 45:24

**unspecified** 81:15

**untruthful** 283:13

**up-and-coming**
79:20 107:20

**upcoming** 82:23

**update** 300:20

**upper** 208:12

**UPS** 116:10 298:7

**upset** 192:7

**upsetting** 191:20

**upwards** 198:9

**Urban** 108:23

**USSA** 9:22 11:4
16:19 23:21 24:8,13
25:6,11,14 26:11,14,
24 27:3,5,16,21,24
28:4,8,10,14,15,18,
20,22 58:14 59:24
62:25 63:18 75:9
76:14 79:25 80:15,22
81:7,8 82:7 83:3,6,17
85:6,25 86:25 88:11
105:16 106:10,12
107:5,25 109:12
112:22 115:6 116:2
126:21 148:25 153:7
154:11 155:11 156:9,
21 157:13,21 158:14
159:4,12,18 160:9
174:2,7,11 177:13
178:25 179:3,11,15,
18 180:2,13,18,24,25
181:4,14,19,22 182:6
206:6 208:17,23
214:2,14 215:9,19,22
216:16 235:4,10
240:7 242:9 243:11,
25 244:20,22 245:12,
18 246:2,3,15,21
247:5,10,15,23
248:5,10 249:20
250:4,11,17 251:5
255:14,20 256:17,19,
23 257:2 259:15,17,
18,21 260:2,8,10,23,
24 261:5 265:2,10,
11,16,17 267:18,19
269:6,24 270:19,21
283:16 284:5 285:5,
17,19 291:5,18

**USSA's** 23:3 110:18
154:13 247:11
257:16 260:16

**utilize** 186:5

—

**V**

**VA** 109:11

**validate** 196:25
197:11

**validated** 132:16
133:13,16 196:4,15,
19 197:3

**valued** 134:25

**variety** 43:18

**varying** 130:16

**vehicle** 32:18 65:14
101:11,17,18,20

**vehicles** 42:21 47:20
122:16

**vendors** 127:25

**verbally** 156:8

**verbiage** 264:14

**Verdi** 105:18 112:24
116:20

**verification** 199:25

**verified** 133:7

**verify** 132:12

**verifying** 86:10

**versus** 12:25 180:20
195:14

**veteran** 145:18

**veterans** 35:25

**viable** 233:9,10

**vice** 217:20

**video** 22:20 47:20
51:21 117:21 125:20

**videos** 126:2

**violated** 23:15,17

**violating** 18:3

**violation** 18:21
24:23 112:3

**violations** 25:3,22
97:4 232:23

**violative** 23:3

**visit** 270:5

**visited** 118:6 127:4

**visitor** 118:6

**visitors** 127:3

**volume** 299:6

**voluntarily** 28:19
252:8

**volunteer** 32:15

**Voyager** 102:5

**vulnerable** 24:25

—

**W**

**W-2S** 114:10

**wage** 157:13

**wait** 201:9,10,12
236:7 242:17 289:14
298:20

**waiting** 21:20 53:4
269:2

**waiver** 20:6 155:24

**Wall** 222:21

**Walmart** 116:10

**wanted** 13:15 14:14,
15 16:24 41:25 62:7
90:18 113:10 159:18
244:3 296:14

**wanting** 247:5

**warehouse** 191:25

**warrior** 36:10

**Washington** 31:13
32:7 103:25

**waste** 213:13

**wasteful** 66:24

**watching** 86:7

**water** 34:15,16 59:13
188:16

**wave** 298:9

**wavered** 296:18

**Wayne** 34:17

**ways** 111:10

**website** 173:14
177:20

**Wednesday** 78:24
79:3 280:5,14,22,24
281:6,13 282:6

**week** 54:3 87:17
255:10 295:18

**weeks** 20:21 41:11
55:5,11 59:4 105:9,
10 215:8 231:12

235:15

**weigh** 34:6

**weight** 5:24

**well-established** 27:19

**Wellesley** 33:21

**Wells** 161:18,19 162:8 169:23 170:3,8 192:25 208:8,15 209:13 210:9,10 213:5 236:5,9,22,24 237:3 239:9,10

**Wells's** 170:18 208:13 209:23

**west** 101:9 242:23 300:24

**Western** 165:12

**whatnot** 38:6 68:22 166:8

**Wheat** 14:4 20:13 21:2

**WHEREOF** 302:15

**whistleblower** 12:8 13:2 16:21 17:6,25 99:20 100:18 225:9 226:4,22 227:5

**White** 17:12

**whomever** 169:16

**Wichita** 269:14

**wide** 43:17

**Wiebke** 104:6,21 116:18

**wife** 31:16 37:18 161:20,22,24,25

**wild** 66:22 69:14

**window** 16:5 210:5

**wire** 43:20,22 45:20 46:2 50:23

**wished** 271:7

**withdraw** 191:8 219:4,6

**witnessed** 77:5

**witnesses** 4:9,10,23 6:5,14,15 7:17 138:22 163:12 189:16 244:5 302:6

**witnessing** 18:2

**wolf** 17:4

**won** 13:11 148:3

**Woodfield** 6:24 7:9, 10,24 8:24 9:4,5 11:12,13 22:12,18 23:8 24:17 29:9,11, 17,20,22 30:9 31:5 37:2,7,14 38:14,19 39:20 40:2 44:16 48:15 49:6 55:13,22 56:13,19 57:4,15,22 60:22 61:6,7,13,20 62:11,17,24 66:10 67:4,15 70:14,20 71:4,6,17,20,22 73:2, 8 74:12,24 75:6 80:7, 13,20 81:5 83:20 84:7,10,13,17,23 85:2 87:21,22,24 89:14 90:2 95:25 96:16 97:16,21 99:23 100:5 104:15,17 107:2,7,13 108:12 110:3,10,13,17 112:6 120:10 121:15 123:2, 14 124:9 126:6 128:11 138:15,17 144:13 152:12 167:3 171:21 176:5,8 178:19 183:13,19 191:5 201:7,11,13 205:6 210:20 216:21 218:11 224:17,22 227:4,6 228:14 229:16 233:6 234:2 236:13 237:10 242:8, 25 243:18 252:10 253:4,24 257:21,23 258:6,8,18 262:18 288:15 289:10,13 290:18 291:2,25 292:12,20 293:6 299:24 300:9

**word** 236:10

**words** 19:23 131:9

**work** 6:6,8 7:17 24:9 33:15,17 36:24 38:3

59:9,19 60:16 63:21, 24 72:20 74:18 75:9 77:4 79:7,11,16,24 80:2,24 85:12 86:24 100:14 107:24 108:16 109:9,16 112:21,22 159:11,18 175:5 176:20,22 177:7 190:14 229:21 234:7 238:17 249:19 260:3 267:23 286:13 293:18 298:16 300:25

**worked** 34:15 36:22 41:9 42:13 43:7 48:3, 5 52:2 58:10 63:5 64:17 78:7 80:4,5 85:5 86:25 95:16 109:11,12,14 115:5 147:7 168:15 180:11 181:5 250:15 259:17 269:23

**working** 16:19 17:3 32:12 33:22 35:20 36:15 39:5 40:3,4,14 41:19 42:9 43:14 58:13 61:11 62:25 65:5 71:25 73:12 76:19 78:3 80:22 95:9 98:18 100:8 105:12 107:5 108:2, 5,14 110:25 111:11 140:5,13 147:16 148:5,11,13 149:18, 20 150:2 154:11 173:12 181:19 208:15,19 213:8 214:24 216:12 239:12 245:14 251:17 265:20 266:22 269:8,13 294:24 298:6

**Workman** 8:4

**worries** 127:18

**worry** 171:17

**worth** 49:22 197:16, 23 199:19

**wounded** 36:12

**wow** 69:7 295:7

**wrap** 221:23

**write** 10:11 44:12 90:12

**writing** 156:2 177:8, 11,13 224:12 282:22

**written** 130:4 135:7 225:21

**wrong** 48:14 61:2 182:23 278:25

**wrongful** 98:15

**wrote** 14:21 16:16, 18,20 72:22 91:21 184:17 199:8

***

**Y**

**yards** 44:4 45:24

**year** 60:11 63:3 109:5 207:11

**years** 33:25 35:24 37:22 109:17 110:20 145:19 146:11 223:14

**yesterday** 254:6

**York** 33:18,20

**young** 34:5

**Yusuf** 14:22

***

**Z**

**zoom** 229:22 253:8 293:3

Page 306

1                JUDICIAL ARBITRATION AND MEDIATION SERVICES
                             (JAMS)
2
      KARL HANSEN,                        )
3                                         )
              Complainant,                )    JAMS REFERENCE NO.
4                                         )    1260005897
      v.                                  )
5                                         )
      ELON MUSK; TESLA, INC., TESLA       )
6     MOTORS, INC.; and U.S.              )
      SECURITY ASSOCIATES,                )
7                                         )
              Respondents.                )
8     _____ )

9

10                           *REVISED*

11                     EVIDENTIARY HEARING

12                  TUESDAY, APRIL 12, 2022

13

14                          VOLUME 2

15

16                     On Tuesday, April 12, 2022, the

17      following proceedings came on to be heard in the

18        above-entitled and -numbered cause before

19             Judge Carl (Bill) Hoffman (Ret.).

20

21

22

23      Job#: 208975

24      Proceedings were reported by stenographic method

25      by: DEBRA A. DIBBLE, RDR, CRR, CRC

Page 307

1      Hansen v Elon Musk - Arbitration Day 2

2

3   ARBITRATOR:

4           Judge Carl (Bill) W. Hoffman (Ret.)

5

6   FOR THE CLAIMANT:

7        THE EMPLOYMENT LAW GROUP

         BY:   NICHOLAS WOODFIELD, ESQ.

8              R. SCOTT OSWALD, ESQ.

         888 17th Street, NW

9        Washington, DC 20006

10

11

12

13  FOR THE RESPONDENT:

14       SEYFARTH SHAW

         BY:   CHRISTOPHER ROBERTSON, ESQ.

15             ANNE DUNNE, ESQ.

         World Trade Center East

16       Two Seaport Lane

         Boston, Massachusetts 02210

17

         Counsel for Elon Musk; Tesla, Inc.; and

18       Tesla Motors, Inc.

19

20

21

22

23

24

25

Page 308

1   Hansen v. Elon Musk - Arbitration Day 2

2        MARTENSON HASBROUCK & SIMON

         BY:   JANINE BRAXTON, ESQUIRE

3              ALEX SMITH, ESQ.

               ROBIN LARGENT, ESQ.

4        455 Capitol Mall

         Sacramento, California 95814

5

         Counsel for U.S. Security Associates

6

7

8

9   ALSO PRESENT:

10       Karl Hansen

11       Stephanie Stroup

         Tesla in-house counsel

12

         Jaime Bodiford

13       Tesla in-house counsel

14       Lisa Flegenheimer

         Tesla paralegal

15

16

17

18

19

20

21

22

23

24

25

Page 309

1        Hansen v. Elon Musk - Arbitration Day 2

2             ------------

3             P R O C E E D I N G S

4             April 12, 2022, 9:04 a.m. PDT

5             ------------

6             JUDGE HOFFMAN:  We're beginning Day 2

7   of our case of Hansen versus Tesla and USSA, and

8   Mr. Karl Hansen is on the witness stand, subject

9   to cross-examination by USSA.

10            And, Mr. Hansen, you are reminded

11  that you are still under oath.

12            THE WITNESS:  Yes, Your Honor.

13            MR. ROBERTSON:  Your Honor, one point

14  of procedure, and this can be on the record.

15            We noticed when we went back to the

16  transcript that both sides referenced

17  Exhibit 205.  But it looks like neither Nick nor

18  I moved it in, so we'd like to add that to the

19  list.

20            MR. WOODFIELD:  No objection,

21  Your Honor.

22            JUDGE HOFFMAN:  Okay.  205 is in.

23            MR. ROBERTSON:  Thank you.

24            JUDGE HOFFMAN:  Ms. Braxton.

25            (Whereupon, Exhibit 205 was

Page 310

1        Hansen v. Elon Musk - Arbitration Day 2

2   received.)

3             MS. BRAXTON:  Thank you.

4             ------------

5             EXAMINATION

6             ------------

7   BY MS. BRAXTON:

8        Q.  So, Mr. Hansen, yesterday you

9   testified that no one had told you to stop the

10  investigations -- your investigation work that

11  you were doing for Tesla.

12            Do you recall that -- saying that

13  yesterday?

14       A.  I don't recall specifically, but

15  that's a pretty accurate statement.

16       Q.  Sure.  So it's your testimony that

17  essentially when you were conducting the

18  investigations for Tesla, no one told you to stop

19  the investigative work that you were doing?

20       A.  That's correct, yes, ma'am.

21       Q.  I would like to enter or I'd like to

22  show you a joint Exhibit No. 10.

23            MS. BRAXTON:  And Alex will pull that

24  up.

25            JUDGE HOFFMAN:  Okay, I'm there.

Page 311

Hansen v. Elon Musk - Arbitration Day 2

1  Hansen v. Elon Musk - Arbitration Day 2
2  BY MS. BRAXTON:
3      Q.  And, Mr. Hansen, do you recognize
4  this as a text exchange between you and
5  Mr. Sprott?
6      A.  Yes, I do.  And we discussed that
7  yesterday.  Yes.
8      Q.  Thank you.
9          And now I would like to show you
10 joint Exhibit No. 212.
11         MS. BRAXTON:  Oh, I'd like to move
12 joint Exhibit 10 into evidence.
13         JUDGE HOFFMAN:  There being no
14 objection, 10 is in.
15         (Whereupon, Exhibit 10 was received.)
16 BY MS. BRAXTON:
17     Q.  And, Mr. Hansen, do you recognize
18 this document?
19     A.  Yes.
20     Q.  I'd like to direct your attention to
21 the last verification page.
22         MS. BRAXTON:  We'll scroll down to
23 that.  I think it's loading.  We're just trying
24 to scroll down to the verification.  Give us a
25 second.

Page 312

1  Hansen v. Elon Musk - Arbitration Day 2
2      Okay.  I think Alex's computer just
3  froze, so this exhibit is probably not going to
4  move.  Let us see if we can -- someone else can
5  put up 212.  Give us a second here.
6          MR. WOODFIELD:  If you let me share,
7  I can pull it up for you.
8          MS. BRAXTON:  The person who has our
9  tech, her computer totally died.  She's logging
10 off and coming back in.  In the meantime, 212,
11 obviously this is a copy of discovery responses
12 from Mr. Hansen.
13         MR. WOODFIELD:  Janine, if you want,
14 share with me and I'll put it up for you.
15         MS. BRAXTON:  And share with you?
16         MR. WOODFIELD:  I can do it now.
17 Hold on one second.
18         What page do you need?
19         MS. BRAXTON:  Just the verification
20 page.
21         MR. WOODFIELD:  Okay.
22         MS. BRAXTON:  Thanks, Nick.
23         MR. WOODFIELD:  No problem.
24 BY MS. BRAXTON:
25     Q.  All right.  Mr. Hansen, do you

Page 313

1  Hansen v. Elon Musk - Arbitration Day 2
2  recognize this as your signature dated
3  November 16, 2021?
4      A.  Yes.
5      Q.  And is it true that at the time you
6  signed this, you reviewed these responses and
7  they were true and accurate to your knowledge?
8      A.  Yes.
9      Q.  Okay.  Thank you.
10     A.  You're welcome.
11         MS. BRAXTON:  And thank you, Nick.
12         MR. WOODFIELD:  No problem.
13         MS. BRAXTON:  And I'd like to move
14 Exhibit No. 212 into evidence.
15         MR. ROBERTSON:  No objection.
16         JUDGE HOFFMAN:  212 is in.
17         (Whereupon, Exhibit No. 212 was
18 received.)
19 BY MS. BRAXTON:
20     Q.  And, Mr. Hansen, also yesterday you
21 testified about the small period of time after
22 you worked at the Gigafactory and the time before
23 you started working at your next assignment as a
24 USSA employee at Verdi, California [sic].
25         And I want to walk you through some

Page 314

1  Hansen v. Elon Musk - Arbitration Day 2
2  of the e-mail exchanges that you had with an
3  individual named Scott Wiebke at the time -- do
4  you recall exchanging e-mails with Mr. Wiebke
5  after your reassignment -- or excuse me, after
6  your removal from the Gigafactory?
7      A.  Yes.
8      Q.  And do you recall telling him that
9  you were traveling with your kids and would not
10 be available for a meeting until on or around
11 October 3rd?
12     A.  I believe that's accurate, yes.
13     Q.  And is it true that the first time
14 you were available for a meeting with Mr. Wiebke
15 was on or around October 3rd, after your removal
16 from the Gigafactory?
17     A.  I believe that's accurate.  I think
18 that is in those e-mails.
19     Q.  And I do want to show you those
20 e-mails.  I'm just not sure our tech is ready
21 yet.
22         MR. WOODFIELD:  Just tell me and I
23 can do it.
24         MS. BRAXTON:  It's joint Exhibit
25 No. 198.

Hansen v. Elon Musk - Arbitration Day 2

1
2      MR. WOODFIELD:  Hold on one second.
3  Okay.  Hold on.
4      JUDGE HOFFMAN:  What was the exhibit
5  number again, please?
6      MS. BRAXTON:  198.
7      JUDGE HOFFMAN:  Thank you.
8  BY MS. BRAXTON:
9      Q.  And, Mr. Hansen, do you recognize
10  this as the text exchange -- excuse me, the
11  e-mail exchange you had with Mr. Wiebke about the
12  meeting on or around -- it looks like -- yeah,
13  October 3, 2018?
14      A.  Yes.
15      MS. BRAXTON:  And if we can scroll
16  down just a little bit to the e-mail there on
17  September 24th.  Hi, Scott.
18  BY MS. BRAXTON:
19      Q.  The e-mail on September 24, 2018
20  appears to be an e-mail from you to Mr. Wiebke.
21  Is this the e-mail where you tell Mr. Wiebke that
22  you're still out of town visiting with your kids
23  and you won't be in Reno until the 1st?
24      A.  It appears to be, yes.
25      Q.  Okay.  Thank you.

Hansen v. Elon Musk - Arbitration Day 2

1
2      MS. BRAXTON:  I don't have any
3  additional questions about Exhibit No. 198.  I'd
4  like to move to submit that into evidence.
5      MR. WOODFIELD:  No objection.
6      JUDGE HOFFMAN:  198 is in.
7      (Whereupon, Exhibit 198 was
8  received.)
9      MS. BRAXTON:  And my final exhibit
10  here is joint Exhibit No. 213.
11      Nick, if you would be so kind.  I
12  really do appreciate this.
13      MR. WOODFIELD:  It's no problem.
14  BY MS. BRAXTON:
15      Q.  And, Mr. Hansen, do you recognize
16  this document?
17      A.  Yes, ma'am, I do.
18      MS. BRAXTON:  And can we scroll down
19  to the verification page.
20      Maybe there's not a verification
21  page.  Is that what I'm seeing?
22      MR. WOODFIELD:  These are RFPs, so
23  there's not a verification page on the RFPs.
24  There are on the irogs.
25      * * *

Hansen v. Elon Musk - Arbitration Day 2

1
2  BY MS. BRAXTON:
3      Q.  And, Mr. Hansen, do you recall
4  reviewing the responses to -- these responses
5  when they were provided and served by your
6  counsel?
7      A.  Yes.
8      Q.  Is it your testimony that when you
9  responded to the request for documents from
10  U.S. Security Associates, that you produced all
11  of the responsive documents that you had in your
12  possession?
13      A.  Yes.
14      MS. BRAXTON:  And I'd like to move to
15  admit Exhibit 213 into evidence.
16      MR. WOODFIELD:  No objection.
17      JUDGE HOFFMAN:  213 is in.
18      (Whereupon, Exhibit 213 was
19  received.)
20      MS. BRAXTON:  And, so I think I'm
21  pretty close to done with my questions.  If you
22  could give me just like five minutes, I might be
23  entirely done.
24      Just want to -- can we go off the
25  record for five minutes?  And I'm probably done,

Hansen v. Elon Musk - Arbitration Day 2

1
2  but I want to be certain that I'm done before I
3  say that.
4      JUDGE HOFFMAN:  We're off the record.
5      MS. BRAXTON:  Thank you.
6      (Recess taken, 9:19 a.m. to
7  9:23 a.m. PDT)
8      JUDGE HOFFMAN:  We're back on the
9  record.
10      MS. BRAXTON:  I have no further
11  questions for Mr. Hansen.
12      JUDGE HOFFMAN:  Okay.  Redirect from
13  Mr. Woodfield.
14      MR. WOODFIELD:  Yes.  Thank you.
15      ------------
16          EXAMINATION
17      ------------
18  BY MR. WOODFIELD:
19      Q.  All right.  Mr. Hansen, if you will
20  recall, Ms. Braxton asked you some questions
21  about conversations you had with Mr. German about
22  what empathy Mr. German might have expressed with
23  you about your situation at Tesla.
24      Do you recall that?
25      A.  I do, yes.

Hansen v. Elon Musk - Arbitration Day 2

Q.  And Ms. Braxton played a recording
for you where you -- where it was the telephone
conversation that you had recorded where you were
being terminated.

Do you recall that?

A.  Yes, sir.

Q.  Do you recall a conversation that you
had with Mr. German previously, where you had
also discussed with him the August 3rd e-mail you
had sent?

A.  Yes, Mr. German and I had several
conversations and that topic did come up, yes.

Q.  At that point, did he tell you that
he thought you would be removed?

A.  I don't recall; but that comment came
from Rick McLellan, and Mr. German did
indicate -- I guess the answer is yes, actually.
Yes, he did express concern.  The pressure being
placed on him and USSA by Jeff Jones might
ultimately lead to that, and I was told that I
could be asked to leave.

Q.  All right.

MR. WOODFIELD:  Your Honor, I'd like
to rehabilitate the witness with this video clip,

Hansen v. Elon Musk - Arbitration Day 2

because this is the clip that I believe the
witness was referring to.

MS. BRAXTON:  Objection, Your Honor.
It wasn't on the witness list and it's not for
impeachment.

MR. WOODFIELD:  Your Honor --

MS. BRAXTON:  And --

MR. WOODFIELD:  I'm sorry.  The
impeachment was not on the witness list.  And to
rehabilitate, you cannot -- countering the
argument that you cannot rehabilitate with
information that is not on the witness -- on the
exhibit list with impeachment information are --
cannot rehabilitate impeachment.

Scratch -- forgive me.

The argument of USSA is that we
cannot use materials that are not on the exhibit
list when they have used materials that are not
on the exhibit list to impeach, and that is
illogical on its face because we did not know
that they were going to impeach with materials
outside.  But I am allowed to both rehabilitate
him with items off the witness -- or the exhibit
list and I'm also allowed to refresh his

Hansen v. Elon Musk - Arbitration Day 2

recollection.

JUDGE HOFFMAN:  So what is the
evidence that you have that you want to present?

MR. WOODFIELD:  It is the recording
of Mr. German expressing that he believed that
Mr. -- that Mr. Hansen was going to be removed as
the result of his having articulated concerns in
his August 3rd e-mail, and that he was going to
be removed from his position at the Gigafactory.

MS. LARGENT:  Your Honor, on behalf
of USSA, we don't think this is appropriate,
because --

MR. WOODFIELD:  There should be one
attorney on each side, Your Honor.

JUDGE HOFFMAN:  Well, I want to
hear -- I want to hear USSA's argument.  You're
right, Mr. Woodfield, I don't want them to gang
up on you, but I'm interested -- this is kind of
a unique situation.  I'd like to hear from USSA.

It seems to me that there has been
some surprise impeachment evidence that was
played by USSA, and now you have something else
that you want to play.  It's an important
question, and Mr. German is going to be

Hansen v. Elon Musk - Arbitration Day 2

testifying soon anyway.  I tend to want to hear
it, but I -- you're saying it's a recording.  How
long is the recording?

MR. WOODFIELD:  The recording in
total is four minutes and 50 seconds, but it's at
one minute and fifteen -- or it's at -- the point
that I have is at one minute and 15 seconds in.
I can play it for about 30 seconds if you want to
hear the limited portion, or I can play the
entire four minutes and 50 seconds of the
recording.

JUDGE HOFFMAN:  When was the
recording made?

MR. WOODFIELD:  Shortly after
August 3rd.  There's no date stamped on the
recording.

MS. LARGENT:  Right.  Your Honor, I
go I don't think this is appropriate, that
Mr. Woodfield is testifying to something he
doesn't have personal knowledge of here as to the
date a recording was made, when none of us know
this.

And secondly, you know, you don't
have to identify impeachment evidence that you

Hansen v. Elon Musk - Arbitration Day 2
1    may use in the exhibit list.  That's the whole
2    reason for impeachment evidence.  USSA didn't
3    know that Mr. Hansen -- this is the first time
4    we've heard him say that USSA's knowledge of the
5    SEC complaint was in some call that he recorded
6    or that he told him this, that he knew about it
7    when he called to tell Mr. Hansen that Tesla was
8    demanding his removal.
9             This is the first we ever heard about
10   it.  We knew it wasn't true.  We had no intention
11   of using any recordings, because frankly,
12   Your Honor, they were completely illegal.  It's
13   undisputed that this was done without
14   Mr. German's consent, and we didn't find them to
15   be appropriate evidence.  The only reason we used
16   it is because we knew that Mr. Hansen was saying
17   something that categorically didn't happen.
18            What Mr. Woodfield is trying to do is
19   essentially, on his redirect, use a different
20   recording that his client did for direct
21   evidence.  You can't do that because it wasn't on
22   his witness list.
23            It's not rehabilitation.  It's about
24   a different conversation on a different subject.

Hansen v. Elon Musk - Arbitration Day 2
1    And he can't impeach your own witness, so it
2    should have been disclosed if Mr. Woodfield
3    wanted to use these recordings affirmatively.
4             Right now, he's trying to use a
5    different recording of a different conversation
6    that was illegally obtained to support something
7    his client is already saying happened.  It's not
8    even to contradict his client.  He wants to use
9    it to further his client's testimony on redirect
10   examination.
11            For those reasons, we think it's
12   totally inappropriate and outside of the rules.
13            JUDGE HOFFMAN:  I tend to agree with
14   you, Ms. Largent.
15            When Mr. German testifies, will that
16   document or that recording then be available to
17   impeach Mr. German?
18            MR. WOODFIELD:  Certainly,
19   Your Honor.
20            JUDGE HOFFMAN:  I'm sorry?
21            MR. WOODFIELD:  It will be indeed,
22   Your Honor.
23            JUDGE HOFFMAN:  Is that -- does that
24   make any difference?  I mean, we can -- it seems

Hansen v. Elon Musk - Arbitration Day 2
1    to me if Mr. German is going to be impeached on
2    this question with this evidence anyway, and
3    we've already used these illegal recordings for
4    that purpose, then it's a goose and gander, isn't
5    it?
6             MS. LARGENT:  Well, Your Honor, I
7    think this is a little bit premature.  You know,
8    we're not in Mr. German's testimony, and
9    Mr. Woodfield isn't trying to use a recording to
10   impeach Mr. German.  I don't know, and no one on
11   this recording knows whether Mr. German is going
12   to say something inconsistent with any of these
13   recordings in order for them to be used to
14   impeach him in the first place.
15            I think we cross that bridge when we
16   get to it.  But I'm not sitting here trying to
17   tell you or Mr. Woodfield that we're going to try
18   to use an illegal recording affirmatively against
19   Mr. Hansen, but then object that it was recorded
20   illegally if he tries to use it to impeach our
21   witness.
22            I'm not telling you that.  I'm just
23   saying that Mr. Woodfield's attempt to use this
24   on direct essentially of his client is

Hansen v. Elon Musk - Arbitration Day 2
1    inappropriate.
2             JUDGE HOFFMAN:  All right.  I think
3    I'm going to sustain USSA's objection at this
4    point.  Not allow that evidence to be used to
5    bolster or to rehabilitate Mr. Hansen's
6    testimony, understanding that if it comes up in
7    the future, we'll take it up again.
8             MR. WOODFIELD:  Thank you,
9    Your Honor.
10            MS. LARGENT:  Thank you.
11            MR. WOODFIELD:  I would like to know
12   who the lawyer is on the other side for the rest
13   of this cross, though.
14            JUDGE HOFFMAN:  Well, I appreciate
15   your concern, and normally it would only be one
16   lawyer.  And I agree with you, Mr. Woodfield.
17   And so I'll ask counsel, as you're deciding who
18   is going to take the roles, to make that
19   decision.  I don't think it's fair to team up on
20   the other side.
21            MR. WOODFIELD:  All right.
22   BY MR. WOODFIELD:
23       Q.  Now, Mr. Hansen, did you record every
24   conversation you had with Mr. German?

Hansen v. Elon Musk - Arbitration Day 2

1    A.  No, sir, I did not.
2    Q.  And did you discuss with Mr. German
3  the fact that you had filed an SEC TCR?
4    A.  Mr. German was aware, yes.
5    Q.  And, in fact, did you discuss that in
6  your direct testimony?
7    A.  I believe I did, yes.
8    Q.  And what, if anything, did you report
9  in your direct testimony about any empathy that
10  he expressed toward you?
11    A.  Mr. German expressed empathy because
12  he -- he empathized with my situation.  He
13  expressed his concerns as well that the influence
14  he was receiving and the directions and the
15  pressure from Jeff Jones to interfere with my
16  positions was something that he didn't -- he
17  didn't know why.  He couldn't answer why this was
18  happening.  He felt that there were some things
19  going on that Jeff Jones and Tesla weren't being
20  forthcoming with him about regarding their
21  rationales and their reasons moving forward with
22  Mr. German as related to my positions.
23    Q.  And -- give me one second.
24         Did he in fact tell you that he did
25

Hansen v. Elon Musk - Arbitration Day 2

1  not want to put up with the BS that Tesla was
2  putting forward?
3    A.  Yes, he did.
4    Q.  And was that set forth in the text
5  that Ms. Braxton showed you?
6    A.  Yes, it was.
7    MR. WOODFIELD:  I have no further
8  questions for this witness.
9    JUDGE HOFFMAN:  Okay.  Circling back,
10  then, to Tesla.  Tesla has the first right to
11  continue its cross-examination within the scope
12  of the redirect.
13    Mr. Robertson, do you have any
14  additional questions?
15    MR. ROBERTSON:  I do, oddly, even
16  though Nick only asked two questions.
17         ------------
18            EXAMINATION
19         ------------
20  BY MR. ROBERTSON:
21    Q.  So, Mr. Hansen, you spent a lot of
22  time talking about Jeff Jones and what you heard
23  Jeff Jones had said through other people.  Did
24  you ever in August -- can you recall one
25

Hansen v. Elon Musk - Arbitration Day 2

1  conversation that you had directly with
2  Jeff Jones at any point in August of 2018?
3    A.  No, sir.
4    MR. ROBERTSON:  And my only other
5  question for you -- and maybe it's more for
6  Nick -- is since USSA put in the interrogatory
7  responses, Nick, I would like to move the
8  interrogatory responses to our interrogatories
9  into evidence.  I wasn't aware whether we needed
10  to do that through the witness or not.
11         Do you have any objection if we put
12  in 211?
13    MR. WOODFIELD:  No, I'm happy to
14  jointly offer 211.
15    MR. ROBERTSON:  Okay.
16    JUDGE HOFFMAN:  All right.  So 211 is
17  in.
18         (Whereupon, Exhibit 211 was
19  received.)
20    MR. ROBERTSON:  Yeah, I have nothing
21  further.  Thank you.
22    JUDGE HOFFMAN:  And then
23  cross-examination by USSA.
24    MS. BRAXTON:  No questions.
25

Hansen v. Elon Musk - Arbitration Day 2

1    JUDGE HOFFMAN:  I have no questions,
2  Mr. Hansen.  Thank you for your testimony.  You
3  can stand down.  Of course, you're going to
4  remain as the client in this case.
5    THE WITNESS:  Thank you, Your Honor.
6    JUDGE HOFFMAN:  All right.
7    Mr. Woodfield, do you have another
8  witness?
9    MR. WOODFIELD:  Yes.  At this time
10  we'd like to call Jacob Nocon.
11    MR. ROBERTSON:  All right.  So let
12  us -- if we can take five.  Mr. Nocon is standing
13  by, but we'll have him join and go into the
14  waiting room.
15    JUDGE HOFFMAN:  Okay.  We're off the
16  record.
17    MR. ROBERTSON:  Thank you.
18         (Recess taken, 9:38 a.m. to
19  9:44 a.m. PDT)
20    JUDGE HOFFMAN:  All right.  We have a
21  quorum here.
22    Mr. Nocon, my name is Judge Hoffman.
23  I am the arbitrator in this case.  And so,
24  Mr. Nocon, you've been called as a witness by
25

Page 331

Hansen v. Elon Musk - Arbitration Day 2

1    Mr. Woodfield in this case.  I'm going to ask the
2    court reporter to swear you in at this time.
3
4              MR. ROBERTSON:  And just for the
5    record, Your Honor, Ms. Dunne will be handling
6    Mr. Nocon's testimony today.
7              JUDGE HOFFMAN:  Thank you.
8              ------------
9              JACOB DONNELLY NOCON,
10             having been duly sworn,
11             testified as follows:
12             ------------
13             EXAMINATION
14             ------------
15   BY MR. WOODFIELD:
16        Q.  Mr. Nocon, could I get you to state
17   your full name for the record, please?
18        A.  Yes.  It's Jacob Donnelly Nocon.
19        Q.  And you testified previously in this
20   matter in your individual capacity and as the
21   corporate representative for Tesla; correct?
22        A.  Yes, that's correct.
23        Q.  And you're testifying today in your
24   personal capacity and as a corporate
25   representative for Tesla; correct?

Page 332

Hansen v. Elon Musk - Arbitration Day 2

1        A.  Yes, that's correct as well.
2        Q.  And by whom are you currently
3    employed?
4
5        A.  I'm currently employed by Tesla.
6        Q.  And that's Tesla, Inc.?
7        A.  Yes, sir.
8        Q.  And when were you first hired by
9    Tesla?
10       A.  My official hire date from -- with
11   Tesla is July 23, 2018.
12       Q.  And what were you hired to do at
13   Tesla?
14       A.  I was initially hired by Tesla to
15   build and manage an investigations team that
16   focused on protection of intellectual property,
17   trade secrets.
18       Q.  And what was that group called?
19       A.  In 2018, the name of the team was
20   Global Security Response.
21       Q.  And did you have a particular title
22   at that time?
23       A.  I believe that my title was manager
24   of investigations for Global Security Response.
25       Q.  And where was your job physically

Page 333

Hansen v. Elon Musk - Arbitration Day 2

1    located?
2
3        A.  Since starting at Tesla, I have
4    worked remotely out of San Diego.  I've got
5    employees that are employed globally, so I manage
6    pretty much everybody remotely.
7        Q.  And who was your supervisor in July
8    of 2018?
9        A.  In 2018, my manager was Nick Gicinto.
10       Q.  And what was Mr. Gicinto's title at
11   the time?
12       A.  I believe his title was senior
13   manager, Global Security Response.
14       Q.  And what is your title now?
15       A.  Currently, my job title is senior
16   manager of security intelligence and security
17   engineering.
18       Q.  And in terms of what -- how --
19   forgive me.
20            For how long did Mr. Gicinto remain
21   your supervisor?
22       A.  I don't remember the exact date that
23   Nick resigned his position.  I believe it was in
24   April of 2019.
25       Q.  Through April of 2019 he was your

Page 334

Hansen v. Elon Musk - Arbitration Day 2

1    supervisor, though?
2
3        A.  Yes, to the best of my recollection.
4        Q.  And one of the topics you testified
5    on as the corporate representative was Tesla's
6    policies and guidelines concerning retaliation in
7    violation of the Dodd-Frank Act; correct?
8        A.  Yes, that's correct.
9        Q.  And in terms of the policies, Tesla
10   employees are protected against retaliation for
11   providing good-faith complaints of concerns that
12   they think are violations of the Dodd-Frank or
13   Sarbanes-Oxley Acts; is that correct?
14       A.  I'm sorry, that was a long question.
15   Would you mind repeating that?
16       Q.  Yes.  If someone comes forward and
17   they think that in good faith that they are
18   reporting a violation of Dodd-Frank or
19   Sarbanes-Oxley, they are protected against
20   retaliation; is that correct?
21       A.  Correct.  My understanding is anybody
22   who comes forward with any type of complaint
23   either about management or the company's
24   activities, you know, is protected.
25       Q.  And do you know if, under Dodd-Frank,

Page 335

```
 1        Hansen v. Elon Musk - Arbitration Day 2
 2   if someone who is a whistleblower can legally
 3   take documents and provide them to the SEC even
 4   though they may be confidential documents at
 5   work?
 6            MS. DUNNE:  Objection.
 7            MS. BRAXTON:  Objection as well.
 8            JUDGE HOFFMAN:  What's the objection?
 9            MS. DUNNE:  Calls for a legal
10   conclusion.
11            JUDGE HOFFMAN:  Okay.  So the
12   question is:  Is this witness competent to
13   testify about that?
14            Maybe a little bit more foundation,
15   Mr. Woodfield, on this witness's competency.
16            MR. WOODFIELD:  Yes.
17   BY MR. WOODFIELD:
18        Q.  Are document -- are witnesses allowed
19   to give documents to the SEC in support of
20   complaints of Dodd-Frank violations?
21        A.  I'm sorry, was that question directed
22   at me?
23        Q.  Yes, sir.
24        A.  I don't know the answer to that
25   question.  I'd have to consult with counsel.
```

Page 336

```
 1        Hansen v. Elon Musk - Arbitration Day 2
 2        Q.  And you are the corporate
 3   representative on that issue for Tesla in this
 4   matter; correct?
 5        A.  I am the corporate representative for
 6   Tesla in this matter.  I don't know if I can
 7   speak to that particular question.
 8        Q.  Does Tesla or Tesla Motors provide
 9   training on Dodd-Frank nonretaliation to
10   employees?
11        A.  We do provide training on
12   nonretaliation.  I don't know if that speaks
13   specifically to Dodd-Frank.
14        Q.  And so in terms of what might be --
15   scratch that.
16            In 2018, did you come to know of an
17   individual named Karl Hansen?
18        A.  Yes, I did.
19        Q.  And how did you come to know of
20   Karl Hansen's name?
21        A.  I believe Mr. Hansen was introduced
22   to me by Sean Gouthro back in 2018.
23        Q.  And what was Mr. Gouthro's job in
24   2018?
25        A.  I believe that his actual job was as
```

Page 337

```
 1        Hansen v. Elon Musk - Arbitration Day 2
 2   manager of the video investigations team at the
 3   Gigafactory, Nevada.  But at the time that I was
 4   interacting with Mr. Gouthro, he was in a -- I
 5   believe a temporary role, managing most of
 6   security for Gigafactory, Nevada.
 7        Q.  And what was it that Mr. Gouthro was
 8   reaching out to you about when he spoke to you
 9   about Mr. Hansen in 2018?
10        A.  Mr. Gouthro contacted me, I believe
11   it was through Nick Gicinto, saying that one of
12   his, I guess, employees had some information that
13   they thought, you know, needed further
14   investigation.
15            So I believe that Sean provided me a
16   report that Mr. Hansen had generated.
17        Q.  I'm going to show you now what I'm
18   marking -- or has already been entered into
19   evidence as joint Exhibit 209.
20            And this is a text that Mr. Hansen
21   sent to you on June 28, 2018.
22            Do you remember sending texts with
23   Mr. Hansen in 2018, in June?
24        A.  Yes.  I mean, I recall receiving this
25   text from him and responding to it.
```

Page 338

```
 1        Hansen v. Elon Musk - Arbitration Day 2
 2        Q.  Do you recall what he was reporting
 3   to you in June of 2018?
 4        A.  The main subject that I recall him
 5   discussing with us was potential narcotics
 6   trafficking allegations that he had been looking
 7   into.
 8        Q.  And was that something that he was
 9   supposed to be looking into in his job duties and
10   responsibilities at Tesla?
11        A.  I don't know what his guidance had
12   been -- or I don't know what guidance he had
13   received from Sean Gouthro.
14        Q.  And what was Mr. Gouthro telling you
15   about narcotics trafficking activity?
16        A.  To the best of my recollection, he
17   stated that there were -- there was a source who
18   provided information stating that narcotics were
19   being moved on semitrailers coming up from
20   Mexico, going through the Gigafactory, Nevada.
21        Q.  And is that something that Tesla as a
22   corporate entity would want to know about?
23        A.  I would assume so.
24        Q.  Why?
25        A.  Well, I don't think any business
```

Page 339

Hansen v. Elon Musk - Arbitration Day 2

1    would want criminal activity happening on their
2    premises.
3        Q.  And it would reflect badly if that
4    was happening; correct?  It would reflect badly
5    on the organization?
6        A.  Yes, I think it would reflect badly
7    on any organization if there was criminal
8    activity afoot within their business.
9        Q.  It's something that Tesla would
10   certainly want to stop if that was the case;
11   correct?
12       A.  If that was the case, yes.
13       Q.  And did Mr. Gouthro offer any opinion
14   on the subject matter that Mr. Hansen was
15   reporting on, on whether he thought it was
16   legitimate or far-fetched or anything like that?
17       A.  I don't recall Mr. Gouthro having an
18   opinion one way or the other.
19       Q.  And at the same time that Mr. Hansen
20   was reporting this information about narcotics
21   trafficking activity at the Gigafactory, were you
22   aware of anyone else who was reporting that there
23   might be narcotics trafficking at the Gigafactory
24   in Reno, Nevada in 2018?
25

Page 340

Hansen v. Elon Musk - Arbitration Day 2

1        A.  I don't believe so, no.
2        Q.  Was Mr. Hansen, in June of 2018, also
3    raising concerns about copper thefts and thefts
4    of other materials?
5        A.  In my personal capacity, I don't
6    believe I was aware of that.
7            As the company representative, yeah,
8    my understanding is that he was raising those
9    concerns as well.
10       Q.  And in June of 2018, were you and
11   Mr. Gicinto conducting an extensive amount of
12   work into the issue of thefts at the Gigafactory?
13       A.  No, we were not.
14       Q.  During that time, did you hear
15   allegations of copper thefts?
16       A.  Yes, I had heard of allegations of
17   copper thefts at the Gigafactory, but that was
18   not -- neither mine nor Mr. Gicinto's area of
19   responsibility.
20       Q.  Was it Mr. Gouthro's?
21       A.  As somebody who was leading security
22   at Gigafactory, Nevada, yeah, I would assume that
23   that would fall partially -- at least partially
24   within his purview.  I think more accurately it
25

Page 341

Hansen v. Elon Musk - Arbitration Day 2

1    would have fallen to the investigations team
2    within global security investigations.
3        Q.  Was anyone other than Mr. Hansen
4    raising concerns about possible infiltration by
5    organized crime cartels and crime syndicates in
6    the Gigafactory other than Mr. Hansen?
7        A.  I'm sorry, is your question was
8    anybody else raising questions about -- or --
9            Could you repeat the question,
10   please?
11       Q.  Yes.
12           Was anyone other than Mr. Hansen
13   raising concerns about possible infiltration by
14   cartels or organized crime syndicates in the
15   Gigafactory?
16       A.  Not that I'm aware of.
17       Q.  Had anyone at Tesla offered any
18   commentary on the concerns being raised by
19   Mr. Hansen in June or July about cartel activity,
20   about whether they thought it was a credible
21   allegation being raised by Mr. Hansen or not?
22       A.  I provided commentary back to
23   Mr. Gouthro.  After I received the initial report
24   from Mr. Hansen, I had the employer who I was

Page 342

Hansen v. Elon Musk - Arbitration Day 2

1    working with at the time, Nisos, conduct some
2    criminal background checks on the individuals who
3    were named in that report.
4            The response that we got back from
5    those criminal background checks was that none of
6    the individuals had any remarkable criminal
7    history, which, given my experience in conducting
8    high-level narcotics investigations as a criminal
9    investigator with the U.S. government, struck me
10   as odd, that somebody would have no criminal
11   record.
12           And when I directed -- or what I
13   commented back to Mr. Gouthro at the time was, it
14   looks like this information would need to be
15   developed further.  And I provided a couple of
16   suggestions on things that they might be able to
17   do.  But I said that it seemed like
18   underdeveloped information at the time.
19       Q.  Did you ever form the opinion that
20   Mr. Hansen was raising any of these allegations
21   or concerns in bad faith?
22       A.  I can't say that I thought about that
23   one way or the other.
24       Q.  So you never formed that opinion?
25

Hansen v. Elon Musk - Arbitration Day 2

1    A.   That it was in bad faith?

2    Q.   Yes, sir.

3    A.   No.

4    Q.   Did you ever form the opinion that he

5  was raising the opinions and part of the concerns

6  other than in good faith?

7    A.   No, I really hadn't formed an opinion

8  one way or the other.  I took it as a report,

9  gave my assessment on it, and then provided it

10  back and said that I'd be happy to assist in any

11  way that I could.

12    Q.   Let me show you joint Exhibit

13  No. 219.

14    JUDGE HOFFMAN:  What was the number

15  again, please?

16    MR. WOODFIELD:  219.

17    JUDGE HOFFMAN:  Thank you.

18    MR. WOODFIELD:  And I will offer it

19  into evidence while I still remember it right

20  now.

21    MS. DUNNE:  No objection.

22    JUDGE HOFFMAN:  All right.  219 is

23  in.

24    (Whereupon, Exhibit 219 was

Hansen v. Elon Musk - Arbitration Day 2

1  received.)

2  BY MR. WOODFIELD:

3    Q.   This is a text between you and

4  Karl Hansen on July 13, 2018.

5    Do you recall texting back and forth

6  with Mr. Hansen about his possibly joining Tesla

7  as an employee?

8    A.   This appears to be an e-mail on the

9  mobile version of Outlook.  So I do recall him

10  e-mailing and inquiring about positions, or he

11  may have texted me and I returned the message via

12  e-mail.

13    He did state that he was interested

14  in a full-time role with Tesla and was interested

15  in the full-time roles that my team was going to

16  be hiring for at the time.  And as I stated in

17  this e-mail, you know, I advised him that he

18  should go through the normal Tesla website to go

19  ahead and apply and have his application and

20  resumé screened by our recruiters.

21    Q.   And as of July 13, 2018, had you made

22  any opinion as to whether he would be a good

23  hire, a bad hire, or had you made no -- formed no

24  opinion at all?

Hansen v. Elon Musk - Arbitration Day 2

1    A.   I don't believe I had an opinion at

2  the time.

3    Q.   So at that point you hadn't decided

4  that based on what he said, you would not

5  consider him as an employee?

6    A.   It was a long time ago, but I don't

7  believe that I had formed any sort of an opinion.

8    Q.   Let me show you what I'm marking as

9  Exhibit No. -- or is marked as Exhibit No. 147.

10  Joint 147 is already in evidence.

11    Sean Gouthro was e-mailing with

12  certain people, including you, Ken Davis,

13  Kristopher Halladay, Nick Gicinto, about hidden

14  copper at the south end of the Gigafactory.

15    A.   Mm-hmm.

16    Q.   Do you recall whether there were

17  concerns that copper theft might be on a large

18  scale at the Gigafactory in July of 2018?

19    A.   As I previously testified, I mean,

20  this was not an area that my team was focused on

21  at the time; however, I do recall there being

22  discussions about copper theft, and it was a

23  concern, you know, amongst both the security

24  teams and also the management team at the

Hansen v. Elon Musk - Arbitration Day 2

1  Gigafactory, Nevada.

2    Q.   And when you say "it was a concern,"

3  it was a concern that the copper theft might be

4  at a large scale?

5    A.   At a large enough scale that you

6  would need to be concerned about it.

7    I mean, I think the term "large" is

8  rather ambiguous.

9    Q.   Well, large enough that it was

10  getting the attention of people up at

11  Mr. Gicinto's level?

12    A.   Yes.  I mean, it was a large enough

13  issue that it needed to be at least investigated

14  to determine the scope.

15    Q.   I'm going to show you now an e-mail

16  marked as 176, joint Exhibit 176.  That's already

17  in evidence.  And this is from Nick Gicinto to

18  Karl Hansen, carbon-copying Gerhard Pretorius.

19    Do you know who Gerhard Pretorius is?

20    A.   Yes, I do.

21    Q.   And what's his -- what was his job

22  title in July of 2018, sir?

23    A.   I believe his job title was senior

24  manager, global security investigations.

Hansen v. Elon Musk - Arbitration Day 2

1    Q.  And where was he located, sir?

2    A.  That's a complicated answer to that

3 question.

4        So his team was run out of Fremont,

5 California, but I believe at the time he was

6 actually living in Seattle.

7    Q.  And this e-mail from Mr. Gicinto was

8 addressed to Mr. Hansen and looped in Gerhard

9 Pretorius, Sean Gouthro, Jake Nocon, you, and

10 Mr. Jones.  It dealt with some hiring issues, and

11 it also stated that he would like -- Mr. Gicinto

12 would like someone from his team to meet with

13 Mr. Hansen to accept turnover of his work on the

14 possible cartel infiltration involvement in our

15 supply chain through Mexico?

16        Had you heard discussions about

17 cartel involvement in Tesla's supply chain

18 through Mexico?

19    A.  Well, if I recall correctly, that was

20 part of the allegations that Mr. Hansen had

21 raised.

22    Q.  Yeah, it -- I mean, clearly that's

23 what he's talking about here.  Had you heard

24 discussions about that?  Did you hear them in

Hansen v. Elon Musk - Arbitration Day 2

1 July of 2018 in Tesla, where people were

2 articulating any concerns about that?

3    A.  Nothing comes to mind.

4    Q.  Well, Mr. Gicinto was asking for

5 Mr. Hansen to debrief someone on his team to

6 discuss that; correct?

7    A.  I believe he was looking for turnover

8 of the work product.

9    Q.  Had you heard anyone say that you --

10 that they believed that there was nothing to the

11 allegations that there might be some cartel

12 involvement in Tesla's supply chain through

13 Mexico?

14    A.  I don't think that I've heard anybody

15 say that there was nothing to it.  I think that

16 the -- what I recall, you know, saying to Nick

17 and to Sean, and then also hearing -- yeah, and

18 this is in my capacity as Tesla's representative,

19 you know, in seeing what Valerie Workman was able

20 to -- or was not able to find, was that the

21 allegations had simply just not been

22 substantiated.

23        I don't know -- I think there's a

24 difference between saying that there's nothing to

Hansen v. Elon Musk - Arbitration Day 2

1 the allegations and then being able to say that

2 there's just no evidence that substantiates

3 what's being -- you know, what's being alleged.

4    Q.  What was Valerie Workman able to

5 find, sir?

6    A.  I don't know.  I mean, I think that

7 the -- that was part of the issue, at least of my

8 understanding, is that she had tried to get

9 information from Mr. Hansen, and that she was --

10 was unable to get much of anything to gain

11 corroborate the allegations that he had made.

12    Q.  Was that after August 3rd of 2018,

13 sir?

14    A.  I don't know when she reached out to

15 him.  I'm not sure.

16    Q.  Okay.  Were you involved in any

17 investigation involving Ms. Workman?

18    A.  I'm sorry, investigation involving

19 Ms. Workman?

20    Q.  Yes.  You had talked about

21 Ms. Workman performing an investigation.  Were

22 you involved in it at all?

23    A.  No.  So the -- at the time, Valerie

24 Workman was the head of compliance for Tesla.

Hansen v. Elon Musk - Arbitration Day 2

1 The -- because of the nature of the complaints

2 that had been made and the fact that, you know,

3 at some point there were allegations made against

4 both myself and also Mr. Gicinto, we were --

5 neither me nor Nick were involved in the

6 investigation.  It was conducted independently by

7 Valerie.

8    Q.  What were the allegations made

9 against you and Mr. Gicinto, sir?

10    A.  You know, I'm actually not sure

11 exactly what the allegations were.  I know that I

12 received questions about a piece of electronic

13 equipment that was in the security room at

14 Gigafactory in Nevada.  You know, there were

15 allegations about method -- investigative methods

16 against us that were made, things that would be

17 illegal that we did not do.  I don't know the

18 exact details.

19    Q.  And when did this investigation take

20 place?

21    A.  I can't recall the exact dates.

22    Q.  Was Mr. Hansen still working there?

23    A.  Like I said, I can't remember the

24 exact dates, so I wouldn't be able to say whether

Hansen v. Elon Musk - Arbitration Day 2

1  or not he was working yet as a contractor with
2  Tesla or not at the time.
3      Q.  Do you know what the questions were
4  about electronic equipment?
5      A.  There was a question about a piece of
6  electronic equipment that Nisos had provided.
7  This is --
8      Q.  Nisos is a contractor that you
9  formerly worked for?
10     A.  That's correct.
11         So when I started working for Tesla,
12 or with Tesla, I was a contractor with Nisos.
13 And during those initial weeks, we had a
14 significant investigation that initiated at
15 Gigafactory, Nevada, involving an individual
16 named Martin Tripp.  As a result of that -- our
17 investigation into Mr. Tripp's activities, there
18 was concern that there was -- there was concern
19 that there may have been code placed onto the
20 network and that there may be suspicious activity
21 happening on Tesla's network that would put
22 Tesla's information and data at risk.
23         So a piece of equipment that was
24 introduced with the blessing of the information

Hansen v. Elon Musk - Arbitration Day 2

1  security team at Tesla going to the necessary
2  work simply provided a bridge for forensic
3  investigators at Nisos to conduct network
4  forensics on Tesla's network.  It was looking at
5  different types of log and activity that were
6  happening on the network just to ensure there
7  weren't any anomalies specific to what was
8  happening with Martin Tripp.
9      Q.  So, for example, it was looking at
10 who was sending e-mails to whom and the like?
11     A.  No.
12     Q.  Tell me what it was doing, sir.
13     A.  I don't have the exact details on
14 what it was doing, but it was not looking at
15 e-mails.  It didn't have the ability to do that.
16 It simply provided a bridge into the network.
17     Q.  Okay.  It provided a bridge into the
18 network.  And you said you don't have the
19 specific details.  Give me the broad details
20 about what you understood it was doing such that
21 it was providing actionable information.
22     A.  The specific piece that we were
23 looking for was any data that was leaking out
24 based on any code that Mr. Tripp had introduced

Hansen v. Elon Musk - Arbitration Day 2

1  into our manufacturing operating system.
2         You know, the concern was that there
3  was persistent access to our network that would
4  be -- would continue to persist after Mr. Tripp
5  was exited from the company.  So that was the
6  purpose of that device.  It required login
7  credentials, which people had within Nisos,
8  including myself at the time, but also some of my
9  colleagues.
10        And although the device ended up
11 staying on the network, my understanding is is
12 that it had largely been forgotten after the
13 Tripp investigation wrapped up.
14     Q.  Was Mr. Hansen ever investigated as
15 part of the Tripp investigation?
16     A.  Not that I'm aware of.  And I should
17 know, I was the lead investigator.
18     Q.  I'm showing you joint Exhibit
19 No. 173.  Do you recall Gerhard Pretorius
20 reaching out to Mr. Hansen to address the issues
21 raised by Nick Gicinto?
22     A.  I can see the e-mail and that I'm on
23 distribution on it.  I don't recall this specific
24 e-mail, no.

Hansen v. Elon Musk - Arbitration Day 2

1      Q.  And this was on July 31, 2018, and it
2  was pointed out to everyone on the e-mail
3  distribution list that everyone who is e-mailing
4  Karl Hansen at kahansen@tesla.com, that
5  Mr. Hansen no longer has access to Tesla e-mail
6  since the RIF that had occurred in June of 2018.
7      Q.  Do you know if people were
8  complaining in July of 2018 that Mr. Hansen was
9  unresponsive to efforts to try and contact him?
10     A.  I'm sorry, can you repeat that
11 question again.
12     Q.  Do you know if people at Tesla were
13 articulating in July of 2018 that Mr. Hansen was
14 unresponsive to efforts to try and contact him?
15     A.  I'm not aware of that, one way or the
16 other.
17     Q.  You would agree with me that it would
18 be unreasonable for Tesla to complain that
19 Mr. Hansen was unresponsive to e-mails that were
20 being sent to his Tesla e-mail address in July of
21 2018 when he was not allowed access to it,
22 wouldn't you?
23     A.  That if people were complaining about
24 him being nonresponsive, if he didn't have

Hansen v. Elon Musk - Arbitration Day 2
1 access?  Is that the question?
2
3      Q.  Yes.
4      A.  Sure.  I mean, if somebody didn't
5 have access to an e-mail account, I don't know if
6 you could expect them to respond to it, to any
7 e-mails going to that account.
8      Q.  Let me show you Exhibit No. 204.
9           It appears Mr. Gouthro subsequently
10 reached out to Mr. Hansen and looped you in on
11 this as well to get Mr. Pretorius in.
12           Do you know why Tesla was so eager to
13 investigate the concerns raised by Mr. Hansen in
14 his allegations to Mr. Gicinto in July?
15      A.  I don't.  I don't know why the issue
16 was raised at that particular moment.
17      Q.  Now, I'm going to show you what's
18 marked as Exhibit No. 46.  Joint Exhibit No. 46,
19 and then I will offer it in.
20           This is an e-mail following -- and
21 mercifully, just to keep the pages down, this the
22 Karl Hansen August 3rd e-mail where he sent it to
23 Sean Gouthro, Elon Musk, Gerhard Pretorius, you
24 as well.  But Yusuf Mohamed -- Mohamed wrote back
25 to Mr. Hansen.

Hansen v. Elon Musk - Arbitration Day 2
1
2      Do you recall receiving this e-mail
3 from Mr. Mohamed in response to Mr. Hansen's
4 August 3rd e-mail that he sent to everyone
5 including Elon Musk?
6      A.  I'm sorry, you're asking me if I
7 received this e-mail from Yusuf Mohamed?
8      Q.  Yes.  Do you recall seeing this
9 e-mail?  Were you bcc'd?
10      A.  I don't recall.
11      Q.  Do you recall seeing the e-mail that
12 Mr. Hansen sent on August 3rd -- Friday,
13 August 3rd to you, Elon Musk, Sean Gouthro,
14 Gerhard Pretorius, Jeff Jones, and Nick Gicinto?
15      A.  I do remember receiving that e-mail.
16      Q.  And what was the reaction amongst
17 Mr. Gouthro, Mr. Pretorius, Mr. Jones,
18 Mr. Gicinto, when Mr. Hansen sent the e-mail?
19      A.  The only conversation I recalled
20 having, that I recall having following this
21 e-mail being sent was a conversation I had with
22 Mr. Gicinto.  At a high level, it was just
23 surprise that this information had been sent
24 directly to Elon.
25      Q.  And did Tesla have an open door

Hansen v. Elon Musk - Arbitration Day 2
1
2 policy in 2018?
3      A.  Open door to the extent that Elon
4 regularly told employees if they had any
5 concerns, that they could feel free to contact
6 him directly.
7      Q.  Did Mr. Hansen do anything
8 inappropriate on August 3rd, when he raised
9 concerns including things such as narcotics
10 trafficking activity and cartel activity at the
11 Gigafactory when he raised them to Elon Musk?
12      A.  Not being able to see the rest of the
13 e-mail, I mean, I can't speak to anything that
14 could have been inappropriate within the e-mail.
15 But simply the act of e-mailing our CEO in
16 general is -- I mean, it's not a policy
17 violation, and it's not something that anybody's
18 going to get in trouble for.
19      Q.  Well, is it something that Mr. Hansen
20 should have been discouraged from doing, from
21 raising concerns about issues like cartel
22 involvement at the Gigafactory to Elon Musk?
23      A.  I think that depends.  You know, if
24 this was information or allegations that had been
25 investigated and addressed and was being handled

Hansen v. Elon Musk - Arbitration Day 2
1
2 by people that reported to Jeff Jones,
3 potentially it's inappropriate to e-mail the CEO
4 of the company on these matters.
5      But, I mean, I think there's a
6 difference between it being inappropriate versus,
7 you know, being a policy violation.
8      Q.  Well, let me ask you, had the issue
9 of cartel involvement been investigated and
10 resolved by Jeff Jones and his group such that it
11 was inappropriate to raise -- for Mr. Hansen to
12 raise these issues to Mr. Musk?
13      A.  I don't know the answer to that
14 because I'm -- again, this was not something that
15 my team and I were focused on investigating.  We
16 were asked to look at this by Mr. Gouthro, I
17 guess, earlier that year.  I don't remember the
18 exact date from the e-mails that you had showed
19 me previously.  You know, we gave an assessment,
20 and it was turned back over to develop further.
21      Q.  You and Mr. Gicinto were surprised at
22 this e-mail; correct?
23      A.  To the extent that it was sent to
24 Mr. Musk, yes.
25      Q.  And you didn't think he should have

Hansen v. Elon Musk - Arbitration Day 2

1  done it, did you?

2  Q.  So it would have been really -- it

3      A.  I mean, I don't know if I would

4  characterize it as I don't think he should have

5  done it.  It certainly is something that I

6  wouldn't have done.

7      Q.  Why not?

8      A.  Because the CEO of the company is

9  somebody who's got numerous other things on his

10  plate, you know, lots of other issues that he's

11  addressing.  Particularly at the time, you know,

12  Tesla was struggling financially, trying to ramp

13  up on Model 3.

14      Yeah, as an employee and somebody who

15  wasn't in a particularly high level at the time,

16  I don't think I had a full appreciation for, you

17  know, the perilous situation that the company was

18  in.  But certainly, yeah, Mr. Musk was extremely

19  busy at the time.

20      I think that, you know, it's always

21  good to measure what you're pushing up to senior

22  leadership, whether it's one of Elon's directs or

23  Elon himself, yeah, making sure that this is

24  something that, you know, really is appropriate

25  for the CEO or one of his directs to address.

Hansen v. Elon Musk - Arbitration Day 2

1      Q.  So it would have been really -- it

2  wouldn't -- it showed bad judgment to distract

3  him at that time with allegations of cartel

4  involvement at the Gigafactory or drug use at the

5  factory or massive theft at the factory.

6      Is that fair to say?

7      A.  In my opinion, yeah.  I mean, I would

8  say, you know, looking at the totality of the

9  facts as I knew them at the time, that it was

10  probably something that would have been better

11  directed towards Jeff Jones rather than directing

12  it towards Elon.

13      Q.  Did other people at Tesla share your

14  opinion, that that was bad judgment?

15      A.  I don't recall.  I don't recall

16  anybody saying -- any commentary on this e-mail,

17  one way or the other, other than the one

18  discussion I had with Mr. Gicinto, and, you know,

19  he shared the same surprise that I did, that Elon

20  had been e-mailed.

21      Q.  Well, did he share your opinion that

22  he wouldn't have done it either?

23      A.  I don't recall him saying one way or

24  the other.

Hansen v. Elon Musk - Arbitration Day 2

1      Q.  People share the opinion that Tesla

2  didn't need that distraction?

3      A.  I don't recall anybody saying that.

4      Q.  Do you recall feeling that way?

5      A.  No, not particularly.

6      Q.  I'm going to show you what I'm

7  marking as Exhibit 186.

8      It's already --

9      JUDGE HOFFMAN:  Are you going to move

10  46 in?

11      MR. WOODFIELD:  Yes, sir, I'm

12  offering 46.

13      JUDGE HOFFMAN:  All right.  If

14  there's no objection, 46 is in.

15      MS. DUNNE:  No objection.

16      JUDGE HOFFMAN:  Thank you.

17      (Whereupon, Exhibit 46 was received.)

18  BY MR. WOODFIELD:

19      Q.  And I'm showing you 186.

20      Did Mr. Gicinto tell you that he

21  reached out to Mr. Musk to tell you that -- or to

22  tell Mr. Musk that Mr. Hansen's allegations were

23  uncorroborated?

24      A.  So the question, did Nick tell me

Hansen v. Elon Musk - Arbitration Day 2

1  that he was going to be reaching out to Mr. Musk?

2      Q.  Yeah.  When you talked to

3  Mr. Gicinto, did Mr. Gicinto tell you he reached

4  out to Mr. Musk and said that Mr. Musk -- or

5  Mr. Hansen's allegations were, according to

6  Mr. Gicinto, not corroborated?

7      A.  I don't recall Mr. Gicinto telling me

8  at the time that he was going to be reaching out

9  to Mr. Musk.

10      Q.  Did he tell you afterwards?

11      A.  I don't remember one way or the

12  other.

13      Q.  Did you discuss with Mr. Gicinto at

14  any time whether Mr. Hansen had made numerous

15  assumptions that were coloring his conclusions?

16      A.  I don't recall having that discussion

17  with Mr. Gicinto.

18      Q.  Had you ever heard anyone say that

19  before August 3, 2018?

20      A.  Not that I can recall.

21      Q.  Had you ever spoken with Mr. Gicinto

22  and had -- heard him say that independent efforts

23  to corroborate Mr. Hansen's allegations about the

24  cartel investigation were not successful as of

Page 363

```
 1          Hansen v. Elon Musk - Arbitration Day 2
 2   August 3, 2018?
 3          A.  I'm sorry, that was a long question.
 4          So --
 5          Q.  Had you ever heard Mr. Gicinto tell
 6   you, as of August 3, 2018, that independent
 7   efforts to corroborate Mr. Hansen's conclusions
 8   about cartel investigation -- or cartel
 9   involvement in the Gigafactory were not
10   successful as of August 3, 2018?  Had Mr. Gicinto
11   ever told you that?
12          A.  I don't believe that Mr. Gicinto ever
13   told me that.  I know that I had a discussion
14   with Nick likely sometime prior to August 3rd of
15   2018, stating that the initial background checks
16   that were conducted on the individuals who were
17   identified by Mr. Hansen did not yield any
18   substantial, you know, criminal history, and that
19   my recommendation was that they should develop
20   the information further.
21          Q.  Did Mr. Gicinto tell you, before --
22   when your call on -- before you spoke with --
23   when you spoke with him, when you said you spoke
24   with him after the August 3rd e-mail that was
25   sent at 9:29 a.m. and then he followed up with
```

Page 364

```
 1          Hansen v. Elon Musk - Arbitration Day 2
 2   Mr. Musk shortly thereafter and you said you
 3   spoke with Mr. Gicinto, did Mr. Gicinto tell you
 4   that it was not Mr. Hansen's role to perform
 5   these investigations and that he appears instead
 6   to be misinformed?  Did he tell you that?
 7          MS. DUNNE:  Objection.  You're
 8   misstating the prior testimony.
 9          JUDGE HOFFMAN:  Well, which part of
10   the prior testimony is being misstated?
11          MS. DUNNE:  About when the
12   conversations happened.  I don't believe that
13   Mr. Nocon has testified as to when those
14   conversations occurred.
15          JUDGE HOFFMAN:  Okay.  All right.
16          Go ahead and clean up your question,
17   then, Mr. Woodfield.
18          MR. WOODFIELD:  Yes.
19   BY MR. WOODFIELD:
20          Q.  Did Mr. -- and I'll read it to you.
21          Did Mr. Gicinto tell you that as
22   early as August 3rd, the same day as the e-mail
23   is sent, that Mr. Gicinto thought there was
24   little or no truth to what Mr. Hansen was
25   alleging?
```

Page 365

```
 1          Hansen v. Elon Musk - Arbitration Day 2
 2          A.  I do not recall having that
 3   conversation with Mr. Gicinto.
 4          Q.  Had Mr. Gicinto ever told you that
 5   Mr. Hansen relied on unnamed or anonymous sources
 6   and that Tesla could not back up any of his
 7   conclusions?
 8          A.  I believe that Mr. Gicinto and I had
 9   conversations about the unnamed and anonymous
10   sources that were part of the allegations that
11   Mr. Hansen had raised.  I don't recall when we
12   had that conversation.  And I'm sorry, you're
13   going to have to repeat the second part of your
14   statement.  Yeah, I just -- I don't recall having
15   that conversation in or around August 3rd.
16          And, you know, further, I don't
17   recall when I had the conversation with Nick,
18   with Mr. Gicinto after the e-mail was sent by
19   Karl Hansen.  I don't know if it was hours or
20   maybe even the next day or two after the e-mail
21   was sent.  You know, Nick and I were not
22   necessarily collocated at all times, you know,
23   during this period in 2018.
24          Q.  Had you ever heard, prior to
25   August 3, 2018, that Mr. Hansen had been
```

Page 366

```
 1          Hansen v. Elon Musk - Arbitration Day 2
 2   counseled by Tesla on his tendency to venture too
 3   far outside of his lane with investigations, and
 4   that even after his cases were referred to
 5   others, because they were not part of his role,
 6   he was not inclined to let go of control?  Had
 7   you ever heard that criticism of him as of
 8   August 3, 2018?
 9          A.  Not that I can remember.
10          Q.  Were you aware of any investigation
11   Yusuf Mohamed made into Mr. Hansen following
12   August 3, 2018?
13          A.  I was not aware of any investigation
14   conducted by Yusuf Mohamed.  The only
15   investigation that I was aware of was conducted
16   by Valerie Workman.
17          Q.  And is that -- when you say -- was it
18   made by legal counsel?
19          A.  I'm sorry, I don't know what you're
20   referring to.
21          Q.  Okay.  What investigation do you know
22   was made by Valerie Workman?
23          A.  Again, as the company representative,
24   my understanding is that Valerie Workman
25   conducted an inquiry into the allegations made by
```

1      Hansen v. Elon Musk - Arbitration Day 2
2   Karl Hansen at some point after those allegations
3   were raised.
4        Q.  And do you know when that
5   investigation commenced?
6        A.  I do not.
7        Q.  Do you know what triggered the
8   investigation?
9        A.  I do not know what triggered that
10  investigation.
11       Q.  Let me show you what's marked as
12  joint Exhibit 208.
13       JUDGE HOFFMAN:  Before you move on,
14  I'm not sure in my notes that 186 is in.
15       Do you move to admit 186?
16       MR. WOODFIELD:  I do move to admit
17  186.
18       MS. DUNNE:  No objection.
19       JUDGE HOFFMAN:  Okay.  It's in.
20       (Whereupon, Exhibit 186 was
21  received.)
22  BY MR. WOODFIELD:
23       Q.  These are Tesla's first interrogatory
24  responses, and I believe they were offered in
25  already and we jointly admitted them, but if not

1      Hansen v. Elon Musk - Arbitration Day 2
2   I'm offering them now.
3        MS. DUNNE:  No objection.
4        JUDGE HOFFMAN:  Okay.  They're in.
5        (Whereupon, Exhibit 208 was
6   received.)
7   BY MR. WOODFIELD:
8        Q.  And I'm going to submit to you that
9   on August 23, 2018, that the interrogatory
10  question was:  Identify and explain in detail any
11  complaints or allegations leveled against Hansen
12  when he was employed by any respondent or
13  thereafter.  It starts with an objection.
14       And then it says:  On August 23,
15  2018, Tesla received a report regarding Hansen's
16  behavior from Hansen's colleague Kenneth Davis.
17  Davis reported witnessing Hansen violating Tesla
18  policies including involving third parties with
19  his investigations and sending confidential Tesla
20  information to outside e-mail addresses to be
21  accessed by individuals not employed by Tesla.
22       Davis expressed concerns about Hansen
23  being temporarily placed at the front desk of the
24  Gigafactory.  Specifically, Davis cited the risks
25  of Hansen possibly having unrestricted access

1      Hansen v. Elon Musk - Arbitration Day 2
2   into Tesla's network coupled with his role as
3   gatekeeper into the Gigafactory after Davis
4   became concerned about Hansen's erratic and
5   unauthorized activities and involvement of
6   activity -- of individuals outside of Tesla.
7        As a result of this report, Tesla
8   reviewed Hansen's employee and contractor e-mail
9   accounts and found that he forwarded numerous
10  e-mails -- Tesla internal documents to his
11  personal e-mail address in violation of Tesla
12  policies.  During this review, Tesla also
13  determined that Hansen permanently deleted the
14  contents of his sent items folders.
15       Do you know if this is the reason why
16  Mr. -- or why Tesla commenced its investigation
17  into Mr. Hansen?
18       A.  I don't know if this was the reason.
19  And again, I would have to speculate, but it
20  would be maybe one of the reasons why Tesla was
21  looking into matters involving Mr. Hansen.
22       Q.  And that is this e-mail, Kenneth
23  Davis's August 23, 2018 e-mail to Jeff Jones and
24  Elon Musk:  Karl Hansen, SEC whistleblower,
25  immediate attention.  Correct?

1      Hansen v. Elon Musk - Arbitration Day 2
2        That's marked as Exhibit 183.
3        A.  I'm sorry, what is the question?
4        Q.  One of the causes is Exhibit 183,
5   Mr. Kenneth Davis's August 23rd e-mail, the
6   referenced e-mail here, August 23rd.  Tesla
7   received a report regarding Hansen's behavior
8   from Hansen's colleague Kenneth Davis.  I'm
9   referring you to Exhibit 183.  You said that one
10  of the causes was this e-mail; correct?
11       A.  Again, I don't know all of the causes
12  of why the investigation was opened and why it
13  was conducted by Valerie Workman.  Yes,
14  certainly --
15       Q.  -- you understand?
16       A.  Excuse me.
17       Q.  Is this one of them, as far as you
18  understand?
19       MS. DUNNE:  Objection.  Let the
20  witness finish answering the question before you
21  ask another.
22       JUDGE HOFFMAN:  I agree.
23       A.  Like I previously stated, I don't
24  know if this was -- e-mail was the cause of one
25  of the -- was one of the triggers that caused the

Page 371

Hansen v. Elon Musk - Arbitration Day 2

1  investigation into Mr. Hansen's activities. I'm
2  not sure. I was not a part of that
3  investigation. I know that the investigation was
4  conducted. I know what the end result of the
5  investigation was, but I do not know what
6  triggered it.
7
8  BY MR. WOODFIELD:
9     Q. You have no -- no one ever told you
10  that Interrogatory 12 was wrong and that it
11  needed to be withdrawn; correct?
12     A. I'm sorry, that something was wrong
13  with Interrogatory 12?
14     Q. Yes, has anyone ever told you that?
15     A. Not that I can recall.
16     Q. And do you know who Nicole White is?
17     A. Yes, I know who Nicole White is.
18     Q. And who is Nicole White?
19     A. Nicole White is an employee at Tesla.
20     Q. And is she a senior manager in people
21  analytics and systems at Tesla, Inc.?
22     A. I don't know if that's her current
23  role, but that sounds right.
24     MR. WOODFIELD: I don't have any
25  further questions for this witness.

Page 372

Hansen v. Elon Musk - Arbitration Day 2

1
2     JUDGE HOFFMAN: All right. Let's
3  see, we're in cross-examination, but this witness
4  was going to be a joint witness. Is that true?
5     MS. DUNNE: Yes.
6     JUDGE HOFFMAN: Okay. So I guess,
7  Mr. Robertson, you can go ahead and inquire. I
8  want to caution you about leading too much. He's
9  going to be your witness as well as
10  Mr. Woodfield's witness, so let's see how that
11  goes.
12     Let's start with --
13     MR. ROBERTSON: I will direct your
14  caution to Ms. Dunne, because she's going to do
15  the question.
16     JUDGE HOFFMAN: Yes, Ms. Dunne.
17     MR. ROBERTSON: Thank you,
18  Your Honor.
19     MS. DUNNE: Your Honor, can we just
20  take five minutes before I start my examination?
21  I will not contact the witness per our previous
22  agreement with counsel.
23     JUDGE HOFFMAN: That's fine. Five
24  minutes. We'll be back at quarter till the hour.
25     MS. DUNNE: Thank you.

Page 373

Hansen v. Elon Musk - Arbitration Day 2

1
2     (Recess taken, 10:41 a.m. to
3  10:51 a.m. PDT)
4     JUDGE HOFFMAN: Ms. Dunne, your
5  opportunity to inquire.
6     We're back on the record, Debbie.
7     MS. DUNNE: Thank you, Your Honor.
8     ------------
9     EXAMINATION
10     ------------
11  BY MS. DUNNE:
12     Q. Good morning, Mr. Nocon.
13     You testified before that your title
14  with Tesla is senior manager of security
15  intelligence; is that correct?
16     A. Yes, that's correct.
17     Q. Can you explain to me what you do in
18  that role?
19     A. Sure. So the mission of security
20  intelligence is to protect Tesla's intellectual
21  property, trade secrets, and confidential
22  information. The team consists of trained
23  investigators, analysts, and forensic experts to
24  deploy different -- a bunch of different measures
25  in order to protect Tesla's information. I mean,

Page 374

Hansen v. Elon Musk - Arbitration Day 2

1
2  I think the -- our philosophy is the best way to
3  protect the information is to not let it leave in
4  the first place. So we spend a lot of time and
5  effort on deterring any type of, you know, either
6  malicious activity or negligent activity that
7  would put information and data at risk.
8     And if we can't deter people from
9  doing the things they need to in order to protect
10  our information, we have systems in place to
11  detect when policy violations are taking place or
12  when there's mishandling of confidential
13  information, and that's where my technical
14  experts come in.
15     And, you know, if neither of those is
16  successful and somebody does either take
17  confidential information or leak information,
18  I've got a team of investigators to fully delve
19  into the incident and take it to a logical
20  conclusion.
21     Q. And you mentioned the leaking of
22  Tesla information. Does that include images of
23  Tesla facilities?
24     A. That can at times. I mean, it would
25  depend upon what the subject matter of that

1      Hansen v. Elon Musk - Arbitration Day 2
2   picture is, but yes.
3         Q.  Okay.  And would it involve the
4   leaking of Tesla security records?
5         A.  Sure.  I mean, any type of controlled
6   record or controlled data, if that information
7   was found to be making its way off of our
8   networks, we would investigate those matters.
9         Q.  And you mentioned that your team is
10  staffed in part by investigators.  And can you
11  explain to me the role that those investigators
12  have as part of their day-to-day routine?
13        A.  Sure.  So the investigators will
14  initiate cases based on, you know, different
15  types of circumstance.  So in one case we may
16  have a react -- a truly reactive investigation
17  where something is reported in the media or
18  social media, and it's clearly, you know, leaked
19  information.
20              Our investigators will take that --
21  you know, leverage the facts that are available
22  to them and work to identify who the source of
23  that leaked information was.
24              We also have systems in place where
25  we can conduct proactive inquiries across our

1      Hansen v. Elon Musk - Arbitration Day 2
2   network.  And if employees or those with access
3   to the network are found to be, you know,
4   sending, you know, internal data outside of the
5   Tesla domain via e-mail or if they're uploading
6   it to cloud drives or if they are uploading it to
7   web mail, we are very good at detecting that and
8   deciphering, you know, what is confidential
9   information and what is not and holding those
10  employees accountable.
11        Q.  Understood.  And in your group, are
12  you ever involved in reviewing security footage
13  related to employee complaints of -- affect their
14  personal property, like a water bottle or a lunch
15  box?
16        A.  Typically that's not going to fall
17  within my team's purview, although we have on
18  occasion had circumstances where we do review
19  video footage.  We've got access to do it, but we
20  can also rely on others within the company whose
21  responsibility it is to review that footage.
22        Q.  Okay.  So the responsibility to
23  review video footage is in general separate from
24  the investigation function of your team?
25        A.  In general, yes.

1      Hansen v. Elon Musk - Arbitration Day 2
2         Q.  Okay.  You testified earlier that you
3   had communications with Mr. Hansen regarding an
4   alleged drug activity at the Gigafactory.
5              Do you recall that?
6         A.  Yes, I do.
7         Q.  And can you please tell me about
8   those communications?
9         A.  I believe the first time that it was
10  raised to me, it was in person by Sean Gouthro.
11  It was while we were conducting an investigation
12  out at Gigafactory, Nevada, myself and Nick
13  Gicinto and a couple of other employees of Nisos,
14  that Mr. Gouthro came into the conference room,
15  where me and Mr. Gicinto were sitting, and
16  mentioned that there was some information that he
17  wanted us to look at and assess and said that
18  he'd be following up with an e-mail with that
19  information.
20              I believe that that e-mail had
21  Mr. Hansen's report about the narcotics
22  trafficking attached to it, and that was the
23  first time that I actually saw that information.
24        Q.  Okay.  I'm going to share my screen
25  with you to show you an exhibit.

1      Hansen v. Elon Musk - Arbitration Day 2
2              Mr. Nocon, I am showing you an
3   exhibit that has previously been marked joint
4   Exhibit 49 and admitted in this matter.
5              You testified before that in your
6   history as a federal investigator, you had high
7   level experience with investigations into drug
8   activity; is that correct?
9         A.  Yes, ma'am.
10        Q.  And so you were familiar with reports
11  compiled by other federal agencies reviewing drug
12  activity, such as the DEA?
13        A.  Yes, that's correct.
14        Q.  And on this exhibit that I have in
15  front of you, Exhibit 49, does this appear to be
16  the type of record that would be created by the
17  DEA?
18        A.  I mean, on its face?  I mean, there's
19  nothing that screams out to me that it was
20  created by the DEA.  I mean, typically any
21  documents that are releasable documents generated
22  by them would have a header that would say what
23  agency they're coming from, that would have some
24  sort classification or sensitivity marking at the
25  top of it.  You know, this looks like -- this

Page 379

```
1       Hansen v. Elon Musk - Arbitration Day 2
2   looks like a -- maybe like a journal or a blotter
3   entry.
4              I'm not sure.  I'm not sure what I'm
5   looking at here.
6         Q.  On the second page here, the final
7   line I've highlighted in yellow, and I'll zoom in
8   for you.
9              Can you read that final line?
10        A.  Sure.  It says:  Star, star, star,
11  report forwarded to Storey County SO and DEA.
12        Q.  And so based on that final line,
13  would it appear to you that this report was
14  generated by the DEA?
15        A.  Likely not.  I mean, if it had been
16  generated, there would be no reason to forward it
17  to them.
18        Q.  Okay.  Thank you.
19             And, Mr. Nocon, I'm going to go back
20  to Exhibit 186, which you had just been looking
21  at with Mr. Woodfield.
22             Can you see that?
23        A.  Yes, I can.
24        Q.  Okay.  And on -- in the second
25  paragraph, can you please read the sentence
```

Page 380

```
1       Hansen v. Elon Musk - Arbitration Day 2
2   beginning with:  I took the cartel investigation?
3         A.  Let's see here.  I took the cartel
4   investigation allegations seriously, but our
5   independent efforts to corroborate his
6   conclusions were not successful.
7         Q.  Can you read -- that's great,
8   actually.
9              And you testified before that you
10  were involved in those independent efforts;
11  correct?
12        A.  In at least a part of it, yes.
13        Q.  And in your role in those independent
14  efforts, you were unable to corroborate
15  Mr. Hansen's allegations; correct?
16        A.  That's correct.
17        Q.  And you were unable to corroborate
18  his conclusions?
19        A.  That's correct, which is why I'd
20  asked them to further develop information if they
21  wanted to pursue it.
22        Q.  Understood.  Thank you.
23             Mr. Nocon, you testified before that
24  in your role, you're involved in the
25  investigation of exfiltration of Tesla data,
```

Page 381

```
1       Hansen v. Elon Musk - Arbitration Day 2
2   including leaks; correct?
3         A.  That's correct.
4         Q.  Can you explain in layman's terms
5   exfiltration of data to the extent you feel you
6   have not fully covered it already?
7         A.  Sure.  So any files or data that are
8   Tesla work product and that are on Tesla's
9   systems are Tesla property.  There are times
10  when, you know, people will send Tesla files or
11  Tesla data to an external e-mail address, like a
12  Gmail address or, you know, a Yahoo address, and
13  it contains that information.  And on its face,
14  it can be evident that that information is being
15  moved off for something other than a work
16  purpose.
17             And obviously, there are instances
18  where sending data off the network is going to be
19  authorized, if you're interacting with a
20  customer, you're interacting with a vendor.  So
21  what my team is specifically looking for and what
22  we classify as exfiltration is, you know, that
23  data that's moving outside of Tesla's control
24  onto networks that we don't -- are not familiar
25  with and that may not be up to the same security
```

Page 382

```
1       Hansen v. Elon Musk - Arbitration Day 2
2   standards as our network.
3         Q.  Okay.  And if you -- if your team
4   determines that data was exfiltrated, what steps
5   do you take?
6         A.  So it depends upon the case, but
7   generally speaking, we will, after getting
8   permission from counsel --
9              Let me back up.
10             So initially what we'll receive is an
11  alert.  And these alerts are set up to monitor
12  logs and metadata that's collected across our
13  networks.
14             Once we receive an alert that
15  somebody has engaged in what could potentially be
16  a policy violation, we'll work with legal counsel
17  in order to get permission to pull the original
18  e-mail or pull an original file from an
19  employee's either e-mail account or from their
20  computer.
21             Yeah, this is done at an abundance of
22  caution.  You know, it's Tesla property.  We let
23  everybody in our company know that their
24  activities are subject to monitoring.  But just
25  to make sure that, you know, we follow process,
```

Page 383

Hansen v. Elon Musk - Arbitration Day 2

1  it's always done with legal concurrence.
2
3         We'll then review the file or review
4  the e-mail, see if it truly is confidential
5  information and does not constitute personal
6  information or other types of data that is not
7  sensitive. And if it is confidential, sensitive,
8  proprietary, intellectual property, we then will
9  make contact with legal, employment legal, Human
10 Resources, and then the employee's manager.
11        And at that time we'll let them know
12 what we found. We will come up with a game plan,
13 depending upon what was disclosed, to determine,
14 all right, if the person doesn't have a
15 legitimate reason for why they moved this off,
16 you know, what is the potential action that's
17 going to be taken, is the person going to be put
18 on administrative leave, are they going to be
19 terminated, are they going to get a final written
20 warning.
21        And then once that's been
22 established, we'll interview the employee or the
23 contractor, try to get an explanation for why
24 they took the actions they did. And then, based
25 on the results of that, that interview, you know,

Page 384

Hansen v. Elon Musk - Arbitration Day 2

1
2  we'll take appropriate work action.
3         And by we, I mean the collective we.
4  Our team doesn't actually do the action.
5     Q.  Understood. I'd like to direct your
6  attention to Exhibit 42. I'm pulling it up on
7  the screen now.
8         It's just loading. One minute,
9  please.
10        MS. DUNNE: And this exhibit has not
11 been entered into evidence yet. Nick, do you
12 have any objection?
13        MR. WOODFIELD: No objection.
14 BY MS. DUNNE:
15    Q.  Okay. Mr. Nocon, can you please tell
16 me the date on this e-mail?
17        JUDGE HOFFMAN: 42 is in.
18        (Whereupon, Exhibit 42 was received.)
19 BY MS. DUNNE:
20    Q.  Mr. Nocon, can you please tell me the
21 date of this e-mail?
22    A.  Yes. It says Tuesday, July 3, 2018.
23    Q.  And can you please tell me the sender
24 and recipient of this e-mail?
25    A.  The sender was Karl Hansen. And

Page 385

Hansen v. Elon Musk - Arbitration Day 2

1  that's kahansen@tesla.com. Recipient is Karl
2  Hansen, and that's sa6892@gmail.com.
3
4     Q.  Thank you.
5         And this exhibit has -- or this
6  e-mail has five attachments. I'm going to keep
7  scrolling because they are larger.
8         So these are the attachments to this
9  e-mail. And can you see this attachment? I can
10 blow it up if you need me to.
11    A.  Yes, I can see it.
12    Q.  Okay. And this attachment was sent
13 from a Tesla e-mail address to a Gmail address.
14        And would the sending of a file such
15 as this trigger an exfiltration -- would the
16 sending of this exhibit be exfiltration of data?
17    A.  Yes. I mean, it meets the criteria
18 that there are files or data that are being sent
19 from a Tesla e-mail address to an external e-mail
20 address.
21    Q.  And are you familiar with this
22 specific attachment, this type of document?
23    A.  On its face, I am not.
24    Q.  Okay. We have learned through
25 testimony in this proceeding that the attachment

Page 386

Hansen v. Elon Musk - Arbitration Day 2

1
2  was a badging record.
3         Are badging records accessible to the
4  Tesla employee population as a whole?
5     A.  No. Badging records are restricted
6  to those who need to have access to those badging
7  records.
8     Q.  Okay. And you testified before that
9  forwarding restricted access documents would be
10 considered exfiltration of data; correct?
11    A.  Correct. And above and beyond that,
12 I mean, forwarding this type of information, it's
13 a little bit small, but if it has personally
14 identifiable information on it is also something
15 that's, you know, looked at being very sensitive.
16 You know, if PII -- or personally identifiable
17 information is forwarded off the network, that
18 sometimes can trigger, you know, other types of
19 investigations and disclosures by our privacy
20 team.
21    Q.  Understood. I'm going to direct your
22 attention to Exhibit 99. Exhibit 99 has
23 previously been entered into evidence in this
24 matter.
25        And, Mr. Nocon, could you please tell

Page 387

Hansen v. Elon Musk - Arbitration Day 2

1       me the date of this e-mail?
2           A.  The e-mail is labeled with Thursday,
3       April 26, 2018.
4           Q.  And can you please tell me who the
5       sender of this e-mail is?
6           A.  The sender was Karl Hansen.  And
7       that's kahansen@tesla.com.
8           Q.  And can you please tell me two
9       recipients of this e-mail?
10          A.  One of the recipients is Karl Hansen
11      at the same tesla.com e-mail address I previously
12      stated.
13          The other recipient is listed as Karl
14      Hansen, with the e-mail address sa6892@gmail.com.
15          Q.  And this exhibit appears to have a
16      number of attachments.
17          And while it does not have the
18      attachments, it was not produced with the
19      attachments actually available, based on your
20      review of the listing of attachments, does this
21      appear to be Tesla proprietary or confidential
22      information?
23          A.  I mean, I think that it's difficult
24      to assess by based on just the file names.

Page 388

Hansen v. Elon Musk - Arbitration Day 2

1           If we were to get an alert, which I
2       assume, given the fact that these are all picture
3       files, that this would be a relatively large
4       e-mail, our team likely would receive an alert on
5       this.  Seeing this many files moving on an
6       externally-directed e-mail would cause us to
7       investigate further and make a determination
8       based on the content of those files.
9           Q.  Understood.  And if they were
10      photographs taken from inside of the Gigafactory,
11      would that constitute exfiltration or leaking of
12      Tesla information?
13          A.  Potentially, depending upon the
14      content of those photos.  But in addition to
15      that, it would also be a violation of Tesla
16      policy regarding photography inside our
17      factories.
18          Q.  Okay.  And is footage to the Tesla
19      security camera system restricted access?
20          A.  Yes, it is.
21          Q.  And so forwarding any restricted
22      access document or information constitutes
23      exfiltration of data; correct?
24          A.  Correct.  I mean, those -- again, the

Page 389

Hansen v. Elon Musk - Arbitration Day 2

1       files, whether it's, you know, security camera
2       footage or pictures, you know, that may be Tesla
3       property.  And if that is Tesla property that's
4       being sent off, that is considered exfiltration
5       of that data.
6           Q.  Okay.  I'm now going to show you
7       Exhibit 92.
8           And if you could be so kind as to
9       again let me know the date of Exhibit 92.
10          A.  Sure.  The date is Monday, June 18,
11      2018.
12          Q.  And who is the sender of this e-mail?
13          A.  The sender is Karl Hansen.  And
14      that's kahansen@tesla.com.
15          Q.  And who were the recipients of this
16      June 18th e-mail?
17          A.  There are two recipients that are
18      listed.  One is Karl Hansen at the same Tesla
19      e-mail address that I just provided.  Second
20      recipient is Karl Hansen with the e-mail address
21      sa6892@gmail.com.
22          Q.  And how many attachments does the
23      face of this e-mail state it contains?
24          A.  It states 17.

Page 390

Hansen v. Elon Musk - Arbitration Day 2

1           Q.  I'm going to zoom in on the
2       attachments.
3           And can you tell what these first two
4       attachments are?
5           A.  They appear to be picture files.  You
6       know, looking closely at the screen, I mean, that
7       appears -- it appears to be security camera
8       footage, like a snapshot of a security camera.
9           Q.  Okay.  And then these next
10      attachments -- I'm going to zoom in, but I don't
11      want to destroy the quality.
12          Can you tell what these attachments
13      are?
14          A.  I mean, they appear to be some sort
15      of employee or personnel record.
16          Q.  And do they --
17          A.  I'm not sure what the --
18          Q.  I apologize.  Do they contain a
19      photograph of the employee?
20          A.  Yes, they contain photographs.
21          Q.  And then these final several
22      attachments, they do not have images like the
23      others, but they have titles.  Can you read the
24      title of this first attachment, that's a pdf

Page 391

Hansen v. Elon Musk - Arbitration Day 2

1    entitled "Herrera" is the first word?

2    A.  Sure.  The name of the file is
3    Herrera, GustavoAccessDenied, Granted and Other
4    Badge Events.pdf.

5    Q.  And would logs of badging information
6    be available to Tesla employee population at
7    large?

8    A.  They would not be.

9    Q.  So these files would be restricted
10   access?

11   A.  Yes, that's correct.

12   Q.  And so the forwarding of these --
13   files types such as these badge events would be
14   considered the exfiltration of Tesla proprietary
15   or confidential data?

16   A.  Yeah, if they were sent from the
17   Tesla domain to an external account, yes.

18   Q.  Okay.  And I believe you testified
19   before that these were sent to a Gmail address?

20   A.  That is correct.

21   Q.  And so based on your review of this
22   June 18, 2018 e-mail, does it fit the parameters
23   of exfiltration of Tesla data?

24   A.  Yes, based on what I can see here, it

Page 392

Hansen v. Elon Musk - Arbitration Day 2

1    does.

2    Q.  You testified earlier with
3    Mr. Woodfield that in August of 2018, you were
4    then currently affiliated with the group that you
5    now manage; correct?

6    A.  Yes, that is correct.

7    Q.  And at that time you were a Tesla
8    employee?

9    A.  Yes, ma'am.

10   Q.  I'm going to show you an exhibit
11   marked as Exhibit 188.

12   MR. WOODFIELD:  Your Honor, I've got
13   the same continuing objection to this, in that I
14   think it's a partial waiver.  And I think that
15   we've only gotten some exhibits, and so I -- I
16   think that you can produce all of the exhibits or
17   you can produce none of the exhibits, but you
18   can't produce the ones that you like and not all
19   of them.

20   JUDGE HOFFMAN:  Yeah, that's too
21   general an objection on this to be very helpful,
22   Mr. Woodfield.  You are right, the
23   attorney-client privilege waived on some
24   categories is going to waive similar categories.

Page 393

Hansen v. Elon Musk - Arbitration Day 2

1    I'm not sure it waives everything.  So, I mean,
2    if your objection is that this document should
3    not be introduced --

4    MR. WOODFIELD:  My objection is that
5    there was -- if you'll recall, following summary
6    judgment, Tesla produced three e-mails and then
7    in the last week it produced three additional
8    e-mails, all of which are dated from the same
9    date which is August 31, 2018.  But you cannot
10   use the attorney-client privilege as both a
11   shield and a sword.

12   And if Ms. Workman is going to say
13   the entire extent of her investigation is limited
14   to these six e-mails, then that's fine, but if
15   there's additional e-mails, then I think we've
16   got a problem in that they can't come in because
17   you can't offer just some of them and offer
18   partial disclosure.  And so I don't think it's
19   equitable to allow Tesla -- to allow a partial
20   offer of documentation.

21   So I would object to the
22   admissibility of these documents, because I -- on
23   the basis of the attorney-client privilege as an
24   affirmative weapon at this point.

Page 394

Hansen v. Elon Musk - Arbitration Day 2

1    JUDGE HOFFMAN:  Yeah, let me hear
2    from Ms. Dunne on this.

3    MR. ROBERTSON:  Your Honor, may I --
4    I know we've done the one witness, but on this
5    issue, obviously we've briefed it.  So if I may
6    weigh in.

7    JUDGE HOFFMAN:  Sure.  Go ahead.

8    MR. ROBERTSON:  Sure.  I mean, we
9    made this point obviously in our brief.  The
10   scope of what we're talking about is the
11   discovery of a very specific violation of Tesla
12   policy in the course of an investigation.  The
13   scope of the waiver that Mr. Woodfield --
14   personally you said we'd deal with this.  I don't
15   think we're -- with this witness, we're
16   specifically, you know, he's being asked any
17   questions about issues where we're asserting
18   privilege.  So we're not asserting privilege as
19   to this.  This is a document that's at a point in
20   time.

21   Our point on the scope was always the
22   fact that -- you know, confirming that on
23   August 31st, this issue of the discovery of the
24   fact that these e-mails have been exfiltrated was

1    Hansen v. Elon Musk - Arbitration Day 2
2    uncovered, and there were communications about
3    those facts, and then that resulted in the
4    communication to USSA that Tesla no longer wanted
5    Mr. Hansen on their facility based on what was
6    uncovered.
7            To say that that opens up a waiver
8    of -- you know, a broader waiver, A, we disagree
9    with; but B, I don't think it's relevant to
10   whether this particular document is admissible in
11   the hearing on the specific issue of what was
12   uncovered factually on August 31st.
13           JUDGE HOFFMAN:  Okay.  I understand
14   the objection, Mr. Woodfield.  I'm going to
15   overrule the objection.  I'm going to allow the
16   exhibit to be considered at this time, and we'll
17   see where this goes.
18           I'm sensitive to your objection and
19   your concerns about fairness, and -- but I want
20   to see how the testimony actually develops here.
21           MR. WOODFIELD:  Thank you.
22           JUDGE HOFFMAN:  Go ahead, Ms. Dunne.
23   BY MS. DUNNE:
24       Q.  I'd like to direct your attention to
25   the second paragraph in this e-mail starting

1    Hansen v. Elon Musk - Arbitration Day 2
2    with:  As a result of the information.
3            And you can read this to yourself.
4    You don't need to read it out loud.
5        A.  Okay.
6        Q.  And were you -- was your group
7    involved with reviewing Mr. Hansen's Tesla e-mail
8    account?
9        A.  So at the time that Ms. Workman was
10   conducting her inquiry, my team would not have
11   been able to review these particular -- these
12   particular e-mails.  You know, e-mails within the
13   Tesla domain or access to employee e-mails within
14   the Tesla domain are extremely restricted.
15           Currently, my team does have the
16   ability to pull and review e-mails from Tesla
17   employee e-mail in-boxes, but at the time we did
18   not have that capability.  It would have had to
19   have come from one of a handful of other people
20   that were working at the company at the time.
21       Q.  Understood.  So did a member of your
22   team or another individual within Tesla review
23   Mr. Hansen's in-box?
24       A.  So typically, for an investigation
25   that's being conducted by our compliance team,

1    Hansen v. Elon Musk - Arbitration Day 2
2    compliance does not have the ability to pull
3    e-mail from an employee's e-mail in-box.  So, you
4    know, like I stated, one of probably three people
5    at the company at the time would have had to have
6    pulled these particular e-mails.
7            What they would have done is looked
8    for any e-mail to and from or the entire contents
9    of, let's say, Karl Hansen's Tesla e-mail
10   account, and they would extract that information
11   into a PST file, which would then be provided
12   over to, you know, Ms. Workman or somebody else
13   from the compliance team in order to conduct a
14   review.
15       Q.  Understood.  And earlier you stated
16   that your team regularly deals with the
17   exfiltration of data by Tesla employees or Tesla
18   contractors; correct?
19       A.  That's correct.
20       Q.  Okay.  And at times when exfiltration
21   of data is identified and your review determines
22   that in fact the data was exfiltrated, are
23   employees terminated for exfiltrating Tesla data?
24       A.  Certainly there have been plenty of
25   instances where employees have been terminated

1    Hansen v. Elon Musk - Arbitration Day 2
2    for exfiltrating Tesla data, you know, based on
3    evidence collected by my team's investigations.
4        Q.  And based your team's investigations,
5    have contractors been removed from the Tesla site
6    based on exfiltration of data?
7        A.  Certainly.  Yeah, we've had instances
8    where, you know, we identify somebody who has a
9    Tesla e-mail account that is able to access the
10   Tesla domain but may not be a Tesla employee.
11           If they're not a Tesla employee, we
12   obviously don't have the ability to take any
13   adverse work action on them as an employer, but
14   we can certainly go to their employer and say
15   that they're not welcome on our site anymore.
16           MS. DUNNE:  I don't believe I have
17   any further questions.  Might I take a two-minute
18   break off the record?
19           JUDGE HOFFMAN:  Go ahead and take two
20   minutes off the record to make sure that you
21   don't have any more questions.  Thank you.
22           MS. DUNNE:  Thank you.
23           (Recess taken, 11:31 a.m. to
24   11:37 a.m. PDT)
25           MS. DUNNE:  Back on the record,

1      Hansen v. Elon Musk - Arbitration Day 2
2  Your Honor?
3                JUDGE HOFFMAN:  Yes.
4                MS. DUNNE:  Mr. Nocon, thank you so
5  much for your -- did we lose the witness?
6                There he is.  Okay.
7                Mr. Nocon, thank you so much for your
8  time.  I have no more questions at this time.
9                JUDGE HOFFMAN:  All right.  Time for
10  cross-examination by USSA.
11                MS. LARGENT:  No questions from USSA.
12  Thank you, Mr. Nocon.
13                JUDGE HOFFMAN:  Redirect to
14  Mr. Woodfield.
15                MR. WOODFIELD:  Yes, please.
16                ------------
17                EXAMINATION
18                ------------
19  BY MR. WOODFIELD:
20      Q.  Mr. Nocon, you mentioned that you had
21  your prior employer run a -- run background
22  checks on employees; correct?  And contractors?
23      A.  On -- of the individuals identified
24  by Mr. Hansen, yes.
25      Q.  All right.  And the absence of

1      Hansen v. Elon Musk - Arbitration Day 2
2  criminal records is not necessarily dispositive
3  of -- or it's not -- it doesn't prove an absence
4  of criminal activity; correct?
5      A.  Absolutely.  That's correct.
6      Q.  And, in fact, one of the issues at
7  the Gigafactory that Mr. Hansen had been looking
8  into was the theft of an ID machine; is that
9  correct?
10      A.  I'm not aware of that.
11      Q.  If there was a theft of an ID machine
12  and people were coming onto the Gigafactory
13  complex with fake IDs, assuming someone else's
14  identity, running background checks would be a
15  fruitless activity, wouldn't it?
16      A.  I mean, obviously the checks would
17  only be as good as the information that was
18  coming in.
19                Now, I conducted the queries or had
20  Nisos conduct those queries based on the
21  information I was presented.
22      Q.  Okay.  But if there was a -- if one
23  of the ID machines that -- that was -- one of the
24  vendors had been using had been compromised and
25  there were IDs being produced that were not

1      Hansen v. Elon Musk - Arbitration Day 2
2  authentic, running background checks on those
3  individuals that were listed on those IDs, that
4  wouldn't be dispositive of anything, correct?
5      A.  I suppose not.  But again, you know,
6  the checks were conducted based on the
7  information that was provided.  And the direction
8  wasn't -- or the assessment wasn't that there
9  wasn't any criminal activity, it was that it just
10  needed to be further developed.
11      Q.  Okay.  And you said that one of three
12  people would have pulled the data for the
13  e-mails; correct?
14      A.  Yeah, three people that I'm aware of
15  that would have had access to those e-mail
16  in-boxes at the time.
17      Q.  Okay.  But you don't know who or when
18  anyone actually pulled that data; correct?
19      A.  If you're referring to the data that
20  was likely reviewed by Valerie Workman, no, I
21  don't know.
22      Q.  And you said someone fairly high up
23  would have had to have asked for it.
24      A.  I'm not sure what you mean by that.
25      Q.  Well, you couldn't -- could you ask

1      Hansen v. Elon Musk - Arbitration Day 2
2  for that data at the time in July of -- in August
3  of 2018, would you have --
4      A.  Yes.
5      Q.  -- the authority to ask for it?
6      A.  Yes.  I mean, we had asked for it
7  pursuant to investigations.  But I would run
8  that -- at the time our practice was that we
9  would go to Todd Maron, who was the general
10  counsel, and, you know, request authorization in
11  order to go into somebody's account.
12                I don't know if Valerie, as part of
13  her investigation, as the head of compliance,
14  would have had to go to her boss in order to ask
15  for that permission.
16      Q.  Would Mr. Jones have had to ask for
17  permission?
18      A.  I don't know.  I'm not sure.
19      Q.  What about Mr. Musk?
20      A.  I don't know.  I don't know if that
21  would be -- if there's any policy preventing him
22  from requesting access to that data.
23      Q.  Now, you said there were other
24  comparators that were -- that have been
25  terminated for exfiltrating data.

Page 403

Hansen v. Elon Musk - Arbitration Day 2

2      Do you know if Tesla has progressive
3  discipline policy?
4      A.  I don't know what a progressive
5  discipline policy is.
6      Q.  Do you know if Tesla has a policy
7  that on first offenses, people get some sort of
8  lesser discipline than higher discipline, like,
9  for example, a warning, et cetera?
10      A.  Certainly the company has different
11  tools at its disposal.  You know, our lawyers,
12  especially our employment counsel, are very
13  conscious of ensuring that whatever the action
14  that we're taking is appropriate based on the
15  circumstances and the evidence that's been
16  collected.
17      But generally speaking, it's -- you
18  know, our policy is if you violate, you know,
19  the -- our nondisclosure agreements, if you
20  violate the business code of ethics, for most
21  violations it is up to and including termination.
22  So it could be -- it could be a written warning;
23  could be, you know, some sort of sanction; or it
24  could be a termination of employment.
25      Q.  Does it also depend upon mitigating

Page 404

Hansen v. Elon Musk - Arbitration Day 2

2  circumstances that you could not have any
3  discipline at all?
4      A.  Certainly.
5      Q.  And so who makes that decision as to
6  whether someone who exfiltrates data in violation
7  of a policy receives no discipline or is
8  terminated potentially as a first offense?
9      A.  That's great question.  I mean,
10  ultimately, it's up to the business, whoever the
11  manager is of the employee to make the
12  determination on what particular action is taken.
13      Now, normally, the managers will
14  follow the advice of counsel.  And if counsel is
15  stating that -- you know, for a particular
16  offense that, you know, we generally terminate an
17  employee for committing this type of policy
18  violation, usually managers will follow that
19  counsel's guidance.
20      Q.  Can you tell me how many times people
21  have been terminated for exfiltrating data?
22      A.  I can't tell you.  I don't know that
23  number off the top of my head.
24      Q.  Can you give me any specific examples
25  of what data has been exfiltrated by someone and

Page 405

Hansen v. Elon Musk - Arbitration Day 2

2  what their prior discipline record was such that
3  it warranted discipline?
4      A.  Sure.  So around the same time as all
5  of these e-mails that I've been shown today were
6  being drafted and sent back and forth, we had an
7  investigation into an individual in Draper, Utah,
8  who had been posting threats on Twitter, that he
9  was going to disclose confidential Tesla
10  information.
11      We were able to investigate it to
12  determine exactly which employee was associated
13  with that particular Twitter account.  And in
14  looking at his background, we were able to see
15  that he had moved a significant number of
16  internal Tesla documents and data to his personal
17  Google Drive account.  That employee was
18  subsequently terminated for his actions, and also
19  he was --
20      Q.  What was --
21      A.  Excuse me?
22      Q.  Sorry, go ahead.
23      A.  I was going to say, he was also
24  prosecuted by the Attorney General's Office in
25  Utah.

Page 406

Hansen v. Elon Musk - Arbitration Day 2

2      Q.  Was that because he was trying to
3  extort the company?
4      A.  Was the prosecution because he was
5  trying to extort the company?
6      Q.  Yes.
7      A.  I don't believe he was ever actually
8  trying to extort the company.  He was just angry
9  with the company and was threatening to disclose
10  information.  Now, in his capacity as an
11  employee, he did have, you know, various claims
12  that he was trying to make, you know, regarding,
13  you know, money that he thought he was due.  But
14  it was not necessarily connected to what he was
15  posting on Twitter.
16      Q.  Okay.  Mr. Hansen never asked for
17  money from Tesla in exchange for documents, did
18  he?
19      A.  No, not that I'm aware of.
20      Q.  And can you tell me any other
21  specific examples that you would hold up as a
22  comparator to Mr. Hansen?
23      A.  Specific examples.  Sure.  So in
24  2019, we had a series of investigations that we
25  were conducting regarding Tesla solar sales

Page 407

Hansen v. Elon Musk - Arbitration Day 2

1     advisors who were taking -- exfiltrating
2     spreadsheets of potential lead -- leads for sales
3     as they were departing Tesla.  There had been a
4     reorganization of our energy department.  They
5     ended up getting lumped in with our vehicle sales
6     department.  There was some discontent over
7     changes to compensation structure along with
8     that.  So many of them were looking for other
9     employment, and as part of that, they tried to
10    take customer logs.
11          I can remember at least two examples
12    where people took information that included
13    customer PII that was stored within our systems.
14    You know, similar to the employee or contractor
15    PII that was in those screenshots that I saw
16    earlier.  And those individuals who were still
17    employed at the time were exited as a result of
18    taking that data, you know, with malicious
19    intent.
20          Q.  And what was the malicious intent
21    that they were intending to use it for?
22          A.  We would surmise to generate sales
23    leads with a new solar employer, because they
24    were all leaving for competitors.

Page 408

Hansen v. Elon Musk - Arbitration Day 2

1          Q.  And what was the intent that you
2     determined, if anything, that you determined that
3     Mr. Hansen was exfiltrating this data for?
4          A.  That's a good question.  I don't
5     know -- I can't, obviously, read Mr. Hansen's
6     mind.  You know, it certainly is bad form to --
7     well, not only bad form.  It's also a violation
8     of our policies to move investigations data and
9     investigations records, you know, outside of
10    Tesla's domain.  Those are records that we're
11    supposed to maintain for -- I believe it's ten
12    years that we're supposed to maintain those
13    internally.  They certainly are confidential, you
14    know, documents.
15          As to the why he would be doing that,
16    I mean, I'm not sure.  I don't know if -- what
17    his intent would have been.  It could have been
18    trying to -- in an effort to further investigate
19    on his own and maybe -- I don't know -- increase
20    his bone fides with those that he was working
21    with, but that would be pure speculation on my
22    part.
23          Q.  So the comparators that you had given
24    us are the individual who was looking to extort

Page 409

Hansen v. Elon Musk - Arbitration Day 2

1     money from Tesla by sending the tweets talking
2     about money being owed and was -- that the Storey
3     County prosecutor had prosecuted, and then the
4     individual --
5          MS. DUNNE:  Objection.  You're
6     miss --
7          Sorry.
8     BY MR. WOODFIELD:
9          Q.  And then the individuals who were
10    taking the sales leads, correct?
11          MS. DUNNE:  I'm going to object,
12    mischaracterization of testimony with regard to
13    the subject matter of the tweets.
14          JUDGE HOFFMAN:  Okay.  I understand
15    the objection.  I'm going to overrule the
16    objection.
17          Mr. Nocon, if you can answer, please
18    do.
19          MR. ROBERTSON:  Sure.  So that isn't
20    what I previously testified.  The tweets that
21    were made by that prior employee were simply
22    tweets that were made.  I don't recall any
23    attempt to extort money out of the company as
24    part of those tweets.

Page 410

Hansen v. Elon Musk - Arbitration Day 2

1          But yes, I mean, those are two
2     examples of many that my team has investigated,
3     you know, over the three-plus years that the team
4     has been in existence, involving, you know, Tesla
5     employees who have taken our property without
6     authorization and in violation of our policies
7     and have lost our employment as a result of it.
8     BY MR. WOODFIELD:
9          Q.  And can you point to any other
10    employees who filed a complaint with the SEC and
11    then were subsequently terminated other than
12    Mr. Hansen?
13          A.  So maybe I'm misunderstanding, but I
14    didn't believe that Mr. Hansen was terminated
15    following his --
16          Q.  Removed.
17          A.  -- following his --
18          Q.  Removed.
19          A.  So those exact set of circumstances?
20          No, I can't recall any other that --
21    that we've had involvement where somebody has
22    gone to the SEC.
23          Q.  How long does it normally take to
24    investigate someone?  If Ms. Workman's e-mails

Page 411

Hansen v. Elon Musk - Arbitration Day 2

1    are all on August 1st, does it typically take one
2    day to investigate someone and have them removed?
3    Is that how fast Tesla normally moves to remove
4    someone?
5         A.  It can.  It can take hours.  I mean,
6    we've -- we've been able to identify, establish,
7    and remove somebody from the property extremely
8    quickly.  I mean, but it depends upon the case.
9    There have also been circumstances where an
10   investigation may run months.  You know,
11   depending upon, you know, what the circumstances
12   are.
13        Q.  If the instruction comes from the
14   top, from, say, Mr. Jones, get this done today,
15   that would be something that you could get done
16   today; correct?
17        A.  Again, I think it would depend.
18   We've had investigations where Mr. Musk has had
19   direct visibility into what we were doing and we
20   weren't able to resolve things in a day.  I mean,
21   we moved as quickly as we can, but it is going to
22   depend upon the circumstances of the
23   investigation.
24        Q.  But this investigation, according to

Page 412

Hansen v. Elon Musk - Arbitration Day 2

1    Ms. Workman's notes, took place in one day.
2         A.  I don't know if that's true or not.
3         Q.  Well, do you know if it actually took
4    more than one day?  Because all of her notes are
5    from one day.
6         Do you know if --
7         A.  I don't know.
8         MR. WOODFIELD:  I have no further
9    questions.
10        MS. DUNNE:  I just have one brief
11   follow-up, Your Honor.
12        ------------
13        EXAMINATION
14        ------------
15   BY MS. DUNNE:
16        Q.  Mr. Nocon, you just discussed
17   potential ramifications of exfiltrating Tesla
18   data as to Tesla employees with Mr. Woodfield; is
19   that correct?
20        A.  Yes, that's correct.
21        Q.  And at this time, Mr. Hansen was a
22   contractor; is that correct?
23        A.  If by "this time" you mean when we
24   were looking into this matter?  Or when the tech

Page 413

Hansen v. Elon Musk - Arbitration Day 2

1    company was looking into the matter?
2         Q.  Yes, in August of 2018, was
3    Mr. Hansen a contractor?
4         A.  Yes, I believe so.
5         Q.  And are contractors ever treated
6    differently in terms of the likelihood of asking
7    for their removal perhaps sooner than you would
8    ask for termination of an employee?
9         A.  Sure.  I would say that with any
10   investigation we conduct, if it's a contractor
11   that's engaged in misconduct, as soon as we've
12   been able to establish that misconduct, we'll
13   engage with the contracting company and ask
14   for -- typically ask for that person to be
15   removed.
16        MS. DUNNE:  Okay.  Thank you.  No
17   further questions for Tesla.
18        MR. WOODFIELD:  One very quick
19   question in follow-up.
20        JUDGE HOFFMAN:  Go ahead.
21        *  *  *
22        *  *  *
23        *  *  *
24        *  *  *

Page 414

Hansen v. Elon Musk - Arbitration Day 2

1         ------------
2         EXAMINATION
3         ------------
4    BY MR. WOODFIELD:
5         Q.  Does Ms. Workman -- what's her job?
6         A.  She is, I believe, general counsel at
7    Handshake now.
8         Q.  Okay.  What was her job in 2018?
9         A.  I believe that she was the head of
10   compliance for Tesla.
11        Q.  Does she normally get involved in
12   work-a-day personnel matters?
13        A.  No, I don't -- I can't speak to what
14   her job responsibilities were at the time.  I
15   would imagine they were compliance issues.
16        Q.  When you say "compliance issues,"
17   what do you mean?
18        A.  So the types of matters that we would
19   refer to compliance would be if somebody -- if we
20   have an employee who is maybe receiving kickbacks
21   from a contractor, conflict of interest
22   investigations.  Matters involving, you know,
23   other, you know, potential violations that may
24   require reporting.

Page 415

Hansen v. Elon Musk - Arbitration Day 2

1    Q.  According to who?
2    A.  Reporting to regulatory bodies.
3    Q.  Like the SEC?
4    A.  Potentially.
5    Q.  Okay.  Thanks.
6        MR. WOODFIELD:  No further questions.
7        JUDGE HOFFMAN:  Okay.  There being no
8  further questions of Mr. Nocon, I have no
9  questions.  Thank you very much for your
10 testimony and you're excused and you can sign
11 off.
12        THE WITNESS:  Thank you.
13        JUDGE HOFFMAN:  Our next witness was
14 to be Mr. German.
15        Ms. Largent, anything new on that?
16        MS. LARGENT:  We asked him to contact
17 us if his job duties cleared and he became
18 available.  We haven't gotten any update yet.  We
19 will keep everyone posted as soon as we hear
20 something with availability.
21        JUDGE HOFFMAN:  Well, in the sequence
22 of events, Mr. Woodfield, do you have anything
23 further from your case in chief?
24        MR. WOODFIELD:  No.  Obviously we'd

Page 416

Hansen v. Elon Musk - Arbitration Day 2

1  like to call Mr. German, but at this point, with
2  that, we'll defer to Tesla to call Tesla's
3  witnesses.
4        JUDGE HOFFMAN:  Okay.  And from
5  Tesla, what's your thoughts here?  Do you want to
6  press on?  Do you have a witness standing by, or
7  should we break for lunch, or what do think?
8        MR. ROBERTSON:  Why don't we break
9  for lunch and we'll coordinate with our folks as
10 to who we can get on today.  But we can probably
11 use the time to figure out where everyone is.
12        JUDGE HOFFMAN:  Okay.  Then let's
13 break for about 30 minutes.  So we'll be back at
14 the half hour.
15        MR. ROBERTSON:  Perfect.  Thank you,
16 Your Honor.
17        JUDGE HOFFMAN:  Thank you.
18        MR. WOODFIELD:  Thank you.
19        (Recess taken, 11:57 a.m. to
20 12:31 p.m. PDT)
21        JUDGE HOFFMAN:  Are we ready to
22 proceed?  I'm going to go ahead and let
23 Ms. Ferrua in.

Page 417

Hansen v. Elon Musk - Arbitration Day 2

1        Good afternoon, Ms. Ferrua.  I'm
2  Judge Hoffman.  Can you hear me okay?
3        THE WITNESS:  Yes, I can.  Hello.
4        JUDGE HOFFMAN:  Okay.  Hello.  We're
5  going to go on the record now, and you'll be
6  sworn in as a witness.
7        All right, Deb, on the record.
8  Please swear in the witness.
9        ------------
10            JENNA RAE FERRUA,
11         having been duly sworn,
12         testified as follows:
13        ------------
14           EXAMINATION
15        ------------
16 BY MR. ROBERTSON:
17    Q.  Good morning or afternoon,
18 Ms. Ferrua, depending on where people are.
19    A.  Good afternoon.
20    Q.  Can you state your full name for the
21 record, please.
22    A.  Jenna Rae Ferrua.
23    Q.  And, Ms. Ferrua, where do you
24 currently work?

Page 418

Hansen v. Elon Musk - Arbitration Day 2

1    A.  I work in Austin, Texas, at
2  Gigafactory, Tesla.
3    Q.  How long have you been an employee at
4  Tesla?
5    A.  Four years and a month.
6    Q.  So if my math is right, you started
7  in 2018?
8    A.  Yes.
9    Q.  And what is your current position at
10 Tesla?
11    A.  I'm a senior manager, HR.
12    Q.  How long have you held that title?
13    A.  Since July 2020.
14    Q.  And before that, what was your title?
15    A.  Senior HR partner.
16    Q.  Did you have any other titles while
17 you were at Tesla?
18    A.  Yes.  HR partner.
19    Q.  Is that the somewhat natural
20 progression of an HR partner, senior HR partner,
21 senior manager?
22    A.  Yes.
23        A little bit of a jump, but yes.
24    Q.  Congratulations.

Page 419

Hansen v. Elon Musk - Arbitration Day 2

1    Hansen v. Elon Musk - Arbitration Day 2
2        A.   Thank you.
3        Q.   So going back to 2018, can you just
4    describe generally for the arbitrator what your
5    day-to-day responsibilities were in your position
6    as HR partner?
7        A.   Yes.  My day-to-day job duties
8    consisted of employee changes in the system,
9    whether that be from pay changes to promotions to
10   location changes, in addition to handling any
11   employee issues and concerns that were raised.  I
12   would do the in-takes and I would be listening to
13   the employees and working with my respective
14   groups that I was overseeing at that time.
15       Q.   And in addition to employees, did you
16   have involvement with any of Tesla's contractor
17   relationships?
18       A.   If the organization had contractors,
19   then we would work with the respective
20   contractor's account manager.
21       Q.   And so, Ms. Ferrua, can you just
22   generally explain how HR works with legal and
23   compliance in connection with the potential
24   either discipline or the potential decision with
25   regard to an employee to either discipline them

Page 420

1    Hansen v. Elon Musk - Arbitration Day 2
2    or terminate their employment?
3        A.   Yes.  HR is anything that is employee
4    facing, and we are there to support the business
5    and be there for the business when any
6    disciplinary actions come into place or if we
7    need to do terminations, devotions, corrective
8    action.
9             With compliance, right, compliance
10   ensures that the rules are being upheld within
11   the company, and then HR's job is to ensure that
12   employees are following the rules within the
13   company.  So what usually would happen is if
14   there were something that came up from a
15   compliance perspective and we needed to address
16   the employee, compliance would reach out to HR
17   and then HR would connect with the employee.
18       Q.   And in your role, did you have --
19   were you connected with any particular groups of
20   employees or departments?
21       A.   Yes.  The -- at the time, in 2018, I
22   oversaw -- sorry, I was the recruiting -- sorry,
23   the HR partner for recruiting and security.
24       Q.   And can you just generally explain
25   what recruiting and security are?

Page 421

1    Hansen v. Elon Musk - Arbitration Day 2
2        A.   Yes.  Recruiting essentially attracts
3    the talent that we have for our company.  They
4    source, they go out and hunt essentially for
5    talent and personnel at Tesla.  And security
6    protects the employees at Tesla.
7        Q.   And we've heard the term -- prior in
8    this proceeding, the term "recruiter" within
9    Tesla.
10            Can you just generally explain what a
11   recruiter does and what their responsibilities
12   are?
13       A.   Yeah.  A recruiter would -- they're
14   in charge of X amount of requisitions that we
15   have, which means how many, you know, open jobs
16   that we have at Tesla.  And therefore, they're
17   assigned to sourcing and finding individuals that
18   fit this job description based on their job
19   qualifications.
20       Q.   And in 2018 -- and you may or may not
21   know this.  This may not be a fair question.
22            But just generally, I mean, how many
23   applications for employment at different
24   positions within the groups you were involved
25   with generally were there?

Page 422

1    Hansen v. Elon Musk - Arbitration Day 2
2        A.   I don't know, but thousands,
3    definitely, for each req that recruiters had to
4    source through.  And we had our own sourcing
5    team, per req as well, requisition.
6        Q.   Is it fair to say that the Tesla jobs
7    were highly competitive?
8        A.   Yes.  Still are.
9        Q.   And, Ms. Ferrua, do you recall having
10   any -- or the name Karl Hansen in 2018 coming to
11   your attention?
12       A.   Yes.
13       Q.   And let's go to Exhibit 157.
14            We're just pulling up a document,
15   Ms. Ferrua.  It will take us a second.
16            So, Ms. Ferrua, I've put a document
17   up on the screen.  It's been identified as joint
18   Exhibit 157.  It's an e-mail exchange, it
19   appears, between Richard Clark, Ricky Gecewich,
20   and Jeff Jones and yourself.
21            Do you see that?
22       A.   I do.
23       Q.   And again, taking us back -- and this
24   is dated August 9, 2018; is that correct?
25       A.   Yes.

Hansen v. Elon Musk - Arbitration Day 2

1
2      Q.  Do you recall who Richard Clark was
3  at that time?
4      A.  I know he was a security contact for
5  university security.
6      Q.  And when you say "university
7  security," what do you mean?
8      A.  Sorry, the -- our contracted service
9  that we use, our third party for our service,
10  security service.
11      Q.  And at that time do you know who
12  Jeff Jones was?
13      A.  Yes.  He was the leader of security.
14      Q.  And then Mr. Gecewich, what was his
15  position?
16      A.  He was an employee relations partner.
17      Q.  And this e-mail seems to indicate a
18  request by Mr. Gecewich to meet with Mr. Hansen.
19        Do you recall around the second week
20  of August there being a request by Mr. Gecewich
21  to meet with Mr. Hansen?
22      A.  Not until seeing this e-mail.
23      Q.  Okay.  So other than what's in this
24  e-mail, you don't have any specific recollection
25  of this request to meet with Mr. Hansen?

Hansen v. Elon Musk - Arbitration Day 2

1
2      A.  No, I do not.
3      Q.  Okay.  But you as an HR
4  representative were involved in these
5  communications; is that correct?
6      A.  Yes, that's correct.
7      Q.  And is that -- I'm sorry.  Go ahead.
8      A.  No, go ahead.
9      Q.  I was just going to say, is that
10  fairly typical --
11      A.  Yes.
12      Q.  -- to the extent that the contractor
13  or employee is being asked to meet with someone
14  from Tesla, that an HR person would be called?
15      A.  Yes, and that's from the employer
16  relations team.  So any time they are reaching
17  out to an employee, they have to include their
18  respective HR partner.
19        MR. ROBERTSON:  I'd move joint
20  Exhibit 157 in.
21        MR. WOODFIELD:  No objection.
22        JUDGE HOFFMAN:  Okay, 157 is in.
23        (Whereupon, Exhibit 157 was
24  received.)
25           *  *  *

Hansen v. Elon Musk - Arbitration Day 2

1
2  BY MR. ROBERTSON:
3      Q.  And, Ms. Ferrua, do you recall later
4  that month, in August of 2018, an issue coming up
5  with regard to Mr. Hansen?
6      A.  Yes.
7      Q.  And just to the extent you can, what
8  do you recall happened later in the month of
9  August 2018 with regard to Mr. Hansen?
10      A.  Yeah, I was brought in at the tail
11  end of this, where Yusuf Mohamed was our -- he
12  was our managing counsel, he was the legal
13  person, and he had called to let me know that
14  there was an investigation that was involving
15  Mr. Hansen, specifically that the -- he was
16  exfiltrating, you know, confidential and
17  proprietary documents from his Tesla account to
18  his personal account.
19        The documents were anything from,
20  like, badge records to photos within the factory,
21  like, footage that we had from our security
22  cameras and pictures of, like, a driver's license
23  that he had sent to himself outside of Tesla.
24        And that is a policy violation, when
25  employees do that, so -- and it violated

Hansen v. Elon Musk - Arbitration Day 2

1
2  specifically our Tesla Code of Conduct and Code
3  of Business and Ethics policy.
4        And at the time, Yusuf, Valerie,
5  Jeff Jones, legal, HR, and the business
6  collectively had decided that Karl needed to be
7  removed from the site due to the policy
8  violations.
9      Q.  If we go to Exhibit 187.  Joint
10  Exhibit 187.
11        This appears to be an e-mail from you
12  to Yusuf Mohamed, Ms. Workman, Jeff Jones, dated
13  August 31, 2018.
14        Do you see this?
15      A.  Yes.
16      Q.  And this is an e-mail from you to
17  these folks on that date; is that right?
18      A.  Correct.
19      Q.  It references a: Just spoke with Rick
20  from U.S. Security.
21        Do you see that?
22      A.  Yes, I do see that.
23      Q.  Do you know who that was?
24      A.  I don't know specifically, but it was
25  definitely Rick which would be the contact from

Page 427

Hansen v. Elon Musk - Arbitration Day 2

1    U.S. Security.

2        Q.  And again, with you as the HR person,

3    was that standard practice with a contractor to

4    reach out to your contact at the contractor?

5        A.  Yes.  So that HR -- or Tesla, if

6    there was ever any issues with our contractors,

7    it was always done by their company.  Tesla never

8    had any sort of disciplinary action or

9    termination conversations with the respective

10   employees.  It was always done by their leader.

11       Q.  And how common -- and I know, again,

12   not a fair question, but does this happen from

13   time to time that contractor employees violate

14   Tesla policies and are instructed with regard to

15   that particular claim?

16       A.  Yes.

17       Q.  And do you know, does Tesla make any

18   recommendation or determination with a contractor

19   about the employees' employment with the

20   contractor as opposed to just being located at

21   Tesla?

22       A.  No, our recommendation is just we

23   want them removed from the site.

24       Q.  And is that what happened here?

Page 428

Hansen v. Elon Musk - Arbitration Day 2

1        A.  Yes.  This was not asking to term.

2    It was just saying we no longer want him to be

3    working on our site due to the policy violations.

4        MR. ROBERTSON:  I'll move 187 in.

5        MR. WOODFIELD:  No objection.

6        JUDGE HOFFMAN:  187 is in.

7        (Whereupon, Exhibit 187 was

8    received.)

9        MR. ROBERTSON:  Let's go to 189.

10   BY MR. ROBERTSON:

11       Q.  And while that document is being

12   pulled up, Ms. Ferrua, you were not involved in

13   the actual underlying investigation, were you?

14       A.  No, I was not.

15       Q.  So whatever information you learned

16   about the investigation came from Ms. Workman and

17   Mr. Mohamed?

18       A.  Correct.

19       Q.  So I'm pulling up what's been

20   identified as Exhibit 189.  Joint Exhibit 189,

21   this appears to be an e-mail.  At the bottom it

22   looks to be from Mr. Jones to Matt German at

23   U.S. Security and then rolls up to Mr. German to

24   Mr. Jones and yourself.

Page 429

Hansen v. Elon Musk - Arbitration Day 2

1        Do you see that?

2        A.  Yes, I do.

3        Q.  Do you recall this communication

4    which is dated September 4, 2018?

5        A.  Do I recall the e-mail or just the

6    conversation between --

7        Q.  Either -- either or both.

8        A.  The e-mail.  But the conversation, I

9    don't recall of -- who did it.

10       Q.  But was it your understanding that as

11   of September 4th, Mr. German had spoken to

12   Mr. Hansen and he would no longer be on the Tesla

13   property?

14       A.  Correct.

15       Q.  And did you ever personally have any

16   direct interaction with Mr. Hansen?

17       A.  No.

18       Q.  Your only interaction was with USSA

19   to communicate Tesla's decision; is that right?

20       A.  Yes.  Correct.

21       Q.  And subsequent to this communication

22   with USSA, do you recall any further

23   communications that you had with regard to

24   Mr. Hansen?

Page 430

Hansen v. Elon Musk - Arbitration Day 2

1        A.  Not that I can recall.

2        Q.  Let me pull up --

3        JUDGE HOFFMAN:  Are you going to move

4    in 189?

5        MR. ROBERTSON:  Oh, yes.  Thank you,

6    Your Honor.

7        MR. WOODFIELD:  No objection.

8        JUDGE HOFFMAN:  189 is in.

9        (Whereupon, Exhibit 189 was

10   received.)

11       MR. ROBERTSON:  Pull up 42.  I think

12   it's already in.

13   BY MR. ROBERTSON:

14       Q.  I'm pulling up document 42,

15   Ms. Ferrua, which is already in.

16       This is an e-mail dated July 3rd.

17   And appreciating that you are not on this e-mail,

18   I just want to ask you some questions about some

19   of the attachments.

20       Do you know what a badging record is?

21       A.  Yes.

22       Q.  Can you just briefly describe what a

23   badging record is?

24       A.  Yes.  The badging record is what

Page 431

Hansen v. Elon Musk - Arbitration Day 2
1  tells us when an employee has physically badged
2  in on-site.  So they have to swipe in with their
3  badge and swipe out when they have left for the
4  day, whether it be a lunch break as well.  That's
5  what a badging record shows us.
7      Q.  And does a badging record have
8  personal information about the individual, either
9  an employee or contractor?
10     A.  Yes.
11     Q.  And would you consider the badging
12 records of employees from an HR perspective to be
13 confidential information?
14     A.  Yes.
15     Q.  Confidential to Tesla?
16     A.  Yes.
17     Q.  Would you consider it a violation if
18 an employee was removing badging records from the
19 facility and sending them to their personal
20 e-mail?
21     A.  Yes.
22         MR. ROBERTSON:  Your Honor, can I
23 just have literally the obligatory two minutes?
24 I think I'm done, but let me make sure.
25         JUDGE HOFFMAN:  Go ahead.

Page 432

Hansen v. Elon Musk - Arbitration Day 2
1
2         (Recess taken, 12:52 p.m. to
3  12:55 p.m. PDT)
4         JUDGE HOFFMAN:  Back on.
5         MR. ROBERTSON:  Thank you,
6  Ms. Ferrua.  I have nothing further.  Appreciate
7  your time.
8         JUDGE HOFFMAN:  Cross-examination
9  from Mr. Woodfield.
10        MR. WOODFIELD:  Thank you, sir.
11        ------------
12        EXAMINATION
13        ------------
14 BY MR. WOODFIELD:
15     Q.  Ms. Ferrua, my name is Nick Woodfield
16 and I represent Mr. Hansen in this matter.
17         You said that you had a conversation
18 with Yusuf Mohamed about Mr. Hansen exfiltrating
19 accounts.  When was that conversation?
20     A.  August 31, 2018.
21     Q.  And do you know when Mr. Mohamed
22 first investigated anything about Mr. Hansen,
23 anything Mr. Hansen might have done?
24     A.  I don't.
25     Q.  Was August 31st the first time

Page 433

Hansen v. Elon Musk - Arbitration Day 2
1  Mr. Mohamed reached out to you?
3      A.  Yes.
4      Q.  And in 2018, how many employees were
5  there at Tesla as far as you know?  Overall, in
6  the company.
7      A.  I don't remember exactly, but we had
8  just gone through some RIFs.  70,000?
9      Q.  70,000?
10     A.  Maybe.
11     Q.  Okay.  And you said that there was a
12 call.  And Jeff Jones, what was his title at the
13 time?
14     A.  Director of security.
15     Q.  In fact, wasn't his title at the time
16 global head of security?
17     A.  That makes sense.  We changed titles
18 a little bit.
19     Q.  And Valerie Workman, her title at the
20 time was chief of -- or of compliance?
21     A.  Head of compliance.
22     Q.  And then Yusuf's title, he was what?
23     A.  He was DGC, deputy general counsel.
24     Q.  And Mr. Hansen was a contractor,
25 hourly security guard in Reno, Nevada; right?

Page 434

Hansen v. Elon Musk - Arbitration Day 2
1
2      A.  Yes.
3      Q.  Do you normally have calls with the
4  assistant -- or the deputy general counsel, head
5  of compliance and global head of security to make
6  a termination decision?
7      A.  Sometimes.
8      Q.  And what sort of "sometimes" warrant
9  that kind of situation for someone who's an
10 hourly security guard?
11     A.  It was based on business groups they
12 supported.  So it was the same structure like HR.
13 We had different business groups that we
14 supported.
15     Q.  Do you -- how many times did you
16 speak with Mr. Jones in 2018, do you think?
17     A.  A lot.  I was his HR partner for his
18 organization.
19     Q.  How many terminations did you work on
20 with him, do you think?
21     A.  A lot as well.  I don't have the
22 exact number.
23     Q.  When you say "a lot," are you talking
24 about like 200?  Are you talking about 5?  What's
25 a lot?

Hansen v. Elon Musk - Arbitration Day 2
1
2      A.  I would say it was 150.
3      Q.  And how many terminations did you
4  work on with Valerie Workman?
5      A.  In 2018?
6      Q.  Yes.
7      A.  Or in total?
8      Q.  In 2018.
9      A.  I can't remember.
10     Q.  Well, give me a ballpark.  Like one?
11     A.  Five.
12     Q.  Okay.  Five.  And you -- how many
13  times did you work with her in total on
14  terminations?
15     A.  I would say the same five.  If it was
16  regarding compliance and investigation that she
17  was investigating, then she would be a part of
18  that discussion.
19     Q.  So Mr. Hansen and four other people
20  would be the compliance issues.
21         And when you say "compliance issues,"
22  that's like SEC compliance issues; right?
23     A.  No, it's anything that is -- if it
24  violated our policy as it pertained to like any
25  sort of regulatory trade or anything that was --

Hansen v. Elon Musk - Arbitration Day 2
1
2  if they were taking documents and sending it to
3  their -- themselves.  I mean, even if it could
4  be -- maybe theft as well.  It was anything
5  really that was violating our policy at the
6  company.
7      Q.  So anything violating a policy at the
8  company, you would go to compliance?
9      A.  Sometimes, yes.
10     Q.  With 70,000 people, anybody violating
11  a policy went to compliance?
12     A.  Sometimes.
13     Q.  Tell me what -- I'm trying to figure
14  out how that's workable over a tenure of years,
15  because people -- what policies escalate to
16  compliance, someone of Ms. Workman's level?
17     A.  If there were -- a lot of it was
18  related to cyber, anything that was happening
19  that could have been exposing Tesla.
20         Anything that we had that -- you
21  know, if there was like training material that
22  was being shared to other businesses, if there
23  was -- yeah, any like tax violations; but a lot
24  of it at the time in 2018 from what I was a part
25  of was employees that were taking documents that

Hansen v. Elon Musk - Arbitration Day 2
1
2  we had -- or taking anything that was
3  confidential to Tesla and they were sending it
4  outside of Tesla.  Because the perception was
5  that was not okay to do that.
6         There had to be a bad reason if it
7  was being sent outside of Tesla to a personal
8  account.
9      Q.  How many times did you work with
10  Jeff Jones and Valerie Workman and Yusuf Mohamed
11  on a termination?
12     A.  I can't remember.  Quite a bit.
13     Q.  Like quite a bit would be like 70?
14  Or 100?  Or 1?
15         Other than Mr. Hansen, can you name
16  one other person you worked with them on?
17     A.  In 2018?
18     Q.  Yeah.
19     A.  I can't remember the names
20  specifically.
21     Q.  Can you remember the names of anyone
22  ever that you worked with Ms. Workman, Mr. Jones,
23  Mr. Mohamed, where you brought that kind of fire
24  power to bear to terminate someone?
25         MR. ROBERTSON:  Objection, just to

Hansen v. Elon Musk - Arbitration Day 2
1
2  the characterization.
3  BY MR. WOODFIELD:
4      Q.  You can go ahead.
5      A.  I don't remember exactly.  There was
6  a couple of names that -- Martin Tripp, perhaps,
7  was a name.  I really can't recall some of the
8  names that we've had.
9      Q.  Do you remember whether
10  Martin Tripp -- do you remember if Martin Tripp
11  was someone that Tesla prosecuted subsequently?
12     A.  I don't know.
13     Q.  Did anyone ever tell that you Mr. --
14  that Mr. Hansen had filed a -- what's called a
15  TCR, a tips complaints -- a TCR, a document or a
16  report with the SEC?
17     A.  Not that I can recall.
18     Q.  Did Ms. Workman ever tell you that he
19  had raised allegations with the SEC saying that
20  things should be reported to shareholders?
21     A.  Not that I can recall.
22     Q.  Is that something you would have
23  wanted to know, that he had filed an SEC TCR two
24  weeks earlier, when he was being terminated?
25     A.  I think that's irrelevant since he

Hansen v. Elon Musk - Arbitration Day 2

1    violated the policy.  We just need to know if he
2    didn't comply to Tesla's...
3        Q.  So, like, if someone had filed -- and
4    let's make sure -- I want to understand that,
5    because you do HR work, right?  If someone files
6    a -- like, say, a discrimination complaint, and
7    then two weeks later, you find out they violated
8    a policy, the person they say violated -- the
9    person that they alleged violated a policy -- the
10   person they say did something wrong,
11   subsequently, say they violated policy, wants
12   them terminated, is that -- forgive me.  Let me
13   back that up.  We'll start fresh.
14       Do you know if Tesla has
15   antiretaliation policies?
16       A.  We do have that, yes.
17       Q.  Do you know if Tesla has a Dodd-Frank
18   antiretaliation policy?
19       A.  I don't know what that means.
20       Q.  Do you know if Tesla has a SOX
21   retaliation policy?
22       A.  Not that I'm aware of.
23       Q.  Do you know if Tesla has Dodd-Frank
24   or SOX retaliation policy -- well, you know what

*(Note: line numbers 2–25)*

---

Hansen v. Elon Musk - Arbitration Day 2

1    Title VII is, right?  And I don't want to be
2    flip.  You're HR, you know what Title VII
3    discrimination is, right?
4        A.  Yes.
5        Q.  You know it's illegal to discriminate
6    against someone who files a protected complaint,
7    like a discrimination complaint; right?
8        A.  Yes.
9        Q.  So if someone files a complaint of
10   discrimination and two weeks later they're --
11   their boss wants them terminated, do you want to
12   know that they've engaged in protected activity
13   two weeks earlier, even if perhaps they did
14   something that possibly warrants termination two
15   weeks later?  Would you want to know that?
16       A.  Possibly.
17       Q.  Why?
18       A.  Because we'd want to look into
19   anything that is brought forward to us.  If
20   there's anything that came after the fact -- if
21   any information is brought to us after the fact
22   that there was a decision made to terminate, we
23   would still look into it.
24       Q.  Do you know if there was ever -- did

---

Hansen v. Elon Musk - Arbitration Day 2

1    you ever see the actual physical results of any
2    investigation made into Mr. Hansen?
3        A.  Did I see results?
4        Q.  Yeah, did you actually see, like, any
5    report that Ms. Workman produced?
6        A.  Not that I can recall.
7        Q.  And do you know who actually asked
8    Ms. Workman to investigate?
9        A.  I don't know.
10       Q.  Do you know when she was asked to
11   investigate?
12       A.  I don't know.
13       Q.  And do you know if anyone asked
14   Ms. Workman to investigate and find a preordained
15   result?
16       A.  I don't know that.
17       Q.  Okay.  Did Ms. Workman ever tell you
18   that -- or how long the investigation took?
19       A.  No.
20       Q.  When you process on people for
21   removal from facilities, do you normally try and
22   document what investigation took place?
23       A.  Yes.
24       Q.  And did you do that here?

*(Note: line numbers 2–25)*

---

Hansen v. Elon Musk - Arbitration Day 2

1        A.  We have the documentation from
2    Valerie, so then we would attach it into the
3    system once the respective employee was being
4    removed from the site.
5        Q.  When you say you got the respective
6    documentation from Valerie, what was it you got
7    from Valerie?
8        A.  We got the documentation that she
9    had -- had this investigation; from this
10   investigation, this is what she confirmed, that
11   there were documents that had been exfiltrated
12   out from Tesla to a personal e-mail account.
13       Q.  And when you say that was -- did --
14   I've seen three e-mails she sent on August 31st.
15       A.  It was on August 31st, that is
16   correct.
17       Q.  Is it the three e-mails she sent?
18       Do you know what you -- what are you
19   talking about?  I'm trying to figure out what she
20   sent you that's Tesla's documentation of any
21   investigation.
22       A.  It was an e-mail that she sent to
23   myself and Yusuf regarding that she had looked
24   into an investigation.  One -- do you want me to

Hansen v. Elon Musk - Arbitration Day 2
1    tell you the number?  Is that what you're asking
2
3    for?
4         Q.  Do you know what it is?
5         A.  It's an e-mail that she had sent.
6         Q.  Hold on one second.
7         MR. WOODFIELD:  Court's indulgence
8    for one moment, sir.
9         Would you do me a favor, Anne, and
10   put up -- I think it's 201.  I'm looking for it
11   right now.
12        MR. ROBERTSON:  Which document?
13        MS. DUNNE:  I don't think you want
14   201, Nick.
15        MR. WOODFIELD:  No, which one is
16   it -- I'm trying to remember which number it is.
17        Is it -- the -- it's the three of
18   them.  They're successive.
19        MS. DUNNE:  187, 188, and 189.
20        MR. WOODFIELD:  Okay.  Let me pull
21   that up.  Thank you.
22   BY MR. WOODFIELD:
23        Q.  I'm showing you right now, one --
24   document No. 187.
25        A.  Yes.

Hansen v. Elon Musk - Arbitration Day 2
1
2         Q.  Is this the extent of the
3    investigation that you're aware of that
4    Valerie Workman performed?
5         A.  Yes.
6         Q.  And this is an e-mail that you --
7    you're forwarding.  I've got 188.
8         This is an e-mail that was sent at
9    12:23 on August 31st.
10        This is 189.
11        Let's see if I can get a better image
12   of it, but...
13        But is this the extent of the
14   investigation, as far as you know it, by
15   Ms. Workman?
16        A.  Yes.
17        Q.  And you know nothing further about
18   who asked her to investigate, when they started
19   it, what she did, et cetera?
20        A.  No, I do not.
21        Q.  Would you have wanted to know that
22   Mr. Hansen filed a complaint with the SEC three
23   weeks earlier?
24        A.  I mean, it's helpful to know, but
25   it's still -- this was what happened.  And the

Hansen v. Elon Musk - Arbitration Day 2
1
2    investigation was taking place during the
3    complaint, from what I understand.
4         Q.  But would you have wanted to know --
5    I mean, there doesn't -- do you know if any
6    investigation actually took place before the
7    complaint -- the SEC complaint was filed.
8         A.  Not that I'm aware of.
9         Q.  Because of the August 31st document.
10        Moreover, I've got a question.
11   Mr. Hansen was on Fox News on August 29th.  And
12   I'm wondering if there's any -- if you saw
13   anything before August 29th.
14        A.  No.
15        Q.  Okay.  Did anyone tell you that
16   Mr. Hansen had been on Fox News talking about his
17   SEC TCR leveled against Tesla and Elon Musk?
18        A.  No.
19        Q.  Did anyone mention whether Elon Musk
20   was upset about this?
21        A.  No.
22        Q.  Did anyone mention that this was not
23   needed in this difficult time where Tesla was
24   having a difficult time and this was not -- this
25   issue that Mr. Hansen was raising was really not

Hansen v. Elon Musk - Arbitration Day 2
1
2    needed at this moment?
3         A.  No.
4         Q.  Are you aware of an individual named
5    Jacob Nocon?
6         A.  Yes.
7         Q.  If Jacob Nocon said that in August of
8    2018, it was a very hard time for Tesla, would
9    you disagree?
10        A.  No.
11        Q.  And why is that?
12        A.  Because we were going through --
13   Tesla was going through a reduction in forces.
14   And we had a few that year.
15        Q.  Okay.  And in August especially, was
16   that a difficult time?
17        A.  I believe so, because RIFs were
18   starting in May of 2018 and continued throughout
19   the year.
20        Q.  And was that right around the time
21   that Elon Musk had tweeted that he was looking at
22   a private equity buyout of the stock?
23        MR. ROBERTSON:  Objection --
24        A.  I don't recall.
25        * * *

Page 447

```
1        Hansen v. Elon Musk - Arbitration Day 2
2  BY MR. WOODFIELD:
3        Q.  Were you surprised when
4  Valerie Workman, Jeff Jones, Yusuf Mohamed all
5  got together and terminated Mr. Hansen, an
6  individual, in one day?
7             MR. ROBERTSON:  Objection.
8        A.  They didn't terminate him, though.
9  They asked for him to be removed from the site.
10 BY MR. WOODFIELD:
11       Q.  That it all came to a head in about
12 two hours?  Were you surprised that this -- that
13 these individuals came in this fast on this one
14 issue?
15       A.  No.
16       Q.  Do you know who actually made the
17 decision to remove Mr. Hansen?
18       A.  It was collective.  It was between
19 legal, the business, and HR.
20       Q.  So if I was to put like a pin on
21 someone, like a name tag that said, hello, my
22 name is -- and I was to put it on someone's
23 jacket, who would I put it on?  Because everyone
24 says it's collective.  But who is the guy or the
25 woman that I would put it on?  Who actually made
```

Page 448

```
1        Hansen v. Elon Musk - Arbitration Day 2
2  the decision to remove Mr. Hansen?  Do you know?
3        A.  It wasn't one person; it's a
4  collective decision.
5        Q.  So name the individuals in legal and
6  HR -- who were the people that if we were to say,
7  these are the people who made the decision, then
8  I want to know the factors that were involved?
9             So who made the decision?
10       A.  Yusuf Mohamed, Valerie Workman,
11 Jeff Jones, the business leader; and HR, myself,
12 Jenna.
13       Q.  When was the decision made?
14       A.  August 31st.
15       Q.  At what time?
16       A.  I don't recall the exact time.  Right
17 after I sent the e-mail to one of the Ricks.
18       Q.  Okay.  And when you say "one of the
19 Ricks," what is one of the Ricks?
20       A.  It would have been the
21 U.S. Security -- U.S. Security contact.
22       Q.  Okay.  You're talking about the
23 e-mail that is -- it looks like I'm looking at --
24             Well, let me ask you:  Was the
25 decision made after you received this e-mail
```

Page 449

```
1        Hansen v. Elon Musk - Arbitration Day 2
2  that's marked as 188, Valerie Workman --
3  August 31, 2018, 12:23 p.m., that provided this
4  information?  Is this what you all considered?
5        A.  We received that e-mail, and then
6  there was a phone call that I received from
7  Yusuf.
8        Q.  And did Yusuf tell you some separate
9  information?
10       A.  Nothing separate than what is on
11 here.
12       Q.  So this is all the information you
13 relied on?
14       A.  Yes.
15       Q.  And the decision was then made by
16 you, Ms. Workman, Mr. Mohamed, and Mr. Jones?
17       A.  Correct.
18       Q.  And did someone sign a document?  Was
19 there someone who was, you know, the titular
20 responsible person or was it signed -- did you
21 all -- is there a -- an actual responsible party
22 or was the decision attributable to the four of
23 you?  How does that work?
24       A.  There was no signed document.  There
25 was a decision, like I said, collectively, that
```

Page 450

```
1        Hansen v. Elon Musk - Arbitration Day 2
2  was made, based on the findings of the
3  investigation and based on the policies that were
4  violated, and therefore, I made the decision to
5  have Mr. Hansen no longer working on our site.
6        Q.  And did anyone ask Ms. Workman
7  whether there were any mitigating factors?
8        A.  Not that I'm aware of.
9        Q.  Did anyone ask Ms. Workman why she
10 was investigating this?
11       A.  Not that I'm aware of.
12       Q.  Did anyone ask Ms. Workman who
13 prompted the investigation?
14       A.  Not that I'm aware of.
15       Q.  Did anyone ask Ms. Workman who asked
16 her to investigate it?
17       A.  Not that I'm aware of.
18            MR. WOODFIELD:  I don't have any
19 further questions for this witness, Your Honor.
20            JUDGE HOFFMAN:  All right.
21 Cross-examination by USSA?
22            MS. LARGENT:  No questions from USSA.
23            JUDGE HOFFMAN:  All right.  Redirect
24 by Tesla?
25                  *  *  *
```

Page 451

1     Hansen v. Elon Musk - Arbitration Day 2
2                   ------------
3                   EXAMINATION
4                   ------------
5  BY MR. ROBERTSON:
6        Q.  Yeah, just one question, Ms. Ferrua.
7             You were asked about Title VII and
8  other ways employees might be protected.  If
9  someone is protected, for whatever reason, does
10 that give them tenure?  They have a lifetime job?
11       A.  No.
12       Q.  And what kind of things could happen
13 after they are protected that would potentially
14 give a company like Tesla the right to take
15 disciplinary action?
16       A.  Sorry, can you repeat the question?
17 I'm sorry.
18       Q.  Sure.  Sure.  What kinds of things
19 might, from an HR perspective, give Tesla reason,
20 even after someone is protected, to potentially
21 take disciplinary action?
22       A.  I mean, anything from -- I mean,
23 really it comes down to our policy violations.
24 And, yeah, if it's a policy violation, that would
25 really come to it, or anything that was harming

Page 452

1     Hansen v. Elon Musk - Arbitration Day 2
2  the company or doing something that would expose
3  the company.  So anything, like I said, that
4  was leaking anything out regarding confidential
5  and proprietary information.
6             MR. ROBERTSON:  Thank you.  That's
7  all I have.
8             JUDGE HOFFMAN:  All right.  I have no
9  questions.
10            Ms. Ferrua, thank you very much for
11 your testimony.  You're excused and you can go
12 ahead and sign out.
13            THE WITNESS:  Thank you.
14            JUDGE HOFFMAN:  Next witness from
15 Tesla?
16            MR. ROBERTSON:  So I take it are we
17 doing Mr. German now tomorrow?  Is that the --
18            MS. LARGENT:  Yeah, we still don't
19 have any update from him.  We've asked him to get
20 in touch with us as soon as he has availability,
21 and that hasn't happened yet.  Sorry for the
22 inconvenience.
23            MR. ROBERTSON:  Yeah.  We're
24 similarly figuring out our -- trying to reach
25 Ms. Workman.

Page 453

1     Hansen v. Elon Musk - Arbitration Day 2
2             So maybe we could take maybe like ten
3  minutes and then we can see.  We're now into
4  witnesses on our side that are no longer
5  employees, so we kind of have to work with the
6  individuals a little bit.
7             JUDGE HOFFMAN:  Sure.  Understand.
8  Well, let's take a break until -- here it's 1 --
9  until 1:35.
10            MR. ROBERTSON:  Great.  Thank you.
11            (Recess taken, 1:23 p.m. to
12 1:38 p.m. PDT)
13            JUDGE HOFFMAN:  Any luck finding a
14 witness?
15            MR. ROBERTSON:  Yes.  I think
16 Ms. Workman should be logging in.
17            JUDGE HOFFMAN:  Okay.  Good.
18            MR. ROBERTSON:  But that's probably
19 all we've got for today.  We did our best, so...
20            (Discussion off the record.)
21            JUDGE HOFFMAN:  Okay.  There she is.
22 Ms. Workman.  Can you hear me okay?
23            THE WITNESS:  Yes.
24            JUDGE HOFFMAN:  I'm Judge Hoffman.
25 I'm the arbitrator in this case.  And you have

Page 454

1     Hansen v. Elon Musk - Arbitration Day 2
2  been called as a witness.  And so we're going to
3  go on the record and the court reporter is going
4  to swear you in.
5             THE WITNESS:  Yes, sir.
6                   ------------
7             VALERIE CAPERS WORKMAN,
8             having been duly sworn,
9             testified as follows:
10                  ------------
11                  EXAMINATION
12                  ------------
13 BY MR. ROBERTSON:
14       Q.  Good afternoon, Ms. Workman.
15       A.  Good afternoon.
16       Q.  Can you just state and spell your
17 full name for the record, please?
18       A.  Sure.  Valerie Capers Workman,
19 V-A-L-E-R-I-E, C-A-P-E-R-S, W-O-R-K-M-A-N.
20       Q.  And, Ms. Workman, where are you
21 currently employed?
22       A.  I am employed in the office out of
23 Austin, Texas, where I am at right now.
24       Q.  Excellent.
25            And what's your current position in

Page 455

```
 1      Hansen v. Elon Musk - Arbitration Day 2
 2   your current job?
 3       A.  I am a chief legal officer for a
 4   privately held company.
 5       Q.  And did you previously work at Tesla?
 6       A.  I did.
 7       Q.  For what time frame did you work at
 8   Tesla?
 9       A.  From approximately February 2018 to
10   December -- January 2022.  Approximate.
11       Q.  And what was your position when you
12   started -- at the end and then I'll back up.
13           When you left Tesla, what was your
14   position?
15       A.  I was vice president of --
16       Q.  You're breaking up a little bit.
17       A.  I'm sorry, vice president, people.
18       Q.  What was the time frame that you held
19   that job?
20       A.  Approximately August '20 to the time
21   I left.
22       Q.  And prior to that, what was your
23   position?  Prior to August of 2020.
24       A.  I was the HR lead for certain regions
25   in the United States, all areas excluding China
```

Page 456

```
 1      Hansen v. Elon Musk - Arbitration Day 2
 2   and Shanghai, I was the HR lead.
 3       Q.  And again, the time frame that you
 4   held that position?
 5       A.  December 2019 to about
 6   August 2020-ish.
 7       Q.  And prior to that, what was your
 8   position?
 9       A.  Sure.  Associate general counsel,
10   compliance.
11       Q.  And what was the time frame of that,
12   holding that position?
13       A.  From the time I joined, which is
14   February 2018 to December 2019, approximately.
15       Q.  And just generally, can you describe
16   for the arbitrator what your day-to-day
17   responsibilities were as the associate general
18   counsel of compliance?
19       A.  Sure.  I would say that I was the
20   lead compliance attorney, and I was responsible
21   for investigating issues and concerns that were
22   raised by employees, certain issues.  I was also
23   responsible for leading our compliance efforts
24   with respect to OFAC sanctions, Foreign Corrupt
25   Practices Act.  Typical corporate governance-type
```

Page 457

```
 1      Hansen v. Elon Musk - Arbitration Day 2
 2   activities, I was responsible for them as well.
 3       Q.  And did you have folks that reported
 4   to you in that role?
 5       A.  I was an individual contributor for
 6   much of the time, and then later on I did have
 7   one person who reported directly to me, yes.
 8       Q.  And when you say individual
 9   contributor, not to do corporate speak, but what
10   do you mean?
11       A.  I was a team of one.
12       Q.  Thank you.
13           And so in terms of the investigations
14   you did, can you just give us a sense of the
15   gamut of different things that you did?
16       A.  So an issue was raised, a decision
17   would be made if it was sort of a -- for lack of
18   a better word, a garden variety issue that HR
19   might take on, or InfoSec might take on, we would
20   decide, you know, which one of us would handle a
21   particular investigation.
22           The ones that I led, I would do
23   everything from beginning to end, from
24   interviewing witnesses, conducting investigation,
25   reviewing documents, sort of go wherever the
```

Page 458

```
 1      Hansen v. Elon Musk - Arbitration Day 2
 2   investigation took me from beginning to
 3   resolution.
 4       Q.  And in 2018, in that role, did you
 5   become aware of a contractor at the time named
 6   Karl Hansen?
 7       A.  Yes.
 8       Q.  And just generally, what can you
 9   remember about how you first learned the name
10   Karl Hansen in connection with your position at
11   Tesla?
12       A.  Yeah, from what I remember, he sent
13   an e-mail, I believe, to Elon and perhaps other
14   people.  I can't recall right now if they were
15   board members or whomever.  And he raised
16   allegations, several allegations against the
17   company, and they were a list of things from, you
18   know, drug trafficking, DEA investigations, from
19   what I can remember, issues with, I think, copper
20   or other materials, but there was a list of
21   allegations that he raised in that e-mail.
22       Q.  And so do you recall, subsequent to
23   that e-mail, being tasked with conducting an
24   investigation?
25       A.  Yes.  That's my job, yes.
```

Page 459

Hansen v. Elon Musk - Arbitration Day 2

1    Hansen v. Elon Musk - Arbitration Day 2
2        Q.  And so how quickly after that e-mail
3    was sent do you recall did you begin doing your
4    investigation?
5        A.  It could not have been more than
6    24 hours.
7        Q.  And do you know whether there was a
8    request made to Mr. Hansen to cooperate in that
9    investigation?
10       A.  Yeah.
11       Q.  And then did he cooperate in that
12   investigation?
13       A.  Did not cooperate, no.
14       Q.  Did you ever meet with Mr. Hansen at
15   any time?
16       A.  No.
17       Q.  Did you ever speak with Mr. Hansen at
18   any time?
19       A.  No.  Not that I recall.
20       Q.  And just generally, in terms of going
21   about your investigation, do you recall what
22   steps you took?
23       A.  Yeah, I sort of categorized it based
24   on the e-mail, you know, what I believe the
25   allegations to be.  I looked at each one and then

Page 460

1    set about investigating whether or not we could
2    determine the veracity of that.
3        Q.  And did there come a point in your
4    investigation where someone raised a concern
5    about Mr. Hansen violating Tesla policies?
6        A.  Yes.
7        Q.  And what do you recall about that?
8        A.  At some point during the
9    investigation, I believe it was an e-mail that I
10   received.  And that person said that he believed
11   that Karl Hansen was violating company policy,
12   and that the person that reported this, he
13   thought I should be aware, and so I looked into
14   it.
15       Q.  And what specifically did you do to
16   look into it?
17       A.  The -- I believe the allegation was
18   that he had been either looking at or something
19   to do with materials with the company.  So one of
20   the first things you do is you look at his e-mail
21   to see whether or not he had indeed looked at or
22   taken anything or -- we call it exfiltrated --
23   any documents from Tesla outside of the company.
24   So that's what I did.
25

Page 461

1    Hansen v. Elon Musk - Arbitration Day 2
2        Q.  And just in terms of procedure, in
3    order to access an employee's e-mail, do you
4    recall who you needed to reach out to?
5        A.  I reached out to InfoSec and I let
6    them know that I was conducting an investigation,
7    yes.  And I requested access to Karl Hansen's
8    e-mail.
9        Q.  And when you say InfoSec, just so the
10   record is clear, who is that?
11       A.  Information security.  Sorry.
12       Q.  And at the time, do you recall who
13   headed up that group?
14       A.  Jeff Jones.
15       Q.  And as a result of accessing
16   Mr. Hansen's e-mail, what did you discover?
17       A.  A large amount of data, private data,
18   company documents, badging records were
19   exfiltrated from his work e-mail to a private
20   e-mail address outside the company.  A lot of
21   data, confidential data.
22       Q.  Let's pull up Exhibit 92, joint
23   Exhibit 92, which is already admitted.
24       So, Ms. Workman, I've put up on the
25   screen what's been previously admitted as joint

Page 462

1    Hansen v. Elon Musk - Arbitration Day 2
2    Exhibit 92.
3        This is an e-mail dated June 18,
4    2018.
5        A.  Yes.
6        Q.  And do you recognize this e-mail?
7        A.  This looks like one of the documents
8    that I viewed that was from a Tesla e-mail
9    address to a private non-Tesla e-mail address.
10       Q.  Okay.  And scrolling down, do you see
11   below it's -- there's identification of how many
12   attachments?  Do you see that?
13       A.  Yes.
14       Q.  And how many attachments were
15   attached to this e-mail?
16       A.  It says 17.
17       Q.  And do you know -- for example, those
18   photographs on that first page, do you know
19   what -- where those photographs came from?
20       A.  Well, they were photographs of Tesla
21   parking lots and parking facilities and Tesla
22   locations.
23       MR. ROBERTSON:  Okay.  And if we go
24   to the next page, Anne.
25       *  *  *

Hansen v. Elon Musk - Arbitration Day 2

1    BY MR. ROBERTSON:
2        Q.  There's two -- do you know what these
3    records are?
4        A.  Personnel records, yes.
5        Q.  And do you know what -- and then if
6    we go to the pdfs at the end.
7            And then they're not listed, but
8    there's some identifying pdfs, and it says, for
9    example, the second one down, Gerardo, badge one.
10   Do you know what that is?
11       A.  Yeah, that would have been the
12   badging records of one individual that either
13   badged in or badged out of the Tesla facilities.
14       Q.  And is this an example of the types
15   of information you saw in Mr. Hansen's e-mail
16   that had been sent from his Tesla e-mail to his
17   personal e-mail?
18       A.  Yes.
19       Q.  Was this the only example of what you
20   found?
21       A.  No.
22       Q.  Do you recall how many examples of
23   this type of information you found?
24       A.  I don't recall how much, but it was a

Hansen v. Elon Musk - Arbitration Day 2

1    large volume of material.
2        Q.  So, Ms. Workman, I've now put up on
3    the screen what's been previously admitted as
4    Exhibit 188.  It appears to be an e-mail from you
5    to a number of people.  Do you see that?  On
6    August 31, 2018.
7        A.  I see.
8        Q.  And just to put this in time frame,
9    in terms of when you actually discovered the --
10   or received the information about the materials
11   that have been exfiltrated, was it on or around
12   this date of August 31?
13       A.  Yes.
14       Q.  And if we look at the second
15   paragraph, it says:  As a result of the
16   information we've gathered thus far, we have
17   learned that while employed by Tesla, Mr. Hansen
18   violated Tesla's Code of Business Conduct and
19   Ethics policy, and then it goes on.
20           Do you see that?
21       A.  Yes.
22       Q.  And the materials that you had found
23   that were sent to Mr. Hansen's personal e-mail,
24   did that violate Tesla's Code of Business Conduct

Hansen v. Elon Musk - Arbitration Day 2

1    and Ethics policy?
2        A.  Yes.
3        Q.  And it lists certain documents below:
4    Badging and access records, personal information,
5    photos from camera feeds.
6            Was that the types of information
7    that you found?
8        A.  Yes.
9        Q.  The last -- the next paragraph talks
10   about -- it says:  I have reason to believe that
11   Mr. Hansen may have intentionally and criminally
12   deleted e-mail messages from his Tesla e-mail
13   account.
14           Do you see that?
15       A.  Yes.
16       Q.  Can you just explain what you meant
17   there?  What you found that led you to have that
18   reason to believe with regard to the e-mail.  The
19   sent box?
20       A.  Yes.  So when you conduct an
21   investigation of e-mail, I found what I was able
22   to find.  But then there were certain indicators
23   that you would see deletion -- deleted, deleted,
24   deleted.  And they would be deleted twice.  So I

Hansen v. Elon Musk - Arbitration Day 2

1    don't know what those documents were, but I
2    believe they were documents that were deleted
3    from his e-mail.
4        Q.  So just to be clear, the basis of
5    that conclusion was there were essentially double
6    deletions of certain documents?
7        A.  Yes.  As best I can describe it,
8    without being -- but yes.
9        Q.  And if we can pull up Exhibit --
10           And just to put time on this, because
11   I think a lot happened on this date.
12           So this e-mail appears to be from
13   12:23 p.m.; is that correct?
14       A.  Yes, that's the date -- the time,
15   yes.
16       Q.  And then let's go to 187.
17           So, Ms. Workman, I've now pulled up
18   what's been identified as Exhibit 187.
19           This is, again, already in evidence.
20   It appears to be an e-mail from Ms. Ferrua, Jenna
21   Ferrua to Mr. Mohamed, yourself, and Jeff Jones.
22           Do you see that?
23       A.  Yes.
24       Q.  And who is Jenna Ferrua?  What was

Page 467

Hansen v. Elon Musk - Arbitration Day 2

1  her position as of August 31, 2018?
2
3      A.  She was an HR partner on the G&A
4  team.  I'm sorry, yeah, G&A.
5      Q.  And just tell me out again, what's
6  G&A?
7      A.  G&A is a general and administrative,
8  so it's the nonbusiness HR teams.  So it would be
9  security, legal.  Several teams she represented
10  from the HR perspective.
11     Q.  Got it.  And do you recall
12  instructing Ms. Ferrua to reach out to
13  U.S. Security with regard to Mr. Hansen?
14     A.  Yes.
15     Q.  And do you recall what the direction
16  was to Ms. Ferrua in terms of reaching out to
17  U.S. Security?
18     A.  That Karl Hansen should not come back
19  to Tesla property.
20     Q.  And was that based on what you had
21  found with regard to his exfiltration of
22  documents?
23     A.  The exfiltration and the ghosts of
24  deletions of records, yes.
25     Q.  Did you yourself have any direct

Page 468

Hansen v. Elon Musk - Arbitration Day 2

1  communications with U.S. Security?
2
3      A.  No.  Not that I recall.
4      Q.  And the group on this e-mail,
5  Ms. Ferrua, yourself, Mr. Mohamed, and Mr. Jones,
6  did you collectively decide that this was the
7  right action item based on what you found?
8      A.  Yes.
9      Q.  Do you recall after that
10  communication having any further communications
11  with Ms. Ferrua about the direction given to
12  USSA?
13     A.  No, I don't recall anything further
14  on that.
15     Q.  Ms. Workman, I'm pulling up what's
16  been identified as Exhibit 1.  This is a letter
17  from a law firm Hueston Hennigan.
18     Do you see that?
19     A.  Yes.
20     Q.  Did you know what law firm Hueston
21  Hennigan is?
22     A.  It may have been Mr. Hansen's law
23  firm.  I'm -- if I recall.
24     Q.  No, that's fine.  I guess my question
25  is simpler than that.  The signatory on this

Page 469

Hansen v. Elon Musk - Arbitration Day 2

1  letter is someone named John Hueston.
2
3      Do you recall whether you personally
4  had any communications with Mr. Hueston in
5  connection with this matter?
6      A.  No.
7      Q.  And if we looked at the second
8  paragraph on the first page.
9      MR. WOODFIELD:  I'm going to object
10  on this one because there's no authentication.
11  She thinks this is Mr. Hansen's firm, and she
12  said she never spoke with this individual.
13  There's no sense in --
14     MR. ROBERTSON:  Right.
15     MR. WOODFIELD:  -- in going through
16  this.
17     MR. ROBERTSON:  A, the document is
18  already in, so...
19     And B, I'm not asking her to
20  authenticate it.  I'm just going to ask her to
21  confirm the information in it.
22     JUDGE HOFFMAN:  All right.  So I
23  understand the objection, Mr. Woodfield.  It
24  sounds like you want to cross-examine this
25  witness on what she knows.  And you'll have your

Page 470

Hansen v. Elon Musk - Arbitration Day 2

1  chance to do that.
2
3      THE WITNESS:  Could I have some time
4  to read the document?
5      MR. ROBERTSON:  Yeah, just -- I'm
6  going to direct you.  You can certainly read the
7  whole thing, Ms. Workman.  We don't want you
8  looking at a document you're not comfortable
9  with, so take whatever time you need.
10     My focus, just so you understand,
11  will be on that second paragraph that starts
12  "Nonetheless."
13     But please, by all means, read the
14  entire letter, if that's helpful.
15     A.  No, I'll just read this paragraph, if
16  you'll give me two minutes.
17     MR. ROBERTSON:  Sure.
18     MS. DUNNE:  And if you need me to
19  zoom in on anything, Ms. Workman, just let me
20  know.
21     THE WITNESS:  I can see it.
22  Thank you.
23     A.  Yes, that second paragraph is
24  correct.
25     * * *

1      Hansen v. Elon Musk - Arbitration Day 2
2   BY MR. ROBERTSON:
3        Q.  And that was my question.  So the
4   information in here, is that -- as you read it
5   now, that information is correct based on your
6   recollection of what you uncovered in your
7   investigation?
8        A.  Yes.
9        Q.  Now, at the time the decision was
10  made to request that Mr. Hansen no longer be
11  assigned to the Tesla property, was that based
12  upon his removal of information and the other
13  items identified in this letter?
14       A.  It was the exfiltration of Tesla
15  data, the viewing of the personal data, and the
16  deletion, what we believed to be deletion of
17  documents, yes.
18       Q.  And did -- at this point in late
19  August, were you aware that Mr. Hansen had filed
20  information with the SEC?
21       A.  I don't remember at what point I
22  learned that, but it was probably -- it was
23  certainly after I found -- started the
24  investigation.  I'll say that.
25           I don't recall the sequence of

1   events.  Maybe if you can give me some more
2   information, I can tell you whether or not I
3   recall it or not.
4        Q.  Sure.  Maybe my question is simpler.
5           In making the decision that was made
6   at the end of August, was the fact that
7   Mr. Hansen had potentially -- had filed materials
8   with the SEC, did that have anything to do with
9   the collective decision of the group to request
10  that USSA not assign Mr. Hansen back to the
11  factory?
12       A.  Absolutely not.  Absolutely not.  No.
13  No.  That -- those were clear policy violations.
14  No.  No.
15           MR. ROBERTSON:  Then, Your Honor, I'd
16  ask for just two minutes.  I may be done.
17           JUDGE HOFFMAN:  Okay.  Take two
18  minutes.
19           (Recess taken, 2:10 p.m. to
20  2:14 p.m. PDT)
21           JUDGE HOFFMAN:  Shall we go back on
22  the record?
23           MR. ROBERTSON:  Yes, please.
24           JUDGE HOFFMAN:  Okay.  We're back on

1      Hansen v. Elon Musk - Arbitration Day 2
2   the record.
3           MR. ROBERTSON:  Thank you,
4   Ms. Workman.  I have no further questions for
5   you.  Appreciate the time.
6           JUDGE HOFFMAN:  Okay.
7   Cross-examination by Mr. Woodfield.
8           MR. WOODFIELD:  Thank you, sir.
9           ------------
10             EXAMINATION
11           ------------
12  BY MR. WOODFIELD:
13       Q.  Ms. Workman, my name is Nick
14  Woodfield.  I represent Mr. Hansen in this
15  matter.
16           In August of 2018, what was your job
17  title?
18       A.  August of 2018 it was associate
19  general counsel, compliance.
20       Q.  And were you aware in August, on
21  August 16th, when there was a press release filed
22  by Mr. Hansen's counsel that he had filed an SEC
23  TCR?
24       A.  The first time I remember
25  Mr. Hansen's name, that I recall, was the e-mail

1      Hansen v. Elon Musk - Arbitration Day 2
2   to Elon.
3        Q.  Okay.  I'm with you.  I saw that, and
4   we've seen the SEC -- or the August 3rd e-mail.
5           Let me ask you about that.
6           There was an August 3rd e-mail to
7   Elon.  Who forwarded that to you?
8        A.  Oh, boy.  I don't recall.
9        Q.  Did you start investigating it then?
10       A.  When I saw the e-mail, within
11  24 hours.
12       Q.  And did you create a file?
13       A.  Yes.
14       Q.  And did you create it in paper or
15  electronically?
16       A.  Electronic.
17       Q.  And did you e-mail back and forth
18  with people?
19       A.  Yes, because there was the -- yes.
20  Yes.  Yes.
21       Q.  Who did you e-mail with?
22       A.  Definitely InfoSec, because I had
23  to -- when I went to look at the e-mail or
24  documents, so probably the generic InfoSec
25  e-mail.  I'm recalling from memory here.

Page 475

Hansen v. Elon Musk - Arbitration Day 2

1          Any witnesses that I wanted to talk
2  to, I probably sent them an e-mail invitation.
3      Q.  Right.
4          And who assigned this to you?  Do you
5  recall?
6      A.  That was just my -- I -- I'm the
7  person, so I knew that was my job the minute I
8  saw the e-mail.
9      Q.  Who was your supervisor?
10     A.  I was.
11     Q.  Someone's got to --
12     A.  I reported -- at Tesla -- no, someone
13  did not assign it to me.  That was immediately my
14  job when I saw it because I'm compliance.  I had
15  a few direct reports.  I believe at the time my
16  immediate was Phil -- Phil's last name --
17     Q.  Forgive me.  Who was your supervisor
18  in August --
19         Hold on, ma'am.
20         Who was your supervisor in August of
21  2018?
22     A.  Phil Rothenberg.
23     Q.  And did you report the results of
24  your investigation to Phil Rothenberg?

Page 476

Hansen v. Elon Musk - Arbitration Day 2

1      A.  I'm not sure he was still there when
2  it was finished.
3      Q.  Who became your successor supervisor?
4      A.  Okay.  After Phil, when Phil left, I
5  reported directly to -- we had a lot of GCs.
6      Q.  Let me show you something to refresh
7  your recollection.
8      A.  Thank you.
9      Q.  This is a document that counsel
10  provided us.  This -- I think it was -- if not
11  this last weekend, the weekend immediately
12  preceding it.
13         I'm showing you a document that was
14  provided to us just recently to supplement
15  production.  And Phil Rothenberg was your boss,
16  apparently, on August 31st, because you e-mailed
17  him, as well as Swapnil Bhatnagar, Carmen Copher,
18  and Yusuf Mohamed.
19     A.  Okay.
20     Q.  So was Phil Rothenberg still your
21  supervisor at that time?
22     A.  If he was there, he was still my
23  supervisor.
24     Q.  Okay.

Page 477

Hansen v. Elon Musk - Arbitration Day 2

1      A.  He was my supervisor, definitely.
2      Q.  So were you regularly communicating
3  with Mr. Rothenberg about the results of your
4  investigation?
5      A.  No, because it was on-going -- there
6  weren't really any results.  So it -- no.  No.
7         I might have talked to him, I might
8  have an interview tomorrow or, you know, casual
9  conversation about how things were going, but
10  there was nothing to report because it wasn't
11  done.
12     Q.  Did you document -- did you keep an
13  e-mail file or a written file somewhere?
14     A.  Oh, yes, there was -- yes.
15     Q.  Does Tesla still have it?
16     A.  I have no idea.
17     Q.  Okay.  And did it document all of the
18  efforts you had made to show what happened with
19  regard to the investigation?
20     A.  Yes.
21     Q.  What the witnesses had to say?
22     A.  Yes.
23     Q.  Did you talk with Jeff Jones?
24     A.  I don't think I spoke with Jeff until

Page 478

Hansen v. Elon Musk - Arbitration Day 2

1  I had to look at Karl Hansen's e-mail.  So
2  probably not until the -- everything was wound
3  down.  He wouldn't have been someone I recall
4  talking to during, but I can't say.  I really
5  can't say.
6      Q.  Let me --
7      A.  Unlikely, but I'm not sure.
8      Q.  The only e-mails we received from
9  you, that we were given, were from August 31,
10  2018.
11         Is that an accurate representation of
12  the only e-mails that you produced in this
13  matter?  That you had relating to the
14  investigation?
15     A.  I don't know what you have, but there
16  were more than two e-mails.
17     Q.  Well, I'm going to show you, there
18  is -- as -- this is -- again, the one that I'm
19  showing you right here, this was supplemented
20  this last weekend, and it was -- it was an e-mail
21  that you sent on August 31st at 10:49 a.m.,
22  saying:  I've received confirmation from global
23  investigations that Karl Hansen sent Tesla
24  information, including badging access records of

Page 479

Hansen v. Elon Musk - Arbitration Day 2

1    several individuals, including in some instances
2    what appears to be their personal information as
3    well as screenshots of photos and/or video
4    footage from Tesla video camera feeds to a
5    private Gmail account.  I will set up calls as
6    appropriate.
7
8         Did you have any information about
9    that prior to August 31st?  Because it seems like
10   this is new information as of that morning.
11       A.  So that would have been an e-mail I
12   sent after I found what I found.  So I can't tell
13   you exactly what date I found those things, but
14   pretty soon after, because it raised alarms.
15   That's when I said I need to see InfoSec, because
16   you have to confirm that you're seeing what
17   you're seeing.  So that's where I set up the
18   call.
19       Q.  Okay.  Well, is one of the things
20   that put you on edge, the -- you said there was
21   an e-mail that you saw from a -- one of
22   Mr. Hansen's co-employees, a complaint about him;
23   right?
24       A.  He sent me an e-mail, yes.
25       Q.  Okay.  And you said the co-employee

Page 480

Hansen v. Elon Musk - Arbitration Day 2

1    sent you an e-mail.
2
3        A.  Co-employee.
4        Q.  Well, let me ask you, is this the
5    e-mail you were referencing, that you said --
6    previously there was an e-mail that you received
7    that caused you to realize there was a complaint
8    about Mr. Hansen mishandling documents.
9            Is this the e-mail that you're
10   talking about right here, from Kenneth Davis?
11       A.  I don't know which e-mail I received.
12   I'm not sure if I got that one from Ken Davis,
13   but Ken Davis was the person that did speak to me
14   about his concerns about Karl.  I can say that.
15       Q.  Was it about August 23rd or so?
16   Would that have been about right?
17       A.  Yes.
18       Q.  Okay.  And did Jeff Jones put him in
19   touch with you?
20       A.  I don't think he would have had to
21   put in -- everybody knew who I was, so Ken
22   probably contacted me directly, but I can't
23   recall.  He wouldn't have to -- he wouldn't have
24   to put him in touch with me.
25       Q.  Okay.  And then there's an e-mail --

Page 481

Hansen v. Elon Musk - Arbitration Day 2

1    forgive me, I'm going to show you -- this is the
2    responses to interrogatories.  And it says here:
3    Identify -- this is interrogatory No. 12.
4
5            Identify and explain in detail any
6    complaints or allegations leveled against Hansen
7    when he was employed by any Respondent.
8            And then it articulates an objection,
9    and then it says:  On August 23rd, Tesla received
10   a report regarding Hansen's behavior from
11   Hansen's colleague, Kenneth Davis.  Davis
12   reported witnessing Hansen violating Tesla
13   policies, including involving third parties with
14   his investigations and sending confidential Tesla
15   information to outside e-mail addresses to be
16   accessed by individuals not employed by Tesla.
17           Davis expressed concerns about Hansen
18   being temporarily placed at the front desk of the
19   Gigafactory.  Specifically, Davis cited the risks
20   of Hansen possibly having unrestricted access
21   into Tesla's network coupled with his role as a
22   gatekeeper into the Gigafactory after Davis
23   became concerned about Hansen's erratic and
24   unauthorized activities and involvement of
25   individuals outside of Tesla.

Page 482

Hansen v. Elon Musk - Arbitration Day 2

1            As a result of this report, Tesla
2    reviewed Hansen's employee and contractor e-mail
3    accounts and found that he forwarded numerous
4    Tesla internal documents to his personal e-mail
5    address in violation of Tesla policies.  During
6    this review, Tesla also determined that Hansen
7    permanently deleted the contents of his sent
8    items folders.
9            Is that the e-mail, the August 23rd
10   e-mail that spurred you on to research his
11   background materials, Mr. Hansen's background
12   materials?
13           MR. ROBERTSON:  Objection --
14       A.  I spoke --
15           MR. ROBERTSON:  Just on foundation
16   and mischaracterizes the answer -- the -- of the
17   document.  That's all.
18           JUDGE HOFFMAN:  Okay.  I'll overrule
19   that objection.
20           And, Ms. Workman, answer if you can.
21       A.  Yes.  I know that I spoke to
22   Mr. Davis directly, so I can't say what pieces of
23   information came from where.  But when I had a
24   conversation with Mr. Davis, that's when he

Page 483

Hansen v. Elon Musk - Arbitration Day 2

1  shared with me all of his concerns.  Directly
2  with me.
3  with me.
4  BY MR. WOODFIELD:
5      Q.  And this says -- this is the e-mail
6  that Mr. Hansen -- or Mr. Davis sent on
7  August 23rd.  And I'm trying to reconcile this,
8  because on August 23rd, he reported to Jeff Jones
9  and Elon Musk about Karl Hansen, the exact same
10  things that they're saying here, that Tesla
11  received a report.
12      And then it says:  As a result of
13  this report, Tesla reviewed his employee and
14  contractor e-mail accounts and found that he
15  forwarded numerous Tesla documents to his
16  personal e-mail address in violation of Tesla
17  policies.
18      And it sounds like exactly what you
19  just reported.  And I'm just wondering, is this
20  what happened?  Is this what you're talking
21  about?
22      MR. ROBERTSON:  And I know that was a
23  long question.  I'm just going to object and move
24  to strike the comment, exactly the same thing, as
25  a mischaracterization.

Page 484

Hansen v. Elon Musk - Arbitration Day 2

1      JUDGE HOFFMAN:  All right.  You want
2  to strike the question.  I'm not sure I want to
3  do that.  I mean, if the witness can --
4      MR. ROBERTSON:  No, just that term,
5  Your Honor.  It's an arbitration.  I'm not going
6  to be picky about the record.  I just want it
7  noted that I believe that's not accurate.
8      JUDGE HOFFMAN:  All right.  So your
9  objection is it misstates the evidence.
10      MR. ROBERTSON:  Correct.
11      JUDGE HOFFMAN:  So, Ms. Workman, you
12  can answer the question, if you can.
13      THE WITNESS:  Can you say that one
14  more time?
15      MR. WOODFIELD:  Yes, ma'am.
16  BY MR. WOODFIELD:
17      Q.  This -- Tesla has reported in its
18  interrogatory answer that on August 23rd, it
19  received a report concerning Hansen's behavior
20  from Kenneth Davis.  And I've shown you Kenneth
21  Davis's e-mail.
22      And as I result of Kenneth Davis's
23  report, Tesla reviewed Hansen's employee and
24  contractor e-mail accounts and found that he

Page 485

Hansen v. Elon Musk - Arbitration Day 2

1  forwarded numerous Tesla internal documents to
2  his personal address in violation of Tesla
3  policies.
4      Now, you said, if I remember
5  correctly, that in response to Mr. Davis's
6  complaints, you reviewed Mr. Hansen's employee
7  and contractor accounts; is that correct?
8      A.  Correct.
9      Q.  Did you do it in response to the
10  e-mail that I showed you?
11      A.  I know I did it in response to
12  speaking with Mr. Davis.  I can't recall if I
13  also used that e-mail that you just showed me,
14  but I spoke directly to Mr. Davis.  And it was on
15  the basis of my conversation with him that I
16  conducted the investigation into Mr. Hansen's
17  e-mail.
18      Q.  And did Mr. Davis tell you what was
19  motivating him?
20      A.  He said he was concerned about Tesla
21  data; that he was concerned about Tesla data,
22  yeah.
23      Q.  And that was on August 23rd; correct?
24      A.  I can't remember the exact day I

Page 486

Hansen v. Elon Musk - Arbitration Day 2

1  spoke to Mr. Davis.
2      Q.  Now, you're -- just to help clarify
3  the timeline, you -- as -- it would be fair to
4  say that as compliance counsel, he probably would
5  have been aware that there was a press release
6  that was out on Reuters about an SEC TCR;
7  correct?  You would have probably picked that up?
8      A.  I probably would have been aware
9  that -- if it hit the media, I might have known
10  about the release itself.  But if it made it to
11  the media, yes, I would have heard about it, yes.
12      Q.  I want to show you Exhibit 216, which
13  is a Reuters press -- or a Reuters communication,
14  August 6th.
15      It said:  Whistleblower accuses Tesla
16  of spying on employees at Gigafactory.
17      And it says:  An employee fired from
18  Tesla's Nevada factory filed a whistleblower
19  complaint with the U.S. Securities Exchange
20  Commission, and it talks about Karl Hansen filing
21  a TCR.
22      You would have been aware, as Tesla's
23  compliance officer, as assistant general counsel
24  in charge of compliance, that a compliance issue

Hansen v. Elon Musk - Arbitration Day 2

1    had been raised with the SEC that was on Reuters;
2    correct?  That would have crossed your radar on
3    August 16th.
4        A.  If it hit the media, I would have
5    seen it, definitely.
6        Q.  So you would have known about the SEC
7    complaint as of August 16th; fair?
8        A.  I would have known that it said it in
9    the media.  I wouldn't have known that it
10   actually occurred, but I would know what the
11   media reports had said, yes.
12       Q.  Well, is it fair to say that you
13   would have probably followed up on it to see if
14   there was some veracity to it?
15       A.  No.  No, I would not.  I was already
16   investigating that, so there was no reason for me
17   to check and see if there was an SEC
18   investigation.  I was already investigating.
19       Q.  I want to make sure I heard that
20   right.  You said -- and I want to make sure I got
21   this, because you're kind of surprising me a
22   little bit there.
23       A.  Okay.
24       Q.  If your title was associate general

Hansen v. Elon Musk - Arbitration Day 2

1    counsel compliance, you didn't want to know if
2    there really was an SEC TCR filed against --
3        A.  I didn't say I didn't want to know.
4    I said I was already investigating.  The concern
5    would have been, as head of compliance, if I
6    didn't know about this and it surprised me.  I
7    already knew about it.  I was already
8    investigating, so that's for outside counsel.  I
9    was already doing what I was supposed to be
10   doing, and I was confident of that.
11       Q.  So you were on it.
12       A.  Yes.
13       Q.  And you were building a file at that
14   point and speaking with Mr. Davis.
15       A.  I spoke with Mr. Davis.
16       Q.  And did you ever speak with Mr. Musk?
17       A.  Can you refresh my recollect -- who
18   is that?
19       Q.  Have you ever heard of Elon Musk?
20       A.  Oh, you said -- I thought you said
21   Lusk.
22       Q.  No.
23       A.  Sorry.  I am so sorry.
24           Did I ever speak with Elon Musk?

Hansen v. Elon Musk - Arbitration Day 2

1    Yes.  Yes.
2        Q.  About the TCR?
3        A.  No.  Oh, no.  No.  Not at all.
4        Q.  How many TCRs were filed about Tesla
5    in 2018?
6        A.  I couldn't tell you.  I don't know.
7        Q.  Well, can you tell me more than one?
8        A.  I don't know.  Like, I couldn't
9    recall from memory.  It's four years ago.
10       Q.  Well, let me ask you:  Is a TCR
11   something that, as a compliance officer, that
12   that's something you want to know about?
13       A.  You're asking me do I know how many.
14   I don't recall how many.  I couldn't tell you
15   from memory.
16       Q.  Well, you know about at least one;
17   right?
18       A.  Yes.
19       Q.  And is it something that is -- gets
20   on your radar?
21       A.  Sometimes.  I mean, it's possible
22   that a TCR could be filed and we're not notified.
23   I don't know if the SEC always follows through.
24   I can't tell you that.  But all I can tell you is

Hansen v. Elon Musk - Arbitration Day 2

1    when an issue comes up that I need to
2    investigate, I investigated it.  I did my job.
3        Q.  Well, forgive me.  This one -- and
4    I'll show you.  I'll show you.  It also -- and
5    I'm going to show you -- this is Exhibit No. 214.
6            This is also on a business --
7            MR. ROBERTSON:  Are you actually
8    moving 216 in or were you just using it?
9            MR. WOODFIELD:  I'm going to offer
10   it.  216 and 214, which is Business Insider, and
11   I'm going to offer 215, which is the New York
12   Post, which was also putting it in.
13   BY MR. WOODFIELD:
14       Q.  So given that it was on multiple news
15   outlets, is that something that you would have
16   escalated?
17       A.  I'm sorry, but "escalated" implies
18   that something wasn't already being done.  If an
19   investigation is already in progress, it's
20   already in progress.
21       Q.  Well, and so tell me:  What
22   investigation was being done into the TCR?  Tell
23   me what -- tell me all about the TCR
24   investigation.

Page 491

Hansen v. Elon Musk - Arbitration Day 2

1    Hansen v. Elon Musk - Arbitration Day 2
2         MR. ROBERTSON:  Objection.
3      A.  I don't have any information about a
4   TCR investigation.  What I can tell you is, I was
5   investigating Mr. Hansen's allegations, and I did
6   my job.
7   BY MR. WOODFIELD:
8      Q.  Okay.  But we have no file for that;
9   right?
10         Do you have -- you have a file, but
11  we were never given one?
12     A.  I'm sorry, I don't have anything.  I
13  don't work there anymore.
14     Q.  I'm going to also show you 217, which
15  I'm offering.
16         Do you remember when Mr. Hansen was
17  on Fox News, where he appeared on Fox News on
18  August 29th?
19     A.  Yes.
20     Q.  And why do you remember that, ma'am?
21         And this is Exhibit 217.  I'm just
22  going to offer this, and I can show the link, but
23  I'm going to -- rather than bring up the video.
24  But you remember it.  He was on Fox News on
25  August 29th; correct?

Page 492

Hansen v. Elon Musk - Arbitration Day 2

1    Hansen v. Elon Musk - Arbitration Day 2
2      A.  Yes.
3      Q.  Yes, ma'am?
4      A.  Yes.  That was big news, yes.
5      Q.  And why was it big news?
6      A.  Yes.
7      Q.  Why was it big news?
8      A.  At Tesla, everything was big news,
9   whether it's true or not.  And when you have, in
10  my opinion, someone willing to talk about their
11  allegations, that's huge news for the media.
12  Huge.
13     Q.  And was it -- did everyone at
14  Tesla -- was that the talk of the company the
15  next day?
16     A.  I think it was the talk of the legal
17  team.  I don't know that it was the talk for the
18  company, but it was certainly a buzz.
19     Q.  When you say "the talk of the legal
20  team," who was talking about it?
21     A.  Colleagues in the room.  It was big
22  news.  It was on the media.  Everybody.  I mean,
23  everybody --
24     Q.  So tell me what everyone was talking
25  about.  Tell me what -- when you went like that,

Page 493

Hansen v. Elon Musk - Arbitration Day 2

1    Hansen v. Elon Musk - Arbitration Day 2
2   tell me what they were saying.
3      A.  It was an allegation on Fox News that
4   actually -- there's someone actually talking in
5   the news to Fox News about allegations against
6   Tesla.  That was huge.
7      Q.  So it was on -- on the night of
8   August 29th, which -- now I keep pulling this up.
9   I believe it was a Wednesday night.  And I'll
10  just pull this up one last time.
11         But it was August 29th -- or, yes,
12  August.
13         Yes, it was August 29th.  It was a
14  Wednesday night.  The next day was Thursday; that
15  was a workday.  Where were you working the next
16  day?
17     A.  Most likely in Fremont, in the
18  office.  Most likely.
19     Q.  And in the Fremont office, was that
20  one of the first things everyone was talking
21  about?
22     A.  Probably.
23     Q.  And was it being talked about in the
24  C-suite, as far as you know?
25     A.  I wasn't in the C-suite at the time,

Page 494

Hansen v. Elon Musk - Arbitration Day 2

1    Hansen v. Elon Musk - Arbitration Day 2
2   so I don't know.
3      Q.  Do you have any reason to believe
4   that it wouldn't be?
5      A.  There's no reason to believe it
6   wouldn't be.  It was big news.
7      Q.  Well, let me ask you, because it
8   seems kind of -- just like a strange coincidence
9   that on -- that Mr. Hansen was on the night of
10  the 29th, and that suddenly all of the e-mails
11  that we have about the investigation show up on
12  the morning of the 31st.  And those are all the
13  e-mails we have.  That it looks like everything
14  was high priority starting August 31st in the
15  morning, like something happened the day before,
16  and I'm trying to figure out where the proof is
17  that anything happened prior to that.  And can
18  you tell me where it is?
19     A.  I can tell you that Kenneth Davis
20  contacted me directly.  I spoke to him directly.
21  And he raised several allegations about Karl that
22  I had to investigate just like any other
23  investigation.  There's an allegation.  I'm
24  supposed to respond to it and look into it, and
25  that's what I did.

Page 495

Hansen v. Elon Musk - Arbitration Day 2

1      Hansen v. Elon Musk - Arbitration Day 2
2          Q.   And you started your investigation
3    based on what Mr. Davis came to you about?
4          A.   No, the investigation started long
5    before that when the -- I saw the e-mail from
6    Mr. Hansen to Elon.  Mr. Davis did not start this
7    investigation, no.
8          Q.   So as of August 3rd, the wheels
9    started turning, but it doesn't look like the
10   fire started getting going until August 31st.
11         Why is that?
12         A.   I don't know what you mean by fire,
13   but the first time anyone had raised any
14   allegation against Karl was Kenneth.
15         Prior to that, I was investigating
16   Mr. Hansen's allegations, and I spent a lot of
17   time doing that.  No one raised any concern about
18   Mr. Hansen until Kenneth, who wanted to talk to
19   me.  And when he wanted to talk, I spoke to him.
20         Q.   So it wasn't until Mr. -- until --
21   and probably -- what was it?  As we were looking
22   at this, I think it was -- I think we determined
23   that Kenneth Davis on August 23rd was coming
24   forward raising these allegations.  That's when
25   people started questioning Mr. Hansen; right?

Page 496

1      Hansen v. Elon Musk - Arbitration Day 2
2          A.   Like I said, I can't remember if I
3    saw that particular e-mail, but I spoke to
4    Mr. Davis myself.
5          Q.   But that's when people started
6    questioning Mr. Hansen?
7          A.   Yes.  Because he was alleging
8    allegations against Mr. Hansen, yes.
9          Q.   So August 23rd is when the eyes
10   started turning at Mr. Hansen and what he might
11   have done?
12         A.   I don't remember the date I spoke to
13   Mr. Davis, but it was Mr. Davis raising concerns
14   about Karl Hansen to me that caused me to look
15   into his e-mail.
16         Prior to that, I was investigating
17   Mr. Hansen's concerns.
18         Q.   And nobody was asking you to do
19   anything before that; correct?
20         A.   Before I start --
21         Q.   Like prior to, say, August 3rd, no
22   one was asking you to investigate Mr. Hansen;
23   correct?
24         A.   Not that I recall.  The first I heard
25   of the issue was that e-mail to Elon.

Page 497

1      Hansen v. Elon Musk - Arbitration Day 2
2          Q.   Okay.  And then, that's when people
3    wanted to know some background, and especially
4    after August 23rd, that's when people wanted to
5    know background about Karl Hansen; right?  They
6    wanted to know what he was doing.
7          A.   No one ever asked me about
8    Karl Hansen.  What I was required to do was look
9    into his allegations, and I did that.
10         Q.   All right.
11         Now, on August 31st, were you
12   involved in a decision, a discussion to terminate
13   Mr. Hansen's employment?
14         MR. ROBERTSON:  Objection.
15         A.   No.  He was not an employee of --
16         JUDGE HOFFMAN:  Just a minute.
17   BY MR. WOODFIELD:
18         Q.   Forgive me.  Were you involved --
19         JUDGE HOFFMAN:  Just a minute.
20   Excuse me.  There's an objection, but I heard
21   objection, but I didn't hear the basis for the
22   objection.
23         MR. WOODFIELD:  I'll withdraw the
24   question.
25         MR. ROBERTSON:  He's withdrawing the

Page 498

1      Hansen v. Elon Musk - Arbitration Day 2
2    question, Your Honor, so we're okay.
3    BY MR. WOODFIELD:
4          Q.   Ms. Workman, were you involved on
5    August 31st in the discussion to ask USSA to have
6    Mr. Hansen removed from the Gigafactory site?
7          A.   Did I speak to his employer directly?
8    No, I did not --
9          Q.   No.
10         A.   -- if that's what you're asking.
11         Q.   No, ma'am, my question is different.
12         On August 31st, were you involved in
13   any discussions with anyone in any
14   decision-making process to remove -- wherein any
15   decision was made to ask USSA to remove
16   Mr. Hansen from the Gigafactory site?
17         A.   Yes.
18         Q.   Who was involved in that conversation
19   or that discussion?
20         A.   HR, InfoSec, legal, myself.
21         Q.   Who is InfoSec?
22         A.   That would be Jeff Jones's team.  I'm
23   sorry, I keep saying that.
24         Q.   And so HR is Ms. Ferrua,
25   Jenna Ferrua?

Page 499

Hansen v. Elon Musk - Arbitration Day 2

1    A.  Yes.
2    Q.  So it's you, Jenna Ferrua.
3    Was Mr. Mohamed there?
4    A.  He was on the e-mail.  I don't
5  remember where we all were physically.  I don't
6  remember, but, yes, he was on the e-mail thread,
7  yes.
8    Q.  And who made the decision to ask or
9  direct USSA to remove Mr. Hansen from the
10  Gigafactory site?
11    A.  That was a group decision.
12    Q.  And the group decision was the three
13  of you collectively made the decision, you,
14  Mr. Jones, and Ms. Ferrua?
15    A.  I can't remember if Mr. Jones, but
16  generally speaking, yes, it was InfoSec, HR, it
17  was legal and myself, yes.
18    Q.  All right.
19    A.  And that was determined for him not
20  to come back to the property.
21    Q.  And was there any other information
22  presented to everyone for consideration in that
23  discussion other than what's set forth here in
24  Exhibit No. 188?

Page 500

Hansen v. Elon Musk - Arbitration Day 2

1    A.  The list of badging documents that
2  were found that were exfiltrated, the list of
3  photos that were exfiltrated, the personal
4  records that were exfiltrated, the deletion
5  ghosts that were found.  To my recollection,
6  that's what we looked at when we made the
7  decision collectively to have him not come back
8  to the Tesla property.
9    Q.  Did you provide those materials to
10  everyone in the room, or to everyone having the
11  discussion?
12    A.  I believe I confirmed the docs with
13  InfoSec, so I confirmed that they were deemed
14  exfiltrated.
15    I sent the e-mail.  I can't remember
16  if we actually looked at the files.  That I can't
17  remember.  Sorry.
18    Q.  Well, what I'm asking about was
19  there's an e-mail that was provided, but I --
20  there was nothing -- there was no file
21  justifications, there was no supporting documents
22  given.
23    So I'm wondering, were there any
24  supporting documents circulated that you gave,

Page 501

Hansen v. Elon Musk - Arbitration Day 2

1  anything like that?  I'm wondering, do they
2  exist?
3    A.  The ones that we just saw a few
4  minutes ago, with the attachments and the photos,
5  those -- that was a portion of the documents that
6  were found.
7    Q.  No, I'm not asking if they were
8  found.  I'm asking did you make those to the
9  people involved in the decision-making process.
10    Were you giving people information
11  other than this e-mail that's set forth as
12  Exhibit 188?
13    A.  I do not remember if any -- found
14  anything physically.  I'm sorry, I can't recall.
15  But I do know what I saw and I know what I
16  reported.
17    Q.  And that's what I'm trying to figure
18  out.  Were you relying on what you were
19  reporting or were you providing information as
20  well to Mr. Jones and Ms. Ferrua?
21    A.  Well, InfoSec -- let me make sure I
22  do the process correctly.
23    InfoSec helped me to verify that I
24  had seen what I had seen.  So that earlier e-mail

Page 502

Hansen v. Elon Musk - Arbitration Day 2

1  that you saw where I said this -- I gave a list
2  of the things, InfoSec confirmed that they were
3  indeed exfiltrated, so that was the team that
4  confirmed it.
5    So once you have me and that
6  confirmation, then we have a conversation and we
7  decide what to do about it.
8    Q.  Okay.  And I want to make sure I have
9  this right.  So Jeff Jones -- when you talk about
10  InfoSec, you're talking Jeff Jones; right?
11    A.  His team.  It's fair to say his team.
12    Q.  But when I'm -- when you're saying
13  InfoSec, I want to know who you're talking about,
14  because that's like me talking about the
15  United States.  There are several hundred million
16  people.
17    Who are you talking about when you
18  say InfoSec in this conversation?  Is Jeff Jones
19  the person you're talking about?  Or is there
20  some other person in the room?
21    A.  If Jeff Jones was in the e-mail, then
22  it's Jeff Jones I'm speaking about.
23    If it was InfoSec, it could have been
24  anybody on his team.

Hansen v. Elon Musk - Arbitration Day 2

Q.  Well, on this e-mail right here, it's
Carmen Copher, Yusuf Mohamed, on Exhibit 8 --
188.

On your prior e-mail, it's
Carmen Copher.  But I don't -- and I'll just
represent to you that on Jenna Ferrura's e-mail,
it's Yusuf Mohamed, Valerie Workman, Jeff Jones;
and Ms. Ferrua said that it was the four of you.
And I'm just trying to figure out who was in this
room, and you keep saying InfoSec, and I -- I'm
trying to figure out who InfoSec is.

A.  Yeah.  So remember when I said
earlier that I had to confirm whether or not what
I believed to be exfiltrated was indeed
exfiltrated and whether or not what I believed to
be deleted was deleted?  The InfoSec team is the
team that I used to figure out what was true.  So
when you ask me who was involved, I'm telling you
who is involved.  So they're -- they are a party
to that because they helped me verify that the
documents were exfiltrated.

The e-mail is as it says.  Those were
the people who were involved in the actual
conversation to have Mr. Hansen not return back

Hansen v. Elon Musk - Arbitration Day 2

to the jobsite.

I hope I got that right.

Q.  Yes, ma'am.

So you relied heavily on Jeff Jones's
team?

A.  They were the -- they confirmed what
I saw with my own eyes.  I just had to be sure.
You can't make decisions like that unless you're
sure.  And I saw an e-mail going from Karl Hansen
to an e-mail address, but I need to use InfoSec
to say is that an exfiltration or not.  And they
confirmed it was an exfiltration, meaning it left
the building.

Q.  Okay.  So it wasn't HR that performed
the investigation; it was Mr. Jones's team;
correct?

A.  Looking at whether or not the data
actually went from a Tesla e-mail address to an
outside e-mail address, I confirmed that, Jenna
confirmed that, InfoSec confirmed that.  We all
were looking at the same things.  But InfoSec is
important, because that's the technical arm that
makes sure that we're correct.

Q.  Well, I'm trying to find this out,

Hansen v. Elon Musk - Arbitration Day 2

because this is an important point.

Did InfoSec confirm it to you and for
everyone else, or did HR confirm it for InfoSec?
I really want to know the answer to that, if you
know the answer to that.

A.  I'm sorry, I'm not following your
question.

Q.  Did -- in terms of Mr. Hansen and
anything that he might have -- any policies that
he violated, did HR make the determination or did
InfoSec make that determination?

A.  HR determines the policy violations.
So, in other words, first you have to figure out
what happened.  And then you have a conversation
and HR handles the policy side.  I have the
compliance side.  InfoSec handles the IT side,
and then there's legal.  The HR policy at the end
of the day is an HR confirmation.

Q.  Okay.  I appreciate that.  Sorry,
there's circular semantics in all of these
things, and I apologize.

A.  Sorry.

Q.  And in terms of just following up
here, you're -- I'm just going to show you this.

Hansen v. Elon Musk - Arbitration Day 2

When you -- you sent this e-mail --
I'm going to show you, very quickly, Exhibit 188.

You told Carmen Copher -- what was
Carmen Copher's job?

A.  She was, I believe, employee
relations.  I believe that was her title, was
employee relations.

Q.  And when you made the recommendation,
when you collectively made the recommendation
along with HR and Ms. -- I will say Jeff Jones,
but correct me if you think it was InfoSec,
someone else there.

Who else did you report this to?  Did
you all tell someone else?  Did you report it
then to someone else in the organization that
Mr. Hansen was being removed from the facility?

A.  I don't remember or recall if we
spoke with anyone else.  Those were the people,
me, Yusuf, Jenna.  That was the team that needed
to have the conversation.  I don't remember
anyone else being involved.

Q.  But this e-mail that went out at
4:07 p.m., just clarifying, it went -- clarifying
it from Jenna through -- it was going to

Page 507

Hansen v. Elon Musk - Arbitration Day 2

1    Yusuf Mohamed, Valerie Workman, and
2    carbon-copying Jeff Jones.
3
4         Do you know why Ms. Ferrua
5    carbon-copied Jeff Jones?  Reporting that Karl
6    was being removed?
7         A.  I believe even as a contractor,
8    somehow Karl's team might have been related to
9    Jeff's InfoSec team.  I believe that's how he was
10   involved.  That makes sense, yeah.  Yeah.  As far
11   as I can recall.
12        MR. WOODFIELD:  At this time I'm --
13   before I rest, I'm going to make sure I offer
14   Exhibit 201, 216, 183, 208, 217, 187, 188, 8,
15   214, and 215.
16        JUDGE HOFFMAN:  Well, wait a minute.
17   I need to have some way to keep track of that.
18   The only one that I have --
19        MR. ROBERTSON:  We give up.
20        JUDGE HOFFMAN:  I can tell you what
21   I've got pending right now, and it's -- there are
22   only four that I have pending.  So if you want to
23   introduce more, you can tell me.
24        You've got 214, -15, -16, and -17.
25   Each of those are media-related exhibits, and I

Page 508

Hansen v. Elon Musk - Arbitration Day 2

1    don't think there's any objection to those.
2
3         MR. ROBERTSON:  No, there's no
4    objection to any of those.
5         JUDGE HOFFMAN:  Okay.  So 214, 215,
6    216, 217 are admitted.
7         MS. DUNNE:  You mentioned 201, but if
8    you recall, 201 was not what you wanted.  You had
9    really wanted, I believe, 188.
10        MR. WOODFIELD:  Yes.  Thank you.
11        (Whereupon, Exhibit 188 was
12   received.)
13        (Whereupon, Exhibit 214 was
14   received.)
15        (Whereupon, Exhibit 215 was
16   received.)
17        (Whereupon, Exhibit 216 was
18   received.)
19        (Whereupon, Exhibit 217 was
20   received.)
21        MR. WOODFIELD:  And then just to make
22   sure -- let's see.  I'm going to make sure that
23   we got all these in.  I also want to make sure --
24   I have open on my screen 8 -- let's see.  I
25   referenced 802, which is not on our list, but it

Page 509

Hansen v. Elon Musk - Arbitration Day 2

1    was the late supplement from opposing counsel,
2    or, you know, it was -- it was Tesla's late
3    supplement after we had submitted the witness
4    list.
5         It was the late document that I
6    offered to refresh recollection.  But there's
7    187, 208, 183, and 6.
8         So 6 is in.  183 is in.  208, I would
9    offer 208 at this point.  187.  I think that's
10   it.
11        JUDGE HOFFMAN:  Any objection to 187?
12        MR. ROBERTSON:  No.  None.  And no
13   objection to 208.
14        JUDGE HOFFMAN:  Okay.  They're both
15   in.
16        (Whereupon, Exhibit 187 was
17   received.)
18        (Whereupon, Exhibit 208 was
19   received.)
20        MR. ROBERTSON:  And then the open
21   question is, Nick, did you actually want to
22   introduce as an exhibit the supplemental e-mail
23   or did you just --
24        MR. WOODFIELD:  Just put it in.
25

Page 510

Hansen v. Elon Musk - Arbitration Day 2

1
2         MR. ROBERTSON:  So that would be --
3    we'll add an exhibit.  That would be 225.
4         MS. DUNNE:  No, because we added the
5    audio clip yesterday, so that would have to be
6    225.  So I believe this would have to be 226.
7         MR. WOODFIELD:  226.
8         MR. ROBERTSON:  And we'll go ahead
9    and mark it and we'll take care of getting it
10   into the set of exhibits.
11        MS. DUNNE:  We'll send it to Debbie
12   to have the sticker applied to it, and then I'll
13   also upload it to JAMS access so that you have
14   access to it, Your Honor.
15        JUDGE HOFFMAN:  Okay.  Thank you.
16        Admitted.
17        (Whereupon, Exhibit 226 was
18   received.)
19        (Discussion off the record.)
20        MR. WOODFIELD:  Is there any chance
21   of getting Mr. Mohamed today, or are we convening
22   with him tomorrow?
23        JUDGE HOFFMAN:  Are we done with
24   cross-examination of Ms. Workman?
25        MR. ROBERTSON:  Are you all set,

Page 511

    Hansen v. Elon Musk - Arbitration Day 2
1   Nick, with --
2           MR. WOODFIELD:  I'm done.
3           JUDGE HOFFMAN:  Does USSA have any
4   cross-examination of Ms. Workman?
5           MS. LARGENT:  No questions.
6           JUDGE HOFFMAN:  Does Tesla have any
7   redirect of Ms. Workman?
8           MR. ROBERTSON:  No, nothing from us.
9   Thank you.
10          JUDGE HOFFMAN:  I have no questions.
11          Ms. Workman, thank you very much for
12  your testimony.  You're excused and you can sign
13  off.
14          THE WITNESS:  Thank you, Your Honor.
15          JUDGE HOFFMAN:  Thank you.
16          MR. ROBERTSON:  And now, Nick, to
17  your question, yeah, we don't have -- we've been
18  unable to reach Mr. Mohamed.  We had sort of
19  indicated -- and we may decide not to call him,
20  given our inability to find him.  But we have
21  Mr. German, so maybe I'll just table that.  I
22  assume Mr. German will be next, likely tomorrow.
23  And then -- but we'll let folks know in the
24  morning before Mr. German comes on whether or not

(Lines numbered 1-25)

Page 512

    Hansen v. Elon Musk - Arbitration Day 2
1   we intend to call Mr. Mohamed.  I think right now
2   I'm inclined to think that we don't need to.
3           And then my understanding is once
4   Mr. German is done testifying, that that's it.
5   And then the only question for Your Honor -- and
6   again, we don't have to decide this tonight, but
7   we should all be thinking about it -- is do we
8   just close the evidence, and are we going to
9   do -- get the transcripts and do post-hearing
10  briefing and then defer closings after we do all
11  of that.  But again, I don't think we need to
12  decide that tonight.  I just throw that out there
13  because that seems to be the next step.
14          MR. WOODFIELD:  Is Mohamed still an
15  employee of Tesla?
16          MR. ROBERTSON:  No, he's not, Nick.
17          No, he left a while ago.
18          JUDGE HOFFMAN:  Okay.  Well, we don't
19  have anything further to do today.  Tomorrow
20  we'll start with -- hopefully start with
21  Mr. German at 9 o'clock and then we'll figure out
22  what happens after that.  And I think we're going
23  to do post-hearing briefs, then we'll figure out
24  what kind of schedule you want to reach, whether

(Lines numbered 1-25)

Page 513

    Hansen v. Elon Musk - Arbitration Day 2
1   or not you want to do post-hearing briefs and
2   then have an argument session, or if you want to
3   just submit it on the post-hearing briefs.  I'm
4   open to either one.
5           And so I think that's -- that's it
6   for us.  Anything further from either side?
7           MR. WOODFIELD:  Not from the
8   complainant, Your Honor.  Thank you.
9           MR. ROBERTSON:  All I would say is if
10  you give lawyers a chance to talk, they're going
11  to take it, so...
12          JUDGE HOFFMAN:  Yeah, I know it.  I
13  know it.
14          MR. ROBERTSON:  Nothing further.
15          JUDGE HOFFMAN:  Okay.  We're off the
16  record.
17          (Time noted: 3:03 p.m. PDT)
18                  --o0o--

(Lines numbered 1-25)

Page 514

    Hansen v. Elon Musk - Arbitration Day 2
1              REPORTER'S CERTIFICATION
2
3
4           I, Debra A. Dibble, RDR, CRR,
5   Notary Public, hereby certify that this
6   transcript is a true record of the arbitration
7   proceedings held in the foregoing matter on
8   Tuesday, April 12, 2022.
9           I further certify that I am
10  neither counsel for, related to, nor employed by
11  any of the parties or attorneys in the action in
12  which these proceedings were taken; and, further,
13  I am not a relative or employee of any attorney
14  of record in these proceedings, nor am I
15  financially or otherwise interested in the
16  outcome of said proceedings.
17          Subscribed and sworn to on
18  this 4-12-2022.
19
20
21  _____
    DEBRA A. DIBBLE
22  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
23
24
25

(Lines numbered 1-25)

Page 515

1          Hansen v Elon Musk - Arbitration Day 2
2                          INDEX
3
4    PROCEEDINGS                                    309
5
6        EXAMINATION OF KARL HANSEN (continued):
7        BY MS. BRAXTON                             310
8        BY MR. WOODFIELD                           318
9        BY MR. ROBERTSON                           328
10       EXAMINATION OF JACOB DONNELLY NOCON:
11       BY MR. WOODFIELD:                          331
12       BY MS. DUNNE                               373
13       BY MR. WOODFIELD                           399
14       BY MS. DUNNE                               412
15       BY MR. WOODFIELD                           414
16       EXAMINATION OF JENNA RAE FERRUA:
17       BY MR. ROBERTSON                           417
18       BY MR. WOODFIELD                           432
19       BY MR. ROBERTSON                           451
20       EXAMINATION OF VALERIE CAPERS WORKMAN:
21       BY MR. ROBERTSON                           454
22       BY MR. WOODFIELD                           473
23
24    REPORTER'S CERTIFICATION                      514
25

Page 516

1          Hansen v Elon Musk - Arbitration Day 2
2                         EXHIBITS
3    NUMBER                  DESCRIPTION         PAGE
4    Exhibit 10      was received               311
5    Exhibit 42      was received               384
6    Exhibit 46      was received               361
7    Exhibit 157     was received               424
8    Exhibit 186     was received               367
9    Exhibit 187     was received               428
10   Exhibit 188     was received               508
11   Exhibit 189     was received               430
12   Exhibit 198     was received               316
13   Exhibit 205     was received               309
14   Exhibit 208     was received               368
15   Exhibit 211     was received               329
16   Exhibit 212     was received               313
17   Exhibit 213     was received               317
18   Exhibit 214     was received               508
19   Exhibit 215     was received               508
20   Exhibit 216     was received               508
21   Exhibit 217     was received               508
22   Exhibit 219     was received               343
23   Exhibit 226     was received               510
24
25

**-**

**-15** 507:24

**-16** 507:24

**-17** 507:24

**1**

**1** 437:14 453:8 468:16

**10** 310:22 311:12,14, 15

**100** 437:14

**10:41** 373:2

**10:49** 478:22

**10:51** 373:3

**11:31** 398:23

**11:37** 398:24

**11:57** 416:20

**12** 309:4 371:10,13 481:4

**12:23** 444:9 449:3 466:14

**12:31** 416:21

**12:52** 432:2

**12:55** 432:3

**13** 344:5,22

**147** 345:10,11

**15** 322:8

**150** 435:2

**157** 422:13,18 424:20,22,23

**16** 313:3

**16th** 473:21 487:4,8

**17** 389:25 462:16

**173** 353:20

**176** 346:17

**18** 389:11 391:23 462:3

**183** 370:2,4,9 507:14 509:8,9

**186** 361:8,20 367:14, 15,17,20 379:20

**187** 426:9,10 428:5,7, 8 443:19,24 466:17, 19 507:14 509:8,10, 12,17

**188** 392:12 443:19 444:7 449:2 464:5 499:25 501:13 503:4 506:3 507:14 508:9, 11

**189** 428:10,21 430:5, 9,10 443:19 444:10

**18th** 389:17

**198** 314:25 315:6 316:3,6,7

**1:23** 453:11

**1:35** 453:9

**1:38** 453:12

**1st** 315:23 411:2

**2**

**2** 309:1,6 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1

**20** 455:20

**200** 434:24

**201** 443:10,14 507:14 508:7,8

**2018** 315:13,19 329:3 332:11,19 333:8,9 336:16,22,24 337:9, 21,23 338:3 339:25 340:3,11 344:5,22 345:19 346:23 348:2 349:13 354:2,7,9,14, 22 357:2 362:20 363:2,6,10,15 365:23,25 366:8,12 368:9,15 369:23

**393:1** 394:1 395:1 396:1 397:1 398:1 399:1 400:1 401:1 402:1 403:1 404:1 405:1 406:1 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1 425:1 426:1 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1 438:1 439:1 440:1 441:1 442:1 443:1 444:1 445:1 446:1 447:1 448:1 449:1 450:1 451:1 452:1 453:1 454:1 455:1 456:1 457:1 458:1 459:1 460:1 461:1 462:1 463:1 464:1 465:1 466:1 467:1 468:1 469:1 470:1 471:1 472:1 473:1 474:1 475:1 476:1 477:1 478:1 479:1 480:1 481:1 482:1 483:1 484:1 485:1 486:1 487:1 488:1 489:1 490:1 491:1 492:1 493:1 494:1 495:1 496:1 497:1 498:1 499:1 500:1 501:1 502:1 503:1 504:1 505:1 506:1 507:1 508:1 509:1

**2019** 333:24,25 406:24 456:5,14

**2020** 418:14 455:23

**2020-ish** 456:6

**2021** 313:3

**2022** 309:4 455:10

**204** 355:8

**205** 309:17,22,25

**208** 367:12 368:5 507:14 509:8,9,10, 14,19

**209** 337:19

**211** 329:13,15,17,19

**212** 311:10 312:5,10 313:14,16,17

**213** 316:10 317:15, 17,18

**214** 490:6,11 507:15, 24 508:5,13

**215** 490:12 507:15 508:5,15

**216** 486:13 490:9,11 507:14 508:6,17

**217** 491:14,21 507:14 508:6,19

**219** 343:14,17,23,25

**23** 332:11 368:9,14 369:23

**23rd** 370:5,6 480:15 481:9 482:10 483:7,8 484:19 485:24 495:23 496:9 497:4

**384:22** 387:4 389:12 391:23 392:4 393:10 402:3 413:3 414:9 418:8 419:3 420:21 421:20 422:10,24 425:4,9 426:13 429:5 432:20 433:4 434:16 435:5,8 436:24 437:17 446:8,18 449:3 455:9 456:14 458:4 462:4 464:7 467:2 473:16,18 475:22 478:11 489:6

**24** 315:19 459:6 474:11

**24th** 315:17

**26** 387:4

**28** 337:21

**29th** 445:11,13 491:18,25 493:8,11, 13 494:10

**2:10** 472:20

**2:14** 472:21

**3**

**3** 315:13 359:13 362:20 363:2,6,10 365:25 366:8,12 384:22

**30** 322:9 416:14

**31** 354:2 393:10 426:13 432:20 449:3 464:7,13 467:2 478:10

**31st** 394:24 395:12 432:25 442:15,16 444:9 445:9 448:14 476:17 478:22 479:9 494:12,14 495:10 497:11 498:5,12

**3rd** 314:11,15 319:10 321:9 322:16 349:13 355:22 356:4,12,13 357:8 363:14,24 364:22 365:15 430:17 474:4,6 495:8 496:21

**4**

**4** 429:5

**42** 384:6,17,18 430:12,15

**46** 355:18 361:11,13, 15,18

**49** 378:4,15

**4:07** 506:24

**4th** 429:12

**5**

**5** 434:24

**50** 322:6,11

**6**

**6** 509:8,9

**6th** 486:15

**7**

**70** 437:13

**70,000** 433:8,9
436:10

**8**

**8** 503:3 507:14 508:24

**802** 508:25

**9**

**9** 422:24

**92** 389:8,10 461:22,
23 462:2

**99** 386:22

**9:04** 309:4

**9:19** 318:6

**9:23** 318:7

**9:29** 363:25

**9:38** 330:19

**9:44** 330:20

**A**

**a.m.** 309:4 318:6,7
330:19,20 363:25
373:2,3 398:23,24
416:20 478:22

**ability** 352:16 396:16
397:2 398:12

**absence** 399:25
400:3

**Absolutely** 400:5
472:13

**abundance** 382:21

**accept** 347:14

**access** 353:4 354:6,
22 355:2,5 368:25
376:2,19 386:6,9
388:20,23 391:11
396:13 398:9 401:15
402:22 461:3,7 465:5
478:25 481:20

**accessed** 368:21
481:16

**accessible** 386:3

**accessing** 461:15

**account** 355:5,7
382:19 391:18 396:8
397:10 398:9 402:11
405:13,17 419:20
425:17,18 437:8
442:13 465:14 479:6

**accountable** 376:10

**accounts** 369:9
432:19 482:4 483:14
484:25 485:8

**accurate** 310:15
313:7 314:12,17
478:12 484:8

**accurately** 340:25

**accuses** 486:16

**act** 334:7 357:15
456:25

**action** 383:16 384:2,
4 398:13 403:13
404:12 420:8 427:9
451:15,21 468:7

**actionable** 352:22

**actions** 383:24
405:18 420:6

**activities** 334:24
351:18 369:5 371:2
382:24 457:2 481:24

**activity** 338:15
339:2,9,22 341:20
351:21 352:6 357:10
369:6 374:6 377:4
378:8,12 400:4,15

**401:9** 440:13

**Acts** 334:13

**actual** 336:25 428:14
441:2 449:21 503:24

**add** 309:18

**addition** 388:15
419:10,15

**additional** 316:3
328:15 393:8,16

**address** 353:21
354:21 359:25
369:11 381:11,12
385:13,19,20 387:12,
15 389:20,21 391:20
420:15 461:20 462:9
482:6 483:16 485:3
504:11,19,20

**addressed** 347:9
357:25

**addresses** 368:20
481:15

**addressing** 359:11

**administrative**
383:18 467:7

**admissibility** 393:23

**admissible** 395:10

**admit** 317:15 367:15,
16

**admitted** 367:25
378:4 461:23,25
464:4 508:6

**adverse** 398:13

**advice** 404:14

**advised** 344:18

**advisors** 407:2

**affect** 376:13

**affiliated** 392:5

**affirmative** 393:25

**affirmatively** 324:4
325:19

**afoot** 339:9

**afternoon** 417:2,18,
20 454:14,15

**agencies** 378:11

**agency** 378:23

**agree** 324:14 326:17
354:18 370:22

**agreement** 372:22

**agreements** 403:19

**ahead** 344:20 364:16
372:7 394:8 395:22
398:19 405:22
413:21 416:23 424:7,
8 431:25 438:4
452:12

**alarms** 479:14

**alert** 382:11,14
388:2,5

**alerts** 382:11

**Alex** 310:23

**Alex's** 312:2

**allegation** 341:22
460:18 493:3 494:23
495:14

**allegations** 338:6
340:16,17 342:21
347:21 348:12,22
349:2,12 350:4,9,12,
16 355:14 357:24
360:4 361:23 362:6,
24 365:10 366:25
367:2 368:11 380:4,
15 438:19 458:16,21
459:25 481:6 491:5
492:11 493:5 494:21
495:16,24 496:8
497:9

**alleged** 349:4 377:4
439:10

**alleging** 364:25
496:7

**allowed** 320:23,25
335:18 354:22

**ambiguous** 346:9

**amount** 340:12
421:14 461:17

**analysts** 373:23

**analytics** 371:21

**agencies** 378:11

**and/or** 479:4

**angry** 406:8

**Anne** 443:9 462:24

**anomalies** 352:8

**anonymous** 365:5,9

**answering** 370:20

**antiretaliation**
439:16,19

**anybody's** 357:17

**anymore** 398:15
491:13

**apologize** 390:19
505:22

**apparently** 476:17

**appeared** 491:17

**appears** 315:20,24
344:9 355:9 364:5
387:16 390:8 422:19
426:11 428:22 464:5
466:13,21 479:3

**application** 344:20

**applications** 421:23

**apply** 344:20

**appreciating** 430:18

**appreciation** 359:16

**Approximate**
455:10

**approximately**
455:9,20 456:14

**April** 309:4 333:24,25
387:4

**arbitration** 309:1
310:1 311:1 312:1
313:1 314:1 315:1
316:1 317:1 318:1
319:1 320:1 321:1
322:1 323:1 324:1
325:1 326:1 327:1
328:1 329:1 330:1
331:1 332:1 333:1
334:1 335:1 336:1
337:1 338:1 339:1
340:1 341:1 342:1
343:1 344:1 345:1
346:1 347:1 348:1

349:1 350:1 351:1
352:1 353:1 354:1
355:1 356:1 357:1
358:1 359:1 360:1
361:1 362:1 363:1
364:1 365:1 366:1
367:1 368:1 369:1
370:1 371:1 372:1
373:1 374:1 375:1
376:1 377:1 378:1
379:1 380:1 381:1
382:1 383:1 384:1
385:1 386:1 387:1
388:1 389:1 390:1
391:1 392:1 393:1
394:1 395:1 396:1
397:1 398:1 399:1
400:1 401:1 402:1
403:1 404:1 405:1
406:1 407:1 408:1
409:1 410:1 411:1
412:1 413:1 414:1
415:1 416:1 417:1
418:1 419:1 420:1
421:1 422:1 423:1
424:1 425:1 426:1
427:1 428:1 429:1
430:1 431:1 432:1
433:1 434:1 435:1
436:1 437:1 438:1
439:1 440:1 441:1
442:1 443:1 444:1
445:1 446:1 447:1
448:1 449:1 450:1
451:1 452:1 453:1
454:1 455:1 456:1
457:1 458:1 459:1
460:1 461:1 462:1
463:1 464:1 465:1
466:1 467:1 468:1
469:1 470:1 471:1
472:1 473:1 474:1
475:1 476:1 477:1
478:1 479:1 480:1
481:1 482:1 483:1
484:1,6 485:1 486:1
487:1 488:1 489:1
490:1 491:1 492:1
493:1 494:1 495:1
496:1 497:1 498:1
499:1 500:1 501:1
502:1 503:1 504:1
505:1 506:1 507:1
508:1 509:1

**arbitrator** 330:24
419:4 453:25 456:16

**area** 340:19 345:21

**areas** 455:25

**argument** 320:12,17
321:17

**arm** 504:23

**articulated** 321:8

**articulates** 481:8

**articulating** 348:3
354:14

**asserting** 394:18,19

**assess** 377:17
387:25

**assessment** 343:10
358:19 401:8

**assign** 472:11
475:14

**assigned** 421:17
471:11 475:5

**assignment** 313:23

**assist** 343:11

**assistant** 434:4
486:24

**associate** 456:9,17
473:18 487:25

**Associates** 317:10

**assume** 338:23
340:23 388:3

**assuming** 400:13

**assumptions**
362:16

**attach** 442:3

**attached** 377:22
462:15

**attachment** 385:9,
12,22,25 390:25

**attachments** 385:6,
8 387:17,19,20,21
389:23 390:3,5,11,
13,23 430:20 462:12,
14 501:5

**attempt** 325:24
409:24

**attention** 311:20
346:11 369:25 384:6
386:22 395:24
422:11

**attorney** 321:15
405:24 456:20

**attorney-client**
392:24 393:11,24

**attracts** 421:2

**attributable** 449:22

**August** 319:10 321:9
322:16 328:25 329:3
349:13 355:22 356:4,
12,13 357:8 362:20
363:2,6,10,14,24
364:22 365:15,25
366:8,12 368:9,14
369:23 370:5,6 392:4
393:10 394:24
395:12 402:2 411:2
413:3 422:24 423:20
425:4,9 426:13
432:20,25 442:15,16
444:9 445:9,11,13
446:7,15 448:14
449:3 455:20,23
456:6 464:7,13 467:2
471:19 472:7 473:16,
18,20,21 474:4,6
475:19,21 476:17
478:10,22 479:9
480:15 481:9 482:10
483:7,8 484:19
485:24 486:15 487:4,
8 491:18,25 493:8,
11,12,13 494:14
495:8,10,23 496:9,21
497:4,11 498:5,12

**Austin** 418:2 454:23

**authentic** 401:2

**authenticate** 469:20

**authentication**
469:10

**authority** 402:5

**authorization**
402:10 410:7

**authorized** 381:19

**availability** 415:21
452:20

**aware** 327:5 329:10
339:23 340:7 341:17
353:17 354:16
366:10,13,15 400:10
401:14 406:19
439:23 444:3 445:8
446:4 450:8,11,14,17
458:5 460:14 471:19
473:20 486:6,9,23

**B**

**back** 309:15 312:10
318:8 328:10 336:22
341:23 342:5,14
343:11 344:6 355:24
358:20 365:6 372:24
373:6 379:19 382:9
398:25 405:6 416:14
419:3 422:23 432:4
439:14 455:12
467:18 472:11,22,25
474:17 499:21 500:8
503:25

**background** 342:3,6
363:15 399:21
400:14 401:2 405:14
482:12 497:3,5

**bad** 342:22 343:2
344:24 360:3,15
408:7,8 437:6

**badge** 391:5,14
425:20 431:4 463:10

**badged** 431:2 463:14

**badging** 386:2,3,5,6
391:6 430:21,24,25
431:6,7,11,18 461:18
463:13 465:5 478:25
500:2

**badly** 339:4,5,7

**ballpark** 435:10

**based** 345:5 352:25
375:14 379:12
383:24 387:20,25
388:9 391:22,25
395:5 398:2,4,6
400:20 401:6 403:14
421:18 434:11 450:2,
3 459:23 467:20
468:7 471:5,11 495:3

**basis** 393:24 466:5
485:16 497:21

**bcc'd** 356:9

**bear** 437:24

**begin** 459:3

**beginning** 309:6
380:2 457:23 458:2

**behalf** 321:11

**behavior** 368:16
370:7 481:10 484:20

**believed** 321:6
348:11 460:11
471:16 503:15,16

**Bhatnagar** 476:18

**big** 492:4,5,7,8,21
494:6

**bit** 315:16 325:8
335:14 386:13
418:24 433:18
437:12,13 453:6
455:16 487:23

**blessing** 351:25

**blotter** 379:2

**blow** 385:10

**board** 458:15

**bodies** 415:3

**bolster** 326:6

**bone** 408:21

**boss** 402:14 440:12
476:16

**bottle** 376:14

**bottom** 428:22

**box** 376:15 465:20

**boy** 474:8

**Braxton** 309:24
310:3,7,23 311:2,11,
16,22 312:8,15,19,
22,24 313:11,13,19
314:24 315:6,8,15,18
316:2,9,14,18 317:2,
14,20 318:5,10,20
319:2 320:4,8 328:6
329:25 335:7

**break** 398:18 416:8, 9,14 431:5 453:8

**breaking** 455:16

**bridge** 325:16 352:3, 17,18

**briefed** 394:6

**briefly** 430:23

**bring** 491:23

**broad** 352:20

**broader** 395:8

**brought** 425:10 437:23 440:20,22

**BS** 328:2

**build** 332:15

**building** 488:14 504:14

**bunch** 373:24

**business** 338:25 339:9 403:20 404:10 420:4,5 426:3,5 434:11,13 447:19 448:11 464:19,25 490:7,11

**businesses** 436:22

**busy** 359:19

**buyout** 446:22

**buzz** 492:18

---

**C**

**C-A-P-E-R-S** 454:19

**C-SUITE** 493:24,25

**California** 313:24 347:6

**call** 323:6 330:11 363:22 416:2,3 433:12 449:6 460:23 479:18

**called** 323:8 330:25 332:18 424:14 425:13 438:14 454:2

**calls** 335:9 434:3 479:6

**camera** 388:20 389:2 390:8,9 465:6 479:5

**cameras** 425:22

**capability** 396:18

**capacity** 331:20,24 340:6 348:19 406:10

**Capers** 454:7,18

**carbon-copied** 507:5

**carbon-copying** 346:19 507:3

**Carmen** 476:18 503:3,6 506:4,5

**cartel** 341:20 347:15, 18 348:12 357:10,21 358:9 360:4 362:25 363:8 380:2,3

**cartels** 341:6,15

**case** 309:7 330:5,24 331:2 339:11,13 375:15 382:6 411:9 415:24 453:25

**cases** 366:4 375:14

**casual** 477:9

**categorically** 323:18

**categories** 392:25

**categorized** 459:23

**caused** 370:25 480:7 496:14

**caution** 372:8,14 382:22

**CEO** 357:15 358:3 359:8,25

**cetera** 403:9 444:19

**chain** 347:16,18 348:13

**chance** 470:2

**changed** 433:17

**characterization** 438:2

**characterize** 359:4

**charge** 421:14 486:25

**check** 487:18

**checks** 342:3,6 363:15 399:22 400:14,16 401:2,6

**chief** 415:24 433:20 455:3

**China** 455:25

**Circling** 328:10

**circular** 505:21

**circulated** 500:25

**circumstance** 375:15

**circumstances** 376:18 403:15 404:2 410:20 411:10,12,23

**cited** 368:24 481:19

**claim** 427:16

**claims** 406:11

**clarify** 486:3

**clarifying** 506:24

**Clark** 422:19 423:2

**classification** 378:24

**classify** 381:22

**clean** 364:16

**clear** 461:10 466:5 472:14

**cleared** 415:18

**client** 323:21 324:8,9 325:25 330:5

**client's** 324:10

**clip** 319:25 320:2

**close** 317:21

**closely** 390:7

**cloud** 376:6

**co-employee** 479:25 480:3

**co-employees** 479:22

**code** 351:20 352:25 403:20 426:2 464:19, 25

**coincidence** 494:8

**colleague** 368:16 370:8 481:11

**colleagues** 353:10 492:21

**collected** 382:12 398:3 403:16

**collective** 384:3 447:18,24 448:4 472:10

**collectively** 426:6 449:25 468:6 499:14 500:8 506:10

**collocated** 365:22

**coloring** 362:16

**comfortable** 470:8

**commenced** 367:5 369:16

**comment** 319:16 483:24

**commentary** 341:19,23 360:17

**commented** 342:14

**Commission** 486:21

**committing** 404:17

**common** 427:12

**communicate** 429:20

**communicating** 477:3

**communication** 395:4 429:4,22 468:10 486:14

**communications** 377:3,8 395:2 424:5 429:24 468:2,10 469:4

**company** 340:8 353:6 358:4 359:8,17 366:23 376:20 382:23 396:20 397:5 403:10 406:3,5,8,9

**company's** 334:23

**comparator** 406:22

**comparators** 402:24 408:24

**compensation** 407:8

**competency** 335:15

**competent** 335:12

**competitive** 422:7

**competitors** 407:25

**compiled** 378:11

**complain** 354:19

**complaining** 354:9, 24

**complaint** 323:6 334:22 410:11 439:7 440:7,8,10 444:22 445:3,7 479:22 480:7 486:20 487:8

**complaints** 334:11 335:20 350:2 368:11 376:13 438:15 481:6 485:7

**completely** 323:13

**complex** 400:13

**compliance** 349:25 396:25 397:2,13 402:13 414:11,16,17, 20 419:23 420:9,15, 16 433:20,21 434:5 435:16,20,21,22 436:8,11,16 456:10, 18,20,23 473:19 475:15 486:5,24,25 488:2,6 489:12 505:17

**complicated** 347:3

**comply** 439:3

**compromised** 400:24

**computer** 312:2,9 382:20

**concern** 319:19 326:16 345:24 346:3, 4 351:19 353:3 460:5 488:5 495:17

**concerned** 346:7 369:4 481:23 485:21, 22

**concerns** 321:8 327:14 334:11 340:4, 10 341:5,14,19 342:22 343:6 345:18 348:3 355:13 357:5, 9,21 368:22 395:19 419:11 456:21 480:14 481:17 483:2 496:13,17

**conclusion** 335:10 374:20 466:6

**conclusions** 362:16 363:7 365:7 380:6,18

**concurrence** 383:2

**conduct** 342:2 352:4 375:25 397:13 400:20 413:11 426:2 464:19,25 465:21

**conducted** 350:7 363:16 366:14,15,25 370:13 371:5 396:25 400:19 401:6 485:17

**conducting** 310:17 340:12 342:8 377:11 396:10 406:25 457:24 458:23 461:6

**conference** 377:14

**confident** 488:11

**confidential** 335:4 368:19 373:21 374:12,17 376:8 383:4,7 387:22 391:16 405:9 408:14 425:16 431:13,15 437:3 452:4 461:21 481:14

**confirm** 469:21 479:16 503:14 505:3, 4

**confirmation** 478:23 502:7 505:19

**confirmed** 442:11 500:13,14 502:3,5 504:7,13,20,21

**confirming** 394:23

**conflict** 414:22

**Congratulations** 418:25

**connect** 420:17

**connected** 406:14 420:19

**connection** 419:23 458:10 469:5

**conscious** 403:13

**consent** 323:15

**consideration** 499:23

**considered** 386:10 389:5 391:15 395:16 449:4

**consisted** 419:8

**consists** 373:22

**constitute** 383:5 388:12

**constitutes** 388:23

**consult** 335:25

**contact** 354:10,15 357:5 372:21 383:9 415:17 423:4 426:25 427:5 448:21

**contacted** 337:10 480:22 494:20

**content** 388:9,15

**contents** 369:14 397:8 482:8

**continue** 328:12 353:5

**continued** 446:18

**continuing** 392:14

**contracted** 423:8

**contracting** 413:14

**contractor** 351:2,9, 13 369:8 383:23 407:15 412:23 413:4, 11 414:22 419:16 424:12 427:4,5,14, 19,21 431:9 433:24 458:5 482:3 483:14 484:25 485:8 507:7

**contractor's** 419:20

**contractors** 397:18 398:5 399:22 413:6 419:18 427:7

**contradict** 324:9

**contributor** 457:5,9

**control** 366:6 381:23

**controlled** 375:5,6

**conversation** 319:4, 8 323:25 324:6 326:25 329:2 356:19, 21 365:3,12,15,17 429:7,9 432:17,19 477:10 482:25 485:16 498:18 502:7, 19 503:25 505:15 506:21

**conversations** 318:21 319:13 364:12,14 365:9 427:10

**cooperate** 459:8,11, 13

**coordinate** 416:10

**Copher** 476:18 503:3,6 506:4

**Copher's** 506:5

**copper** 340:4,16,18 345:15,18,23 346:4 458:19

**copy** 312:11

**corporate** 331:21,24 334:5 336:2,5 338:22 456:25 457:9

**correct** 310:20 331:21,22,25 332:2 334:7,8,13,20,21 336:4 339:5,12 348:7 351:11 358:22 369:25 370:10

**371:11 373:15,16 378:8,13 380:11,15, 16,19 381:2,3 386:10,11 388:24,25 391:12,21 392:6,7 397:18,19 399:22 400:4,5,9 401:4,13, 18 409:11 411:17 412:20,21,23 422:24 424:5,6 426:18 428:19 429:15,21 442:17 449:17 466:14 470:24 471:5 484:11 485:8,9,24 486:8 487:3 491:25 496:19,23 504:17,24 506:12

**corrective** 420:7

**correctly** 347:20 485:6 501:23

**corroborate** 349:12 362:24 363:7 380:5, 14,17

**corroborated** 362:7

**Corrupt** 456:24

**counsel** 317:6 326:18 335:25 366:18 372:22 382:8, 16 402:10 403:12 404:14 414:7 425:12 433:23 434:4 456:9, 18 473:19,22 476:10 486:5,24 488:2,9 509:2

**counsel's** 404:19

**counseled** 366:2

**countering** 320:11

**County** 379:11 409:4

**couple** 342:16 377:13 438:6

**coupled** 369:2 481:21

**court** 331:3 454:3

**Court's** 443:7

**covered** 381:6

**create** 474:12,14

**created** 378:16,20

**credentials** 353:8

**credible** 341:21

**crime** 341:6,15

**criminal** 339:2,8 342:3,6,7,9,11 363:18 400:2,4 401:9

**criminally** 465:12

**criteria** 385:17

**criticism** 366:7

**cross** 325:16 326:14

**cross-examination** 309:9 328:12 329:2 372:3 399:10 432:8 450:21 473:7

**cross-examine** 469:24

**crossed** 487:3

**current** 371:22 418:10 454:25 455:2

**customer** 381:20 407:11,14

**cyber** 436:18

---

**D**

**data** 351:23 352:24 374:7 375:6 376:4 380:25 381:5,7,11, 18,23 382:4 383:6 385:16,18 386:10 388:24 389:6 391:16, 24 397:17,21,22,23 398:2,6 401:12,18,19 402:2,22,25 404:6, 21,25 405:16 407:19 408:4,9 412:19 461:17,21 471:15 485:22 504:18

**date** 322:16,22 332:10 333:22 358:18 384:16,21 387:2 389:10,11 393:10 426:17 464:13 466:12,15 479:13 496:12

**dated** 313:2 393:9 422:24 426:12 429:5

430:17 462:3

**dates** 350:22,25

**Davis** 345:13 368:16,
17,22,24 369:3 370:8
480:10,12,13 481:11,
17,19,22 482:23,25
483:6 484:21 485:13,
15,19 486:2 488:15,
16 494:19 495:3,6,23
496:4,13

**Davis's** 369:23 370:5
484:22,23 485:6

**day** 309:1,6 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1,22
365:1,20 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1,3,21
412:1,2,5,6 413:1
414:1 415:1 416:1
417:1 418:1 419:1
420:1 421:1 422:1
423:1 424:1 425:1
426:1 427:1 428:1
429:1 430:1 431:1,5

432:1 433:1 434:1
435:1 436:1 437:1
438:1 439:1 440:1
441:1 442:1 443:1
444:1 445:1 446:1
447:1,6 448:1 449:1
450:1 451:1 452:1
453:1 454:1 455:1
456:1 457:1 458:1
459:1 460:1 461:1
462:1 463:1 464:1
465:1 466:1 467:1
468:1 469:1 470:1
471:1 472:1 473:1
474:1 475:1 476:1
477:1 478:1 479:1
480:1 481:1 482:1
483:1 484:1 485:1,25
486:1 487:1 488:1
489:1 490:1 491:1
492:1,15 493:1,14,16
494:1,15 495:1 496:1
497:1 498:1 499:1
500:1 501:1 502:1
503:1 504:1 505:1,19
506:1 507:1 508:1
509:1

**day-to-day** 375:12
419:5,7 456:16

**DEA** 378:12,17,20
379:11,14 458:18

**deal** 394:15

**deals** 397:16

**dealt** 347:11

**Deb** 417:8

**Debbie** 373:6

**debrief** 348:6

**December** 455:10
456:5,14

**decide** 457:20 468:6
502:8

**decided** 345:4 426:6

**deciding** 326:18

**deciphering** 376:8

**decision** 326:20
404:5 419:24 429:20
434:6 440:23 447:17
448:2,4,7,9,13,25
449:15,22,25 450:4

457:16 471:9 472:6,
10 497:12 498:15
499:9,12,13,14 500:8

**decision-
making**
498:14 501:10

**decisions** 504:9

**deemed** 500:14

**defer** 416:3

**deleted** 369:13
465:13,24,25 466:3
482:8 503:17

**deletion** 465:24
471:16 500:5

**deletions** 466:7
467:24

**delve** 374:18

**demanding** 323:9

**departing** 407:4

**department** 407:5,7

**departments** 420:20

**depend** 374:25
403:25 411:18,23

**depending** 383:13
388:14 411:12
417:19

**depends** 357:23
382:6 411:9

**deploy** 373:24

**deputy** 433:23 434:4

**describe** 419:4
430:23 456:15 466:8

**description** 421:18

**desk** 368:23 481:18

**destroy** 390:12

**detail** 368:10 481:5

**details** 350:19
352:14,20

**detect** 374:11

**detecting** 376:7

**deter** 374:8

**determination**
388:8 404:12 427:19

505:11,12

**determine** 346:15
383:13 405:12 460:3

**determined** 369:13
408:3 482:7 495:22
499:20

**determines** 382:4
397:21 505:13

**deterring** 374:5

**develop** 358:20
363:19 380:20

**developed** 342:16
401:10

**develops** 395:20

**device** 353:7,11

**devotions** 420:7

**DGC** 433:23

**died** 312:9

**Diego** 333:4

**difference** 324:25
348:25 358:6

**differently** 413:7

**difficult** 387:24
445:23,24 446:16

**direct** 311:20 323:21
325:25 327:7,10
372:13 384:5 386:21
395:24 411:20
429:17 467:25 470:6
475:16 499:10

**directed** 335:21
342:13 360:12

**directing** 360:12

**direction** 401:7
467:15 468:11

**directions** 327:15

**directly** 329:2 356:24
357:6 457:7 476:6
480:22 482:23 483:22
485:15 494:20 498:7

**Director** 433:14

**directs** 359:22,25

**disagree** 395:8

446:9

**disciplinary** 420:6
427:9 451:15,21

**discipline** 403:3,5,8
404:3,7 405:2,3
419:24,25

**disclose** 405:9 406:9

**disclosed** 324:3
383:13

**disclosure** 393:19

**disclosures** 386:19

**discontent** 407:7

**discouraged** 357:20

**discover** 461:16

**discovered** 464:10

**discovery** 312:11
394:12,24

**discriminate** 440:6

**discrimination**
439:7 440:4,8,11

**discuss** 327:3,6
348:7 362:14

**discussed** 311:6
319:10 412:17

**discussing** 338:5

**discussion** 360:19
362:17 363:13
435:18 453:20
497:12 498:5,19
499:24 500:12

**discussions** 345:23
347:17,25 498:13

**disposal** 403:11

**dispositive** 400:2
401:4

**distract** 360:3

**distraction** 361:3

**distribution** 353:24
354:4

**docs** 500:13

**document** 311:18
316:16 324:17
335:18 385:22

388:23 393:3 394:20
395:10 422:14,16
428:12 430:15
438:15 441:23
443:12,24 445:9
449:18,24 469:17
470:4,8 476:10,14
477:13,18 482:18
509:6

**documentation**
393:21 442:2,7,9,21

**documents** 317:9,
11 335:3,4,19 369:10
378:21 386:9 393:23
405:16 406:17
408:15 425:17,19
436:2,25 442:12
457:25 460:24
461:18 462:7 465:4
466:2,3,7 467:22
471:17 474:24 480:8
482:5 483:15 485:2
500:2,22,25 501:6
503:22

**Dodd-frank** 334:7,
12,18,25 335:20
336:9,13 439:18,24

**domain** 376:5 391:18
396:13,14 398:10
408:11

**Donnelly** 331:9,18

**door** 356:25 357:3

**double** 466:6

**drafted** 405:6

**Draper** 405:7

**Drive** 405:17

**driver's** 425:22

**drives** 376:6

**drug** 360:5 377:4
378:7,11 458:18

**due** 406:13 426:7
428:4

**duly** 331:10 417:12
454:8

**Dunne** 331:5 335:6,9
343:22 361:16 364:7,
11 367:18 368:3
370:19 372:5,14,16,

19,25 373:4,7,11
384:10,14,19 394:3
395:22,23 398:16,22,
25 399:4 409:6,12
412:11,16 413:17
443:13,19 470:18
508:7

**duties** 338:9 415:18
419:7

---

**E**

---

**e-mail** 314:2 315:11,
16,19,20,21 319:10
321:9 344:9,13,18
346:16 347:8 353:23,
25 354:3,6,21 355:5,
20,22 356:2,4,7,9,11,
15,18,21 357:13,14
358:3,22 360:17
363:24 364:22
365:18,20 368:20
369:8,11,22,23
370:5,6,10,24 376:5
377:18,20 381:11
382:18,19 383:4
384:16,21,24 385:6,
9,13,19 387:2,3,6,10,
12,15 388:5,7
389:13,17,20,21,24
391:23 395:25 396:7,
17 397:3,8,9 398:9
401:15 422:18
423:17,22,24 426:11,
16 428:22 429:6,9
430:17,18 431:20
442:13,23 443:5
444:6,8 448:17,23,25
449:5 458:13,21,23
459:2,24 460:10,21
461:3,8,16,19,20
462:3,6,8,9,15
463:16,17,18 464:5,
24 465:13,19,22
466:4,13,21 468:4
473:25 474:4,6,10,
17,21,23,25 475:3,9
477:14 478:2,21
479:11,21,24 480:2,
5,6,9,11,25 481:15
482:3,5,10,11 483:5,
14,16 484:22,25
485:11,14,18 495:5
496:3,15,25 499:5,7
500:16,20 501:12,25

502:22 503:2,5,7,23
504:10,11,19,20
506:2,23 509:23

**e-mailed** 360:21
476:17

**e-mailing** 344:11
345:12 354:4 357:15

**e-mails** 314:4,18,20
352:11,16 354:20
355:7 358:18 369:10
393:7,9,15,16 394:25
396:12,13,16 397:6
401:13 405:5 410:25
442:15,18 478:9,13,
17 494:10,13

**eager** 355:12

**earlier** 358:17 377:2
392:3 397:15 407:17
438:24 440:14
444:23 501:25
503:14

**early** 364:22

**edge** 479:20

**effort** 374:5 408:19

**efforts** 354:10,15
362:23 363:7 380:5,
10,14 456:23 477:19

**electronic** 350:13
351:5,7 474:16

**electronically**
474:15

**Elon** 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1,23
356:1,5,13,24 357:1,
3,11,22 358:1 359:1,
23 360:1,13,20 361:1

362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1,24 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1 418:1
419:1 420:1 421:1
422:1 423:1 424:1
425:1 426:1 427:1
428:1 429:1 430:1
431:1 432:1 433:1
434:1 435:1 436:1
437:1 438:1 439:1
440:1 441:1 442:1
443:1 444:1 445:1,
17,19 446:1,21 447:1
448:1 449:1 450:1
451:1 452:1 453:1
454:1 455:1 456:1
457:1 458:1,13 459:1
460:1 461:1 462:1
463:1 464:1 465:1
466:1 467:1 468:1
469:1 470:1 471:1
472:1 473:1 474:1,2,
7 475:1 476:1 477:1
478:1 479:1 480:1
481:1 482:1 483:1,9
484:1 485:1 486:1
487:1 488:1,20,25
489:1 490:1 491:1
492:1 493:1 494:1
495:1,6 496:1,25
497:1 498:1 499:1
500:1 501:1 502:1
503:1 504:1 505:1
506:1 507:1 508:1
509:1

**Elon's** 359:22

**else's** 400:13

**empathized** 327:13

**empathy** 318:22
327:10,12

**employed** 332:4,5
333:5 368:12,21
407:18 454:21,22
464:18 481:7,16

**employee** 313:24
344:8 345:6 359:14
369:8 371:19 376:13
383:22 386:4 390:16,
20 391:7 392:9
396:13,17 398:10,11
404:11,17 405:12,17
406:11 407:15
409:22 413:9 414:21
418:4 419:8,11,25
420:3,16,17 423:16
424:13,17 431:2,9,18
442:4 482:3 483:13
484:24 485:7 486:18
497:15 506:6,8

**employee's** 382:19
383:10 397:3 461:3

**employees** 333:5
334:10 336:10
337:12 357:4 376:2,
10 377:13 397:17,23,
25 399:22 410:6,11
412:19 419:13,15
420:12,20 421:6
425:25 427:11,14
431:12 433:4 436:25
451:8 453:5 456:22
486:17

**employees'** 427:20

**employer** 341:25
398:13,14 399:21
407:24 424:15 498:7

**employment** 383:9
403:12,24 407:10
410:8 420:2 421:23
427:20 497:13

**end** 345:15 371:5
425:11 455:12
457:23 463:7 472:7
505:18

**ended** 353:11 407:6

**energy** 407:5

**engage** 413:14

**engaged** 382:15 413:12 440:13

**engineering** 333:17

**ensure** 352:7 420:11

**ensures** 420:10

**ensuring** 403:13

**enter** 310:21

**entered** 337:18 384:11 386:23

**entire** 322:11 393:14 397:8 470:14

**entitled** 391:2

**entity** 338:22

**entry** 379:3

**equipment** 350:14 351:5,7,24

**equitable** 393:20

**equity** 446:22

**erratic** 369:4 481:23

**escalate** 436:15

**escalated** 490:17,18

**essentially** 310:17 323:20 325:25 421:2,4 466:6

**establish** 411:7 413:13

**established** 383:22

**ethics** 403:20 426:3 464:20 465:2

**events** 391:14 415:23 472:2

**Events.pdf.** 391:5

**evidence** 311:12 313:14 316:4 317:15 321:4,22 322:25 323:3,16,22 325:3 326:5 329:10 337:19 343:20 345:11 346:18 349:3 384:11 386:23 398:3 403:15 466:20 484:10

**evident** 381:14

**exact** 333:22 350:19, 22,25 352:14 358:18 410:20 434:22 448:16 483:9 485:25

**examination** 310:5 318:16 324:11 328:19 331:13 372:20 373:9 399:17 412:14 414:3 417:15 432:12 451:3 454:11 473:10

**examples** 404:24 406:21,23 407:12 410:3 463:23

**Excellent** 454:24

**exchange** 311:4 315:10,11 406:17 422:18 486:20

**exchanges** 314:2

**exchanging** 314:4

**excluding** 455:25

**excuse** 314:5 315:10 370:16 405:21 497:20

**excused** 415:11 452:11

**exfiltrated** 382:4 394:25 397:22 404:25 442:12 460:23 461:19 464:12 500:3,4,5,15 502:4 503:15,16,22

**exfiltrates** 404:6

**exfiltrating** 397:23 398:2 402:25 404:21 407:2 408:4 412:18 425:16 432:18

**exfiltration** 380:25 381:5,22 385:15,16 386:10 388:12,24 389:5 391:15,24 397:17,20 398:6 467:21,23 471:14 504:12,13

**exhibit** 309:17,25 310:22 311:10,12,15 312:3 313:14,17 314:24 315:4 316:3, 7,9,10 317:15,18

320:14,18,20,24 323:2 329:19 337:19 343:13,25 345:10 346:17 353:19 355:8, 18 361:8,18 367:12, 20 368:5 370:2,4,9 377:25 378:3,4,14,15 379:20 384:6,10,18 385:5,16 386:22 387:16 389:8,10 392:11,12 395:16 422:13,18 424:20,23 426:9,10 428:8,21 430:10 461:22,23 462:2 464:5 466:10, 19 468:16 486:13 490:6 491:21 499:25 501:13 503:3 506:3 507:14 508:11,13,15, 17,19 509:17,19,23

**exhibits** 392:16,17, 18 507:25

**exist** 501:3

**existence** 410:5

**exited** 353:6 407:18

**expect** 355:6

**experience** 342:8 378:7

**experts** 373:23 374:14

**explain** 368:10 373:17 375:11 381:4 419:22 420:24 421:10 465:17 481:5

**explanation** 383:23

**expose** 452:2

**exposing** 436:19

**express** 319:19

**expressed** 318:22 327:11,12,14 368:22 481:17

**expressing** 321:6

**extensive** 340:12

**extent** 357:3 358:23 381:5 393:14 424:12 425:7 444:2,13

**external** 381:11

385:19 391:18

**externally-directed** 388:7

**extort** 406:3,5,8 408:25 409:24

**extract** 397:10

**extremely** 359:18 396:14 411:8

**eyes** 496:9 504:8

---

**F**

**face** 320:21 378:18 381:13 385:23 389:24

**facilities** 374:23 441:22 462:21 463:14

**facility** 395:5 431:19 506:17

**facing** 420:4

**fact** 327:4,6,25 350:3 388:3 394:23,25 397:22 400:6 433:15 440:21,22 472:7

**factories** 388:18

**factors** 448:8 450:7

**factory** 360:6 425:20 472:12 486:19

**facts** 360:10 375:21 395:3

**factually** 395:12

**fair** 326:20 360:7 421:21 422:6 427:13 486:4 487:8,13 502:12

**fairly** 401:22 424:10

**fairness** 395:19

**faith** 334:17 342:22 343:2,7

**fake** 400:13

**fall** 340:24 376:16

**fallen** 341:2

**familiar** 378:10 381:24 385:21

**far-fetched** 339:17

**fast** 411:4 447:13

**favor** 443:9

**February** 455:9 456:14

**federal** 378:6,11

**feeds** 465:6 479:5

**feel** 357:5 381:5

**feeling** 361:5

**felt** 327:19

**Ferrua** 416:24 417:2, 11,19,23,24 419:21 422:9,15,16 425:3 428:13 430:16 432:6, 15 451:6 452:10 466:21,22,25 467:12, 16 468:5,11 498:24, 25 499:3,15 501:21 503:9 507:4

**Ferrua's** 503:7

**fides** 408:21

**fifteen** 322:7

**figure** 416:12 436:13 442:20 494:16 501:18 503:10,12,18 505:14

**figuring** 452:24

**file** 382:18 383:3 385:14 387:25 391:3 397:11 474:12 477:14 488:14 491:8, 10 500:21

**filed** 327:4 410:11 438:14,23 439:4 444:22 445:7 471:19 472:8 473:21,22 486:19 488:3 489:5, 23

**files** 381:7,10 385:18 388:4,6,9 389:2 390:6 391:10,14 439:6 440:7,10 500:17

**filing** 486:21

**final** 316:9 379:6,9,12
383:19 390:22

**financially** 359:12

**find** 323:15 348:21
349:6 439:8 441:15
465:23 504:25

**finding** 421:17
453:13

**findings** 450:2

**fine** 372:23 393:15
468:24

**finish** 370:20

**finished** 476:3

**fire** 437:23 495:10,12

**fired** 486:18

**firm** 468:17,20,23
469:11

**fit** 391:23 421:18

**flip** 440:3

**focus** 470:10

**focused** 332:16
345:21 358:15

**folders** 369:14 482:9

**folks** 416:10 426:17
457:3

**follow** 382:25
404:14,18

**follow-up** 412:12
413:20

**footage** 376:12,19,
21,23 388:19 389:3
390:9 425:21 479:5

**forces** 446:13

**Foreign** 456:24

**forensic** 352:3
373:23

**forensics** 352:5

**forgive** 320:16
333:19 439:13
475:18 481:2 490:4
497:18

**forgotten** 353:13

**form** 342:20 343:5
408:7,8

**formed** 342:25 343:8
344:24 345:8

**forthcoming** 327:21

**forward** 327:22
328:3 334:16,22
379:16 440:20
495:24

**forwarded** 369:9
379:11 386:17 474:7
482:4 483:15 485:2

**forwarding** 386:9,12
388:22 391:13 444:7

**found** 369:9 375:7
376:3 383:12 463:21,
24 464:23 465:8,18,
22 467:21 468:7
471:23 479:12,13
482:4 483:14 484:25
500:3,6 501:7,9,14

**foundation** 335:14
482:16

**Fox** 445:11,16
491:17,24 493:3,5

**frame** 455:7,18
456:3,11 464:9

**frankly** 323:12

**free** 357:5

**Fremont** 347:5
493:17,19

**fresh** 439:14

**Friday** 356:12

**front** 368:23 378:15
481:18

**froze** 312:3

**fruitless** 400:15

**full** 331:17 359:16
417:21 454:17

**full-time** 344:15,16

**fully** 374:18 381:6

**function** 376:24

**future** 326:8

**G**

**G&a** 467:3,4,6,7

**game** 383:12

**gamut** 457:15

**gander** 325:5

**gang** 321:18

**garden** 457:18

**gatekeeper** 369:3
481:22

**gathered** 464:17

**gave** 343:10 358:19
500:25 502:2

**GCS** 476:6

**Gecewich** 422:19
423:14,18,20

**general** 357:16
376:23,25 392:22
402:9 414:7 433:23
434:4 456:9,17 467:7
473:19 486:24
487:25

**General's** 405:24

**generally** 382:7
403:17 404:16 419:4,
22 420:24 421:10,22,
25 456:15 458:8
459:20 499:17

**generate** 407:23

**generated** 337:16
378:21 379:14,16

**generic** 474:24

**Gerardo** 463:10

**Gerhard** 346:19,20
347:9 353:20 355:23
356:14

**German** 318:21,22
319:9,12,17 321:6,25
324:16,18 325:2,11,
12 326:25 327:3,5,
12,23 415:15 416:2
428:23,24 429:12
452:17

**German's** 323:15

325:9

**ghosts** 467:23 500:6

**Gicinto** 333:9,20
337:11 340:12
345:14 346:18 347:8,
12 348:5 350:5,10
353:22 355:14
356:14,18,22 358:21
360:19 361:21 362:4,
7,8,14,18,22 363:5,
10,12,21 364:3,21,23
365:3,4,8,18 377:13,
15

**Gicinto's** 333:10
340:19 346:12

**Gigafactory** 313:22
314:6,16 321:10
337:3,6 338:20
339:22,24 340:13,18,
23 341:7,16 345:15,
19 346:2 350:15
351:16 357:11,22
360:5 363:9 368:24
369:3 377:4,12
388:11 400:7,12
418:3 481:19,22
486:17 498:6,16
499:11

**give** 311:24 312:5
317:22 327:24
335:19 352:20
404:24 435:10
451:10,14,19 457:14
470:16 472:2 507:19

**giving** 501:11

**global** 332:20,24
333:13 341:3 346:25
433:16 434:5 478:23

**globally** 333:5

**Gmail** 381:12 385:13
391:20 479:6

**good** 334:17 343:7
344:23 359:21
373:12 376:7 400:17
408:5 417:2,18,20
453:17 454:14,15

**good-faith** 334:11

**Google** 405:17

**goose** 325:5

**Gouthro** 336:22
337:4,7,10 338:13,14
339:14,18 341:24
342:14 345:12
347:10 355:9,23
356:13,17 358:16
377:10,14

**Gouthro's** 336:23
340:21

**governance-type**
456:25

**government** 342:10

**Granted** 391:4

**great** 380:7 404:9
453:10

**group** 332:18 358:10
376:11 392:5 396:6
461:13 468:4 472:10
499:12,13

**groups** 419:14
420:19 421:24
434:11,13

**guard** 433:25 434:10

**guess** 319:18 337:12
358:17 372:6 468:24

**guidance** 338:11,12
404:19

**guidelines** 334:6

**Gustavoaccessden
ied** 391:4

**guy** 447:24

**H**

**half** 416:15

**Halladay** 345:14

**handful** 396:19

**handle** 457:20

**handled** 357:25

**handles** 505:16,17

**handling** 331:5
419:10

**Handshake** 414:8

**Hansen** 309:1,7,8,10

310:1,8 311:1,3,17
312:1,12,25 313:1,20
314:1 315:1,9 316:1,
15 317:1,3 318:1,11,
19 319:1 320:1
321:1,7 322:1 323:1,
4,8,17 324:1 325:1,
20 326:1,24 327:1
328:1,22 329:1
330:1,3 331:1 332:1
333:1 334:1 335:1
336:1,17,21 337:1,9,
16,20,23 338:1
339:1,15,20 340:1,3
341:1,4,7,13,20,22,
25 342:1,21 343:1
344:1,5,7 345:1
346:1,19 347:1,9,14,
21 348:1,6 349:1,10
350:1,23 351:1 352:1
353:1,15,21 354:1,5,
6,9,14,20 355:1,10,
13,22,25 356:1,12,18
357:1,7,19 358:1,11
359:1 360:1 361:1
362:1,15 363:1,17
364:1,24 365:1,5,11,
19,25 366:1,11
367:1,2 368:1,11,17,
22,25 369:1,13,17,
21,24 370:1 371:1
372:1 373:1 374:1
375:1 376:1 377:1,3
378:1 379:1 380:1
381:1 382:1 383:1
384:1,25 385:1,3
386:1 387:1,7,11,15
388:1 389:1,14,19,21
390:1 391:1 392:1
393:1 394:1 395:1,5
396:1 397:1 398:1
399:1,24 400:1,7
401:1 402:1 403:1
404:1 405:1 406:1,
16,22 407:1 408:1,4
409:1 410:1,13,15
411:1 412:1,22
413:1,4 414:1 415:1
416:1 417:1 418:1
419:1 420:1 421:1
422:1,10 423:1,18,
21,25 424:1 425:1,5,
9,15 426:1 427:1
428:1 429:1,13,17,25
430:1 431:1 432:1,
16,18,22,23 433:1,24

434:1 435:1,19 436:1
437:1,15 438:1,14
439:1 440:1 441:1,3
442:1 443:1 444:1,22
445:1,11,16,25 446:1
447:1,5,17 448:1,2
449:1 450:1,5 451:1
452:1 453:1 454:1
455:1 456:1 457:1
458:1,6,10 459:1,8,
14,17 460:1,6,12
461:1 462:1 463:1
464:1,18 465:1,12
466:1 467:1,13,18
468:1 469:1 470:1
471:1,10,19 472:1,8,
11 473:1,14 474:1
475:1 476:1 477:1
478:1,24 479:1
480:1,8 481:1,6,12,
17,20 482:1,7 483:1,
6,9 484:1 485:1
486:1,21 487:1 488:1
489:1 490:1 491:1,16
492:1 493:1 494:1,9
495:1,6,18,25 496:1,
6,8,10,14,22 497:1,5,
8 498:1,6,16 499:1,
10 500:1 501:1 502:1
503:1,25 504:1,10
505:1,9 506:1,17
507:1 508:1 509:1

**Hansen's** 326:6
336:20 356:3 361:23
362:6,24 363:7 364:4
368:15,16 369:4,8
370:7,8 371:2 377:21
380:15 396:7,23
397:9 408:6 461:7,16
463:16 464:24
468:22 469:11
473:22,25 478:2
479:22 481:10,11,23
482:3,12 484:20,24
485:7,17 491:5
495:16 496:17
497:13

**happen** 323:18
420:13 427:13
451:12

**happened** 324:8
364:12 425:8 427:25
444:25 452:21
466:12 477:19

**happening** 327:19
339:2,5 351:22
352:7,9 436:18

**happy** 329:14 343:11

**hard** 446:8

**harming** 451:25

**head** 349:25 402:13
404:23 414:10
433:16,21 434:4,5
447:11 488:6

**headed** 461:13

**header** 378:22

**hear** 321:17,20
322:2,10 340:15
347:25 394:2 415:20
417:3 453:22 497:21

**heard** 323:5,10
328:23 340:17
347:17,24 348:10,15
362:19,23 363:5
365:24 366:7 421:7
486:12 487:20
488:20 496:24
497:20

**hearing** 348:18
395:11

**heavily** 504:5

**held** 418:13 455:4,18
456:4

**helped** 501:24
503:21

**helpful** 392:22
444:24 470:14

**Hennigan** 468:17,21

**Herrera** 391:2,4

**hidden** 345:14

**high** 356:22 359:15
378:6 401:22 494:14

**high-level** 342:9

**higher** 403:8

**highlighted** 379:7

**highly** 422:7

**hire** 332:10 344:24

**hired** 332:8,12,14

**hiring** 344:17 347:11

**history** 342:8 363:18
378:6

**hit** 486:10 487:5

**Hoffman** 309:6,22,24
310:25 311:13
313:16 315:4,7 316:6
317:17 318:4,8,12
321:3,16 322:13
324:14,21,24 326:3,
15 328:10 329:17,23
330:2,7,16,21,23
331:7 335:8,11
343:15,18,23 361:10,
14,17 364:9,15
367:13,19 368:4
370:22 372:2,6,16,23
373:4 384:17 392:21
394:2,8 395:13,22
398:19 399:3,9,13
409:15 413:21 415:8,
14,22 416:5,13,18,22
417:3,5 424:22 428:7
430:4,9 431:25
432:4,8 450:20,23
452:8,14 453:7,13,
17,21,24 469:22
472:18,22,25 473:6
482:19 484:2,9,12
497:16,19 507:16,20
508:5 509:12,15

**hold** 312:17 315:2,3
406:21 443:6 475:20

**holding** 376:9
456:12

**Honor** 309:12,13,21
319:24 320:4,7
321:11,15 322:18
323:13 324:20,23
325:7 326:10 330:6
331:5 372:18,19
373:7 392:13 394:4
399:2 412:12 416:17
430:7 431:22 450:19
472:16 484:6 498:2

**hope** 504:3

**hour** 372:24 416:15

**hourly** 433:25 434:10

**hours** 365:19 411:6
447:12 459:6 474:11

**HR** 418:12,16,19,21
419:6,22 420:3,16,
17,23 424:3,14,18
426:5 427:3,6 431:12
434:12,17 439:6
440:3 447:19 448:6,
11 451:19 455:24
456:2 457:18 467:3,
8,10 498:20,24
499:17 504:15 505:4,
11,13,16,18,19
506:11

**HR's** 420:11

**Hueston** 468:17,20
469:2,4

**huge** 492:11,12
493:6

**Human** 383:9

**hundred** 502:16

**hunt** 421:4

**I**

**ID** 400:8,11,23

**idea** 477:17

**identifiable** 386:14,
16

**identification**
462:11

**identified** 363:17
397:21 399:23
422:17 428:21
466:19 468:16
471:13

**identify** 322:25
368:10 375:22 398:8
411:7 481:4,5

**identifying** 463:9

**identity** 400:14

**IDS** 400:13,25 401:3

**illegal** 323:13 325:4,
19 350:18 440:6

**illegally** 324:7
325:21

**illogical** 320:21

**image** 444:11

**images** 374:22 390:23

**imagine** 414:16

**immediately** 475:14 476:12

**impeach** 320:20,22 324:2,18 325:11,15, 21

**impeached** 325:2

**impeachment** 320:6,10,14,15 321:22 322:25 323:3

**implies** 490:18

**important** 321:24 504:23 505:2

**in-box** 396:23 397:3

**in-boxes** 396:17 401:16

**in-takes** 419:12

**inappropriate** 324:13 326:2 357:8, 14 358:3,6,11

**incident** 374:19

**inclined** 366:6

**include** 374:22 424:17

**included** 407:13

**including** 345:13 353:9 356:5 357:9 368:18 381:2 403:21 478:25 479:2 481:13

**inconsistent** 325:13

**inconvenience** 452:22

**increase** 408:20

**independent** 362:23 363:6 380:5,10,13

**independently** 350:7

**indicators** 465:23

**individual** 314:3 331:20 336:17 351:16 396:22 405:7 408:25 409:5 431:8 446:4 447:6 457:5,8 463:13 469:12

**individuals** 342:3,7 363:16 368:21 369:6 399:23 401:3 407:17 409:10 421:17 447:13 448:5 453:6 479:2 481:16,25

**indulgence** 443:7

**infiltration** 341:5,14 347:15

**influence** 327:14

**information** 320:13, 14 337:12 338:18 339:21 342:15,19 349:10 351:23,25 352:22 356:23 357:24 363:20 368:20 373:22,25 374:3,7,10,13,17,22 375:6,19,23 376:9 377:16,19,23 380:20 381:13,14 383:5,6 386:12,14,17 387:23 388:13,23 391:6 396:2 397:10 400:17, 21 401:7 405:10 406:10 407:13 428:16 431:8,13 440:22 449:4,9,12 452:5 461:11 463:16, 24 464:11,17 465:5,7 469:21 471:4,5,12,20 472:3 478:25 479:3, 8,10 481:15 482:24 491:3 499:22 501:11, 20

**Infosec** 457:19 461:5,9 474:22,24 479:15 498:20,21 499:17 500:14 501:22,24 502:3,11, 14,19,24 503:11,12, 17 504:11,21,22 505:3,4,12,17 506:12 507:9

**initial** 341:24 351:14 363:15

**initially** 332:14 382:10

**initiate** 375:14

**initiated** 351:15

**inquire** 372:7 373:5

**inquiries** 375:25

**inquiring** 344:11

**inquiry** 366:25 396:10

**inside** 388:11,17

**Insider** 490:11

**instances** 381:17 397:25 398:7 479:2

**instructed** 427:15

**instructing** 467:12

**instruction** 411:14

**intellectual** 332:16 373:20 383:8

**intelligence** 333:16 373:15,20

**intending** 407:22

**intent** 407:20,21 408:2,18

**intention** 323:11

**intentionally** 465:12

**interacting** 337:4 381:19,20

**interaction** 429:17, 19

**interest** 414:22

**interested** 321:19 344:14,15

**interfere** 327:16

**internal** 369:10 376:4 405:16 482:5 485:2

**internally** 408:14

**interrogatories** 329:9 481:3

**interrogatory** 329:7, 9 367:23 368:9 371:10,13 481:4

484:19

**interview** 383:22,25 477:9

**interviewing** 457:24

**introduce** 507:23 509:23

**introduced** 336:21 351:25 352:25 393:4

**investigate** 355:13 375:8 388:8 405:11 408:19 410:25 411:3 441:9,12,15 444:18 450:16 490:3 494:22 496:22

**investigated** 346:14 353:15 357:25 358:9 410:3 432:22 490:3

**investigating** 358:15 435:17 450:10 456:21 460:2 474:9 487:17,19 488:5,9 491:5 495:15 496:16

**investigation** 310:10 337:14 349:18,19,22 350:7, 20 351:15,18 353:14, 16 362:25 363:8 366:10,13,15,21 367:5,8,10 369:16 370:12 371:2,4,6 375:16 376:24 377:11 380:2,4,25 393:14 394:13 396:24 402:13 405:7 411:11,24,25 413:11 425:14 428:14,17 435:16 441:3,19,23 442:10,11,22,25 444:3,14 445:2,6 450:3,13 457:21,24 458:2,24 459:4,9,12, 21 460:5,10 461:6 465:22 471:7,24 475:25 477:5,20 478:15 485:17 487:19 490:20,23,25 491:4 494:11,23 495:2,4,7 504:16

**investigations** 310:10,18 332:15,24

337:2 341:2,3 342:9 346:25 364:5 366:3 368:19 378:7 386:19 398:3,4 402:7 406:24 408:9,10 411:19 414:23 457:13 458:18 478:24 481:14

**investigative** 310:19 350:16

**investigator** 342:10 353:18 378:6

**investigators** 352:4 373:23 374:18 375:10,11,13,20

**invitation** 475:3

**involve** 375:3

**involved** 349:17,23 350:6 376:12 380:10, 24 396:7 414:12 421:24 424:4 428:13 448:8 497:12,18 498:4,12,18 501:10 503:19,20,24 506:22 507:10

**involvement** 347:15,18 348:13 357:22 358:9 360:5 363:9 369:5 410:22 419:16 481:24

**involving** 349:18,19 351:16 368:18 369:21 410:5 414:23 425:14 481:13

**irogs** 316:24

**irrelevant** 438:25

**issue** 336:3 340:13 346:14 349:8 355:15 358:8 394:6,24 395:11 425:4 445:25 447:14 457:16,18 486:25 490:2 496:25

**issues** 347:11 353:21 357:21 358:12 359:10 394:18 400:6 414:16, 17 419:11 427:7 435:20,21,22 456:21, 22 458:19

**item** 468:7

**items** 320:24 369:14 471:13 482:9

---

**J**

**jacket** 447:23

**Jacob** 330:11 331:9, 18 446:5,7

**Jake** 347:10

**Janine** 312:13

**January** 455:10

**Jeff** 319:20 327:16,20 328:23,24 329:3 356:14 358:2,10 360:12 369:23 422:20 423:12 426:5, 12 433:12 437:10 447:4 448:11 461:14 466:22 477:24,25 480:18 483:8 498:22 502:10,11,19,22,23 503:8 504:5 506:11 507:3,5

**Jeff's** 507:9

**Jenna** 417:11,23 448:12 466:21,25 498:25 499:3 503:7 504:20 506:20,25

**job** 332:25 333:15 336:23,25 338:9 346:22,24 414:6,9,15 415:18 419:7 420:11 421:18 451:10 455:2, 19 458:25 473:16 475:8,15 490:3 491:6 506:5

**jobs** 421:15 422:6

**jobsite** 504:2

**John** 469:2

**join** 330:14

**joined** 456:13

**joining** 344:7

**joint** 310:22 311:10, 12 314:24 316:10 337:19 343:13 345:11 346:17

353:19 355:18 367:12 372:4 378:3 422:17 424:19 426:9 428:21 461:22,25

**jointly** 329:15 367:25

**Jones** 319:20 327:16,20 328:23,24 329:3 347:11 356:14, 17 358:2,10 360:12 369:23 402:16 411:15 422:20 423:12 426:5,12 428:23,25 433:12 434:16 437:10,22 447:4 448:11 449:16 461:14 466:22 468:5 477:24 480:18 483:8 499:15,16 501:21 502:10,11,19,22,23 503:8 506:11 507:3,5

**Jones's** 498:22 504:5,16

**journal** 379:2

**Judge** 309:6,22,24 310:25 311:13 313:16 315:4,7 316:6 317:17 318:4,8,12 321:3,16 322:13 324:14,21,24 326:3, 15 328:10 329:17,23 330:2,7,16,21,23 331:7 335:8,11 343:15,18,23 361:10, 14,17 364:9,15 367:13,19 368:4 370:22 372:2,6,16,23 373:4 384:17 392:21 394:2,8 395:13,22 398:19 399:3,9,13 409:15 413:21 415:8, 14,22 416:5,13,18,22 417:3,5 424:22 428:7 430:4,9 431:25 432:4,8 450:20,23 452:8,14 453:7,13, 17,21,24 469:22 472:18,22,25 473:6 482:19 484:2,9,12 497:16,19 507:16,20 508:5 509:12,15

**judgment** 360:3,15 393:7

**July** 332:11 333:7 341:20 344:5,22 345:19 346:23 348:2 354:2,9,14,21 355:14 384:22 402:2 418:14 430:17

**jump** 418:24

**June** 337:21,23 338:3 340:3,11 341:20 354:7 389:11, 17 391:23 462:3

**justifications** 500:22

---

**K**

**kahansen@tesla.com** 354:5

**kahansen@tesla.com.** 385:2 387:8 389:15

**Karl** 309:8 336:17,20 344:5 346:19 354:5 355:22 365:19 367:2 369:24 384:25 385:2 387:7,11,14 389:14, 19,21 397:9 422:10 426:6 458:6,10 460:12 461:7 467:18 478:2,24 480:14 483:9 486:21 494:21 495:14 496:14 497:5, 8 504:10 507:5

**Karl's** 507:8

**Ken** 345:13 480:12, 13,21

**Kenneth** 368:16 369:22 370:5,8 480:10 481:11 484:21,23 494:19 495:14,18,23

**kickbacks** 414:21

**kids** 314:9 315:22

**kind** 316:11 321:19 389:9 434:9 437:23 451:12 453:5 487:22 494:8

**kinds** 451:18

**knew** 323:7,11,17 360:10 475:8 480:21 488:8

**knowledge** 313:7 322:21 323:5

**Kristopher** 345:14

---

**L**

**labeled** 387:3

**lack** 457:17

**lane** 366:3

**large** 345:18 346:5,6, 8,10,13 388:4 391:8 461:17 464:2

**largely** 353:13

**Largent** 321:11 322:18 324:15 325:7 326:11 399:11 415:16,17 450:22 452:18

**larger** 385:7

**late** 471:18 509:2,3,6

**law** 468:17,20,22

**lawyer** 326:13,17

**lawyers** 403:11

**layman's** 381:4

**lead** 319:21 353:18 407:3 455:24 456:2, 20

**leader** 423:13 427:11 448:11

**leadership** 359:22

**leading** 340:22 372:8 456:23

**leads** 407:3,24 409:11

**leak** 374:17

**leaked** 375:18,23

**leaking** 352:24 374:21 375:4 388:12 452:4

**leaks** 381:2

**learned** 385:24 428:16 458:9 464:18 471:22

**leave** 319:22 374:3 383:18

**leaving** 407:25

**led** 457:22 465:18

**left** 431:4 455:13,21 476:5 504:13

**legal** 335:9 366:18 382:16 383:2,9 419:22 425:12 426:5 447:19 448:5 455:3 467:9 492:16,19 498:20 499:18 505:18

**legally** 335:2

**legitimate** 339:17 383:15

**lesser** 403:8

**letter** 468:16 469:2 470:14 471:13

**level** 346:12 356:22 359:15 378:7 436:16

**leveled** 368:11 445:17 481:6

**leverage** 375:21

**license** 425:22

**lifetime** 451:10

**likelihood** 413:7

**limited** 322:10 393:14

**link** 491:22

**list** 309:19 320:5,10, 14,19,20,25 323:2,23 354:4 458:17,20 500:2,3 502:2 508:25 509:5

**listed** 387:14 389:19 401:3 463:8

**listening** 419:12

**listing** 387:21

**lists** 465:4

**literally** 431:23

**living** 347:7

**loading** 311:23 384:8

**located** 333:2 347:2
427:21

**location** 419:10

**locations** 462:22

**log** 352:6

**logging** 312:9
453:16

**logical** 374:19

**login** 353:7

**logs** 382:12 391:6
407:11

**long** 322:4 333:20
334:14 345:7 363:3
410:24 418:4,13
441:19 483:23 495:4

**longer** 354:6 395:4
428:3 429:13 450:5
453:4 471:10

**looked** 386:15 397:7
442:24 459:25
460:14,22 469:7
500:7,17

**looped** 347:9 355:10

**lose** 399:5

**lost** 410:8

**lot** 328:22 374:4
434:17,21,23,25
436:17,23 461:20
466:12 476:6 495:16

**lots** 359:10 462:21

**loud** 396:4

**luck** 453:13

**lumped** 407:6

**lunch** 376:14 416:8,
10 431:5

**Lusk** 488:22

―――――――

**M**

―――――――

**machine** 400:8,11

**machines** 400:23

**made** 322:14,22
344:22,24 349:12
350:3,4,9,17 362:15
366:11,18,22,25
394:10 409:22,23
440:23 441:3 447:16,
25 448:7,9,13,25
449:15 450:2,4
457:17 459:8 471:10
472:6 477:19 486:11
498:15 499:9,14
500:7 506:9,10

**mail** 376:7

**main** 338:4

**maintain** 408:12,13

**make** 324:25 326:19
382:25 383:9 388:8
398:20 404:11
406:12 427:18
431:24 434:5 439:5
487:20,21 501:9,22
502:9 504:9 505:11,
12 507:13 508:21,22,
23

**makes** 404:5 433:17
504:24 507:10

**making** 359:23 375:7
472:6

**malicious** 374:6
407:19,21

**manage** 332:15
333:5 392:6

**management**
334:23 345:25

**manager** 332:23
333:9,13,16 337:2
346:25 371:20
373:14 383:10
404:11 418:12,22
419:20

**managers** 404:13,18

**managing** 337:5
425:12

**manufacturing**
353:2

**marked** 345:10
346:17 355:18

**machines** 400:23

**marking** 337:18
345:9 361:8 378:24

**Maron** 402:9

**Martin** 351:17 352:9
438:6,10

**massive** 360:6

**material** 436:21
464:2

**materials** 320:18,19,
22 340:5 458:20
460:20 464:11,23
472:8 482:12,13
500:10

**math** 418:7

**Matt** 428:23

**matter** 331:20 336:4,
6 339:15 374:25
378:4 386:24 409:14
412:25 413:2 432:16
469:5 473:15 478:14

**matters** 358:4
369:21 375:8 414:13,
19,23

**Mclellan** 319:17

**meaning** 504:13

**means** 421:15
439:20 470:13

**meant** 465:17

**meantime** 312:10

**measure** 359:21

**measures** 373:24

**media** 375:17,18
486:10,12 487:5,10,
12 492:11,22

**media-related**
507:25

**meet** 347:13 423:18,
21,25 424:13 459:14

**meeting** 314:10,14
315:12

**meets** 385:17

**member** 396:21

**members** 458:15

**memory** 474:25
489:10,16

**mention** 445:19,22

**mentioned** 374:21
375:9 377:16 399:20
508:7

**mercifully** 355:21

**message** 344:12

**messages** 465:13

**metadata** 382:12

**method** 350:16

**methods** 350:16

**Mexico** 338:20
347:16,19 348:14

**million** 502:16

**mind** 334:15 348:4
408:7

**mine** 340:19

**minute** 322:7,8 384:8
475:8 497:16,19
507:16

**minutes** 317:22,25
322:6,11 372:20,24
398:20 416:14
431:23 453:3 470:16
472:17,19 501:5

**mischaracterizatio
n** 409:13 483:25

**mischaracterizes**
482:17

**misconduct** 413:12,
13

**mishandling** 374:12
480:8

**misinformed** 364:6

**mission** 373:19

**misstated** 364:10

**misstates** 484:10

**misstating** 364:8

**misunderstanding**

410:14

**mitigating** 403:25
450:7

**Mm-hmm** 345:16

**mobile** 344:10

**Model** 359:13

**Mohamed** 355:24
356:3,7 366:11,14
425:11 426:12
428:18 432:18,21
433:2 437:10,23
447:4 448:10 449:16
466:22 468:5 476:19
499:4 503:3,8 507:2

**moment** 355:16
443:8 446:2

**Monday** 389:11

**money** 406:13,17
409:2,3,24

**monitor** 382:11

**monitoring** 382:24

**month** 418:6 425:4,8

**months** 411:11

**morning** 373:12
417:18 479:10
494:12,15

**motivating** 485:20

**Motors** 336:8

**move** 311:11 312:4
313:13 316:4 317:14
329:8 361:10 367:13,
15,16 408:9 424:19
428:5 430:4 483:23

**moved** 309:18
338:19 381:15
383:15 405:15
411:22

**moves** 411:4

**moving** 327:22
381:23 388:6 490:9

**multiple** 490:15

**Musk** 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1

320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1,23
356:1,5,13 357:1,11,
22 358:1,12,24
359:1,18 360:1
361:1,22,23 362:1,2,
5,10 363:1 364:1,2
365:1 366:1 367:1
368:1 369:1,24 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1,19 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1,19 412:1
413:1 414:1 415:1
416:1 417:1 418:1
419:1 420:1 421:1
422:1 423:1 424:1
425:1 426:1 427:1
428:1 429:1 430:1
431:1 432:1 433:1
434:1 435:1 436:1
437:1 438:1 439:1
440:1 441:1 442:1
443:1 444:1 445:1,
17,19 446:1,21 447:1
448:1 449:1 450:1
451:1 452:1 453:1
454:1 455:1 456:1
457:1 458:1 459:1
460:1 461:1 462:1
463:1 464:1 465:1
466:1 467:1 468:1
469:1 470:1 471:1
472:1 473:1 474:1
475:1 476:1 477:1
478:1 479:1 480:1

481:1 482:1 483:1,9
484:1 485:1 486:1
487:1 488:1,17,20,25
489:1 490:1 491:1
492:1 493:1 494:1
495:1 496:1 497:1
498:1 499:1 500:1
501:1 502:1 503:1
504:1 505:1 506:1
507:1 508:1 509:1

**N**

**named** 314:3 336:17
342:4 351:17 446:4
458:5 469:2

**names** 387:25
437:19,21 438:6,8

**narcotics** 338:5,15,
18 339:21,24 342:9
357:9 377:21

**natural** 418:20

**nature** 350:2

**necessarily** 365:22
400:2 406:14

**needed** 329:10
337:13 346:14
371:11 401:10
420:15 426:6 445:23
446:2 461:4 506:20

**negligent** 374:6

**network** 351:21,22
352:4,5,7,17,19
353:4,12 369:2
376:2,3 381:18 382:2
386:17 481:21

**networks** 375:8
381:24 382:13

**Nevada** 337:3,6
338:20 339:25
340:23 346:2 350:15
351:16 377:12
433:25 486:19

**news** 445:11,16
490:15 491:17,24
492:4,5,7,8,11,22
493:3,5 494:6

**Nick** 309:17 312:22
313:11 316:11

328:17 329:7,8
333:9,23 337:11
345:14 346:18
348:17 350:6 353:22
356:14 361:25
363:14 365:17,21
377:12 384:11
432:15 443:14
473:13 509:22

**Nicole** 371:16,17,18,
19

**night** 493:7,9,14
494:9

**Nisos** 342:2 351:7,9,
13 352:4 353:8
377:13 400:20

**Nocon** 330:11,13,23,
25 331:9,16,18
347:10 364:13
373:12 378:2 379:19
380:23 384:15,20
386:25 399:4,7,12,20
409:18 412:17 415:9
446:5,7

**Nocon's** 331:6

**non-tesla** 462:9

**nonbusiness** 467:8

**nondisclosure**
403:19

**Nonetheless** 470:12

**nonresponsive**
354:25

**nonretaliation**
336:9,12

**normal** 344:19

**noted** 484:8

**notes** 367:14 412:2,5

**noticed** 309:15

**notified** 489:23

**November** 313:3

**number** 315:5
343:15 387:17
404:23 405:15
434:22 443:2,16
464:6

**numerous** 359:9

362:15 369:9 482:4
483:15 485:2

---

**O**

**oath** 309:11

**object** 325:20 393:22
409:12 469:9 483:23

**objection** 309:20
311:14 313:15 316:5
317:16 320:4 326:4
329:12 335:6,7,8
343:22 361:15,16
364:7 367:18 368:3,
13 370:19 384:12,13
392:14,22 393:3,5
395:14,15,18 409:6,
16,17 424:21 428:6
430:8 437:25 446:23
447:7 469:23 481:8
482:14,20 484:10
491:2 497:14,20,21,
22 508:2,4 509:12,14

**obligatory** 431:23

**obtained** 324:7

**occasion** 376:18

**occurred** 354:7
364:14 487:11

**October** 314:11,15
315:13

**odd** 342:11

**oddly** 328:16

**OFAC** 456:24

**offense** 404:8,16

**offenses** 403:7

**offer** 329:15 339:14
343:19 355:19
393:18,21 490:10,12
491:22 507:13
509:10

**offered** 341:18
367:24 509:7

**offering** 361:13
368:2 491:15

**office** 405:24 454:22
493:18,19

**officer** 455:3 486:24
489:12

**official** 332:10

**on-going** 477:6

**on-site** 431:3

**open** 356:25 357:3
421:15 508:24
509:21

**opened** 370:12

**opens** 395:7

**operating** 353:2

**opinion** 339:14,19
342:20,25 343:5,8
344:23,25 345:2,8
360:8,15,22 361:2
492:10

**opinions** 343:6

**opportunity** 373:5

**opposed** 427:21

**opposing** 509:2

**order** 325:14 373:25
374:9 382:17 397:13
402:11,14 461:3

**organization** 339:6,
8 419:18 434:18
506:16

**organized** 341:6,15

**original** 382:17,18

**outlets** 490:16

**Outlook** 344:10

**overrule** 395:15
409:16 482:19

**oversaw** 420:22

**overseeing** 419:14

**owed** 409:3

---

**P**

**p.m.** 416:21 432:2,3
449:3 453:11,12
466:14 472:20,21
506:24

**pages** 355:21

**paper** 474:14

**paragraph** 379:25
395:25 464:16
465:10 469:8 470:11,
15,23

**parameters** 391:23

**parking** 462:21

**part** 343:6 347:21
349:8 353:16 364:9
365:10,13 366:5
371:3 375:10,12
380:12 402:12
407:10 408:23
409:25 435:17
436:24

**partial** 392:15
393:19,20

**partially** 340:24

**parties** 368:18
481:13

**partner** 418:16,19,21
419:6 420:23 423:16
424:18 434:17 467:3

**party** 423:9 449:21
503:20

**pay** 419:9

**pdf** 390:25

**pdfs** 463:7,9

**PDT** 309:4 318:7
330:20 373:3 398:24
416:21 432:3 453:12
472:21

**pending** 507:21,22

**people** 328:24
345:13 346:11 348:2
353:8 354:8,13,24
358:2 360:14 361:2
371:20 374:8 381:10
396:19 397:4 400:12
401:12,14 403:7
404:20 407:13
417:19 435:19
436:10,15 441:21
448:6,7 455:17
458:14 464:6 474:18
495:25 496:5 497:2,4
501:10,11 502:17
503:24 506:19

**perception** 437:4

**Perfect** 416:16

**perform** 364:4

**performed** 444:4
504:15

**performing** 349:22

**perilous** 359:17

**period** 313:21 365:23

**permanently** 369:13
482:8

**permission** 382:8,
17 402:15,17

**persist** 353:5

**persistent** 353:4

**person** 312:8 377:10
383:14,17 413:15
424:14 425:13 427:3
437:16 439:9,10,11
448:3 449:20 457:7
460:11,13 475:8
480:13 502:20,21

**personal** 322:21
331:24 340:6 369:11
376:14 383:5 405:16
425:18 431:8,19
437:7 442:13 463:18
464:24 465:5 471:15
479:3 482:5 483:16
485:3 500:4

**personally** 386:13,
16 394:15 429:16
469:3

**personnel** 390:16
414:13 421:5 463:5

**perspective** 420:15
431:12 451:19
467:10

**pertained** 435:24

**Phil** 475:17,23,25
476:5,16,21

**Phil's** 475:17

**philosophy** 374:2

**phone** 449:6

**photograph** 390:20

**photographs**
388:11 390:21
462:18,19,20

**photography**
388:17

**photos** 388:15
425:20 465:6 479:4
500:4 501:5

**physical** 441:2

**physically** 332:25
431:2 499:6 501:15

**picked** 486:8

**picky** 484:7

**picture** 375:2 388:3
390:6

**pictures** 389:3
425:22

**piece** 350:13 351:6,
24 352:23

**pieces** 482:23

**PII** 386:16 407:14,16

**pin** 447:20

**place** 325:15 350:21
374:4,10,11 375:24
412:2 420:6 441:23
445:2,6

**plan** 383:12

**plate** 359:10

**play** 321:24 322:9,10

**played** 319:2 321:23

**plenty** 397:24

**point** 309:13 319:14
322:7 326:5 329:3
345:4 350:4 367:2
393:25 394:10,20,22
410:10 416:2 460:4,9
471:18,21 488:15
505:2 509:10

**pointed** 354:3

**policies** 334:6,9
368:18 369:12 408:9
410:7 427:15 436:15
439:16 450:3 460:6
481:13 482:6 483:17
485:4 505:10

**policy** 357:2,16
358:7 374:11 382:16
388:17 394:13
402:21 403:3,5,6,18
404:7,17 425:24
426:3,7 428:4 435:24
436:5,7,11 439:2,9,
10,12,19,22,25
451:23,24 460:12
464:20 465:2 472:14
505:13,16,18

**population** 386:4
391:7

**portion** 322:10 501:6

**position** 321:10
333:23 418:10 419:5
423:15 454:25
455:11,14,23 456:4,
8,12 458:10 467:2

**positions** 327:17,23
344:11 421:24

**possession** 317:12

**possibly** 344:7
368:25 440:15,17
481:20

**Post** 490:13

**posted** 415:20

**posting** 405:8
406:15

**potential** 338:5
383:16 407:3 412:18
414:24 419:23,24

**potentially** 358:3
382:15 388:14 404:8
415:5 451:13,20
472:8

**power** 437:24

**practice** 402:8 427:4

**Practices** 456:25

**preceding** 476:13

**premature** 325:8

**premises** 339:3

**preordained** 441:15

**present** 321:4

**presented** 400:21
499:23

**president** 455:15,17

**press** 416:7 473:21
486:6,14

**pressure** 319:19
327:16

**Pretorius** 346:19,20
347:10 353:20
355:11,23 356:14,17

**pretty** 310:15 317:21
333:6 479:14

**preventing** 402:21

**previous** 372:21

**previously** 319:9
331:19 345:20
358:19 370:23 378:3
386:23 387:12
409:21 455:5 461:25
464:4 480:6

**prior** 363:14 364:8,10
365:24 399:21 405:2
409:22 421:7 455:22,
23 456:7 479:9
494:17 495:15
496:16,21 503:5

**priority** 494:14

**privacy** 386:19

**private** 446:22
461:17,19 462:9
479:6

**privately** 455:4

**privilege** 392:24
393:11,24 394:19

**proactive** 375:25

**problem** 312:23
313:12 316:13
393:17

**procedure** 309:14
461:2

**proceed** 416:23

**proceeding** 385:25
421:8

**process** 382:25
441:21 498:14
501:10,23

**produce** 392:17,18,
19

**produced** 317:10 387:19 393:7,8 400:25 441:6 478:13

**product** 348:9 381:8

**production** 476:16

**progress** 490:20,21

**progression** 418:21

**progressive** 403:2,4

**promotions** 419:9

**prompted** 450:13

**proof** 494:16

**property** 332:16 373:21 376:14 381:9 382:22 383:8 389:4 410:6 411:8 429:14 467:19 471:11 499:21 500:9

**proprietary** 383:8 387:22 391:15 425:17 452:5

**prosecuted** 405:24 409:4 438:11

**prosecution** 406:4

**prosecutor** 409:4

**protect** 373:20,25 374:3,9

**protected** 334:10,19, 24 440:7,13 451:8,9, 13,20

**protection** 332:16

**protects** 421:6

**prove** 400:3

**provide** 335:3 336:8, 11 500:10

**provided** 317:5 337:15 338:18 341:23 342:16 343:10 351:7 352:3, 17,18 389:20 397:11 401:7 449:3 476:11, 15 500:20

**providing** 334:11 352:22 501:20

**PST** 397:11

**pull** 310:23 312:7 382:17,18 396:16 397:2 430:3,12 443:20 461:22 466:10 493:10

**pulled** 397:6 401:12, 18 428:13 466:18

**pulling** 384:6 422:14 428:20 430:15 468:15 493:8

**pure** 408:22

**purpose** 325:5 353:7 381:16

**pursuant** 402:7

**pursue** 380:21

**purview** 340:25 376:17

**pushing** 359:21

**put** 312:5,14 328:2 329:7,12 351:22 374:7 383:17 422:16 443:10 447:20,22,23, 25 461:24 464:3,9 466:11 479:20 480:18,21,24 509:25

**putting** 328:3 490:13

---

**Q**

**qualifications** 421:19

**quality** 390:12

**quarter** 372:24

**queries** 400:19,20

**question** 321:25 325:3 329:6 334:14 335:12,21,25 336:7 341:8,10 347:4 351:6 354:12 355:2 361:25 363:3 364:16 368:10 370:3,20 372:15 404:9 408:5 413:20 421:21 427:13 445:10 451:6,16 468:24 471:3 472:5 483:23 484:3,13 497:24 498:2,11 505:8 509:22

**questioning** 495:25 496:6

**questions** 316:3 317:21 318:11,20 328:9,15,17 329:25 330:2 341:9 350:13 351:4 371:25 394:18 398:17,21 399:8,11 412:10 413:18 415:7, 9,10 430:19 450:19, 22 452:9 473:4

**quick** 413:19

**quickly** 411:9,22 459:2 506:3

**quorum** 330:22

---

**R**

**radar** 487:3 489:21

**Rae** 417:11,23

**raise** 358:11,12

**raised** 341:19,22 347:22 353:22 355:13,16 357:8,11 365:11 367:3 377:10 419:11 438:19 456:22 457:16 458:15,21 460:5 479:14 487:2 494:21 495:13,17

**raising** 340:4,9 341:5,9,14 342:21 343:6 357:21 445:25 495:24 496:13

**ramifications** 412:18

**ramp** 359:12

**rationales** 327:22

**reach** 420:16 427:5 452:24 461:4 467:12

**reached** 349:15 355:10 361:22 362:4 433:2 461:5

**reaching** 337:8 353:21 362:2,9 424:16 467:16

**react** 375:16

**reaction** 356:16

**reactive** 375:16

**read** 364:20 379:9,25 380:7 390:24 396:3,4 408:6 470:4,6,13,15 471:4

**ready** 314:20 416:22

**realize** 480:7

**reason** 323:3,16 369:15,18 379:16 383:15 437:6 451:9, 19 465:11,19 487:17 494:3,5

**reasons** 324:12 327:22 369:20

**reassignment** 314:5

**recall** 310:12,14 314:4,8 317:3 318:20,24 319:6,8,16 328:25 337:24 338:2, 4 339:18 344:6,10 345:17,22 347:20 348:17 350:22 353:20,24 356:2,8, 10,11,20 360:16,24 361:4,5 362:8,17,21 365:2,11,14,17 371:15 377:5 393:6 409:23 410:21 422:9 423:2,19 425:3,8 429:4,6,10,23 430:2 438:7,17,21 441:7 446:24 448:16 458:14,22 459:3,19, 21 460:8 461:4,12 463:23,25 467:11,15 468:3,9,13,23 469:3 471:25 472:4 473:25 474:8 475:6 478:4 480:23 485:13 489:10,15 496:24 501:15 506:18 507:11 508:8

**recalled** 356:19

**recalling** 474:25

**receive** 382:10,14 388:5

**received** 310:2 311:15 313:18 316:8 317:19 329:20

338:13 341:24 344:2 350:13 356:7 361:18 367:21 368:6,15 370:7 384:18 424:24 428:9 430:11 448:25 449:5,6 460:11 464:11 478:9,23 480:6,11 481:9 483:11 484:20 508:12,14,16,18,20 509:18,20

**receives** 404:7

**receiving** 327:15 337:24 356:2,15 414:21

**recently** 476:15

**recess** 318:6 330:19 373:2 398:23 416:20 432:2 453:11 472:20

**recipient** 384:24 385:2 387:14 389:21

**recipients** 387:10,11 389:16,18

**recognize** 311:3,17 313:2 315:9 316:15 462:6

**recollect** 488:18

**recollection** 321:2 334:3 338:16 423:24 471:6 476:8 500:6 509:7

**recommendation** 363:19 427:19,23 506:9,10

**reconcile** 483:7

**record** 309:14 317:25 318:4,9 326:24 330:17 331:5, 17 342:12 373:6 375:6 378:16 386:2 390:16 398:18,20,25 405:2 417:6,8,22 430:21,24,25 431:6,7 453:20 454:3,17 461:10 472:23 473:2 484:7

**recorded** 319:4 323:6 325:20

**recording** 319:2 321:5 322:3,4,5,12, 14,17,22 323:21 324:6,17 325:10,12, 19

**recordings** 323:12 324:4 325:4,14

**records** 375:4 386:3, 5,7 400:2 408:10,11 425:20 431:12,18 461:18 463:4,5,13 465:5 467:24 478:25 500:5

**recruiter** 421:8,11,13

**recruiters** 344:21 422:3

**recruiting** 420:22, 23,25 421:2

**redirect** 318:12 323:20 324:10 328:13 399:13 450:23

**reduction** 446:13

**refer** 414:20

**referenced** 309:16 370:6 508:25

**references** 426:19

**referencing** 480:5

**referred** 366:4

**referring** 320:3 366:20 370:9 401:19

**reflect** 339:4,5,7

**refresh** 320:25 476:7 488:18 509:7

**regard** 409:13 419:25 425:5,9 427:15 429:24 465:19 467:13,21 477:20

**regions** 455:24

**regularly** 357:4 397:16 477:3

**regulatory** 415:3 435:25

**rehabilitate** 319:25 320:11,12,15,23

**326**:6

**rehabilitation** 323:24

**related** 327:23 376:13 436:18 507:8

**relating** 478:14

**relations** 423:16 424:16 506:7,8

**relationships** 419:17

**releasable** 378:21

**release** 473:21 486:6,11

**relevant** 395:9

**relied** 365:5 449:13 504:5

**rely** 376:20

**relying** 501:19

**remain** 330:5 333:20

**remarkable** 342:7

**remember** 333:22 337:22 343:20 350:24 356:15 358:17 362:12 366:9 407:12 433:7 435:9 437:12,19,21 438:5, 9,10 443:16 458:9, 12,19 471:21 473:24 485:5,25 491:16,20, 24 496:2,12 499:6,7, 16 500:16,18 501:14 503:13 506:18,21

**reminded** 309:10

**remotely** 333:4,6

**removal** 314:6,15 323:9 413:8 441:22 471:12

**remove** 411:4,8 447:17 448:2 498:14, 15 499:10

**removed** 319:15 321:7,10 398:5 410:17,19 411:3 413:16 426:7 427:24 442:5 447:9 498:6 506:17 507:6

**removing** 431:18

**Reno** 315:23 339:25 433:25

**reorganization** 407:5

**repeat** 341:10 354:11 365:13 451:16

**repeating** 334:15

**report** 327:9 337:16 341:24 342:4 343:9 368:15 369:7 370:7 377:21 379:11,13 438:16 441:6 475:24 477:11 481:10 482:2 483:11,13 484:20,24 506:14,15

**reported** 358:2 368:17 375:17 438:20 457:3,7 460:13 475:13 476:6 481:12 483:8,19 484:18 501:17

**reporter** 331:3 454:3

**reporting** 334:18 338:2 339:16,21,23 414:25 415:3 501:20 507:5

**reports** 378:10 475:16 487:12

**represent** 432:16 473:14 503:7

**representation** 478:12

**representative** 331:21,25 334:5 336:3,5 340:8 348:19 366:23 424:4

**represented** 467:9

**req** 422:3,5

**request** 317:9 402:10 423:18,20,25 459:8 471:10 472:10

**requested** 461:7

**requesting** 402:22

**require** 414:25

**required** 353:7 497:8

**requisition** 422:5

**requisitions** 421:14

**research** 482:11

**resigned** 333:23

**resolution** 458:3

**resolve** 411:21

**resolved** 358:10

**Resources** 383:10

**respect** 456:24

**respective** 419:13, 19 424:18 427:10 442:4,6

**respond** 355:6 494:24

**responded** 317:9

**respondent** 368:12 481:7

**responding** 337:25

**response** 332:20,24 333:13 342:5 356:3 485:6,10,12

**responses** 312:11 313:6 317:4 329:8,9 367:24 481:3

**responsibilities** 338:10 414:15 419:5 421:11 456:17

**responsibility** 340:20 376:21,22

**responsible** 449:20, 21 456:20,23 457:2

**responsive** 317:11

**rest** 326:13 357:12 507:13

**restricted** 386:5,9 388:20,22 391:10 396:14

**result** 321:8 351:17 369:7 371:5 396:2 407:18 410:8 441:16 461:15 464:16 482:2 483:12 484:23

**resulted** 395:3

**results** 383:25 441:2, 4 475:24 477:4,7

**resumé** 344:21

**retaliation** 334:6,10, 20 439:22,25

**return** 503:25

**returned** 344:12

**Reuters** 486:7,14 487:2

**review** 369:12 376:18,21,23 383:3 387:21 391:22 396:11,16,22 397:14, 21 482:7

**reviewed** 313:6 369:8 401:20 482:3 483:13 484:24 485:7

**reviewing** 317:4 376:12 378:11 396:7 457:25

**RFPS** 316:22,23

**Richard** 422:19 423:2

**Rick** 319:17 426:19, 25

**Ricks** 448:17,19

**Ricky** 422:19

**RIF** 354:7

**RIFS** 433:8 446:17

**risk** 351:23 374:7

**risks** 368:24 481:19

**Robertson** 309:13, 23 313:15 328:14,16, 21 329:5,16,21 330:12,18 331:4 372:7,13,17 394:4,9 409:20 416:9,16 417:17 424:19 425:2 428:5,10,11 430:6, 12,14 431:22 432:5 437:25 443:12 446:23 447:7 451:5 452:6,16,23 453:10, 15,18 454:13 462:23 463:2 469:14,17 470:5,17 471:2 472:16,24 473:3

482:14,16 483:22
484:5,11 490:8 491:2
497:14,25 507:19
508:3 509:13,21

**role** 337:5 344:15
364:4 366:5 369:2
371:23 373:18
375:11 380:13,24
420:18 457:4 458:4
481:21

**roles** 326:19 344:16

**rolls** 428:24

**room** 330:15 350:14
377:14 492:21
500:11 502:21
503:11

**Rothenberg** 475:23,
25 476:16,21 477:4

**routine** 375:12

**rules** 324:13 420:10,
12

**run** 347:5 399:21
402:7 411:11

**running** 400:14
401:2

---

**S**

**sa6892@gmail.
com.** 385:3 387:15
389:22

**sales** 406:25 407:3,6,
23 409:11

**San** 333:4

**sanction** 403:23

**sanctions** 456:24

**Sarbanes-oxley**
334:13,19

**scale** 345:19 346:5,6

**scope** 328:12 346:15
394:11,14,22

**Scott** 314:3 315:17

**scratch** 320:16
336:15

**screams** 378:19

**screen** 377:24 384:7
390:7 422:17 461:25
464:4 508:24

**screened** 344:21

**screenshots** 407:16
479:4

**scroll** 311:22,24
315:15 316:18

**scrolling** 385:7
462:10

**Sean** 336:22 337:15
338:13 345:12
347:10 348:18
355:23 356:13
377:10

**Seattle** 347:7

**SEC** 323:6 327:4
335:3,19 369:24
410:11,23 415:4
435:22 438:16,19,23
444:22 445:7,17
471:20 472:9 473:22
474:4 486:7 487:2,7,
18 488:3 489:24

**seconds** 322:6,8,9,
11

**secrets** 332:17
373:21

**Securities** 486:20

**security** 317:10
332:20,24 333:13,16
337:6 340:22 341:3
345:24 346:25
350:14 352:2 373:14,
19 375:4 376:12
381:25 388:20 389:2
390:8,9 420:23,25
421:5 423:4,5,7,10,
13 425:21 426:20
427:2 428:24 433:14,
16,25 434:5,10
448:21 461:11 467:9,
13,17 468:2

**semantics** 505:21

**semitrailers** 338:19

**send** 381:10

**sender** 384:23,25
387:6,7 389:13,14

**sending** 337:22
352:11 368:19 376:4
381:18 385:14,16
409:2 431:19 436:2
437:3 481:14

**senior** 333:12,15
346:24 359:21
371:20 373:14
418:12,16,21,22

**sense** 433:17 457:14
469:13 507:10

**sensitive** 383:7
386:15 395:18

**sensitivity** 378:24

**sentence** 379:25

**separate** 376:23
449:8,10

**September** 315:17,
19 429:5,12

**sequence** 415:22
471:25

**series** 406:24

**served** 317:5

**service** 423:8,9,10

**set** 328:5 382:11
410:20 460:2 479:6,
17 499:24 501:12

**Shanghai** 456:2

**share** 312:6,14,15
360:14,22 361:2
377:24

**shared** 360:20
436:22 483:2

**shareholders**
438:20

**shield** 393:12

**shortly** 322:15 364:2

**show** 310:22 311:9
314:19 337:17
343:13 345:9 346:16
355:8,17 361:7
367:11 377:25 389:7
392:11 476:7 477:19
478:18 481:2 486:13
490:5,6 491:14,22
494:11 505:25 506:3

**showed** 328:6
358:18 360:3 485:11,
14

**showing** 353:19
361:20 378:2 443:23
476:14 478:20

**shown** 405:5 484:21

**shows** 431:6

**sic** 313:24

**side** 321:15 326:13,
21 453:4 505:16,17

**sides** 309:16

**sign** 415:11 449:18
452:12

**signatory** 468:25

**signature** 313:2

**signed** 313:6 449:20,
24

**significant** 351:15
405:15

**similar** 392:25
407:15

**similarly** 452:24

**simpler** 468:25 472:5

**simply** 348:22 352:3,
17 357:15 409:22

**sir** 319:7 327:2 329:4
332:7 335:23 343:3
346:23 347:2 349:6,
14 350:10 352:13
361:12 432:10 443:8
454:5 473:8

**site** 398:5,15 426:7
427:24 428:4 442:5
447:9 450:5 498:6,16
499:11

**sitting** 325:17 377:15

**situation** 318:23
321:20 327:13
359:17 434:9

**small** 313:21 386:13

**snapshot** 390:9

**social** 375:18

**solar** 406:25 407:24

**somebody's** 402:11

**someone's** 447:22
475:12

**sooner** 413:8

**sort** 345:8 378:24
390:15 403:7,23
427:9 434:8 435:25
457:17,25 459:23

**sounds** 371:23
469:24 483:18

**source** 338:17
375:22 421:4 422:4

**sources** 365:5,10

**sourcing** 421:17
422:4

**south** 345:15

**SOX** 439:21,25

**speak** 336:7 357:13
414:14 434:16 457:9
459:17 480:13
488:17,25 498:7

**speaking** 382:7
403:17 485:13
488:15 499:17
502:23

**speaks** 336:12

**specific** 352:8,20,23
353:24 385:22
394:12 395:11
404:24 406:21,23
423:24

**specifically** 310:14
336:13 368:24
381:21 394:17
425:15 426:2,24
437:20 460:16
481:19

**speculate** 369:19

**speculation** 408:22

**spell** 454:16

**spend** 374:4

**spent** 328:22 495:16

**spoke** 337:8 363:22,
23 364:3 426:19

469:12 477:25
482:15,22 485:15
486:2 488:16 494:20
495:19 496:3,12
506:19

**spoken** 362:22
429:12

**spreadsheets** 407:3

**Sprott** 311:5

**spurred** 482:11

**spying** 486:17

**staffed** 375:10

**stamped** 322:16

**stand** 309:8 330:4

**standard** 427:4

**standards** 382:2

**standing** 330:13
416:7

**star** 379:10

**start** 372:12,20
439:14 474:9 495:6
496:20

**started** 313:23
351:12 418:7 444:18
455:12 471:23 495:2,
4,9,10,25 496:5,10

**starting** 333:3
395:25 446:18
494:14

**starts** 368:13 470:11

**state** 331:16 344:14
389:24 417:21
454:16

**stated** 338:17 344:17
347:12 370:23
387:13 397:4,15

**statement** 310:15
365:14

**states** 389:25 455:25
502:16

**stating** 338:18
363:15 404:15

**staying** 353:12

**steps** 382:4 459:22

**stock** 446:22

**stop** 310:9,18 339:11

**stored** 407:14

**Storey** 379:11 409:3

**strange** 494:8

**strike** 483:24 484:3

**struck** 342:10

**structure** 407:8
434:12

**struggling** 359:12

**subject** 309:8 323:25
338:4 339:15 374:25
382:24 409:14

**submit** 316:4 368:8

**submitted** 509:4

**subsequent** 429:22
458:22

**subsequently** 355:9
405:18 410:12
438:11 439:12

**substantial** 363:18

**substantiated**
348:23

**substantiates** 349:3

**successful** 362:25
363:10 374:16 380:6

**successive** 443:18

**successor** 476:4

**suddenly** 494:10

**suggestions** 342:17

**summary** 393:6

**supervisor** 333:7,21
334:2 475:10,18,21
476:4,22,24 477:2

**supplement** 476:15
509:2,4

**supplemental**
509:23

**supplemented**
478:20

**supply** 347:16,18
348:13

**support** 324:7
335:19 420:4

**supported** 434:12,
14

**supporting** 500:22,
25

**suppose** 401:5

**supposed** 338:9
408:12,13 488:10
494:24

**surmise** 407:23

**surprise** 321:22
356:23 360:20

**surprised** 358:21
447:3,12 488:7

**surprising** 487:22

**suspicious** 351:21

**sustain** 326:4

**Swapnil** 476:18

**swear** 331:3 417:9
454:4

**swipe** 431:3,4

**sword** 393:12

**sworn** 331:10 417:7,
12 454:8

**syndicates** 341:6,15

**system** 353:2 388:20
419:8 442:4

**systems** 371:21
374:10 375:24 381:9
407:14

---

**T**

**tag** 447:21

**tail** 425:10

**taking** 374:11 403:14
407:2,19 409:11
422:23 436:2,25
437:2 445:2

**talent** 421:3,5

**talk** 475:2 477:24
492:10,14,16,17,19
495:18,19 502:10

**talked** 349:21 362:3
477:8 493:23

**talking** 328:23
347:24 394:11 409:2
434:23,24 442:20
445:16 448:22 478:5
480:10 483:20
492:20,24 493:4,20
502:11,14,15,18,20

**talks** 465:10 486:21

**tasked** 458:23

**tax** 436:23

**TCR** 327:4 438:15,23
445:17 473:23 486:7,
22 488:3 489:3,11,23
490:23,24 491:4

**TCRS** 489:5

**team** 326:20 332:15,
19 337:2 341:2
344:16 345:21,25
347:5,13 348:6 352:2
358:15 373:22
374:18 375:9 376:24
381:21 382:3 384:4
386:20 388:5 396:10,
15,22,25 397:13,16
410:3,4 422:5 424:16
457:11 467:4 492:17,
20 498:22 502:4,12,
25 503:17,18 504:6,
16 506:20 507:8,9

**team's** 376:17 398:3,
4

**teams** 345:25 467:8,
9

**tech** 312:9 314:20
412:25

**technical** 374:13
504:23

**telephone** 319:3

**telling** 314:8 325:23
338:14 362:8 503:19

**tells** 431:2

**temporarily** 368:23
481:18

**temporary** 337:5

**ten** 408:12 453:2

**tend** 322:2 324:14

**tendency** 366:2

**tenure** 436:14 451:10

**term** 346:8 421:7,8
428:2 484:5

**terminate** 404:16
420:2 437:24 440:23
447:8 497:12

**terminated** 319:5
383:19 397:23,25
402:25 404:8,21
405:18 410:12,15
438:24 439:13
440:12 447:5

**termination** 403:21,
24 413:9 427:10
434:6 437:11 440:15

**terminations** 420:7
434:19 435:3,14

**terms** 333:18 334:9
336:14 381:4 413:7
457:13 459:20 461:2
464:10 467:16 505:9,
24

**Tesla** 309:7 310:11,
18 318:23 323:8
327:20 328:2,11
331:21,25 332:5,6,9,
11,13,14 333:3 334:9
336:3,6,8 338:10,21
339:10 341:18 344:7,
15,19 348:2 349:25
351:3,12,13 352:2
354:6,13,19,21
355:12 356:25
359:12 360:14 361:2
365:6 366:2 368:15,
17,19,21 369:6,7,10,
11,12,16,20 370:6
371:19,21 373:14
374:22,23 375:4
376:5 380:25 381:8,
9,10,11 382:22
385:13,19 386:4
387:22 388:13,16,19
389:3,4,19 391:7,15,
18,24 392:8 393:7,20
394:12 395:4 396:7,

13,14,16,22 397:9,
17,23 398:2,5,9,10,
11 403:2,6 405:9,16
406:17,25 407:4
409:2 410:5 411:4
412:18,19 413:18
414:11 416:3,6
418:3,5,11,18 421:5,
6,9,16 422:6 424:14
425:17,23 426:2
427:6,8,15,18,22
429:13 431:15 433:5
436:19 437:3,4,7
438:11 439:15,18,21,
24 442:13 445:17,23
446:8,13 450:24
451:14,19 452:15
455:5,8,13 458:11
460:6,24 462:8,20,21
463:14,17 464:18
465:13 467:19
471:11,14 475:13
477:16 478:24 479:5
481:9,12,14,16,25
482:2,5,6,7 483:10,
13,15,16 484:18,24
485:2,3,21,22 486:16
489:5 492:8,14 493:6
500:9 504:19

**Tesla's** 334:5 347:18
348:13,19 351:22,23
352:5 367:23 369:2
373:20,25 381:8,23
408:11 416:3 419:16
429:20 439:3 442:21
464:19,25 481:21
486:19,23 509:3

**tesla.com** 387:12

**testified** 310:9
313:21 331:11,19
334:4 345:20 364:13
373:13 377:2 378:5
380:9,23 386:8
391:19 392:3 409:21
417:13 454:9

**testifies** 324:16

**testify** 335:13

**testifying** 322:2,20
331:23

**testimony** 310:16
317:8 324:10 325:9
326:7 327:7,10 330:3

331:6 364:8,10
385:25 395:20
409:13 415:11
452:11

**Texas** 418:2 454:23

**text** 311:4 315:10
328:5 337:20,25
344:4

**texted** 344:12

**texting** 344:6

**texts** 337:22

**theft** 345:18,23 346:4
360:6 400:8,11 436:4

**thefts** 340:4,13,16,18

**thing** 470:7 483:24

**things** 327:19 342:17
350:17 357:9 359:9
374:9 411:21 438:20
451:12,18 457:15
458:17 460:21
477:10 479:13,19
483:10 493:20 502:3
504:22 505:22

**thinks** 469:11

**thought** 319:15
337:13 339:16
341:21 342:23
364:23 406:13
460:14 488:21

**thoughts** 416:6

**thousands** 422:2

**thread** 499:7

**threatening** 406:9

**threats** 405:8

**three-plus** 410:4

**Thursday** 387:3
493:14

**till** 372:24

**time** 313:5,21,22
314:3,13 323:4
328:23 330:10 331:3
332:22 333:11 337:3
339:20 340:15 342:2,
14,19 344:17 345:3,
7,22 347:6 349:24
351:3 353:9 359:11,

15,19 360:4,10
362:9,15 374:4
377:9,23 383:11
392:8 394:21 395:16
396:9,17,20 397:5
399:8,9 401:16
402:2,8 405:4 407:18
412:22,24 414:15
416:12 419:14
420:21 423:3,11
424:16 426:4 427:14
432:7,25 433:13,15,
20 436:24 445:23,24
446:8,16,20 448:15,
16 455:7,18,20
456:3,11,13 457:6
458:5 459:15,18
461:12 464:9 466:11,
15 470:3,9 471:9
473:5,24 475:16
476:22 484:15
493:10,25 495:13,17
507:12

**timeline** 486:4

**times** 365:22 374:24
381:9 397:20 404:20
434:15 435:13 437:9

**tips** 438:15

**title** 332:21,23
333:10,12,14,15
346:23,24 373:13
390:25 418:13,15
433:12,15,19,22
440:2,3 451:7 473:17
487:25 506:7

**titles** 390:24 418:17
433:17

**titular** 449:19

**today** 331:6,23 405:5
411:15,17 416:11
453:19

**Todd** 402:9

**told** 310:9,18 319:21
323:7 357:4 363:11,
13 365:4 371:9,14
506:4

**tomorrow** 452:17
477:9

**tools** 403:11

**top** 378:25 404:23
411:15

**topic** 319:13

**topics** 334:4

**total** 322:6 435:7,13

**totality** 360:9

**totally** 312:9 324:13

**touch** 452:20 480:19,
24

**town** 315:22

**track** 507:17

**trade** 332:17 373:21
435:25

**trafficking** 338:6,15
339:22,24 357:10
377:22 458:18

**trained** 373:22

**training** 336:9,11
436:21

**transcript** 309:16

**traveling** 314:9

**treated** 413:6

**trigger** 385:15
386:18

**triggered** 367:7,9
371:7

**triggers** 370:25

**Tripp** 351:17 352:9,
25 353:5,14,16
438:6,10

**Tripp's** 351:18

**trouble** 357:18

**true** 313:5,7 314:13
323:11 372:4 412:3
492:9 503:18

**truth** 364:24

**Tuesday** 384:22

**turned** 358:20

**turning** 495:9 496:10

**turnover** 347:14
348:8

**tweeted** 446:21

**tweets** 409:2,14,21,
23,25

**Twitter** 405:8,13
406:15

**two-minute** 398:17

**type** 334:22 374:5
375:5 378:16 385:22
386:12 404:17
463:24

**types** 352:6 375:15
383:6 386:18 391:14
414:19 463:15 465:7

**typical** 424:10
456:25

**typically** 376:16
378:20 396:24 411:2
413:15

U

**U.S.** 317:10 342:10
426:20 427:2 428:24
448:21 467:13,17
468:2 486:20

**ultimately** 319:21
404:10

**unable** 349:11
380:14,17

**unauthorized** 369:5
481:24

**uncorroborated**
361:24

**uncovered** 395:2,6,
12 471:6

**underdeveloped**
342:19

**underlying** 428:14

**understand** 370:15,
18 395:13 409:15
439:5 445:3 453:7
469:23 470:10

**understanding**
326:7 334:21 340:9
349:9 353:12 366:24
429:11

**understood** 352:21 376:11 380:22 384:5 386:21 388:10 396:21 397:15

**undisputed** 323:14

**unique** 321:20

**United** 455:25 502:16

**university** 423:5,6

**unnamed** 365:5,9

**unreasonable** 354:19

**unresponsive** 354:10,15,20

**unrestricted** 368:25 481:20

**update** 415:19 452:19

**upheld** 420:10

**uploading** 376:5,6

**upset** 445:20

**USSA** 309:7,9 313:24 319:20 320:17 321:12,20,23 323:3 329:7,24 395:4 399:10,11 429:19,23 450:21,22 468:12 472:11 498:5,15 499:10

**USSA's** 321:17 323:5 326:4

**Utah** 405:7,25

---

**V**

**V-A-L-E-R-I-E** 454:19

**Valerie** 348:20 349:5, 24 350:8 366:16,22, 24 370:13 401:20 402:12 426:4 433:19 435:4 437:10 442:3, 7,8 444:4 447:4 448:10 449:2 454:7, 18 503:8 507:2

**variety** 457:18

**vehicle** 407:6

**vendor** 381:20

**vendors** 400:24

**venture** 366:2

**veracity** 460:3 487:15

**Verdi** 313:24

**verification** 311:21, 24 312:19 316:19,20, 23

**verify** 501:24 503:21

**version** 344:10

**versus** 309:7 358:6

**vice** 455:15,17

**video** 319:25 337:2 376:19,23 479:4,5 491:23

**viewed** 462:8

**viewing** 471:15

**VII** 440:2,3 451:7

**violate** 403:18,20 427:14 464:25

**violated** 425:25 435:24 439:2,8,9,10, 12 450:4 464:19 505:11

**violating** 368:17 436:5,7,10 460:6,12 481:12

**violation** 334:7,18 357:17 358:7 369:11 382:16 388:16 394:12 404:6,18 408:8 410:7 425:24 431:17 451:24 482:6 483:16 485:3

**violations** 334:12 335:20 374:11 403:21 414:24 426:8 428:4 436:23 451:23 472:14 505:13

**visibility** 411:20

**visiting** 315:22

**volume** 464:2

---

**W**

**W-O-R-K-M-A-N** 454:19

**wait** 507:16

**waiting** 330:15

**waive** 392:25

**waived** 392:24

**waiver** 392:15 394:14 395:7,8

**waives** 393:2

**walk** 313:25

**wanted** 324:4 377:17 380:21 395:4 438:23 444:21 445:4 475:2 495:18,19 497:3,4,6 508:8,9

**warning** 383:20 403:9,22

**warrant** 434:8

**warranted** 405:3

**warrants** 440:15

**water** 376:14

**ways** 451:8

**weapon** 393:25

**web** 376:7

**website** 344:19

**Wednesday** 493:9, 14

**week** 393:8 423:19

**weekend** 476:12 478:21

**weeks** 351:14 438:24 439:8 440:11,14,16 444:23

**weigh** 394:7

**wheels** 495:8

**whistleblower** 335:2 369:24 486:16, 19

**White** 371:16,17,18, 19

**whomever** 458:15

**Wiebke** 314:3,4,14 315:11,20,21

**withdraw** 497:23

**withdrawing** 497:25

**withdrawn** 371:11

**witness's** 335:15

**witnesses** 335:18 416:4 453:4 457:24 475:2 477:22

**witnessing** 368:17 481:12

**woman** 447:25

**wondering** 445:12 483:19 500:24 501:2

**Woodfield** 309:20 312:6,13,16,21,23 313:12 314:22 315:2 316:5,13,22 317:16 318:13,14,18 319:24 320:7,9 321:5,14,18 322:5,15,20 323:19 324:3,19,22 325:10, 18 326:9,12,17,22,23 328:8 329:14 330:8, 10 331:2,15 335:15, 16,17 343:17,19 344:3 361:12,19 364:17,18,19 367:16, 22 368:7 371:8,24 379:21 384:13 392:4, 13,23 393:5 394:14 395:14,21 399:14,15, 19 409:9 410:9 412:9,19 413:19 414:5 415:7,23,25 416:19 424:21 428:6 430:8 432:9,10,14,15 438:3 443:7,15,20,22 447:2,10 450:18 469:9,15,23 473:7,8, 12,14 483:4 484:16, 17 490:10,14 491:7 497:17,23 498:3 507:12 508:10,21 509:25

**Woodfield's** 325:24 372:10

**word** 391:2 457:18

**words** 505:14

**work** 310:10,19 335:5 340:13 347:14 348:9 352:3 375:22 381:8,15 382:16 384:2 398:13 417:25 418:2 419:19 434:19 435:4,13 437:9 439:6 449:23 453:5 455:5,7 461:19 491:13

**work-a-day** 414:13

**workable** 436:14

**workday** 493:15

**worked** 313:22 333:4 351:10 437:16,22

**working** 313:23 342:2 350:23 351:2, 12 396:20 408:21 419:13 428:4 450:5 493:15

**Workman** 348:20 349:5,18,20,22,25 366:16,22,24 370:13 393:13 396:9 397:12 401:20 414:6 426:12 428:17 433:19 435:4 437:10,22 438:18 441:6,9,15,18 444:4, 15 447:4 448:10 449:2,16 450:6,9,12, 15 452:25 453:16,22 454:7,14,18,20 461:24 464:3 466:18 468:15 470:7,19 473:4,13 482:21 484:12 498:4 503:8 507:2

**Workman's** 410:25 412:2 436:16

**works** 419:22

**wound** 478:3

**wrapped** 353:14

**written** 383:19 403:22 477:14

**wrong** 371:10,12 439:11

**wrote** 355:24

**Y**

**Yahoo**  381:12

**year**  358:17 446:14,
19

**years**  408:13 410:4
418:6 436:14 489:10

**yellow**  379:7

**yesterday**  310:8,13
311:7 313:20

**yield**  363:17

**York**  490:12

**Yusuf**  355:24 356:7
366:11,14 425:11
426:4,12 432:18
437:10 442:24 447:4
448:10 449:7,8
476:19 503:3,8
506:20 507:2

**Yusuf's**  433:22

**Z**

**zoom**  379:7 390:2,11
470:19

Page 517

1              JUDICIAL ARBITRATION AND MEDIATION SERVICES
                            (JAMS)
2
    KARL HANSEN,                        )
3                                       )
              Complainant,              )   JAMS REFERENCE NO.
4                                       )   1260005897
    v.                                  )
5                                       )
    ELON MUSK; TESLA, INC., TESLA       )
6   MOTORS, INC.; and U.S.              )
    SECURITY ASSOCIATES,                )
7                                       )
              Respondents.              )
8   _____)

9

10

11                    EVIDENTIARY HEARING

12                WEDNESDAY, APRIL 13, 2022

13

14                       VOLUME 3

15

16              On Wednesday, April 13, 2022, the

17      following proceedings came on to be heard in the

18         above-entitled and -numbered cause before

19               Judge Carl (Bill) Hoffman (Ret.).

20

21

22

23   Proceedings were reported by stenographic method

24   by: DEBRA A. DIBBLE, RDR, CRR, CRC

25   Job no. 208977

Page 518

Hansen v Elon Musk - Arbitration Day 3

1
2
3  ARBITRATOR:
4          Judge Carl (Bill) W. Hoffman (Ret.)
5
6  FOR THE CLAIMANT:
7          EMPLOYMENT LAW GROUP
8          BY:   NICHOLAS WOODFIELD, ESQ.
                 R. SCOTT OSWALD, ESQ.
9          888 17th Street N.W.
           Washington, DC 20006
10
11
12
13  FOR THE RESPONDENT:
14          SEYFARTH SHAW LLP
15          BY:   CHRISTOPHER ROBERTSON, ESQ.
                  ANNE DUNNE, ESQ.
16          Two Seaport Lane
            Boston, Massachusetts 02210
17
18
19          Counsel for Elon Musk; Tesla, Inc.; and
            Tesla Motors, Inc.
20
21
22
23
24
25

Page 519

Hansen v Elon Musk - Arbitration Day 3

1
2          MARTENSON HASBROUCK & SIMON LLP
           BY:   JANINE BRAXTON, ESQ.
3                ALEX SMITH, ESQ.
                 ROBIN LARGENT, ESQ.
4          455 Capitol Mall
           Sacramento, California 95814
5
6
7
           Counsel for U.S. Security Associates
8
9
10  ALSO PRESENT:
11          Karl Hansen
12          Stephanie Stroup
            Tesla in-house counsel
13
            Jaime Bodiford
14          Tesla in-house counsel
15          Lisa Flegenheimer
            Tesla paralegal
16
17
18
19
20
21
22
23
24
25

Page 520

Hansen v Elon Musk - Arbitration Day 3

1
2                  ------------
3             P R O C E E D I N G S
4          April 13, 2022, 9:09 a.m. PDT
5                  ------------ .
6             JUDGE HOFFMAN:  Mr. German, you are
7  the first witness for today's proceedings, and so
8  I'm going to ask that the court reporter swear
9  you in.
10                 ------------
11            MATTHEW DAVID GERMAN,
12            having been duly sworn,
13            testified as follows:
14                 ------------
15               EXAMINATION
16                 ------------
17  BY MR. WOODFIELD:
18       Q.  Mr. German, my name is Nick
19  Woodfield.  Could I get you to state your full
20  name for the record, please?
21       A.  Full name is Matthew David German.
22       Q.  And you've already testified in this
23  matter as the corporate representative of
24  U.S. Security Associates; correct?
25       A.  Yes.  Yes, sir.

Page 521

Hansen v Elon Musk - Arbitration Day 3

1
2       Q.  And you're testifying today in your
3  own personal capacity and as the representative
4  for U.S. Security Associates; correct?
5       A.  Correct.
6       Q.  By whom are you currently employed?
7       A.  TAO Group Hospitality.
8       Q.  And how long have you worked for
9  TAO Group?
10      A.  Since June of 2021.  So approaching
11  one year.
12      Q.  And what were you doing before June
13  of 2021?
14      A.  I was employed by Madison Square
15  Garden Entertainment.
16      Q.  And how long did you work for Madison
17  Square Garden?
18      A.  Roughly two years.
19      Q.  And was that from October of 2019
20  until June of 2021?
21      A.  Yes.
22      Q.  And what is your job with TAO Group?
23      A.  I am the head of global security for
24  TAO Group.
25      Q.  And what were you doing before you

Hansen v Elon Musk - Arbitration Day 3

1  were working -- back prior to May of '20 --
2  sorry, before October of 2019?
3      A.  I was unemployed from June of 2019
4  until October of 2019.
5      Q.  And what happened in June of 2019?
6      A.  I was released from service from
7  Allied Universal in a reduction of force due to
8  the acquisition of U.S. Security Associates.
9      Q.  How long did you work for
10 U.S. Security Associates?
11     A.  February of 2014 until my release in
12 June of 2019.
13     Q.  And Allied Universal purchased
14 U.S. Security Associates; is that correct?
15     A.  That is correct, yes.
16     Q.  What was your job title at Allied
17 Universal?
18     A.  National account manager.
19     Q.  And how long did you work at
20 U.S. Security Associates and subsequently
21 Allied Universal?
22     A.  Five years.  Five years.
23     Q.  And was that from February of 2014
24 until March of 2019?

Hansen v Elon Musk - Arbitration Day 3

1      A.  Yes.  I believe it was June 2019, but
2  yes.
3      Q.  If you would, run us through your job
4  history at U.S. Security, please.
5      A.  I started at U.S. Security in
6  February of 2014 as an operations manager at a
7  local branch office in Wichita, Kansas, servicing
8  every client contract that we had in that
9  specific market.
10         Did that for roughly a year, maybe
11 slightly more, and then was brought on to the
12 national account team.  Taking that over, I was
13 initially a national account training manager,
14 servicing a client called PacifiCorp out of
15 Portland, Oregon and Salt Lake City, were the two
16 corporate headquarter locations.  But had
17 numerous power plants scattered throughout the
18 American West.
19         Did that for roughly a year and then
20 was effectively promoted into the actual national
21 account management role supporting the same
22 client.  During the course of that time, I
23 absorbed other contracts that were in the same
24 geographical location as PacifiCorp, DynCorp

Hansen v Elon Musk - Arbitration Day 3

1  being one based out of Cheyenne, Wyoming.
2          And there was another smaller that I
3  cannot recall at this time.
4      Q.  All right.  And when did you -- when
5  did you assume or pick up the Tesla national
6  account?
7      A.  So the discussions that -- at least
8  when I became involved were in May of 2018.  I
9  believe we actually brought that account on board
10 in -- beginning in June of 2018.
11     Q.  And as the national account manager,
12 for USSA on the Tesla contract, what were your
13 job duties and responsibilities?
14     A.  I was responsible for the oversight
15 and the coordination of deliverables from a
16 security perspective -- security guards being the
17 most namely -- for the entire Tesla agreement in
18 North America.
19         In addition to that, it was largely
20 focused on client relationships.
21     Q.  And during the time that you were the
22 Tesla national account manager, who was your
23 employer?
24     A.  U.S. Security Associates.

Hansen v Elon Musk - Arbitration Day 3

1      Q.  Now, when you said that you were
2  overseeing security officers there, roughly how
3  many officers were there at Gigafactory that USSA
4  put in place while you were there?
5          MS. LARGENT:  Objection, misstates
6  the testimony.
7          Go ahead.
8      A.  So I didn't oversee individual
9  security officers.  I oversaw the deliverables
10 that they produced.  Right?  Making sure that,
11 you know, the posts were covered, that we had
12 enough staff, that the quality of that work was
13 up to par.
14         To answer the question, roughly 6- to
15 800 throughout the Continental U.S.
16 BY MR. WOODFIELD:
17     Q.  And how many were at the Gigafactory
18 while you were there?
19     A.  I want to believe -- less than 100.
20 75 to 100 is my estimate.
21     Q.  And what exactly were their job
22 duties and responsibilities?
23     A.  Widely varying.  It depended on the
24 post that they were assigned.

Hansen v Elon Musk - Arbitration Day 3

1    Q.  Can you give me some examples?

2    A.  Again, entry points.  So vehicle

3  gates.  You know, checking vehicles as they come

4  in, parking placards, any kind of deliveries

5  there that are being received by the client.

6  Making sure they're logged in the logbook so we

7  have accurate representation, and, you know,

8  understanding who's coming in and who's going

9  out.  That's one example.

10         Another example is supervisory-type

11  roles that oversee the actual physical security

12  guards from a direct perspective.  They're very

13  mobile in nature, moving from post to post

14  ensuring that the security officers are, number

15  one, awake and healthy, and, you know, attentive

16  and doing what they're supposed to be doing

17  according to the post orders that were assigned

18  in the agreement.

19    Q.  When did you first come to be aware

20  of an individual named Karl Hansen?

21    A.  The exact date is -- I don't recall,

22  but I want to say sometime in either late May,

23  early June of 2018.

24    Q.  I'm going to show you right now joint

25

Hansen v Elon Musk - Arbitration Day 3

1  Exhibit No. 206.  And I'll put it up on the

2  screen.

3         MR. WOODFIELD:  And I'm just going to

4  offer it into evidence at this point for the sake

5  of housekeeping.

6         JUDGE HOFFMAN:  Any objection to 206?

7         MS. LARGENT:  No, Your Honor.

8         JUDGE HOFFMAN:  206 is in.

9         (Whereupon, Exhibit 206 was

10  received.)

11  BY MR. WOODFIELD:

12    Q.  Is this an e-mail you received on

13  June 11th from Sean Gouthro at Tesla?

14    A.  Yes, sir.

15    Q.  And this was forwarded from

16  Sean Gouthro, and it was an e-mail that he had

17  had with Parker Fellows.

18         Do you recall who Parker Fellows was?

19    A.  I do.

20    Q.  Who was Parker Fellows?

21    A.  He was a manager, a Tesla-employed

22  manager.  If memory serves correct, I believe he

23  was in the, like, fire safety, the safety

24  department.

25

Hansen v Elon Musk - Arbitration Day 3

1    Q.  And do you recall what Sean Gouthro's

2  job was at Tesla as of June 11, 2018?

3    A.  He was the -- I'm not sure if he was

4  the manager or the lead.  Yeah, I can't recall,

5  but he was involved in the investigations

6  department for Tesla.

7    Q.  What was your understanding of why

8  Mr. Gouthro was sending you a list of individuals

9  that were being let go in a RIF by Tesla?

10    A.  It was a handful of individuals that

11  Tesla wanted U.S. Security to consider bringing

12  on board with us, that they felt that the quality

13  of work and the product of work was great, and so

14  they wanted us to potentially extend offers for

15  them to remain in support of the Gigafactory,

16  just in a contract perspective with

17  U.S. Security.

18    Q.  Did Mr. Gouthro talk to you or

19  emphasize three individuals in particular?

20    A.  I don't recall having detailed

21  discussions with Sean specifically about three

22  individuals, but I certainly read the e-mail

23  which highlights it.

24    Q.  And what was the discussion at Tesla

25

Hansen v Elon Musk - Arbitration Day 3

1  about Mr. Hansen?

2         MS. LARGENT:  Objection, calls for

3  speculation.

4         MR. WOODFIELD:  I'm not asking --

5         Well, Your Honor, I'm going to tell

6  him --

7         JUDGE HOFFMAN:  Overruled.

8         Answer if you can.

9         THE WITNESS:  Can you restate the

10  question, sir?

11  BY MR. WOODFIELD:

12    Q.  Yes.

13         Can you tell me what you understood

14  the discussion to be at Tesla about Mr. Hansen as

15  it was reported to you?

16    A.  That he was a very good employee, did

17  very well at his job, had value to the

18  organization at Tesla.  Tesla was forced to have

19  a reduction in its staff.  I'm not sure as to the

20  nature of why.  My speculation, I suppose, would

21  be financial troubles.

22         But while they figured that they had

23  to do this, Karl was certainly one of the

24  individuals that was highlighted as being a

25

Page 530

Hansen v Elon Musk - Arbitration Day 3

1    superb performer, and they would like for us to
2    take that into account.
3        Q.  Now, after -- did you have an
4    opportunity to work with Mr. Hansen at any point?
5        A.  Not directly, no.
6        Q.  Did you have an opportunity to hear
7    feedback from USSA supervisors and co-workers
8    about Mr. Hansen's performance?
9        A.  In relation to his time as a Tesla
10   employee?
11       Q.  In terms of his value as a security
12   employee at the Tesla Gigafactory in 2018.
13       A.  Upon his inception into
14   U.S. Security, certainly, yes.  Prior to that, no
15   contract employee would have had, to my
16   knowledge, any insight into Karl's performance as
17   a Tesla employee.
18       Q.  Well, did you form the opinion that
19   he'd be a good employee, a good security officer
20   for USSA?
21       A.  I did.  I had no reason to speculate
22   otherwise.
23       Q.  And as of June of 2018, had you
24   received any contradictory information about
25

Page 531

Hansen v Elon Musk - Arbitration Day 3

1    Mr. Hansen other than what was reported to you by
2    Mr. Gouthro and Mr. Fellows?
3        A.  No.
4        Q.  What is a specialty position?
5        A.  Generally speaking, it is anything
6    additional to our normal scope of services, which
7    is security guard services, security supervisor
8    services and account management.
9            So anything that doesn't fall within
10   those three categories would be considered
11   specialty.  Executive protection is an example of
12   that.  Armed security officers, another example.
13       Q.  Were you looking to hire Mr. Hansen
14   into a specialty position?
15       A.  Yes.  Namely, an investigator, I
16   guess, department, for lack of a better term, but
17   that Tesla wanted us to -- us being U.S. Security
18   Associates -- to house and manage.  It's not
19   something we traditionally did, so it was
20   certainly a specialty type role.
21       Q.  And what were the -- what would have
22   the terms and conditions of the compensation have
23   been for that investigation position?
24       A.  I don't recall the specific dollar
25

Page 532

Hansen v Elon Musk - Arbitration Day 3

1    amount, but it was -- we did have pricing that we
2    had submitted to Tesla and to some degree was
3    accepted, although the position never
4    materialized.  And I'm unsure as to why Tesla
5    made that decision, but there certainly was
6    pricing established.
7        Q.  What was it roughly, that you recall?
8        A.  80,000.  Somewhere between 80 to
9    90,000 annual.
10       Q.  In terms of compensation for the
11   employee?
12       A.  Correct.  Yes, sir.
13       Q.  What were the job duties and
14   responsibilities supposed to be?
15       A.  They were never established.
16       Q.  And did you discuss with Mr. Hansen
17   potentially hiring him into that position?
18       A.  I did, yes.
19       Q.  And did you talk to him about the
20   tenure of that position if you were able to hire
21   him into it?
22       A.  Can you clarify that for me?  I'm
23   unsure as to --
24       Q.  Yes.
25

Page 533

Hansen v Elon Musk - Arbitration Day 3

1            How long was USSA's contract with
2    Tesla?
3        A.  Three years.
4        Q.  And would the -- if the specialty
5    position was to be in force, would it be in -- or
6    be part of the contract, would it be part of the
7    contract for three years?  Was that what was
8    contemplated?
9        A.  Yes, it would have been added as an
10   addendum to the agreement, falling under the same
11   parameters.
12       Q.  And did you discuss that with
13   Mr. Hansen?
14       A.  I don't recall discussing that piece
15   of it particularly with Karl.  There certainly
16   was discussions with Tesla about that.
17       Q.  And what, if anything, was told to
18   you about why Tesla shifted away from that
19   position?
20       A.  They decided to -- to my knowledge,
21   they decided to retain the investigator role
22   in-house, meaning as a Tesla-offered position.
23   And it also seemed that there was a consolidation
24   effort into a single geographic location.
25

Page 534

Hansen v Elon Musk - Arbitration Day 3

1  Hansen v Elon Musk - Arbitration Day 3
2      Q.  When did Mr. Hansen, when was he
3  hired by Tesla?  I mean by -- forgive me, by
4  USSA?
5      A.  Officially, I believe mid-July of
6  2018.
7      Q.  And do you recall what job he was
8  hired to take?
9      A.  Security officer.
10     Q.  And do you recall what the
11 compensation was for that?
12     A.  Not directly.  Somewhere around $20,
13 I believe, $20 an hour.
14     Q.  And annualized, how much was that?
15     A.  Depends how many hours a week they
16 work.
17     Q.  If you worked 40 hours a week?
18         MS. LARGENT:  I don't think he's
19 asking you to do calculations.
20         MR. WOODFIELD:  If you know.
21     A.  Okay.  I do not know.
22 BY MR. WOODFIELD:
23     Q.  Was it a substantial step down from
24 the job that you had initially discussed for
25 Mr. Hansen in terms of compensation?

Page 535

1  Hansen v Elon Musk - Arbitration Day 3
2      A.  Yes.
3      Q.  And was Mr. Hansen disappointed?
4      A.  I imagine so.
5      Q.  And were you disappointed in the job
6  that you were offering to him?
7      A.  It was not offered in terms of that.
8  We had to get him on the books and officially
9  hired into U.S. Security, and the only job codes
10 that we had built at that time were security
11 officer positions.  It was never the intent for
12 him to stay there.  It was a formality to get him
13 into our system.
14         It's not an uncommon practice.
15     Q.  And did you -- can you tell me who
16 Rick McLellan is?
17     A.  Rick McLellan was the account manager
18 working directly underneath me assigned to the
19 Gigafactory in Sparks, Nevada.
20     Q.  And what was Mr. McLellan's job, or
21 what were his job duties and responsibilities as
22 the account manager?
23     A.  He had day-to-day direct oversight of
24 all contract security-related items.
25         So a lot of direct involvement with

Page 536

1  Hansen v Elon Musk - Arbitration Day 3
2  the local Tesla counterparts.  That would be guys
3  like Sean, like Parker.  So he communicated with
4  them on a daily basis.
5          Any client requests, you know, if
6  they need an adjustment in the scope of work or,
7  you know, we want to add a few things here and
8  there on post orders that we'd like the security
9  guards to help us out with, that would have been
10 run through Mr. McLellan.
11     Q.  And in late June, did you advise
12 Mr. Hansen that after speaking with
13 Mr. Jeff Jones, that you directed Mr. McLellan to
14 put Mr. Hansen on the books as a swing-shift
15 supervisor?
16     A.  I did, yes.
17     Q.  And why did you put -- why did you
18 advise Mr. McLellan to put Mr. Hansen on the
19 books as a swing-shift supervisor?
20     A.  So I believe at that point in time
21 there were several other things that had
22 happened, but one being that I had Karl's resumé
23 and had a chance to review it.  And it was a
24 certainly far more decorated past than anybody
25 else that we could have selected that currently

Page 537

1  Hansen v Elon Musk - Arbitration Day 3
2  existed at that site.  He was far more qualified
3  to serve as a supervisor for us than -- to my
4  recollection, than anyone else there.
5      Q.  And do you recall what the rate was
6  per hour?
7      A.  27, I believe.  $27 an hour.
8      Q.  And did the -- at some point did
9  you -- hold on one sec.
10         At some point did you receive some
11 pushback from Tesla about classifying or
12 categorizing Mr. Hansen as a swing-shift
13 supervisor?
14     A.  Yes, I believe I did.
15     Q.  And when was that, roughly?
16     A.  Maybe mid-to-late July.
17     Q.  And who told you they did not want
18 Mr. Hansen to be a swing-shift supervisor?
19     A.  For clarification, I don't think I
20 ever got told that they didn't want it; but that
21 conversation would have been between either Sean
22 and myself or Jeff Jones and myself or a
23 combination of the two and myself.
24     Q.  And what did -- what were you told?
25     A.  I don't recall the specifics.  We're

Hansen v Elon Musk - Arbitration Day 3

1  approaching nearly four years ago.  But it would
2  have been something to the effect of, Are you
3  sure that, you know, you want Karl in this role?
4  And my answer was, you know, for the time that
5  I've interacted with him and, you know, have seen
6  what he has done, the answer is yes.
7      Q.  And what were you told in response?
8      A.  Nothing.  They didn't try and block
9  it -- well, I would consider that to be an
10 attempt at a block.  However, we -- being
11 U.S. Security Associates, we have kind of the
12 ultimate authority of who we assign into specific
13 roles, and Karl was certainly an individual that
14 I wanted to serve in that role.
15     Q.  Did anyone tell you why there was any
16 reticence or reluctance on the part of Tesla
17 about Mr. Hansen serving in that role?
18     A.  Not at that time, no.
19     Q.  Did anyone tell you subsequently?
20     A.  Not directly.  There was certainly a
21 ton of cryptic speech that -- I didn't want to
22 get involved in, quite frankly.  Speak plainly
23 and I'll make the decisions based upon that,
24 but...

Hansen v Elon Musk - Arbitration Day 3

1      Q.  Who was engaging in cryptic speech?
2      A.  It was a common Tesla practice.
3  Nearly all of them, if not all of them.  Jeff,
4  Sean, Parker.  A lot of the names escape me, you
5  know, now, but a lot of the -- the investigator,
6  the Tesla investigators.  I had minimal
7  interaction with them, but when I did, it was --
8  you'd think you were dealing with the NSA or
9  something.
10     Q.  Give me an example of cryptic speech
11 that anyone in particular was telling you about
12 Mr. Hansen.
13     A.  I don't think I can give specific
14 examples of cryptic speech.  I think the best
15 example was from a combo -- from what I remember,
16 a combo of Jeff and Sean, you know, acting kind
17 of strange when we were going through our
18 selections for the supervisor roles and picking
19 Karl specifically out of that, saying, Are you
20 sure you want that?  And the answer was yes.
21     That, to me, is a cryptic sign.
22     Q.  Let me show you some texts you sent
23 back and forth with Mr. Hansen.
24     These are marked and in evidence as

Hansen v Elon Musk - Arbitration Day 3

1  joint Exhibit 121.
2      Do you have the exhibits or this text
3  in front of you?
4      A.  Excuse me, sir.
5      Q.  Do you have the texts in front of
6  you?
7      A.  I do not.
8      Q.  Hold on one second.
9      Do you have the texts in front of
10 you?
11     A.  I can see them now, yes.
12     Q.  Do you recall telling Mr. Hansen:  I
13 got shot down.  I don't know what the specifics
14 are, but I can offer you an officer role at
15 19.80.  I truly hate doing this and don't
16 understand why, but I have my orders.
17     A.  I do recall.
18     Q.  And what did you mean by you "got
19 shot down"?
20     A.  I believe that was when we were
21 experiencing some of that cryptic -- that cryptic
22 speech among the Tesla folks.  There was also
23 indications in that specific --
24     Can you scroll back up, please?

Hansen v Elon Musk - Arbitration Day 3

1      Q.  Certainly.
2      A.  There's also indication in that
3  particular message there.  We were having some
4  internal struggles in getting the account ready
5  and prepping to take it over from Securitas,
6  namely from an HR perspective.
7      As I believe I previously mentioned,
8  at that time the only job codes that had been
9  created in support of a Gigafactory account were
10 security officer roles.  In order to get
11 Mr. Hansen on the books for us officially as an
12 employee of U.S. Security, we have to assign him
13 a job code.  That's the way the HR IS system
14 works.  The only job codes that exist, once
15 again, were security officer roles.
16     So the orders mentioned -- there is a
17 reference to a U.S. Security internal struggle
18 where the regional president and I didn't
19 necessarily see eye to eye on the speed that his
20 team was moving in getting the account prepped,
21 so...
22     Q.  Did you believe that someone was
23 playing BS games with you?
24     A.  No.  Not at this point, no.

Hansen v Elon Musk - Arbitration Day 3

1     Q.  Let me refer you to a little further
2 down, to an e-mail you sent subsequently in that
3 e-mail chain where you said:  You are my swing
4 sup.  End of story.  I refuse to play BS games.
5     Do you recall sending that text?
6     A.  I do.
7     Q.  What were you talking about there?
8     A.  I can't recall exactly what I mean,
9 but, I mean, the end state is that Karl was going
10 to be the swing-shift supervisor.
11     Q.  And did Mr. Hansen ever end up being
12 the swing-shift supervisor?
13     A.  I believe so.  For a short period of
14 time, yes, I believe so.
15     Q.  When Mr. Hansen was working for USSA,
16 did you ever have any criticisms of his job
17 performance?
18     A.  Certainly not.  Definitely not.
19     Q.  I'm going to show you now an exhibit
20 marked as joint Exhibit 186.
21     JUDGE HOFFMAN:  What was the number
22 again, please?
23     MR. WOODFIELD:  186.
24     JUDGE HOFFMAN:  Thank you.

Hansen v Elon Musk - Arbitration Day 3

1 BY MR. WOODFIELD:
2     Q.  Did Mr. Hansen forward to you this
3 e-mail that he had sent to Sean Gouthro, Elon
4 Musk, Gerhard Pretorius, Jake Nocon, Jeff Jones,
5 and Nick Gicinto after he sent it to them on
6 Friday, August 3rd?
7     A.  Yes.
8     Q.  And what was your response when you
9 received it from Mr. Hansen?
10     A.  I didn't necessarily understand the
11 nature of what was being discussed.  These were
12 things that were being flagged that were entirely
13 inclusive of Tesla and had no impact on how I was
14 to carry out my duty as the national account
15 manager assigned as a contract security.
16     Q.  Do you recall telling Mr. Hansen that
17 you don't blame him for sending it?
18     A.  I'll never blame anybody for doing
19 what they think is right.
20     Q.  Do you recall telling Mr. Hansen you
21 don't blame him for sending it?
22     A.  I do not recall that, no.
23     Q.  Do you recall telling him that you
24 wouldn't be surprised if he was removed from the

Hansen v Elon Musk - Arbitration Day 3

1 Gigafactory for having sent it?
2     A.  I do.
3     Q.  And do you recall telling him that if
4 he was removed from the Gigafactory, that you
5 expected that USSA would likely try to find him a
6 job at a reduced rate of pay somewhere else?
7     A.  I do recall that.  However, I refute
8 the reduced rate of pay.  I made conceded (sic)
9 efforts to retain his pay.  Whether it actually
10 happened or not once he departed the Tesla
11 account, I had no control over that.  They would
12 then turn it over to the region.
13     Q.  I'd like to play a recording for you
14 at this time to see if it refreshes your
15 recollection, sir.
16     A.  Okay.
17     MS. LARGENT:  We're going to object
18 to this, Your Honor.
19     As we discussed a little bit
20 yesterday, I believe what Mr. Woodfield is about
21 to play is a recorded call, not the one that was
22 played a couple of days ago with Mr. Hansen, but
23 a different one that Mr. Hansen recorded without
24 Mr. German's consent or knowledge, making the

Hansen v Elon Musk - Arbitration Day 3

1 recording illegal.  It's not being used for
2 impeachment purposes.  Mr. Woodfield is
3 attempting to use it on direct for other
4 purposes.  It wasn't disclosed on the witness
5 list, for one thing -- or excuse me, on the
6 exhibit list, for one thing, making it improper.
7     Additionally, I don't believe that
8 USSA has waived any right to object to this based
9 on the illegal nature of the recording by virtue
10 of having used a different call for impeachment
11 purposes against Mr. Hansen, who is the one who
12 engaged in the wrongful conduct by recording the
13 call.
14     In my view, you know, this is not
15 that different than a situation where you've got
16 someone who goes to ten different stores and
17 engages in ten different thefts.  If the district
18 attorney's office decides not to prosecute one,
19 they're not waiving the right to prosecute the
20 other nine.
21     Each act is illegal, and the person
22 who engages in the illegal recording shouldn't
23 get to benefit from that.  That wouldn't serve
24 any policy associated with the Nevada law making

```
 1          Hansen v Elon Musk - Arbitration Day 3
 2    it illegal to do this in the first place.
 3               And in Lane versus Allstate, a Nevada
 4    Supreme Court case, the Court held that the
 5    appropriate remedy is exclusion of the evidence
 6    in those circumstances.
 7          JUDGE HOFFMAN:  I'm interested to
 8    know, Mr. Woodfield, on why this wasn't disclosed
 9    previously in your case in chief.
10          MR. WOODFIELD:  Your Honor, this is
11    impeachment evidence.  I'm really kind of -- I
12    wouldn't make the argument that USSA did, that
13    when it uses the recording that was made
14    immediately before this for impeachment purposes
15    and then argues that the next impeachment -- or
16    the next recording cannot be used for impeachment
17    purposes because it wasn't disclosed.  I find
18    that a fairly hypocritical position.
19               I'm kind of -- I would be embarrassed
20    to make that argument.  But I'm offering it.  And
21    while USSA may make the suggestion that I'm not
22    offering it for impeachment purposes, I assure
23    you I am offering it for impeachment purposes
24    because it is a prior inconsistent statement.
25    I'm being gentle by telling the witness that I'm
```

```
 1          Hansen v Elon Musk - Arbitration Day 3
 2    offering -- I'm going to play it for him to see
 3    if it refreshes his recollection, but he stated
 4    to the contrary.
 5               And the fact that USSA feels that it
 6    can use the recordings that it has had -- that
 7    they have had for months offensively and then
 8    seek to use them defensively subsequently, I find
 9    a very -- I wouldn't make such arguments.  But I
10    am offering this not as substantive evidence but
11    to impeach the witness and then to ask if the
12    witness might recall subsequently what he said.
13          JUDGE HOFFMAN:  What is the --
14    setting aside the legality of the recording, what
15    is the issue to be impeached?  I must have missed
16    it along the way.  What is it that Mr. German
17    said that you now want to contradict?
18          MR. WOODFIELD:  Mr. German in the
19    recording states specifically that he does not
20    blame Mr. Hansen for sending the e-mail that's
21    marked as joint Exhibit 186 and that he wouldn't
22    be surprised if Tesla removed him from the
23    Gigafactory.
24               And then he states:  I expect that
25    you're going -- that we will try and find you
```

```
 1          Hansen v Elon Musk - Arbitration Day 3
 2    another job, but you've got to understand it's
 3    probably going to be at a lower rate of pay,
 4    which is contrary to what he just testified to.
 5          JUDGE HOFFMAN:  Okay, I guess I
 6    understood that is what he testified to.  So,
 7    okay.  I'm going to allow you to play the
 8    impeachment.  How long is it?
 9          MR. WOODFIELD:  It is roughly four
10    minutes -- well, it's three and a half minutes
11    here.
12          MS. LARGENT:  I don't think the
13    portion that he's referring to as stating that is
14    four minutes long.  Again, I am objecting to him
15    trying to play an entirety of a conversation for
16    one tiny part of it that he's claiming is
17    impeachment, for what Mr. German has said.
18          JUDGE HOFFMAN:  Can you nail that
19    down a little bit more?
20          MR. WOODFIELD:  Your Honor, I -- the
21    clip is 3.25.  I appreciate USSA's concern about
22    the austerity of the time.  The reason we're here
23    today is because of USSA's delays in -- on Monday
24    in terms of how long it took.  I appreciate that
25    it is concern, but I will clip three minutes of
```

```
 1          Hansen v Elon Musk - Arbitration Day 3
 2    direct testimony to go through this.  But I
 3    really -- I just don't -- I assure you that we
 4    are not going to hear a lot of wasted verbiage
 5    here.
 6               And I -- I also understood that the
 7    arbitrator has ruled, and it seems like USSA just
 8    keeps coming back and rearguing the point, and I
 9    think at some point we're just wasting time.
10          MS. LARGENT:  I don't see why we
11    can't take a break and he can find the part he
12    wants to play.  We're happy to do that.
13          MR. WOODFIELD:  This is more of the
14    same wasting time, Your Honor.
15          JUDGE HOFFMAN:  Yeah.  Go ahead and
16    play the recording and let's move on.
17          MR. WOODFIELD:  Thank you.
18          (Tape played.)
19          Mr. German:  Outside of this Ricky,
20    Rick -- was trying to set up your -- that phone
21    call or whatever the fuck they were trying to do
22    with you.
23          Mr. Hansen:  Ricky Gecewich.  Okay.
24          Mr. German:  Yeah.  And that's been
25    over a week.
```

Page 550

Hansen v Elon Musk - Arbitration Day 3

1
2     Mr. Hansen: Yeah. Yeah. We had one
3 meeting. I went in and, you know, on the advice
4 of counsel, I told them that I'd listen to them.
5 I've presented them everything they needed. And
6 that -- that's fine. But anyway, I just didn't
7 know where things stood.
8     You know, and I had already -- I told
9 them I had nothing more to say, you know? And if
10 he wanted to, I'd review his stuff and we
11 could -- we'd get together next week. And
12 essentially he sent me a follow-on e-mail
13 indicating the scope of his investigation. And
14 obviously I felt that there was more to that and
15 just decided to decline.
16     Mr. German: The thing is that --
17 yeah. And then I don't (indiscernible).
18     Mr. Hansen: Say that again? I
19 didn't hear you.
20     Mr. German: I said I (indiscernible)
21 for what you did. I mean, I think it needed to
22 be done and I think you saw what needed to be
23 done.
24     I would not be surprised, Karl,
25 however, if even though this thing happened while

Page 551

Hansen v Elon Musk - Arbitration Day 3

1
2 you were a Tesla employee, I would not be
3 surprised in the least if it (indiscernible)
4 site. Be prepared for that.
5     Mr. Hansen: Yeah, no, if they come
6 to you and ask you to remove me from the site.
7 Did I hear that right? I just have a shitty
8 signal here. I can't --
9     Mr. German: Yeah.
10     Mr. Hansen: And I expect that,
11 truly, I do, which is why I wanted to call you
12 tonight. I wanted to give you at least that
13 professional courtesy. Because, Matt, like I
14 said, you've been exceptional to me, and I do
15 appreciate it, but I understand the strategic
16 importance of the U.S. Security contract, you
17 know?
18     And the bottom line is, Tesla
19 knows -- you know, Tesla knows that it's a
20 federal violation if they do that, if it's
21 reported. And that's fine. I get it. You know,
22 that would be retaliation, and I know that that
23 is what it is. But if you get that call, please
24 contact me directly. And I -- you know.
25     Mr. German: Sure.

Page 552

Hansen v Elon Musk - Arbitration Day 3

1
2     Mr. Hansen: The bottom line is, I
3 get it. I understand it. Don't --
4     Mr. German: (Indiscernible) Yeah,
5 when I said don't be shocked if it happens, it
6 doesn't mean that I'm obligated to follow through
7 on anything.
8     Mr. Hansen: Well, you -- I want you
9 to understand that the --
10     Mr. German: Do you know what I mean?
11     Mr. Hansen: Yes, I do, and I get
12 that. And believe me, trust me, I know you're
13 not obligated to follow through and the client
14 can make recommendations. But at the same time,
15 I also want you to understand that that
16 environment out there is -- is something else. I
17 mean, maybe we can talk about a transfer to
18 another post if that happens within U.S. Security
19 or something along those lines.
20     Mr. German: Yeah. Absolutely.
21     Mr. Hansen: Okay. All right,
22 brutha.
23     Mr. German: (Indiscernible) we have
24 another national (indiscernible). It's not going
25 to pay anywhere near what you're making at Tesla,

Page 553

Hansen v Elon Musk - Arbitration Day 3

1
2 but we do have at least three other national
3 accounts right down the road.
4     Mr. Hansen: Okay. And you'd be okay
5 to --
6     Mr. German: The options are there.
7     Mr. Hansen: So you'd be okay to keep
8 me on as an employee with U.S. Security even if
9 Tesla says get this guy off-site. I can still
10 work with you?
11     Mr. German: Absolutely. Because
12 whatever happened is none of my concern and/or
13 business because it occurred under the Tesla
14 watch.
15     Mr. Hansen: Understood.
16     Mr. German: (Indiscernible) issues.
17     Mr. Hansen: And, of course, my pay
18 would be reduced to whatever that site paid;
19 correct?
20     Mr. German: Correct. Yeah, correct.
21     Mr. Hansen: Okay. Fair enough.
22     Matt, I -- you know, that is what it
23 is.
24     Mr. German: I will be there Monday.
25     Mr. Hansen: You're going to be in

Page 554

Hansen v Elon Musk - Arbitration Day 3

1   Monday?
2
3           (End of tape played.)
4           MR. WOODFIELD:  I can play the rest
5   if you'd like, but we can stop it there.
6           I can play the rest if you'd like,
7   but we can stop it there.
8           THE WITNESS:  Is that for me?
9   BY MR. WOODFIELD:
10          Q.  Do you recall that conversation, sir?
11          A.  I do now, yes.
12          Q.  And was that your voice, sir?
13          A.  Yes.
14          Q.  It was that in response to your being
15   contacted by Ricky Gecewich?
16          A.  Yeah, I believe that's his name, yes,
17   sir.
18          Q.  And this is such a silly question,
19   because we have to ask everyone this, but do you
20   remember how to say Gecewich or whatever his name
21   is?
22          A.  I never met the individual.  I don't
23   know how to say his name.
24          Q.  Okay.  Gecewich.
25          A.  We can go with that.  It's fine by

Page 555

Hansen v Elon Musk - Arbitration Day 3

1
2   me.
3           Q.  Okay.  I'm showing you right now
4   Exhibit 165.
5           Have you -- do you recall seeing this
6   e-mail that was sent to you on August 3rd at
7   1:15 p.m.?
8           A.  I do recall that.  I was the author
9   of that e-mail.
10          Q.  And this was an e-mail that you were
11   sending after Ricky Gecewich reached out to you
12   after Mr. Hansen had told you he had sent the
13   e-mail; correct?
14          That we had discussed, the e-mail
15   where he had reached out to Elon Musk?
16          A.  Correct, yes.
17          Q.  And that was the e-mail that you told
18   Mr. Hansen that you wouldn't be surprised if
19   Tesla removed him from the Gigafactory site for?
20          A.  Correct.
21          Q.  Do you recall having a conversation
22   on or about August 30th with Jeff Jones?
23          A.  It's likely.  I had conversations
24   frequently with Jeff.
25          Q.  Do you recall a conversation about

Page 556

Hansen v Elon Musk - Arbitration Day 3

1
2   Jeff Jones asking that Mr. Hansen be removed from
3   the Tesla compound, the Tesla Gigafactory
4   compound?
5           A.  I do.
6           Q.  And what, if anything, did he tell
7   you was the reasoning behind it?
8           A.  There was no reasoning provided.  It
9   was, again, a cryptic -- a cryptic call that
10   lasted perhaps 60 seconds.  I was at home in
11   Kansas, received the call very late at night for
12   me, so right around midnight-ish, I believe.
13          And the message was pretty blunt and
14   clear, and it was to inform Mr. Hansen that he
15   was no longer welcome on Tesla property.  And to
16   some degree I believe Jeff hung up after that.
17   But I do remember that, you know, Karl had
18   requested of me to -- if that happened, to let
19   him know directly, and so I did.
20          Q.  When, if ever, did you discuss with
21   Mr. Jones, Mr. Musk arriving on August 30, 2018
22   at the Gigafactory through the west gate
23   entrance?
24          MS. LARGENT:  Sorry, Nick, can you
25   repeat that?  I missed it.

Page 557

Hansen v Elon Musk - Arbitration Day 3

1
2   BY MR. WOODFIELD:
3           Q.  Yeah, let me ask you:  Was it your
4   understanding that Mr. Jones communicated with
5   you about Mr. Musk traveling through the west
6   gate of the Gigafactory entrance on August 30,
7   2018, shortly before Tesla said that Mr. Hansen
8   was to be removed from the contract?
9           A.  I do not recall the date of that
10   discussion.  I do recall the content -- or I
11   guess the context, rather.  Yes.
12          Q.  Well, let me just read this from your
13   deposition.  It's page 76, line 14.
14          Was it your understanding that that
15   was about August 30, 2018, shortly before Tesla
16   said that he was to be removed from the contract?
17          And you said, Answer:  That sounds
18   accurate.
19          Let me read you -- or let me ask you:
20   What did Mr. Jones tell you about any interaction
21   about -- between Mr. Hansen and Mr. Musk at the
22   west gate of the Gigafactory at the end of
23   August, 2018?
24          A.  Again, to my recollection, it was,
25   again, very cryptic.  I was told that there was

Page 558

Hansen v Elon Musk - Arbitration Day 3

1  an interaction.  I believe I asked if it was --
2  if there was anything physical in nature.  And
3  the answer to that was no.
4      I also believe I asked was there
5  anything, you know, extremely negative in nature,
6  and I believe the answer I received was, it's
7  unknown at this time.
8  Q.  And Mr. Jones told you that at the
9  same time that he was telling you that Mr. Hansen
10  was no longer supposed to be on the Gigafactory
11  property?
12  A.  I don't believe so.  I believe there
13  were -- I believe they were separate calls.
14  Q.  Let me refer you to your deposition
15  testimony again, and I'll just read you page 75,
16  line 17 -- or line 18 through line -- 76,
17  line 17.  And it's:
18      What I'm wondering is, do you
19  remember -- did you ever discuss with Mr. Hansen
20  Mr. Musk arriving at the Gigafactory through the
21  west gate entrance?
22      Answer:  I do not recall specifically
23  interacting with Mr. Hansen on this, but I do
24  have knowledge that this interaction occurred,

Page 559

Hansen v Elon Musk - Arbitration Day 3

1  from what I can remember, other sources, namely
2  Jeff Jones.
3      Question:  What did Mr. Jones tell
4  you?
5      Answer:  That there was a negative
6  interaction with Mr. Hansen and Mr. Musk at the
7  west gate.  He would not go into the specifics
8  around that interaction.  As that was told to me,
9  Mr. Hansen and Mr. Musk were the only two
10  present.
11      So even Mr. Jones did not have --
12  didn't have the full scope and download of the
13  entire interaction.  So once again, I was not
14  provided the full breadth of the information at
15  hand.
16      Question:  Was it your understanding
17  that that was about August 30, 2018, shortly
18  before Tesla said that he was to be removed from
19  the contract?
20      Answer:  That sounds accurate.
21  BY MR. WOODFIELD:
22  Q.  Do you recall testifying that way,
23  sir?
24  A.  I do.

Page 560

Hansen v Elon Musk - Arbitration Day 3

1  Q.  Does that sound correct now?
2  A.  I honestly don't see a whole lot of
3  difference in what I provided today.
4      Can you help me identify that
5  specific part?  Maybe I can elaborate.
6  JUDGE HOFFMAN:  Mr. Woodfield, would
7  you take down your exhibit if you're not going to
8  use it?
9  MR. WOODFIELD:  Yes.  Thank you.
10  Sorry, I forgot it was up.
11  BY MR. WOODFIELD:
12  Q.  Was Mr. Musk removed on or about --
13  excuse me.  Was Mr. Hansen removed on or about
14  September 5th officially by USSA from the
15  Gigafactory as per Tesla's request?
16  A.  Did you say September 5th?
17  Q.  Yes, September 4th or 5th of 2008.
18  A.  That sounds accurate.  Sounds right.
19  Q.  Was USSA free to say to Tesla, no, I
20  want to keep -- we want to keep Mr. Hansen on
21  this property.  We're going to staff it however
22  we would like to?
23  A.  To some degree.  Generally speaking,
24  when clients request removal, it's something that

Page 561

Hansen v Elon Musk - Arbitration Day 3

1  industry practice is generally accommodated.  Had
2  I felt at that point in time -- and again, I was
3  provided cryptic information from nearly everyone
4  involved, was not really provided enough
5  information for me to make a -- an opinion that I
6  would be willing to jeopardize, you know, my
7  stance within this -- within my employer for.
8  Okay?
9      However, if I had any indication that
10  there was illegal behaviors associated with the
11  request, I would not have honored it.  I would
12  have automatically referred it to our HR team,
13  because then it becomes, for me, a consideration
14  of, you know, protecting that particular employee
15  from anything further retaliatory-wise on that
16  site.
17      If we get the client request removal
18  and I feel that there is any illegal activity
19  associated with that request, and we subsequently
20  leave that individual on that site, that creates
21  a pretty bad environment for that employee.
22  However, we would have done that, and, you know,
23  asked the employee if they feel comfortable
24  remaining at the site.  If not, they are free to

Hansen v Elon Musk - Arbitration Day 3

1  leave, and, you know, we'll pay them as normal.
2      But I did not get the sense with the
3  information that I had been provided up to this
4  time that there was anything illegal with Tesla's
5  request; therefore, it was honored.
6      Q.  What was your understanding of why
7  Tesla wanted Mr. Hansen removed from the
8  Gigafactory compound?
9      A.  Yeah, so it's my understanding it was
10  more centered around a request to meet with HR --
11  I believe it was HR.  It could have been a blend
12  of HR and Tesla employees and what I labeled to
13  be -- or what I understood to be a request to
14  finalize investigations that Mr. Hansen had
15  worked on for Tesla, perhaps turn over
16  information for that, to which that meeting did
17  not occur.
18      Q.  Do you recall that roughly one month
19  earlier, you were speculating with Mr. Hansen and
20  you were bracing him for the possibility that you
21  expected that he was going to be removed because
22  of the August 3rd e-mail that he sent to
23  Elon Musk?
24      A.  I'm not sure I can agree to the time
25

Hansen v Elon Musk - Arbitration Day 3

1  frame of one month.  I don't believe the date of
2  the phone recording was provided.
3      Q.  Well, Mr. Gecewich's e-mail is dated
4  August 3rd; correct?
5      A.  Yes.
6      Q.  And on September 5th -- or 4th or
7  5th, which was roughly 30 days later, Mr. Hansen
8  was officially -- Tesla asked and USSA acceded to
9  his official removal from the Gigafactory site;
10  correct?
11      A.  Correct.
12      Q.  And that's consistent with what you
13  prognosticated one month earlier; correct?
14      A.  To Mr. Hansen directly?
15      Q.  Sure.
16      A.  Are you referencing the phone call?
17      Q.  Yes, sir.
18      A.  I can't answer that unless I have the
19  date of that phone call.
20      Q.  But regardless of the date of the
21  phone call, it's what you prognosticated in the
22  phone call; correct?
23      A.  I can answer that yes, correct.
24      Q.  And did you ever escalate that issue
25

Hansen v Elon Musk - Arbitration Day 3

1  to HR?
2      A.  I did.
3      Q.  And what did HR do about it?
4      A.  Began working directly with
5  Gecewich -- or Gecewich.
6      Q.  And what is your understanding
7  that -- of Tesla's response when Mr. Gecewich
8  inquired of Tesla about what was going on?
9      A.  I have no understanding.  I was not
10  present.
11      Q.  Do you know if USSA -- ever
12  investigating why Mr. Hansen was removed from the
13  Gigafactory?
14      A.  If they did, it would have been
15  handled by the HR team.
16      Q.  When you testified in your
17  deposition, did you respond that you were not
18  provided any reasoning?
19      A.  Any reasoning as to...
20      JUDGE HOFFMAN:  Can you speak up?  I
21  couldn't hear your question.
22  BY MR. WOODFIELD:
23      Q.  When you testified in your
24  deposition, did you respond that USSA was not
25

Hansen v Elon Musk - Arbitration Day 3

1  provided any reasoning?
2      MS. LARGENT:  Objection, vague and
3  ambiguous.  By who?  I'm not sure what we're
4  talking about, Mr. Woodfield.
5      JUDGE HOFFMAN:  Can you rephrase your
6  question a little bit?
7      MR. WOODFIELD:  Yes.
8  BY MR. WOODFIELD:
9      Q.  Was USSA ever provided any reasoning
10  for Tesla's removing Mr. Hansen from the
11  property, from the Gigafactory property?
12      A.  No.
13      Q.  Have you ever been told whether Tesla
14  cooperated with any investigation that USSA
15  attempted to run into why Mr. Hansen was removed
16  from the Gigafactory property?
17      MS. LARGENT:  Objection, asked and
18  answered.
19      JUDGE HOFFMAN:  I'm not sure I
20  understood the question.  Would you ask the
21  question again?
22      MR. WOODFIELD:  Yes.
23  BY MR. WOODFIELD:
24      Q.  Were you ever told whether Tesla
25

Page 566

Hansen v Elon Musk - Arbitration Day 3

1    cooperated in any investigation that Tesla --
2    that USSA attempted to run into why Mr. Hansen
3    was removed from the Gigafactory property?
4        A.  I was not ever told of the
5    cooperation, whether it occurred or not.
6        MR. WOODFIELD:  I don't have any
7    further questions for this witness.
8        JUDGE HOFFMAN:  I guess this would be
9    cross-examination, then, by USSA.
10            ------------
11            EXAMINATION
12            ------------
13   BY MS. LARGENT:
14       Q.  Hi, Mr. German.  Thank you again --
15       A.  Hello.
16       Q.  -- for being here today, appreciate
17   you taking your time out, even though you're not
18   a USSA employee and still helping.
19           I'd like to show you an exhibit.
20       MS. LARGENT:  Alex, can you pull up
21   189, please?
22           Can you blow it up a tiny bit?
23   BY MS. LARGENT:
24       Q.  Mr. German, taking a look at what has

Page 567

Hansen v Elon Musk - Arbitration Day 3

1    been marked as Exhibit 189 for this hearing.  Do
2    you recognize this e-mail, the second part,
3    from -- it says you, Matt German, to Jeff Jones?
4        A.  I do.
5        Q.  And do you see the date, September 4,
6    2018?
7        A.  Yes.
8        MS. LARGENT:  Can you scroll down a
9    little bit, Alex?
10   BY MS. LARGENT:
11       Q.  Can you see the one later on, from
12   Jeff Jones to you, where it says:  Thanks for the
13   help, Matt.  Let us know when he's been informed,
14   if you could, please?
15       A.  I do see it, yes.
16       Q.  Okay.  Scroll back up.
17           Can you read that e-mail to yourself,
18   from you to Jeff Jones on September 4th?
19       A.  I'm done.
20       Q.  Does this refresh your recollection
21   at all of when you were notified by Jeff Jones
22   that he wanted Karl Hansen removed from the Tesla
23   account?
24       A.  Maybe not of the timing.  I mean, I

Page 568

Hansen v Elon Musk - Arbitration Day 3

1    certainly remember the phone call.  I guess based
2    upon the time stamp, I -- my recollection was
3    that it was much later than that, but...
4        Q.  Do you recall the phone call you got
5    from Jeff Jones being the same day that you
6    notified Karl that he was removed?
7        A.  I believe that I attempted the same
8    day; however, I don't believe Karl answered.  I
9    believe he called me back the following morning.
10       Q.  Okay.  Do you think more than one day
11   passed between the time Jeff Jones called you and
12   the time you notified Karl?
13       A.  No, I do not.
14       Q.  So the earliest you learned about the
15   removal request from Jeff, then, is
16   September 3rd?
17       A.  That's correct.
18       Q.  And had you heard from anyone else
19   prior to September 3rd that Tesla was demanding
20   his removal?
21       A.  No.
22       Q.  At the time Jeff contacted you and
23   notified you that they no longer wanted
24   Mr. Hansen assigned to the Tesla site, did you

Page 569

Hansen v Elon Musk - Arbitration Day 3

1    know that Mr. Hansen had filed an SEC complaint
2    against Tesla?
3        A.  No.
4        Q.  We talked a little bit on questioning
5    by Mr. Woodfield about an earlier incident in
6    which you heard about some sort of interaction
7    between Mr. Hansen and Elon Musk.
8            Remember that?
9        A.  I do.
10       Q.  And you said that there was some kind
11   of a -- well, I don't want to put words in your
12   mouth.
13           Was there some sort of a request to
14   move the branch that Mr. -- or the post that
15   Mr. Hansen was stationed at?
16       A.  Yes, there was.  I believe I received
17   questioning as to why he was assigned to the west
18   gate specifically, to which I had to defer to the
19   account manager.  I would have no such knowledge
20   of the specifics of that.  But there was a
21   request to not have Karl work that specific gate
22   again.
23       Q.  Is that an unusual type of client
24   request?

Hansen v Elon Musk - Arbitration Day 3

1
2   A.  No, not particularly.  Generally
3   speaking -- not even general.  To give examples,
4   when you have entry points, you know, for C-suite
5   individuals, CEO and the such, they generally
6   want to see a certain, you know, type of
7   individual, you know, well put together, a
8   different uniform, usually jacket and a tie type
9   thing.  So, no, it's certainly not an unusual
10  thing.
11      Q.  Do you know if Elon Musk even knew
12  who Karl Hansen was?
13      A.  I have no idea who -- if Elon knew
14  who Karl was or not, by face or otherwise.  I was
15  never present when they ever had an interaction,
16  so I have no reason to think.
17      Q.  Have you ever heard of a client
18  requesting an officer be removed from a post
19  because, let's say, the officer is rude to
20  someone in upper management?
21      A.  Yes.
22      Q.  Have you ever heard of a client
23  requesting an officer be removed from a security
24  post because a security officer didn't greet
25  them?

Hansen v Elon Musk - Arbitration Day 3

1
2   A.  Yes.
3   Q.  Have you ever heard of a client
4   requesting that a security officer be removed
5   from a post because they looked sloppy?
6   A.  Yes.
7   Q.  I will tell you that Mr. Hansen
8   testified yesterday about this incident,
9   described it as Mr. Musk driving, speeding with
10  lights flashing, coming up to the gate to enter
11  the facility, and that the car did not respond to
12  a security officer that was outside the guard
13  area so that Mr. Hansen came out and essentially
14  kind of motioned or flagged down the car to slow
15  down because they felt it was unsafe.
16      In that kind of hypothetical
17  scenario, is it plausible in your mind that a CEO
18  of a company, potentially in a hurry to come into
19  a facility, would be annoyed by a security guard
20  doing that?
21      A.  It's certainly plausible, yes.
22      Q.  You testified prior, on questioning
23  from Mr. Woodfield, about some communications
24  that you had with Mr. Hansen where he forwarded
25  an e-mail that he had sent to Elon Musk.

Hansen v Elon Musk - Arbitration Day 3

1
2   Remember that?
3   A.  I do.
4   Q.  Prior to that happening, do you
5   remember him telling you that management at Tesla
6   had reached out to him to try to schedule a
7   meeting with him to discuss transitioning the
8   work that he was doing, the investigation work
9   that he was doing as a Tesla employee prior to
10  coming to USSA?
11      A.  I do.
12      Q.  Okay.  What do you remember about
13  that?
14      A.  I remember Mr. Hansen flagging it, I
15  believe for Rick McLellan and myself, and asking
16  for guidance.  And I believe I responded to the
17  effect of, you know, it looks like they just want
18  to close the loop on, you know, some of the work
19  that he did as a Tesla employee, maybe get some
20  of their info back, or if you're housing any of
21  it, get it back.
22      Unsure as to the specifics, but I
23  think I provided instruction that, you know, go
24  ahead and attend; however, if the meeting takes a
25  different turn, excuse yourself and have them set

Hansen v Elon Musk - Arbitration Day 3

1
2   that up through Rick and myself and we'll bring
3   our HR folks in and take that route.
4       For me, it seemed an entirely
5   professional and common ask, when there's any
6   kind of transfer of data.
7       Q.  Did he respond to you when you told
8   him go ahead and attend?
9       A.  I don't believe so.
10      Q.  Do you know if he went ahead and
11  attended?
12      A.  Yes.  Yeah, he did not.
13      Q.  Okay.  Did he tell you why?
14      A.  Yeah.  I think to some degree.  I
15  think it was slightly cryptic as well, but
16  that -- I think the term was security thugs have
17  showed up, and he felt there was going to be more
18  interrogation-based rather than a professional
19  meeting, so...
20      Q.  I'm going to show you Exhibit 121,
21  which Mr. Woodfield previously went over with you
22  a little bit.
23      MS. LARGENT:  And specifically,
24  page 878, Alex.
25      (Discussion off the record.)

Hansen v Elon Musk - Arbitration Day 3

1
2    THE WITNESS:  I can see the exhibit.
3
4    MS. LARGENT:  Can you scroll down so
5  he can see the whole conversation?
6  BY MS. LARGENT:
7    Q.  Is this the conversation that you
8  were just describing between you and Karl?
9    A.  Yes.
10    MS. LARGENT:  Can we switch over?
11  I'm going to use this one again, but can you
12  switch over to Exhibit 204?  190 to 192.
13    Can you scroll down a little bit?
14  BY MS. LARGENT:
15    Q.  All right.  I'm showing you what has
16  already been introduced as Exhibit 204,
17  Mr. German.
18    Do you see, in the middle of the page
19  here, an e-mail from Sean Gouthro to
20  Gerhard Pretorius, cc'ing some other individuals,
21  Jeff Jones, Nick Gicinto, Jake Nocon?
22    A.  I see it, yes.
23    Q.  And appears to be an e-mail to Karl
24  saying:  I've scheduled a meeting for 10:00 a.m.
25  this Friday.

Hansen v Elon Musk - Arbitration Day 3

1
2    Which I guess would be August 3rd?
3    Does that look right to you?
4    A.  It does.
5    Q.  Okay.  And it says:  Please see below
6  for additional contexts and requests from your
7  prior conversations with our team.
8    And then scroll above, please, to the
9  e-mail to Matt German.
10    And do you see above there, there's
11  an e-mail to you on August 1st, letting you know?
12    A.  Yeah.
13    Q.  Is this the e-mail that Karl
14  forwarded you, asking for your advice on whether
15  he should go to this meeting that they're trying
16  to get him to go to?
17    A.  Yes.
18    Q.  And can you flip back to Exhibit 121.
19  878.
20    All right.  And as you testified
21  previously, and he's asking if you've had a
22  chance to look at that e-mail.  You tell him:  Go
23  ahead and attend.  Looks to me like they just
24  want to meet with you to finalize the work you
25  did on the cartel case and turn over any

Hansen v Elon Musk - Arbitration Day 3

1
2  additional info.
3    Right?
4    A.  Correct.
5    MS. LARGENT:  Can we please to go
6  879, the next communication.
7  BY MS. LARGENT:
8    Q.  So it looks like this is the next
9  text communication between you and Karl.  And as
10  you can see at the top, it says:  Shots fired!
11  Love it.
12    Is that an e-mail that you sent him
13  in response to him forwarding you the e-mail that
14  he sent to Elon Musk?
15    A.  Yes.
16    Q.  And that e-mail to Elon Musk was on
17  August 3rd; correct?
18    A.  Yes.
19    Q.  I'd like you to read Mr. Hansen's
20  response to you on the same day.
21    MS. LARGENT:  Can you scroll down a
22  little bit, Alex?
23    A.  Done.
24  BY MS. LARGENT:
25    Q.  And then I'm going to come back to

Hansen v Elon Musk - Arbitration Day 3

1
2  this, but let's go to Exhibit 20 -- wait a
3  minute -- Exhibit 204, 193.
4    All right.  Can you --
5    Do you recognize this as the e-mail
6  that Mr. Hansen forwarded you that he had
7  e-mailed to Elon Musk?
8    A.  I do.
9    MS. LARGENT:  Can you scroll down a
10  little bit farther, please?
11    Back up, please.
12    All right, let's go back to 121.
13  879.
14  BY MS. LARGENT:
15    Q.  From the text message that Mr. Hansen
16  sent you on August 3rd, did you understand him to
17  be telling you that he didn't go to the meeting
18  he was requested to attend on August 3rd, and
19  that he instead sent the e-mail to Elon Musk?
20    A.  Yes.
21    Q.  Did you think that was an appropriate
22  thing to do?
23    A.  No, not really, no.
24    Q.  Why not?
25    A.  It's not common for employees of that

Hansen v Elon Musk - Arbitration Day 3

1  level or even, you know, of my level subsequently
2  to send direct comms straight to the CEO of any
3  organization.  There's a filtration process that
4  goes into that in every organization.  Especially
5  I didn't feel it was good taste coming from Karl
6  in this particular scenario as being a contract
7  employee at the time that he sent it.
8  Q.  And I think you testified earlier
9  that you didn't see anything wrong with the
10 meeting request that he had been asked to attend
11 on August 3rd in any event.
12     A.  Correct.
13     Q.  Did you believe that Tesla may have
14 reason to be annoyed with Mr. Hansen for refusing
15 to participate in their meeting and instead
16 escalating things to Elon Musk?
17     A.  Sure.  Of course.
18     Q.  Did you tell him that?
19     A.  It's likely, via the suggestion to,
20 you know, attend the meetings.
21     Q.  When Mr. Hansen sent you the e-mail
22 that he had sent to Elon Musk, do you know
23 whether you read it?
24     A.  I believe I read it throughout the

Hansen v Elon Musk - Arbitration Day 3

1  course of -- you know, there was some time
2  elapsed.  It was quite a long e-mail, and this
3  was certainly not one -- the Gigafactory was only
4  one piece of my pie, so it didn't get all of my
5  time and attention.
6  So I digested it throughout the
7  course of X number of even probably days.
8  Q.  At any time prior to Tesla asking for
9  Mr. Hansen to be removed from their site, based
10 on conversations, whether text or phone calls
11 that you had with Mr. Hansen, did you understand
12 him to be telling you that there was some sort of
13 failure to disclose to shareholders going on at
14 Tesla?
15     A.  No.
16     Q.  Did you understand him to be telling
17 you that Tesla was somehow misrepresenting the
18 value of Tesla shares to shareholders?
19     A.  No.
20     Q.  What, if anything, did you understand
21 about what he had told you about any misconduct
22 going on at Tesla?
23     A.  So to my understanding, which was
24 very minimal, was there were concerns about drug

Hansen v Elon Musk - Arbitration Day 3

1  activity in and around the Gigafactory as well as
2  some potential theft of Tesla property; scrap
3  metal, things like that.
4  Q.  And did you understand that this was
5  stuff that Mr. Hansen observed or heard about all
6  during the course of his employment at Tesla
7  rather than USSA?
8  A.  Correct.
9  Q.  Was there any reason for him to be
10 sharing the details of this with you as his
11 employer at USSA?
12     A.  No, not that I can think of.
13     Q.  Did you ever communicate to him that
14 you really didn't want to know the details of
15 this type of stuff from him?
16     A.  I'm sorry, I had audio cut out.  Can
17 you --
18     Q.  Did you ever communicate to him that
19 you really didn't want to hear any of the details
20 of this type of stuff from him?
21     A.  Yeah, I believe I did.
22     When things were of our client's
23 nature, we were hired, you know, to provide
24 security guard services, not to, you know,

Hansen v Elon Musk - Arbitration Day 3

1  investigate internal threat programs.
2  Q.  Okay.  Prior to the removal request
3  from Tesla, had you heard that Mr. Hansen had
4  gone to the media and badmouthed Tesla?
5  A.  No, I had not.
6  Q.  You indicated previously that when
7  you got the call from Jeff Jones to remove
8  Mr. Hansen from the Tesla site, you granted the
9  request; right?
10     A.  I did.
11     Q.  And was that your decision to make?
12     A.  Not necessarily.  It's a common
13 practice within the security industry.  There's
14 also some language in the master services
15 agreement that affords them a certain level of
16 being able to execute upon those requests.
17     Q.  All right.  So under the terms of the
18 service agreement with Tesla and with other
19 clients, it's common for there to be a provision
20 allowing the customer to request removal of any
21 employee they don't care for.
22     A.  Correct.
23     Q.  And you recall the Tesla agreement
24 having a provision like that?

Hansen v Elon Musk - Arbitration Day 3

1    Hansen v Elon Musk - Arbitration Day 3
2    A.  I do.
3    Q.  Okay.  And I assume as a matter of
4  client relations purposes, you generally try to
5  accommodate client requests?
6    A.  That's accurate, yes.
7    Q.  Did you have to go and obtain
8  approval from anyone at USSA to grant that
9  accommodation -- I'm sorry, the removal request?
10    A.  No.
11    Q.  And you may have already answered
12  this, and I apologize if I'm asking you again.
13  Is the only reason that you removed Mr. Hansen
14  from the Tesla account because Tesla asked you
15  to?
16    A.  Yes.
17    Q.  Tesla didn't ask you to terminate
18  Mr. Hansen at that time, did he?  Did they?
19    A.  No, they did not.
20    Q.  Okay.  And, Mr. Hansen was not
21  terminated; correct?
22    A.  That is correct.
23    Q.  Do you know if he went on to be
24  reassigned at another site?
25    A.  I do not know if he did or not.

1    Hansen v Elon Musk - Arbitration Day 3
2    Q.  Okay.  Did your involvement with
3  Mr. Hansen essentially end once he was no longer
4  assigned to the Tesla account?
5    A.  Yes.
6    MS. LARGENT:  If you could just give
7  me maybe two minutes to review my notes real
8  quick, Your Honor, that would be helpful.
9    JUDGE HOFFMAN:  Okay.  You can take
10  down your exhibit.
11    (Recess taken, 10:33 a.m. to
12  10:36 a.m. PDT)
13    JUDGE HOFFMAN:  Okay.  I think we're
14  ready.
15  BY MS. LARGENT:
16    Q.  All right.  Mr. German, just one or
17  two more questions and I'll be finished.
18    Did you ever become aware that
19  Mr. Hansen had gone to the media and made reports
20  about Tesla?
21    A.  No.
22    Q.  No?
23    A.  At some point, well after I had left
24  the Tesla account, which would have been
25  March 2019.

1    Hansen v Elon Musk - Arbitration Day 3
2    Q.  Prior to the -- getting the demand
3  for removal from Tesla, did you have -- had
4  Mr. Hansen ever told you that he was going to
5  file an SEC complaint?
6    A.  No.
7    MS. LARGENT:  Okay.  I don't have
8  anything else.
9    JUDGE HOFFMAN:  Okay.  Let's take a
10  break and then we'll come back with Mr. Robertson
11  or Ms. Dunne's examination -- cross-examination.
12    So let's go -- let's be back at ten
13  minutes until the hour.
14    (Recess taken, 10:39 a.m. to
15  10:51 a.m. PDT)
16    JUDGE HOFFMAN:  We are back on the
17  record.  Mr. German, cross-examination will be
18  conducted by Tesla's representatives.
19    ------------
20    EXAMINATION
21    ------------
22  BY MR. ROBERTSON:
23    Q.  Good morning or good afternoon,
24  depending on where you are, Mr. German.
25    A.  Afternoon.  Afternoon.

1    Hansen v Elon Musk - Arbitration Day 3
2    Q.  Afternoon it is.
3    So my name is Chris Robertson.  You
4  may recall me from the deposition.  I also
5  represent Tesla and Mr. Musk in this matter.  I
6  just have a few questions.
7    Could we pull up Exhibit 1?
8    And while Ms. Dunne is pulling that
9  up, were you aware at the time that Mr. Hansen --
10  a request was made by Tesla that Mr. Hansen was
11  represented by counsel?
12    Did he ever tell you that?
13    A.  It appears so.  In the phone call
14  that was admitted as an exhibit earlier, he does
15  reference counsel.
16    Q.  Did Mr. Hansen ever share with you a
17  letter that was sent by Tesla's counsel to his
18  personal counsel on the same day, September 4,
19  that the request was made?
20    A.  No, sir.
21    Q.  So this letter --
22    MR. ROBERTSON:  If you go up to the
23  top, Anne.
24  BY MR. ROBERTSON:
25    Q.  Do you see this letter is from a law

Hansen v Elon Musk - Arbitration Day 3

1       Hansen v Elon Musk - Arbitration Day 3
2  firm Hueston Hennigan?
3              Do you see that?
4       A.  I do.
5       Q.  Have you ever seen this letter before
6  today?
7       A.  No, sir.
8       MR. ROBERTSON:  Let's go to the
9  second paragraph.
10             Well, actually, let's go to the
11 second page, the last paragraph on the second
12 page.
13 BY MR. ROBERTSON:
14      Q.  So the last sentence on the second
15 page, you see here it says this letter -- it
16 says:  However, given what we know about his
17 misappropriation of Tesla confidential
18 information, whether regarding to Tesla or its
19 employees or contractors, I understand that Tesla
20 has asked U.S. Security to end Mr. Hansen's
21 assignment at the Gigafactory.
22             Do you see that?
23      A.  I do.
24      Q.  And you indicated in your testimony
25 that Tesla had not provided you a specific reason

1       Hansen v Elon Musk - Arbitration Day 3
2  why they had asked for the assignment to end;
3  correct?
4       A.  That's correct.
5       Q.  Did you know on that same day,
6  though, that Mr. Tesla provided a very specific
7  reason to Mr. Hansen's attorneys?
8       A.  I was not aware, no.
9       MR. ROBERTSON:  And let's go to the
10 first page.
11 BY MR. ROBERTSON:
12      Q.  Were you aware at that time that
13 Tesla had discovered that Mr. Hansen had
14 misappropriated confidential information from
15 Tesla?
16      A.  I was not aware, no.
17      Q.  If we look at the second paragraph
18 here in this letter, looking at the -- I think
19 it's the third sentence.  It starts:  That
20 review?
21      A.  I see it.
22      Q.  See where it says:  That review
23 revealed that Mr. Hansen has intentionally and
24 permanently deleted nearly his entire "sent"
25 folder from his Outlook e-mail account.

1       Hansen v Elon Musk - Arbitration Day 3
2              Were you aware of that at the time
3  that the instruction was given to USSA with
4  regard to Mr. Hansen?
5       A.  No, sir.
6       Q.  Or that on June 18th, Mr. Hansen
7  forwarded numerous Tesla internal documents to
8  his personal Gmail account, including internal
9  security badging records which display the
10 recorded dates and times that named individuals
11 accessed Tesla's facilities?  Were you aware that
12 that had been uncovered by Tesla?
13      A.  No, sir.
14      Q.  Or documents from personnel files
15 which display employee picture identification,
16 ID numbers, and personal license plate numbers,
17 were you aware of that?
18      A.  No, sir.
19      Q.  And photos of facility parking lots
20 taken from Tesla security cameras, were you aware
21 that that material had been sent by Mr. Hansen to
22 his personal Gmail account?
23      A.  No.
24      Q.  Looking at this today, knowing that
25 this is what Tesla uncovered, would that, in your

1       Hansen v Elon Musk - Arbitration Day 3
2  view, have provided grounds for them to have
3  called USSA and indicated they did not want
4  Mr. Hansen assigned back to the Gigafactory?
5       A.  Yes.
6       MR. WOODFIELD:  Objection,
7  Your Honor.  This is all going to sort of a
8  speculative argument because it's all going to
9  posed questions and completely skipping all of
10 the protected activity.
11             JUDGE HOFFMAN:  Okay, I understand
12 the objection.  I'll overrule the objection and I
13 understood the answer from the witness.
14             MR. ROBERTSON:  Okay.  Thank you,
15 Your Honor.
16             You can take that down.
17             Let's pull up Exhibit 206.
18 BY MR. ROBERTSON:
19      Q.  Mr. German, I'm going to show you
20 what's been identified as Exhibit 206.  It's a
21 document that you were shown in your direct
22 testimony under questioning by Mr. Woodfield.
23             This may take us a second.
24             And let's go to the end of
25 paragraph 1, the number.

Hansen v Elon Musk - Arbitration Day 3

2    So I'm looking at this paragraph,
3 Mr. German.
4    MR. ROBERTSON: And we can bring it
5 up a little bit, Anne, so you can read it.
6 BY MR. ROBERTSON:
7    Q. This was an e-mail that was forwarded
8 to you by Mr. Gouthro; correct?
9    A. Yes, sir.
10    Q. Okay. In this e-mail, it says -- in
11 the body of the e-mail it says: Karl has 20-plus
12 years of FBI investigation background.
13    Do you see that?
14    A. I do.
15    Q. Did Mr. Hansen ever tell you that he
16 had an FBI investigation background?
17    A. I don't recall anything verbal;
18 however, I do believe it is -- it lives in his
19 resumé, which I did testify to receiving.
20    Q. Do you know whether Mr. Hansen has
21 ever worked for the FBI?
22    A. I don't know.
23    Q. There are three individuals in the A,
24 B, and C, below. Do you see that? Ivan
25 Garcia-Flores, James Nolle, and Karl Hansen?

Hansen v Elon Musk - Arbitration Day 3

2    A. Yes.
3    Q. So these were three individuals that
4 were identified as potentially either not being
5 part of the RIF or being in this special
6 category.
7    Am I fair in saying that?
8    A. That's fair, yes.
9    Q. Okay. And did all three of these
10 individuals end up being part of the RIF and come
11 over to USSA?
12    A. I don't recall. There was a --
13 basically a 50/50 split of the individuals that
14 Tesla provided to us that they would like us to
15 make offers to.
16    50/50 being they either completely
17 left involvement with Tesla and/or USSA or they
18 stayed on board and came on with us.
19    The specific names, I cannot recall.
20    Q. Okay. I guess the simpler question
21 is, but Mr. Hansen wasn't alone in what was
22 happening. There were a number of individuals
23 involved; correct?
24    A. That is correct, yes.
25    MR. ROBERTSON: As long as we're

Hansen v Elon Musk - Arbitration Day 3

2 here, let's go to 205.
3 BY MR. ROBERTSON:
4    Q. So, Mr. German, I've put up on the
5 screen Exhibit 205. I believe it's already in
6 evidence.
7    If we could go down. And this is,
8 appears to be an exchange in September of '18,
9 and it's from Scott Wiebke.
10    Am I saying that right?
11    A. I imagine so.
12    Q. Did you have any interactions with
13 Mr. Wiebke?
14    A. Very, very minimal. Scott was a
15 local, either operations manager or a branch
16 manager in the Reno market.
17    Q. Okay. And it looks to me on this
18 document, if we go up, that you were blind copied
19 on it?
20    A. Yes.
21    Q. So do you remember some exchange with
22 Karl Hansen about opportunities that USSA might
23 have for him after the request came from Tesla?
24    A. Yes. I made it a point for -- with
25 our HR team that Karl can remain on as a

Hansen v Elon Musk - Arbitration Day 3

2 U.S. Security employee at a different facility, a
3 different contract, if you will.
4    MR. ROBERTSON: And let's go down,
5 Anne.
6    Q. And here, in this e-mail, there are
7 three -- it looks like there's three
8 opportunities that are identified: One is UPS,
9 one is Greyhound, and one is Walmart.
10    Do you see those?
11    A. I do.
12    Q. Did you have any visibility as to the
13 specific terms of the contract with either UPS,
14 Greyhound, or Walmart?
15    A. No.
16    Q. Do you know whether the opportunities
17 that -- any or all of those would have presented,
18 do you know what the pay rates would have been or
19 what the available shift hours would have been?
20    A. No.
21    Q. And are you aware that Mr. Hansen
22 didn't take any of these opportunities, but
23 instead left Nevada through early October? Were
24 you aware of that?
25    A. I was not, no.

Hansen v Elon Musk - Arbitration Day 3

1    Q.  Again, you made efforts to try to
2    transition him into another position once the
3    request came from Tesla that he not be at Tesla?
4        A.  Yeah, I'm sorry, could you restate,
5    please?
6        Q.  Yeah, I'm just saying you -- in
7    addition to Mr. Wiebke, you also were making
8    efforts to try to find another opportunity for
9    Mr. Hansen; is that fair?
10       A.  That's fair, yes.
11           MR. ROBERTSON:  Let's pull up
12   Exhibit 150.
13   BY MR. ROBERTSON:
14       Q.  Mr. German, I'm pulling up what's
15   been identified as Exhibit 150.  Again, this is
16   already in evidence.
17           I promise not to torture you with
18   this document, since it's long and small print.
19           But at the top it says Tesla, Inc.
20   Master Services Agreement.  Do you see that?
21       A.  I do.
22       Q.  Okay.  And this would be the
23   agreement that would govern the relationship
24   between Tesla and USSA; correct?

Hansen v Elon Musk - Arbitration Day 3

1        A.  That is correct.
2        Q.  And if we go to the -- it's
3    Bates 589.  It's the signature page.  Page 14 of
4    the document.  Just keep going down.
5            And there's a signature here by
6    someone named M. Blake Beach.
7            Do you know who that is?
8        A.  I do, yes.
9        Q.  Who is that?
10       A.  He was the senior vice president of
11   the national accounts group for U.S. Security
12   Associates.
13           MR. ROBERTSON:  And then if we go to
14   the next page, Anne.  Just one down.  At the top.
15           There you go.
16   BY MR. ROBERTSON:
17       Q.  And then here it says Annex 1 -
18   Additional Service Terms.
19           Do you see that?
20       A.  I do.
21       Q.  And so is this -- when you talked
22   about an addendum that would have to be
23   negotiated between Tesla and USSA, is this the
24   type of addendum that would be like an annex or

Hansen v Elon Musk - Arbitration Day 3

1    an attachment to the agreement?
2        A.  Correct, yes.
3        Q.  And I just want to be clear.  This
4    sort of investigator role, that would be an
5    investigator, not security guard, that addendum
6    never got signed; correct?
7        A.  Correct.
8        Q.  So there never was a position ever
9    created that -- between Tesla contractually with
10   USSA for that position that was being discussed;
11   correct?
12       A.  The finality -- or the final piece of
13   it never occurred, no.
14       Q.  And in any addendum that you've ever
15   seen in the entire time you worked at USSA, is
16   there ever a specific employee identified in an
17   addendum or is it a job position that then USSA
18   fills?
19       A.  Position that we fill.
20       Q.  All right.  Thank you.
21           MR. ROBERTSON:  Can we pull up 151?
22           And I don't believe this is actually
23   in evidence, so I'm going to establish
24   foundation, hopefully, and we can move to admit.

Hansen v Elon Musk - Arbitration Day 3

1    BY MR. ROBERTSON:
2        Q.  I'm pulling up what's been identified
3    as joint Exhibit 151, Mr. German.
4            And this appears to be a rate
5    addendum.  Do you see that?
6        A.  I do.
7        Q.  Were you involved at all in the
8    negotiation of any of the rates between Tesla and
9    USSA under the master services agreement?
10       A.  Yes, to a degree.
11           Can you scroll down for me, please?
12       Q.  Sure.
13       A.  Yeah.  So these were the original
14   rates that were agreed to via the MSA.  There
15   were subsequent rate markets that were
16   established with approval from Jeff Jones that
17   highlight the elevated rates that we've seen
18   throughout the course of this, the $27 an hour
19   for a supervisor, the 19.80 for a security
20   officer.
21           So there was an entire separate
22   negotiation that took place either just prior to
23   contract initiation or slightly thereafter.
24       Q.  Okay.  And here for Nevada, it looks

Hansen v Elon Musk - Arbitration Day 3

1 like there's a $16.50 rate.
2
3          Do you see that?
4     A. I do.
5     Q. Do you know what Mr. Hansen was
6 making when he was a Tesla employee?
7     A. I can't recall it. I know it was --
8 it was told to me at some point, but I do not
9 recall what it was.
10    Q. If it was 16.50 -- and I'll represent
11 that to you -- and then there were negotiated
12 higher rates, isn't it true that by moving to
13 USSA, Mr. Hansen actually did better pay wise at
14 USSA than he was doing at Tesla?
15    A. I think it's fair to speculate that.
16 Again, keeping consistent, it depends on the
17 hours worked.
18    Q. Right. Because you could go to a
19 site and maybe have a higher rate but work fewer
20 hours, and then you're not going to make as much
21 as if you, you know -- maybe at a lower rate have
22 better hours or better shifts; is that fair?
23    A. That's fair.
24    Q. And with any of these assignment that
25 Mr. Hansen had after Tesla instructed USSA that

Hansen v Elon Musk - Arbitration Day 3

1 it didn't want Mr. Hansen on the property
2 anymore, do you know what positions he took from
3 the standpoint of pay rate or available hours or
4 overtime? Do you have any visibility on any of
5 that?
6
7     A. I do not.
8     Q. Okay.
9         JUDGE HOFFMAN: Do you move to admit
10 151?
11         MR. ROBERTSON: Oh, yes, Your Honor.
12 Thank you. Yes. Sorry. Move to admit 151.
13         MR. WOODFIELD: No objection.
14         JUDGE HOFFMAN: 151 is in.
15         (Whereupon, Exhibit 151 was
16 received.)
17 BY MR. ROBERTSON:
18    Q. Mr. German, Mr. Woodfield, during
19 your direct, noted that you had been previously
20 deposed.
21         MR. ROBERTSON: You can take the
22 document down, Anne.
23 BY MR. ROBERTSON:
24    Q. And then he read you some excerpts
25 from the deposition, one of which was this

Hansen v Elon Musk - Arbitration Day 3

1 conversation with Jeff Jones about this
2 interaction with Mr. -- this alleged or purported
3 interaction between Mr. Hansen and Mr. Musk.
4
5         Do you recall that?
6     A. I do.
7     Q. Have you ever seen Mr. Hansen's sworn
8 deposition testimony about what occurred?
9     A. I have not.
10    Q. Did you know that Mr. Hansen stated
11 that, for example, that there was a driver in the
12 car with Mr. Musk?
13         Did you know that?
14    A. I did not.
15    Q. Did you know that there was not just
16 Mr. Hansen but another security guard at the
17 security gate?
18    A. No, sir.
19    Q. And in your testimony which was read
20 into the record -- and I want to read what you
21 said -- you said: He would not go into the
22 specifics -- this is Mr. Jones -- around that
23 interaction. As it was told to me, Mr. Hansen
24 and Mr. Musk were the only two present.
25         Do you recall testifying to that in

Hansen v Elon Musk - Arbitration Day 3

1 your deposition?
2     A. I do.
3     Q. Would that be inconsistent with the
4 fact that there were two security guards and a
5 driver in Mr. Musk's car?
6         MR. WOODFIELD: Objection,
7 Your Honor, he's asking to opine on another
8 witness's testimony. It's improper.
9         MR. ROBERTSON: It's not improper,
10 Your Honor. I mean, this is all hearsay to begin
11 with.
12         JUDGE HOFFMAN: Overruled.
13         MR. ROBERTSON: It would be hearsay
14 within hearsay. And what I'm doing is I'm
15 impeaching the -- quite frankly, the hearsay to
16 the extent that Mr. Woodfield is trying to
17 attribute this statement to Mr. Jones.
18         JUDGE HOFFMAN: Sure. I'll overrule
19 the objection.
20         And answer if you can.
21    A. Would you mind restating the
22 question, sir?
23         MR. ROBERTSON: Actually, Debbie, can
24 you just read it back? I don't know that I can

Hansen v Elon Musk - Arbitration Day 3

1    do it as well.
2    
3            (Whereupon, the following testimony
4    was read by the court reporter.)
5        "QUESTION:  Would that be
6    inconsistent with the fact that there were two
7    security guards and a driver in Mr. Musk's car?"
8            (End of readback.)
9        A.  Yes, it would be inconsistent.
10   BY MR. ROBERTSON:
11       Q.  And just a couple more questions,
12   Mr. German.
13           Mr. German, did you ever have any
14   interactions with someone at Tesla named Jenna
15   Ferrua?
16       A.  Yes, very brief.
17       Q.  Okay.  When you say "very brief,"
18   what interactions and when, if you can recall?
19       A.  The only interaction I had with Jenna
20   was centered around the notification of the
21   request for Tesla to remove Karl from the site,
22   and then a request from Jeff and Jenna for me to
23   send them an e-mail when it had been done.
24       Q.  So you do recall that that occurred.
25   So it wasn't just Jeff Jones that reached out to

Hansen v Elon Musk - Arbitration Day 3

1    you; it was also Ms. Ferrua?
2    
3        A.  That, I cannot be sure of.  Jeff was
4    the only one who spoke on the phone.  I don't
5    know if anybody else was on the phone as well.
6    But I do recall Jeff making the statement of, you
7    know, Let myself and Jenna know when it's done.
8        Q.  And did you know at the time that
9    Ms. Ferrua was with Tesla human resources?
10       A.  Yes.
11       Q.  And when a request like the one that
12   was made, is made, is it common in your
13   experience to have someone from HR involved?
14       A.  Yes.
15           MR. ROBERTSON:  Let me just check my
16   notes real quick.  I think I'm done.
17   BY MR. ROBERTSON:
18       Q.  Oh, one other thing.
19           Again, in your deposition,
20   Mr. German, do you recall that you were asked a
21   specific question about whether Tesla ever made a
22   request that Mr. Hansen not be in a supervisory
23   role?
24           Do you recall being asked that
25   question?

Hansen v Elon Musk - Arbitration Day 3

1        A.  Not directly.  I think they
2    questioned if I wanted -- if I really wanted him
3    in a supervisory role, but not necessarily to the
4    extent of them trying to block it, if you will.
5        Q.  Right.  Well, let me just read -- the
6    question and answer was:  Were you ever told
7    by --
8            MR. WOODFIELD:  There's impeachment
9    and then there's just reading the witness's --
10           MR. ROBERTSON:  That's what you did.
11   So I was just doing the same.
12           MR. WOODFIELD:  No, I asked him a
13   question, I didn't just say, hey, do you remember
14   your deposition?  Let me read you some deposition
15   testimony.
16           JUDGE HOFFMAN:  If you all are going
17   to make objections, I assume those objections are
18   to me.  I'd appreciate an opportunity to get a
19   word in edgewise.
20           I understood the question to be
21   laying a foundation for the question that was
22   coming, and so I'm going to overrule the
23   objection and allow the question.
24           MR. ROBERTSON:  The question was:

Hansen v Elon Musk - Arbitration Day 3

1            Do you recall, Mr. German, in your
2    deposition testimony being asked the question,
3    quote, Were you ever told by Tesla that
4    Mr. Hansen was not to be in a supervisory role at
5    the Tesla Gigafactory?
6            Do you remember being asked that
7    question?
8        A.  I'm sorry, I do not.
9    BY MR. ROBERTSON:
10       Q.  Okay.  Do you remember answering:  I
11   do not believe so, no?
12       A.  If I don't remember the question,
13   it's likely I won't remember the answer.
14       Q.  Given that, if I -- well, do you in
15   fact recall ever being told by Tesla that
16   Mr. Hansen was not to be in a supervisory role?
17       A.  No.
18           MR. ROBERTSON:  Okay.  Thank you.
19   That's all I have.  Thank you.
20           JUDGE HOFFMAN:  Okay.  Let's see
21   here.  Redirect by Mr. Woodfield.
22           MR. WOODFIELD:  Yes, Your Honor.
23           *  *  *
24           *  *  *

```
1        Hansen v Elon Musk - Arbitration Day 3
2                    ------------
3                    EXAMINATION
4                    ------------
5   BY MR. WOODFIELD:
6        Q.  Mr. German, there has been a lot of
7   discussion about Mr. Musk coming through the west
8   gate of the Gigafactory on August 30th.
9             Do you remember a discussion at the
10  end of August of 2018 that you might have had
11  with Mr. Hansen where he might have told you what
12  he thinks -- he thought occurred?
13       A.  I do not recall.
14       Q.  Did he tell you about any event where
15  he thought that Mr. Musk went through the gate
16  and told you that it occurred?
17       A.  No, I do not recall.
18       Q.  Do you recall having a telephone
19  conversation with him where he told you about it
20  and you acknowledged that you were aware of it?
21       A.  I do not.
22       Q.  If I played you a video -- a tape
23  recording of you acknowledging a -- him talking
24  about when he talked to you about an event where
25  Elon Musk went through the gate a couple of weeks
```

```
1   ago, when you were talking with him in September
2   of 2018, might that refresh your recollection?
3        A.  I would suppose so.  Would we have
4   the date for that clip?
5        Q.  It would be in September of 2018.
6             And I assure you, it's not too long,
7   because USSA played it for us and they thought it
8   was reasonable at that time.
9             So hold on one second.
10            (Tape played. )
11            Mr. Hansen:  If you can hear me, I
12  can hear you.  Go ahead, my friend.
13            Mr. German:  Okay.  Let me preface
14  this with saying I have to get through a business
15  piece first and then I have a personal piece at
16  the end of it.  Okay?
17            Mr. Hansen:  Sounds good.
18            Mr. German:  So business, you are
19  effectively removed via client request from the
20  Tesla site.  I will not go into details.  I'm
21  sure you are already aware, a letter has been
22  populated from Tesla to both yourself and your
23  lawyers.  I will let that take its course.  All
24  right?
25
```

```
1        Hansen v Elon Musk - Arbitration Day 3
2             Now moving into the business piece
3   now -- or the personal piece.  I'm working with
4   the region right now to reassign you to another
5   one of our accounts but keep your rate the same.
6   So as U.S. Security Associates, we will eat
7   whatever marginal difference the contractual
8   agreement pay rates are for your new account --
9             Mr. Hansen:  Okay.
10            Mr. German:  -- and keep you at your
11  current rate.
12            Mr. Hansen:  Wow.  I appreciate that.
13  Can't ask for more than that as I need to stay
14  employed.  And holy shit --
15            Mr. German:  I'm not going to go into
16  details on that.
17            Mr. Hansen:  Okay.
18            Mr. German:  But you know who I am
19  and what I'm about.
20            Mr. Hansen:  Absolutely.  Absolutely.
21            I didn't -- I didn't know any of
22  this, actually.  I mean, I suspected something
23  was coming down the road, quite honestly.  You
24  know, you heard the piece about Elon Musk coming
25  through the gate last week.  I'm sure he --
```

```
1        Hansen v Elon Musk - Arbitration Day 3
2             Mr. German:  Oh, yeah.
3             Mr. Hansen:  Yeah.  Yeah.  Okay.
4             And I haven't -- I haven't seen the
5   letter.  Do you have --
6             (Tape ended.)
7   BY MR. WOODFIELD:
8        Q.  Now, that is in evidence, but when
9   Mr. Musk [sic] spoke to you, and that, I believe,
10  was in a call you had with him on September 4,
11  2018, and he said, you heard the piece about
12  Elon Musk coming through the gate last week, and
13  you said, oh, yeah, were you speaking to him
14  honestly?
15            MR. ROBERTSON:  Objection.
16            JUDGE HOFFMAN:  Yes, what's the
17  objection?
18            MR. ROBERTSON:  The objection is that
19  Mr. Woodfield said when he had a conversation
20  with Mr. Musk.
21            MR. WOODFIELD:  Excuse me.  It was
22  Mr. Hansen.
23  BY MR. WOODFIELD:
24        Q.  When you were speaking with
25  Mr. Hansen in that recording, and Mr. Hansen said
```

Page 610

Hansen v Elon Musk - Arbitration Day 3

1  to you, you heard about the event when Mr. Musk
2  came through the gate last week, and you said,
3  oh, yeah, were you speaking honestly with
4  Mr. Hansen?
5  A.  In terms of did I know about the
6  incident?
7  Q.  Yes, sir.
8  A.  Yes, I knew about it.
9  Q.  Okay.  So how did you know about it?
10  A.  I believe it was --
11  MS. LARGENT:  Objection, asked and
12  answered.
13  JUDGE HOFFMAN:  Overruled.
14  How did you know about it?
15  A.  It was Jeff Jones who told me about
16  it.
17  BY MR. WOODFIELD:
18  Q.  Who else told you about it?
19  A.  Jeff's the only one I recall.
20  Q.  Mr. Hansen didn't talk to you about
21  it?
22  A.  Outside of what we just heard on that
23  phone call, I don't recall anything.
24  Q.  Mr. German, have you ever told anyone
25  


Page 611

Hansen v Elon Musk - Arbitration Day 3

1  that you worked for Tesla?
2  A.  No, not for.
3  Q.  On your LinkedIn page, do you list
4  yourself as a Tesla employee for the period of
5  June 2018 to March 2019?
6  A.  No.  It references as a national
7  account manager for Tesla.  But when you, on
8  LinkedIn, have a company's name, it will
9  automatically apply that -- that logo or that
10  brand.
11  Q.  So on your LinkedIn page, is this
12  your LinkedIn page that you're seeing right now?
13  A.  It is.
14  Q.  And so where, for the period of
15  2015 -- February 2015 to June 2018, you list
16  yourself as a national account manager for
17  PacifiCorp, and then you list yourself from
18  June 2018 to March 2019 as a national account
19  manager, and it says for Tesla.  There's no
20  mention in here of working for someone else
21  during that time period; is that correct?
22  A.  I was also charged with the accuracy
23  of services provided by U.S. Security Associates,
24  Inc.

Page 612

Hansen v Elon Musk - Arbitration Day 3

1  Q.  And then you said you were laid off
2  in March of 2019; correct?
3  A.  Incorrect.  In June.
4  Q.  In June of 2019.  And how long were
5  you out of work?
6  A.  From June until October.
7  MR. WOODFIELD:  I don't have any
8  further questions for this witness.
9  JUDGE HOFFMAN:  Any recross within
10  the scope of that direct by USSA?
11  MS. LARGENT:  No questions.
12  JUDGE HOFFMAN:  Mr. Robertson, any
13  more questions?
14  MR. ROBERTSON:  No questions,
15  Your Honor.  Thank you.
16  JUDGE HOFFMAN:  All right.
17  Thank you, Mr. German, for your testimony.
18  You're excused and you can sign off now.
19  MS. LARGENT:  Thank you.
20  JUDGE HOFFMAN:  Okay.  Well, what's
21  next?  Did we ever find -- was it Mr. Mohamed?
22  MR. ROBERTSON:  So, Nick, are you
23  going to rest?
24  MR. WOODFIELD:  Yes.

Page 613

Hansen v Elon Musk - Arbitration Day 3

1  MR. ROBERTSON:  Now officially?
2  MR. WOODFIELD:  Yes.
3  MR. ROBERTSON:  And I believe on
4  behalf of Tesla, we will rest as well.  Just -- I
5  don't -- I don't -- we're not going to call
6  Mr. Mohamed.  I won't go into why.  He's not
7  available, and I think we're comfortable with the
8  record, so we'll just go ahead and rest.
9  JUDGE HOFFMAN:  And from USSA, are
10  you resting?
11  MS. LARGENT:  Yes.
12  JUDGE HOFFMAN:  All right.  So it
13  looks like all of the evidence is in.  Is there
14  any reason to keep the record open?  Well, I
15  guess we have a report coming from our court
16  reporter, and that will be part of the record.
17  Any need to keep the record open
18  beyond that?
19  All right.  I'm hearing no reason to
20  do that.  So now I'm interested in your desires
21  on proceeding.
22  Should we -- are the parties
23  interested in providing post-hearing briefs, and
24  what does this look like if you want to do that?

1    Hansen v Elon Musk - Arbitration Day 3
2        MS. LARGENT:  On behalf of USSA, we
3    would be in favor of post-hearing briefs, and I
4    will probably say between 14 to 30 days after the
5    court reporter is able to provide the
6    transcripts.  It's not a terribly long
7    proceeding, so I don't think it should be too
8    long, but I'm flexible.
9        JUDGE HOFFMAN:  And are you proposing
10   post-hearing briefs simultaneously landing, or
11   would the post-hearing briefs be in the nature of
12   a motion, opposition and reply?
13       MS. LARGENT:  In my experience, I
14   usually do simultaneous post-hearing briefs,
15   where no one does replies, but flexible as well.
16       MR. WOODFIELD:  I concur with
17   Ms. Largent on that.  I think -- I think we do it
18   30 days after, and we'd do concurrent filings
19   with no replies.
20       JUDGE HOFFMAN:  Okay.  I would
21   reserve the right to ask for a reply if I found
22   something that I got stuck on.  Okay.  But
23   simultaneous.
24       What about you, Mr. Robertson?
25       MR. ROBERTSON:  That's all fine with

1    Hansen v Elon Musk - Arbitration Day 3
2    us.
3        JUDGE HOFFMAN:  Deb, when do you
4    think that the record will be ready, without
5    putting any expedited requirements on it?
6        So the transcript will be out
7    probably by April 25th.
8        And so I guess I would propose
9    opening briefs on May 20th.
10       Well, it wouldn't be opening briefs,
11   it would be a brief.  Right?
12       MS. LARGENT:  Post-hearing.
13       JUDGE HOFFMAN:  Post-hearing, yes.
14   The post-hearing brief would be on April 20th.
15       MR. WOODFIELD:  May 20th?
16       JUDGE HOFFMAN:  Yes.  May 20th, by
17   the close of business.
18       Do counsel want to have a hearing
19   after the briefs have been filed?  I -- what I
20   would propose is that I -- I'll ask for it if I
21   feel like I need it.  But otherwise, I don't
22   think -- I don't think that it's going to be
23   useful for me.  We've got a very thorough record
24   here, and the briefing has been exhaustive.  So I
25   don't think there's a reason for it, but I'll

1    Hansen v Elon Musk - Arbitration Day 3
2    hear what you have to say on that.
3        MS. LARGENT:  It's nice of you to say
4    exhaustive instead of exhausting.
5        JUDGE HOFFMAN:  I choose my words
6    carefully.
7        MR. ROBERTSON:  I think from Tesla's
8    perspective, that sounds fine.  That's what we
9    were going to suggest, actually, was just
10   submitting the papers, and if there was anything
11   you needed clarified, you could do that either
12   through a reply or if you wanted to get us in a
13   hearing, you could do that, but it would be at
14   your discretion, Your Honor.
15       JUDGE HOFFMAN:  All right.  Well,
16   that sounds good.
17       So May 20th, we'll start a 30-day
18   obligation for me to produce a reasoned opinion
19   and award in this case.
20       I always usually make it a practice
21   of issuing an interim award at the very end to
22   allow parties to address any post-hearing issues.
23   And I know the rules allow, for example, on
24   consideration after the final award of an offer
25   of judgment, for example, that might have been

1    Hansen v Elon Musk - Arbitration Day 3
2    done in the case, or on some other application
3    for fees and that sort of thing.
4        And so the decision will be an
5    interim award, and I will invite any additional
6    information after that.  And if fees and costs
7    are expected for some reason, then that would be
8    the opportunity to hear about that.  So it will
9    really be a two-stage process.  The interim award
10   will come out, and it will invite anything else,
11   and then it will be a final award after that.
12       MR. WOODFIELD:  Right.  Your Honor,
13   may I ask, do you want a page limitation on the
14   briefing?
15       JUDGE HOFFMAN:  I don't really want
16   to set a page limitation, but I have -- I'm aware
17   in writing some of these briefs myself, sometimes
18   it's easy to cut and paste things that have been
19   done before and then add to them, which creates a
20   lot of redundancy.  We've had a motion for
21   summary judgment here, and I think the issues
22   have been pretty -- I've tried to carefully
23   narrow the issues to just a couple of causes of
24   action.  And so I would appreciate that you only
25   go to those issues.  Whatever you want to talk

Page 618

```
1        Hansen v Elon Musk - Arbitration Day 3
2   about is fine, but I don't want to create an
3   artificial limit on what you provide to me.
4   We'll leave it at that, I think.
5        MR. WOODFIELD:  All right.  And then
6   in terms of the briefing, do you want the
7   briefing on the liability and damages at this
8   point, and if there is to be a finding on
9   liability and damages, then a subsequent -- or
10  a -- there would be an interim award or a
11  subsequent briefing for fees and costs?
12        JUDGE HOFFMAN:  Exactly right.
13        MR. WOODFIELD:  Understood.
14        JUDGE HOFFMAN:  Okay, good.  Well, I
15  think we've got a plan here, then.
16        Let me first thank our court
17  reporter, Debbie, for being patient with us all
18  and keeping us in line.  And thank you for that.
19        Mr. Hansen, thank you for your
20  participation in this case.  You are well
21  represented, as is the other side, and I've heard
22  the evidence and I feel like you've had your
23  opportunity to be heard here, and that's
24  extremely important.  And so now I'll take the
25  evidence and take all of the information and
```

Page 619

```
1        Hansen v Elon Musk - Arbitration Day 3
2   write a reward -- or an award that will be
3   understandable to both sides.  So that's what's
4   going to happen next.
5        And finally, to counsel, thank you
6   very much.  You've been civil with each other,
7   which I appreciate, and you've presented the case
8   well.  We got through the testimony with time to
9   spare, and I'll spend that time reviewing my
10  notes and getting ready for your post-hearing
11  briefs.
12        Anything further?
13        MR. HANSEN:  Thank you, Your Honor.
14        MS. LARGENT:  Thank you.
15        MR. WOODFIELD:  Thank you.
16        JUDGE HOFFMAN:  Mr. Woodfield, any
17  final thoughts?
18        MR. WOODFIELD:  No, Your Honor.  I
19  appreciate it, and I appreciate the flexibility
20  and not forcing us all to get on airplanes.
21        JUDGE HOFFMAN:  Yeah, you bet.  You
22  bet.
23        Mr. Robertson, Ms. Dunne, anything?
24        MR. ROBERTSON:  No, nothing from us,
25  Your Honor.
```

Page 620

```
1        Hansen v Elon Musk - Arbitration Day 3
2        JUDGE HOFFMAN:  And, Ms. Braxton,
3   Ms. Largent?
4        MS. LARGENT:  Nothing from us.
5   Thank you.
6        JUDGE HOFFMAN:  Okay.  It's been a
7   pleasure, all.  Thank you very much.
8        (Time noted: 11:32 a.m. PDT)
9             --o0o--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 621

```
1        Hansen v Elon Musk - Arbitration Day 3
2        REPORTER'S CERTIFICATION
3
4        I, Debra A. Dibble, RDR, CRR,
5   Notary Public, hereby certify that this
6   transcript is a true record of the arbitration
7   proceedings held in the foregoing matter on
8   Wednesday, April 13, 2022.
9        I further certify that I am
10  neither counsel for, related to, nor employed by
11  any of the parties or attorneys in the action in
12  which these proceedings were taken; and, further,
13  I am not a relative or employee of any attorney
14  of record in these proceedings, nor am I
15  financially or otherwise interested in the
16  outcome of said proceedings.
17        Subscribed and sworn to on
18  this April 13, 2022.
19
20
21  _____
         DEBRA A. DIBBLE
22       NCRA Registered Diplomate Reporter
         NCRA Certified Realtime Reporter
23
24
25
```

Page 622

1
2                      INDEX
3
4  PROCEEDINGS                          520
5
6      EXAMINATION OF MATTHEW DAVID GERMAN:
7      BY MR. WOODFIELD               520
8      BY MS. LARGENT                 566
9      BY MR. ROBERTSON               584
10     BY MR. WOODFIELD               606
11
12  REPORTER'S CERTIFICATION            621
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 623

1
2                  DEPOSITION EXHIBITS
3  NUMBER              DESCRIPTION        PAGE
4  Exhibit 151    was received            599
5  Exhibit 206    was received            527
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**$**

**$16.50** 598:2

**$20** 534:12,13

**$27** 537:7 597:19

**-**

**--o0o--** 620:9

**1**

**1** 585:7 589:25 595:18

**100** 525:20,21

**10:00** 574:24

**10:33** 583:11

**10:36** 583:12

**10:39** 584:14

**10:51** 584:15

**11** 528:3

**11:32** 620:8

**11th** 527:14

**121** 540:2 573:20 575:18 577:12

**13** 520:4 621:8,18

**14** 557:13 595:4 614:4

**150** 594:13,16

**151** 596:22 597:4 599:10,12,14,15

**16.50** 598:10

**165** 555:4

**17** 558:17,18

**18** 558:17 592:8

**186** 542:21,24 547:21

**189** 566:22 567:2

**18th** 588:6

**19.80** 540:16 597:20

**190** 574:12

**192** 574:12

**193** 577:3

**1:15** 555:7

**1st** 575:11

**2**

**20** 522:2 577:2

**20-plus** 590:11

**2008** 560:18

**2014** 522:12,24 523:7

**2015** 611:16

**2018** 524:9,11 526:24 528:3 530:13,24 534:6 556:21 557:7, 15,23 559:18 567:7 606:10 607:3,6 609:11 611:6,16,19

**2019** 521:19 522:3,4, 5,6,13,25 523:2 583:25 611:6,19 612:3,5

**2021** 521:10,13,20

**2022** 520:4 621:8,18

**204** 574:12,16 577:3

**205** 592:2,5

**206** 527:2,7,9,10 589:17,20

**20th** 615:9,14,15,16 616:17

**25th** 615:7

**27** 537:7

**3**

**3** 520:1 521:1 522:1 523:1 524:1 525:1 526:1 527:1 528:1 529:1 530:1 531:1 532:1 533:1 534:1 535:1 536:1 537:1 538:1 539:1 540:1 541:1 542:1 543:1 544:1 545:1 546:1 547:1 548:1 549:1 550:1 551:1 552:1

**553:**1 554:1 555:1 556:1 557:1 558:1 559:1 560:1 561:1 562:1 563:1 564:1 565:1 566:1 567:1 568:1 569:1 570:1 571:1 572:1 573:1 574:1 575:1 576:1 577:1 578:1 579:1 580:1 581:1 582:1 583:1 584:1 585:1 586:1 587:1 588:1 589:1 590:1 591:1 592:1 593:1 594:1 595:1 596:1 597:1 598:1 599:1 600:1 601:1 602:1 603:1 604:1 605:1 606:1 607:1 608:1 609:1 610:1 611:1 612:1 613:1 614:1 615:1 616:1 617:1 618:1 619:1 620:1 621:1

**3.25** 548:21

**30** 556:21 557:6,15 559:18 563:8 614:4, 18

**30-day** 616:17

**30th** 555:22 606:8

**3rd** 543:7 555:6 562:23 563:5 568:17, 20 575:2 576:17 577:16,18 578:12

**4**

**4** 567:6 585:18 609:10

**40** 534:17

**4th** 560:18 563:7 567:19

**5**

**50/50** 591:13,16

**589** 595:4

**5th** 560:15,17,18 563:7,8

**6**

**6-** 525:15

**60** 556:10

**7**

**75** 525:21 558:16

**76** 557:13 558:17

**8**

**80** 532:9

**80,000** 532:9

**800** 525:16

**878** 573:24 575:19

**879** 576:6 577:13

**9**

**90,000** 532:10

**9:09** 520:4

**A**

**a.m.** 520:4 574:24 583:11,12 584:14,15 620:8

**Absolutely** 552:20 553:11 608:20

**absorbed** 523:24

**acceded** 563:9

**accepted** 532:4

**accessed** 588:11

**accommodate** 582:5

**accommodated** 561:2

**accommodation** 582:9

**account** 522:19 523:13,14,22 524:7, 10,12,23 530:3 531:9

**535:**17,22 541:5,10, 21 543:15 544:12 567:24 569:20 582:14 583:4,24 587:25 588:8,22 608:8 611:8,17,19

**accounts** 553:3 595:12 608:5

**accuracy** 611:23

**accurate** 526:8 557:18 559:21 560:19 582:6

**acknowledged** 606:20

**acknowledging** 606:23

**acquisition** 522:9

**act** 545:22

**acting** 539:17

**action** 617:24 621:11

**activity** 561:19 580:2 589:10

**actual** 523:21 526:12

**add** 536:7 617:19

**added** 533:10

**addendum** 533:11 595:23,25 596:6,15, 18 597:6

**addition** 524:20 594:8

**additional** 531:7 575:6 576:2 595:19 617:5

**Additionally** 545:8

**address** 616:22

**adjustment** 536:6

**admit** 596:25 599:9, 12

**admitted** 585:14

**advice** 550:3 575:14

**advise** 536:11,18

**affords** 581:16

**afternoon** 584:23,25 585:2

**agree** 562:25

**agreed** 597:15

**agreement** 524:18 526:19 533:11 581:16,19,24 594:21, 24 596:2 597:10 608:8

**ahead** 525:8 549:15 572:24 573:8,10 575:23 607:13 613:9

**airplanes** 619:20

**Alex** 566:21 567:10 573:24 576:22

**alleged** 600:3

**Allied** 522:8,14,17,22

**allowing** 581:21

**Allstate** 546:3

**ambiguous** 565:4

**America** 524:19

**American** 523:19

**amount** 532:2

**and/or** 553:12 591:17

**Anne** 585:23 590:5 593:5 595:15 599:22

**annex** 595:18,25

**annoyed** 571:19 578:15

**annual** 532:10

**annualized** 534:14

**answering** 605:11

**anymore** 599:3

**apologize** 582:12

**appears** 574:23 585:13 592:8 597:5

**application** 617:2

**apply** 611:10

**approaching** 521:10 538:2

**approval** 582:8

597:17

**April** 520:4 615:7,14 621:8,18

**arbitration** 520:1 521:1 522:1 523:1 524:1 525:1 526:1 527:1 528:1 529:1 530:1 531:1 532:1 533:1 534:1 535:1 536:1 537:1 538:1 539:1 540:1 541:1 542:1 543:1 544:1 545:1 546:1 547:1 548:1 549:1 550:1 551:1 552:1 553:1 554:1 555:1 556:1 557:1 558:1 559:1 560:1 561:1 562:1 563:1 564:1 565:1 566:1 567:1 568:1 569:1 570:1 571:1 572:1 573:1 574:1 575:1 576:1 577:1 578:1 579:1 580:1 581:1 582:1 583:1 584:1 585:1 586:1 587:1 588:1 589:1 590:1 591:1 592:1 593:1 594:1 595:1 596:1 597:1 598:1 599:1 600:1 601:1 602:1 603:1 604:1 605:1 606:1 607:1 608:1 609:1 610:1 611:1 612:1 613:1 614:1 615:1 616:1 617:1 618:1 619:1 620:1 621:1,6

**arbitrator** 549:7

**area** 571:13

**argues** 546:15

**argument** 546:12,20 589:8

**arguments** 547:9

**Armed** 531:13

**arriving** 556:21 558:21

**artificial** 618:3

**assign** 538:13 541:13

**assigned** 525:25 526:18 535:18 543:16 568:25 569:18 583:4 589:4

**assignment** 586:21 587:2 598:24

**Associates** 520:24 521:4 522:9,11,15,21 524:25 531:19 538:12 595:13 608:6 611:24

**assume** 524:6 582:3 604:18

**assure** 546:22 549:3 607:7

**attachment** 596:2

**attempt** 538:11

**attempted** 565:16 566:3 568:8

**attempting** 545:4

**attend** 572:24 573:8 575:23 577:18 578:11,21

**attended** 573:11

**attention** 579:6

**attentive** 526:16

**attorney** 621:13

**attorney's** 545:19

**attorneys** 587:7 621:11

**attribute** 601:18

**audio** 580:17

**August** 543:7 555:6, 22 556:21 557:6,15, 23 559:18 562:23 563:5 575:2,11 576:17 577:16,18 578:12 606:8,10

**austerity** 548:22

**author** 555:8

**authority** 538:13

**automatically** 561:13 611:10

**awake** 526:16

**award** 616:19,21,24 617:5,9,11 618:10 619:2

**aware** 526:20 583:18 585:9 587:8,12,16 588:2,11,17,20 593:21,24 606:20 607:22 617:16

**B**

**back** 522:2 539:24 540:25 549:8 567:17 568:10 572:20,21 575:18 576:25 577:11,12 584:10,12, 16 589:4 601:25

**background** 590:12, 16

**bad** 561:22

**badging** 588:9

**badmouthed** 581:5

**based** 524:2 538:24 545:9 568:2 579:10

**basically** 591:13

**basis** 536:4

**Bates** 595:4

**Beach** 595:7

**Began** 564:5

**begin** 601:11

**beginning** 524:11

**behalf** 613:5 614:2

**behaviors** 561:11

**benefit** 545:24

**bet** 619:21,22

**bit** 544:20 548:19 565:7 566:23 567:10 569:5 573:22 574:13 576:22 577:10 590:5

**Blake** 595:7

**blame** 543:18,19,22 547:20

**blend** 562:12

**blind** 592:18

**block** 538:9,11 604:5

**blow** 566:23

**blunt** 556:13

**board** 524:10 528:13 591:18

**body** 590:11

**books** 535:8 536:14, 19 541:12

**bottom** 551:18 552:2

**bracing** 562:21

**branch** 523:8 569:15 592:15

**brand** 611:11

**Braxton** 620:2

**breadth** 559:15

**break** 549:11 584:10

**briefing** 615:24 617:14 618:6,7,11

**briefs** 613:24 614:3, 10,11,14 615:9,10,19 617:17 619:11

**bring** 573:2 590:4

**bringing** 528:12

**brought** 523:12 524:10

**brutha** 552:22

**BS** 541:24 542:5

**built** 535:10

**business** 553:13 607:15,19 608:2 615:17

**C**

**C-SUITE** 570:4

**calculations** 534:19

**call** 544:22 545:11,14 549:21 551:11,23 556:9,11 563:17,20, 22,23 568:2,5 581:8

585:13 609:10 610:24 613:6

**called** 523:15 568:10,12 589:3

**calls** 529:3 558:14 579:11

**cameras** 588:20

**capacity** 521:3

**car** 571:11,14 600:12 601:6 602:7

**care** 581:22

**carefully** 616:6 617:22

**carry** 543:15

**cartel** 575:25

**case** 546:4,9 575:25 616:19 617:2 618:20 619:7

**categories** 531:11

**categorizing** 537:12

**category** 591:6

**cc'ing** 574:20

**centered** 562:11 602:20

**CEO** 570:5 571:17 578:3

**CERTIFICATION** 621:2

**Certified** 621:22

**certify** 621:5,9

**chain** 542:4

**chance** 536:23 575:22

**charged** 611:23

**check** 603:15

**checking** 526:4

**Cheyenne** 524:2

**chief** 546:9

**choose** 616:5

**Chris** 585:3

**circumstances** 546:6

**City** 523:16

**civil** 619:6

**claiming** 548:16

**clarification** 537:19

**clarified** 616:11

**clarify** 532:23

**classifying** 537:11

**clear** 556:14 596:4

**client** 523:9,15,23 524:21 526:6 536:5 552:13 561:18 569:24 570:17,22 571:3 582:4,5 607:20

**client's** 580:23

**clients** 560:25 581:20

**clip** 548:21,25 607:5

**close** 572:18 615:17

**co-workers** 530:8

**code** 541:14

**codes** 535:9 541:9, 15

**combination** 537:23

**combo** 539:16,17

**comfortable** 561:24 613:8

**common** 539:3 573:5 577:25 581:13, 20 603:12

**comms** 578:3

**communicate** 580:14,19

**communicated** 536:3 557:4

**communication** 576:6,9

**communications** 571:23

**company** 571:18

**company's** 611:9

**compensation** 531:23 532:11 534:11,25

**complaint** 569:2 584:5

**completely** 589:9 591:16

**compound** 556:3,4 562:9

**conceded** 544:9

**concern** 548:21,25 553:12

**concerns** 579:25

**concur** 614:16

**concurrent** 614:18

**conditions** 531:23

**conduct** 545:13

**conducted** 584:18

**confidential** 586:17 587:14

**consent** 544:25

**consideration** 561:14 616:24

**considered** 531:11

**consistent** 563:13 598:16

**consolidation** 533:24

**contact** 551:24

**contacted** 554:15 568:23

**contemplated** 533:9

**content** 557:10

**context** 557:11

**contexts** 575:6

**Continental** 525:16

**contract** 523:9 524:13 528:17 530:16 533:2,7,8 535:24 543:16 551:16 557:8,16

559:20 578:7 593:3, 13 597:24

**contractors** 586:19

**contracts** 523:24

**contractual** 608:7

**contractually** 596:10

**contradict** 547:17

**contradictory** 530:25

**contrary** 547:4 548:4

**control** 544:12

**conversation** 537:21 548:15 554:10 555:21,25 574:5,7 600:2 606:19 609:19

**conversations** 555:23 575:7 579:11

**cooperated** 565:15 566:2

**cooperation** 566:6

**coordination** 524:16

**copied** 592:18

**corporate** 520:23 523:17

**correct** 520:24 521:4,5 522:15,16 527:23 532:13 553:19,20 555:13,16, 20 560:2 563:5,11, 12,14,23,24 568:18 576:4,17 578:13 580:9 581:23 582:21, 22 587:3,4 590:8 591:23,24 594:25 595:2 596:3,7,8,12 611:22 612:3

**costs** 617:6 618:11

**counsel** 550:4 585:11,15,17,18 615:18 619:5 621:10

**counterparts** 536:2

**couple** 544:23 602:11 606:25 617:23

**court** 520:8 546:4 602:4 613:16 614:5 618:16

**courtesy** 551:13

**covered** 525:12

**create** 618:2

**created** 541:10 596:10

**creates** 561:21 617:19

**criticisms** 542:17

**cross-examination** 566:10 584:11,17

**CRR** 621:4

**cryptic** 538:22 539:2, 11,15,22 540:22 556:9 557:25 561:4 573:15

**current** 608:11

**customer** 581:21

**cut** 580:17 617:18

---

**D**

**daily** 536:4

**damages** 618:7,9

**data** 573:6

**date** 526:22 557:9 563:2,20,21 567:6 607:5

**dated** 563:4

**dates** 588:10

**David** 520:11,21

**day** 520:1 521:1 522:1 523:1 524:1 525:1 526:1 527:1 528:1 529:1 530:1 531:1 532:1 533:1 534:1 535:1 536:1 537:1 538:1 539:1 540:1 541:1 542:1 543:1 544:1 545:1 546:1 547:1 548:1 549:1 550:1 551:1 552:1 553:1 554:1

555:1 556:1 557:1
558:1 559:1 560:1
561:1 562:1 563:1
564:1 565:1 566:1
567:1 568:1,6,9,11
569:1 570:1 571:1
572:1 573:1 574:1
575:1 576:1,20 577:1
578:1 579:1 580:1
581:1 582:1 583:1
584:1 585:1,18 586:1
587:1,5 588:1 589:1
590:1 591:1 592:1
593:1 594:1 595:1
596:1 597:1 598:1
599:1 600:1 601:1
602:1 603:1 604:1
605:1 606:1 607:1
608:1 609:1 610:1
611:1 612:1 613:1
614:1 615:1 616:1
617:1 618:1 619:1
620:1 621:1

**day-to-day** 535:23

**days** 544:23 563:8
579:8 614:4,18

**dealing** 539:9

**Deb** 615:3

**Debbie** 601:24
618:17

**Debra** 621:4,21

**decided** 533:21,22
550:15

**decides** 545:19

**decision** 532:6
581:12 617:4

**decisions** 538:24

**decline** 550:15

**decorated** 536:24

**defensively** 547:8

**defer** 569:19

**degree** 532:3 556:16
560:24 573:14
597:11

**delays** 548:23

**deleted** 587:24

**deliverables** 524:16
525:10

**deliveries** 526:5

**demand** 584:2

**demanding** 568:20

**departed** 544:11

**department** 527:25
528:7 531:17

**depended** 525:24

**depending** 584:24

**depends** 534:15
598:16

**deposed** 599:20

**deposition** 557:13
558:15 564:18,25
585:4 599:25 600:8
601:2 603:19 604:15
605:3

**describing** 574:8

**desires** 613:21

**detailed** 528:21

**details** 580:11,15,20
607:21 608:16

**Dibble** 621:4,21

**difference** 560:4
608:7

**digested** 579:7

**Diplomate** 621:22

**direct** 526:13 535:23,
25 545:4 549:2 578:3
589:21 599:19
612:11

**directed** 536:13

**directly** 530:6 534:12
535:18 538:21
551:24 556:19
563:15 564:5 604:2

**disappointed** 535:3,
5

**disclose** 579:14

**disclosed** 545:5
546:8,17

**discovered** 587:13

**discretion** 616:14

**discuss** 532:17
533:13 556:20
558:20 572:7

**discussed** 534:24
543:12 544:20
555:14 596:11

**discussing** 533:15

**discussion** 528:25
529:15 557:10
573:25 606:7,9

**discussions** 524:8
528:22 533:17

**display** 588:9,15

**district** 545:18

**document** 589:21
592:18 594:19 595:5
599:22

**documents** 588:7,
14

**dollar** 531:25

**download** 559:13

**driver** 600:11 601:6
602:7

**driving** 571:9

**drug** 579:25

**due** 522:8

**duly** 520:12

**Dunne** 585:8 619:23

**Dunne's** 584:11

**duties** 524:14 525:23
532:14 535:21

**duty** 543:15

**Dyncorp** 523:25

—————

**E**

**e-mail** 527:13,17
528:23 542:3,4 543:4
547:20 550:12 555:6,
9,10,13,14,17 562:23
563:4 567:3,18
571:25 574:19,23

**discovered** 587:13

575:9,11,13,22
576:12,13,16 577:5,
19 578:22 579:3
587:25 590:7,10,11
593:6 602:23

**e-mailed** 577:7

**earlier** 562:20 563:14
569:6 578:9 585:14

**earliest** 568:15

**early** 526:24 593:23

**easy** 617:18

**eat** 608:6

**edgewise** 604:20

**effect** 538:3 572:17

**effectively** 523:21
607:20

**effort** 533:25

**efforts** 544:10 594:2,
9

**elaborate** 560:6

**elapsed** 579:3

**elevated** 597:18

**Elon** 520:1 521:1
522:1 523:1 524:1
525:1 526:1 527:1
528:1 529:1 530:1
531:1 532:1 533:1
534:1 535:1 536:1
537:1 538:1 539:1
540:1 541:1 542:1
543:1,4 544:1 545:1
546:1 547:1 548:1
549:1 550:1 551:1
552:1 553:1 554:1
555:1,15 556:1 557:1
558:1 559:1 560:1
561:1 562:1,24 563:1
564:1 565:1 566:1
567:1 568:1 569:1,8
570:1,11,13 571:1,25
572:1 573:1 574:1
575:1 576:1,14,16
577:1,7,19 578:1,17,
23 579:1 580:1 581:1
582:1 583:1 584:1
585:1 586:1 587:1
588:1 589:1 590:1
591:1 592:1 593:1

594:1 595:1 596:1
597:1 598:1 599:1
600:1 601:1 602:1
603:1 604:1 605:1
606:1,25 607:1
608:1,24 609:1,12
610:1 611:1 612:1
613:1 614:1 615:1
616:1 617:1 618:1
619:1 620:1 621:1

**embarrassed**
546:19

**emphasize** 528:20

**employed** 521:6,14
608:14 621:10

**employee** 529:17
530:11,13,16,18,20
532:12 541:13 551:2
553:8 561:15,22,24
566:19 572:9,19
578:8 581:22 588:15
593:2 596:17 598:6
611:5 621:13

**employees** 562:13
577:25 586:19

**employer** 524:24
561:8 580:12

**employment** 580:7

**end** 542:5,10,12
554:3 557:22 583:3
586:20 587:2 589:24
591:10 602:8 606:10
607:17 616:21

**ended** 609:6

**engaged** 545:13

**engages** 545:18,23

**engaging** 539:2

**ensuring** 526:15

**enter** 571:10

**Entertainment**
521:15

**entire** 524:18 559:14
587:24 596:16
597:22

**entirety** 548:15

**entrance** 556:23
557:6 558:22

**entry** 526:3 570:4

**environment** 552:16 561:22

**escalate** 563:25

**escalating** 578:17

**escape** 539:5

**essentially** 550:12 571:13 583:3

**establish** 596:24

**established** 532:7, 16 597:17

**estimate** 525:21

**event** 578:12 606:14, 24 610:2

**evidence** 527:5 539:25 546:5,11 547:10 592:6 594:17 596:24 609:8 613:14 618:22,25

**exact** 526:22

**examination** 520:15 566:12 584:11,20 606:3

**examples** 526:2 539:15 570:3

**exceptional** 551:14

**excerpts** 599:24

**exchange** 592:8,21

**exclusion** 546:5

**excuse** 540:5 545:6 560:14 572:25 609:21

**excused** 612:19

**execute** 581:17

**Executive** 531:12

**exhausting** 616:4

**exhaustive** 615:24 616:4

**exhibit** 527:2,10 540:2 542:20,21 545:7 547:21 555:4 560:8 566:20 567:2 573:20 574:2,12,16

575:18 577:2,3 583:10 585:7,14 589:17,20 592:5 594:13,16 597:4 599:15

**exhibits** 540:3

**exist** 541:15

**existed** 537:2

**expect** 547:24 551:10

**expected** 544:6 562:22 617:7

**expedited** 615:5

**experience** 603:13 614:13

**experiencing** 540:22

**extend** 528:15

**extent** 601:17 604:5

**extremely** 558:6 618:24

**eye** 541:20

___

**F**

**face** 570:14

**facilities** 588:11

**facility** 571:11,19 588:19 593:2

**fact** 547:5 601:5 602:6 605:16

**failure** 579:14

**fair** 553:21 591:7,8 594:10,11 598:15,22, 23

**fairly** 546:18

**fall** 531:10

**falling** 533:11

**farther** 577:10

**favor** 614:3

**FBI** 590:12,16,21

**February** 522:12,24 523:7 611:16

**federal** 551:20

**feedback** 530:8

**feel** 561:19,24 578:6 615:21 618:22

**feels** 547:5

**fees** 617:3,6 618:11

**Fellows** 527:18,19, 21 531:3

**felt** 528:13 550:14 561:3 571:15 573:17

**Ferrua** 602:15 603:2, 9

**fewer** 598:19

**figured** 529:23

**file** 584:5

**filed** 569:2 615:19

**files** 588:14

**filings** 614:18

**fill** 596:20

**fills** 596:19

**filtration** 578:4

**final** 596:13 616:24 617:11 619:17

**finality** 596:13

**finalize** 562:15 575:24

**finally** 619:5

**financial** 529:22

**financially** 621:15

**find** 544:6 546:17 547:8,25 549:11 594:9 612:22

**finding** 618:8

**fine** 550:6 551:21 554:25 614:25 616:8 618:2

**finished** 583:17

**fire** 527:24

**fired** 576:10

**firm** 586:2

**flagged** 543:13 571:14

**flagging** 572:14

**flashing** 571:10

**flexibility** 619:19

**flexible** 614:8,15

**flip** 575:18

**focused** 524:21

**folder** 587:25

**folks** 540:23 573:3

**follow** 552:6,13

**follow-on** 550:12

**force** 522:8 533:6

**forced** 529:19

**forcing** 619:20

**foregoing** 621:7

**forgive** 534:3

**forgot** 560:11

**form** 530:19

**formality** 535:12

**forward** 543:3

**forwarded** 527:16 571:24 575:14 577:6 588:7 590:7

**forwarding** 576:13

**found** 614:21

**foundation** 596:25 604:22

**frame** 563:2

**frankly** 538:23 601:16

**free** 560:20 561:25

**frequently** 555:24

**Friday** 543:7 574:25

**friend** 607:13

**front** 540:4,6,10

**fuck** 549:21

**full** 520:19,21 559:13, 15

___

**G**

**games** 541:24 542:5

**Garcia-flores** 590:25

**Garden** 521:15,17

**gate** 556:22 557:6,22 558:22 559:8 569:19, 22 571:10 600:17 606:8,15,25 608:25 609:12 610:3

**gates** 526:4

**Gecewich** 549:23 554:15,20,24 555:11 564:6,8

**Gecewich's** 563:4

**general** 570:3

**generally** 531:6 560:24 561:2 570:2,5 582:4

**gentle** 546:25

**geographic** 533:25

**geographical** 523:25

**Gerhard** 543:5 574:20

**German** 520:6,11,18, 21 547:16,18 548:17 549:19,24 550:16,20 551:9,25 552:4,10, 20,23 553:6,11,16, 20,24 566:15,25 567:4 574:17 575:9 583:16 584:17,24 589:19 590:3 592:4 594:15 597:4 599:18 602:12,13 603:20 605:2 606:6 607:14, 19 608:10,15,18 609:2 610:25 612:18

**German's** 544:25

**get all** 579:5

**Gicinto** 543:6 574:21

**Gigafactory** 525:4, 18 528:16 530:13 535:19 541:10 544:2,

5 547:23 555:19
556:3,22 557:6,22
558:11,21 560:16
562:9 563:10 564:14
565:12,17 566:4
579:4 580:2 586:21
589:4 605:6 606:8

**give** 526:2 539:11,14
551:12 570:3 583:6

**global** 521:23

**Gmail** 588:8,22

**good** 529:17 530:20
578:6 584:23 607:18
616:16 618:14

**Gouthro** 527:14,17
528:9,19 531:3 543:4
574:19 590:8

**Gouthro's** 528:2

**govern** 594:24

**grant** 582:8

**granted** 581:9

**great** 528:14

**greet** 570:24

**Greyhound** 593:9,
14

**grounds** 589:2

**group** 521:7,9,22,24
595:12

**guard** 531:8 571:12,
19 580:25 596:6
600:16

**guards** 524:17
526:13 536:9 601:5
602:7

**guess** 531:17 548:5
557:11 566:9 568:2
575:2 591:20 613:16
615:8

**guidance** 572:16

**guy** 553:9

**guys** 536:2

**H**

**half** 548:10

**hand** 559:16

**handful** 528:11

**handled** 564:16

**Hansen** 520:1 521:1
522:1 523:1 524:1
525:1 526:1,21 527:1
528:1 529:1,2,15
530:1,5 531:1,2,14
532:1,17 533:1,14
534:1,2,25 535:1,3
536:1,12,14,18
537:1,12,18 538:1,18
539:1,13,24 540:1,13
541:1,12 542:1,12,16
543:1,3,10,17,21
544:1,23,24 545:1,12
546:1 547:1,20 548:1
549:1,23 550:1,2,18
551:1,5,10 552:1,2,8,
11,21 553:1,4,7,15,
17,21,25 554:1
555:1,12,18 556:1,2,
14 557:1,7,21 558:1,
10,20,24 559:1,7,10
560:1,14,21 561:1
562:1,8,15,20 563:1,
8,15 564:1,13 565:1,
11,16 566:1,3 567:1,
23 568:1,25 569:1,2,
8,16 570:1,12 571:1,
7,13,24 572:1,14
573:1 574:1 575:1
576:1 577:1,6,15
578:1,15,22 579:1,
10,12 580:1,6 581:1,
4,9 582:1,13,18,20
583:1,3,19 584:1,4
585:1,9,10,16 586:1
587:1,13,23 588:1,4,
6,21 589:1,4 590:1,
15,20,25 591:1,21
592:1,22 593:1,21
594:1,10 595:1 596:1
597:1 598:1,5,13,25
599:1,2 600:1,4,10,
16,23 601:1 602:1
603:1,22 604:1
605:1,5,17 606:1,11
607:1,12,18 608:1,9,
12,17,20 609:1,3,22,
25 610:1,5,21 611:1
612:1 613:1 614:1
615:1 616:1 617:1
618:1,19 619:1,13

620:1 621:1

**Hansen's** 530:9
576:19 586:20 587:7
600:7

**happen** 619:4

**happened** 522:6
536:22 544:11
550:25 553:12
556:18

**happening** 572:4
591:22

**happy** 549:12

**hate** 540:16

**head** 521:23

**headquarter** 523:17

**healthy** 526:16

**hear** 530:7 549:4
550:19 551:7 564:22
580:20 607:12,13
616:2 617:8

**heard** 568:19 569:7
570:17,22 571:3
580:6 581:4 608:24
609:11 610:2,23
618:21,23

**hearing** 567:2
613:20 615:18
616:13

**hearsay** 601:11,14,
15,16

**held** 546:4 621:7

**helpful** 583:8

**helping** 566:19

**Hennigan** 586:2

**hey** 604:14

**higher** 598:12,19

**highlight** 597:18

**highlighted** 529:25

**highlights** 528:24

**hire** 531:14 532:21

**hired** 534:3,8 535:9
580:24

**hiring** 532:18

**history** 523:5

**HOFFMAN** 520:6
527:7,9 529:8
542:22,25 546:7
547:13 548:5,18
549:15 560:7 564:21
565:6,20 566:9
583:9,13 584:9,16
589:11 599:9,14
601:13,19 604:17
605:21 609:16
610:14 612:10,13,17,
21 613:10,13 614:9,
20 615:3,13,16
616:5,15 617:15
618:12,14 619:16,21
620:2,6

**hold** 537:9 540:9
607:10

**holy** 608:14

**home** 556:10

**honestly** 560:3
608:23 609:14 610:4

**Honor** 527:8 529:6
544:19 546:10
548:20 549:14 583:8
589:7,15 599:11
601:8,11 605:23
612:16 616:14
617:12 619:13,18,25

**honored** 561:12
562:6

**Hospitality** 521:7

**hour** 534:13 537:6,7
584:13 597:19

**hours** 534:15,17
593:19 598:17,20,22
599:4

**house** 531:19

**housekeeping**
527:6

**housing** 572:20

**HR** 541:7,14 561:13
562:11,12,13 564:2,
4,16 573:3 592:25
603:13

**Hueston** 586:2

**human** 603:9

**hung** 556:16

**hurry** 571:18

**hypocritical** 546:18

**hypothetical** 571:16

**I**

**ID** 588:16

**idea** 570:13

**identification**
588:15

**identified** 589:20
591:4 593:8 594:16
596:17 597:3

**identify** 560:5

**illegal** 545:2,10,22,
23 546:2 561:11,19
562:5

**imagine** 535:4
592:11

**immediately** 546:14

**impact** 543:14

**impeach** 547:11

**impeached** 547:15

**impeaching** 601:16

**impeachment**
545:3,11 546:11,14,
15,16,22,23 548:8,17
604:9

**importance** 551:16

**important** 618:24

**improper** 545:7
601:9,10

**in-house** 533:23

**inception** 530:14

**incident** 569:6 571:8
610:7

**including** 588:8

**inclusive** 543:14

**inconsistent** 546:24 601:4 602:6,9

**Incorrect** 612:4

**indicating** 550:13

**indication** 541:3 561:10

**indications** 540:24

**indiscernible** 550:17,20 551:3 552:4,23,24 553:16

**individual** 525:9 526:21 538:14 554:22 561:21 570:7

**individuals** 528:9, 11,20,23 529:25 570:5 574:20 588:10 590:23 591:3,10,13, 22

**industry** 561:2 581:14

**info** 572:20 576:2

**inform** 556:14

**information** 530:25 559:15 561:4,6 562:4,17 586:18 587:14 617:6 618:25

**informed** 567:14

**initially** 523:14 534:24

**initiation** 597:24

**inquired** 564:9

**insight** 530:17

**instructed** 598:25

**instruction** 572:23 588:3

**intent** 535:11

**intentionally** 587:23

**interacted** 538:6

**interacting** 558:24

**interaction** 539:8 557:20 558:2,25 559:7,9,14 569:7 570:15 600:3,4,23 602:19

**interactions** 592:12 602:14,18

**interested** 546:7 613:21,24 621:15

**interim** 616:21 617:5,9 618:10

**internal** 541:5,18 581:2 588:7,8

**interrogation-based** 573:18

**introduced** 574:16

**investigate** 581:2

**investigating** 564:13

**investigation** 531:24 550:13 565:15 566:2 572:8 590:12,16

**investigations** 528:6 562:15

**investigator** 531:16 533:22 539:6 596:5,6

**investigators** 539:7

**invite** 617:5,10

**involved** 524:9 528:6 538:23 561:5 591:23 597:8 603:13

**involvement** 535:25 583:2 591:17

**issue** 547:15 563:25

**issues** 553:16 616:22 617:21,23,25

**issuing** 616:21

**items** 535:24

**Ivan** 590:24

**J**

**jacket** 570:8

**Jake** 543:5 574:21

**James** 590:25

**Jeff** 536:13 537:22 539:4,17 543:5 555:22,24 556:2,16

**Jeff's** 610:20

**Jenna** 602:14,19,22 603:7

**jeopardize** 561:7

**job** 521:22 522:17 523:4 524:14 525:22 528:3 529:18 532:14 534:7,24 535:5,9,20, 21 541:9,14,15 542:17 544:7 548:2 596:18

**joint** 526:25 540:2 542:21 547:21 597:4

**Jones** 536:13 537:22 543:5 555:22 556:2, 21 557:4,20 558:9 559:3,4,12 567:4,13, 19,22 568:6,12 574:21 581:8 597:17 600:2,22 601:18 602:25 610:16

**JUDGE** 520:6 527:7, 9 529:8 542:22,25 546:7 547:13 548:5, 18 549:15 560:7 564:21 565:6,20 566:9 583:9,13 584:9,16 589:11 599:9,14 601:13,19 604:17 605:21 609:16 610:14 612:10,13,17,21 613:10,13 614:9,20 615:3,13,16 616:5,15 617:15 618:12,14 619:16,21 620:2,6

**judgment** 616:25 617:21

**July** 537:16

**June** 521:10,12,20 522:4,6,13 523:2 524:11 526:24 527:14 528:3 530:24 536:11 588:6 611:6, 16,19 612:4,5,7

**K**

**Kansas** 523:8 556:11

**Karl** 526:21 529:24 533:16 538:4,14 539:20 542:10 550:24 556:17 567:23 568:7,9,13 569:22 570:12,14 574:8,23 575:13 576:9 578:6 590:11, 25 592:22,25 602:21

**Karl's** 530:17 536:22

**keeping** 598:16 618:18

**kind** 526:5 538:12 539:17 546:11,19 569:11 571:14,16 573:6

**knew** 570:11,13 610:9

**knowing** 588:24

**knowledge** 530:17 533:21 544:25 558:25 569:20

**L**

**labeled** 562:13

**lack** 531:17

**laid** 612:2

**Lake** 523:16

**landing** 614:10

**Lane** 546:3

**language** 581:15

**largely** 524:20

**Largent** 525:6 527:8 529:3 534:18 544:18 548:12 549:10 556:24 565:3,18 566:14,21,24 567:9, 11 573:23 574:4,6, 10,14 576:5,7,21,24 577:9,14 583:6,15 584:7 610:12 612:12, 20 613:12 614:2,13,

17 615:12 616:3 619:14 620:3,4

**lasted** 556:10

**late** 526:23 536:11 556:11

**law** 545:25 585:25

**lawyers** 607:24

**laying** 604:22

**lead** 528:5

**learned** 568:15

**leave** 561:21 562:2 618:4

**left** 583:23 591:17 593:23

**legality** 547:14

**letter** 585:17,21,25 586:5,15 587:18 607:22 609:5

**letting** 575:11

**level** 578:2 581:16

**liability** 618:7,9

**license** 588:16

**lights** 571:10

**limit** 618:3

**limitation** 617:13,16

**lines** 552:19

**Linkedin** 611:4,9,12, 13

**list** 528:9 545:6,7 611:4,16,18

**listen** 550:4

**lives** 590:18

**local** 523:8 536:2 592:15

**location** 523:25 533:25

**locations** 523:17

**logbook** 526:7

**logged** 526:7

**logo** 611:10

**long** 521:8,16
522:10,20 533:2
548:8,14,24 579:3
591:25 594:19 607:7
612:5 614:6,8

**longer** 556:15 558:11
568:24 583:3

**looked** 571:5

**loop** 572:18

**lot** 535:25 539:5,6
549:4 560:3 606:6
617:20

**lots** 588:19

**Love** 576:11

**lower** 548:3 598:21

---

**M**

**made** 532:6 544:9
546:13 583:19
585:10,19 592:24
594:2 603:12,21

**Madison** 521:14,16

**make** 538:24 546:12,
20,21 547:9 552:14
561:6 581:12 591:15
598:20 604:18
616:20

**making** 525:11 526:7
544:25 545:7,25
552:25 594:8 598:6
603:6

**manage** 531:19

**management**
523:22 531:9 570:20
572:5

**manager** 522:19
523:7,14 524:12,23
527:22,23 528:5
535:17,22 543:16
569:20 592:15,16
611:8,17,20

**March** 522:25 583:25
611:6,19 612:3

**marginal** 608:7

**marked** 539:25
542:21 547:21 567:2

**market** 523:10
592:16

**markets** 597:16

**master** 581:15
594:21 597:10

**material** 588:21

**materialized** 532:5

**Matt** 551:13 553:22
567:4,14 575:9

**matter** 520:23 582:3
585:5 621:7

**Matthew** 520:11,21

**Mclellan** 535:16,17
536:10,13,18 572:15

**Mclellan's** 535:20

**meaning** 533:23

**media** 581:5 583:19

**meet** 562:11 575:24

**meeting** 550:3
562:17 572:7,24
573:19 574:24
575:15 577:17
578:11,16

**meetings** 578:21

**memory** 527:23

**mention** 611:21

**mentioned** 541:8,17

**message** 541:4
556:13 577:15

**met** 554:22

**metal** 580:4

**mid-july** 534:5

**mid-to-late** 537:16

**middle** 574:18

**midnight-ish** 556:12

**mind** 571:17 601:22

**minimal** 539:7
579:25 592:14

**minute** 577:3

**minutes** 548:10,14,
25 583:7 584:13

**misappropriated**
587:14

**misappropriation**
586:17

**misconduct** 579:22

**misrepresenting**
579:18

**missed** 547:15
556:25

**misstates** 525:6

**mobile** 526:14

**Mohamed** 612:22
613:7

**Monday** 548:23
553:24 554:2

**month** 562:19 563:2,
14

**months** 547:7

**morning** 568:10
584:23

**motion** 614:12
617:20

**motioned** 571:14

**mouth** 569:13

**move** 549:16 569:15
596:25 599:9,12

**moving** 526:14
541:21 598:12 608:2

**MSA** 597:15

**Musk** 520:1 521:1
522:1 523:1 524:1
525:1 526:1 527:1
528:1 529:1 530:1
531:1 532:1 533:1
534:1 535:1 536:1
537:1 538:1 539:1
540:1 541:1 542:1
543:1,5 544:1 545:1
546:1 547:1 548:1
549:1 550:1 551:1
552:1 553:1 554:1
555:1,15 556:1,21
557:1,5,21 558:1,21
559:1,7,10 560:1,13
561:1 562:1,24 563:1
564:1 565:1 566:1
567:1 568:1 569:1,8

570:1,11 571:1,9,25
572:1 573:1 574:1
575:1 576:1,14,16
577:1,7,19 578:1,17,
23 579:1 580:1 581:1
582:1 583:1 584:1
585:1,5 586:1 587:1
588:1 589:1 590:1
591:1 592:1 593:1
594:1 595:1 596:1
597:1 598:1 599:1
600:1,4,12,24 601:1
602:1 603:1 604:1
605:1 606:1,7,15,25
607:1 608:1,24
609:1,9,12,20 610:1,
2 611:1 612:1 613:1
614:1 615:1 616:1
617:1 618:1 619:1
620:1 621:1

**Musk's** 601:6 602:7

---

**N**

**nail** 548:18

**named** 526:21
588:10 595:7 602:14

**names** 539:5 591:19

**narrow** 617:23

**national** 522:19
523:13,14,21 524:6,
12,23 543:15 552:24
553:2 595:12 611:7,
17,19

**nature** 526:14 529:21
543:12 545:10 558:3,
6 580:24 614:11

**NCRA** 621:22

**necessarily** 541:20
543:11 581:13 604:4

**needed** 550:5,21,22
616:11

**negative** 558:6 559:6

**negotiated** 595:24
598:11

**negotiation** 597:9,
23

**Nevada** 535:19

**545:25 546:3 593:23**
597:25

**nice** 616:3

**Nick** 520:18 543:6
556:24 574:21
612:23

**night** 556:11

**Nocon** 543:5 574:21

**Nolle** 590:25

**normal** 531:7 562:2

**North** 524:19

**Notary** 621:5

**noted** 599:19 620:8

**notes** 583:7 603:16
619:10

**notification** 602:20

**notified** 567:22
568:7,13,24

**NSA** 539:9

**number** 526:15
542:22 579:8 589:25
591:22

**numbers** 588:16

**numerous** 523:18
588:7

---

**O**

**object** 544:18 545:9

**objecting** 548:14

**objection** 525:6
527:7 529:3 565:3,18
589:6,12 599:13
601:7,20 604:24
609:15,17,18 610:12

**objections** 604:18

**obligated** 552:6,13

**obligation** 616:18

**observed** 580:6

**obtain** 582:7

**occur** 562:18

**occurred** 553:13

558:25 566:6 596:14 600:8 602:24 606:12, 16

**October** 521:19 522:3,5 593:23 612:7

**off-site** 553:9

**offensively** 547:7

**offer** 527:5 540:15 616:24

**offered** 535:7

**offering** 535:6 546:20,22,23 547:2, 10

**offers** 528:15 591:15

**office** 523:8 545:19

**officer** 530:20 534:9 535:11 540:15 541:11,16 570:18,19, 23,24 571:4,12 597:21

**officers** 525:3,4,10 526:15 531:13

**official** 563:10

**officially** 534:5 535:8 541:12 560:15 563:9 613:2

**open** 613:15,18

**opening** 615:9,10

**operations** 523:7 592:15

**opine** 601:8

**opinion** 530:19 561:6 616:18

**opportunities** 592:22 593:8,16,22

**opportunity** 530:5,7 594:9 604:19 617:8 618:23

**opposition** 614:12

**options** 553:6

**order** 541:11

**orders** 526:18 536:8 540:17 541:17

**Oregon** 523:16

**organization** 529:19 578:4,5

**original** 597:14

**outcome** 621:16

**Outlook** 587:25

**overrule** 589:12 601:19 604:23

**Overruled** 529:8 601:13 610:14

**oversaw** 525:10

**oversee** 525:9 526:12

**overseeing** 525:3

**oversight** 524:15 535:23

**overtime** 599:5

---

**P**

**p.m.** 555:7

**Pacificorp** 523:15, 25 611:18

**paid** 553:18

**papers** 616:10

**par** 525:14

**paragraph** 586:9,11 587:17 589:25 590:2

**parameters** 533:12

**Parker** 527:18,19,21 536:3 539:5

**parking** 526:5 588:19

**part** 533:7 538:17 548:16 549:11 560:6 567:3 591:5,10 613:17

**participate** 578:16

**participation** 618:20

**parties** 613:23 616:22 621:11

**passed** 568:12

**past** 536:24

**paste** 617:18

**patient** 618:17

**pay** 544:7,9,10 548:3 552:25 553:17 562:2 593:18 598:13 599:4 608:8

**PDT** 520:4 583:12 584:15 620:8

**performance** 530:9, 17 542:18

**performer** 530:2

**period** 542:14 611:5, 15,22

**permanently** 587:24

**person** 545:22

**personal** 521:3 585:18 588:8,16,22 607:16 608:3

**personnel** 588:14

**perspective** 524:17 526:13 528:17 541:7 616:8

**phone** 549:20 563:3, 17,20,22,23 568:2,5 579:11 585:13 603:4, 5 610:24

**photos** 588:19

**physical** 526:12 558:3

**pick** 524:6

**picking** 539:19

**picture** 588:15

**pie** 579:5

**piece** 533:15 579:5 596:13 607:16 608:2, 3,24 609:11

**placards** 526:5

**place** 525:5 546:2 597:23

**plainly** 538:23

**plan** 618:15

**plants** 523:18

**plate** 588:16

**plausible** 571:17,21

**play** 542:5 544:14,22 547:2 548:7,15 549:12,16 554:4,6

**played** 544:23 549:18 554:3 606:22 607:8,11

**playing** 541:24

**pleasure** 620:7

**point** 527:5 530:5 536:20 537:8,10 541:25 549:8,9 561:3 583:23 592:24 598:8 618:8

**points** 526:3 570:4

**policy** 545:25

**populated** 607:23

**portion** 548:13

**Portland** 523:16

**posed** 589:9

**position** 531:5,15,24 532:4,18,21 533:6, 20,23 546:18 594:3 596:9,11,18,20

**positions** 535:11 599:3

**possibility** 562:21

**post** 525:25 526:14, 18 536:8 552:18 569:15 570:18,24 571:5

**post-hearing** 613:24 614:3,10,11,14 615:12,13,14 616:22 619:10

**posts** 525:12

**potential** 580:3

**potentially** 528:15 532:18 571:18 591:4

**power** 523:18

**practice** 535:14 539:3 561:2 581:14

616:20

**preface** 607:14

**prepared** 551:4

**prepped** 541:21

**prepping** 541:6

**present** 559:11 564:11 570:15 600:24

**presented** 550:5 593:17 619:7

**president** 541:19 595:11

**Pretorius** 543:5 574:20

**pretty** 556:13 561:22 617:22

**previously** 541:8 546:9 573:21 575:21 581:7 599:19

**pricing** 532:2,7

**print** 594:19

**prior** 522:2 530:15 546:24 568:20 571:22 572:4,9 575:7 579:9 581:3 584:2 597:23

**proceeding** 613:22 614:7

**proceedings** 520:7 621:7,12,14,16

**process** 578:4 617:9

**produce** 616:18

**produced** 525:11

**product** 528:14

**professional** 551:13 573:5,18

**prognosticated** 563:14,22

**programs** 581:2

**promise** 594:18

**promoted** 523:21

**property** 556:15 558:12 560:22

565:12,17 566:4
580:3 599:2

**propose** 615:8,20

**proposing** 614:9

**prosecute** 545:19,20

**protected** 589:10

**protecting** 561:15

**protection** 531:12

**provide** 580:24
614:5 618:3

**provided** 556:8
559:15 560:4 561:4,5
562:4 563:3 564:19
565:2,10 572:23
586:25 587:6 589:2
591:14 611:24

**providing** 613:24

**provision** 581:20,25

**Public** 621:5

**pull** 566:21 585:7
589:17 594:12
596:22

**pulling** 585:8 594:15
597:3

**purchased** 522:14

**purported** 600:3

**purposes** 545:3,5,12
546:14,17,22,23
582:4

**pushback** 537:11

**put** 525:5 527:2
536:14,17,18 569:12
570:7 592:4

**putting** 615:5

---

**Q**

**qualified** 537:2

**quality** 525:13
528:13

**question** 525:15
529:11 554:18 559:4,
17 564:22 565:7,21,
22 591:20 601:23

602:5 603:21,25
604:7,14,21,22,24,25
605:3,8,13

**questioned** 604:3

**questioning** 569:5,
18 571:22 589:22

**questions** 566:8
583:17 585:6 589:9
602:11 612:9,12,14,
15

**quick** 583:8 603:16

**quote** 605:4

---

**R**

**rate** 537:5 544:7,9
548:3 597:5,16
598:2,19,21 599:4
608:5,11

**rates** 593:18 597:9,
15,18 598:12 608:8

**RDR** 621:4

**reached** 555:11,15
572:6 602:25

**read** 528:23 557:12,
19 558:16 567:18
576:19 578:24,25
590:5 599:24 600:19,
20 601:25 602:4
604:6,15

**readback** 602:8

**reading** 604:10

**ready** 541:5 583:14
615:4 619:10

**real** 583:7 603:16

**Realtime** 621:22

**rearguing** 549:8

**reason** 530:22
548:22 570:16
578:15 580:10
582:13 586:25 587:7
613:15,20 615:25
617:7

**reasonable** 607:9

**reasoned** 616:18

**reasoning** 556:7,8
564:19,20 565:2,10

**reassign** 608:4

**reassigned** 582:24

**recall** 524:4 526:22
527:19 528:2,5,21
531:25 532:8 533:15
534:7,10 537:5,25
540:13,18 542:6,9
543:17,21,23,24
544:4,8 547:12
554:10 555:5,8,21,25
557:9,10 558:23
559:23 562:19 568:5
581:24 585:4 590:17
591:12,19 598:7,9
600:5,25 602:18,24
603:6,20,24 605:2,16
606:13,17,18 610:20,
24

**receive** 537:10

**received** 526:6
527:11,13 530:25
543:10 556:11 558:7
569:17 599:16

**receiving** 590:19

**recess** 583:11
584:14

**recognize** 567:3
577:5

**recollection** 537:4
544:16 547:3 557:24
567:21 568:3 607:3

**recommendations**
552:14

**record** 520:20
573:25 584:17
600:20 613:9,15,17,
18 615:4,23 621:6,14

**recorded** 544:22,24
588:10

**recording** 544:14
545:2,10,13,23
546:13,16 547:14,19
549:16 563:3 606:23
609:25

**recordings** 547:6

**records** 588:9

**recross** 612:10

**Redirect** 605:22

**reduced** 544:7,9
553:18

**reduction** 522:8
529:20

**redundancy** 617:20

**refer** 542:2 558:15

**reference** 541:18
585:15

**references** 611:7

**referencing** 563:17

**referred** 561:13

**referring** 548:13

**refresh** 567:21 607:3

**refreshes** 544:15
547:3

**refuse** 542:5

**refusing** 578:15

**refute** 544:8

**regard** 588:4

**region** 544:13 608:4

**regional** 541:19

**Registered** 621:22

**related** 621:10

**relation** 530:10

**relations** 582:4

**relationship** 594:24

**relationships**
524:21

**relative** 621:13

**release** 522:12

**released** 522:7

**reluctance** 538:17

**remain** 528:16
592:25

**remaining** 561:25

**remedy** 546:5

**remember** 539:16

**recross** 612:10

**Redirect** 605:22

**reduced** 544:7,9
553:18

**reduction** 522:8
529:20

**redundancy** 617:20

**refer** 542:2 558:15

**reference** 541:18
585:15

**references** 611:7

**referencing** 563:17

**referred** 561:13

**referring** 548:13

**refresh** 567:21 607:3

**refreshes** 544:15
547:3

**refuse** 542:5

**refusing** 578:15

**refute** 544:8

**regard** 588:4

**region** 544:13 608:4

**regional** 541:19

**Registered** 621:22

**related** 621:10

**relation** 530:10

**relations** 582:4

**relationship** 594:24

**relationships**
524:21

**relative** 621:13

**release** 522:12

**released** 522:7

**reluctance** 538:17

**remain** 528:16
592:25

**remaining** 561:25

**remedy** 546:5

**remember** 539:16

**554**:20 556:17
558:20 559:2 568:2
569:9 572:2,5,12,14
592:21 604:14 605:7,
11,13,14 606:9

**removal** 560:25
561:18 563:10
568:16,21 581:3,21
582:9 584:3

**remove** 551:6 581:8
602:21

**removed** 543:25
544:5 547:22 555:19
556:2 557:8,16
559:19 560:13,14
562:8,22 564:13
565:16 566:4 567:23
568:7 570:18,23
571:4 579:10 582:13
607:20

**removing** 565:11

**Reno** 592:16

**repeat** 556:25

**rephrase** 565:6

**replies** 614:15,19

**reply** 614:12,21
616:12

**report** 613:16

**reported** 529:16
531:2 551:21

**reporter** 520:8 602:4
613:17 614:5 618:17
621:22

**REPORTER'S** 621:2

**reports** 583:19

**represent** 585:5
598:10

**representation**
526:8

**representative**
520:23 521:3

**representatives**
584:18

**represented** 585:11
618:21

**request** 560:16,25 561:12,18,20 562:6, 11,14 568:16 569:14, 22,25 578:11 581:3, 10,21 582:9 585:10, 19 592:23 594:4 602:21,22 603:11,22 607:20

**requested** 556:18 577:18

**requesting** 570:18, 23 571:4

**requests** 536:5 575:6 581:17 582:5

**requirements** 615:5

**reserve** 614:21

**resources** 603:9

**respond** 564:18,25 571:11 573:7

**responded** 572:16

**response** 538:8 543:9 554:14 564:8 576:13,20

**responsibilities** 524:14 525:23 532:15 535:21

**responsible** 524:15

**rest** 554:4,6 612:24 613:5,9

**restate** 529:10 594:5

**restating** 601:22

**resting** 613:11

**resumé** 536:22 590:19

**retain** 533:22 544:10

**retaliation** 551:22

**retaliatory-wise** 561:16

**reticence** 538:17

**revealed** 587:23

**review** 536:23 550:10 583:7 587:20, 22

**reviewing** 619:9

**reward** 619:2

**Rick** 535:16,17 549:20 572:15 573:2

**Ricky** 549:19,23 554:15 555:11

**RIF** 528:10 591:5,10

**road** 553:3 608:23

**Robertson** 584:10, 22 585:3,22,24 586:8,13 587:9,11 589:14,18 590:4,6 591:25 592:3 593:4 594:12,14 595:14,17 596:22 597:2 599:11, 17,21,23 601:10,14, 24 602:10 603:15,17 604:11,25 605:10,19 609:15,18 612:13,15, 23 613:2,4 614:24,25 616:7 619:23,24

**role** 523:22 531:21 533:22 538:4,15,18 540:15 596:5 603:23 604:4 605:5,17

**roles** 526:12 538:14 539:19 541:11,16

**roughly** 521:18 523:11,20 525:3,15 532:8 537:15 548:9 562:19 563:8

**route** 573:3

**rude** 570:19

**ruled** 549:7

**rules** 616:23

**run** 523:4 536:10 565:16 566:3

——————————

**S**

**safety** 527:24

**sake** 527:5

**Salt** 523:16

**scattered** 523:18

**scenario** 571:17 578:7

**schedule** 572:6

**scheduled** 574:24

**scope** 531:7 536:6 550:13 559:13 612:11

**Scott** 592:9,14

**scrap** 580:3

**screen** 527:3 592:5

**scroll** 540:25 567:9, 17 574:4,13 575:8 576:21 577:9 597:12

**Sean** 527:14,17 528:2,22 536:3 537:21 539:5,17 543:4 574:19

**sec** 537:9 569:2 584:5

**seconds** 556:10

**Securitas** 541:6

**security** 520:24 521:4,23 522:9,11, 15,21 523:5,6 524:17,25 525:3,10 526:12,15 528:12,18 530:12,15,20 531:8, 13,18 534:9 535:9,10 536:8 538:12 541:11, 13,16,18 543:16 551:16 552:18 553:8 570:23,24 571:4,12, 19 573:16 580:25 581:14 586:20 588:9, 20 593:2 595:12 596:6 597:20 600:16, 17 601:5 602:7 608:6 611:24

**security-related** 535:24

**seek** 547:8

**selected** 536:25

**selections** 539:19

**send** 578:3 602:23

**sending** 528:9 542:6 543:18,22 547:20 555:11

**senior** 595:11

**sense** 562:3

**sentence** 586:14 587:19

**separate** 558:14 597:22

**September** 560:15, 17,18 563:7 567:6,19 568:17,20 585:18 592:8 607:2,6 609:10

**serve** 537:3 538:15 545:24

**serves** 527:23

**service** 522:7 581:19 595:19

**services** 531:7,8,9 580:25 581:15 594:21 597:10 611:24

**servicing** 523:8,15

**serving** 538:18

**set** 549:20 572:25 617:16

**setting** 547:14

**share** 585:16

**shareholders** 579:14,19

**shares** 579:19

**sharing** 580:11

**shift** 593:19

**shifted** 533:19

**shifts** 598:22

**shit** 608:14

**shitty** 551:7

**shocked** 552:5

**short** 542:14

**shortly** 557:7,15 559:18

**shot** 540:14,20

**Shots** 576:10

**show** 526:25 539:23 542:20 566:20 573:20 589:19

**showed** 573:17

**showing** 555:3 574:15

**shown** 589:21

**sic** 544:9 609:9

**side** 618:21

**sides** 619:3

**sign** 539:22 612:19

**signal** 551:8

**signature** 595:4,6

**signed** 596:7

**silly** 554:18

**simpler** 591:20

**simultaneous** 614:14,23

**simultaneously** 614:10

**single** 533:25

**sir** 520:25 527:15 529:11 532:13 540:5 544:16 554:10,12,17 559:24 563:18 585:20 586:7 588:5, 13,18 590:9 600:18 601:23 610:8

**site** 537:2 551:4,6 553:18 555:19 561:17,21,25 563:10 568:25 579:10 581:9 582:24 598:19 602:21 607:21

**situation** 545:16

**skipping** 589:9

**slightly** 523:12 573:15 597:24

**sloppy** 571:5

**slow** 571:14

**small** 594:19

**smaller** 524:3

**sort** 569:7,14 579:13 589:7 596:5 617:3

**sound** 560:2

Index: sounds..thugs

**sounds** 557:17 559:21 560:19 607:18 616:8,16

**sources** 559:2

**spare** 619:9

**Sparks** 535:19

**speak** 538:23 564:21

**speaking** 531:6 536:12 560:24 570:3 609:13,24 610:4

**special** 591:5

**specialty** 531:5,12, 15,21 533:5

**specific** 523:10 531:25 538:13 539:14 540:24 560:6 569:22 586:25 587:6 591:19 593:13 596:17 603:21

**specifically** 528:22 539:20 547:19 558:23 569:19 573:23

**specifics** 537:25 540:14 559:8 569:21 572:22 600:22

**speculate** 530:22 598:15

**speculating** 562:20

**speculation** 529:4, 21

**speculative** 589:8

**speech** 538:22 539:2,11,15 540:23

**speed** 541:20

**speeding** 571:9

**spend** 619:9

**split** 591:13

**spoke** 603:4 609:9

**Square** 521:14,17

**staff** 525:13 529:20 560:22

**stamp** 568:3

**stance** 561:8

**standpoint** 599:4

**start** 616:17

**started** 523:6

**starts** 587:19

**state** 520:19 542:10

**stated** 547:3 600:10

**statement** 546:24 601:18 603:6

**states** 547:19,24

**stating** 548:13

**stationed** 569:16

**stay** 535:12 608:13

**stayed** 591:18

**step** 534:23

**stood** 550:7

**stop** 554:5,7

**stores** 545:17

**story** 542:5

**straight** 578:3

**strange** 539:18

**strategic** 551:15

**struggle** 541:18

**struggles** 541:5

**stuck** 614:22

**stuff** 550:10 580:6, 16,21

**submitted** 532:3

**submitting** 616:10

**Subscribed** 621:17

**subsequent** 597:16 618:9,11

**subsequently** 522:21 538:20 542:3 547:8,12 561:20 578:2

**substantial** 534:23

**substantive** 547:10

**suggest** 616:9

**suggestion** 546:21 578:20

**summary** 617:21

**superb** 530:2

**supervisor** 531:8 536:15,19 537:3,13, 18 539:19 542:11,13 597:20

**supervisors** 530:8

**supervisory** 603:22 604:4 605:5,17

**supervisory-type** 526:11

**support** 528:16 541:10

**supporting** 523:22

**suppose** 529:21 607:4

**supposed** 526:17 532:15 558:11

**Supreme** 546:4

**surprised** 543:25 547:22 550:24 551:3 555:18

**suspected** 608:22

**swear** 520:8

**swing** 542:4

**swing-shift** 536:14, 19 537:12,18 542:11, 13

**switch** 574:10,12

**sworn** 520:12 600:7 621:17

**system** 535:13 541:14

**T**

**takes** 572:24

**taking** 523:13 566:18,25

**talk** 528:19 532:20 552:17 610:21 617:25

**talked** 569:5 595:22 606:24

**talking** 542:8 565:5 606:23 607:2

**TAO** 521:7,9,22,24

**tape** 549:18 554:3 606:22 607:11 609:6

**taste** 578:6

**team** 523:13 541:21 561:13 564:16 575:7 592:25

**telephone** 606:18

**telling** 539:12 540:13 543:17,21,24 544:4 546:25 558:10 572:5 577:17 579:13,17

**ten** 545:17,18 584:12

**tenure** 532:21

**term** 531:17 573:16

**terminate** 582:17

**terminated** 582:21

**terms** 530:12 531:23 532:11 534:25 535:7 548:24 581:18 593:13 595:19 610:6 618:6

**terribly** 614:6

**Tesla** 524:6,13,18,23 527:14 528:3,7,10, 12,25 529:15,19 530:10,13,18 531:18 532:3,5 533:3,17,19 534:3 536:2 537:11 538:17 539:3,7 540:23 543:14 544:11 547:22 551:2, 18,19 552:25 553:9, 13 555:19 556:3,15 557:7,15 559:19 560:20 562:8,13,16 563:9 564:9 565:14, 25 566:2 567:23 568:20,25 569:3 572:5,9,19 578:14 579:9,15,18,19,23 580:3,7 581:4,5,9,19, 24 582:14,17 583:4, 20,24 584:3 585:5,10 586:17,18,19,25 587:6,13,15 588:7, 12,20,25 591:14,17 592:23 594:4,20,25 595:24 596:10 597:9 598:6,14,25 602:14, 21 603:9,21 605:4,6, 16 607:21,23 611:2, 5,8,20 613:5

**Tesla's** 560:16 562:5 564:8 565:11 584:18 585:17 588:11 616:7

**Tesla-employed** 527:22

**Tesla-offered** 533:23

**testified** 520:13,22 548:4,6 564:17,24 571:8,22 575:20 578:9

**testify** 590:19

**testifying** 521:2 559:23 600:25

**testimony** 525:7 549:2 558:16 586:24 589:22 600:8,19 601:9 602:3 604:16 605:3 612:18 619:8

**text** 540:3 542:6 576:9 577:15 579:11

**texts** 539:23 540:6, 10

**theft** 580:3

**thefts** 545:18

**thing** 545:6,7 550:16, 25 570:9,10 577:22 603:18 617:3

**things** 536:7,21 543:13 550:7 578:17 580:4,23 617:18

**thinks** 606:12

**thought** 606:12,15 607:8

**thoughts** 619:17

**threat** 581:2

**thugs** 573:16

**tie** 570:8

**time** 523:23 524:4,22 530:10 535:10 536:20 538:5,19 541:9 542:15 544:15 548:22 549:9,14 552:14 558:8,10 561:3 562:5,25 566:18 568:3,12,13, 23 578:8 579:2,6,9 582:18 585:9 587:12 588:2 596:16 603:8 607:9 611:22 619:8,9 620:8

**times** 588:10

**timing** 567:25

**tiny** 548:16 566:23

**title** 522:17

**today** 521:2 548:23 560:4 566:17 586:6 588:24

**today's** 520:7

**told** 533:18 537:17, 20,24 538:8 550:4,8 555:12,17 557:25 558:9 559:9 565:14, 25 566:5 573:7 579:22 584:4 598:8 600:23 604:7 605:4, 16 606:11,16,19 610:16,19,25

**ton** 538:22

**tonight** 551:12

**top** 576:10 585:23 594:20 595:15

**torture** 594:18

**traditionally** 531:20

**training** 523:14

**transcript** 615:6 621:6

**transcripts** 614:6

**transfer** 552:17 573:6

**transition** 594:3

**transitioning** 572:7

**traveling** 557:5

**troubles** 529:22

**true** 598:12 621:6

**trust** 552:12

**turn** 544:13 562:16 572:25 575:25

**two-stage** 617:9

**type** 531:21 569:24 570:6,8 580:16,21 595:25

### U

**U.S.** 520:24 521:4 522:9,11,15,21 523:5,6 524:25 525:16 528:12,18 530:15 531:18 535:9 538:12 541:13,18 551:16 552:18 553:8 586:20 593:2 595:12 608:6 611:24

**ultimate** 538:13

**uncommon** 535:14

**uncovered** 588:12, 25

**underneath** 535:18

**understand** 540:17 543:11 548:2 551:15 552:3,9,15 577:16 579:12,17,21 580:5 586:19 589:11

**understandable** 619:3

**understanding** 526:9 528:8 557:4,14 559:17 562:7,10 564:7,10 579:24

**understood** 529:14 548:6 549:6 553:15 562:14 565:21 589:13 604:21 618:13

**unemployed** 522:4

**uniform** 570:8

**Universal** 522:8,14,

18,22

**unknown** 558:8

**unsafe** 571:15

**unsure** 532:5,24 572:22

**unusual** 569:24 570:9

**upper** 570:20

**UPS** 593:8,13

**USSA** 524:13 525:4 530:8,21 534:4 542:16 544:6 545:9 546:12,21 547:5 549:7 560:15,20 563:9 564:12,25 565:10,15 566:3,10, 19 572:10 580:8,12 582:8 588:3 589:3 591:11,17 592:22 594:25 595:24 596:11,16,18 597:10 598:13,14,25 607:8 612:11 613:10 614:2

**USSA's** 533:2 548:21,23

### V

**vague** 565:3

**varying** 525:24

**vehicle** 526:3

**vehicles** 526:4

**verbal** 590:17

**verbiage** 549:4

**versus** 546:3

**vice** 595:11

**video** 606:22

**view** 545:15 589:2

**violation** 551:20

**virtue** 545:10

**visibility** 593:12 599:5

**voice** 554:12

### W

**wait** 577:2

**waived** 545:9

**waiving** 545:20

**Walmart** 593:9,14

**wanted** 528:12,15 531:18 538:15 550:10 551:11,12 562:8 567:23 568:24 604:3 616:12

**wasted** 549:4

**wasting** 549:9,14

**watch** 553:14

**Wednesday** 621:8

**week** 534:15,17 549:25 550:11 608:25 609:12 610:3

**weeks** 606:25

**west** 523:19 556:22 557:5,22 558:22 559:8 569:18 606:7

**Wichita** 523:8

**Widely** 525:24

**Wiebke** 592:9,13 594:8

**wise** 598:13

**witness's** 601:9 604:10

**wondering** 558:19

**Woodfield** 520:17, 19 525:17 527:4,12 529:5,12 534:20,22 542:24 543:2 544:21 545:3 546:8,10 547:18 548:9,20 549:13,17 554:4,9 557:2 559:22 560:7, 10,12 564:23 565:5, 8,9,23,24 566:7 569:6 571:23 573:21 589:6,22 599:13,18 601:7,17 604:9,13 605:22,23 606:5 609:7,19,21,23

610:18 612:8,25 613:3 614:16 615:15 617:12 618:5,13 619:15,16,18

**word** 604:20

**words** 569:12 616:5

**work** 521:16 522:10, 20 525:13 528:14 530:5 534:16 536:6 553:10 569:22 572:8, 18 575:24 598:19 612:6

**worked** 521:8 534:17 562:16 590:21 596:16 598:17 611:2

**working** 522:2 535:18 542:16 564:5 608:3 611:21

**works** 541:15

**Wow** 608:12

**write** 619:2

**writing** 617:17

**wrong** 578:10

**wrongful** 545:13

**Wyoming** 524:2

### Y

**year** 521:11 523:11, 20

**years** 521:18 522:23 533:4,8 538:2 590:12

**yesterday** 544:21 571:8